1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  CHEROKEE D.M. MELTON
   Supervising Deputy Attorney General
4  JENNIFER C. BONILLA
   LISA CISNEROS
5  JULIA HARUMI MASS
   ANITA GARCIA VELASCO
6  BRENDA AYON VERDUZCO
   ANNA RICH, State Bar No. 230195
7  Deputy Attorneys General
       1515 Clay Street, 20th Floor
8      P.O. Box 70550
       Oakland, CA  94612-0550
9      Telephone: 510-879-0296
       Fax: 510-622-2270
10     E-mail:  Anna.Rich@doj.ca.gov
   *Attorneys for Plaintiff State of California*

11 *Additional Counsel Listed on Signature Page*

12

13                IN THE UNITED STATES DISTRICT COURT

14           FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16

17

18  **STATE OF CALIFORNIA, DISTRICT OF**        Civil Case No. _____
    **COLUMBIA, STATE OF MAINE,**
19  **COMMONWEALTH OF**
    **PENNSYLVANIA** and **STATE OF**
20  **OREGON,**                                  **COMPLAINT FOR DECLARATORY**
                                                  **AND INJUNCTIVE RELIEF**
21                              Plaintiffs,
                                                  Administrative Procedure Act Case
22            v.

23  **U.S. DEPARTMENT OF HOMELAND**
    **SECURITY; KEVIN MCALEENAN,** in his
24  official capacity as Acting Secretary of
    Homeland Security; **U.S. CITIZENSHIP**
25  **AND IMMIGRATION SERVICES;** and
    **KENNETH T. CUCCINELLI**, in his official
26  capacity as Acting Director of U.S. Citizenship
    and Immigration Services**,**
27
                                Defendants.
28

# INTRODUCTION

1.     The State of California, the District of Columbia, the State of Maine, the Commonwealth of Pennsylvania, and the State of Oregon (hereinafter, Plaintiffs) bring this action to challenge unlawful regulations promulgated by Defendants, the U.S. Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), Acting Secretary of DHS Kevin McAleenan, and Acting Director of USCIS Kenneth Cuccinelli.  Inadmissibility on Public Charge Grounds, RIN 1615-AA22, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("Public Charge Rule" or "Rule").  In the Rule, Defendants illegally expand the circumstances in which DHS may deny individuals' admission to the United States on "public charge" grounds, when seeking an extension of stay, change of visa category, or lawful permanent resident status.  The Rule stacks the deck against marginalized populations, such as children, students, individuals with disabilities, older adults, and low-wage working families.  The Rule uproots the understanding of public charge as primary dependence on the government, creating new bars that have not been authorized by Congress, such as making a low income a "heavily weighted" negative factor in admissibility.  The Rule also penalizes immigrants who use common, non-cash federal public benefit programs—community (i.e. non-institutional) Medicaid, Supplemental Nutrition Assistance Program (SNAP), Section 8 Housing Choice Voucher Program, Section 8 Project-Based Rental Assistance, and Section 9 Public Housing—for which they are legally eligible.

2.     Overall, the Rule represents a radical departure in the treatment of low- and moderate-income immigrants, whom the United States has historically welcomed.  "Public charge" is a legal term used first by Congress to exclude "any person unable to take care of himself or herself without becoming a public charge" alongside "convict[s], lunatic[s], and idiot[s]."  An Act to Regulate Immigration, ch. 376, 22 Stat. 214, 47th Cong. (1882).  For generations, the term has applied to exclude only individuals who are primarily dependent on the government for subsistence, such as by receiving public cash assistance for income maintenance or institutionalization at government expense.

3.    With the Public Charge Rule, Defendants have expanded the law to block vast swaths of our nation's foreign-born residents from making critical changes in their immigration status, just because they are not wealthy.  Indeed, the Rule is so draconian that a substantial proportion of all U.S. citizens could, if subjected to the Rule, be deemed a "public charge."

4.    As Defendants themselves acknowledged, the Rule will cause grievous harm to immigrants and their communities.  It will increase the prevalence of disease, drive up the costs of medical care, and increase poverty.  It will encourage immigrants to disenroll from federal healthcare, supplemental nutrition assistance, and housing programs for which they are otherwise eligible.  And it will chill the participation of immigrants and families with mixed immigration-status in public benefit programs generally, even for individuals not directly subject to a public charge test, and even with respect to benefits and services that are not enumerated in the Rule.

5.    The interests of Plaintiffs will suffer as a result.  Plaintiffs will lose federal funds as immigrants disenroll from affected programs.  Responding to the Rule will impose substantial administrative costs for Plaintiffs' agencies that respond to the confusion and fear it will engender, and disrupt health and social services systems that serve as safety nets for Plaintiffs' residents.  The negative public health repercussions of reduced access to healthcare and housing and poorer nutrition will ultimately be paid for by Plaintiffs.

6.    The Rule does not comport with the requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701, *et seq*.  It is contrary to established law regarding what it means to be a public charge.  Defendants' primary purported rationale for the rule—encouraging self-sufficiency—is directly undermined by the Rule itself.  The Rule's new income thresholds target low-and moderate-income individuals and families *who have never used public benefits*.  In addition, the Rule discourages use of publicly funded benefits that are critical to furthering the self-sufficiency of vast numbers of working families—immigrant and native-born U.S. citizens alike.

7.    Defendants' true motivations are not difficult to discern.  The Rule will disproportionately impact non-White, non-European immigrants from Asia, Latin America, the Caribbean, and Africa, as well as prevent more immigrants of color from changing or extending

2

their visas or becoming lawful permanent residents and, ultimately, citizens. The Rule was motivated by intentional race- and national origin-based animus against individuals from what President Trump has referred to as "shit-hole countries." For this reason, the Rule violates the equal protection guarantee of the Fifth Amendment of the United States Constitution.

8. More than any other jurisdiction, California will bear the brunt of this illegal Rule. California has the largest immigrant population in the United States and is home to more than 10 million immigrants from around the world. In fact, nearly 25 percent of the 43.7 million foreign-born immigrants in the U.S. live in California, and almost half of California children have at least one immigrant parent. Of these children, over 4 million are U.S. citizens. Defendants' Public Charge Rule will disrupt California's statutory and regulatory interests, cause harm to millions of its residents, and damage its economy.

9. The District of Columbia is home to people from more than 170 nations. More than 95,000 District residents, who make up approximately 15 percent of the District's population, were born in another country. Another 10 percent of District residents are native-born U.S. citizens with at least one immigrant parent. Immigrants make up almost a quarter of the District's civilian workforce. The Public Charge Rule will impair the District's statutory and regulatory interests, cause harm to thousands of its residents, and damage its economy.

10. The State of Oregon is home to approximately 400,000 immigrants, who make up over 14% of the population. Approximately 12 percent of the U.S.-citizen children residing in Oregon have at least one immigrant parent. Nearly 90,000 U.S. citizens living in Oregon have at least one family member who is undocumented. Most importantly, Oregon has more than 10,000 Deferred Action for Childhood Arrivals (DACA) recipients. Finally, approximately 260,000 workers in Oregon are immigrants, comprising over 12 percent of the workforce generally. The Public Charge Rule will disrupt Oregon's statutory and regulatory interests, cause harm to thousands of its residents, and damage its economy.

11. In the Commonwealth of Pennsylvania, almost 900,000 residents were born in another country, representing seven percent of Pennsylvania's population. Almost half of these immigrants have not yet become naturalized citizens. Immigrants are an integral part of

Pennsylvania's economy: almost half a million immigrant workers contributed to Pennsylvania communities in 2015.  Immigrant-led households in Pennsylvania paid $5 billion in federal taxes and $2.1 billion in state and local taxes in 2014.  In addition, more than 342,000 children in Pennsylvania have at least one immigrant parent.  Of these children, almost 288,000 are U.S. citizens, over 143,000 are in low-income families, and over 113,000 are under the age of six.  As of 2016, nearly 5,000 DACA recipients live in Pennsylvania.  The Public Charge Rule will disrupt Pennsylvania's statutory and regulatory interests, cause harm to thousands of its residents, and damage its economy.

12.  Therefore, Plaintiffs respectfully request that this Court declare that the Public Charge Rule violates the Administrative Procedure Act, 5 U.S.C. § 706, because it is contrary to law, exceeds Defendants' statutory authority, is arbitrary, capricious, and an abuse of discretion, and because it violates the Due Process Clause of the Fifth Amendment to the United States Constitution.  Plaintiffs further request that this Court enjoin Defendants from implementing or enforcing the Rule.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

13.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

14.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). A substantial part of the events or omissions giving rise to this action occurred in this district, Plaintiff State of California resides in this district, and no real property is involved in the action. This is a civil action in which Defendants are agencies of the United States or officers of such an agency.

15.  Intradistrict assignment is proper in San Francisco or Oakland pursuant to Local Rules 3-2(c) and (d) because a substantial part of the events or omissions which give rise to the claim occurred in the counties of San Francisco and Alameda.

**PARTIES**

**PLAINTIFFS**

16.  Plaintiff the State of California, by and through Attorney General Xavier Becerra, brings this action.  As California's Chief Law Officer, the Attorney General has the authority to

file civil actions to protect public rights and interests and promote the health and welfare of Californians.  Cal. Const. art V, § 13.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

17.  Plaintiff the District of Columbia (the District) is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government.  The District brings this case through Karl Racine, the Attorney General for the District of Columbia, who is the Chief Legal Officer for the District and possesses all powers afforded the Attorney General by the common and statutory law of the District.  The Attorney General is responsible for upholding the public interest and has the authority to file civil actions in order to protect the public interest.  D.C. Code § 1-301.81.

18.  Plaintiff the State of Maine, represented by and through its Attorney General Aaron Frey, is a sovereign state of the United State of America.  The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business.  Me. Const. art. IX, Sec. 11; Me. Rev. Stat. tit. 5, §§ 191 *et seq.*  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

19.  Plaintiff the State of Oregon is a sovereign state of the United States of America.  Plaintiff the State of Oregon, by and through its Attorney General Ellen Rosenblum, brings this action.  Attorney General Rosenblum, is the Chief Law Officer of Oregon and is empowered to bring this action on behalf of the State of Oregon and the affected state agencies.  Or. Rev. Stat. §§ 180.060, 180.210, 180.220.

20.  Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1.  Attorney

5

General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority.  71 Pa. Stat. § 732-204.

21.  Plaintiffs are aggrieved by the actions of Defendants and have standing to bring this action because of the injuries to their sovereign, quasi-sovereign, and/or proprietary interests caused by the Public Charge Rule.

22.  By making receipt of healthcare, nutrition, and housing assistance negative factors in admissibility determinations, the Rule threatens Plaintiffs' interests in protecting the health, safety, and well-being of its residents, regardless of immigration status.  *See, e.g.*, Cal. Civ. Code § 3339(a); Cal. Gov't. Code § 7285(a); Cal. Health & Safety Code § 24000(a); Cal. Lab. Code § 1171.5(a); D.C. Code §§ 2-1402.01, *et seq*; Or. Rev. Stat. § 180.805-810; Or. Rev. Stat. § 181A.820; Or. Rev. Stat. § 414.231(3).

23.  By disproportionately targeting immigrant communities of color, the Rule further threatens Plaintiffs' interest in prohibiting discrimination and preventing the denial of equal protection on the basis of race, color, national origin, and immigration status.  *See, e.g.,* Cal. Const. art. I, §§ 7, 8, 31; D.C. Code §§ 2-1402.01, *et seq*; Or. Rev. Stat. § 659A.006; 43 P.S. §§ 951–963.

24.  By placing new barriers to full economic and social participation for low-wage workers and their families, immigrant and non-immigrant alike, the Rule threatens Plaintiffs' economies, in which more than 7.4 million immigrant workers comprise a substantial proportion of the labor force.

**DEFENDANTS**

25.  Defendant DHS is a federal cabinet agency responsible for implementing and enforcing key aspects of immigration law.  DHS is a Department of the Executive Branch of the United States Government, and is an "agency" within the meaning of 5 U.S.C. § 552(f)(1).

26.  Defendant USCIS is a component agency of DHS.  USCIS has primary responsibility implementing, administering, and enforcing federal immigration laws and policies, including processing applications by foreign nationals in the United States for immigrant and nonimmigrant

visas, extension or change of visa, and adjustment of status to lawful permanent resident status. The Final Rule identifies USCIS as the agency that will implement the Final Rule.

27.  Defendant Kevin McAleenan is the Acting Secretary of Homeland Security.  He is responsible for implementing and enforcing immigration laws, and oversees DHS.  He is sued in his official capacity.

28.  Defendant Kenneth T. Cuccinelli is the Acting Director of USCIS.  He is responsible for overseeing USCIS and its administration, implementation, and enforcement of federal immigration law and policy.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.  BACKGROUND ON PUBLIC CHARGE AND RELATED FEDERAL LAWS

29.  Noncitizens seeking to be lawfully admitted into the United States must establish that they are not inadmissible.  Inadmissibility is determined by Section 212 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(4), which contains several categories of inadmissibility, including inadmissibility on the public charge ground.

30.  The public charge ground of inadmissibility is applicable to noncitizens when applying for a nonimmigrant visa or adjusting to lawful permanent resident status ("LPRs," commonly known as "green card" holders).  Even with a valid visa, such as a student visa, visa holders are subject to an inadmissibility determination by Customs and Border Protection every time they enter the United States at the port of entry. 84 Fed. Reg. 41,331.  Under certain circumstances, green card holders returning to the United States after brief trips abroad of more than six months can be considered to be seeking admission.  8 U.S.C. § 1101(a)(13)(C).

31.  A green card holder can be denied citizenship as well as removed from the United States if the DHS establishes that they were inadmissible at the time of their original entry or adjustment of status under the law existing at the time of their adjustment.  8 U.S.C. § 1227(a)(1)(A); 8 U.S.C. § 1429.

32.  Immigration officers evaluating a noncitizen's admissibility make a public charge determination based on the totality of the circumstances, weighing five categories of statutorily defined factors.  These factors are:  (1) age; (2) health; (3) family status; (4) assets, resources, and

financial status; (5) education and skills, and in some circumstances, whether the noncitizen has provided an affidavit of support from a qualifying sponsor.  8 U.S.C. § 1182(a)(4).

**A.      History of Public Charge Law**

33.   In immigration law, the term "public charge" has been used for more than 100 years to refer to a person who is primarily dependent on the government for subsistence.  Congress first used the term to provide for the exclusion of "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge."  An Act to Regulate Immigration, ch. 376, 22 Stat. 214, 47th Cong. (1882).  The primary purpose of this and similar public charge laws lay in preventing recently-arrived individuals from becoming primarily dependent on accommodations in institutions, such as almshouses, asylums, or charitable hospitals.

34.   During the late nineteenth and early twentieth centuries, over twenty-four million people immigrated to the United States—most destined for low-wage jobs.  During this time, a handful of immigration laws were approved that provided grounds for exclusion or deportation on the basis of poverty, mental and physical health, morality, or political beliefs.  While "paupers" and "persons likely to become a public charge" accounted for the majority of exclusions and deportations, the numbers of people excluded on these grounds remained sparingly low relative to the number of immigrants admitted.  The vast majority of immigrants, though poor, were welcome.

35.   In 1952, Congress enacted the INA, collecting various federal provisions and reorganizing them into the modern, codified structure of immigration law.  The INA formalized numerous "nonimmigrant" categories of individuals entering the United States on a temporary basis, and enabled some to apply for legal permanent residency (i.e., adjustment of status) without having to leave the country and apply through a U.S. consulate abroad.

36.   In considering the INA, a congressional subcommittee tasked with investigating the existing immigration system recognized that "the elements constituting the likelihood of becoming a public charge are varied."  Congress ultimately decided to include "public charge" as a basis for inadmissibility in section 212(a)(4) of the INA.

8

37.  In 1965, Congress did away with quotas that had severely limited the number of immigrants allowed entry from certain nations of origin, and repudiated the legacy of racial discrimination rooted in enactments such as the Chinese Exclusion Act of 1882 and the Immigration Act of 1924.  Congress put in place the system of immigrant admissions that the United States has largely continued to the present.  Congress weighted the system in favor of family reunification, allocating 74 percent of all permanent visas granted annually for family reunification categories, and the other 26 percent for employment-based categories.

38.  Congress began to impose additional restrictions on benefits eligibility for lawful permanent residents in the 1980s.  In 1986, the Immigration Reform and Control Act (IRCA) prohibited immigrants with newly gained temporary lawful residency status under the specific "legalization" provisions of that law from receiving public benefits for the first five years.  The IRCA provided that an immigrant's inadmissibility on public charge grounds under Section 212(a)(4) could be waived so long as they demonstrated a history of employment in the United States evidencing self-sufficiency without receipt of "public cash assistance."  8 U.S.C. § 1255a(d)(2)(B)(iii).  The implementing regulations defined "public cash assistance" as "income or needs-based monetary assistance…received…through federal, state or local programs designed to meet subsistence levels," and specifically excluded "assistance in kind such as food stamps, public housing, and other non-cash benefits," including Medicaid.  8 C.F.R. § 245a.1(i).

**B.    1996 Welfare Reform Law and Codification of the Public Charge Test**

39.  In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), setting new limitations on immigrant access to public benefits, and delegating responsibility for implementation of benefits to a greater degree to state governments through block grants.  The PRWORA imposed new restrictions on immigrants' eligibility for federal means-tested public benefits.  The law created two categories of immigrants: "qualified" and "non-qualified."  Qualified immigrants include, for example, lawful permanent residents, refugees, and asylees.  Non-qualified individuals include temporary visitors and undocumented immigrants.  Eligibility for federal benefits largely hinged on the category to

Complaint for Declaratory and Injunctive Relief

1   which an immigrant was assigned, whether the individual arrived before or after the PRWORA's

2   enactment, and whether a five-year waiting period applied.

3       40.  Congress continued to make certain services available to all people regardless of

4   immigration status, including: emergency medical care, public health programs (immunizations

5   and treatment for communicable diseases); school breakfast and lunch programs; public education

6   for kindergarten through twelfth grade; the Women, Infant and Children nutrition (WIC)

7   program; and short-term, non-cash emergency disaster assistance.

8       41.  The PRWORA also preserved states' authority to extend certain benefits to certain

9   immigrants.  States were given the option to use federal funds to extend Medicaid and Temporary

10   Assistance for Needy Families (TANF) benefits to qualified immigrants who arrived before the

11   PRWORA was enacted.  States also retained authority to create state-funded programs for

12   immigrants who were no longer eligible for federal benefits under the PRWORA.

13       42.  One month after the PRWORA was enacted through bipartisan agreement, Congress

14   approved the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA) and

15   codified a "totality of the circumstances" test for determining inadmissibility based on the public

16   charge ground.

17       43.  Nothing in the PRWORA or the IIRIRA suggested that Congress intended to subject

18   immigrants eligible for state or federally funded *non-cash* assistance to a public charge

19   determination based on application for or receipt of such congressionally authorized benefits.  In

20   fact, Congress considered and rejected a public charge definition that would have included food,

21   healthcare, and housing assistance.  IIRIRA, H.R. 104-828 at 138 (1996) (Conf. Rep.).

22   **C.   Additional Public Charge Guidance and Related Laws**

23       44.  The 1996 changes in law caused widespread confusion and fear, resulting in serious

24   chilling effects, in which many immigrants declined to apply for or disenrolled from public

25   benefits for which they were legally eligible under federal and state law.

26       45.  In order to alleviate the harms caused by immigrants not having healthcare coverage,

27   food assistance, or other work supports, the Immigration and Naturalization Service (INS)

28   proposed a rule confirming long-standing understanding of the term "public charge."  In a Notice

of Proposed Rulemaking, the agency confirmed that "public charge" meant only those "likely to become […] primarily dependent on the Government for subsistence, as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at Government expense."  Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676, 28,677 (May 26, 1999).

46.  While this proposed rule was never finalized, its substance was confirmed in the agency's Field Guidance issued at the same time as the proposed rule and effective on that date, and used by the agencies responsible for assessing inadmissibility on public charge grounds, including Defendants, for more than 20 years.  Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999).  The Field Guidance was intended to "help alleviate public confusion over the meaning of the term 'public charge' in immigration law and its relationship to the receipt of Federal, State, and local public benefits" and to "provide aliens with better guidance as to the types of public benefits that will and will not be considered in public charge determinations."  *Id*. at 28692.  The INS explained that "federal, state, and local benefits are increasingly being made available to families" and that "participation in such non-cash programs is not evidence of poverty or dependence."  *Id*.

47.  The IIRIRA established that immigration officials must rely on affidavits of support submitted by sponsors in deciding whether an individual is inadmissible on the public charge ground.  Affidavits of support are legally enforceable as contracts, in which the sponsor agrees to support the immigrant financially.  8 U.S.C. § 1183a.

48.  For decades, DHS considered an affidavit of support as strong evidence that an immigrant will not become primarily dependent on the government.  Affidavits of support became a well established, straightforward and efficient process for adjudicators and immigrants to evaluate the public charge ground.

49.  In addition to sponsor affidavits, the standard surety bond for an individual deemed likely to become a public charge is $1,000.  8 U.S.C. § 1183; 8 C.F.R. § 213.1.

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.    Congress and States Create New Opportunities for Access to Public Benefit Programs to Promote Public Health and Welfare**

50.  Since the PRWORA, Congress has approved amendments to rollback certain restrictions on federal public benefits for immigrants, particularly pregnant women and children, and all states have exercised their authority to varying degrees to make public benefits available to these immigrant populations.  Plaintiffs, in particular, have created robust safety nets that rely upon this public benefits framework to extend program services to immigrant residents as authorized by federal law.

51.  For example, Medicaid is an essential source of health insurance for underserved population groups, including children, pregnant women, individuals with disabilities, and seniors. Every state except for Wyoming has extended Medicaid to certain noncitizens who arrived before the PRWORA.

52.  Since 1997, states have had the option to provide 12 months of continuous Medicaid and Children's Health Insurance Program (CHIP) eligibility for noncitizen children, guaranteeing a full year of coverage regardless of changes in family circumstances, such as income or household size.  Guaranteeing ongoing coverage ensures that children and families access critical care needed for healthy child development, supports the development of patient-provider relationships, and reduces the state's administrative burden.

53.  Plaintiffs California, Oregon, and the District of Columbia have selected the option provided by federal law for twelve-month continuous certification periods for Medicaid, allowing the states and District to maintain low uninsured rates and healthier communities.   Plaintiff Pennsylvania covers children under Medicaid in continuous eligibility up to age three, regardless of citizenship status.

54.  Medicaid enables states to provide a wide range of federally mandated healthcare services, in addition to various optional services as determined by each state, to individuals who qualify for program eligibility.

### 1.    California

55.   California has exercised its authority to expand its Medicaid program (known as Medi-Cal) and SNAP (known as CalFresh) programs to include a broader range of services and beneficiaries.

56.   In 1998, recognizing the contributions of immigrants to the strength of our economy and communities, and the fundamental importance of nutrition to individual and community wellbeing, California established the California Food Assistance Program.  Cal. Welf. & Inst. Code §§ 18930, *et seq*.  The program was established to provide state-funded nutrition services for qualified noncitizens who are not eligible for federal benefits.  In doing so, California exercised its discretion and authority as provided for under federal law.

57.   California has also taken advantage of a number of options for offering additional healthcare services.  For example, Medi-Cal's 250% Working Disabled Program allows certain working individuals with disabilities to become eligible for Medi-Cal by paying low monthly premiums based on their net income.

58.   California also supports individuals with disabilities through In-Home Supportive Services (IHSS), a Medi-Cal program that provides assistance with activities of daily living for individuals with disabilities who are otherwise at risk of institutionalization.

59.   In 2014, California implemented Medicaid expansion, made available under the Affordable Care Act (ACA), to extend Medi-Cal eligibility to adults without children as well as parent and caretaker relatives.

60.   California has significantly invested in outreach and enrollment for affordable health programs.  As part of its implementation of the ACA, California established a single, statewide accessible application for all of its affordable health programs.  This application is used by all California entities authorized to make eligibility determinations, and all California residents are encouraged to apply.  A single automated system, the California Healthcare Eligibility, Enrollment, and Retention System (CalHEERS), serves as a consolidated system support for all eligibility, enrollment, and retention in Covered California (the state's health insurance exchange) and Medi-Cal.

61.  To better address the needs of the state's uninsured population, in 2015, California expanded full-scope Medi-Cal coverage to all low-income children through age 18, including immigrants, consistent with federal law.  Building on this expansion and its positive health outcomes, in 2019, California expanded full scope Medi-Cal benefits to individuals from age 19 to 25 who meet all other eligibility criteria, including income standards, across all immigration and citizenship categories.

## 2.   District of Columbia

62.  The District of Columbia has implemented programs to ensure that all residents have access to health coverage, regardless of their income, health status, or immigration status.  The District's Medicaid programs fund health care to over 250,000 residents who meet income thresholds established by the District in accordance with federal guidelines.

63.  In addition, the District makes health care coverage available to DC residents regardless of immigration status through the DC Healthcare Alliance Program, the Immigrant Children's Program, and Cover All DC.

64.  The DC Healthcare Alliance Program is a managed care health plan that provides medical assistance to low-income District residents who have no other health insurance and are not eligible for either Medicaid or Medicare.  This program is sponsored and paid for by the District government funds.

65.  The Immigrant Children's Program (ICP) is a health coverage program that is offered to children under age 21 who are not eligible for Medicaid due to citizenship or immigration status.  The ICP provides coverage for residents of the District of Columbia who have no other health insurance and meet a certain income threshold. Services covered under the Immigrant Children Program are very similar to the services covered under Medicaid for children under age twenty-one (21).  It is sponsored and paid for by District government funds.

66.  Cover All DC allows District residents who do not meet the income eligibility requirements for the Alliance and who are also ineligible to purchase private insurance on the DC Health Link (the District's state health insurance exchange) to enroll in private health insurance.

14

67.  The District's Medicaid program and its locally-funded programs have helped reduce the uninsured rate among District residents, including in its immigrant communities.

### 3.  Oregon

68.  Oregon has also exercised various options to expand its Medicaid program (known as the Oregon Health Plan) to include a broad range of services and beneficiaries.

69.  In 2014, Oregon implemented Medicaid expansion, as authorized under the ACA, to extend Medicaid eligibility to adults without children as well as parent and caretaker relatives.

70.  As part of its implementation of the ACA, Oregon established a single, statewide accessible application for all affordable health programs.  This application is used by all Oregon entities authorized to make eligibility determinations, and all Oregon residents are encouraged to apply.  A single automated system, serves as a consolidated system support for all eligibility, enrollment, and retention in the state's health insurance exchange and in numerous public benefit programs.

71.  To better address the needs of the state's uninsured population, Oregon expanded full-scope coverage to all low-income children, including undocumented immigrants.

### 4.  Pennsylvania

72.  The Pennsylvania Department of Human Services (PADHS) administers the Commonwealth's Medicaid program (known as Medical Assistance).  Pennsylvania has maximized the provision of Medical Assistance at the federal level, including implementing the ACA's Medicaid expansion in 2015.  In March 2019, more than 2.8 million Pennsylvania residents received essential health coverage under Medical Assistance, including more than 1.2 million children under the age of 21.  Of these, approximately 174,580 individuals were non-citizens.

73.  Pennsylvania provides Medical Assistance to its immigrant residents to the full extent allowed under federal law.  For example, non-citizen residents who are pregnant or children under age 21 are eligible for federally funded Medical Assistance if they meet other eligibility requirements.

74.  Pennsylvania also provides state-funded Medical Assistance to certain groups of immigrants who do not otherwise qualify.  For example, non-citizen residents—both permanent and temporary—who are not pregnant, are not children under age 21, or have not resided in the U.S. for at least five years are eligible for state-funded Medical Assistance if they meet state criteria.

75.  Pennsylvania residents cannot apply for state-funded Medical Assistance without also applying for federally funded Medical Assistance.

76.  PADHS also administers Pennsylvania's SNAP program, which distributed approximately $218 million in food assistance benefits in May 2019 alone.  SNAP currently provides essential food assistance to more than 1.75 million Pennsylvanians, including almost 80,000 immigrants.  Qualified immigrants are eligible for SNAP in Pennsylvania after five years.  Some immigrants are exempt from the five-year bar, including immigrants under age 18 and immigrants who are blind or have another disability.  Pennsylvania also provides a Special Supplemental Nutrition Program for Women, Infants, and Children (WIC).  WIC is available to pregnant, breastfeeding, and postpartum women and to infants and children under five who have an income below 185% of the federal poverty limit and who have a medical or nutritional risk.  WIC provides nutrition services, breastfeeding support, health care and social service referrals, and healthy foods.  Residents who are eligible for TANF, Medical Assistance, and SNAP are categorically eligible for WIC, but participation in these other programs is not a prerequisite.

77.  PADHS also administers the Pennsylvania Housing Assistance Program, which provides grants to Pennsylvania counties.  These grants are then distributed to Pennsylvania residents to prevent homelessness and assist them in securing permanent housing.  Qualified immigrants under the PRWORA are eligible to receive housing assistance.  The Pennsylvania Housing Assistance Program is funded by state and federal dollars; for state fiscal year 2019-2020, Pennsylvania has budgeted more than $24 million in grant monies.

### 5.    Maine

78.  The State of Maine has implemented state-funded health service programs to give certain health benefits to individuals who are not eligible for federal programs.

79.   The Maine Health Insurance Purchase Option provides health benefits similar to the federal CHIP program to certain children who are not eligible for CHIP.  22 M.R.S.A. § 3174-T(2)(E).

80.   Maine provides state-funded SNAP, a food supplement program for legal aliens.  22 M.R.S. § 3104-A.

81.   Maine has also exercised various options to expand its Medicaid program (known as "MaineCare") to include a broad range of services and beneficiaries.

82.   Maine implemented Medicaid expansion, effective July 2018, pursuant to the ACA, to extend MaineCare eligibility to adults without children as well as parent and caretaker relatives.

83.   In the midsummer of 2019, hundreds of noncitizens arrived in Portland, Maine. These noncitizens are eligible for the following state and municipal benefits:  Municipal General Assistance (Me. Rev. Stat. tit. 22, § 4301(3)); food banks; free vaccines provided through a Maine Centers for Disease Control (CDC) program; education; emergency MaineCare only; and general healthcare provided by Greater Portland Health, a health care entity.  Once a noncitizen applies for asylum or become paroled, they become eligible for state-funded SNAP and MaineCare if they are pregnant or under age 22.

## II.   THE NEW PUBLIC CHARGE RULE

### A.   Summary of the New Public Charge Rule

84.   Defendants' August 14, 2019 Public Charge Rule, 84 Fed. Reg. 41,292, represents a sweeping change in federal immigration policy that transforms a traditionally narrow ground of inadmissibility into a major barrier for thousands of low- and moderate-income immigrants present in the United States, limiting their ability to continue working or attending school, reunite with family, and become lawful permanent residents—thereby impeding their path to citizenship.

85.   The Public Charge Rule creates a new weighted evaluation system with a multitude of new positive and negative factors.  Multiple components of the evaluation system are significant departures from the federal government's long-standing public charge test.  For example, under the Rule, a household income above the 250 percent income threshold, $30,350

17

for an individual or $62,750 for a family of four, is a heavily weighted positive factor, while a household income at the 125 percent income threshold (currently $15,613 for an individual or $32,188 for a family of four) is a negative factor. 84 Fed. Reg. 41,503-41,504; 8 C.F.R. § 212.22(c). Other negative factors include being neither employed nor enrolled in school, not speaking English well or at all, not having a high school diploma, being either under age 18 or over age 61, and having any financial liabilities or a poor credit score. *Id.*

86. The Rule states that when evaluating an immigrant's health, DHS will consider whether the individual "has any physical or mental condition that [...] is significant enough to interfere with the person's ability to care for himself or herself or to attend school or work, or that is likely to require extensive medical treatment." 84 Fed. Reg. 41,407. But the Rule additionally includes a "heavily weighted negative factor" that gives significant consideration in a public charge determination to whether the immigrant is "uninsured and has neither the prospect of obtaining private health insurance, or the financial resources to pay for reasonably foreseeable medical costs related to the medical condition." 84 Fed. Reg. 41,504; 8 C.F.R. §212.22(c)(1)(iii).

87. The Rule also imposes two major changes regarding the treatment of public benefits. First, it expands the list of public benefits programs considered in the public charge determination. 84 Fed. Reg. 41,501; 8 C.F.R. §212.21. Previous DHS policy considered only cash assistance for subsistence and institutionalization at public expense to be negative factors. The Rule dramatically expands the types of public benefits considered in the public charge determination to include almost all federally-funded Medicaid healthcare coverage, food assistance through SNAP (known in California as CalFresh, and in Oregon as the Oregon Trail Card), and various types of housing assistance. Second, immigration officials must now consider any current or likely use of these benefits as a "heavily weighted" negative factor, even if the value of the benefit reflects only small share of the immigrant's total income, if the applicant received any of the enumerated benefits for more than 12 months in the aggregate within a 36-month period (receipt of two benefits in one month counts as two months). 84 Fed. Reg. 41,501; 8 C.F.R. §212.21(a).

88.  For the first time in the history of the public charge doctrine, the Rule makes low wages alone a potential basis for a public charge determination.  Having a family income below $15,613 for an individual or $32,188 for a family of four—i.e. an income *above the official poverty level*—is now a negative factor in the public charge determination.  84 Fed. Reg. 41,503; 8 C.F.R. §212.22(b)(4).  This income threshold is entirely independent from the individual's past use of—or even application for—public benefits (itself a separate heavily negative factor, as described in the paragraph above).  Thus, immigrants who meet the Rule's ostensible goal of "self-sufficiency" by foregoing public assistance can still be deemed inadmissible on public charge grounds simply because they earn less than an arbitrary amount selected by Defendants.

89.  The Rule mandates use of household size as a factor in the calculation of household income.  The significance the Rule gives household size disfavors families that live together and share resources, compared to single individuals.  84 Fed. Reg. 41,501-41,502; 8 C.F.R. §212.21(d).  This negative weight associated with family size is another first in the history of the public charge doctrine and illustrates the Rule's profound shift in orientation toward negative treatment of immigrant families and the value of family unity.

90.  The Rule substantially increases the minimum surety bond that an immigrant seeking a green card who is found to be inadmissible on public charge grounds (but is not otherwise inadmissible) may be permitted to submit.  Under the current policy, the minimum bond is $1,000.  The Rule multiplies this by a factor of eight to a *minimum* of $8,100.  This significant upfront cost imposes a much greater burden than the contractual obligations that immigrants, their families, and sponsors have traditionally agreed to when signing affidavits of support on behalf of intending immigrants.  The Rule also severely limits the use of public charge bonds, stating that they "generally will not" be allowed if an immigrant "has one or more heavily weighted negative factors" under the Rule.  84 Fed. Reg. at 41,451.

91.  In a final major break from historic policy, the Rule calls for a new "condition" on the approval of applications to change or extend visas by requiring applicants to establish that they did not receive public benefits for more than 12 months in the aggregate within any 36-month period from the time they received their visas.  This condition creates new circumstances for visa

19

holders to be found a public charge and makes the process for extensions and changes in categories more onerous.  84 Fed. Reg. 41,507; *cf*. 8 C.F.R. §214.1(a)(3)(iv).

92.  Altogether, these changes reject the long-standing "primary dependency" test for inadmissibility on public charge grounds.  In the words of Acting USCIS Director Ken Cuccinelli, this Rule will rewrite the Emma Lazarus poem affixed to the Statue of Liberty to read, "give me your tired and your poor who can stand on their own two feet and will not become a public charge."

**B.   Broad Scope and Disparate Impacts of the Rule**

93.  The Rule applies to several categories of people.  Individuals currently living and working in the U.S. who seek to adjust status to legal permanent residency, extend their legal status, or change their visa category to reflect relevant life transitions, will potentially be subject to the Rule.  People in these scenarios include graduating students, temporary workers, or undocumented persons who have married a U.S. citizen.  This includes a vast number of people—already living in the country—who have been waiting patiently in line for a visa through a family-based immigration petition.

94.  In 2017, approximately 380,000 individuals adjusted to legal permanent resident status through a pathway that likely would have subjected them to a public charge determination under the new Rule.  Similarly situated immigrants will now be at risk of being found to be inadmissible under the new Rule.

95.  The new, bright-line thresholds for income alone will result in DHS finding many more working immigrants likely to become a public charge.

96.  The incomes of fifty-six percent of recently admitted immigrants—a huge proportion of the workforce—would fall below the 250 percent income threshold, one of the Rule's "heavily weighed positive" factors.  Many immigrant workers have incomes under the 125 percent threshold, which is a "heavily weighted negative factor" under the Rule.  The Rule recognized that many people with incomes below the 125 percent income threshold will now receive a public charge finding.  84 Fed. Reg. 41,417.

97.   For example, California childcare and early education providers' average annual income is only $30,000, which for a family of four, equates almost exactly to the Rule's 125 percent income cutoff.   Farmworkers earn less still, an average of $17,500 per year in seasonal employment.   And homecare workers earn just $14,000 in median annual income.

98.   In the District of Columbia, earnings tend to be slightly more modest for immigrant workers compared with District workers overall.   The share of workers earning under $10,000 per year is similar for immigrants and all District workers (13 to 14 percent).   But immigrant workers in the District are more likely than the average District worker to have annual earnings between $10,000 and $49,999, and they are less likely to earn $100,000 or more a year than all District workers.   Approximately 36 percent of immigrant workers in the District are below 200 percent of the federal poverty level.

99.   In Oregon, a child day care providers' average income is only $26,740, which for a family of four, equates almost exactly to the Rule's 125 percent income cutoff.   Similarly, in Oregon, farmworkers earn a median annual income of less than $26,500 per year home health aides earn $26,450.

100.   In Oregon, one must earn $21.26 an hour to afford a two-bedroom apartment with unsubsidized rent.   Workers earning minimum wage would need to work at least 79 hours a week in order to afford rent on that same two-bedroom apartment.

101.   In Pennsylvania, over 140,000 immigrants (16 percent) live below the federal poverty level and over 300,000 immigrants (34.7 percent) live below 200 percent of the federal poverty level.   The median household income in Pennsylvania is $56,951, well below the 250 percent income threshold for a family of four ($64,375).   There are over 380,000 Pennsylvania residents living in immigrant families with incomes under the 250 percent threshold, but only 17,800 individuals living in immigrant families receiving a cash assistance benefit.   This means approximately 366,000 Pennsylvania residents have the potential to be subject to heavy scrutiny under the Rule despite not receiving any cash assistance.

102.   The Rule will have a profound disparate impact on immigrants from countries whose residents are non-White, and who already face significant economic disadvantage.   The

21

poverty rate in California for Latinos (14 percent) is twice the poverty rate for Whites (7 percent). For Blacks, the poverty rate is higher still, at 17 percent. In Pennsylvania, the poverty rate for Hispanics (24 percent) and Blacks (23 percent) is more than three times that of Whites (7 percent). In Oregon, the poverty rate for Blacks is 25.8%, 19.4% for Latinos, and 12.4% for Whites.

103. The gap between Latino and White elders in California is even wider than the overall Latino-White general population gap; the poverty rate for Latinos over age 65 is more than two-and-a-half times that for Whites. Thus, the Rule's disproportionate effect will be even more pronounced on elderly people of color and the extended families of which they are often a critical part.

104. Non-White families in the United States are less likely to have the wealth necessary to post the substantial minimum bonds that may be allowed for family members who are found to be inadmissible on public charge grounds.

105. Further, many people of color tend to have considerably larger household sizes than Whites, a function of housing costs, income, family size, culture, and the extended family living arrangements discussed above. Conversely, the percentage of single-person households in California is much higher among White families than Latino families and most other immigrant groups.

106. Since the income needed to avoid a negative weight increases with larger household sizes, the incomes of immigrants from communities of color are more likely to fall within the negative band.

107. Because of these disparities, the Rule is more likely to prevent immigrants of color in the United States from adjusting their status, or extending or changing their visas, compared to their White immigrant counterparts. Defendants concede that the Rule "may impact in greater numbers communities of color, including Latinos and AAPI [Asian-American, Pacific Islander] […] and therefore may impact the overall composition of immigration with respect to these groups." 84 Fed. Reg. 41,369.

108.  In addition to immigrants directly affected by the Rule because they may be subject to a public charge test, many more of our nation's immigrants and families with mixed immigration-status will be indirectly affected.  The Rule's inclusion of non-cash benefits as relevant to *any* public charge determinations will create a chilling effect that will discourage many other immigrants, such as refugees and asylees who are not otherwise subject to the Rule, from accessing benefits that they need and for which they are eligible.  *See* Section IV below.

109.  Defendants concede that the Rule will have a "potentially outsized impact […] on individuals with disabilities" while claiming that "disability itself would not be the sole basis for an inadmissibility finding," 84 Fed. Reg. 41,368, 41,410.

110.  In fact, the Rule's new criteria are so broad that they will exclude some persons with significant disabilities solely on that basis.  In addition to the already-existing health criteria, the Rule now requires immigration officials to consider whether the applicant "has any physical or mental condition […] significant enough to interfere with the person's ability to care for himself or herself […]."  84 Fed. Reg. 41,407.  Medicaid-funded home and community-based services, which can assist individuals with disabilities with self-care and help them attain and retain independence and the ability to work, are treated as independent, heavily weighted negative factors against an immigrant with a disability.

### III.   THE NEW PUBLIC CHARGE RULE IS DEEPLY FLAWED AND CONTRARY TO FEDERAL LAW

#### A.   The Rule is Contrary to Law

111.  A person who merely happens to be of moderate income or poor, or who is likely to receive the types of public benefits that many other working members of society receive, is not a "public charge" within the meaning of Section 212(a)(4) of the INA.

112.  The Rule's interpretation of public charge is inconsistent with all prior judicial interpretations of that term to date.

113.  Nor is the Rule consistent with prior agency interpretations of public charge.  Past DHS policy limited the term "public charge" to individuals likely to be "primarily dependent" on cash benefits for income maintenance, or institutionalized in "primarily government-funded" long-term care facilities.

114.  While application of the totality of the circumstances test involves some discretion, prior interpretations of the term require a public charge determination to be founded upon an individual's primary dependence on the government for subsistence.

115.  Bright-line thresholds for income as a factor in inadmissibility determinations are contrary to the INA and to the IIRIRA's codification of the "totality of the circumstances" test, and also bear no relationship to the meaning of public charge as established by Congress.

116.  For example, nothing in federal law supports establishment of an $8,100 minimum surety bond, a significant increase over the current minimum.  This amount is prohibitively high and deprives immigrants of the individualized analysis required by the IIRIRA.

117.  The bond requires low-income individuals to freeze significant assets in government-held bonds for years.  And while Defendants acknowledge that bond expenses may further destabilize an applicant's self-sufficiency, they fail to provide any meaningful explanation why no alternative option would suffice, claiming that the mere likelihood of becoming a public charge requires monetary assurance.  84 Fed. Reg. 41,454.  The median American household's savings balance, regardless of citizenship status, is just $11,700.  An $8,100 bond requirement would decimate a typical family's cash reserves, and require many to go into debt to obtain the funds to post such a bond.  The new bond requirement only increases the likelihood that an immigrant will need to access public benefits in case of an emergency.

118.  Pursuant to the IIRIRA, USCIS has for decades accepted legally enforceable affidavits of support as contracts from sponsors, employers, and relatives, and in certain circumstances, failure to provide such an affidavit renders the applicant inadmissible.  Defendants offer no explanation for not treating these affidavits as sufficient assurance that immigrant applicants will not become overly reliant on the social safety net, without requiring immigrants to freeze significant assets in government-held bonds for years.  84 Fed. Reg. 41,454.

119.  The Rule's inclusion in the definition of public charge of benefits used for more than 12 months in the aggregate within a 36-month period, where receipt of two benefits in one month counts as two months, in supplemental medical, nutritional, or housing assistance, is also contrary to Section 212(a)(4).  84 Fed. Reg. 41,501; 8 C.F.R. §212.21(a).

120. Congress designed the programs enumerated by the Rule (community Medicaid, SNAP, public housing and housing subsidies) to improve health outcomes and economic opportunity for working communities. As the INS concluded twenty years ago, modern public benefit programs reflect "broad public policy decisions about improving general public health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient." 64 Fed. Reg. at 28692.

121. Congress intended to give states the flexibility to make decisions about whether and in what circumstances to include immigrants in certain federal benefit programs, and gave the states even more flexibility with respect to state-funded programs. But immigrant families may not know or be able to determine whether a program is federally or State-funded, and many will disenroll from all public benefits as a precaution. The chilling effects of the Final Rule will dramatically undercut state flexibility and reduce the ability of states to effectuate their respective policy priorities.

122. Moreover, in the years since the original inclusion of the term "public charge" in immigration law, Congress has enacted laws that substantially revise the rights of individuals with disabilities. No longer is a person with a disability assumed to be a burden on society, and receipt of publicly-funded support services—such as Medicaid personal care services to keep individuals in their homes and communities as opposed to hospitals or other institutions—is common. The rights of persons with disabilities to use such home- and community-based services have been codified in the Rehabilitation Act, the Americans with Disabilities Act and the Supreme Court's landmark *Olmstead v. L.C.*, 527 U.S. 581 (1999) decision, and the ACA. Congress intended that Medicaid services for persons with disabilities help them "attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1. Congress never intended to attach negative weight to the receipt of such services for purposes of a public charge determination.

123. State laws go even further. For example, Pennsylvania has an "Employment First" law designed to "ensure that individuals with a disability be given the opportunity to achieve economic independence through jobs that pay competitive wages in community integrated settings." 62 Pa. Stat. Ann. § 3402(1). State, county, and other entities receiving public funding

1   must consider competitive integrated employment as the preferred outcome of services and

2   support for individuals with a disability who are eligible to work under state law.  62 Pa. Stat.

3   Ann. § 3404.

4         124.  The Public Charge Rule attaches heavily negative weight to a healthcare program,

5   Medicaid, that working individuals with disabilities use to support their independence.

6         125.  The Rule's addition of community-based Medicaid, in addition to heavily weighting

7   those who have been "diagnosed with a medical condition" that will "interfere with the alien's

8   ability to support him or herself," 84 Fed. Reg. at 41316, means that some persons with

9   disabilities now face an impossible hurdle to admissibility.

10        126.  Defendants' attempted transformation of long-standing law and policy concerning

11   who may be considered a public charge undermines Congress' well-established goals of family

12   reunification.  Congress did not delegate authority to DHS to make these changes to national

13   immigration policy.  Similarly, DHS does not have authority to make substantial changes to

14   impacting immigrant access to healthcare and other congressionally authorized benefit programs.

15        **B.   Defendants Fail to Offer Adequate Justification for the Rule**

16        127.  The APA requires reasonable justification for agency action, in particular where

17   long-standing regulations are changed.  DHS has not presented evidence or research to justify its

18   profound changes in the Public Charge Rule.

19        128.  The Rule's purported justifications—to "minimize the incentive of aliens to

20   immigrate to the United States because of the availability of public benefits and to promote self-

21   sufficiency of aliens within the United States," 84 Fed. Reg. 41,309— are not based on the

22   statute, and is not even served by provisions of the Rule itself.

23        129.  Those subject to the Rule's new changes—including immigrants adjusting to LPR

24   status and those seeking to extend or change visa categories—are largely ineligible for any of the

25   newly enumerated federal benefits.  Defendants acknowledge that "[noncitizens] who are

26   unlawfully present and nonimmigrants [visa holders] physically present in the United States are

27   generally barred from receiving federal public benefits other than emergency assistance," and in

28   fact, remain barred once admitted into lawful status for an additional five years.  84 Fed. Reg.

41,313.  Furthermore, the Rule will primarily impact individuals adjusting status or changing their visa conditions who are generally not seeking to immigrate—they are already living in the United States.

130.   In light of these narrow direct effects, penalizing the use of congressionally authorized public benefits for individuals already residing in the U.S. in a manner that creates even broader chilling effects is not a proportionate or rational method to minimize incentives for immigration to the U.S.

131.   The Rule's design fails to promote self-sufficiency because its income threshold is prohibitive even to low- and moderate-wage workers who do *not* use public benefits, and instead stifles a noncitizen's ability to attain upward mobility by creating barriers to medical coverage and lawful employment.

132.   Nor is self-sufficiency served by a rule that discourages the use of non-cash healthcare, housing, and nutrition assistance.  Public benefits such as SNAP, for example, are intended to supplement, not replace, an individual's ability purchase of basic food. Programs such as SNAP also provide employment services and enable families to afford to work and pay for housing.  As the administrative record shows, many workers and their dependents, regardless of immigration status, qualify for, utilize, and rely upon a wide range of public benefits.  Nearly three quarters of enrollees in the major federal programs are members of working families. Overall, across immigration and citizenship categories, almost 60 percent of households with workers in the lowest decile of hourly wages (earning less than $7.42 per hour), and over half of those in the next highest decile (between $7.42 and $9.91 per hour), receive one of the public benefits enumerated in the Rule.

133.   Moreover, low-wage rates of many immigrants are not determinative of their abilities to contribute to and advance in the United States.  Immigrants work and contribute far more to the U.S. economy than they ever receive in public benefits.  Nevertheless, the Rule irrationally penalizes many immigrants for their low wages.

134.  Defendants' stated purpose of promoting self-sufficiency is further undermined by the Rule's focus on income-earning capacity and age, neglecting the important contributions that

non-citizen parents of adult children (themselves often naturalized citizens) make to support households' economic self-sufficiency and emotional health.

135.   In many working-class households, grandparents may be caretakers, providing critical support for working parents and their small children, or family members with illnesses or disabilities.  The Rule penalizes such arrangements based on the household's income even when the applicant would add value to, and save costs for, the household, notwithstanding the Rule's exemptions for caregivers.

136.   In adopting the Rule, Defendants ignored evidence in the administrative record showing that the Rule would cause serious harm to immigrants, their families, their communities, and Plaintiffs.  *See* 84 Fed. Reg. 41,417.  These harms are described in more detail in Sections IV and V below.

137.   Defendants refused to consider in the design of the Rule substantial evidence that despite the Rule's various exemptions (e.g., for school-based Medicaid or vaccines), the Rule will have the predictable effect of causing harm to vulnerable populations and the community at large, due to chilling effects.

138.   In addition, Defendants included an exemption for individuals under the age of 21 who receive Medicaid benefits, but did not include a similar exemption for individuals under the age of 21 who receive SNAP benefits.  84 Fed. Reg. 41,501; 8 C.F.R. §212.21(b)(5)(iv).  The Rule does not acknowledge or address the harsh results that the Rule will impose on legal permanent resident children who will be subject to the public charge test pursuant to 8 U.S.C. § 1101(a)(13)(C) for reasons not within their control.

139.   Although Defendants acknowledged when proposing the Rule that it may have the impact of "decreas[ing] disposable income and increas[ing] the poverty of certain families and children, including U.S. citizen children," 83 Fed. Reg. 51277, it failed to conduct any meaningful assessment of chilling effect impacts on families' well-being or on the State and local entities that will be impacted.

140.   The Rule provides an exemption from the public charge test for military service members and their spouses and children.  The factors considered in creating the military

exemptions also apply to individuals who work in other low-wage sectors, such as agriculture, but Defendants failed to address those considerations.

141.   Defendants failed to weigh substantial reliance interests, including those associated with Plaintiffs' integration of the administration of state and federal benefits, and other policies designed to promote broad-based access to healthcare services.

## IV.   THE RULE WILL REDUCE PARTICIPATION IN VALUABLE PUBLIC PROGRAMS

142.   As Defendants acknowledge, 84 Fed. Reg. 41,312, the Public Charge Rule will have a chilling effect on immigrants' willingness to avail themselves of critically needed public benefits.

143.   The mere prospect of a public charge determination under the Rule will cause widespread confusion and fear, discouraging individuals from participating in public benefit programs in which they are eligible and authorized to participate.

144.   Defendants estimate that this chilling effect will result in a 2.5 percent disenrollment rate in programs that are expressly included in the new public charge test (Medicaid, SNAP, and housing assistance).  84 Fed. Reg. 41,463.  According to the Rule's estimates, over 324,438 individuals who are members of households with foreign-born noncitizens and about 9,632 households with at least one foreign-born noncitizen may forgo benefits for which they are eligible—an aggregate annual value that Defendants estimated to be over $1.5 billion.  *Id.*; 83 Fed. Reg. 51,266-69.

145.   These estimates grossly understate the likely magnitude of chilling effects.  The Rule fails to quantify or weigh the chilling effects that will also impact immigrants who are not subject to the Public Charge Rule, U.S. citizens in mixed-status families, and public benefits, both state and federal, ostensibly exempted from consideration under the Rule.

146.   History demonstrates the likelihood of even greater chilling effects.  The 1996 enactment of the PRWORA caused disenrollment rates between 15 percent and 35 percent for all noncitizen immigrants and children in families with mixed immigration status.  Chilling effects for refugees have historically been even higher—with up to 60 percent disenrollment found in

some cases, despite the fact that refugees have been generally exempted from restrictions on access to benefits.

147.   Plaintiffs operate a number of important programs that serve state residents, including immigrants, and will be negatively affected by the Rule's chilling effect.

148.   California's Medi-Cal provides healthcare coverage for one out of every three Californians, including more than two million noncitizens.  Similarly, one-third of the residents of the District of Columbia receive quality health care through the Medicaid program, including eligible noncitizens in accordance with federal law.  Over one-fifth of Pennsylvania residents receive health care through Pennsylvania Medical Assistance.  Approximately 23% of Oregonians receive quality health care through the Medicaid program, with children making up over half of the recipients.  Oregon's Medicaid program is available to eligible noncitizens.

149.   Some of the noncitizens in the Plaintiff States who are eligible are enrolled in Medicaid programs that are funded with federal matching funds.  Noncitizens in the Plaintiff States who are not eligible to participate in federally-funded Medicaid programs are enrolled in authorized state-funded programs.  In practice, however, many participants do not distinguish between different types of publicly-funded healthcare services.  Fear that participation will jeopardize immigration status will affect utilization of all services, even those exempt from the Rule.

150.   Plaintiffs' Medicaid programs provide comprehensive healthcare benefits to millions of participants.  In California, for example, full-scope Medi-Cal gives beneficiaries access to primary and preventive care, oral healthcare, hospitalization, prescription drugs, behavioral healthcare, and other vital services.

151.   Limited scope healthcare programs offer more targeted services.  For example, California's state-funded Family Planning, Access, Care, and Treatment (Family PACT) program is available to eligible low-income men and women in need of family planning coverage.  Family PACT services include a full range of FDA-approved contraceptives and comprehensive education, assistance, and services related to family planning.

152.   CHIP federal funds are used to extend Medicaid funding to children in working families whose parents or guardians exceed the income eligibility threshold for Medicaid, but lack access to affordable private coverage.  In California, District of Columbia, and Oregon, CHIP is part of the Medicaid program.

153.   Hundreds of thousands of Californians are likely to disenroll from Medi-Cal as a result of the Rule.  Those likely to disenroll include more than 40,000 children with at least one potentially life-threatening condition, such as asthma, influenza, diabetes, epilepsy, or cancer; 27,000 children using prescribed medications; 24,000 newborns; and 17,000 children with musculoskeletal and rheumatologic conditions.

154.   Medicaid and CHIP provide health coverage to more than 132,000 children in Oregon who are U.S. citizens and have at least one immigrant parent.  If the immigrant parents avoid health care coverage, for fear of losing their immigration status, so will their child.

155.   Thousands of residents in the District of Columbia are also likely to disenroll or forgo enrollment in the District's Medicaid program, and its other District-funded health care programs for immigrants who do not qualify for federal benefits.  Currently, there are 9,800 Medicaid enrollees who are asylees, refugees, lawful permanent residents beyond the five-year bar, or have other qualifying immigration status.  In addition, more than 18,000 District residents are currently enrolled in the District-funded Alliance and ICP.  Many of these individuals will choose to opt out of coverage out of concern for their immigration status, or that of their family members.

156.   Thousands of residents in Oregon are also likely to disenroll or forgo enrollment in Oregon's Medicaid program, and its other state-funded health care programs for immigrants who do not qualify for federal benefits.  Oregon DHS's call center has already had a surge in calls from concerned immigrants.

157.   Pennsylvania Medical Assistance provides health coverage to almost 330,000 individuals with a household member who is a non-citizen.  The total number of these non-citizens is nearly 175,000.  Pennsylvania-funded Medical Assistance currently covers nearly 1,800 immigrant children and pregnant women who not otherwise qualify for federally funded

31

Medical Assistance.  If 35 percent of immigrant families disenrolled from Medical Assistance, almost 37,500 Pennsylvania families would lose health insurance.

158.  As commenters on the proposed rule noted, some of the chilling effects began occurring before the Rule was even finalized.  For example, the District of Columbia's Department of Health Care Finance noted in its comment letter that it had already seen a 3.5 percent average decline in participation in local health care programs that extend coverage to immigrant adults and children.  Local health providers in the District of Columbia reported that this decline was directly attributable to fear and confusion about the application of a new public charge rule and its effect on the immigration status of immigrant families.

159.  SNAP helped more than 39 million people avoid food insecurity in 2018.  In providing SNAP benefits for the nation's most vulnerable immigrants, Congress recognized the critical nature of nutrition for healthy families and communities.

160.  In 2017, in California alone, SNAP served over four million California residents, including more than a million people at risk of chilling effects due to the Rule.  More than 74 percent of SNAP participants are in families with children, and almost 9 percent were in families with members who are elderly or have disabilities.  In addition, the California Food Assistance Program provides state-funded nutrition services for certain noncitizens who are not eligible for federal benefits.

161.  SNAP provides critical nutrition support to more than 64,000 households comprising more than 100,000 residents of the District of Columbia.  SNAP provides eligible individuals and families, including qualified immigrants and their families, non-cash benefits to support the health and well-being of low-wage workers, families, and elders.  In addition, many children in the District are directly certified for free or reduced-price school meals as a result of their families' participation in SNAP.  The Public Charge Rule will chill participation of these eligible individuals and families in SNAP.

162.  In March 2019, there were more than 1.75 million Pennsylvania residents receiving essential food access via SNAP. There are almost 150,000 individuals receiving SNAP who live in a household with a non-citizen. The total number of these non-citizens is nearly 80,000.

32

Pennsylvania has already witnessed a decrease in the number of SNAP cases since the Rule was first proposed in 2018. If 35% of immigrant families disenrolled from SNAP, more than 17,600 Pennsylvania families would lose access to basic nutrition.

163.   DHS has conceded the Rule will lead to disenrollment of children from SNAP, a critical nutritional support.  84 Fed. Reg. 41,477.

164.   More than one hundred thousand Californians are likely to disenroll from CalFresh as a result of the Rule.

165.   In Oregon, SNAP or food stamp benefits are administered under a program called the Oregon Trail Card.  Approximately 597,000 Oregonians are using SNAP benefits in 2019, which benefits around 351,000 households.  Of those, approximately 25,000 children on Oregon's SNAP caseload in the past year have an immigrant family member.  Oregon is already experiencing a decrease in applications for benefits due to fears that participation could affect a family member's immigration status.  Children living in households who choose not to participate in SNAP or Medicaid, for fear of impacting their immigration status, will not automatically qualify for free or reduced-price school meals.

166.   In 2017, more than 58,000 District residents received housing assistance that will be included as a "public benefit" under the Rule.  More than 1,000 noncitizens in the District, including more than 400 noncitizens above the age of 62 received these benefits in 2017.  Up to 1,000 District households could be negatively impacted by the Rule.

167.   In 2017, more than one million Californians received a type of housing assistance that is now included as a public benefit under the Rule, including Section 8 housing vouchers or rental assistance, public housing, or other federal subsidies.

168.   Oregon Housing and Community Services has approximately 400 children in HUD-project housing with a head or co-head/spouse who is an immigrant.  The proposed rule change is likely to negatively impact these families and children.  If immigrant children become homeless, this will be a significant negative impact.  With regard to health outcomes, young children who experienced homelessness for more than six months were significantly more likely to have developmental delays, fair or poor health, and be hospitalized, than children who never

33

experienced homelessness or did so for less than six months.  Thus, Oregon children who are U.S. citizens, but have immigrant parents, have much more to lose than just their homes because of this Rule.

169.  In Pennsylvania, 175,600 residents in 78,200 households use Section 8 Housing Choice Vouchers to afford decent, privately owned housing. There are an additional 406,700 people in 217,000 Pennsylvania households using Section 8 Rental Assistance.

## V.   THE RULE WILL CAUSE IMMEDIATE, IRREPARABLE HARM TO PLAINTIFFS' COMMUNITIES, ECONOMIES AND PUBLIC SYSTEMS

### A.   The Rule Will Harm the Administration of Public Programs and Services

### 1.   Loss of Federal Funds to Support State Public Benefit Programs

170.  The Rule's chilling effects will harm Plaintiffs by reducing the number of eligible individuals who choose to participate in public benefits programs, thereby causing loss of federal funding associated with all individuals who were otherwise eligible for federally funded programs.

171.  For example, Plaintiffs receive 50 percent or more in federal matching funds for qualified Medicaid expenditures.  Noncitizens who are eligible for federally funded Medicaid but choose not to apply for such benefits reduces the amount of federal funding with which Plaintiffs can ensure that their residents have access to healthcare.

172.  Families with mixed immigration-status, *i.e.*, families that include both U.S. citizen children and noncitizen parents, are particularly at risk of disenrollment due to chilling effects. When parents perceive enrollment in public programs to place their own immigration status at risk, they are less likely to enroll their children in those programs as well, even if their children are U.S. citizens.  For this reason, even though Defendants excluded CHIP from the list of programs considered in a public charge determination, enrollment in CHIP is threatened by the Rule.

### 2.   Harm to State Programs' Reliance Interests

173.  Plaintiffs' efforts to ensure broad-based access to health and nutrition programs have engendered significant reliance interests that will be harmed by the Rule.

174.  Plaintiffs have made deep investments in human services and public healthcare infrastructure, and encouraged broad-based participation in healthcare and nutrition programs.

175.  Plaintiffs have succeeded in reducing rates of individuals without health insurance to historic lows.  In California, for example, 96 percent of children currently have private or public health insurance.  In Pennsylvania, 94.5% of residents and 95.6% of children have health insurance.  In Oregon, 97.1% of children are insured.

176.  As part of these efforts, Plaintiffs have developed complex systems to implement public benefit programs in a timely, efficient, and accurate manner.  They have designed streamlined processes for benefits applications, eligibility determinations, and benefits distribution, as well as communications with applicants, beneficiaries, and the general public.

177.  California has heavily invested time and monetary resources in outreach and enrollment in public benefit programs.  For example, as part of its implementation of the ACA, CalHEERS, a central automation system jointly administered by Covered California (the state's health insurance Exchange) and the Department of Health Care Services, that consolidates state eligibility enrollment and retention for both Covered California and Medi-Cal.  CalHEERS is designed to integrate federal and state-funded health programs and to provide beneficiaries with timely and clear eligibility notices regarding coverage.

178.  Also in connection with the ACA, California established a single, accessible statewide application for all affordable health programs.  This application is used by all California entities authorized to make eligibility determinations, and all California residents are encouraged to apply.

179.  In designing CalHEERS and the single statewide application, California substantially relied upon longstanding federal agency guidance that limited benefits relevant to public charge determinations to a discrete, easily understood list that included only direct cash assistance programs and institutionalization at government expense.

180.  Similarly, the District of Columbia has implemented a "no wrong door" environment for District residents seeking help with insurance coverage and costs.  The District's Health Benefits Exchange Authority (HBX) created and operates DC Health Link, where District

residents and employees, including qualified immigrants, can apply for Medicaid and purchase private health insurance.

181.   DC Health Link also provides information and links to more information about the District-funded programs that are available to immigrants who do not qualify for Medicaid and those who are not eligible to the use the Health Benefits Exchange.  The District provides a Combined Application for the Alliance Program and the ICP, which is also used to apply for other public benefits, including SNAP.

182.   In Pennsylvania, COMPASS is central online tool for Pennsylvanians to apply for many health and human service programs and manage benefit information.  Pennsylvania implemented COMPASS with the approval of the federal Centers for Medicare and Medicaid Services as part of Pennsylvania's implementation of the ACA.  COMPASS serves as a single access point for Medical Assistance, SNAP, free or reduced price school meals, subsidized childcare, and cash assistance.  COMPASS allows Pennsylvania residents to see if they or their household members qualify for benefits, apply for and renew benefits, save and submit applications, check the status of applications, submit documents electronically, view their case benefit information, report changes to their cases, receive notices electronically, and manage other aspects of their cases online.

183.   Pennsylvania has also created a single paper application for Medical Assistance and SNAP, among others.

184.   In connection with the implementation of the Affordable Care Act (ACA), Maine modified its automated eligibility system, ACES, that consolidates state eligibility enrollment and retention for the federal health insurance exchange and MaineCare.  Also in connection with the ACA, Maine has established a single, accessible statewide application for all affordable health programs.

185.   If immigrants and their family members become confused or fearful about the possibility of a public charge determination, and decide to stop using statewide application and enrollment systems, then those systems will not operate as effectively as they do now.  The State's ability to provide broad-based access will be compromised.

186.   Another policy that will be undermined by the Rule is Plaintiffs' election of the option provided under federal law for twelve-month continuous certification periods for Medicaid.

187.   The Rule puts a strict twelve-month limit on overall time spent receiving public benefits for public charge purposes, regardless of whether services are used during that period of time.  In doing so, the Rule incentivizes "churn," the phenomenon of otherwise eligible immigrants dropping in and out of Medicaid enrollment based on their perceived or actual medical needs, in order to reduce risks to their immigration status.

188.   Churn creates undesirable gaps in coverage that can disrupt the continuity of healthcare services, leading to worse patient outcomes and higher administrative costs.  The Rule thus undermines the efficacy of twelve-month continuous enrollment periods.

189.   In these and other healthcare and nutrition policy choices, Plaintiffs' legislatures and/or state agencies relied upon federal immigration authorities' long-standing guidance on immigrant inadmissibility in order to encourage immigrants' participation in congressionally authorized benefit programs for which they are eligible.

### 3.   Additional Administrative Burdens Caused by the Rule

190.   Implementation of the Rule will cause additional administrative and fiscal burdens for Plaintiffs.

191.   State agencies will need to divert outreach and education funds in order to explain the Rule to affected communities.

192.   Plaintiffs already engage in extensive outreach efforts to inform and educate the public about availability of healthcare and nutrition programs.  For example, since the ACA's initial open enrollment in 2013, Covered California has spent approximately $91,575,000 on targeted marketing campaigns designed to educate communities with high populations of eligible immigrants about the benefits of enrolling in health insurance coverage, including Spanish-speaking and Asian communities.  The State's FFY 2019-2021 CalFresh outreach plan has an annual budget of over $44 million for each of those three years, and funds 145 contractors and subcontractors and works with local government agencies, local schools, community-based

organizations, the California State University system, and many others to encourage CalFresh enrollment.

193.   The Oregon Department of Human Services ("ODHS") provides refugee assistance services, coordinating with Refugee Resettlement Agencies to provide assistance for refugee families in applying for social services, medical benefits, vocational training, employments supports and language training.

194.   Pennsylvania has allocated almost $500,000 for SNAP outreach.

195.   Portions of these budgets will have to be diverted in order to evaluate the Rule's impact, train employees and volunteers, and develop new outreach materials and applications.

196.   Plaintiffs' outreach programs specifically includes outreach to immigrant or non-English-speaking communities.  State agencies have developed outreach materials and training guidelines that make clear that nutrition benefits have not been considered part of a public charge determination.

197.   The Rule will necessitate the diversion of resources toward revising materials that provide technical support and advice to community members and stakeholders confused by the Rule.

**B.   The Rule Will Harm Health and Well-Being of Plaintiffs' Residents**

198.The Public Charge Rule will cause harm to the intended beneficiaries of public benefit programs, leading to deterioration of public health and well-being.  These irreparable harms are abundantly demonstrated throughout the administrative record.  Ultimately, Plaintiffs will bear costs associated with many of these harms.

**1.   Impact on Health**

199.   Healthcare coverage makes a real difference to its recipients.  Medicaid coverage has proven positive impacts on health; improves access to prescriptions; reduces financial hardship; helps women plan their pregnancies; and reduces preventable mortality.

200.   In addition to benefits to the individual, healthcare services help Plaintiffs prevent the spread of communicable diseases; prevent, prepare for and respond to public health threats and emergencies; and achieve numerous other health-related goals.  Conversely, reductions in

utilization of publicly-funded healthcare services due to immigrants' decisions to avoid or minimize potential risks to their immigration status will have a direct, long-term negative effect on Plaintiffs' ability to protect the public health.

201.   For instance, California's Department of Public Health works to promote healthy communities by providing for the control and prevention of infectious diseases like the Zika virus, HIV/AIDS and other sexually transmitted diseases, tuberculosis, and viral hepatitis, and the prevention of unintended pregnancies.  California invests about $7 million annually so that local health departments can administer half a million doses of influenza vaccine that protect vulnerable populations, such as pregnant woman, children under five, adults over 65, and people with chronic conditions who are at high-risk for flu-related complications.

202.   The District of Columbia's Vaccines for Children (VFC) Program provides qualifying health care practices with free vaccines for persons under the age of 19 who are eligible for Medicaid, uninsured, or underinsured.  It is a federally-funded program that provides vaccines free of charge to enrolled providers that serve eligible patients.  VFC helps ensure that all children have a better chance of getting their recommended vaccinations on schedule.

203.   The Pennsylvania Department of Health (PADOH) works to promote healthy lifestyles, prevent injury and disease, and to assure the safe delivery of quality health care for all Commonwealth residents. PADOH programs facilitate, among many other things: breast and cervical cancer screenings; immunizations to children who cannot easily afford childhood immunizations; HIV treatment and care; prescription drug monitoring; research, education, prevention, and intervention activities regarding cancer, tobacco use, and lead hazards; and operational support for public health emergencies and emerging diseases such as measles, Ebola, influenza, Lyme disease, Zika, sexually transmitted diseases, and Hepatitis A, B, and C.

204.   The Maine Center for Disease Control offers free vaccines to individuals who are uninsured or underinsured, including noncitizens.

205.   Public health efforts are most effective when they encompass the States' entire population, including immigrants.  Protection of population health depends on broad-based access to healthcare services.

39

206.   The Rule's restrictions on receipt of federally funded Medicaid and its chilling effects on all public healthcare benefits will make it harder for state agencies to reach populations in need.

207.   Defendants acknowledge that the Rule does not assure access to vaccinations to an extent that mirrors the PRWORA-defined exceptions for immunizations and testing and treatment of communicable diseases.  84 Fed. Reg. 41,384 ("[T]his final rule does not consider receipt of Medicaid by a child under age 21, or during a person's pregnancy . . . This should address a substantial portion, though not all of the vaccination issue.").  Under the Rule, if a person "enrolls in Medicaid for the purpose of obtaining vaccines, the Medicaid itself qualifies as a public benefit."  Defendants are aware of the concerns that the Rule will increase the prevalence of disease and put at risk the health of vulnerable populations, even those not directly subject to the rule, 84 Fed. Reg. 41,311, but instead of quantifying these costs, DHS simply opines that such actions would be "unwarranted choices."  84 Fed. Reg. 41,313.

208.   Rates of vaccinations and other preventive public health services make a difference not just to those who are unvaccinated, but to the overall health of the community at large.  Community immunity, also known as "herd immunity," is achieved only when a sufficient proportion of a population is immune to an infectious disease, making the disease's spread from person to person unlikely.  Community immunity helps protect individuals who cannot be vaccinated due to compromised immune systems, such as newborns and persons with chronic illnesses.

209.   The Rule will severely undermine access to all public healthcare services—from preventative screenings for sexually transmitted diseases to childhood immunizations—and in doing so place the entire community's health at risk.

### 2.   Impact on Hunger

210.   The Rule's chilling of eligible immigrants from seeking both federally and state-funded nutrition assistance will thwart Plaintiffs' programs addressing hunger and food insecurity.

211.  Annually, between 2009 and 2012, SNAP kept an average of 806,000 people out of poverty in California, including 417,000 children.  In Pennsylvania, SNAP currently provides essential food assistance to more than 1.75 million Pennsylvanians, including almost 80,000 immigrants.

212.  Reduced access to SNAP benefits leads to food insecurity, which is associated with numerous negative health outcomes in children, such as depression, fatigue, poor self-efficacy, and behavioral problems.  Low-income children who go without nutritious food will struggle to learn in classrooms, impacting their educational advancement and that of their peers.

213.  Conversely, food security translates to better health outcomes and lower public healthcare expenditures.  Low-income adults participating in SNAP incur about $1,400 less in medical care costs in a year than low-income non-participants.  When immigrants forego SNAP, these benefits will be lost.

214.  The Census Bureau also uses receipt of SNAP benefits to calculate the Supplemental Poverty Measure, which "serve[s] as an additional indicator of economic well-being and will provide a deeper understanding of economic conditions and policy effects."  Disenrollment from SNAP will undermine the accuracy of this measure and therefore misrepresent national and statewide economic conditions.

215.  In addition to harming individual SNAP recipients, the Rule will have a broader negative impact on the National School Lunch Program and School Breakfast Program (collectively "school meals" programs), despite the fact that those benefits are not included in the Rule's new public charge determination.

216.  School meals programs help to fight hunger and obesity by assisting schools in providing healthy meals to children.

217.  Although the Rule exempts these programs from its definition of "public benefits," the Rule will still indirectly undermine school meals programs and their goal of ensuring adequate nutrition for America's schoolchildren because the school meal programs' automatic enrollment process is linked to participation in SNAP and Medicaid.  DHS notes the importance of these processes to school meals, but merely states, without explanation, that the Rule "will not

41

stop the child from accessing these programs through existing enrollment process other than direct certification." 84 Fed. Reg. 41,374.

218.  California currently certifies over 730,000 children for free meals and over 310,000 children for reduced price meals due to their households' participation in Medicaid, as well as almost 1.6 million children for free meals due to their households' participation in SNAP.

219. Oregon automatically certifies approximately 47% of its children for free and reduced lunches, many due to the households' participation in Medicaid or SNAP.

220.  In the 2017-2018 school year, Pennsylvania served more than 167 million school lunches, enabling children from low-income households to focus on learning, not hunger. Pennsylvania families that qualify for Medical Assistance, SNAP, or TANF are automatically eligible for free school lunches.  Pennsylvania is one of only a few states that provide direct certification based on Medical Assistance.

221.  In Maine, for the 2018 year, SNAP helped to keep on average 167,000 people out of poverty in Maine, including 60,000 children.

222.  Maine currently certifies approximately 60,000 children for free meals due to their household's participation in SNAP.

223.  Without these automatic certifications, many eligible children in Plaintiffs' jurisdictions will go without free or reduced-price school meals.

224.  The community eligibility provision of the school meals program allows all students in eligible communities to obtain free school meals without a showing of individual eligibility. For example, where at least 40 percent of students in a particular school are directly certified for free meals through programs like SNAP, all students receive free school lunch. If the percentage of eligible students dips below that mark, however, the school can no longer offer free schools meals to all.

225.  Thus, the Rule will cause some students in lower-income areas who are not themselves eligible for nutritional assistance based on higher household income—but may nevertheless be struggling with hunger—to lose access to healthy meals provided by their local school to all children.

### 3.   Impact on Housing

226.   Loss of housing assistance will also seriously harm affected families.

227.   Housing vouchers have been repeatedly shown to improve children's educational and health outcomes, and to help pull their families out of poverty.

228.   Children whose families were able to move to higher opportunity neighborhoods due to their receipt of housing assistance experienced long-term improvements in their income and educational attainment.  Children in these families also experienced reduced homelessness, housing instability, and overcrowding.

229.   A study conducted by the U.S. Housing and Urban Development Department (HUD) showed that youth who live in public housing improved their self-sufficiency long term.

230.   In contrast, if immigrant children become homeless, this will cause significant negative impacts.  Young children who experience homelessness for more than six months are significantly more likely to have developmental delays, fair or poor health, and be hospitalized, than children who never experienced homelessness or did so for less than six months.

231.   In addition, many housing authorities provide a suite of "wraparound" services to public housing residents, including employment, clinical, health, and financial literacy services. In San Francisco, for example, an innovative program aimed at families involved with the child welfare system and at risk of homelessness offers housing vouchers along with intensive case management services, including mental and behavioral healthcare, parenting classes, and peer support.

232.   All of these will be lost to eligible families who withdraw from public housing assistance programs or fail to apply due to fear of impact on their immigration status, harming families and their communities, and undermining program effectiveness.

### C.   The Rule Will Cause Economic Harms to States

### 1.   Impact on Healthcare Providers and Insurers

233.   The Public Charge Rule will cause direct economic harm to Plaintiffs in the form of increased uncompensated costs for hospital care.

234.  Since passage of the ACA, which Congress enacted to increase access to care and improve healthcare affordability, in part, by increasing the insured proportion of the population, Plaintiffs have experienced a considerable decrease in the number of uninsured residents.  This is predominantly attributable to the expansion of eligibility in Medicaid programs and the newfound availability of health coverage through exchanges.

235.  Participation of eligible immigrants without fear of negative impacts on their ability to naturalize is a meaningful part of that improvement.  But now, hundreds of thousands of immigrants who have purchased health insurance through state exchanges, like Covered California, or who have taken advantage of Medicaid coverage for which they are eligible, may be impacted or chilled by the Public Charge Rule.

236.  Immigrants, on average, use fewer healthcare services than similarly situated native-born U.S. residents, and their participation in health care systems lowers costs for all participants in the insurance pool.

237.  The Public Charge Rule reverses these achievements and undoes the virtuous circle of more healthcare coverage, improved health outcomes, and lower costs.

238.  Defendants admit that the proposed regulation could lead to "increased use of emergency rooms and emergent care as a method of primary health care due to delayed treatment" and "increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient."  84 Fed. Reg. 41,384.  However, Defendants fail to acknowledge and weigh the full ramifications of these harms.

239.  Higher rates of uninsured residents have a negative financial impact on hospital systems—which are charged with providing care in emergency situations regardless of insurance coverage—and therefore adversely impact community access to quality healthcare for all local residents.

240.  The Rule will have a particularly harmful effect on hospitals that serve a disproportionate share of low-income individuals. These facilities already operate on thin margins.  If public funding drops and uncompensated care rises, these hospitals will be less able to serve all patients in need.

241.  Immigrants who are chilled from accessing publicly funded health insurance programs for which they are eligible will be more likely to defer primary or preventive healthcare.  Deferred care leads to more complex medical conditions later on that are more expensive to treat.

242.  As the California Hospital Association warned in its opposition to the Rule, "Increased emergency room use by the uninsured leads to an increased financial burden on hospitals, which are required to provide care to all patients—regardless of their ability to pay. This increase in uncompensated care causes financial strain, particularly for hospitals in communities with large immigrant populations."

243.  The Rule will undermine the efficacy of Plaintiffs' established presumptive eligibility Medicaid programs designed to maximize the likelihood of coverage for people with emergency health conditions.

244.  The Rule will also increase administrative costs and burdens on healthcare providers, as they will need to devote considerable time and resources to educating their frontline and clinical staff about the various ways patients might be impacted by the Rule.

245.  As the primary funder for all their low-income residents' healthcare services, Plaintiffs' publicly funded healthcare programs will ultimately bear the cost of both financial pressure on safety net providers and the increased public health harms described in Section V(B)(1) above.

246.  For example, if those chilled from participating in Medicaid programs experience an unintended pregnancy as a result of reduced access to contraceptives and other family planning services, then many of the costs of that unintended pregnancy will be borne by Plaintiffs.

247.  Unintended pregnancy is likely to result in relatively higher health costs, because shorter inter-pregnancy intervals are more likely to result in premature births, low birth weight infants, and congenital defects, all of which produce considerable harm to Plaintiffs, in addition to the worse health outcomes for the child and mother.  The average medical cost to Plaintiffs in the first year of life of a premature or low birth weight baby is up to 10 times higher than the cost of a full term baby.

248.   Medicaid programs are also likely to bear a portion of the costs associated with any delays in diagnosis and treatment of serious medical conditions such as cancer, unintended pregnancy, preventable diseases such as sexually transmitted diseases, and other serious health problems.

249.   Overall, the Public Charge Rule's effect of pushing more people into the ranks of the uninsured will introduce financial strain on state, local, and private health systems and programs.

### 2.   Impact on Other Safety Net Providers

250.   In addition to healthcare provider impacts, discouraging immigrants from accessing public benefits for which they are eligible will ultimately transfer costs to state and local governments and community organizations, as families increasingly rely on emergency services and public safety net programs, such as local shelters, homeless services, and food pantries.

251.   Food banks, for example, are already struggling to fill a growing nutrition gap that has arisen, in part, by immigrants avoiding public food assistance programs due to rumors of the Rule's implications.  In Oregon, 552,900 people are facing food insecurity, of those, 194,070 are children.

252.   Implementation of the Rule will worsen the burden on food banks that already provide for 4.6 million Californians (including 1.7 million children) facing food insecurity.  In Maine, hundreds of food banks and pantries around the state provide food to 14.4 percent of Maine households, which face food insecurity.

### 3.   Impact on Consumer Spending

253.   Reduced participation in public benefit programs causes additional economic harm to the Plaintiffs.

254.   Decreased participation in SNAP and state nutrition programs has economic consequences beyond hunger and public health.

255.   Fewer Californians using CalFresh will harm the 26,599 grocers, farmers' markets, and other merchants in California that accept SNAP benefits for food purchases.  SNAP benefits generate secondary economic effects that increase overall spending and production; the United

States Department of Agriculture estimates that in a slowing economy, every $1 in SNAP benefits generates $1.54 in economic activity. Decisions by immigrant families (an estimated 1.5 million in California) to forgo critical nutritional benefits will also result in loss of economic activity.

256. In Alameda County, 41 percent of noncitizens live in families that use at least one means-tested benefit, and the County estimated in its comment on the Rule that its immigrant population could miss out on millions of dollars of benefits due to the chilling effect generated by the Rule. If half of the county's households with noncitizens who use relevant benefits—over 8,000—disenrolled from programs for which they are eligible, the direct annual economic impact would be approximately $39 million.

257. In Pennsylvania, there are 10,257 retailers that accept SNAP, including grocers and farmer's markets. If 35% of immigrant families disenrolled from SNAP (i.e., more than 17,600 Pennsylvania families), the direct annual economic impact from lack of food purchase alone would be nearly $4 million.

### 4. Impact on Workforce

258. Limiting the ability of immigrants to adjust their status, extend, or change the basis for their legal presence will also harm the economy by reducing important parts of the workforce.

259. Any diminution of the immigrant labor force and lost productivity will be especially pronounced in sectors that are critical to the economy. Sectors that will be impacted include agriculture, construction, healthcare, childcare and early childhood education, food services, and janitorial and maintenance services.

260. In California, for example, immigrants are a major share of all California workers in farming, fishing, and forestry (77.1 percent); building and grounds cleaning and maintenance (61.7 percent); and construction and extraction (43 percent). Thirty-nine percent of child care and early education providers in California—81,000 people—are immigrants. These impacted occupations and industries are known to pay workers low wages, making them particularly vulnerable to public charge determinations under the Rule.

261. Immigrants make up about 24 percent of the District's civilian labor force. The top job categories for immigrant workers in the District include management, business, science, and

47

the arts, building and grounds cleaning and maintenance, construction, and food preparation and serving.  Immigrant workers also provide office and administrative support, and education, training, and library services.  As noted above, earnings tend to be slightly more modest for immigrant workers compared with District workers overall.

262.  With current immigration trends and birth rates, almost all of the growth in the nation's working-age population between now and 2050 will take place among immigrants and their U.S.-born children.  In Pennsylvania, which has an aging population, a reduction in the number of immigrants to the U.S. along with declining birth rates could cause serious economic consequences, as the number of workers needed to support older adults continues to increase.

263.  Maine had over 25,000 immigrant workers in 2015.

264.  Approximately 260,000 workers in Oregon are immigrants, comprising over 12% of the workforce generally.  The top categories for immigrant workers in Oregon include manufacturing, accommodation and food services, health care and social assistance, retail trade, and agriculture, forestry, fishing and hunting.

265.  In an era of tight labor supplies, the Rule threatens to further reduce availability of workers in these occupational categories and industries.  Workers lost across these sectors cannot be replaced without significant economic disruption.

266.  The Rule creates particularly steep barriers for immigrant students in public colleges and universities.  These students, many of whom live for a period of time on sparse incomes and thus are particularly susceptible to a public charge determination under the Rule, are critical components of the emergent workforce.

267.  The Rule's new public charge condition will make it more difficult for nonimmigrant visa holders such as graduate students and specialized workers to extend or change their statuses.  These valued members of our schools, workplaces, and communities may be excluded or discouraged from seeking extended or changed statuses due to the Rule.

268.  Graduating students' understandably low incomes are no indicator of their future earnings.  Working students are frequently poor, but by no means unproductive.  Yet students who seek to become legal permanent residents, or extend or otherwise adjust their status, face the

48

Rule's punitive public charge test.  As a result, Plaintiffs are likely to be deprived of the benefits of this skilled nascent workforce.

**D.   The Rule Will Harm the Integrity of Immigrant Families and Plaintiffs' Communities**

269.  The Rule will undermine the integrity, stability, and financial health of working immigrant families by discouraging immigration to the United States, including adjustment of status for persons already residing in the United States.

270.  The Rule's definition of "household," combined with its arbitrary income and asset standards, will pressure extended families to live in separate households and to refrain from supporting each other financially.  *See* 8 C.F.R. § 212.21(d), 84 Fed. Reg. 41,501 (including in "household" any individuals to whom the immigrant provides at least 50 percent of the individual's financial support).

271.  This perverse incentive created by the Rule will discourage noncitizen members of mixed immigration-status families from living with and providing support to U.S.-citizen family members in order to avoid adverse immigration consequences.

272.  In addition, the Rule will prevent permanent unification of grandparents, parents, and siblings who have been living in the United States patiently waiting for available visas through family-based immigration petitions.

273.  Thousands of immigrant families have taken significant measures to come out of the shadows.  In the last three years, California has been the state with the highest number of individuals obtaining lawful permanent resident status.  The Rule will reverse this trend, to the detriment of Plaintiffs and their residents.

274.  For many applicants, denial of the requested adjustment, extension, or change of status under the Rule would leave them without permission to remain in the United States.  In fact, under a recent DHS policy memorandum, those who are denied adjustment of status could be placed in removal proceedings if they do not have a valid status, heightening the risk of deportation after the application.  The Rule will thus lead to immigrants either declining to apply

49

for lawful status out of fear—forcing them into unauthorized status, relegated to the margins of society—or risking deportation.

275.  For example, a DACA recipient who is a student and has a U.S. citizen child may be afraid to seek a visa through marriage with a U.S. citizen spouse if their household income could put them at risk of an adverse public charge determination, or if they have disabilities that may make them likely to receive Medicaid.

276.  Similar fears could also prevent vulnerable populations that are exempted from public charge considerations, such as Temporary Protected Status (TPS) holders or Violence Against Women Act (VAWA) petitioners, from adjusting their status through family-based petitions.

277.  The Rule will also subject individuals with ongoing lawful nonimmigrant status (such as long-term, multiple-entry visas like student visas) to the more expansive public charge inadmissibility standards every time they return to the United States.  84 Fed. Reg. 41,507; 8 C.F.R. §214.1(a)(3)(iv).

278.  If DHS (acting through CBP) determines that, after a visit outside of the United States longer than six months, a green card holder is seeking admission they could be subject to the expanded public charge inadmissibility ground.  This individual may have been receiving benefits for which they have long been eligible, and yet still be subject in the expanded inadmissibility ground.  84 Fed. Reg. 41,326.

279.  This will discourage immigrant communities from remaining in contact with their families abroad, leading to unnecessary separation of family members during times of joy and hardship, such as a period of serious illness.

280.  By subjecting derivative family members of visa holders, such as the spouses and children of those on employment-based visas, to the public charge condition when they request to extend or change their status, the Rule could result family separations and denials.

## VI.   THE RULE IS MOTIVATED BY RACIAL AND ETHNIC ANIMUS TOWARD NON-WHITE, NON-EUROPEAN IMMIGRANTS

281.   Defendants ignored thousands of comments describing the harm the Rule would cause.  They also ignored thousands of comments submitted in the public record opposing the Rule on the ground that it would disproportionately impact immigrants of color, especially Latino and Black immigrants.  These commenters highlighted the fact that the public charge determination is being hijacked by Defendants and converted into a vehicle for discrimination. *See* 84 Fed. Reg. 41,401.

282.   The federal government's decision to adopt the Public Charge Rule is motivated by improper discriminatory intent and animus toward non-White, non-European immigrants, who account for the vast majority of people who will be adversely affected by the Rule.  The Rule violates the Equal Protection Clause, pursuant to *Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977).

283.   As described in Section II(B) above, the Rule disproportionately impacts non-White, non-European immigrants because they are substantially more likely than their White, European counterparts to be treated disfavorably under the Rule.

284.   Numerous statements and actions by President Trump and high-ranking officials in his administration reflect a pattern of bias against Mexicans, Latinos, Africans, Haitians, and other non-White, non-European immigrants.

285.   Prior to his election, and during his campaign, President Trump voiced his disdain for non-White, non-European immigrants, and in particular, Mexicans.  For example, on June 16, 2015, during his speech launching his presidential campaign, Donald Trump characterized immigrants from Mexico as criminals, "rapists," and "people that have lots of problems."  In June 2018, President Trump asserted that these remarks were "100 percent right."

286.   On September 25, 2015, then-candidate Trump suggested that the United States would "no longer take care" of "anchor babies" from Mexico.

51

287.  In October 2016, during a presidential debate, then-candidate Trump responded to a question about immigration by stating:  "We have some bad hombres here and we're going to get them out."

288.  This pattern of racist animosity continued into his presidency.  President Trump repeated incendiary language at rallies and in social media conflating the issue of immigration with criminality, and raising the specter of invasion at the Southern border by individuals from Mexico and Central America.

289.  Against this backdrop of vitriol towards immigrants, in August 2017, President Trump endorsed the RAISE Act, introduced by Senators Tom Cotton and David Perdue.  The RAISE Act proposed substantial cuts to family-based immigration, which comprises approximately two-thirds of the annual total number of green cards.  The bill sought to eliminate several categories of relatives eligible for family-sponsored immigration, and lower the caps for other categories of family-sponsors from 226,000 green cards to 88,000.  The bill's design resulted in the deepest prospective cuts to immigration from Mexico, the Dominican Republic, the Philippines, China, India, and Vietnam.

290.  The bill faced bipartisan resistance, and gained only one additional co-sponsor, Senator Wicker of Mississippi, in November 2017.

291.  Frustrated with the lack of progress on this legislation, in early January 2018, at a Camp David meeting with congressional leaders, the President demanded the end to so-called "chain migration," his preferred term for describing family-based immigration.

292.  Days later, on January 11, 2018, during a White House meeting with several U.S. Senators, the President is widely reported to have disparaged a draft immigration plan that protected people from El Salvador, Haiti, and some African countries, asking, "Why are we having all these people from shithole countries come here?"  In this meeting, the President is also widely reported to have expressed his preference for more immigrants from places like Norway, where the population is over 90 percent white.  Senator Dick Durbin, who attended the White House meeting, confirmed that Trump used "vile, vulgar" language, including repeatedly using the word "shithole" when speaking about African countries.

293.   In February 2018, President Trump gave a speech at the annual Conservative Political Action Conference where he used MS-13 – a gang with many members having ties to Mexico and Central America – to disparage immigrants, indicating that all immigrants from Mexico and Central America are criminals and comparing them to snakes.

294.   In May 2018, President Trump again lashed out at immigrants, branding them as "animals" during a public White House meeting in which he aired his frustrations related to immigration.

295.   In addition to this pattern of conduct, procedural irregularities in the rulemaking process underscore the animus that has driven the Rule's adoption.  The manipulation of agency leadership in 2019 that was required to institute it.  This included the ouster of key DHS officials, and the selection of their replacements without Senate approval.

296.   In April 2019, after then-Secretary Kristjen Nielson announced her departure, President Trump promptly tweeted that then-U.S. Customs and Border Protection Commissioner Kevin McAleenan would take over DHS on an acting basis.  Representative Bennie Thompson implored the President to follow the law of succession, specifically 6 U.S.C. § 113, under which Acting Deputy Secretary Claire Grady would be statutorily required to serve as Acting Secretary.  Within a day, Grady, a career civil servant, offered her resignation, clearing the pathway for Defendant Acting Secretary McAleenan.

297.   On May 24, 2019, L. Francis Cissna, USCIS Director announced in an email to his staff that, at the request of the President, he was stepping down.  After it became clear that Senate Republicans intended to reject Trump's preferred replacement, Ken Cuccinelli, the Administration circumvented the Senate.  On June 10, 2019, Defendant Acting Secretary McAleenan created a brand new position, Principal Deputy Director of USCIS, and installed Mr. Cuccinelli in that role.  This decision effectively demoted Mark Koumans, who was already serving as Acting Director, and replaced him with Mr. Cuccinelli.

298.   These maneuvers deviated from the customary practices of Presidents with regard to the appointment of acting officials, and are contrary to the typical requirements for Senate approval.

299.  Furthermore, President Trump installed an acting USCIS Director with a record of animus and disregard towards immigrants consistent with his own views.  In his prior role as a state legislator, Mr. Cuccinelli advocated for extreme restrictions on immigration, including limitations on birth right citizenship.  Mr. Cuccinelli later likened immigration policy to animal control measures, complaining that Washington D.C.'s animal control policies were worse than U.S. immigration policies because, "You can't break up rat families."

300.  This leadership turnover served to fast-track a pre-ordained Rule sought by the President, regardless of its lawfulness.  This manipulation of agency leadership has occurred alongside undue White House meddling in the rulemaking process.

301.  The process has been driven by White House political calculations and a strategy focused on inflaming racial animosities within the electorate and reducing the political influence of historically underrepresented minorities, rather than adhering to established law and sound rulemaking.

302.  According to emails from senior federal officials obtained via the Freedom of Information Act, the Public Charge Rule originated directly from the White House.  Trump administration senior advisor Stephen Miller reportedly maintained a "singular obsession" with the Rule.  According to these emails, Mr. Miller urged DHS to rush to release the rule, complaining that the agency's deliberative process timeline was "unacceptable," and stating, "I don't care what you need to do to finish it on time."

303.  The end result is a flawed Rule that radically upends the longstanding definition of public charge and weaponizes it against non-wealthy minorities of color.

304.  The Rule resulting from this improper process violates the Equal Protection Clause under *United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973).

305.  The Administration has identified a politically unpopular minority, namely non-White, Non-European immigrants, and has instituted a Public Charge Rule that punishes this class of individuals without advancing its stated purposes—i.e., ensuring that immigrants are productive and capable of self-sufficiency and minimizing incentives for immigrating to the United States because of the availability of public benefits.  As discussed earlier, the Rule will

impact a substantial number of immigrants who are capable of working and contributing meaningfully to the economy; indeed, in many cases, the impacted individuals already have been productive participants in the Plaintiffs' economies and communities.  Furthermore, the Rule's chilling effect will harm a larger class of predominantly non-White, non-European immigrants who work in critical sectors and—like many low- and moderate-income U.S.-born citizens—rely on non-cash public benefits programs designed to safeguard the health and well-being of the general population.

306.  Various factors in the Rule do not rationally operate to further the purpose of the INA's public charge test.  In combination with evidence of improper manipulation of agency processes, this suggests that the Rule's rationale is pretextual.  *See Dep't. of Commerce v. New York*, 139 S.Ct. 2551 (2019).

307.  For example, the bright-line income thresholds do not meaningfully identify individuals who are productive and capable of self-sufficiency.  This is particularly true given the evidence of immigrants' upward mobility, and how the Rule would impact immigrant students in colleges and universities.

308.  Additionally, the manner in which the Rule treats public benefits is not reasonably connected with the purpose of the public charge test.  The Rule penalizes the mere application for benefits.  The Rule also penalizes receipt of public benefits even if they represent a small percentage of a worker's income or were needed for a material reason, such as to facilitate the treatment of an acute medical condition or following a loss of a job until starting a new one.

309.  For these reasons, the Rule does not rationally advance the purpose of the public charge test, as enacted by Congress.

**FIRST CLAIM FOR RELIEF**
**(VIOLATION OF APA; 5 U.S.C. § 706—CONTRARY TO LAW, INA AND IIRIRA)**

310.  Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

311.  The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

312.  The Rule's broad and novel interpretation of the term "public charge" is contrary to the meaning of the statutory term, and will exclude immigrants on public charge grounds in a manner that is inconsistent with the public charge statute, 8 U.S.C. § 1182(a)(4), and 8 U.S.C. § 1183a.

313.  By heavily weighting factors such as an immigrant's likelihood of receiving public benefits and imposing strict income thresholds, Defendants exceeded their statutory authority under the IIRIRA, making some factors effectively determinative in isolation, contrary to the IIRIRA's clear requirement that multiple factors be considered.

314.  By changing the weight traditionally given to legally enforceable affidavits of support filed by qualifying sponsors on behalf of intending immigrants, as required under the IIRIRA, Defendants have improperly reduced the significance of what Congress deemed substantial assurances that avert a finding of inadmissibility.

315.  Applying a public charge condition, which is essentially a public charge determination, to non-immigrant visa holders who are seeking to change or extend their visas is not grounded in any statutory authority.

316.  By promulgating this Rule, Defendants have acted contrary to the INA and the IIRIRA.  In doing so, Defendants have taken action in violation of the APA.  The Rule is therefore invalid.

**SECOND CLAIM FOR RELIEF**
**(VIOLATION OF APA; 5 U.S.C. § 706—CONTRARY TO LAW, SECTION 504 OF THE REHABILITATION ACT)**

317.  Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

318.  The Public Charge Rule conflicts with Section 504 of the Rehabilitation Act of 1973, which prohibits "any program or activity receiving federal financial assistance" or any "program or activity conducted by any Executive agency," from excluding, denying benefits to, or discriminating against persons with disabilities.  29 U.S.C. § 794.  This includes programs and activities conducted by DHS or receiving Federal financial assistance from DHS.  6 C.F.R. § 15.30.

319.   In relevant part, Section 504 requires DHS to refrain from disability discrimination, ensure program access, provide applicants with reasonable accommodations, and refrain from utilizing discriminatory criteria or methods of administration in its programs and activities or in any contractual licensing, or other arrangement.  6 C.F.R. §§ 15.30(b), 15.49.

320.   The Public Charge Rule's new criteria will discriminatorily screen out applicants on the basis of disability and deny them an equal opportunity to participate in admission and naturalization processes.

321.   By promulgating this new Rule, Defendants have acted contrary to the Section 504 of the Rehabilitation Act, and in doing so, violate the APA.  The Rule is therefore invalid.

## THIRD CLAIM FOR RELIEF
### (VIOLATION OF APA; 5 U.S.C. § 706—CONTRARY TO LAW, STATE HEALTHCARE DISCRETION)

322.   Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

323.   Congress has given states the option to cover, with regular federal matching dollars, lawfully residing children and pregnant women under Medicaid and CHIP during their first five years in the U.S.  Section 214 of the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA), Pub. L. No. 111-3, 123 Stat. 8.

324.   The Public Charge Rule will effectively deprive Plaintiffs of their statutory option to extend program eligibility to this group.

325.   Congress also specifically authorized Plaintiffs to make their own eligibility determinations for state public benefits for qualified aliens, nonimmigrants, and aliens paroled into the United States for less than a year.  8 U.S.C. §§ 1612, 1613, 1621(d), 1622(a); 7 U.S.C. § 2016(i).

326.   The Public Charge Rule will effectively deprive Plaintiffs of their statutory option to provide healthcare and nutrition benefits to these immigrants.

327.   Defendants' improper attempt to reinterpret the INA disrupts the cooperative federalism that characterizes the Medicaid program and interferes with Plaintiffs' authority to regulate their internal public welfare administration.

57

328.  By promulgating this new Rule, Defendants have acted contrary to federal laws, and in doing so, violate the APA.  The Rule is therefore invalid.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
**(VIOLATION OF APA; 5 U.S.C. § 706—ARBITRARY AND CAPRICIOUS)**

329.  Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

330.  The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary," "capricious," or an "abuse of discretion."  5 U.S.C. § 706(2)(A)

331.  The Public Charge Rule is arbitrary and capricious and an abuse of discretion because Defendants have relied on factors that Congress did not intend, failed to consider important aspects of the problem the agency is addressing, and has offered no explanation for the Rule that is consistent with the evidence that is before the agency.  *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983).

332.  Although DHS may change its policies within statutory limits, the agency must "provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).  Even if the Rule were consistent with the INA—and it is not—Defendants fail to provide the necessary "satisfactory explanation" for their proposed changes to the public charge determination.  *See State Farm*, 463 U.S. at 43.

333.  Further, if an agency relies on contradictory factual findings, the justification for the changed policy must be "more detailed."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).   The Rule contains numerous contrary factual findings, but lacks sufficient detail in a number of respects to justify the massive changes in the Rule.

334.  Defendants failed to comply with Executive Orders 12866 and 13563, which require agencies to "assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits."

335.  Defendants failed to adequately assess, among other things, the actual costs to the Nation, its States, and communities from increasing the poverty of families and U.S. citizen children, in violation of the APA.

58

336.   The government departed significantly from its normal procedures in adopting the Public Charge Rule.

337.   Because Defendants' new Rule is arbitrary, capricious, and an abuse of discretion, the Rule is invalid.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF FIFTH AMENDMENT**
**(DUE PROCESS—EQUAL PROTECTION BASED ON RACE)**

338.   Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

339.   The Due Process Clause of the Fifth Amendment of the U.S. Constitution prohibits the federal government from denying equal protection of the laws.

340.   The Fifth Amendment also prohibits federal officials from acting with a discriminatory intent or purpose.

341.   As set forth above, the Public Charge Rule was motivated by improper discriminatory intent and bias against non-White immigrants.  Accordingly, judicial deference to Defendants' decision to adopt the Rule is not justified.

342.   The government departed significantly from its normal procedures in adopting the Public Charge Rule.

343.   The history, procedure, substance, context, and impact of the decision to adopt the Public Charge Rule all demonstrate that the decision was motivated by discriminatory animus against non-White immigrants.  Because it was motivated by a discriminatory purpose, the adoption of the Rule violates the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF FIFTH AMENDMENT**
**(DUE PROCESS—EQUAL PROTECTION BASED ON UNCONSTITUTIONAL**
**ANIMUS)**

344.   Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

59

345.   The classification here further violates equal protection principles because defendants adopted it to harm a politically unpopular group and advance unconstitutional animus, and therefore, it is without a permissible, rational basis.

346.   The reasons offered by Defendants in the preamble of the Rule are unfounded and pretextual.

347.   Defendants' equal protection violation causes ongoing harm to Plaintiffs and their residents, as discussed above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.   Issue a declaratory judgment that the Rule is contrary to the law;

2.   Issue a declaratory judgment that the Rule exceeds Defendants' statutory authority;

3.   Issue a declaratory judgment that the Rule is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedures Act;

4.   Issue a declaratory judgment that the Rule violates the Equal Protection Clause;

5.   Postpone the effective date of the Rule, pending judicial review, pursuant to 5 U.S.C. § 705;

6.   Hold unlawful and set aside the Rule, pursuant to 5 U.S.C. § 706(2);

7.   Permanently enjoin implementation of the Rule;

8.   Award Plaintiffs costs, expenses, and reasonable attorneys' fees;

9.   Award such other relief as the Court deems just and proper.

///

///

///

Complaint for Declaratory and Injunctive Relief

1

2    Dated:  August 16, 2019                              Respectfully Submitted,

3    KARL A. RACINE                                       XAVIER BECERRA
     Attorney General for the District of Columbia        Attorney General of California
4    JIMMY ROCK                                           MICHAEL L. NEWMAN
     Acting Deputy Attorney General                       Senior Assistant Attorney General
5                                                         CHEROKEE D.M. MELTON
     /s/ Valerie M. Nannery                               Supervising Deputy Attorney General
6    VALERIE M. NANNERY                                   JENNIFER C. BONILLA
     Assistant Attorney General                           LISA CISNEROS
7    441 4th Street, N.W., Suite 630 South                WILLIAM DOWNER
     Washington, DC 20001                                 REBEKAH FRETZ
8    Tel (202) 442-9596                                   KATHERINE LEHE
     Fax (202) 730-1465                                   MARISSA MALOUFF
9    jimmy.rock@dc.gov                                    JULIA HARUMI MASS
     valerie.nannery@dc.gov                               ERANDI ZAMORA
10   Attorneys for Plaintiff District of Columbia         ANITA GARCIA VELASCO
                                                          BRENDA AYON VERDUZCO
11
     JOSH SHAPIRO                                         /s/Anna Rich
12   Attorney General for the Commonwealth of             Anna Rich
     Pennsylvania                                         Deputy Attorneys General
13   MICHAEL J. FISCHER                                   Attorneys for Plaintiff State of California
     Chief Deputy Attorney General
14
     /s/ Aimee D. Thomson                                 ELLEN ROSENBLUM
15   AIMEE D. THOMSON*                                    Attorney General of Oregon
     Deputy Attorney General
16   1600 Arch St., Suite 300                             /s/Nicole DeFever
     Philadelphia, PA 19103                               NICOLE DEFEVER
17   Tel (267) 940-6696                                   MICHAEL KRON
     athomson@attorneygeneral.gov                         Assistant Attorney General
18   Attorneys for Plaintiff Commonwealth of              Oregon Department of Justice
     Pennsylvania                                         100 SW Market Street
19                                                        Phone: (971) 673-1880
     * Application for admission pro hac vice             Fax: (971) 673-5000
20   forthcoming                                          Scott.Kaplan@doj.state.or.us
                                                          Attorneys for Plaintiff State of Oregon
21
     AARON M. FREY
22   Attorney General of Maine

23   /s/ Susan P. Herman
     SUSAN P. HERMAN*
24   Deputy Attorney General
     6 State House Station
25   Augusta, Maine 04333-0006
     Telephone: (207) 626-8814
26   Email: susan.herman@maine.gov
     Attorneys for Plaintiff State of Maine
27
     *pro hac vice pending
28

1

OK2019200893
91142062.docx

Complaint for Declaratory and Injunctive Relief