# Tab 1

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  CHEROKEE DM MELTON
   Supervising Deputy Attorney General
4  JENNIFER C. BONILLA
   LISA CISNEROS
5  JULIA HARUMI MASS
   ANITA GARCIA VELASCO
6  BRENDA AYON VERDUZCO
   ANNA RICH, State Bar No. 230195
7  Deputy Attorneys General
     1515 Clay Street, 20th Floor
8    P.O. Box 70550
     Oakland, CA  94612-0550
9    Telephone: 510-879-0296
     Fax: 510-622-2270
10   E-mail:  Anna.Rich@doj.ca.gov
   *Attorneys for Plaintiff State of California, by and*
11 *through Attorney General Xavier Becerra*

12                 IN THE UNITED STATES DISTRICT COURT

13               FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16 | **STATE OF CALIFORNIA, DISTRICT OF** | CASE NO. CASE NO. 3:19-cv-04975 |
   | **COLUMBIA, STATE OF MAINE,** | |
17 | **COMMONWEALTH OF** | **DECLARATION OF JENNIFER VAN** |
   | **PENNSYLVANIA** and **STATE OF** | **HOOK IN SUPPORT OF PLAINTIFF'S** |
18 | **OREGON,** | **MOTION FOR A PRELIMINARY** |
   | | **INJUNCTION** |
19 |                                    Plaintiffs, | |

20          **v.**

21

22 **U.S. DEPARTMENT OF HOMELAND**
   **SECURITY; KEVIN MCALEENAN,** in his
23 official capacity as Acting Secretary of
   Homeland Security; **U.S. CITIZENSHIP**
24 **AND IMMIGRATION SERVICES;** and
   **KENNETH T. CUCCINELLI**, in his official
25 capacity as Acting Director of U.S. Citizenship
   and Immigration Services**,**

26                                    Defendants.

27

28

I, Jennifer L. Van Hook, declare as follows:

1.      I am Roy C. Buck Professor of Sociology and Demography at the Pennsylvania State University.  I served as director of the Population Research Institute at Penn State from 2011 through 2016 and co-editor of *Demography,* the official journal of the Population Association of America, from 2016-2019.  Currently, I am the director of graduate studies in Sociology at Penn State.  I am also a non-resident fellow at the Migration Policy Institute.

2.      The facts stated herein are of my own personal knowledge, and I could and would competently testify to them.

## EXPERT BACKGROUND

3.      I am trained as a sociologist and demographer.  I obtained a PhD in Sociology in 1996 from the University of Texas at Austin.  I have an M.S. in Sociology from the University of Wisconsin at Madison and B.A. from Carleton College.  After obtaining my PhD, I worked at the Urban Institute on projects related to education and program participation among immigrants.  In 1999, I joined the faculty at Bowling Green State University, and then moved to Penn State University in 2007.

4.      I have over 20 years of research experience analyzing large demographic data sources on topics related to immigration.  My publications have appeared in major sociology and demography journals, including *Demography*, *Journal of Health* and *Social Behavior*, *Social Science and Medicine*, *Sociology of Education*, *Social Forces*, and *American Sociological Review*, and I have received external funding for my work from the National Institutes of Health, the National Science Foundation, the Foundation for Child Development, the Russell Sage Foundation, and the U.S. Census Bureau.  In recognition of my contributions to research, I was awarded the Clifford C. Clogg Award for Mid-Career Achievement in 2016 by the Population Association of America, and I was elected to the Sociological Research Association in 2019.

5.      My work uses demographic methods to estimate the size, characteristics, and dynamics of the foreign-born population.  Since the mid-1990s, my research has focused on the socioeconomic incorporation of immigrants, particularly on public assistance use, poverty, food insecurity, school segregation, and family-level strategies for managing these challenges.  Across

1

multiple journal articles and book chapters, my colleagues and I documented the patterns and trends in public benefit use among immigrant groups in the United States.  One study found that Mexican immigrant women who receive welfare tend to have shorter welfare spells and are more likely to exit welfare for work than their U.S.-born counterparts (Van Hook and Bean 2009).  This study was published in *American Sociology Review*, the flagship journal of the American Sociological Association.  I have attached a true and complete list of all of my publications over the past ten years as Exhibit B to this Declaration (those referenced here are bolded entries in my publication list).

6.      My colleagues and I have also evaluated and improved estimates of the unauthorized foreign-born population.  This line of research resulted in several high-profile publications, including new estimates of the size and heterogeneity of the unauthorized Mexican-born population (Bean et al. 2001); the development of a new method and estimates of foreign-born emigration (Van Hook et al. 2006; Van Hook & Zhang 2011) and coverage error (Van Hook et al. 2014); new assessments of the quality of self-reported data on citizenship and legal status (Van Hook and Bachmeier 2013; Bachmeier, Van Hook and Bean 2014); and monte carlo simulations that tested a variety of legal status imputation approaches (Van Hook et al. 2015). The work on legal status led to important innovations that have enabled researchers at the Migration Policy Institute and elsewhere to produce estimates of the characteristics and geographic distribution of the unauthorized population in greater detail than possible with earlier methods.  Attached is a true and correct copy of my curriculum vitae as Exhibit C to this Declaration, which includes a complete list of my professional publications.

7.      I served as a member of the Census Advisory Committee of Professional Organizations, PAA, from 2008 to 2011.  I also served as an expert for the 2010 Census Demographic Analysis Program (Net International Migration Team) and am currently serving on the 2020 Census Demographic Analysis Program (Net International Migration Team).  In such capacities, I advise the Census Bureau on various issues related to the measurement of population trends and immigrant characteristics.

2

8.      I have also served as an expert witness in *State of New York v. United States Department of Commerce* at the Federal District Court for the Southern District of New York, November 5, 2018.  I provided a written report and live testimony regarding the impact the addition of a question on citizenship will have on the accuracy of the 2020 U.S. Census.

9.      I was asked by Counsel to bring my scientific expertise and experience to bear on the question of the disparate impacts of the Public Charge Rule issued by the Department of Homeland Security on August 14, 2019 (the "Public Charge Rule" or "Rule").  84 Fed. Reg. 41,292.  Based on my experience, training, knowledge, and education, I offer expert opinions on the disparate impact of the Public Charge Rule.  I hold my opinions in this case to a strong degree of professional certainty.

## SUMMARY OF OPINIONS

10.     My analyses of the disparate impact of the public charge Rule focuses primarily on the aspects of the Rule related to the Totality of Circumstances (TOC) test, omitting any public benefit use as a factor.  I use recently-adjusted Lawful permanent residents (LPRs) and legal nonimmigrants (LNI) as a proxy for assessing what their risk level would be were they to adjust under the new public charge Rule.  My analyses point to a number of key findings regarding these noncitizen groups:

### THE UNITED STATES

- Latinos are more likely to be at risk of being deemed inadmissible by the TOC test than Asians and Whites.  Blacks are also more likely to be at risk but to a lesser degree than Latinos.

- Mexicans/Central Americans and, to a lesser degree, those from the Caribbean are much more likely to be at high risk of being deemed inadmissible by the TOC test than those of European origin.  Other groups (South Americans, Middle Easterners/Central Asians, sub-Saharan Africans, and South/East Asians) are also at significantly higher risk than those of European origin, but lower risk than Mexicans/Central Americans and those from the Caribbean.

### STATE OF CALIFORNIA

- Latinos are more likely to be at risk of being deemed inadmissible by the TOC test than Whites.  Blacks and Asians also are more likely to be at risk than Whites, but to a lesser degree than Latinos.

3

- Mexicans/Central Americans are much more likely to be at risk of being deemed inadmissible by the TOC test than those of European origin.  Other groups (South Americans, Middle Easterners/Central Asians, sub-Saharan Africans, and South/East Asians) are also significantly more likely to be at risk than those of European origin, but less likely than Mexicans/Central Americans.

- Members of vulnerable groups (namely the working poor, the disabled, those with limited English proficiency, those living in large households, and the elderly) would face very high risks of being deemed inadmissible by the TOC test.  By definition, nearly all would be at least some risk and two out of five or more may be at high risk because they often have multiple negative factors and few positive factors. The DACA-eligible population is also more likely to be at risk of being deemed inadmissible than the average applicant, but to lesser degree than the groups listed above.

11.  I conducted several sensitivity analyses and found that my findings were robust to alternative measures and specifications.  First, I found that the findings about the disparate impacts of the Rule were consistent regardless of whether or not I included public benefit use as a negative factor in the TOC test.  This suggests that even if potential applicants use public benefits prior to admission (which is unlikely due to non-LPR's ineligibility for most federally funded public benefits), my conclusions are unlikely to be different.

12.  Second, I found that the conclusions regarding the disparate impacts of the Rule are consistent across measures of the risk of inadmissibility.  The share of potential applicants defined to be at "high" risk does vary across measures due to the ambiguousness of the Rule regarding the precise number and combination of factors required for a public charge designation. It is precisely because of this ambiguity that I do not attempt to predict the precise share of individuals who would be deemed inadmissible.  Instead, I confine my opinion to comparisons of the relative risks of inadmissibility designations between groups, and my conclusions about relative risks are consistent regardless of how I measured risk.

13.  Third, I found that the conclusions are robust to the inclusion of other foreign-born groups such as new arrivals LPRs and unauthorized immigrants, in the analysis.  While I found that the share with high, medium, and low risk of inadmissibility differs somewhat depending on which groups are in the analysis, the key findings reported here concerning Latino-White disparities in risk of inadmissibility are consistent regardless of whether I included or excluded

4

the other foreign-born groups in the analysis.  In fact, the Latino-White disparities reported here are conservative relative to the disparities that would be observed had I included the other foreign-born groups in the analysis.

14.  Overall, I have a high degree of confidence in the conclusions that Latinos, Mexicans/Central Americans, and to a lesser degree other non-White and non-European origin groups, are more likely to experience risk of being deemed inadmissible by the TOC test than are Whites and applicants of European origin.  This finding holds for the entire United States and for California.  Vulnerable groups in California—the working poor, the disabled, those with limited English proficiency, those living in large families, the elderly—also face an elevated risk of inadmissibility determinations (I did not provide estimates for these groups for the entire United States).

## OVERVIEW OF ANALYSIS

15.    Under the Immigration and Nationality Act (INA) Section 212(a)(4), inadmissibility based on public charge grounds is currently determined by the statute's "totality of the circumstances" test (TOC), which includes, at minimum, consideration of the following factors: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills.  8 U.S.C. § 1182(a)(4)(B).  The public charge inadmissibility grounds applies when noncitizens are applying for admission to the United States or to adjust to a LPR status.  In addition, DHS currently considers public benefits in public charge determinations that include cash benefits for income maintenance or institutionalization for long-term care, such as General Assistance, Temporary Assistance for Needy Families (TANF), and Social Security Income (SSI).[1]

16.    On October 10, 2018, the U.S. Department of Homeland Security (DHS) issued a Notice of Proposed Rulemaking that proposed to expand the definition of public charge.[2]

17.    On August 14, 2019, the Department for Homeland Security issued the final Rule.[3]

---

[1] Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999).
[2] 83 Fed. Reg. 51,114.
[3] 84 Fed. Reg. 41,292.

5

## I.     THE RULE'S ENUMERATED PUBLIC BENEFITS AND FACTORS

18.     The Rule, among other things, establishes a list of new enumerated public benefit programs (in addition to the previously considered cash benefits) and a set of positive and negative factors that are considered when determining a noncitizen's inadmissibility on public charge grounds.  The Rule is forward-looking and seeks to determine, through the TOC test, not only whether an applicant used an expanded set of public benefits, but also whether they are more likely than not to use public benefits in the future.

### A.     Federally-funded Programs

19.     New federally-funded programs include: (1) Medicaid, with certain exceptions; (2) Supplemental Nutrition Assistance Program (SNAP); (3) Section 8 housing; (4) Section 8 Housing Assistance under the Housing Choice Voucher Program; (5) Section 8 Project-Based Rental Assistance; and (6) Federal Public Housing.

### B.     Heavily-weighted negative factors

(1) Economic Inactivity:  The noncitizen is "not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history, or a reasonable prospect of future employment;"[4]

(2) Public Benefit Use:  The noncitizen has "received or has been certified or approved to receive one or more public benefits, as defined in § 212.21(b) [including Medicaid, Supplemental Nutrition Assistance Program (SNAP), Section 8 housing, Section 8 Project-Based rental assistance, Federal public housing, SSI, and TANF or other state income-support means-tested programs] for more than 12 months in the aggregate within any 36 month period prior to the…application;"[5]

(3) Health Condition:  The noncitizen "has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work; and…is uninsured and has neither the prospect of obtaining private health insurance, or the financial resources to pay for reasonably foreseeable medical costs;"[6] and

(4) Previous Public Charge Finding:  The noncitizen "was previously found inadmissible or deportable on public charge grounds."[7]

---

[4] 8 C.F.R. §212.22(c)(1)(i).
[5] 8 C.F.R. §212.22(c)(1)(ii).
[6] 8 C.F.R. §212.22(c)(1)(iii).
[7] 8 C.F.R. §212.22(c)(1)(iv).

6

**C.    Heavily-weighted positive factors**

(1) Household Income:  The noncitizen has a "household income, assets, or resources, and support…of at least 250 percent of the Federal Poverty Guidelines [(FPG)];"[8]

(2) Employment Income:  The noncitizen is authorized to work and is currently employed in a legal industry with an annual income…250 percent of the Federal Poverty Guidelines [(FPG)] for the [applicant's] household size;";[9] and

(3) Private Insurance:  The noncitizen "has private health insurance…private health must be appropriate for the expected period of admission, and does not include health insurance for which the [applicant] receives subsidies in the form of premium tax credits under the [ACA]."Coverage by private health insurance, not purchased with ACA subsidies like premium tax credits.[10]

**D.    Additional Factors & Considerations**

20.    Additionally, pursuant to the statute, age, health, family status, assets, resources, and financial status, and education and skills must also be considered when determining whether an applicant is "more likely than not" to become a public charge in the future.[11]  The weight given to these factors when compared to the new list of heavily weighted negative/positive factors is unclear.

21.    The Rule is ambiguous about the precise number or combination of positive and negative factors that will lead to an applicant being deemed inadmissible, or the degree to which heavily weighted factors are likely to override several other negative or positive factors.  It states: "The presence of a single positive or negative factor, or heavily weighted negative or positive factor, will never, on its own, create a presumption that an applicant is inadmissible as likely to become a public charge or determine the outcome of the public charge inadmissibility determination.  Rather, a public charge inadmissibility determination must be based on the totality of the circumstances presented in an applicant's case."  84 Fed. Reg. 41,295.

**E.    Factors Exempted from Consideration Under Rule[12]**

(1) Public benefits received by family members

---

[8] 8 C.F.R. §212.22(c)(2)(i).
[9] 8 C.F.R. §212.22(c)(2)(ii).
[10] 8 C.F.R. §212.22(c)(2)(iii).
[11] 8 C.F.R. §212.22(b).
[12] The final Rule exempts from consideration the following public benefit programs and

7

(2) Medicaid use by Children under 21 or Pregnant women, including 60 days after[13]

(3) Children's Health Insurance Program (CHIP)

(4) Women, Infants, and Children (WIC) Program

(5) Medicare Part D Low Income Subsidy

(6) ACA Marketplace coverage subsidies[14]

22.      Finally, pursuant to §§207(c)(3) and 209(c) of the Act, 8 U.S.C. §§1157(c)(3), 1159(c), certain categories of noncitizens are exempt from the public charge test, such as refugees and asylees.  The complete list of noncitizens who are not affected by the public charge test is included and attached to this Declaration as Exhibit D.

## II.   STRUCTURE OF ANALYSIS

23.      I was asked by Counsel to bring my scientific expertise and experience to bear on the question of the disparate impacts of the new Rule, particularly its impact on the share of applicants for LPR status who would be at risk of being denied admission (i.e. adjustment) due to the Rule's expanded definition of the meaning of public charge, by race/ethnicity and nationality, for the entire United States and separately for the State of California.  I was also asked to assess the impact on certain vulnerable groups in California:  the elderly, working poor, disabled, limited English proficient, those with large household size, and the DACA-eligible population.

## III.   METHODOLOGY

24.      To assess the likely impact of the Rule on the number of immigrants granted LPR status, I followed the approach taken by Capps and his colleagues at the *Migration Policy Institute* (2018) (hereafter the "Capps study").[15]  They analyzed recently-arrived LPRs in the

---

receipt thereof. Some of these benefits were to be considered in the Department's proposed rulemaking issued on October 10, 2018.  In the final Rule, the Department determined that these benefits would not in fact be considered.

[13] 8 C.F.R. §212.21(b)(5)(iv).  Additionally, Emergency Medicaid, Medicaid services provided under the Individuals with Disabilities Education Act (IDEA) and school-based services are also exempt.

[14] With respect to purchase of private insurance as a heavily weighted positive factor, the Rule requires this not be purchased with any ACA premium tax credits.  *See* 84 Fed. Reg. 41,506; 8 C.F.R. §213.1(c)(2).

[15] Capps, Randy, Mark Greenberg, Michael Fix, and Jie Zong.  2018. "Gauging the

8

American Community Survey (ACS) to answer this question.  When they conducted their study, the final Rule had not yet been made public, so they evaluated the likely impacts of the draft of the proposed public charge rule that was leaked in January and March 2018 by *Vox*.[16]  They found that the leaked public charge rule could dramatically change the national origin make-up of immigrants who are granted LPR status.  This would happen because the application of negative and positive factors according to the leaked rule could lead to Latinos being deemed inadmissible more often than other groups.

**A.   Test Group: Potential Applicants**

25.   Counsel asked me to analyze the share of LPR applicants who may be deemed inadmissible due to the application of the Rule.  To do this, I examined the characteristics of those who adjusted as LPRs ("adjustees") over the last five years.  I also included legal nonimmigrants (LNI) in my analysis, which includes temporary visas holders, such as student or special skilled worker visas.  Under the new Rule, LNIs must demonstrate a new condition—that they have not accepted public benefits since their initial admission into the country—when they are seeking to extend their visa status or change their visa category.  Under the old rule, when extending or changing their visas, LNI members were not subject to any public charge determination or condition.  I estimated the percentage of these noncitizens who would be vulnerable to being deemed inadmissible if their case were evaluated under the expanded criteria of the Public Charge Rule, specifically focusing on the TOC test and its several factors, regardless of any public benefits use.  This percentage represents the additional impact of the Public Charge Rule above and beyond any pre-existing admission criteria before 2019.

---

Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration."  Migration Policy Institute: Washington, DC.  https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration.

[16] https://docs.google.com/viewerng/viewer?url=https://cdn.vox-cdn.com/uploads/chorus_asset/file/10188201/DRAFT_NPRM_public_charge.0.pdf and https://apps.washingtonpost.com/g/documents/world/read-the-trump-administrations-draft-proposal-penalizing-immigrants-who-accept-almost-any-public-benefit/2841/

9

### B.   American Community Survey Dataset

26.     I rely primarily on data obtained from the 2013-2017 years of the ACS[17].  The ACS is a very large survey that is continuously conducted by the U.S. Census Bureau across all communities in the United States.  An important strength of the ACS is that it has a very large sample size and therefore supports analyses of recently-adjusted LPRs for the nation as well as for California for small-sized national origin groups. The Capps study also relied on the ACS for this reason.

27.     I limit my analysis to adults age 18 years and older, who compose 90 percent of the sample of adjustees and LNIs[18].  I also limited my analysis to those adjustees who adjusted status in the last five years and had lived in the country no more than ten years, or in the case of LNIs, arrived in the country in the previous five years.  In addition, I exclude from my analysis foreign-born persons who are unlikely to be LPR applicants (i.e., unauthorized immigrants, although there may exist pathways to adjustment for this group under family-based petitions), and those who are exempt from the Public Charge Rule (refugees, asylees, parolees, those admitted under a Special Immigrant Visa, Cuban and Haitian entrants and asylum seekers, TPS, NACARA, American Indians born in Canada, and qualified aliens who had worked in the U.S. for 40 or more quarters).  I was unable to remove other exempt categories (e.g., VAWA, Ameriasians, Special Immigrant Juveniles) because the ACS lacks the information necessary to identify them.  I use the same methodology and computer algorithms as the Migration Policy Institute developed and uses for identifying these groups.[19]  These methods are well documented

---

[17] I downloaded the ACS data from the IPUMS-USA archive (Steven Ruggles, Sarah Flood, Ronald Goeken, Josiah Grover, Erin Meyer, Jose Pacas and Matthew Sobek. IPUMS USA: Version 9.0 [dataset]. Minneapolis, MN: IPUMS, 2019. https://doi.org/10.18128/D010.V9.0).

[18] Sensitivity analyses show no substantive differences in the results for adults versus both children and adults (see Figure 11)

[19] Many of the exempt categories are dropped from my analysis by virtue of the fact that I include only recently-arrived immigrants in my analysis; by definition, this means that most TPS, NACARA, Ameriasians, and qualified aliens are excluded from my sample.  Refugees and asylees are identified as individuals who were born in countries and arrived in years during which over 40% of the immigrants from those country-year combinations were admitted as refugees or over 20% are admitted as asylees, special immigrant visa holders, and Cuban and Haitian entrants (prior to 2017).  Non-immigrants are identified as noncitizens who arrived in the last six years

10

and validated.  I assessed how sensitive the results are to the decision to exclude these groups in supplementary analyses by comparing the results with results that do not exclude the likely unauthorized and exempted groups from the sample.  These analyses show that analyses that exclude these individuals produces conservative estimates of Latino-White disparate impacts of the Rule.

28.     After excluding the aforementioned groups, the sample includes a large number of LPRs who adjusted status in the last five years, or in the case of LNI adults, arrived in the United States in the past five years:  106,572 in the entire United States and 26,815 in California.  For brevity, I refer to this group as "potential applicants" as they constitute the pool of people who are likely to have recently adjusted status or who could seek to adjust their status in the near future (such as LNIs).  The large sample sizes make it possible to examine the impact of the Rule with precision by race/ethnicity and national origin for the nation as a whole and for California separately.

**C.     Public Charge Factors Identified**

29.     I created measures that indicate whether potential applicants would be at risk of being classified as having negative and positive factors according to the 2019 Public Charge Rule if they were to apply for LPR status.

---

whose occupations and family/household characteristics are congruent with the eligibility criteria for specific nonimmigrant visa categories, such as foreign-student, diplomat, au pair, and high-tech worker.  For example, foreign students must be enrolled in post-secondary school, not working, not on public assistance, and if married, their spouse must not be employed.  Adjustees, new arrivals, and other (residual) foreign-born are identified using a unique imputation methodology as developed and validated by myself and James D. Bachmeier and used by the Migration Policy Institute for their estimates (Van Hook et al. 2015; Capps, Bachmeier, and Van Hook 2018).  This methodology assigns noncitizens in the ACS an immigration status (adjustee, new arrival, other) by linking the ACS data to the Survey of Income and Program Participation, which includes a question on immigrants' legal status, using multiple imputation methods.  For a more detailed description of this methodology, see Batalova, Jeanne, Sarah Hooker, and Randy Capps.  2014.  "DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action." Migration Policy Institute:  Washington, DC, available online at https://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

30.     Using the ACS data, I am able to measure the following factors.[20]  It is important to note that ACS survey data is limited by how the questions have been posed or categorized.  I note these parameters below.

### 1.     Heavily-weighted negative factors

(1) The ACS included measures of means-tested public assistance receipt in the past year (TANF or other means-tested income assistance,[21] SSI, and current receipt of Medicaid, or other means-tested health benefits[22]).  Women who gave birth in the past year are not counted as having a negative factor if they receive Medicaid;[23] I did not include food assistance (e.g, SNAP) because the ACS measures food assistance at the household level rather than individual level[24] and the Public Charge Rule specifies that individual receipt—not receipt of benefits by family members—is to be considered. *Because most noncitizen applicants are ineligible for all of the federally funded public benefits programs listed in the Rule, and the limitations of the ACS measures of public assistance that I describe further below, I exclude public benefit use from my main assessment of risk but I do consider SSI,*

---

[20] I exclude the heavily weighted negative factor of having been previously found to be inadmissible or deportable on public charge grounds, as these individuals are not identified in the data sample.

[21]Individuals were asked whether they received "Any public assistance or welfare payments from the state or local welfare office."

[22]The ACS questionnaire asks respondents, whether they received "Medicaid, Medical Assistance, or any kind of government- assistance plan for those with low incomes or a disability."  The ACS data does not provide a breakdown of federally funded Medicaid coverage alone, only whether respondents answered yes or no to that question (subpart d.).  NOTE:  The public charge Rule does not consider state-funded Medicaid receipt or emergency Medicaid as a negative factor, only federally-funded Medicaid.  In addition, Medicaid programs vary across states, and individuals may not be aware of what type of coverage program they are enrolled in—whether it is a state-only or federally-funded program—when responding to this question.  For example, in California, all Medicaid is known as "Medi-Cal," both federally funded Medicaid and state-funded Medicaid.  State-funded Medicaid is made available for undocumented noncitizens under Medi-Cal.

[23] ACS available data does not capture women's pregnancy term or length of coverage during pregnancy.  Data indicate whether a woman gave birth in past year and the age of the child only in years, not months.

[24] The ACS questionnaire asks: "did you or any member of this household receive benefits from the Food Stamp Program or SNAP"?  In contrast, the TANF, SSI, and Medicaid measures are more clearly ascribed to the individual rather than to the individual's family, asking:  When reporting SSI and TANF income, individuals are instructed to report only the share of income that they personally received.  With regard to Medicaid, ACS respondents are asked "is *this person* CURRENTLY covered by…Medicaid, Medical Assistance, or any kind of government-assistance plan for those with low incomes or a disability" (italics added).

12

*TANF, and Medicaid benefit use in my sensitivity analyses below. The Capps study omitted public benefit use in their analysis for the same reason.*

(2) Health condition (having at least one chronic condition or functional limitation[25] and not having private health insurance or an income that is 250% of FPG or greater, not counting public assistance income); and

(3) Economic inactivity (not attending school and not employed or in the armed forces among adults age 16+, excluding persons age 18+ who are the parent of a pre-school child or who live with a parent with one or more functional limitations (primary care givers under the Rule)).

**2.    Other negative factors:**

(1) Low income (<125% of FPG; <100% of FPG for active armed forces personnel and their spouse and children; this measure excludes public assistance income). The Rule indicates that assets for low income applicants would be considered, so I excluded low-income immigrants with assets that could possibly be liquidated in times of need, namely those who own a home free and clear and those who reported more than $2,500 income from investments (at a 4% interest rate, this implies a principle greater than $60,000, which is more than 250% of the FPG for a family of four);

(2) Low skills (having less than a high school degree);

(3) Low English proficiency (speaking English "not well" or "not at all")[26]; the Rule is unclear about the definition of low English proficiency; I used the definition used in the Capps study;

(4) Age-related criteria (being 62 or older and having an income that is less than 125% of the FPG, not counting public assistance income; 100% FPG is used as cut-off for armed services personnel and their spouse and children); and

(5) Large household size (the Rule is unclear about the meaning of large household. I defined large household size as 6 or more persons, which is more than twice the average U.S. household size in 2017, 2.54).

---

[25]These conditions include whether individuals have serious difficulty "concentrating, remembering, or making decisions" (cognitive difficulty), "walking or climbing stairs" (ambulatory difficulty), "doing errands alone such as visiting a doctor's office or shopping" (independent living difficulty), "dressing or bathing" (self-care difficulty), "seeing even when wearing glasses" (vision difficulty), and being deaf or having a hearing difficulty.

[26] ACS measures limited English proficiency by asking respondents who report speaking a language other than English at home to indicate how well they speak English:  "very well," "well," "not well" or "not at all."  Based on these responses, I consider "not well" or "not at all" to indicate low English proficiency.

13

### 3.    Heavily weighted positive factors:

(1) High household income (250% of FPG or higher, excluding public assistance income);

(2) Currently working with individual earnings greater than 250% of FPG for a single adult; and

(3) Private health insurance coverage[27].

### 4.    Three-Tier Inadmissibility Risk Scale

31.    Because the Rule is ambiguous about the number or combination of factors that would lead to an inadmissibility designation, I provide variety of estimates to gauge the disparate impact of the Rule.  First, I present the percentage of each group that would be classified as having each of the negative and positive factors separately.  Second, I developed a three-tiered risk scale (high, medium, low) to summarize the number and weight of positive and negative factors.  This scale gives greater weight to strongly-weighted negative and positive factors than the other negative factors.  It also takes into consideration how positive factors may offset negative factors, and it accounts for the statement in the Rule that a single negative factor would be insufficient for a public charge designation.  The high-risk group is defined as having a combination of at least one heavily weighted negative factor or two more other negative factors, and having no positive factors at all.  As shown in Supplemental Table S1, 10.7 percent of the potential applicants in the high-risk group have a health condition, 31.3 percent are economically inactive, 63.5% are low income, 64.3% are low skilled, and 78.5% have low English proficiency. The medium risk group is defined as having a combination of negative and positive factors or having only one non-heavily-weighted negative factor.  It is unclear whether their positive factors are enough to outweigh their negative factors, so their risk level is uncertain.   This group is less likely to have heavily-weighted negative factors and other negative factors than the high-risk group and has at least one positive factor (38.5% have high household income, 3.9% are working with high earnings, and 70.6% have private health insurance).  Finally, the low-risk group is defined as having no negative factors at all.  This group is also the most likely to have positive

---

[27] With regard to private insurance, ACS data provides when respondent is covered by "Insurance purchased directly from an insurance company (by this person or another family member)."

14

factors (77.7% high household income, 49.0% working with high earnings, and 88.2% have private health insurance).

32.     This three-tiered risk scale has broad categories that are simply intended to differentiate low, medium, and high risk.  Due to the ambiguity of the Rule, it is difficult to predict the share of individuals within each risk category that would be deemed inadmissible by the TOC test.  Because the Rule is unclear about the ways in which negative and positive factors would be considered in combination, however, I also tested alternative measures in sensitivity analyses.

**IV.   ANALYSIS LIMITATIONS**

33.     It is important to note the limitations of the ACS measures.  I was unable to examine credit scores, whether the applicant received a fee waiver, or their relationship to their sponsor, or their sponsor's financial information, because this information was not collected in the ACS.  The ACS also does not contain measures of public benefit use that are consistent with those used by Rule for making a public charge determination.  I was also unable to measure participation in SNAP because, as noted in ¶ 30 above, ACS measures food assistance at the household level rather than individual level.  Additionally, I was unable to measure participation in public housing or rental assistance because the ACS does not collect data on these programs.

34.     Notably important, is that the public assistance/benefits measures do not capture participation in these programs during the 36-month period prior to when noncitizens applied for LPR status.  Instead, the TANF and SSI measures pertain to the 12 months prior to the interview, and the Medicaid measure reflects current health insurance coverage (and is further limited by its grouping with other public health insurance benefits).  This distinction is important because very few adjustees or LNIs would have been eligible to receive federal public assistance prior to their adjustment to LPRs, or under a LNI status.  In fact, it is highly likely that federal public benefit use for the potential applicants in my sample was very low in the 36 months prior to their application.  Apart from refugees and asylees (whom I exclude from my analysis), this group is ineligible for most federally public assistance programs newly listed in the Rule, including all federally funded cash assistance programs (SSI, TANF, General Assistance), SNAP, and

15

Medicaid (although non-LPRs may receive emergency medical services), and federal public housing assistance.  In short, and as noted in the Rule, most potential applicants become eligible for these federal programs enumerated in the Rule only after obtaining LPR status, and even then, many must wait several years before becoming eligible (the specific rules vary by program and state).

### A.   Survey of Income and Program Participation

35.     I conducted supplementary analyses of the 2008 Survey of Income and Program Participation (SIPP) to help illustrate this point.  The SIPP is a small-sized Census survey[28] designed in part to measure public assistance trends for the U.S. population.  I rely on the ACS rather than the SIPP for my main analysis because of ACS's greater sample size.  Nevertheless, the SIPP can provide useful insights about immigrants' welfare history.  One unique feature of the SIPP is that it collects data on when an individual started receiving SNAP, TANF/AFDC, and SSI.  Additionally, the 2008 SIPP included information on whether and when LPRs adjusted status.  I examined the 2008 SIPP to see what percentage of adjustees reported having received any of these types of assistance prior to their year of adjustment to LPR status.  The results confirm that very few adjustees received cash assistance prior to the time of adjustment (0.6 percent AFDC/TANF and 0.9 percent SSI, and neither estimate is significantly different from zero).  A small but statistically significant share reported receiving SNAP (4 percent), which may reflect receipt by eligible household members rather than receipt by the LPR applicant.

### B.   Sensitivity Analysis

36.     I evaluated the sensitivity of the results to the inclusion of public benefit use as a negative factor.  On the one hand, public benefit use is weighted heavily in the Rule, and the Rule will consider whether immigrants have not just received but also "applied for, [or] been certified to receive" public benefits as evidence suggesting a likelihood of future receipt, as well as utilize

---

[28] For example, the 2008 SIPP interviewed 10,501 individuals in its first wave.  While this sample size is typical among social science surveys (and large compared with most public opinion polls), it is small relative to the ACS, which samples about 1 percent of the U.S. population, over 3 million individuals, every year. The large sample size of the ACS is the primary reason I use it for my primary analyses.

this as a negative evaluation of their financial status, 8 C.F.R. § 212.22(b)(4)(i)(E); 8 C.F.R. § 212.21(e).  On the other hand, the ACS does not adequately capture public benefit receipt in the precise time period specified by the Rule and is therefore not a good data source to evaluate the share of applicants who would be found to have used public benefits for 12 months of the last 36 months prior to application.  It is for this reason that I confine my analysis to the disparate impacts of the forward-looking TOC portion of the Rule.  Moreover, my analysis of the SIPP data suggests that immigrants' use of federal public benefits prior to their adjustment, was very rare, and future immigrants are likely to avoid using all public benefits in response to the Rule, including food assistance, public health insurance, and housing assistance, which should drive public benefit use down further still.

37.     Considering the flaws of the ACS public benefits measures, the fact that immigrants are ineligible for public benefits prior to adjustment, and that their use of public benefits during the most relevant time period is likely to be very low, I decided to exclude public benefits use as one of the negative factors in my main assessment of risk.  The Capps study omitted public benefits from their analysis for the same reason.  My estimates therefore represent *conservative* estimates of risk.  However, in supplemental analyses, I provide some estimates of risk that account for immigrants' current use Medicaid and use of TANF and SSI in the previous year in order to test how different the results would be if I were incorrect in my assumption that immigrants do not use public programs prior to their adjustment as LPRs.  These estimates represent *upper-bound* estimates of the impact of the Rule.

38.     As noted above, I also tested the sensitivity of the results to the inclusion of different immigrant status groups in the analysis, and I assessed the sensitivity of the results across different measures of risk of inadmissibility.

**C.     Groups Identified**

39.     Among the noncitizen population sample identified, I distinguish among the following racial-ethnic groups:  Latino, and non-Latino White, Black, and Asian, based on Census racial and ethnic classifications (which does not currently include a category for Middle Eastern/North African).  I also distinguish among the following national origin groups based on

17

the respondent's place of birth:  Mexicans and Central Americans, Caribbeans, South Americans, those from Middle East and Central Asia[29], sub-Saharan Africans, South/East Asians, and those from Europe or countries that were predominately settled by Europeans (Canada and Oceania– i.e., mostly Australia and New Zealand), whom I refer to as "European-origin."  It should be understood that my analysis pertains to groups of noncitizens, as I have identified them above.

40.     Counsel also requested estimates for the following vulnerable groups:  working poor (defined as those in families with at least one fulltime worker yet a family income less than 125% FPG), the disabled (having at least one functional limitation), those with limited English proficiency (speaking English "not very well" or "not at all"), those living in large households (>=6 persons), the elderly (age 65+), and DACA-eligible persons (I used the same definition as used by MPI in their report on the DACA-eligible population[30]).

### D.   Data Sampling

41.     All estimates generated from randomly-selected samples such as the ACS are subject to uncertainty due to sampling variability.  This means that if we were to draw another independent sample of equal size, there is a chance that we would obtain different results. However, we can quantify how much the estimates are likely to vary by calculating standard errors (SE).  Larger standard errors signal more uncertainty about the estimates than smaller standard errors.  I provide standard errors for all of the estimates in a set of appendix tables (A1-A9).[31]

---

[29]Afghanistan, Armenia, Azerbaijan, Bahrain, Cyprus, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Oman, Palestine, Gaza Strip, West Bank, Qatar, Saudi Arabia, Syria, Turkey, United Arab Emirates, Yemen, Pakistan, Republic of Georgia, Kazakhstan, Kirghizia, Tadzhik, Turkmenistan, Uzbekistan, Algeria, Egypt, Libya, Morocco, Sudan, Tunisia, and Western Sahara.

[30] Batalova, Jeanne, Sarah Hooker, and Randy Capps.  2014. "DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action." Migration Policy Institute:  Washington, DC, available online at https://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

[31] I estimated the standard errors using the 80 replicate weights as recommended by the U.S. Census Bureau for the ACS (https://usa.ipums.org/usa/repwt.shtml). I also adjust for uncertainty related to the multiple imputation of immigrants' LPR status using Reuben's Rules (Rubin, D. B. 1987. *Multiple imputation for nonresponse in surveys*. New York, NY: John Wiley and Sons).

18

42.     I use the standard errors to estimate 95 percent confidence intervals, which provide a more intuitive indicator of how much the estimates are likely to vary.  95% confidence intervals can be interpreted as the range within which we are 95% confident that the true value falls.  If we were to draw 100 equal-sized samples, the true value would fall within the 95% confidence interval about 95 times.  I indicate the 95% confidence intervals with error bars for all the estimates shown in Figures 1-9.

43.     I also use the standard errors to compare the characteristics of two groups by conducting "t-tests."  These tests assess the likelihood that two groups are significantly different from one another on a given characteristic and that the difference observed between the groups is not due to sampling variability.  A difference between two groups is considered to be statistically significant if the absolute difference in the estimate is greater than 1.96 times the standard error of the difference, where $SE_{diff} = \sqrt{SE_{group\,1}^2 + SE_{group\,1}^2}$.  I denote with asterisks (*) in the tables the results of t-tests to signify the instances whereby groups are significantly different from a reference group (i.e., Whites in analyses of racial/ethnic differences, and European-origin in analyses of national origin differences).  In analyses of the vulnerable groups (e.g., working poor, disabled, elderly, etc.), I tested whether each group was significantly different from the average applicant given that the different groups overlapped in their membership and there was therefore no common reference group for those analyses.

## RESULTS

### I.     RESULTS FOR THE ENTIRE UNITED STATES POPULATION

44.     Excluding refugees, asylees, and parolees, an average of 383 thousand people adjusted to LPR status each year,[32] cumulating to 1.9 million, over the last five years.  Two-thirds of these adjustees qualified under family-sponsored or immediate relatives of U.S. citizens preferences.  About 37% come from Asia, 19% from Mexico, 22% from other Latin American countries, 15% from Europe, Canada, or Oceania, and 6% from Africa. Additionally, as of FY2016, there were about 2.3 million legal nonimmigrants living in the country.[33]  In what

---

[32]Office of Immigration Statistics, Immigration Yearbook (various years), Table 6.

[33] Baker, Bryan.  2018. Nonimmigrants residing in the United States: Fiscal Year 2016.

19

follows, I provide an assessment of disparate risk posed to these groups of noncitizens posed by the implementation of the Rule.

45.     I first present estimates of the percentage with negative and positive factors by race/ethnicity for potential applicants in Table 1 and Figure 1a.  Recall that the term "potential applicants" here refers to recently-arrived adjustees and LNIs.  Looking first at the heavily weighted negative factors, we see only small racial/ethnic differences.  Latino and Black potential applicants are significantly more likely to have a health condition although the share with a health condition is low for all groups (3.4%, 2.2%, and 1.1% for Latino, Blacks, and Whites, respectively).  Also, Asians are significantly less likely than Whites to be economically inactive, but again, the differences are substantively small.

46.     Turning next to the other negative factors, Latino, Black, and Asian potential applicants are significantly more likely to have low income, be low skilled, low English proficiency, and a large household size compared with Whites.  Latinos are the most likely of the four groups to have these negative factors: 35.7% are low income, 42.3% are low skilled, 53.7% have low English proficiency, and 20.5% have large households; comparable estimates for Whites are, respectively: 21.2%, 4.9%, 10.6%, and 5.1%.  The only negative factor for which racial/ethnic minorities have a significant advantage relative to Whites is that Asians are less likely to be 62 or older, but the share with this age-related negative factor is very low—1.6% or less—for all groups.

47.     With respect to the heavily-weighted positive factors, Latino and Black potential applicants are significantly less likely than Whites to have a household income greater than 250% of FPG (28.6%, 40.6% for Latino and Blacks, respectively, compared with 61.1% among Whites), to work and have earnings above 250% FPG (7.6%, 12.5%, and 33.2% for Latino, Blacks, and Whites, respectively), and to have private health insurance (33.2%, 57.7%, and 80.3% for Latino, Blacks, and Whites, respectively).  Asians are much more similar to Whites on these characteristics than are Latinos and Blacks, and are even significantly more likely than Whites to have private health insurance.

Office of Immigration Statistics, Department of Homeland Security.

20

48.     Looking next at the three-tiered inadmissibility risk scale at the bottom of Table 1 and in Figure 1a, 40% of Latino potential applicants are in the high-risk category, meaning that they have no positive factors combined with at least one heavily-weighted negative factor or at least two other negative factors.  This is over three times as high as among Blacks (13%), and about eight times higher as among Asians (5%) and Whites (6%).  Only 22% of Latino potential applicants are in the low-risk category (having no negative factors), compared with 47% among Blacks, 52% among Asians, and 59% among Whites.  This means that about four out of five Latinos would experience at least some risk of being deemed inadmissible, and about two out of five would face high risk.

49.     To summarize, the data presented in Table 1 and Figure 1a suggests that, even without considering public benefits use, Latino potential applicants would experience the greatest risk of being deemed inadmissible due the implementation of the Rule.  Latino's higher risk is due to their higher likelihood of having other negative factors such as low income, low skills, and low English proficiency, and less often having positive factors to offset the negative factors.  Black potential applicants would experience the next highest risk.  Compared with Latino applicants, they are less likely to be low-skilled and to have low English proficiency, and more often have high incomes and private health insurance.  Finally, Asian and White applicants would experience the lowest risks due to a combination of less often having negative factors and more often having positive factors.

50.     I next present estimates of risk by national origin for the entire United States in Table 2 and Figure 2a.  The patterns are similar to the results for racial-ethnic groups because of the way that racial/ethnic categories tend to overlap with world regions.  One benefit of breaking out the results by national origin, however, is that it permits a separate evaluation of Middle Eastern and South Asian potential applicants, many of whom are classified as "White" in the ACS's racial-ethnic classification.

51.     With regard to the heavily-weighted negative factors, and like the results in Table 1, very few potential applicants have health conditions, and all non-European groups, except those from the Caribbean, are either less likely than European-origin applicants to be economic

21

inactive or are no different from them.  Those from the Caribbean are more likely than European-origin applicants to be economically inactive by about five percentage points.  Additionally, all non-European groups are significantly more likely to have low income, low skills, low English proficiency (except sub-Saharan Africans, many of whom come from English-speaking countries), and a large household size compared with applicants of European origin.  Applicants from Mexico/Central America stand out as particularly low income (38.2%), low skilled (49.5%), low English proficient (58.1%), and likely to live in large households (23.0%).  For European-origin applicants, these figures are, respectively:  16.2%, 4.2%, 7.5%, and 4.9%.  Middle Eastern/Central Asian applicants also are likely to have low household income (36.3%).

52.      Non-European-origin groups are also significantly less likely than potential applicants of European origins to have heavily-weighted positive factors.  Applicants from Mexico/Central America and the Caribbean stand out as among the least likely to have a household income greater than 250% of FPG, to work with earnings above 250% FPG, and to have private health insurance.  South/East Asians are the most advantaged among the non-European groups (for example, their rate of private health insurance coverage is not statistically different from European-origin applicants), but they are still significantly less likely to have high household income and earnings than European-origin applicants.

53.      Considering the three-tiered risk scale (Figure 2a), all of the non-European-origin groups are significantly more likely to be at the high-risk categories of being deemed inadmissible, and significantly less likely to be in the low-risk category, compared with European-origin applicants.  Mexicans/Central Americans would face the highest risks under the Rule.  45% are in the high-risk category and only 17% are in the low-risk category.  Caribbean applicants also experience high risk of being deemed inadmissible; 26% are in the high-risk category, and only 31% are in the low-risk category.  Applicants from South/East Asia experience lower risk (5% are high-risk and 53% are low-risk).  Finally, European-origin applicants face the lowest risk (4% are high-risk and 64% are low-risk).

54.      Overall, the results in Table 2 and Figure 2a suggest that potential applicants from Europe, Canada, or Oceania (i.e., Australia and New Zealand) would experience the least risk of

22

being deemed inadmissible due the implementation of the Rule due to the TOC test.  In contrast, Mexicans and Central Americans would experience the greatest risk.

55.     To summarize, my analysis finds that in the United States, even without accounting for public benefit use, Latinos and Mexican/Central Americans are at substantially higher risk for being deemed inadmissible under the Rule compared with Whites and European-origin applicants.  They are at higher risk not so much because they are more likely to have heavily-weighted negative factors, but rather because they are more likely to have multiple "other" negative factors and they have few heavily-weighted positive factors to offset these negative factors.  Other groups would also be impacted by the Rule, but to a lesser degree, including Blacks, Asians, Caribbeans, South Americans, sub-Saharan Africans, and Middle Easterners and Central Asians.  The risks faced by these groups may be even higher than depicted here because the ACS does not permit me to measure all of the positive and negative factors.

## II.     RESULTS FOR CALIFORNIA

56.     Over the past five years, about 432 thousand Californians adjusted to LPR status, not counting refugees and asylees.[34]  About 52% come from Latin America and 37% from Asia.  Additionally, as of FY2016, there were about 410 thousand legal nonimmigrants living in the state.[35]  Below, I provide an assessment of disparate risk posed to these groups by the Rule.

57.     Table 4 and Figure 4a shows the percentages of potential applicants in California with negative and positive factors by race/ethnicity.  There are small racial/ethnic differences on the heavily weighted negative factors that I was able to measure.  Latinos potential applicants are significantly more likely to have a health condition although the share with a health condition is 4% or less for all groups.  Also, Latinos and Asians are significantly more likely than Whites to be economically inactive, but the differences (about 3 percentage points in each case) are substantively small.

---

[34] Office of Immigration Statistics. Profiles on Legal Permanent Residents: State (2013-2014, 2015, 2016, and 2017)

[35] Baker, Bryan.  2018. Nonimmigrants residing in the United States: Fiscal Year 2016. Office of Immigration Statistics, Department of Homeland Security.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



Figure 4a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule* By Race/Ethnicity, California

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.

19   58.     Turning next to the other negative factors, Latino, Black, and Asian potential

20  applicants tend to be more likely to have other negative factors compared with Whites, including

21  low income (Latinos and Blacks), low skills (Latinos, Blacks, and Asians), low English

22  proficiency (Latinos and Asians), and large households (Latinos, Blacks, and Asians).  Latinos

23  are the most likely of the four groups to have these negative factors:  40.5% are low income,

24  52.4% are low skilled, 61.6% have low English proficiency, and 28.0% have large households;

25  comparable estimates for Whites are, respectively: 21.8%, 3.9%, 9.0%, and 4.8%.  There were no

26  significant racial/ethnic differences in the share with the age-related negative factor.

27   59.     Of all four racial/ethnic groups, Latinos are also the least likely to have heavily-

28  weighted positive factors.  They are significantly less likely than Whites to have a household

24

income greater than 250% of FPG (23.4% versus 64.2% among Whites), to work and have earnings above 250% FPG (3.9% versus 36.9% among Whites), and to have private health insurance (26.0% versus 80.0% among Whites). Blacks are the second-most disadvantaged group and Asians are more similar Whites on these characteristics, although they too show significant disadvantages relative to Whites on all three positive factors.

60.     Looking next at the three-tiered risk scale (Figure 4a), 48% of Latino potential applicants are in the high-risk category, meaning that they have no positive factors combined with at least one heavily-weighted negative factor or at least two other negative factors. This is over four times as high as among Blacks (11%), Asians (8%) and Whites (6%). Only 15% of Latino potential applicants are in the low-risk category (having no negative factors), compared with 50% among Blacks, 49% among Asians, and 61% among Whites. This means that about 85% of Latinos would experience at least some risk of being deemed inadmissible, and about half would face high risk due to the application of the TOC test.

61.     To summarize, the data presented in Table 4 and Figure 4a suggests that in California, Latino potential applicants would experience the greatest risk of being deemed inadmissible due the implementation of the Rule. Latino's higher risk is due not because they are more likely to have heavily-weighted negative factors, but rather because they are more likely to have multiple other negative factors such as low income, low skills, and low English proficiency, and they less often have positive factors to offset the negative factors.

62.     I next present estimates of risk by national origin for California in Table 5 and Figure 5a. With regard to the heavily-weighted negative factors, Mexican/Central American and Middle Eastern/Central Asian and South/East Asian applications are more likely to have health conditions than European-origin potential applicants (4.1%, 4.6%, and 1.2% versus 0.6%, respectively), although these differences are substantive small. Also, Mexicans/Central Americans, Middle Eastern/Central Asian, and South/East Asians are more likely—by about four to five percentage points – to be economic inactive than European-origin potential applicants.





Figure 5a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule* By National Origin, California

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.

63.     All non-European groups are also significantly more likely to have low income, low skills, low English proficiency (except sub-Saharan Africans, many of whom come from English-speaking countries).  Applicants from Mexico/Central America stand out as particularly low income (41.7%), low skilled (54.8%), low English proficient (63.6%), and likely to live in large households (29.0%).  For European-origin applicants, these figures are quite a bit lower, 17.1%, 2.8%, 4.7%, and 4.8%, respectively.  Middle Eastern/Central Asian applicants also are the most likely to have low household income (33.9%, versus 17.1% among European-origin applicants).

64.     The non-European-origin groups are also significantly less likely than European-origin potential applicants to have heavily-weighted positive factors.  Applicants from

26

Mexico/Central America and Middle East/Central Asia are among the least likely to have a household income greater than 250% of FPG, to work with earnings above 250% FPG, and to have private health insurance.

65.     Considering the three-tiered risk scale, all of the non-European-origin groups are significantly more likely to be at the high-risk category of being deemed inadmissible, and significantly less likely to be in the low-risk category, compared with European-origin applicants. Mexicans/Central Americans would face the highest risks under the Rule.  Half are in the high-risk category and only 13% are in the low-risk category.  European-origin applicants face the lowest risk (only 3% are high-risk and 67% are low-risk).

66.     Overall, the results in Table 5 and Figure 5a suggest that in California, European-origin potential applicants would experience the least risk of being deemed inadmissible due the implementation of the TOC portion of the Rule, and Mexicans and Central Americans would experience the largest impact.

67.     Finally, I present results for vulnerable groups in California, as requested by Counsel in Table 6 and Figure 6a, namely the working poor, the disabled, those with limited English proficiency, those living in large households, the elderly, and DACA-eligible.  I also included estimates for all potential applicants for comparison purposes.  With respect to the heavily-weighted negative factors, the disabled are very likely to have a health condition combined with the lack of health insurance or low income (53.3%), and both the disabled (59.5%) and elderly (87.9%) have very high rates of economic inactivity.

///

///

///

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



Figure 6a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule* For Designated Groups in California

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.

19   68.   These groups are also likely to have other negative factors, sometimes by

20  definition.  For example, 95.7% working poor have low income (the figure is not 100% because

21  certain groups with household incomes less than 125% FPG are not treated as having a negative

22  factor, such as those in the armed forces and those with assets), 100% of limited English

23  proficient have a "limited English proficiency" negative factor, and 100% of those in a large

24  household have a "large household" negative factor.  Yet many people in these groups have other

25  negative factors too, which further compounds their risk.  For example, 61.6% of the working

26  poor, 66.3% of the disabled, and 56.3% of those in large households, and 70.6% of the elderly

27  also have low English proficiency.

28

DECL. OF JENNIFER VAN HOOK IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-04975

69.     These groups are also less likely to have a positive factor relative to the average applicant, which makes it more difficult to offset their negative factors.  Among the working poor, for example, only 23.2% have private health insurance.  The other groups tend to be somewhat more likely to have high household income, especially the elderly (52.7%, which is higher than the average applicant at 48.3%), but the share who have private health insurance is 31% or less in all cases, compared with 58.9% for the average applicant.

70.     Considering the three-tiered risk scale, members of all of the vulnerable groups are significantly more likely to be in the high-risk category of being deemed inadmissible, and significantly less likely to be in the low-risk category, compared with the average applicant.  The working poor would face the highest risks under the Rule.  Two-thirds are in the high-risk category and virtually none are in the low-risk category.  The disabled, the limited English proficient, those in large families, and the elderly also face high risks, with the share in the high-risk category ranging from 41% to 53%.  DACA-eligible persons are slightly less likely to be in the high-risk category (28%) and much more likely to be in the low-risk category (30%).

71.     To summarize, my analysis finds that in California, Latinos, Mexicans/Central Americans, the working poor, disabled, limited English proficient, those with large families, and the elderly are all at significantly higher risk for being deemed inadmissible under the Rule than other groups, particularly Whites and European-origin applicants.  These disadvantages are largely due to the fact that many of these groups are more likely to have multiple other negative factors such as low income, low skills, low English proficiency and large families, and are less likely to have positive factors such as high household income, high earnings, and private health insurance to offset the negative factors.  Of all the racial/ethnic and national origin groups examined, Latinos and Mexicans/Central Americans would be most impacted by the Rule.

III.   SENSITIVITY ANALYSIS

72.     The proceeding analyses assessed the risk of being deemed inadmissible due to the Rule posed to recently-adjusted LPRs and legal nonimmigrants because they represent the pool of people who are most likely to be impacted by the Rule.  How would the assessment change if other groups were included the assessment, namely new arrivals—who could face similar scrutiny

29

when they apply for admission at a foreign consulate—and the unauthorized—some of whom could also seek to adjust their status?  Supplemental Table S2 shows the share in each risk category (excluding public benefit use) by race/ethnicity for three groups:

Group 1:   recently-adjusted LPRs and legal nonimmigrants (just as used in the analyses presented above);

Group 2:   recently-adjusted LPRs, legal nonimmigrants, and new arrivals; and

Group 3:   all recently-arrived foreign-born except for those exempt from the Rule (e.g., refugees and asylees).

73.     Results show some variations across the groups.  Among Latinos, the group for whom I observe the greatest levels of risk, the share in the high-risk category increases as the analysis expands to include new arrivals and other (likely unauthorized) foreign born (39.7%, 41.1%, and 45.0% in Groups 1, 2, and 3, respectively).  Additionally, the difference between Latinos and Whites in the share in the high-risk group increases across groups (24.9%, 31.5%, and 33.3% for Groups 1, 2, and 3, respectively).  This suggests that the results presented in Tables 1-9 and Figures 1-9 represent conservative estimates of the disparate impacts of the Rule.  Had I expanded the analysis to include other potentially-impacted groups rather than focus only on adjustees and LNIs, I would have found even larger shares of Latinos in the high-risk category and even larger disparities between Latinos and Whites in the level of risk.

74.  I also evaluated the sensitivity of the results to the way that risk of inadmissibility is measured, that is, whether current public benefit use is considered and how the positive and negative factors are summarized.  I tested four different measures in Figure 10.  The measures I tested include:

Measure 1:   Number of negative factors (e.g., 1, 2, 3 or more).  This is a simple count of the number of negative factors and is similar to the risk measure in the Capps study.

Measure 2:   Number of negative factors while having no positive factors.  This measure is an elaboration of the first risk measure.  It considers whether the applicant has a positive factor, which could balance out a negative factor. Persons are coded as having no heavily weighted positive factors while having 1, 2, or 3 or more negative factors.

30

Measure 3    <u>No positive factors and at least one heavily negative factor</u>.  This measure focuses only on the heavily weighted factors and ignores the other factors in the TOC test.

Measure 4    <u>Three-tiered risk scale</u> (high, medium, low).  This is the scale developed and used in my analysis.

75.  I constructed two versions of each risk measure, one that includes current public benefit use as a heavily-weighted negative factor, and another that excludes it.  As shown in Figure 10 and Supplemental Table S3, the share of individuals designated as being at risk differs depending on which risk measure is used.  The measures that account for the number of negative factors (measures 1, 2, and 4) tend to show more gradations and higher levels of risk than the dichotomous measure that focuses only on the heavily-weighted factors (Risk Measure 3a and 3b).  Additionally, the measures that account for current public benefit use tend to show higher shares in the high-risk category.  For example, 39.7% of Latinos are classified as being at high risk when public program use is not considered, and this increases to 42.1% when it is.

76.  Nevertheless, all measures – whether they account for public program use or not – show statistically significantly higher levels of risk among Latinos than Whites.  Additionally, Blacks are consistently shown to face moderate levels of risk (more than Whites but less than Latinos), regardless of which measure is used.  Notably, the difference between Whites and Latinos in the share in the high-risk group is nearly identical when public programs are excluded and when they are included.  For example, the Latino-White gap in the high-risk category of the three-tiered risk scale is 34.8 percentage points when public benefits are considered, and 34.1 percentage points when they are not.

## IV.    CONCLUSIONS

77.  My analyses of the disparate impact of the public charge Rule, focusing on the TOC test, on recently-adjusted LPRs and legal nonimmigrants point to a number of key findings:

**The United States:**

- Latinos are more likely to be at risk of being deemed inadmissible by the TOC test than Asians and Whites.  Blacks are also more likely to be at risk but to a lesser degree than Latinos.

31

- Mexicans/Central Americans and, to a lesser degree, those from the Caribbean, are much more likely to be at high risk of being deemed inadmissible by the TOC test than those of European origin.  Other groups (South Americans, Middle Easterners/Central Asians, sub-Saharan Africans, and South/East Asians) are also at significantly higher risk than those of European origin, but lower risk than Mexicans/Central Americans and those from the Caribbean.

**State of California:**

- Latinos are more likely to be at risk of being deemed inadmissible by the TOC test than Whites.  Blacks and Asians also are more likely to be at risk than Whites, but to a lesser degree than Latinos.

- Mexicans/Central Americans are much more likely to be at risk of being deemed inadmissible by the TOC test than those of European origin.  Other groups (South Americans, Middle Easterners/Central Asians, sub-Saharan Africans, and South/East Asians) are also significantly more likely to be at risk than those of European origin, but less likely than Mexicans/Central Americans.

- Members of vulnerable groups (namely the working poor, the disabled, those with limited English proficiency, those living in large households, the elderly) would face very high risks of being deemed inadmissible by the TOC test.  By definition, nearly all would be at least some risk and two out of five or more may be at high risk because they often have multiple negative factors and few positive factors. The DACA-eligible population is also more likely to be at risk of being deemed inadmissible than the average applicant, but to lesser degree than the groups listed above.

78.  I conducted several sensitivity analyses and found that my findings were robust to alternative measures and specifications.  First, I found that the conclusions are robust to the inclusion of other foreign-born groups such as new arrivals LPRs and unauthorized immigrants, in the analysis.  In fact, the Latino-White disparities reported here are conservative relative to the disparities that would be observed had I included the other foreign-born groups in the analysis. Second, I found that the findings about the disparate impacts of the Rule were consistent regardless of whether or not I included public benefit use as a negative factor.  This suggests that even if potential applicants use public benefits prior to LPR adjustment (an unlikely possibility given their ineligibility for most federally funded public benefits), the share in the high-risk group would be slightly larger for most groups and large disparities in inadmissibility would still occur. This also suggests that my assessments of the risk of inadmissibility—which omit public benefit

32

use—are conservative.  Third, I found that the conclusions regarding the disparate impacts of the Rule are consistent regardless of how I summarized the negative and positive factors to measure the risk of inadmissibility.

79.  Overall, I have a high degree of confidence in the conclusions that applicants who are Latinos, Mexicans/Central Americans, and to a lesser degree other non-White and non-European origin groups, are more likely to experience risk of being deemed inadmissible due to the application of totality of circumstances test as described in the Rule than are applicants who are White and of European origin.  This finding holds for the entire United States and for California. Vulnerable groups in California—the working poor, the disabled, those with limited English proficiency, those living in large families, the elderly—also face an elevated risk of inadmissibility determinations (I did not provide estimates for these groups for the entire United States).

80.  A complete list of Figures and Tables corresponding to this analysis and discussed in this report are attached to this Declaration as Exhibit A.


I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on August 26, 2019, in State College, Pennsylvania.


Jennifer L. Van Hook
Roy C. Buck Professor of Sociology
Director, Graduate Program in Sociology
Pennsylvania State University

33

EXHIBIT A

# LIST OF FIGURES AND TABLES

**Figures**

Figure 1a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule, By Race/Ethnicity

Figure 2a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule, By National Origin

Figure 4a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule By Race/Ethnicity, California

Figure 5a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule By National Origin, California

Figure 6a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule, For Designated Groups, California

Figure 10.  Sensitivity Analysis of Risk Measures

Figure 11.  Sensitivity Analysis of the Inclusion of Children in the Analysis

**Tables**

Table 1.  Percentage With Negative and Positive Factors by Race/Ethnicity, Recent Adjustees & Legal Nonimmigrants

Table 2.  Percentage With Negative and Positive Factors by National Origin, Recent Adjustees & Legal Nonimmigrants

Table 4.  Percentage With Negative and Positive Factors by Race/Ethnicity, Recent Adjustees & Legal Nonimmigrants in California

Table 5.  Percentage With Negative and Positive Factors by National Origin, Recent Adjustees & Legal Nonimmigrants in California

Table 6.  Percentage With Negative and Positive Factors for Designated Groups in California

**Supplemental Tables**

*Tables A1 through A9 contain the same information as Tables 1-9, except that they include standard errors for all estimates.*

Supplemental Table S1:   Risk profiles among Recent Adjustees & Legal Nonimmigrants

Supplemental Table S2:   Estimated Risk By Race/ethnicity For Different Immigrant Status Groups

Supplemental Table S3:   Sensitivity Analysis of Risk Measures by Race/Ethnicity

Table A1.  Percentage With Negative and Positive Factors by Race/Ethnicity, Recent Adjustees & Legal Nonimmigrants

Table A2.  Percentage With Negative and Positive Factors by National Origin, Recent Adjustees & Legal Nonimmigrants

Table A4.  Percentage With Negative and Positive Factors by Race/Ethnicity, Recent Adjustees & Legal Nonimmigrants in California

Table A5.  Percentage With Negative and Positive Factors by National Origin, Recent Adjustees & Legal Nonimmigrants in California

Table A6.  Percentage With Negative and Positive Factors for Designated Groups in California



Figure 1a. Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule*, By Race/Ethnicity

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors.  Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.



Figure 2a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule*, By National Origin

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.



Figure 4a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule* By Race/Ethnicity, California

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.



Figure 5a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule* By National Origin, California

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.



Figure 6a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule* For Designated Groups in California

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.



Figure 10.  Sensitivity Analysis of Risk Measures





Table 1. Percentage With Negative and Positive Factors by Race/Ethnicity, Recent Adjustees & Legal Nonimmigrants

|  | Latino | Black | Asian | White |
|---|---|---|---|---|
| Heavily-weighted Negative Factors |  |  |  |  |
| Health Condition | 3.4 * | 2.2 * | 0.8 | 1.1 |
| Economic Inactivity | 15.2 | 13.6 | 14.0 | 14.3 |
|  |  |  |  |  |
| Other Negative Factors |  |  |  |  |
| Low Income | 35.7 * | 29.3 * | 24.8 * | 21.2 |
| Low Skill | 42.3 * | 14.1 * | 6.0 * | 4.9 |
| Low English Proficiency | 53.7 * | 12.5 * | 15.4 * | 10.6 |
| Age >= 62 & Low Income | 1.6 | 1.6 | 0.8 * | 1.3 |
| Large Household Size | 20.5 * | 13.8 * | 6.8 * | 5.1 |
|  |  |  |  |  |
| Heavily-weighted Positive Factors |  |  |  |  |
| High HH Income | 28.6 * | 40.6 * | 58.8 * | 61.1 |
| Earning > 250% FPL | 7.6 * | 12.5 * | 29.5 * | 33.2 |
| Private Health Insurance | 33.2 * | 57.7 * | 83.3 * | 80.3 |
|  |  |  |  |  |
| Three-tiered Inadmissibility Risk Scale |  |  |  |  |
| High | 39.7 * | 13.3 * | 5.4 | 5.6 |
| Medium | 38.6 * | 39.4 * | 42.2 * | 35.7 |
| Low | 21.7 * | 47.2 * | 52.4 * | 58.7 |
|  |  |  |  |  |
| Sample Size | 29,384 | 6,255 | 48,058 | 22,804 |

* significantly different from Whites.
Source:  2013-2017 American Community Survey.
See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Table 2. Percentage With Negative and Positive Factors by National Origin, Recent Adjustees & Legal Nonimmigrants

| | Mexico, Central America | Caribbean | South America | Midddle East, Central Asia | sub-Saharan Africa | South & East Asia | Europe, Canada, Oceania |
|---|---|---|---|---|---|---|---|
| Heavily-weighted Negative Factors | | | | | | | |
| Health Condition | 3.5 * | 4.3 * | 1.7 * | 2.3 * | 1.7 * | 0.8 | 0.7 |
| Economic Inactivity | 14.9 | 19.6 * | 13.6 | 13.2 * | 11.1 * | 14.0 | 14.8 |
| Other Negative Factors | | | | | | | |
| Low Income | 38.2 * | 31.4 * | 23.3 * | 36.3 * | 27.8 * | 24.6 * | 16.2 |
| Low Skill | 49.5 * | 25.5 * | 9.0 * | 6.3 * | 9.8 * | 5.8 * | 4.2 |
| Low English Proficiency | 58.1 * | 36.8 * | 24.7 * | 17.2 * | 8.2 | 15.5 * | 7.5 |
| Age >= 62 & Low Income | 1.4 | 3.3 * | 1.4 | 1.3 | 0.9 | 0.7 * | 1.4 |
| Large Household Size | 23.0 * | 17.8 * | 8.1 * | 8.7 * | 11.6 * | 6.4 * | 4.9 |
| Heavily-weighted Positive Factors | | | | | | | |
| High HH Income | 24.6 * | 33.9 * | 51.0 * | 39.0 * | 45.8 * | 59.2 * | 68.4 |
| Earning > 250% FPL | 5.2 * | 7.4 * | 20.6 * | 15.8 * | 17.7 * | 29.8 * | 39.5 |
| Private Health Insurance | 26.6 * | 45.3 * | 65.4 * | 70.7 * | 62.9 * | 83.9 | 84.5 |
| Three-tiered Inadmissibility Risk Scale | | | | | | | |
| High | 45.3 * | 26.4 * | 11.1 * | 10.2 * | 9.4 * | 5.2 * | 4.1 |
| Medium | 37.6 * | 42.5 * | 41.6 * | 45.2 * | 37.3 * | 42.2 * | 32.3 |
| Low | 17.1 * | 31.1 * | 47.3 * | 44.6 * | 53.3 * | 52.6 * | 63.6 |
| Sample Size | 22,922 | 4,358 | 6,128 | 5,466 | 4,042 | 45,960 | 17,696 |

* significantly different from Europe/Canada/Oceania.
Source: 2013-2017 American Community Survey.
See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Table 4. Percentage With Negative and Positive Factors by Race/Ethnicity, Recent Adjustees & Legal Nonimmigrants in California

|  | Latino | Black | Asian | White |
|---|---|---|---|---|
| **Heavily-weighted Negative Factors** |  |  |  |  |
| Health Condition | 4.0 * | 3.6 | 1.2 | 1.5 |
| Economic Inactivity | 17.2 * | 13.3 | 16.9 * | 14.0 |
|  |  |  |  |  |
| **Other Negative Factors** |  |  |  |  |
| Low Income | 40.5 * | 33.4 * | 21.6 | 21.8 |
| Low Skill | 52.4 * | 11.5 * | 7.9 * | 3.9 |
| Low English Proficiency | 61.6 * | 9.7 | 21.5 * | 9.0 |
| Age >= 62 & Low Income | 1.5 | 1.8 | 1.3 | 1.4 |
| Large Household Size | 28.0 * | 9.4 * | 10.8 * | 4.8 |
|  |  |  |  |  |
| **Heavily-weighted Positive Factors** |  |  |  |  |
| High HH Income | 23.4 * | 46.6 * | 61.5 * | 64.2 |
| Earning > 250% FPL | 3.9 * | 17.6 * | 26.5 * | 36.9 |
| Private Health Insurance | 26.0 * | 64.3 * | 76.2 * | 80.0 |
|  |  |  |  |  |
| **Three-tiered Inadmissibility Risk Scale** |  |  |  |  |
| High | 47.8 * | 11.0 * | 8.3 * | 6.1 |
| Medium | 36.9 * | 39.3 | 42.6 * | 32.5 |
| Low | 15.3 * | 49.7 * | 49.2 * | 61.4 |
|  |  |  |  |  |
| Sample Size | 8,581 | 409 | 13,183 | 4,626 |

* significantly different from Whites.

Source: 2013-2017 American Community Survey.

See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Table 5. Percentage With Negative and Positive Factors by National Origin, Recent Adjustees & Legal Nonimmigrants in California

|  | Mexico, Central America | South America | Midddle East, Central Asia | sub-Saharan Africa | South & East Asia | Europe, Canada, Oceania |
|---|---|---|---|---|---|---|
| Heavily-weighted Negative Factors |  |  |  |  |  |  |
| Health Condition | 4.1 * | 1.2 | 4.6 * | 3.2 | 1.2 * | 0.6 |
| Economic Inactivity | 17.3 * | 11.7 | 18.6 * | 12.7 | 16.9 * | 13.2 |
|  |  |  |  |  |  |  |
| Other Negative Factors |  |  |  |  |  |  |
| Low Income | 41.7 * | 23.5 * | 33.9 * | 27.1 * | 21.6 * | 17.1 |
| Low Skill | 54.8 * | 6.6 * | 7.3 * | 10.5 * | 7.9 * | 2.8 |
| Low English Proficiency | 63.6 * | 19.7 * | 20.2 * | 8.6 | 21.9 * | 4.7 |
| Age >= 62 & Low Income | 1.6 * | 0.7 | 2.8 * | 1.6 | 1.3 | 0.8 |
| Large Household Size | 29.0 * | 7.4 | 7.4 | 8.8 * | 10.8 * | 4.8 |
|  |  |  |  |  |  |  |
| Heavily-weighted Positive Factors |  |  |  |  |  |  |
| High HH Income | 21.8 * | 51.9 * | 43.7 * | 54.6 * | 61.6 * | 71.6 |
| Earning > 250% FPL | 2.8 * | 23.7 * | 16.3 * | 23.7 * | 26.4 * | 44.0 |
| Private Health Insurance | 23.6 * | 69.7 * | 64.6 * | 68.7 * | 76.2 * | 85.6 |
|  |  |  |  |  |  |  |
| Three-tiered Inadmissibility Risk Scale |  |  |  |  |  |  |
| High | 49.8 * | 8.2 * | 14.8 * | 9.7 * | 8.2 * | 3.5 |
| Medium | 36.8 * | 39.7 * | 39.4 * | 33.8 | 43.0 * | 29.7 |
| Low | 13.4 * | 52.1 * | 45.9 * | 56.4 * | 48.8 * | 66.9 |
|  |  |  |  |  |  |  |
| Sample Size | 8,074 | 693 | 1,157 | 419 | 12,712 | 3,694 |

* significantly different from Europe/Canada/Oceania.
Source:  2013-2017 American Community Survey.
See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Table 6. Percentage With Negative and Positive Factors for Designated Groups in California

| | Working Poor | Disabled | Limited English | Large HH | Elderly | DACA Eligible | All Applicants |
|---|---|---|---|---|---|---|---|
| Heavily-weighted Negative Factors | | | | | | | |
| Health Condition | 4.0 * | 53.3 * | 5.3 * | 3.9 * | 17.5 * | 2.0 | 2.3 |
| Economic Inactivity | 12.8 * | 59.5 * | 26.6 * | 23.6 * | 87.9 * | 13.8 | 16.4 |
| | | | | | | | |
| Other Negative Factors | | | | | | | |
| Low Income | 95.7 * | 33.6 * | 39.6 * | 34.9 * | 19.1 * | 40.4 * | 28.5 |
| Low Skill | 51.5 * | 53.7 * | 55.0 * | 46.1 * | 52.4 * | 7.3 * | 22.9 |
| Low English Proficiency | 61.1 * | 66.3 * | 100.0 * | 56.3 * | 70.6 * | 12.6 * | 33.3 |
| Age >= 62 & Low Income | 3.3 * | 12.4 * | 3.2 * | 2.2 * | 21.9 * | 0.0 * | 1.4 |
| Large Household Size | 28.3 * | 27.5 * | 26.8 * | 100.0 * | 36.3 * | 35.8 * | 15.9 |
| | | | | | | | |
| Heavily-weighted Positive Factors | | | | | | | |
| High HH Income | 0.0 * | 36.6 * | 27.6 * | 31.6 * | 52.7 * | 25.1 * | 48.3 |
| Earning > 250% FPL | 0.4 * | 4.2 * | 3.0 * | 1.8 * | 1.0 * | 3.4 * | 20.1 |
| Private Health Insurance | 23.2 * | 22.9 * | 27.6 * | 31.1 * | 17.5 * | 28.8 * | 58.9 |
| | | | | | | | |
| Three-tiered Inadmissibility Risk Scale | | | | | | | |
| High | 65.8 * | 53.3 * | 52.7 * | 46.7 * | 40.5 * | 27.8 * | 21.8 |
| Medium | 33.5 * | 38.6 | 47.3 * | 53.3 * | 57.1 * | 42.3 * | 38.9 |
| Low | 0.7 * | 8.2 * | 0.0 * | 0.0 * | 2.4 * | 29.9 * | 39.3 |
| | | | | | | | |
| Sample Size | 3,814 | 1,208 | 8,422 | 4,066 | 1,279 | 3,278 | 26,815 |

* significantly different from the average potential applicant
Source: 2013-2017 American Community Survey.
See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Supplemental Table S1. Risk profiles among Recent Adjustees & Legal Nonimmigrants

|                                        | High Risk |       | Medium Risk |       | Low Risk |       |
|----------------------------------------|-----------|-------|-------------|-------|----------|-------|
| Heavily-weighted Negative Factors      |           |       |             |       |          |       |
| Health Condition                       | 10.7      | (0.4) | 0.0         | (0.0) | 0.0      | (0.0) |
| Economic Inactivity                    | 31.3      | (0.7) | 23.9        | (0.4) | 0.0      | (0.0) |
| Other Negative Factors                 |           |       |             |       |          |       |
| Low Income                             | 63.5      | (0.8) | 43.5        | (0.6) | 0.0      | (0.0) |
| Low Skill                              | 64.3      | (0.5) | 17.7        | (0.4) | 0.0      | (0.0) |
| Low English Proficiency                | 78.5      | (0.5) | 34.3        | (0.7) | 0.0      | (0.0) |
| Age >= 62 & Low Income                 | 6.1       | (0.3) | 0.6         | (0.1) | 0.0      | (0.0) |
| Large Household Size                   | 29.0      | (0.8) | 15.1        | (0.4) | 0.0      | (0.0) |
| Heavily-weighted Positive Factors      |           |       |             |       |          |       |
| High HH Income                         | 0.0       | (0.0) | 38.5        | (0.5) | 77.7     | (0.3) |
| Earning > 250% FPL                     | 0.0       | (0.0) | 3.9         | (0.1) | 49.0     | (0.3) |
| Private Health Insurance               | 0.0       | (0.0) | 70.6        | (0.5) | 88.2     | (0.2) |
|                                        |           |       |             |       |          |       |
| Sample Size                            | 17,742    |       | 40,888      |       | 47,942   |       |

Standard errors are shown in parentheses.

Source:  2013-2017 American Community Survey.

See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Supplemental Table S2. Estimated Risk By Race/ethnicity For Different Immigrant Status Groups

|  | Latino | Black | Asian | White |
|---|---|---|---|---|
| **Recent Adjustees & LNIs** | | | | |
| High | 39.7 * (0.3) | 22.8 * (0.4) | 13.9 * (0.2) | 14.8 (0.2) |
| Medium | 43.3 * (0.3) | 41.1 (0.4) | 46.9 * (0.3) | 40.8 (0.3) |
| Low | 16.4 * (0.2) | 36.1 * (0.5) | 39.2 * (0.3) | 44.3 (0.3) |
| **Recent Adjustees, LNIs, & New Arrivals** | | | | |
| High | 41.1 * (0.3) | 19.2 * (0.6) | 10.8 * (0.2) | 9.6 (0.3) |
| Medium | 40.5 * (0.3) | 40.0 (0.6) | 45.4 * (0.3) | 39.4 (0.4) |
| Low | 18.4 * (0.3) | 40.8 * (0.6) | 43.8 * (0.4) | 51.0 (0.4) |
| **Recent Adjustees, LNIs, New Arrivals, & other FB** | | | | |
| High | 45.0 * (0.3) | 21.0 * (0.5) | 12.4 * (0.2) | 11.6 (0.3) |
| Medium | 39.1 (0.3) | 40.3 (0.5) | 46.2 * (0.3) | 39.8 (0.4) |
| Low | 16.0 * (0.2) | 38.7 * (0.5) | 41.4 * (0.3) | 48.6 (0.4) |

* significantly different from Whites.
Source:  2013-2017 American Community Survey.

See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors and at least 1 heavily weighted negative factor or multiple other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors.

Supplemental Table S3. Sensitivity Analyses of Risk Measures by Race/Ethncity

| | Latino | | | Black | | | Asian | | | White | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Including public benefits** | | | | | | | | | | | |
| Number of negative factors | | | | | | | | | | | |
| 1+ negative factors | 79.4 | * | (0.4) | 55.9 | * | (1.1) | 48.4 | * | (0.5) | 42.5 | (0.5) |
| 2+ negative factors | 55.7 | * | (0.5) | 24.8 | * | (1.1) | 15.2 | * | (0.5) | 13.2 | (0.5) |
| 3+ negative factors | 32.1 | * | (0.4) | 11.0 | * | (0.6) | 6.3 | * | (0.3) | 4.8 | (0.3) |
| | | | | | | | | | | | |
| Number of negative factors, no negative factors | | | | | | | | | | | |
| 1+ negative factors | 51.1 | * | (0.4) | 26.0 | * | (1.0) | 9.9 | * | (0.3) | 11.1 | (0.4) |
| 2+ negative factors | 40.7 | * | (0.4) | 15.1 | * | (0.8) | 6.0 | | (0.3) | 6.2 | (0.3) |
| 3+ negative factors | 26.1 | * | (0.4) | 7.8 | * | (0.5) | 3.5 | | (0.2) | 3.1 | (0.2) |
| | | | | | | | | | | | |
| No Positive Factors and 1+ heavily-weighted negative | 19.0 | * | (0.3) | 14.1 | * | (0.7) | 5.2 | | (0.3) | 5.8 | (0.3) |
| | | | | | | | | | | | |
| Risk Scale | | | | | | | | | | | |
| High | 42.1 | * | (0.4) | 17.7 | * | (0.9) | 6.6 | | (0.3) | 7.3 | (0.4) |
| Medium | 37.4 | * | (0.5) | 38.2 | * | (0.8) | 41.8 | * | (0.4) | 35.2 | (0.4) |
| Low | 20.6 | * | (0.4) | 44.1 | * | (1.1) | 51.6 | * | (0.5) | 57.5 | (0.5) |
| | | | | | | | | | | | |
| **Excluding public benefits** | | | | | | | | | | | |
| Number of negative factors | | | | | | | | | | | |
| 1+ negative factors | 78.3 | * | (0.4) | 52.8 | * | (1.1) | 47.6 | * | (0.5) | 41.3 | (0.5) |
| 2+ negative factors | 53.3 | * | (0.5) | 20.7 | * | (1.0) | 13.7 | * | (0.5) | 11.5 | (0.4) |
| 3+ negative factors | 28.5 | * | (0.4) | 8.5 | * | (0.6) | 4.8 | * | (0.3) | 3.7 | (0.3) |
| | | | | | | | | | | | |
| Number of negative factors, no negative factors | | | | | | | | | | | |
| 1+ negative factors | 50.3 | * | (0.4) | 24.2 | * | (1.0) | 9.6 | | (0.3) | 10.5 | (0.4) |
| 2+ negative factors | 39.0 | * | (0.4) | 12.3 | * | (0.7) | 5.1 | | (0.2) | 5.0 | (0.3) |
| 3+ negative factors | 23.2 | * | (0.3) | 5.9 | * | (0.5) | 2.6 | | (0.2) | 2.4 | (0.2) |
| | | | | | | | | | | | |
| No Positive Factors and 1+ heavily-weighted negative | 11.2 | * | (0.2) | 7.7 | * | (0.7) | 3.0 | | (0.2) | 3.3 | (0.2) |
| | | | | | | | | | | | |
| Risk Scale | | | | | | | | | | | |
| High | 39.7 | * | (0.4) | 13.3 | * | (0.8) | 5.4 | | (0.2) | 5.6 | (0.3) |
| Medium | 38.6 | * | (0.5) | 39.4 | * | (0.9) | 42.2 | * | (0.4) | 35.7 | (0.4) |
| Low | 21.7 | * | (0.4) | 47.2 | * | (1.1) | 52.4 | * | (0.5) | 58.7 | (0.5) |
| | | | | | | | | | | | |
| Sample Size | 29,384 | | | 6,255 | | | 48,058 | | | 22,804 | |

* significantly different from whites

Table A1. Percentage With Negative and Positive Factors by Race/Ethnicity, Recent Adjustees & Legal Nonimmigrants

| | Latino | | Black | | Asian | | White | |
|---|---|---|---|---|---|---|---|---|
| Heavily-weighted Negative Factors | | | | | | | | |
| Health Condition | 3.4 * | (0.2) | 2.2 * | (0.3) | 0.8 | (0.1) | 1.1 | (0.1) |
| Economic Inactivity | 15.2 | (0.3) | 13.6 | (0.8) | 14.0 | (0.4) | 14.3 | (0.3) |
| | | | | | | | | |
| Other Negative Factors | | | | | | | | |
| Low Income | 35.7 * | (0.5) | 29.3 * | (0.9) | 24.8 * | (0.4) | 21.2 | (0.5) |
| Low Skill | 42.3 * | (0.5) | 14.1 * | (0.8) | 6.0 * | (0.3) | 4.9 | (0.2) |
| Low English Proficiency | 53.7 * | (0.5) | 12.5 * | (0.6) | 15.4 * | (0.5) | 10.6 | (0.4) |
| Age >= 62 & Low Income | 1.6 | (0.1) | 1.6 | (0.2) | 0.8 * | (0.1) | 1.3 | (0.1) |
| Large Household Size | 20.5 * | (0.6) | 13.8 * | (0.6) | 6.8 * | (0.3) | 5.1 | (0.3) |
| | | | | | | | | |
| Heavily-weighted Positive Factors | | | | | | | | |
| High HH Income | 28.6 * | (0.4) | 40.6 * | (0.9) | 58.8 * | (0.4) | 61.1 | (0.6) |
| Earning > 250% FPL | 7.6 * | (0.2) | 12.5 * | (0.6) | 29.5 * | (0.4) | 33.2 | (0.4) |
| Private Health Insurance | 33.2 * | (0.4) | 57.7 * | (1.1) | 83.3 * | (0.4) | 80.3 | (0.6) |
| | | | | | | | | |
| Three-tiered Inadmissibility Risk Scale | | | | | | | | |
| High | 39.7 * | (0.4) | 13.3 * | (0.8) | 5.4 | (0.2) | 5.6 | (0.3) |
| Medium | 38.6 * | (0.5) | 39.4 * | (0.9) | 42.2 * | (0.4) | 35.7 | (0.4) |
| Low | 21.7 * | (0.4) | 47.2 * | (1.1) | 52.4 * | (0.5) | 58.7 | (0.5) |
| | | | | | | | | |
| Sample Size | 29,384 | | 6,255 | | 48,058 | | 22,804 | |

* significantly different from Whites.

Source: 2013-2017 American Community Survey.

See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Table A2. Percentage With Negative and Positive Factors by National Origin, Recent Adjustees & Legal Nonimmigrants

| | Mexico, Central America | Caribbean | South America | Midddle East, Central Asia | sub-Saharan Africa | South & East Asia | Europe, Canada, Oceania |
|---|---|---|---|---|---|---|---|
| **Heavily-weighted Negative Factors** | | | | | | | |
| Health Condition | 3.5 * (0.2) | 4.3 * (0.4) | 1.7 * (0.3) | 2.3 * (0.3) | 1.7 * (0.3) | 0.8 (0.1) | 0.7 (0.1) |
| Economic Inactivity | 14.9 (0.4) | 19.6 * (0.8) | 13.6 (0.7) | 13.2 * (0.6) | 11.1 * (0.8) | 14.0 (0.4) | 14.8 (0.4) |
| **Other Negative Factors** | | | | | | | |
| Low Income | 38.2 * (0.6) | 31.4 * (1.1) | 23.3 * (0.8) | 36.3 * (1.0) | 27.8 * (1.1) | 24.6 * (0.4) | 16.2 (0.6) |
| Low Skill | 49.5 * (0.6) | 25.5 * (1.3) | 9.0 * (0.6) | 6.3 * (0.5) | 9.8 * (0.7) | 5.8 * (0.3) | 4.2 (0.2) |
| Low English Proficiency | 58.1 * (0.5) | 36.8 * (1.2) | 24.7 * (0.9) | 17.2 * (0.7) | 8.2 (0.7) | 15.5 * (0.5) | 7.5 (0.4) |
| Age >= 62 & Low Income | 1.4 (0.1) | 3.3 * (0.4) | 1.4 (0.2) | 1.3 (0.2) | 0.9 (0.2) | 0.7 (0.1) | 1.4 (0.2) |
| Large Household Size | 23.0 * (0.7) | 17.8 * (1.1) | 8.1 * (0.6) | 8.7 * (0.8) | 11.6 * (0.7) | 6.4 * (0.2) | 4.9 (0.2) |
| **Heavily-weighted Positive Factors** | | | | | | | |
| High HH Income | 24.6 * (0.5) | 33.9 * (1.1) | 51.0 * (1.0) | 39.0 * (1.0) | 45.8 * (1.2) | 59.2 * (0.4) | 68.4 (0.7) |
| Earning > 250% FPL | 5.2 * (0.2) | 7.4 * (0.7) | 20.6 * (0.6) | 15.8 * (0.6) | 17.7 * (0.7) | 29.8 * (0.4) | 39.5 (0.6) |
| Private Health Insurance | 26.6 * (0.4) | 45.3 * (1.0) | 65.4 * (0.9) | 70.7 * (1.1) | 62.9 * (1.4) | 83.9 (0.4) | 84.5 (0.6) |
| **Three-tiered Inadmissibility Risk Scale** | | | | | | | |
| High | 45.3 * (0.4) | 26.4 * (1.1) | 11.1 * (0.8) | 10.2 * (0.6) | 9.4 * (0.7) | 5.2 * (0.2) | 4.1 (0.3) |
| Medium | 37.6 * (0.4) | 42.5 * (1.5) | 41.6 * (1.0) | 45.2 * (1.0) | 37.3 * (1.1) | 42.2 * (0.4) | 32.3 (0.5) |
| Low | 17.1 * (0.4) | 31.1 * (1.3) | 47.3 * (0.8) | 44.6 * (1.0) | 53.3 * (1.2) | 52.6 * (0.5) | 63.6 (0.6) |
| Sample Size | 22,922 | 4,358 | 6,128 | 5,466 | 4,042 | 45,960 | 17,696 |

* significantly different from Europe/Canada/Oceania.

Source: 2013-2017 American Community Survey.

See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Table A4. Percentage With Negative and Positive Factors by Race/Ethnicity, Recent Adjustees & Legal Nonimmigrants in California

|  | Latino | | Black | | Asian | | White | |
|---|---|---|---|---|---|---|---|---|
| Heavily-weighted Negative Factors | | | | | | | | |
| Health Condition | 4.0 * | (0.2) | 3.6 | (1.5) | 1.2 | (0.1) | 1.5 | (0.3) |
| Economic Inactivity | 17.2 * | (0.6) | 13.3 | (2.4) | 16.9 * | (0.7) | 14.0 | (0.6) |
| Other Negative Factors | | | | | | | | |
| Low Income | 40.5 * | (1.1) | 33.4 * | (3.5) | 21.6 | (0.6) | 21.8 | (1.0) |
| Low Skill | 52.4 * | (0.7) | 11.5 * | (2.6) | 7.9 * | (0.5) | 3.9 | (0.5) |
| Low English Proficiency | 61.6 * | (0.7) | 9.7 | (2.1) | 21.5 * | (0.7) | 9.0 | (0.7) |
| Age >= 62 & Low Income | 1.5 | (0.2) | 1.8 | (0.8) | 1.3 | (0.1) | 1.4 | (0.3) |
| Large Household Size | 28.0 * | (1.0) | 9.4 * | (2.0) | 10.8 * | (0.6) | 4.8 | (0.5) |
| Heavily-weighted Positive Factors | | | | | | | | |
| High HH Income | 23.4 * | (0.7) | 46.6 * | (3.4) | 61.5 * | (0.7) | 64.2 | (1.1) |
| Earning > 250% FPL | 3.9 * | (0.3) | 17.6 * | (2.6) | 26.5 * | (0.7) | 36.9 | (0.9) |
| Private Health Insurance | 26.0 * | (0.7) | 64.3 * | (2.9) | 76.2 * | (0.7) | 80.0 | (1.3) |
| Three-tiered Inadmissibility Risk Scale | | | | | | | | |
| High | 47.8 * | (0.7) | 11.0 * | (2.0) | 8.3 * | (0.4) | 6.1 | (0.6) |
| Medium | 36.9 * | (0.8) | 39.3 | (3.4) | 42.6 * | (0.7) | 32.5 | (1.1) |
| Low | 15.3 * | (0.6) | 49.7 * | (3.2) | 49.2 * | (0.8) | 61.4 | (1.2) |
| Sample Size | 8,581 | | 409 | | 13,183 | | 4,626 | |

* significantly different from Whites.

Source: 2013-2017 American Community Survey.

See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Table A5. Percentage With Negative and Positive Factors by National Origin, Recent Adjustees & Legal Nonimmigrants in California

| | Mexico, Central America | South America | Middle East, Central Asia | sub-Saharan Africa | South & East Asia | Europe, Canada, Oceania |
|---|---|---|---|---|---|---|
| **Heavily-weighted Negative Factors** | | | | | | |
| Health Condition | 4.1 * (0.3) | 1.2 (0.5) | 4.6 * (1.0) | 3.2 (1.4) | 1.2 * (0.2) | 0.6 (0.2) |
| Economic Inactivity | 17.3 * (0.6) | 11.7 (1.5) | 18.6 * (1.5) | 12.7 (2.3) | 16.9 * (0.7) | 13.2 (0.8) |
| **Other Negative Factors** | | | | | | |
| Low Income | 41.7 * (1.2) | 23.5 * (2.6) | 33.9 * (2.4) | 27.1 * (3.2) | 21.6 * (0.6) | 17.1 (0.9) |
| Low Skill | 54.8 * (0.7) | 6.6 * (1.2) | 7.3 * (1.2) | 10.5 * (2.2) | 7.9 * (0.5) | 2.8 (0.5) |
| Low English Proficiency | 63.6 * (0.8) | 19.7 * (2.2) | 20.2 * (1.7) | 8.6 (2.1) | 21.9 * (0.8) | 4.7 (0.5) |
| Age >= 62 & Low Income | 1.6 * (0.2) | 0.7 (0.7) | 2.8 * (0.8) | 1.6 (0.8) | 1.3 (0.1) | 0.8 (0.2) |
| Large Household Size | 29.0 * (1.0) | 7.4 (1.5) | 7.4 (1.3) | 8.8 * (1.9) | 10.8 * (0.6) | 4.8 (0.6) |
| **Heavily-weighted Positive Factors** | | | | | | |
| High HH Income | 21.8 * (0.7) | 51.9 * (2.8) | 43.7 * (2.3) | 54.6 * (3.4) | 61.6 * (0.7) | 71.6 (1.4) |
| Earning > 250% FPL | 2.8 * (0.2) | 23.7 * (1.9) | 16.3 * (1.4) | 23.7 * (2.9) | 26.4 * (0.7) | 44.0 (1.2) |
| Private Health Insurance | 23.6 * (0.6) | 69.7 * (2.9) | 64.6 * (2.7) | 68.7 * (3.1) | 76.2 * (0.7) | 85.6 (1.1) |
| **Three-tiered Inadmissibility Risk Scale** | | | | | | |
| High | 49.8 * (0.8) | 8.2 * (1.6) | 14.8 * (1.7) | 9.7 * (2.0) | 8.2 * (0.4) | 3.5 (0.4) |
| Medium | 36.8 * (0.8) | 39.7 * (2.6) | 39.4 * (2.2) | 33.8 (3.4) | 43.0 * (0.7) | 29.7 (1.2) |
| Low | 13.4 * (0.5) | 52.1 * (2.7) | 45.9 * (2.1) | 56.4 * (3.2) | 48.8 * (0.8) | 66.9 (1.3) |
| Sample Size | 8,074 | 693 | 1,157 | 419 | 12,712 | 3,694 |

* significantly different from Europe/Canada/Oceania.

Source:  2013-2017 American Community Survey.

See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

Table A6. Percentage With Negative and Positive Factors for Designated Vulnerable Groups in California

| | Working Poor | Disabled | Low English Proficiency | Large HH | Elderly | DACA Eligible | All Potential Applicants |
|---|---|---|---|---|---|---|---|
| **Heavily-weighted Negative Factors** | | | | | | | |
| Health Condition | 4.0 * (0.5) | 53.3 * (2.0) | 5.3 * (0.3) | 3.9 * (0.5) | 17.5 * (1.6) | 2.0 (0.4) | 2.3 (0.1) |
| Economic Inactivity | 12.8 * (0.7) | 59.5 * (2.2) | 26.6 * (1.0) | 23.6 * (1.5) | 87.9 * (1.2) | 13.8 (1.4) | 16.4 (0.5) |
| **Other Negative Factors** | | | | | | | |
| Low Income | 95.7 * (0.5) | 33.6 * (2.1) | 39.6 * (1.3) | 34.9 * (1.6) | 19.1 * (1.8) | 40.4 * (1.4) | 28.5 (0.5) |
| Low Skill | 51.5 * (1.1) | 53.7 * (1.6) | 55.0 * (0.8) | 46.1 * (1.3) | 52.4 * (2.1) | 7.3 * (0.9) | 22.9 (0.4) |
| Low English Proficiency | 61.1 * (1.2) | 66.3 * (2.0) | 100.0 * (0.0) | 56.3 * (1.0) | 70.6 * (1.9) | 12.6 * (1.3) | 33.3 (0.5) |
| Age >= 62 & Low Income | 3.3 * (0.5) | 12.4 * (1.2) | 3.2 * (0.2) | 2.2 * (0.3) | 21.9 * (1.8) | 0.0 * (0.0) | 1.4 (0.1) |
| Large Household Size | 28.3 * (1.2) | 27.5 * (1.9) | 26.8 * (0.9) | 100.0 * (0.0) | 36.3 * (2.5) | 35.8 * (1.1) | 15.9 (0.5) |
| **Heavily-weighted Positive Factors** | | | | | | | |
| High HH Income | 0.0 * (0.0) | 36.6 * (1.7) | 27.6 * (0.8) | 31.6 * (1.0) | 52.7 * (2.0) | 25.1 * (1.1) | 48.3 (0.5) |
| Earning > 250% FPL | 0.4 * (0.1) | 4.2 * (0.7) | 3.0 * (0.3) | 1.8 * (0.3) | 1.0 * (0.2) | 3.4 * (0.4) | 20.1 (0.4) |
| Private Health Insurance | 23.2 * (1.0) | 22.9 * (1.7) | 27.6 * (0.7) | 31.1 * (1.2) | 17.5 * (1.6) | 28.8 * (1.6) | 58.9 (0.6) |
| **Three-tiered Inadmissibility Risk Scale** | | | | | | | |
| High | 65.8 * (1.0) | 53.3 * (2.0) | 52.7 * (0.8) | 46.7 * (1.1) | 40.5 * (2.0) | 27.8 * (1.7) | 21.8 (0.3) |
| Medium | 33.5 * (0.9) | 38.6 (1.8) | 47.3 * (0.8) | 53.3 * (1.1) | 57.1 * (2.0) | 42.3 * (1.5) | 38.9 (0.5) |
| Low | 0.7 * (0.2) | 8.2 * (1.4) | 0.0 * (0.0) | 0.0 * (0.0) | 2.4 * (0.4) | 29.9 * (1.0) | 39.3 (0.5) |
| Sample Size | 3,814 | 1,208 | 8,422 | 4,066 | 1,279 | 3,278 | 26,815 |

* significantly different from the average potential applicant

Source: 2013-2017 American Community Survey.

See text for definitions of negative and positive Factors. High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor, or only one "other" negative factor; Low risk = no negative factors.

EXHIBIT B

# EXHIBIT B

## PUBLICATIONS OF JENNIFER L. VAN HOOK

1.      Van Hook, Jennifer. Forthcoming. "Nominal versus Variable Approaches for Understanding Group Differences." *Ethnic and Racial Studies Review.*

2.      Bélanger, Alain, Patrick Sabourin, Guillaume Marois, and Jennifer Van Hook, and Samuel Vézina. 2019. "A Framework for the Prospective Analysis of Ethno-Cultural Super-Diversity." *Demographic Research.*

3.      Frisco, Michelle L., Jennifer Van Hook, and Robert Hummer. 2019. "Would the Elimination of Obesity and Smoking Reduce U.S. Racial/Ethnic/Nativity Disparities in Total and Healthy Life Expectancy?" *Social Science and Medicine: Population Health.*

4.      Frisco, Michelle L., Molly A. Martin, and Jennifer Van Hook. 2019. "Socioeconomic Status and Acculturation: Why Mexican-Americans are Heavier than Mexican Immigrants and Whites." *Advances in Medical Sociology*, "Immigration and Health". Emerald Publishing Limited, pp. 71-96.

5.      Frisco, Michelle L, Jennifer Van Hook, and Erin Baumgartner. 2019. "The weight of school entry: Weight gain among Latino children of immigrants during the early elementary school years." *Demographic Research* 40 (article 5): 95-120.

6.      Van Hook, Jennifer. 2019. "Counting 11 Million Undocumented Immigrants is Easier Than Trump Thinks." The Conversation, July 18, 2019. https://theconversation.com/counting-11-million-undocumented-immigrants-is-easier-than-trump-thinks-120459.

7.      Van Hook, Jennifer, Susan McHale, and Valarie King. (Eds.). 2018. *Families and Technology.* New York: Springer.

8.      Dondero, Molly, Jennifer Van Hook, Michelle Frisco and Molly Martin. 2018. "Dietary Assimilation among Mexican Children in Immigrant Households: Code-switching and Healthy Eating across Social Institutions." *Journal of Health and Social Behavior* 59(4): 601-624. (PMCID: PMC6495556)

9.      Capps, Randy, Julia Gelatt, Jennifer Van Hook, and Michael Fix. 2018. "Commentary on 'The Number of Undocumented Immigrants in the United States: Estimates Based on Demographic Modeling with Data from 1990-2016.'" PLOS-ONE *13*(9), e0204199. (PMCID: PMC6150498)

10.      Gelatt, Julia, Michael Fix, and Jennifer Van Hook. 2018. "People Leave Footprints: Millions More Unauthorized Immigrants Cannot Be 'Hidden' in Data Estimates." Migration Policy Institute, September 20, 2018. https://www.migrationpolicy.org/news/people-leave-footprints-millions-more-unauthorized-immigrants-cannot-be-hidden

11.      Van Hook, Jennifer. 2018. "Why the 2020 Census Shouldn't Ask About Your Citizenship Status." The Conversation, February 22, 2018. https://theconversation.com/why-the-2020-census-shouldnt-ask-about-your-citizenship-status-91036

12.    Van Hook, Jennifer, Susana Quiros, Molly Dondero, and Claire Altman. 2018. "Healthy Eating Among Mexican Immigrants: Migration in Childhood and Time in the U.S." *Journal of Health and Social Behavior* 59(3): 391-410. (PMCID: PMC6416786).

13.    Randy Capps, James D. Bachmeier, and Jennifer Van Hook. 2018. "Estimating the Characteristics of Unauthorized Immigrants using US Census Data: Combined Sample Multiple Imputation." *The Annals of the American Academy of Political and Social Science* 677(1), 165-179.

14.    Burton, Linda, Damian Burton, Susan McHale, Valarie King, and Jennifer Van Hook. (Eds.). 2017. *Boys and Men in African American Families.* New York: Springer.

15.    Van Hook, Jennifer and Barrett Lee. 2017. "Diversity is on the Rise in Urban and Rural Communities, and it's Here to Stay." The Conversation, February 20, 2017. https://theconversation.com/diversity-is-on-the-rise-in-urban-and-rural-communities-and-its-here-to-stay-69095

16.    Altman, Claire E., Jennifer Van Hook, and Jonathan Gonzalez. 2017. "Becoming Overweight Without Gaining a Pound: Weight Evaluations and the Social Integration of Mexicans in the United States." *International Migration Review* 51(1): 3-36.

17.    McHale, Susan M., Valarie King, Jennifer Van Hook, and Alan Booth. (Eds.). 2016. *Gender and Couple Relationships.* New York: Springer.

18.    Van Hook, Jennifer. 2016. "Counting 11 Million Undocumented Immigrants is Easier Than You Think." The Conversation, November 1, 2016. https://theconversation.com/counting-11-million-undocumented-immigrants-is-easier-than-you-think-67921

19.    Frisco, Michelle L., Susana Quiros, and Jennifer Van Hook. 2016. "One Size May Not Fit All: How Obesity among Mexican-Origin Youth Varies by Generation, Gender, and Age." *Demography* 53(6): 2031–2043. (PMCID: PMC5138860)

20.    Van Hook, Jennifer, Susana Quiros, Michelle Frisco, and Emnet Fikru. 2016. "It is Hard to Swim Upstream: Dietary Acculturation among Mexican-origin Children." *Population Research and Policy Review* 35(2): 177-196. (PMCID: PMC4852553)

21.    Dondero, Molly and Jennifer Van Hook. 2016. "Generational Status, Neighborhood Context, and Mother-Child Resemblance in Dietary Quality in Mexican-origin Families." *Social Science and Medicine* 150: 212-220. (PMCID: PMC4733591)

22.    Altman, Claire E., Jennifer Van Hook, and Marianne Hillemeier. 2016. "What does self-rated health mean? Changes and variations in the association of obesity with objective and subjective components of self-rated health." *Journal of Health and Social Behavior* 57(1): 39-58.

23.    Amato, Paul R., Booth, Alan, McHale, Susan M., & Van Hook, Jennifer (Eds.). 2015. *Families in an Era of Increasing Inequality: Diverging Destinies*. New York: Springer.

24.    Zhou, Nan, Charrisa Cheah, Jennifer Van Hook, Darcy A. Thompson, Shelby S. Jones. 2015. "A Cultural Understanding of Chinese Immigrant Mothers' Feeding Practices: A Qualitative Study." *Appetite* 87: 160-167.

25.     Martin, Molly A., Jennifer Van Hook, and Susana Quiros. 2015. "Is Socioeconomic Incorporation Associated with a Healthier Diet? Dietary Patterns among Mexican-origin Children in the United States." *Social Science and Medicine* 147: 20-29 (PMCID: PMC4689621).

**26.     Van Hook, Jennifer, James D. Bachmeier, Donna Coffman, and Ofer Harel. 2015. "Can We Spin Straw Into Gold? An Evaluation of Immigrant Legal Status Imputation Approaches".** *Demography* **52(1): 329-354. (PMCID: PMC4318768)**

27.     Van Hook, Jennifer, Susana Quiros, and Michelle Frisco. 2015. "The Food Similarity Index: A Dimension of Dietary Acculturation Based on Dietary Recall Data". *Journal of Immigrant and Minority Health* 17(2): 441-449 (PMCID: PMC4378569)

**28.     Bachmeier, James D., Jennifer Van Hook, and Frank D. Bean. 2014. "Can We Measure Immigrants' Legal Status? Lessons from Two U.S. Surveys."** *International Migration Review 48*(2), 538-566. (PMCID:PMC4267286)

**29.     Van Hook, Jennifer, Frank D. Bean, James D. Bachmeier, and Catherine Tucker. 2014. "Recent Trends in Coverage of the Mexican-Born Population of the United States: Results from Applying Multiple Methods Across Time."** *Demography* **51(2): 699-726. (PMCID: PMC24570373)**

30.     Gubernskaya, Zoya, Frank D. Bean, and Jennifer Van Hook. 2013. "(Un)Healthy Immigrant Citizens: Naturalization and Activity Limitations in Older Age" *Journal of Health and Social Behavior* 54(4): 427-443. (PMCID: PMC3969823)

**31.     Van Hook, Jennifer, and James D. Bachmeier. 2013. "How Well Does the American Community Survey Count Naturalized Citizens?"** *Demographic Research* **29(1), 1-32. (PMCID: PMC3783022)**

32.     Van Hook, Jennifer and Claire E. Altman. 2013. "Using Discrete-time Event History Fertility Models to Simulate Total Fertility Rates and Other Fertility Measures." *Population Research and Policy Review* 32(4), 585-610*. (PMCID: PMC3734869)

33.     Tucker, Catherine, and Jennifer Van Hook. 2013. "Surplus Chinese Men: Demographic Determinants of the Sex Ratio at Marriageable Ages in China." *Population and Development Review* 39(2): 209-230. (PMCID: PMC3734869)

34.     Van Hook, Jennifer, Claire Altman, and Kelly Balistreri. 2013. "Global Patterns in Overweight Among Children and Mothers in Less Developed Countries." *Public Health Nutrition* 16(4): 573-581. (PMCID: PMC3422412)

35.     Capps, Randy, Bachmeier, James D., Fix, Michael, & Van Hook, Jennifer. 2013. A demographic, socioeconomic, and health coverage profile of unauthorized immigrants in the United States. Washington, DC: Migration Policy Institute.

36.     Bean, Frank D., Susan K. Brown, Mark A. Leach, James D. Bachmeier, and Jennifer Van Hook. 2013. "Unauthorized Mexican migration and the socioeconomic integration of Mexican Americans." Pp 341-374 in *Diversity and disparities: America enters a new century* (John Logan, Editor). New York: Russell Sage Foundation.

37.     Van Hook, Jennifer, Nancy S. Landale, and Marianne M. Hillemeier. 2013. Is the United States Bad for Children's Health? Risk and Resilience Among Young Children of Immigrants. Washington, DC: Migration Policy Institute.

38.     Bean, Frank D, Brown, Susan K, Leach, Mark A, Bachmeier, James D, & Van Hook, Jennifer. 2013. Unauthorized Mexican Migration and the Socioeconomic Integration of Mexican Americans: research report, US2010: Discover America in a New Century, Russell Sage Foundation.

39.     Cheah, Charissa and Jennifer Van Hook. 2012. "Chinese and Korean Immigrants' Early Life Deprivation: An Important Factor for Child Feeding Practices and Children's Body Weight in the United States." *Social Science and Medicine* 74(5): 744–752. (PMCID: PMC22265872)

40.     Van Hook, Jennifer, Elizabeth Baker, Claire E. Altman, and Michelle Frisco. 2012. "Canaries in a Coalmine: Immigration and Obesity among Mexican-origin Children." *Social Science and Medicine* 74(2): 125–134. (PMCID: PMC3259272)

41.     Van Hook, Jennifer and Claire Altman. 2012. "Competitive Food Sales in Schools and Childhood Obesity: A Longitudinal Study." *Sociology of Education* 85(1): 23-39. (PMCID: PMC3352595)

42.     Glick, Jennifer E. and Jennifer Van Hook. 2011. "Does a house divided stand? Kinship and continuity of shared living arrangements." *Journal of Marriage and the Family* 73(5): 1149–1164. (PMCID: PMC3258516)

43.     Scheitle, Chris, Jenn Buher-Kane, and Jennifer Van Hook. 2011. "Demographic Imperatives and Religious Markets: Considering the Individual and Interactive Roles of Fertility and Switching in Group Growth." *Journal for the Scientific Study of Religion* 50(3): 470-482. (PMCID: PMC3267579)

44.     Balistreri, Kelly Stamper and Jennifer Van Hook. 2011. "Trajectories of Overweight among US School Children: A focus on social and economic characteristics." *Maternal and Child Health Journal* 15(5): 610-619. (PMCID: PMC3193986)

45.     Landale, Nancy S., Kevin J. A. Thomas, and Jennifer Van Hook. 2011. "The Living Arrangements of Children of Immigrants." *The Future of Children* 21(1): 43-70. (PMCID: PMC3241619)

46.     **Van Hook, Jennifer and Weiwei Zhang. 2011. "Who Stays? Who Goes? Selective Emigration Among the Foreign Born." *Population Research and Policy Review* 30(1): 1-24. (PMCID: PMC3367327)**

47.     Van Hook, Jennifer and Michael Fix. 2011. "The Demographic Impacts of Repealing Birthright Citizenship." Pp. 173-186 in *Legal Briefs on Immigration Reform from 25 of the Top Legal Minds in the Country, Volume 1,* edited by Deborah Robinson and Mona Parsa. Robinson Omnimedia Publishing & Studios.

48.     Van Hook, Jennifer and Elizabeth Baker. 2010. "Big Boys, Little Girls: Gender, Acculturation, and Weight among Young Children of Immigrants." *Journal of Health and Social Behavior* 51: 200-214. (PMCID: PMC3245318)

49.     Van Hook, Jennifer. 2010. "Structure and Acculturation: Explaining Outcomes for Children in Mexican American Families " pp. 145-154 in *Growing up Latino: Health and Development of Children of Immigrants*, edited by Nancy S. Landale, Susan M. McHale, and Alan Booth. Washington, DC: Urban Institute Press.

50.     Balistreri, Kelly S. and Jennifer Van Hook. 2009. "Socioeconomic Status and Body Mass Index Among Latino Children of Immigrants and Children of Natives." *American Journal of Public Health* 99(12): 2238-2246. (PMCID: PMC2775779)

51.     Zhang, Yuanting and Jennifer Van Hook. 2009. "Marital Dissolution among Interracial Couples." *Journal of Marriage and the Family* 71: 95-107. (PMCID: PMC4183451)

52.     Van Hook, Jennifer and Frank D. Bean. 2009. "Explaining Mexican-Immigrant Welfare Behaviors: The Importance of Employment Related Cultural Repertoires." *American Sociological Review* 74(3): 423-444. (PMCID: PMC3906684)

53.     Bean, Frank D., Cynthia Feliciano, Jennifer Lee, and Jennifer Van Hook. 2009. "The New U.S. Immigrants: How do they affect our Understanding of the African-American Experience?" *The Annals 621: 202 – 220. (*PMCID: PMC3244721)

54.     Baker, Elizabeth, Kelly S. Balistreri, and Jennifer Van Hook. 2009. "Maternal Employment and Overweight among Latino Children of Immigrants and Children of Natives." *Journal of Immigrant and Minority Health* 11(3): 158-167 (PMCID: PMC3305809).

55.     Van Hook, Jennifer, Elizabeth Baker, and Claire Altman. 2009. "Does it begin at school or home? The institutional origins of overweight among young children of immigrants." Pp. 205-224 in *Immigration, Diversity, and Education*, edited by Elena L. Grigorenko and Ruby Takanishi. New York: Routledge/Taylor and Francis Group.

56.     Van Hook, Jennifer and Frank D. Bean. 2009. "Immigrant Welfare Receipt: Implications for Immigrant Settlement and Integration." Pp. 93-122 in *Immigrants and Welfare: The Impact of Welfare Reform on America's Newcomers,* Michael Fix and Kirin Kalia (eds.). Russell Sage Foundation: New York.

57.     Buelow, Victoria and Jennifer Van Hook. 2008. "Timely Immunization Series Completion Among Children of Immigrants." *Journal of Immigrant and Minority Health* 10(1): 37-44 (PMCID: PMC3298969).

*58.*     Brown, Susan L., Jennifer Van Hook, and Jennifer E. Glick. 2008. "Generational Differences in Cohabitation and Marriage in the U.S." *Population Research and Policy Review* 27(5): 531-550. (PMCID: PMC3242441)

*59.*     Glick, Jennifer E. and Jennifer Van Hook. 2008. "Through Children's Eyes: Families and Households of Latino Children in the United States," pp. 72-86 in *Latinos/as in the United States: Changing the Face of América,* edited by Havidán Rodríguez and Cecilia Menjivar. New York: Springer.

*60.*     Van Hook, Jennifer, and Jennifer E. Glick. 2007. "Immigration and Living Arrangements: Moving Beyond Economic Need Versus Acculturation." *Demography* 44(2): 225-249.

*61.*     Van Hook, Jennifer, and Jason Snyder. 2007. "Immigration, Ethnicity, and the Loss of White Students From California Public Schools, 1990-2000." *Population Research and Policy Review* 26: 259-277.

*62.*     Van Hook, Jennifer and Kelly S. Balistreri. 2007. "Immigrant Generation, Socioeconomic Status, and Economic Development of Countries of Origin: A Longitudinal Study of BMI among Children." *Social Science and Medicine* 65: 976-989.

*63.*     Ryabov, Igor K. and Jennifer Van Hook. 2007. "School Segregation and Academic Achievement among Latino Adolescents." *Social Science Research* 36(2): 767-788.

**_64._     Van Hook, Jennifer, Weiwei Zhang, Frank D. Bean, and Jeffrey Passel. 2006. "Foreign-born Emigration: A New Approach and Estimates Based on Matched CPS Files." _Demography_ 43(2): 361-382.**

*65.*     Van Hook, Jennifer, Susan K. Brown, and Frank D. Bean. 2006. "For Love or Money? Welfare Reform and Immigrant Naturalization." *Social Forces* 85(2): 643-666.

*66.*     Van Hook, Jennifer and Kelly Stamper Balistreri. 2006. "Ineligible Parents, Eligible Children: Food Stamps Receipt, Allotments and Food Insecurity among Children of Immigrants." *Social Science Research* 35(1): 228-251.

*67.*     Van Hook, Jennifer, Susan L. Brown, and Maxwell Kwenda. 2004. "A Decomposition of Trends in Poverty Among Children of Immigrants." *Demography* 41(4): 649-670.

*68.*     Balistreri, Kelly and Jennifer Van Hook. 2004. "The more things change the more they stay the same: Mexican Naturalization Before and After Welfare Reform." *International Migration Review* 38(Spring): 113-130.

*69.*     Van Hook, Jennifer. 2003. "Welfare Reform's Chilling Effects on Non-citizens: Changes in Non-citizen Recipiency or Shifts in Citizenship Status?" *Social Science Quarterly* 84(3): 613-631.

*70.*     Van Hook, Jennifer. 2003. "Easier Said Than Done: A Review of *Migration Theory: Talking Across Disciplines*." *Journal of American Ethnic History* 22(3): 92-93.

*71.*     Bean, Frank D., Gillian Stevens, and Jennifer Van Hook. 2003. "Immigration and Immigrant Welfare Receipt." In Frank D. Bean and Gillian Stevens, *Americas Newcomers and the Dynamics of Diversity*. New York: Russell Sage and ASA Arnold Rose Monograph Series. (winner of the American Sociological Association's 2003 Otis Dudley Duncan book award)

*72.*     Van Hook, Jennifer. 2002. "Immigration and African American Educational Opportunity: The Transformation of Minority Schools" *Sociology of Education* 75(2): 169-189.

*73.*     Van Hook, Jennifer, and Kelly Balistreri. 2002. "Diversity and Change in the Institutional Context of Immigrant Adaptation: California Schools 1985-2000." *Demography* 39(4): 639-654.

*74.*     Glick, Jennifer E. and Jennifer Van Hook. 2002. "Parents' Coresidence with Adult Children: Can Immigration Explain Racial and Ethnic Variation?" *Journal of Marriage and the Family* 64: 240-253.

75.     Bean, Frank D., Rodolfo Corona, Rodolfo Tuiran, Karen Woodrow-Lafield, and Jennifer Van Hook. 2001. "Circular, Invisible, and Ambiguous Migrants: Components of Difference in Estimates of the Number of Unauthorized Mexican Migrants in the United States." *Demography* 38(3): 411-422.

76.     Van Hook, Jennifer. 2000. "SSI Eligibility and Participation Among Elderly Naturalized Citizens and Noncitizens," *Social Science Research* 29: 51-69.

77.     Van Hook, Jennifer and Michael Fix. 2000. "A Profile of the Immigrant Student Population." Pp. 9-33 in Jorge Ruiz DeVelasco, Michael Fix and Toni Clewell (eds.), *Overlooked and Underserved: Immigrant Children in U.S. Secondary Schools*. The Urban Institute Press: Washington, D.C.

78.     Van Hook, Jennifer, Jennifer E. Glick, and Frank D. Bean. 1999. "Public Assistance Receipt among Immigrants and Natives: How the Unit of Analysis Affects Research Findings," *Demography* 36(1): 111-120.

        a.    2007.   Reprinted in Diane Kholos Wysocki (ed.), *Readings in Social Research Methods, third edition*. Stamford, CT: Wadsworth Group.

        b.    2001.   Reprinted pp. 84-98 in Diane Kholos Wysocki (ed.), *Readings in Social Research Methods*. Stamford, CT: Wadsworth Group.

79.     Van Hook, Jennifer and Frank D. Bean. 1999. "The Growth in Noncitizen SSI Caseloads 1979-1996: Aging Versus New Immigrant Effects," *Journal of Gerontology: Social Sciences* 54(1): S16-S23.

80.     Bean, Frank D., Jennifer Van Hook and Mark Fossett. 1999. "Immigration, Spatial and Economic Change, and African American Employment," pp. 31-63 in Frank D. Bean and Stephanie Bell-Rose (eds.), *Immigration and Opportunity: Race, Ethnicity, and Employment in the United States*. New York: Russell Sage Foundation.

81.     Glick, Jennifer E. and Jennifer Van Hook. 1998. "The Mexican Origin Population of the United States in the Twentieth Century," pp. 571-586 in *Migration Between Mexico and the United States, Research Reports and Background Materials*, Mexico City and Washington, D.C.: Mexican Ministry of Foreign Affairs and U.S. Commission on Immigration Reform.

82.     Van Hook, Jennifer and Frank D. Bean. 1998. "Estimating Unauthorized Migration to the United States: Issues and Results," pp. 511-550 in *Migration Between Mexico and the United States, Research Reports and Background Materials*, Mexico City and Washington, D.C.: Mexican Ministry of Foreign Affairs and U.S. Commission on Immigration Reform.

83.     Van Hook, Jennifer and Frank D. Bean. 1998. "Estimating Underenumeration among Unauthorized Mexican Migrants to the United States: Applications of Mortality Analyses," pp. 551-570 in *Migration Between Mexico and the United States, Research Reports and Background Materials*, Mexico City and Washington, D.C.: Mexican Ministry of Foreign Affairs and U.S. Commission on Immigration Reform.

84.     Van Hook, Jennifer V. W. and Frank D. Bean. 1998. "Welfare Reform and SSI Receipt among Immigrants in the United States," pp. 139-158 in H. Kurthen, J. Fijalkowski, and G. Wagner (eds.), *Immigration, Citizenship, and the Welfare State*. Greenwich, CT: JAI Press.

*85.*    Glick, Jennifer E., Frank D. Bean, and Jennifer V.W. Van Hook. 1997. "Immigration and Changing Patterns of Extended Family Household Structure in the United Status: 1970-1990," *Journal of Marriage and the Family* 59 (February): 177-191.

*86.*    Bean, Frank D., Robert G. Cushing, Charles Haynes, and Jennifer V.W. Van Hook. 1997. "Immigration and the Social Contract," *Social Science Quarterly* 78(2): 249-268.

*a.*    1999.   Reprinted in C. Zelinsky (ed.), *Readings: Racial and Ethnic Groups in America*. Dubuque, Iowa: Kendall Hunt Publishing.

*b.*    1999.   Reprinted in C. Ellison and A. Martin (eds.), *Race and Ethnic Relations in the United States: Readings for the 21st Century*. Los Angeles: Roxbury Publishing Company.

*87.*    Bean, Frank D., Jennifer V.W. Van Hook and Jennifer E. Glick. 1997. "Country of Origin, Type of Public Assistance and Patterns of Welfare Recipiency Among U.S. Immigrants and Natives," *Social Science Quarterly* 78(2): 432-451.

*88.*    Van Hook, Jennifer V.W., Frank D. Bean and Jennifer E. Glick. 1996. "The Development and Assessment of Census-Based Measures of AFDC and SSI Recipiency," *Journal of Economic and Social Measurement* 22(1): 1-23.

*89.*    Bean, Frank D., Ruth R. Berg, and Jennifer V. W. Van Hook. 1996. "Socioeconomic and Cultural Incorporation and Marital Disruption Among Mexican Americans," *Social Forces* 75(2): 593-617.

# EXHIBIT C

**CURRICULUM VITAE**
Jennifer Van Hook

Department of Sociology                690 Tanager Drive
Pennsylvania State University          State College, PA 16803
University Park, PA 16802              Phone: 814-237-1691
Phone: 814-867-2276
jxv21@psu.edu

EDUCATION
1996   Ph.D. Sociology, The University of Texas at Austin.
1991   M.S. Sociology, The University of Wisconsin at Madison.
1990   B.A. Sociology and Anthropology, Carleton College, Northfield, Minnesota.

POSITIONS
2017-        Director of Graduate Studies, Sociology, Pennsylvania State University
2016-2018    Co-editor, *Demography*
2011-2016    Director, Population Research Institute, Pennsylvania State University
2017-        Roy C. Buck Professor of Sociology and Demography, Pennsylvania State University
2016-2017    Liberal Arts Research Professor of Sociology and Demography, Pennsylvania State University
2010-        Non-resident Fellow, Migration Policy Institute
2007-2016    Associate to Full Professor of Sociology and Demography, Pennsylvania State University
1999-2007    Assistant to Associate Professor, Department of Sociology, Bowling Green State University.
1998-1999    Research Associate, Center for Population Research, The Urban Institute, Washington, D.C.

HONORS
Clifford C. Clogg Award for Mid-Career Achievement, 2016
Raymond Lombra Award for Distinction in the Social or Life Sciences, 2016
Sociological Research Association, 2019-present

RESEARCH INTERESTS
International immigration, health and well-being of children of immigrants, unauthorized migration, immigrant incorporation, welfare and poverty

TEACHING INTERESTS
Migration, Population and Society, Demographic Techniques, Research Methods, Secondary Data Analysis, Race and Ethnicity

GRANT ACTIVITY
2018-2019    Russell Sage Foundation. "Summer Institute in Migration Methods", Pennsylvania State University, Jennifer Van Hook and Irene Bloemraad, co-PIs.
2018-2019    Russell Sage Foundation. "Educational Integration Across Generations Among Mexicans and Other National Origin Groups", Pennsylvania State University, Jennifer Van Hook, P.I.

| | |
|---|---|
| 2013-2015 | National Science Foundation. "Pennsylvania State University Census Research Data Center", Pennsylvania State University, Jennifer Van Hook, P.I. |
| 2011-2016 | National Institutes of Health. 2 R24 HD041025. "Population Research Institute Infrastructure Support", Pennsylvania State University, Jennifer Van Hook, P.I. |
| 2010-2014 | National Institutes of Health. 1 P01 HD062498. PI of a project ("Obesity among Mexican Children of Immigrants ") in a larger P01 ("The Mexican Children of Immigrants Program Project"), Pennsylvania State University, Nancy Landale, P.I. |
| 2009-2011 | National Institutes of Health. RC2 HD064497. "Generating Linked NCHS and OIS Data for Immigrant Health and Mortality Research," Pennsylvania State University, Jennifer Van Hook and Frank D. Bean, co-P.I.s. |
| 2009-2011 | National Institutes of Health. R21 HD058142. "A Demographic Analysis of Socioeconomic Instability and Well-being Among Children of Immigrants", Bowling Green State University, (Jennifer Van Hook and Kelly Balistreri, co-P.I.s.) |
| 2008-2011 | Department of Homeland Security. "Improving estimates of unauthorized migration," University of Arizona, UC-Irvine, and Penn State University. Co-investigator with Frank D. Bean, $840,000. |
| 2006-2007 | U.S. Census Bureau (research contract) "Estimates of the foreign-born emigration and internal migration", Bowling Green State University, Jennifer Van Hook, Principal Investigator, $153,000. |
| 2005-2008 | Foundation for Child Development. "Obesity Among Young Children of Immigrants", Bowling Green State University, Jennifer Van Hook, Principal Investigator, $233,633. |
| 2006 | Center for Family and Demographic Research. "Extended Family Living Arrangements and Adult Health," Bowling Green State University, Jennifer Van Hook, P-I, $5,000. |
| 2004-2006 | National Institutes of Health. R03 HD44700-01A1: "Stability of Extended Family Living Arrangements Among Mexican Immigrants," Bowling Green State University. Jennifer Van Hook, Principal Investigator, with Jennifer E. Glick, Arizona State University, $100,000. |
| 2003-2006 | U.S. Census Bureau (research contract) "Estimates of the foreign-born Population of the United States by Migration Status and Geography," Bowling Green State University. Jennifer Van Hook, Principal Investigator, $176,000. |
| 2002-2003 | Joint Center for Poverty Research, USDA-funded Research Development Grant. "Welfare Reform and Long-term Stability in Food Security among Children of Immigrants," Bowling Green State University. Jennifer Van Hook, Principal Investigator, $40,000. |
| 1999-2002 | National Institutes of Health. R01 HD-39075-1 "Naturalization and Immigrant Public Assistance Receipt," The University of California at Irvine. Co- investigator, with Frank D. Bean as Principal Investigator, $750,000. |
| 1997-1998 | National Institute of Aging. R03 "Patterns of SSI Receipt among Elderly Immigrants", The University of Texas at Austin. Co-Investigator with Frank D. Bean as Principal Investigator, $50,000. |

## PUBLICATIONS

Books

Van Hook, Jennifer, Susan McHale, and Valarie King. (Eds.). 2018. *Families and Technology.* New York: Springer.

Burton, Linda, Damian Burton, Susan McHale, Valarie King, and Jennifer Van Hook. (Eds.). 2017. *Boys and Men in African American Families.* New York: Springer.

McHale, Susan M., Valarie King, Jennifer Van Hook, and Alan Booth. (Eds.). 2016. *Gender and Couple Relationships.* New York: Springer.

Amato, Paul R., Booth, Alan, McHale, Susan M., & Van Hook, Jennifer (Eds.). 2015. *Families in an Era of Increasing Inequality: Diverging Destinies*. New York: Springer.

Referred Journal Articles

Van Hook, Jennifer, Bélanger, Alain, Patrick Sabourin, and Anne Morse. "Immigration Selection and the Educational Composition of the U.S. Labor Force: A Microsimulation Approach." Conditionally accepted in *Population and Development Review*.

Van Hook, Jennifer. Forthcoming. "Nominal versus Variable Approaches for Understanding Group Differences." *Ethnic and Racial Studies Review*.

Bélanger, Alain, Patrick Sabourin, Guillaume Marois, and Jennifer Van Hook, and Samuel Vézina. 2019. "A Framework for the Prospective Analysis of Ethno-Cultural Super-Diversity." *Demographic Research*.

Frisco, Michelle L., Jennifer Van Hook, and Robert Hummer. 2019. "Would the Elimination of Obesity and Smoking Reduce U.S. Racial/Ethnic/Nativity Disparities in Total and Healthy Life Expectancy?" *Social Science and Medicine: Population Health*.

Frisco, Michelle L., Molly A. Martin, and Jennifer Van Hook. 2019. "Socioeconomic Status and Acculturation: Why Mexican-Americans are Heavier than Mexican Immigrants and Whites." *Advances in Medical Sociology*, "Immigration and Health". Emerald Publishing Limited, pp. 71-96.

Frisco, Michelle L, Jennifer Van Hook, and Erin Baumgartner. 2019. "The weight of school entry: Weight gain among Hispanic children of immigrants during the early elementary school years." *Demographic Research* 40 (article 5): 95-120.

Dondero, Molly, Jennifer Van Hook, Michelle Frisco and Molly Martin. 2018. "Dietary Assimilation among Mexican Children in Immigrant Households: Code-switching and Healthy Eating across Social Institutions." *Journal of Health and Social Behavior* 59(4): 601-624. (PMCID: PMC6495556)

Capps, Randy, Julia Gelatt, Jennifer Van Hook, and Michael Fix. 2018. "Commentary on 'The Number of Undocumented Immigrants in the United States: Estimates Based on Demographic Modeling with Data from 1990-2016.'" PLOS-ONE *13*(9), e0204199. (PMCID: PMC6150498)

Van Hook, Jennifer, Susana Quiros, Molly Dondero, and Claire Altman. 2018. "Healthy Eating Among Mexican Immigrants: Migration in Childhood and Time in the U.S." *Journal of Health and Social Behavior* 59(3): 391-410. (PMCID: PMC6416786).

Randy Capps, James D. Bachmeier, and Jennifer Van Hook. 2018. "Estimating the Characteristics of Unauthorized Immigrants using US Census Data: Combined Sample Multiple Imputation." *The Annals of the American Academy of Political and Social Science 677*(1), 165-179.

Altman, Claire E., Jennifer Van Hook, and Jonathan Gonzalez. 2017. "Becoming Overweight Without Gaining a Pound: Weight Evaluations and the Social Integration of Mexicans in the United States." *International Migration Review* 51(1): 3-36.

Frisco, Michelle L., Susana Quiros, and Jennifer Van Hook. 2016. "One Size May Not Fit All: How Obesity among Mexican-Origin Youth Varies by Generation, Gender, and Age." *Demography* 53(6): 2031–2043. (PMCID: PMC5138860)

Van Hook, Jennifer, Susana Quiros, Michelle Frisco, and Emnet Fikru. 2016. "It is Hard to Swim Upstream: Dietary Acculturation among Mexican-origin Children." *Population Research and Policy Review* 35(2): 177-196. (PMCID: PMC4852553)

Dondero, Molly and Jennifer Van Hook. 2016. "Generational Status, Neighborhood Context, and Mother-Child Resemblance in Dietary Quality in Mexican-origin Families." *Social Science and Medicine* 150: 212-220. (PMCID: PMC4733591)

Altman, Claire E., Jennifer Van Hook, and Marianne Hillemeier. 2016. "What does self-rated health mean? Changes and variations in the association of obesity with objective and subjective components of self-rated health." *Journal of Health and Social Behavior* 57(1): 39-58.

Zhou, Nan, Charrisa Cheah, Jennifer Van Hook, Darcy A. Thompson, Shelby S. Jones. 2015. "A Cultural Understanding of Chinese Immigrant Mothers' Feeding Practices: A Qualitative Study." *Appetite* 87: 160-167.

Martin, Molly A., Jennifer Van Hook, and Susana Quiros. 2015. "Is Socioeconomic Incorporation Associated with a Healthier Diet? Dietary Patterns among Mexican-origin Children in the United States." *Social Science and Medicine* 147: 20-29 (PMCID: PMC4689621).

Van Hook, Jennifer, James D. Bachmeier, Donna Coffman, and Ofer Harel. 2015. "Can We Spin Straw Into Gold? An Evaluation of Immigrant Legal Status Imputation Approaches". *Demography* 52(1): 329-354. (PMCID: PMC4318768)

Van Hook, Jennifer, Susana Quiros, and Michelle Frisco. 2015. "The Food Similarity Index: A Dimension of Dietary Acculturation Based on Dietary Recall Data". *Journal of Immigrant and Minority Health* 17(2): 441-449 (PMCID: PMC4378569)

Bachmeier, James D., Jennifer Van Hook, and Frank D. Bean. 2014. "Can We Measure Immigrants' Legal Status? Lessons from Two U.S. Surveys.**"** *International Migration Review 48*(2), 538-566. (PMCID:PMC4267286)

Van Hook, Jennifer, Frank D. Bean, James D. Bachmeier, and Catherine Tucker. 2014. "Recent Trends in Coverage of the Mexican-Born Population of the United States: Results from Applying Multiple Methods Across Time." *Demography* 51(2): 699-726. (PMCID: PMC24570373)

Gubernskaya, Zoya, Frank D. Bean, and Jennifer Van Hook. 2013. "(Un)Healthy Immigrant Citizens: Naturalization and Activity Limitations in Older Age" *Journal of Health and Social Behavior* 54(4): 427-443. (PMCID: PMC3969823)

Van Hook, Jennifer, and James D. Bachmeier. 2013. "How Well Does the American Community Survey Count Naturalized Citizens?" *Demographic Research* 29(1), 1-32. (PMCID: PMC3783022)

Van Hook, Jennifer and Claire E. Altman. 2013. "Using Discrete-time Event History Fertility Models to Simulate Total Fertility Rates and Other Fertility Measures." *Population Research and Policy Review* 32(4), 585-610. (PMCID: PMC3734869)

Tucker, Catherine, and Jennifer Van Hook. 2013. "Surplus Chinese Men: Demographic Determinants of the Sex Ratio at Marriageable Ages in China." *Population and Development Review* 39(2): 209-230. (PMCID: PMC3734869)

Van Hook, Jennifer, Claire Altman, and Kelly Balistreri. 2013. "Global Patterns in Overweight Among Children and Mothers in Less Developed Countries.**"** *Public Health Nutrition* 16(4): 573-581. (PMCID: PMC3422412)

Cheah, Charissa and Jennifer Van Hook. 2012. "Chinese and Korean Immigrants' Early Life Deprivation: An Important Factor for Child Feeding Practices and Children's Body Weight in the United States." *Social Science and Medicine* 74(5): 744–752. (PMCID: PMC22265872)

Van Hook, Jennifer, Elizabeth Baker, Claire E. Altman, and Michelle Frisco. 2012. "Canaries in a Coalmine: Immigration and Obesity among Mexican-origin Children.**"** *Social Science and Medicine* 74(2): 125–134. (PMCID: PMC3259272)

Van Hook, Jennifer and Claire Altman. 2012. "Competitive Food Sales in Schools and Childhood Obesity: A Longitudinal Study." *Sociology of Education* 85(1): 23-39. (PMCID: PMC3352595)

Glick, Jennifer E. and Jennifer Van Hook. 2011. "Does a house divided stand? Kinship and continuity of shared living arrangements." *Journal of Marriage and the Family* 73(5): 1149–1164. (PMCID: PMC3258516)

Scheitle, Chris, Jenn Buher-Kane, and Jennifer Van Hook. 2011. "Demographic Imperatives and Religious Markets: Considering the Individual and Interactive Roles of Fertility and Switching in Group Growth." *Journal for the Scientific Study of Religion* 50(3): 470-482. **(**PMCID: PMC3267579)

Balistreri, Kelly Stamper and Jennifer Van Hook. 2011. "Trajectories of Overweight among US School Children: A focus on social and economic characteristics." *Maternal and Child Health Journal* 15(5): 610-619. (PMCID: PMC3193986)

Landale, Nancy S., Kevin J. A. Thomas, and Jennifer Van Hook. 2011. "The Living Arrangements of Children of Immigrants." *The Future of Children* 21(1): 43-70. (PMCID: PMC3241619)

Van Hook, Jennifer and Weiwei Zhang. 2011. "Who Stays? Who Goes? Selective Emigration Among the Foreign Born." *Population Research and Policy Review* 30(1): 1-24. (PMCID: PMC3367327)

Van Hook, Jennifer and Elizabeth Baker. 2010. "Big Boys, Little Girls: Gender, Acculturation, and Weight among Young Children of Immigrants." *Journal of Health and Social Behavior* 51: 200-214. (PMCID: PMC3245318)

Balistreri, Kelly S. and Jennifer Van Hook. 2009. "Socioeconomic Status and Body Mass Index Among Hispanic Children of Immigrants and Children of Natives." *American Journal of Public Health* 99(12): 2238-2246. (PMCID: PMC2775779)

Zhang, Yuanting and Jennifer Van Hook. 2009. "Marital Dissolution among Interracial Couples." *Journal of Marriage and the Family* 71: 95-107. (PMCID: PMC4183451)

Van Hook, Jennifer and Frank D. Bean. 2009. "Explaining Mexican-Immigrant Welfare Behaviors: The Importance of Employment Related Cultural Repertoires." *American Sociological Review* 74(3): 423-444. (PMCID: PMC3906684)

Bean, Frank D., Cynthia Feliciano, Jennifer Lee, and Jennifer Van Hook. 2009. "The New U.S. Immigrants: How do they affect our Understanding of the African-American Experience?" *The Annals 621: 202 – 220.* (PMCID: PMC3244721)

Baker, Elizabeth, Kelly S. Balistreri, and Jennifer Van Hook. 2009. "Maternal Employment and Overweight among Hispanic Children of Immigrants and Children of Natives." *Journal of Immigrant and Minority Health* 11(3): 158-167 (PMCID: PMC3305809).

Buelow, Victoria and Jennifer Van Hook. 2008. "Timely Immunization Series Completion Among Children of Immigrants." *Journal of Immigrant and Minority Health* 10(1): 37-44 (PMCID: PMC3298969).

Brown, Susan L., Jennifer Van Hook, and Jennifer E. Glick. 2008. "Generational Differences in Cohabitation and Marriage in the U.S." *Population Research and Policy Review* 27(5): 531-550. (PMCID: PMC3242441)

Van Hook, Jennifer, and Jennifer E. Glick. 2007. "Immigration and Living Arrangements: Moving Beyond Economic Need Versus Acculturation." *Demography* 44(2): 225-249.

Van Hook, Jennifer, and Jason Snyder. 2007. "Immigration, Ethnicity, and the Loss of White Students From California Public Schools, 1990-2000." *Population Research and Policy Review* 26: 259-277.

Van Hook, Jennifer and Kelly S. Balistreri. 2007. "Immigrant Generation, Socioeconomic Status, and Economic Development of Countries of Origin: A Longitudinal Study of BMI among Children." *Social Science and Medicine* 65: 976-989.

Ryabov, Igor K. and Jennifer Van Hook. 2007. "School Segregation and Academic Achievement among Hispanic Adolescents." *Social Science Research* 36(2): 767-788.

Van Hook, Jennifer, Weiwei Zhang, Frank D. Bean, and Jeffrey Passel. 2006. "Foreign-born Emigration: A New Approach and Estimates Based on Matched CPS Files." *Demography* 43(2): 361-382.

Van Hook, Jennifer, Susan K. Brown, and Frank D. Bean. 2006. "For Love or Money? Welfare Reform and Immigrant Naturalization." *Social Forces* 85(2): 643-666.

Van Hook, Jennifer and Kelly Stamper Balistreri. 2006. "Ineligible Parents, Eligible Children: Food Stamps Receipt, Allotments and Food Insecurity among Children of Immigrants." *Social Science Research* 35(1): 228-251.

Van Hook, Jennifer, Susan L. Brown, and Maxwell Kwenda. 2004. "A Decomposition of Trends in Poverty Among Children of Immigrants." *Demography* 41(4): 649-670.

Balistreri, Kelly and Jennifer Van Hook. 2004. "The more things change the more they stay the same: Mexican Naturalization Before and After Welfare Reform." *International Migration Review* 38(Spring): 113-130.

Van Hook, Jennifer. 2003. "Welfare Reform's Chilling Effects on Non-citizens: Changes in Non-citizen Recipiency or Shifts in Citizenship Status?" *Social Science Quarterly* 84(3): 613-631.

Van Hook, Jennifer. 2002. "Immigration and African American Educational Opportunity: The Transformation of Minority Schools" *Sociology of Education* 75(2): 169-189.

Van Hook, Jennifer, and Kelly Balistreri. 2002. "Diversity and Change in the Institutional Context of Immigrant Adaptation: California Schools 1985-2000." *Demography* 39(4): 639-654.

Glick, Jennifer E. and Jennifer Van Hook. 2002. "Parents' Coresidence with Adult Children: Can Immigration Explain Racial and Ethnic Variation?" *Journal of Marriage and the Family* 64: 240-253.

Bean, Frank D., Rodolfo Corona, Rodolfo Tuiran, Karen Woodrow-Lafield, and Jennifer Van Hook. 2001. "Circular, Invisible, and Ambiguous Migrants: Components of Difference in Estimates of the Number of Unauthorized Mexican Migrants in the United States." *Demography* 38(3): 411-422.

Van Hook, Jennifer. 2000. "SSI Eligibility and Participation Among Elderly Naturalized Citizens and Noncitizens," *Social Science Research* 29: 51-69.

Van Hook, Jennifer, Jennifer E. Glick, and Frank D. Bean. 1999. "Public Assistance Receipt among Immigrants and Natives: How the Unit of Analysis Affects Research Findings," *Demography* 36(1): 111-120.

    2007.   Reprinted in Diane Kholos Wysocki (ed.), *Readings in Social Research Methods, third edition*. Stamford, CT: Wadsworth Group.

    2001.   Reprinted pp. 84-98 in Diane Kholos Wysocki (ed.), *Readings in Social Research Methods*. Stamford, CT: Wadsworth Group.

Van Hook, Jennifer and Frank D. Bean. 1999. "The Growth in Noncitizen SSI Caseloads 1979-1996: Aging Versus New Immigrant Effects," *Journal of Gerontology: Social Sciences* 54(1): S16-S23.

Glick, Jennifer E., Frank D. Bean, and Jennifer V.W. Van Hook. 1997. "Immigration and Changing Patterns of Extended Family Household Structure in the United Status: 1970-1990," *Journal of Marriage and the Family* 59 (February): 177-191.

Bean, Frank D., Robert G. Cushing, Charles Haynes, and Jennifer V.W. Van Hook. 1997. "Immigration and the Social Contract," *Social Science Quarterly* 78(2): 249-268.

    1999.   Reprinted in C. Zelinsky (ed.), *Readings: Racial and Ethnic Groups in America*. Dubuque, Iowa: Kendall Hunt Publishing.

    1999.   Reprinted in C. Ellison and A. Martin (eds.), *Race and Ethnic Relations in the United States: Readings for the 21st Century*. Los Angeles: Roxbury Publishing Company.

Bean, Frank D., Jennifer V.W. Van Hook and Jennifer E. Glick. 1997. "Country of Origin, Type of Public Assistance and Patterns of Welfare Recipiency Among U.S. Immigrants and Natives," *Social Science Quarterly* 78(2): 432-451.

Van Hook, Jennifer V.W., Frank D. Bean and Jennifer E. Glick. 1996. "The Development and Assessment of Census-Based Measures of AFDC and SSI Recipiency," *Journal of Economic and Social Measurement* 22(1): 1-23.

Bean, Frank D., Ruth R. Berg, and Jennifer V. W. Van Hook. 1996. "Socioeconomic and Cultural Incorporation and Marital Disruption Among Mexican Americans," *Social Forces* 75(2): 593-617.

Book Chapters and Other Publications

Van Hook, Jennifer. 2019. "Counting 11 Million Undocumented Immigrants is Easier Than Trump Thinks." The Conversation, July 18, 2019. https://theconversation.com/counting-11-million-undocumented-immigrants-is-easier-than-trump-thinks-120459.

Gelatt, Julia, Michael Fix, and Jennifer Van Hook. 2018. "People Leave Footprints: Millions More Unauthorized Immigrants Cannot Be 'Hidden' in Data Estimates." Migration Policy Institute,

September 20, 2018. https://www.migrationpolicy.org/news/people-leave-footprints-millions-more-unauthorized-immigrants-cannot-be-hidden

Van Hook, Jennifer. 2018. "Why the 2020 Census Shouldn't Ask About Your Citizenship Status." The Conversation, February 22, 2018. https://theconversation.com/why-the-2020-census-shouldnt-ask-about-your-citizenship-status-91036

Van Hook, Jennifer and Barrett Lee. 2017. "Diversity is on the Rise in Urban and Rural Communities, and it's Here to Stay." The Conversation, February 20, 2017. https://theconversation.com/diversity-is-on-the-rise-in-urban-and-rural-communities-and-its-here-to-stay-69095

Van Hook, Jennifer. 2016. "Counting 11 Million Undocumented Immigrants is Easier Than You Think." The Conversation, November 1, 2016. https://theconversation.com/counting-11-million-undocumented-immigrants-is-easier-than-you-think-67921.

Capps, Randy, Bachmeier, James D., Fix, Michael, & Van Hook, Jennifer. 2013. A demographic, socioeconomic, and health coverage profile of unauthorized immigrants in the United States. Washington, DC: Migration Policy Institute.

Bean, Frank D., Susan K. Brown, Mark A. Leach, James D. Bachmeier, and Jennifer Van Hook. 2013. "Unauthorized Mexican migration and the socioeconomic integration of Mexican Americans." Pp 341-374 in *Diversity and disparities: America enters a new century* (John Logan, Editor). New York: Russell Sage Foundation.

Van Hook, Jennifer, Nancy S. Landale, and Marianne M. Hillemeier. 2013. Is the United States Bad for Children's Health? Risk and Resilience Among Young Children of Immigrants. Washington, DC: Migration Policy Institute.

Bean, Frank D, Brown, Susan K, Leach, Mark A, Bachmeier, James D, & Van Hook, Jennifer. 2013. Unauthorized Mexican Migration and the Socioeconomic Integration of Mexican Americans: research report, US2010: Discover America in a New Century, Russell Sage Foundation.

Van Hook, Jennifer and Michael Fix. 2011. "The Demographic Impacts of Repealing Birthright Citizenship." Pp. 173-186 in *Legal Briefs on Immigration Reform from 25 of the Top Legal Minds in the Country, Volume 1,* edited by Deborah Robinson and Mona Parsa. Robinson Omnimedia Publishing & Studios.

Van Hook, Jennifer. 2010. "Structure and Acculturation: Explaining Outcomes for Children in Mexican American Families " pp. 145-154 in *Growing up Hispanic: Health and Development of Children of Immigrants*, edited by Nancy S. Landale, Susan M. McHale, and Alan Booth. Washington, DC: Urban Institute Press.

Van Hook, Jennifer, Elizabeth Baker, and Claire Altman. 2009. "Does it begin at school or home? The institutional origins of overweight among young children of immigrants." Pp. 205-224 in *Immigration, Diversity, and Education*, edited by Elena L. Grigorenko and Ruby Takanishi. New York: Routledge/Taylor and Francis Group.

Van Hook, Jennifer and Frank D. Bean. 2009. "Immigrant Welfare Receipt: Implications for Immigrant Settlement and Integration." Pp. 93-122 in *Immigrants and Welfare: The Impact of Welfare Reform on America's Newcomers,* Michael Fix and Kirin Kalia (eds.). Russell Sage Foundation: New York.

Glick, Jennifer E. and Jennifer Van Hook. 2008. "Through Children's Eyes: Families and Households of Latino Children in the United States," pp. 72-86 in *Latinos/as in the United States: Changing the Face of América,* edited by Havidán Rodríguez and Cecilia Menjivar. New York: Springer.

Van Hook, Jennifer. 2003. "Easier Said Than Done: A Review of *Migration Theory: Talking Across Disciplines.*" *Journal of American Ethnic History* 22(3): 92-93.

Bean, Frank D., Gillian Stevens, and Jennifer Van Hook. 2003. "Immigration and Immigrant Welfare Receipt." In Frank D. Bean and Gillian Stevens, *Americas Newcomers and the Dynamics of Diversity*. New York: Russell Sage and ASA Arnold Rose Monograph Series. (winner of the American Sociological Association's 2003 Otis Dudley Duncan book award)

Van Hook, Jennifer and Michael Fix. 2000. "A Profile of the Immigrant Student Population." Pp. 9-33 in Jorge Ruiz DeVelasco, Michael Fix and Toni Clewell (eds.), *Overlooked and Underserved: Immigrant Children in U.S. Secondary Schools*. The Urban Institute Press: Washington, D.C.

Bean, Frank D., Jennifer Van Hook and Mark Fossett. 1999. "Immigration, Spatial and Economic Change, and African American Employment," pp. 31-63 in Frank D. Bean and Stephanie Bell-Rose (eds.), *Immigration and Opportunity: Race, Ethnicity, and Employment in the United States*. New York: Russell Sage Foundation.

Glick, Jennifer E. and Jennifer Van Hook. 1998. "The Mexican Origin Population of the United States in the Twentieth Century," pp. 571-586 in *Migration Between Mexico and the United States, Research Reports and Background Materials*, Mexico City and Washington, D.C.: Mexican Ministry of Foreign Affairs and U.S. Commission on Immigration Reform.

Van Hook, Jennifer and Frank D. Bean. 1998. "Estimating Unauthorized Migration to the United States: Issues and Results," pp. 511-550 in *Migration Between Mexico and the United States, Research Reports and Background Materials*, Mexico City and Washington, D.C.: Mexican Ministry of Foreign Affairs and U.S. Commission on Immigration Reform.

Van Hook, Jennifer and Frank D. Bean. 1998. "Estimating Underenumeration among Unauthorized Mexican Migrants to the United States: Applications of Mortality Analyses," pp. 551-570 in *Migration Between Mexico and the United States, Research Reports and Background Materials*, Mexico City and Washington, D.C.: Mexican Ministry of Foreign Affairs and U.S. Commission on Immigration Reform.

Van Hook, Jennifer V. W. and Frank D. Bean. 1998. "Welfare Reform and SSI Receipt among Immigrants in the United States," pp. 139-158 in H. Kurthen, J. Fijalkowski, and G. Wagner (eds.), *Immigration, Citizenship, and the Welfare State*. Greenwich, CT: JAI Press.


TEACHING

Undergraduate Courses
*Introduction to Demographic Methods*, 2 semesters, The University of Texas
*Population and Society* (Sociology 312), 2 semesters, BGSU
*Principles of Sociology* (Sociology 101), 1 semester, BGSU
*Population and Policy,* 1 semester, PSU
*Sociology of Immigration,* 1 semester, PSU

Graduate Courses
*Event History Analysis* (Sociology 577), 2 semesters, PSU
*Introduction to Demographic Techniques,* 6 semesters, PSU
*Applied Demography* (Sociology 627), 3 semesters, BGSU
*Market Demography* (Sociology 629), 1 semester, BGSU
Techniques of Demographic Analysis I (Sociology 520), 2 semesters, BGSU
Techniques of Demographic Analysis II (Sociology 726), 2 semesters, BGSU
*W. Wilson: Race and Urban Poverty* (Sociology 680), 1 semester, BGSU

**Supervision of graduate dissertations and theses**

| Candidate's Name | Degree | Year | University |
|---|---|---|---|
| Kelly Balistreri | MA | 2000 | BGSU (Chair) |
| Katrina Wengert | MA | 2003 | BGSU (Chair) |
| Jason Snyder | MA | 2004 | BGSU (Chair) |
| Amy Wenmoth | MA | 2004 | BGSU (Chair) |
| Maxwell Kwenda | PhD | 2004 | BGSU (Chair) |
| Dana Haddox | MA | 2005 | BGSU (Chair) |
| Victoria Buelow | MA | 2005 | BGSU (Chair) |

| | | | |
|---|---|---|---|
| Kelly Jeffreys | MA | 2005 | BGSU (Chair) |
| Igor Ryabov | PhD | 2005 | BGSU (Co-Chair) |
| Weiwei Zhang | MA | 2006 | BGSU (Chair) |
| Kelly Balistreri | PhD | 2006 | BGSU (Chair) |
| Yuanting Zhang | PhD | 2007 | BGSU (Chair) |
| Stefan Jonsson | PhD | 2008 | PSU (Co-Chair) |
| Elizabeth Baker | PhD | 2010 | PSU (Chair) |
| Jonathon Gonzalez | MA | 2012 | PSU (Chair) |
| Claire Altman | PhD | 2013 | PSU (Chair) |
| Catherine Tucker | PhD | 2014 | PSU (Chair) |
| Emnet Fikru | MA | 2015 | PSU (Chair) |
| Anne Morse | MA | 2017 | PSU (Chair) |
| Susana Quiros | PhD | 2018 | PSU (Chair) |
| Anne Morse | PhD | | PSU (Chair) |
| Kendal Lowrey | MA | | PSU (Chair) |
| Juliana Levchenko | MA | | PSU (Chair) |

## Other Experience and Professional Memberships

| | |
|---|---|
| - | Member, PAA |
| - | Member, ASA |
| 2007 - 2009 | Reengineering the SIPP, National Academy of Sciences Panel Member |
| 2008 - 2011 | Census Advisory Committee of Professional Organizations, PAA |
| 2010 - 2013 | Board of Directors, Population Association of America |
| 2010 - 2013 | Population Section Council Member, American Sociological Association |
| 2010 | Summer at the Census, International Migration Branch, U.S. Census Bureau (May 17-21, 2010) |
| 2010 | Expert for the 2010 Demographic Analysis Program (Net International Migration Team) |
| 2013 - 2016 | Editorial Board Member, Demography |
| 2014 - 2016 | Treasurer, Association of Population Centers |
| 2014 | Summer at the Census, International Migration Branch, U.S. Census Bureau (June 22-25, 2014) |
| 2015 - 2016 | Associate Editor, Population Research and Policy Review |
| 2015 - 2016 | Nominations Committee Member, PAA |
| 2016 - | Editorial Board Member, Journal of Health and Social Behavior |
| 2016 | Summer at the Census, Center for Administrative Records and Applications, U.S. Census Bureau (September 18-23, 2016) |
| 2016 - 2018 | Co-editor, Demography |
| 2017 - | IPUMS-USA Advisory Board Member |
| 2018 | Expert for the 2020 Demographic Analysis Program (Net International Migration Team) |
| 2018 | State of New York v. United States Department of Commerce. Federal District Court for the Southern District of New York, (November 5, 2018). I provided a written report and live testimony regarding the impact the addition of a question on citizenship will have on accuracy of the 2020 U.S. Census. |

Tab 2

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   CHEROKEE DM MELTON
    Supervising Deputy Attorney General
4   JENNIFER C. BONILLA
    LISA CISNEROS
5   JULIA HARUMI MASS
    ANITA GARCIA VELASCO
6   BRENDA AYON VERDUZCOS
    ANNA RICH, State Bar No. 230195
7   Deputy Attorneys General
       1515 Clay Street, 20th Floor
8      P.O. Box 70550
       Oakland, CA  94612-0550
9      Telephone: 510-879-0296
       Fax: 510-622-2270
10     E-mail:  Anna.Rich@doj.ca.gov
    *Attorneys for Plaintiff State of California*

11

12                  IN THE UNITED STATES DISTRICT COURT

13                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16
    | | |
    |---|---|
    | **STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF PENNSYLVANIA** and **STATE OF OREGON,**<br><br>                                Plaintiffs,<br><br>        **v.**<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN,** in his official capacity as Acting Secretary of Homeland Security; **U.S. CITIZENSHIP AND IMMIGRATION SERVICES;** and **KENNETH T. CUCCINELLI,** in his official capacity as Acting Director of U.S. Citizenship and Immigration Services**,**<br><br>                                Defendants. | CASE NO. 3:19-cv-04975<br><br>**DECLARATION OF NINEZ PONCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

28

---

I, Ninez Ponce, declare as follows:

1.   I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

2.   I am the Director at the UCLA Center for Health Policy Research, the Principal Investigator of the California Health Interview Survey ("CHIS"), and a Professor in the Department of Health Policy and Management in the UCLA Fielding School of Public Health.  I received my Bachelor's Degree of Science in Nutrition and Food Sciences from UC Berkeley in 1984, my Master's Degree in public policy in International Development from Harvard University in 1988, and a Ph.D. in Health Services from UCLA in 1998.

3.   My research is focused on immigrant and global health, survey-based research, social determinants of health, and health disparities.  I helped develop the first CHIS in 2001 and have led numerous pioneering efforts in multicultural survey research, including measures of racial/ethnic identity, acculturation, generational status and discrimination.

4.   I have served as the deputy director of the Asian and Pacific Islander American Health Forum, a national advocacy organization promoting the health of Asian, Native Hawaiian, and Pacific Islander communities in the United States and U.S. territories.

5.   I have contributed extensively to professional societies and committees focused on racial/ethnic disparities research, such as the National Academy of Medicine Subcommittee on the Standardized Collection of Race, Ethnicity, and Language Data.  I was also previously a board member of the California Pan-Ethnic Health Network, and board vice-chair of the National Health Law Program. I have co-chaired the National Quality Forum Disparities Standing Committee, and served on the Multicultural External Advisory Council of the Nielsen Company (U.S.).  I currently serve on the Board of Scientific Counselors of the National Center for Health Statistics, which conducts most major federal health surveys in the United States.

6.   I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration, which includes a list of all of my publications over the past 17 years.

7.   All of the opinions expressed here are my own.

//

1

**Public Charge Inadmissibility**

8.   I am familiar with the Public Charge Rule, "Inadmissibility on Public Charge Grounds," (hereinafter "the Rule") issued on August 14, 2019 by the Department of Homeland Security (DHS).

9.   I understand the Rule will expand the universe of public benefits that are considered for purposes of the "public charge" test (which currently only includes cash assistance and long-term institutional care) to include certain healthcare, housing and nutrition assistance benefits.

**The Chilling Effect**

10.   Empirical research shows that a significant number of immigrants disenrolled from public benefits after the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) due to fear and confusion among the immigrant community.  *See* Michael Fix, et al., "Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform: 1994-1997," (1999) (finding significant disenrollment in public benefits by immigrants who actually had no change in eligibility for these benefits), a true and correct copy is attached hereto as Exhibit B; *see also* Michael Fix and Jeffrey Passel, "The Scope and Impact of Welfare Reform's Immigrant Provisions" (Jan. 2002) (showed Medicaid disenrollment rate of up to 58 percent among low-income refugees, as opposed to citizen disenrollment rate of 8 percent), a true and correct copy is attached hereto as Exhibit C. This phenomenon is known as the "chilling effect."

11.   My estimates are evidence based and conservative, due to the uncertainty of how the Rule will be perceived by the immigrant community, implemented and enforced.  I provide a range of estimates, 15 percent, 25 percent and 35 percent—to provide decision makers and the public a low, mid and high point for assessing the impact a "chilling effect" could have on the economy and public benefit systems.  To estimate the effects of the "chilling effect" I use the Fix Study's estimation that there was a 22 percent decline in use of Medicaid among all noncitizen households and a 19 percent decline of Medicaid use in households below 200 percent of the Federal Poverty Level to draw a conservative estimate of 15 percent at the lowest level.  Since the Fix Study, Exhibit C, also showed that there was a 35 percent disenrollment rate among all public

2

benefits in all categories of noncitizens, and because there is evidence in another study of a higher SNAP disenrollment, 54 percent[1], the 35 percent as a high range estimate is justifiable.  I set a midpoint of 25 percent, in order to give a midpoint estimation for a full analysis of the "chilling effect" impacts.

12.   Recent research relating to the Rule itself also shows a strong chilling effect. One study used national internet-based survey results to find that the chilling effect was twice for Latino adults, with the following percentages of respondents reporting that they avoided public benefit programs due to fear about the Rule:

- 20.6 percent of Latino adults in immigrant families;
- 8.5 percent of non-Latino white adults in immigrant families; and
- 6 percent of adults from other minority groups in immigrant families.

*See* Bernstein, et al. "One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018" ("One in Seven Study"), Urban Institute (May 22, 2019), a true and correct copy is attached hereto as Exhibit D.

13.   The One in Seven Study also found that, although the Rule would not actually impact them, individuals with LPR and citizenship status exhibited chilling effects, including:

- 7 percent of adults in families where all noncitizen members had LPR status; and
- 9 percent of adults in families where all members were naturalized citizens.

14.   Additionally, the One in Seven Study found that adults in immigrant families living with children under age 19 were almost twice as likely to be subject to chilling effects, meaning that families *with* children are more likely to be impacted.  Specifically, the Study found 17.4 percent of adults with children in the household reporting this as opposed to only 8.9 percent of adults without children in the household.

15.   Almost two out of three adults in immigrant families reported an awareness of the proposed Public Charge Rule, at 62.9 percent.

16.   Adults who heard "a lot" about the proposed rule were highly likely (31 percent) to report chilling effects in their families.

---

[1] Jenny Genser, (1999). Who is leaving the Food Stamps Program: An analysis of Caseload Changes from 1994 to 1997. Washington, D.C.: U.S. Department of Agriculture, Food and Nutrition Service, Office of Analysis, Nutrition, and Evaluation. Available at https://www.fns.usda.gov/snap/who-leaving-food-stamp-program-analysis-caseload-changes-1994-1997

17.  Significant numbers of adults in immigrant families nationally are avoiding routine activities—including visits to their healthcare professionals—due to fear of being asked about their immigration status. Bernstein, et al., "Adults in Immigrant Families Report Avoiding Routine Activities Because of Immigration Concerns" (July 2019) ("Avoiding Routine Activities Survey") (finding that 17 percent of adults in immigrant families reported that they or a family member avoided routine activities in which they might be asked about their citizenship, with 6 percent avoiding visiting a doctor or a clinic), a true and correct copy is attached hereto as Exhibit E.

18.  The same survey found a higher rate among individuals in families with less secure immigration status, with 32.8 percent of adults in families with one or more relatives who are not permanent residents or citizens reporting that they have avoided routine activities (and 7.8 percent avoiding healthcare visits) as opposed to 11.7 percent of adults in families where all members have LPR or citizenship status (with 5.6 percent avoiding healthcare visits).

**Chilling Effect in California**

19.  I analyzed the above data (particularly the almost 33 percent figure in the paragraph immediately preceding this one) to establish a high-end estimate of the potential chilling effect in California of 35 percent.  California has a higher proportion of families potentially subject to a chilling effect figure because of the state's high proportion of households with mixed immigrant status.

20.  In December 2018, I published a study entitled "Proposed Changes to Immigration Rules Would Cost California Jobs, Harm Public Health" in collaboration with Laurel Lucia and Tia Shimada, a true and correct copy is attached hereto as Exhibit F (hereinafter referred to as "December 2018 Study").  In this study, we estimated the population of Californians affected by the Rule.

21.    We focused our analysis on the size of the population potentially subject to a "chilling effect," i.e, those who may disenroll or forego enrollment due to fear, worry and confusion about the implication of receiving benefits on their legal status.

4

22.  Our December 2018 study is still valid based on the finalized Rule.   The final Rule excludes Medicare, and our December 2018 study did not include this.   Although CHIP is excluded in the final rule, the chilling effects for this group is still valid given CHIP's integration into the Medi-Cal program.  Additional exclusion for certain categories of Medi-Cal such as for pregnant women are still subject to the chilling effect.

23.  In the study, my co-authors and I defined the chilling effect population as non-citizens who may be indirectly affected because of fear, confusion or worry over the regulation, including:

    a.  Non-citizens in California who are eligible for and enrolled in CalFresh and/or full-scope Medi-Cal with federal funding, including:
        i.  LPR adults over the 5-year bar;
       ii.  LPR children and pregnant women under the 5-year bar, because California gets federal funding for these groups;
     iii.  Other non-citizens eligible for full benefits; and
     iv.  Refugees and asylees who are exempt from the proposed Rule, but who are also likely to experience a chilling effect.

    b.  This chilling effect population also includes citizen children with at least one non-citizen parent.

24.  Approximately 2.2 million Californians in immigrant families fit into the categories described in the preceeding paragraph, and are potentially subject to a chilling effect.

25.  Based on the Fix study and other factors discussed above, we project that disenrollment rates from benefits programs due to the "chilling effect" could reach as high as 35 percent. We also analyzed the potential impact based on lower projected disenrollment rates of 15 and 25 percent.

26.  Based on the results of our December 2018 study that the "chilling effect" could impact up to 2.2 million Californians in immigrant families.

27.  California has intentionally been more inclusive in its safety net programs than the federal government, extending eligibility to noncitizens, including children and the young adult population up to age 26 regardless of immigration status.

28.  Our December 2018 study focused on how Californians enrolled in federally-financed programs for full-scope Medi-Cal would be affected by the Rule.  Our analysis included an estimate of the lost federal dollars to California and the economic impact of those losses, as discussed in the Declaration of Laurel Lucia also submitted in support of this motion.   The actual population potentially subject to the chilling effect, however, is broader, because it includes individuals who receive state-only financed healthcare services.

29.  Based upon CHIS data, I estimate that an additional 228,000 Californians enrolled in Medi-Cal through state-only financing might be chilled from accessing health insurance by the Rule, bringing the total to 2.34 million Californians.

30.  Based on a total of 2.34 million Californian, the following disenrollment scenarios would apply:

c.  At a 15 percent rate, 351,000 people;
d.  At a 25 percent rate, nearly 585,000 people; and
e.  At a 35 percent rate, over 819,000 people.

31.  Other important findings of the December 2018 study were:

f.  Nearly 70 percent of the California residents projected to disenroll from healthcare and nutrition assistance benefits would be children.
g.  Across California, disenrollment from CalFresh and Medi-Cal due to a chilling effect would most significantly impact Latinos, up to 88 percent, and Asians, up to 8 percent.

32.  The loss of benefits caused by the Rule will make it harder for low-income immigrant families to achieve food security and healthcare.

33.  Food insecurity means having limited, uncertain, or inconsistent access to the quality and quantity of food that is necessary to live a healthy life.  Having sustained access to enough food is tied to positive social, physical, and mental health outcomes. *Id.*

34.  Disenrollment from Medicaid is likely to result in adults and children lapsing into the financially vulnerable state of not having insurance, making it much harder to obtain health care. Medi-Cal enrollees are 1.8 times more likely to have a usual place to get health care and 1.5 times more likely to have had a preventive care visit in the past year, compared with people who were uninsured.  An individual's having a usual source of care and gaining access to a preventive visit is strongly associated with better health outcomes and reduced costs to the health system.

6

35.  Lack of health insurance does not affect all immigrants equally.  Latino and low-income families are more likely to be uninsured.

**Children's Health Insurance Program Will Be Impacted by the Rule**

36.  The Children's Health Insurance Program ("CHIP") is a federal and state partnership to expand health insurance coverage to uninsured low-income children.

37.  Over 4 million U.S. citizen children in California have at least one immigrant parent, and 2 million of these children are enrolled in Medi-Cal and CHIP.  "State Immigration Data Profiles: California", Migration Policy Institute, https://www.migrationpolicy.org/data/state-profiles/state/demographics/CA, (last visited Aug. 23, 2019).  Together, they represent 25 percent of all CHIP enrollees in the country.  61 percent of these children are Latino.

38.  Although CHIP is not included in the Rule, eligible beneficiaries will still likely be chilled from accessing it, because California has integrated CHIP with Medi-Cal. Thus, enrollees in CHIP may disenroll out of fear of an adverse public charge determination, although they would not actually be considered public charges on the basis of CHIP usage alone.  Accordingly, our December 2018 study includes CHIP in our analysis of disenrollment scenarios.

39.  Currently in California, the federal government pays 88 percent of the costs for children enrolled in CHIP, Petek, G., "The 2019-20 Budget: Analysis of the Medi-Cal Budget", California Legislative Analyst Office, (February 13, 2019), at 4. This would leave the state with fewer resources with which to ensure that its children specifically and its residents more broadly have access to healthcare.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge and expert opinion.

Executed on August 26, 2019, in Los Angeles, California.

_____
Ninez A. Ponce

7

Exhibit A

CURRICULUM VITAE

**Ninez Alafriz PONCE**

Professor
Department of Health Policy and Management
650 Charles E. Young Drive, room 31-236C
Fielding School of Public Health
University of California, Los Angeles,
Los Angeles, CA 90095
USA

Director
UCLA Center for Health Policy Research
10960 Wilshire Boulevard, suite 1550
Fielding School of Public Health
University of California, Los Angeles
Los Angeles, CA 90024
USA

## I.    EDUCATION

*Bachelor of Science*      Nutrition and Food Sciences (1984), University of California, Berkeley, CA

*Master in Public Policy*   International Development (1988), Harvard University, Cambridge, MA

*Doctor of Philosophy*     Health Services (1998), University of California, Los Angeles, CA
                           *Field in Labor Economics*

## Training

AHRQ Pre-Doctoral Fellow, Health Services, University of California, Los Angeles, CA 1992-1995

Research Assistant, National Bureau of Economic Research, Cambridge, MA, 1995

AHRQ Post-Doctoral Fellow, Health Policy and Management, University of California, Berkeley, CA, 1998-
   1999

## II.    PROFESSIONAL EXPERIENCE

1999 to present         University of California                    Los Angeles, CA

*Faculty Appointments:*

*Professor, Department of Health Policy & Management (2013-present)*

*Associate Professor, Department of Health Services (2008-2013) (tenured)*

*Associate Professor-In Residence, Department of Health Services (2007-2008)*

*Assistant Professor-In Residence, Department of Health Services (1999-2007)*

*Administrative Appointments:*

*Director, UCLA Center for Health Policy Research (2018-present)*

*Director, Center for Global and Immigrant Health, UCLA (2014-2018)*

*Vice-Chair, Department of Health Policy and Management (2016-2018)*

*Associate Center Director, UCLA Center for Health Policy Research (2014-2018)*

*Senior Research Scientist, UCLA Center for Health Policy Research (1999-2013)*

*Associate Director, Asian American Studies Center (2011-2012)*

*Research Affiliations:*

*Associate Director, UCLA Bridging Research, Training, and Education in Minority Health Disparities Solutions, NIH/NIMHD Center (2013-2015)*

*Faculty Associate, Division of Cancer Control and Prevention Research, Jonsson Comprehensive Cancer Center (2002-2014)*

*Faculty Associate, UCLA Asian American Studies Center (2000-2018)*

*Faculty Executive Committee, UCLA Asia Pacific Center (2016-2018)*

*Faculty Associate, UCLA Department of Women's Studies (2008-2014)*

*Faculty Associate, UCLA Department of Southeast Asian Studies (2005-2018)*


1999 - 2005                  Community Voices-Oakland/ La Clinica de la Raza & Asian Health Services
*Research Consultant*
 Conduct program evaluation, survey research and public policy analysis for a W.K. Kellogg Foundation national initiative on improving health care for the underserved.  Community Voices-Oakland focuses on developing affordable health insurance products for low-income Latino and Asian immigrant groups in Alameda County.


1996 - 1998                  RAND                                                    Skopje, MACEDONIA

*Policy Adviser*
 Advised the Ministry of Health, Republic of Macedonia on national health insurance reforms, including developing a minimum benefits package, setting cost-sharing policies, and introducing capitation in primary care. Wrote the proposal with the principal investigator to supplement original grant with $575,000 to continue technical assistance and to conduct a social experiment testing the effect of capitation on access, utilization, provider behavior and cost of services.

1988 - 1992                  Asian & Pacific Islander American Health Forum         San Francisco, California
*Deputy Director*
 Co-directed a national advocacy and policy research non-profit organization whose mission is to advance the health of all Asians and Pacific Islanders in the U.S. and Trust Territories. Developed the strategy for improving health statistics for Asians and Pacific Islanders, wrote grant proposals for program development and policy papers for legislative education.  Prepared the primary text for the Asian American Health Care Act of 1992 that mandated the collection of Asian American subgroup ethnicities in all federal data collection efforts.


## III. TEACHING

HPM= (Health Policy and Management)


1. HPM 249-1   *Health Economics: Low- and Middle-Income Country Perspective*s

       MPH-level elective hybrid online course, synchronous with University of the Philippines, Manila, College of Public Health, Department of Health Policy and Administration (Winter/Spring 2018, 2019)

2. HPM 249-2   *Global Health: Frameworks, Policy and Practice*

       MPH-level elective hybrid online course, synchronous with University of the Philippines, Manila, College of Public Health, Department of Health Policy and Administration (Winter/Spring 2018)

3.  HPM 237C               *Issues in Health Services Methodologies* (Spring 2011 - Spring 2015; Spring 2017) (Winter/Spring 2018)
                           MS/PhD-level required course in applied econometrics.

4.  HPM 237B               *Introduction to Health Services Research Methods* (Winter 2007; Winter 2008)
                           MS/PhD-level required course in applied econometrics.

5.  HPM 226A               *Readings in Health Services Research* (Fall 2010 co-taught with Jack Needleman; Winter 2011-2012; Fall 2013)
                           MS/PhD-level required seminar.

6.  HPM 226B               *Readings in Health Services Research* (Winter 2011 co-taught with Jack Needleman; Winter 2012)
                           MS/PhD-level required seminar.

7.  HPM M236               *Microeconomic Theory of the Health Sector,* (Winter 2000; Winter 2001; Winter 2004; Winter 2005; Spring 2009)
                           MPH-level required course in health management and health policy.

8.  HPM 249E; PS 266 *Advanced Topics in Health Economics,* (Winter 2003)
                           MPH/PhD-level elective.

9.  Health Services M233   *Health Policy Analysis*, (Spring 2002; Spring 2003 co-taught with Robert Nordyke; Spring 2011)
                           MPH-level required course in health policy

10. Health Services 400    *Master's Student's course on Consulting Report*, (Fall 2000)
                           MPH-level required course in health management and health policy.

Guest Lectures:

1.  "Surveys, Questionnaire Design, and a Sample of Sampling" for Professor Deborah Freund, Claremont Graduate University (Fall 2018)

2.   "CHIS and Health Disparities" for UCLA National Clinician Scholars Pressing Health Issues Los Angeles Seminar, (Summer 2018)

3.  "CHIS and Southern California Health Disparities" for UCLA National Clinician Scholars Pressing Health Issues Los Angeles Seminar, (Summer 2017), with Professor Gerald Kominski.

4.  "Surveys and Small Area Estimation:  Complementary Strategies to Measure the Health of Populations" for RCMAR/CHIME and Project EXPORT Methodological Seminar and Work in Progress (WiP) Session, March 20, 2017, with Dr. Yueyan Wang.

5.  "Cost Containment" for HS200A Robert Wood Johnson Clinical Scholars Program Professor José Escarce (Fall 2006, Fall 2007, Fall 2008; Fall 2010-Fall 2016)

6.  "Surveys, Questionnaire Design, and a Sample of Sampling" for HPM 225A, Professor James Macinko (Fall 2016)

7.  UCLA School of Medicine Comparative Effectiveness Research Module:  "Community Characteristics: Measuring Neighborhood Effects and the Use of Geo-coded Variables" with Professor Arleen Brown (Winter 2012-2015)

8.  "Quantitative research methods for policy analysis" for Health Policy Analysis (HS 233), Professor Jack Needleman  (Spring 2004, Spring 2012-Spring 2014)

9.  "Multicultural Survey Research" for Nursing School, Professor Margaret Compton, Winter 2012.

10. "Aging across Cultures" for VA Geriatrics Fellowship Program, Professor Josea Kramer Winter 2012.

11. "Healthcare Disparities" for Health Services Organization (HS 200B), Professor E. Richard Brown (Winter 2008; Winter 2009); Professors E. Richard Brown and Arturo Vargas Bustamante  (Winter 2011); Arturo Vargas Bustamante  (Winter 2012)

12. "Coverage and the Safety Net" for Health Services Organization (HS 200A), Professor Leah Vriesman (Fall 2006), Professor E. Richard Brown (Fall 2007, Fall 2008); Professors E. Richard Brown and Arturo Vargas Bustamante  (Fall 2010)

13. "The U.S. National Health Care System " for PH 150, Professor Roger Detels (Fall 2006, Fall 2007, Fall 2008)

14. "Inequities in Health" for Ethics and Public Health class, Professors Emily Abel & Ruth Roemer (Winter 2001); Patricia Parkerton (Winter 2002); Professors Patricia Ganz (Fall 2003; Winter 2005; Winter 2006; Winter 2007; Winter 2008).

15. "Vulnerable Populations and Managed Care" for Managed Care (HS 442), Professor Patricia Parkerton (Spring 2007)

16. "Health Care Financing" for Introduction to Health Services Organization (HS 100A), Professor Margaret Wang (Spring 2007)

17. "Cost Benefit Analysis" for Health Policy Analysis (HS 233), Professor Jack Needleman  (Spring 2006)

18. "Physician and Hospital Payments" for Health Economics (HS 236), Professor Thomas Rice (Winter 2006)

19. "Economics of Disparities" for Advanced Topics in Health Economics (HS 249E), Professor Thomas Rice (Spring 2005)

20. "Public Finance" for Health Policy Analysis (HS 233), Professor Jack Needleman  (Spring 2004)

21. "The State of Health Insurance in California: The Evidence, the Consequences, The Fixes" for Health Services Organization (HS 200A), Professor Amardeep Thind (Fall 2003; Fall 2004)

22. "Medical Malpractice" for Microeconomic Theory of the Health Sector, Professor Stuart Schweitzer (Fall 2002)

23. "Health Status and Health Behaviors of Ethnic Groups" for Ethical Considerations in Conducting Research with Minority Populations, Professor Vickie Mays (Winter 2001; Winter 2002)

24. "Cost-Benefit & Cost-Effectiveness Analysis" for Evaluation, Professor Roshan Bastani (Spring 2001; Spring 2002)

25. "A Primer on Health Economics in Developing Countries" for Professor Peabody (Spring 2002)

26. "Asian American and Pacific Islander Women's Health:  Measurement Issues in Disparities Research" for Professor Emily Abel (Winter 2002; Fall 2002; Fall 2004)

27. "Drug Development Cost Estimates: How Precise Are They, How Are They Used?" With Robert Nordyke, for Pharmaceutical Economics Seminar, Professors William Comanor and Stuart Schweitzer (Spring 2002)

1. Dissertation Chair:
    1. Jeanne Black (PhD, 2007; Senior Researcher, Cedars Sinai Health Systems)
    2. Janet Cummings (PhD 2009); Associate Professor, Emory University
    3. Kimberly Enard (PhD 2010); Assistant Professor, St. Louis University
    4. Melissa Gatchell (PhD 2012); Assistant Professor, Oregon Health Sciences University
    5. Michelle Ko (PhD 2012); UCSF Assistant Professor, UC Davis
    6. Jacqueline Tran (DrPH, 2013); OCAPICA

7. Annalyn Valdez (DrPH 2014); UCLA; co-chair with Prof Kagawa-Singer
8. Chikarlo Leak (DrPH 2014); co-chair with Prof McCarthy
9. Alice Villatoro (PhD 2014); co-chair with Prof Mays; Latino Research Institute, UT Austin)
10. Catherine Chanfreau (PhD 2015), VA, Los Angeles
11. Andrew Siroka (PhD 2016), Health Economist, WHO, Geneva
12. Lauren Gase (PhD 2016), Senior Researcher, SPARK Policy Institute, Denver, CO
13. Joseph Viana (PhD 2018), Consultant, Los Angeles County Department of Health
14. Linda Diem Tran (PhD 2018), Post-Doctoral Fellow, VA Palo Alto
15. Natalie Bradford (PhD student) co-chair Prof Chandra Ford
16. Dahai Yue, (PhD student) co-Chair Prof Adriana Lleras-Muney (Economics)

Thesis/Dissertation Committee Member:

1. Thy Bich Nguyen, (Asian American Studies, MA, 2001)
2. Judith Connell, (Health Services, DrPH, 2002)
3. Soonim Huh, (Health Services, PhD 2005) Associate Professor, University of Seoul, Department of Public Affairs and Economics
4. Katherine Hoggatt, (Epidemiology, PhD 2005) Researcher, VA Los Angeles
5. Laura D'Anna, (Community Health Sciences, PhD 2006) Assistant Professor Cal State Long Beach
6. France Nguyen, (Asian American Studies, MA 2005)
7. Richard Hector, (Health Services, PhD, 2007)
8. Cynthia Mojica, (Health Services, PhD, 2007)
9. Shana Alex Lavarreda (Health Services, PhD 2009); Assistant Professor, Cal State Fullerton
10. Catherine Aqua (Health Services, MS, 2010)
11. Neetu Chawla (Health Services, PhD 2011) Researcher, VA Los Angeles
12. JoKay Ghosh, (Epidemiology, PhD 2011)
13. Mona Au-Young (Health Services, PhD 2013)
14. Selena Ortiz (Health Policy and Management, PhD 2013) Assistant Professor, Penn State
15. Brittnie Bloom (Community Health Sciences, MS 2014)
16. Alison Wong (Health Services, MS, 2014)
17. Jeremiah Garza  (Health Policy and Management, PhD 2014)
18. Yan Kim  (Health Policy and Management, PhD 2015)
19. Folasade May (Health Policy and Management, PhD 2015)
20. Charlene Hsuan  (Health Policy and Management, PhD 2016) Assistant Professor, Penn State
21. Kimberly Narain (Health Policy and Management, PhD 2016)
22. Anna Davis (Health Policy and Management, PhD 2016) Research Fellow, Kaiser, Southern California
23. Christabel Cheung (Social Welfare, PhD 2017) Assistant Professor, Social Welfare, University of Hawaii, Manoa

Independent Study Student Supervision:

1. Ramogi Huma (MPH), Health Services, 2001
2. Estee Liebross (MPH), Health Services, 2005
3. Christabel Cheung (PhD), Social Welfare, 2015
4. Thalia Portney (Harvard PhD ) Health Policy, 2015, 2016
5. Angelo Mendoza (undergraduate) Internet Research Incubator mentee, 2018

Research Grant Sponsor:

1. Dahai Yue (HPM PhD student) UCLA Summer Mentorship 2017
2. Joseph Viana (HPM 2018) UCLA Graduate Research Mentorship 2016
3. Christabel Cheung (Social Welfare 2017) Graduate Research Mentorship 2015
4. Jennifer Tsui (Health Services PhD 2012) UCLA Summer Mentorship 2009
5. Melissa Gatchell (Health Services PhD 2012) UCLA JCCC Seed Grant 2008-2009
6. Kimberly Enard (Health Services PhD 2010) UCLA Research Mentorship 2008
7. Neetu Chawla (Health Services, PhD 2011) UCLA Summer Research Mentorship 2007
8. Andrew Barnes (Health Services, PhD 2011) UCLA Research Mentorship 2007
9. Janet Cummings (Health Services PhD 2009) NIMH F-31 Dissertation Grant 2008-2010
10. Jeanne Black  (Health Services, PhD 2007)  AHRQ Dissertation Grant 2003-2005

Robert Wood Johnson Clinical Scholars:

1. Kristina Cordasco, MD, MPH
2. Rashmi Shetgiri, MD
3. Kara Odom Walker, MD
4. Christoph Lee, MD
5. Luwam Semere, MD

Robert Wood Johnson Multicultural Health Scholars:

1. Aimee Afable-Munsuz, PhD (Associate Professor, SUNY downstate Brooklyn)
2. Victoria Ojeda, PhD (Associate Professor, UC San Diego)
3. Edna A. Viruell-Fuentes, PhD (Associate Professor, University of Illinois, Urbana-Champaign)
4. Annalijn Conklin, PhD (Assistant Professor), University of British Columbia, Vancouver, CA

Robert Wood Johnson Health Policy Research Scholars 2016-present:

1. Seciah Aquino, (Harvard, DrPH 2018)
2. Mary Keovisai (University of Illinois, PhD Candidate)
3. Erica Browne (UC Berkeley, DrPH Candidate)
4. Bukola Bakare (North Dakota State, PhD Candidate)

PhD Adviser:

1. Soonim Huh, (Health Services, PhD 2005)
2. Andrew Barnes (Health Services, PhD 2011) Associate Professor, Virginia Commonwealth University
3. Jennifer Tsui (Health Services, PhD 2013) Assistant Professor, Rutgers University
4. Selena Ortiz (Health Policy and Management, PhD 2013) Assistant Professor, Penn State Health Policy and Administration
5. Sandhya Shimoga (Health Services, PhD 2014) Assistant Professor, Cal State University, Northridge

6.  Geoffrey Hoffman (Health Policy and Management, PhD 2015) Assistant Professor, University of Michigan School of Nursing
7.  Selene Mak (Health Policy and Management, PhD Candidate)
8.  Linh Chuong (Health Policy and Management, PhD Candidate)

## IV.    PEER REVIEWED ARTICLES & BOOK CHAPTERS

**PUBLICATIONS:**

*Peer-reviewed articles*

1.  **Ponce NA**, and Penserga L.  Language access in health:  why the policy and practice inertia? Harvard Health Policy Review. 2002:3(2): 47-53.

2.  Mays VM, **Ponce NA**, Washington DL, Cochran SD. Classification of race and ethnicity: implications for public health. Annu Rev Public Health. 2003;24:83-110.

3.  **Ponce NA,** Lavarreda SA, Yen W, Brown ER, DiSogra C, Satter DE. The California Health Interview Survey 2001: translation of a major survey for California's multiethnic population. Public Health Rep. 2004 Jul-Aug;119(4):388-95.

4.  Etzioni DA, **Ponce NA**, Babey SH, Spencer BA, Brown ER, Ko CY, Chawla N, Breen N, Klabunde CN. A population-based study of colorectal cancer test use: results from the 2001 California Health Interview Survey. Cancer. 2004 Dec 1;101(11):2523-32.

5.  Yancey AK, Kumanyika SK, **Ponce NA**, McCarthy WJ, Fielding JE, Leslie JP,Akbar J. Population-based interventions engaging communities of color in healthy eating and active living: a review. Prev Chronic Dis. 2004 Jan;1(1):A09. PMCID: PMC2396989.

6.  **Ponce N**, Nordyke RJ, Hirota S. Uninsured working immigrants: a view from a California county. J Immigr Health. 2005 Jan;7(1):45-53.

7.  Rice T, Lavarreda SA, **Ponce NA**, Brown ER. The impact of private and public health insurance on medication use for adults with chronic diseases. Med Care Res Rev. 2005 Apr;62(2):231-49.

8.  **Ponce NA**, Hoggatt KJ, Wilhelm M, Ritz B. Preterm birth: the interaction of traffic-related air pollution with economic hardship in Los Angeles neighborhoods. Am J Epidemiol. 2005 Jul 15;162(2):140-8.

9.  **Ponce NA**, Huh S, Bastani R. Do HMO market level factors lead to racial/ethnic disparities in colorectal cancer screening? A comparison between high-risk Asian and Pacific Islander Americans and high-risk whites. Med Care. 2005 Nov;43(11):1101-8.

10. Peabody JW, Nordyke RJ, Tozija F, Luck J, Munoz JA, Sunderland A, Desalvo K, **Ponce N**, McCulloch C. Quality of care and its impact on population health: a cross-sectional study from Macedonia. Soc Sci Med. 2006 May;62(9):2216-24.

11. **Ponce NA**.  Gatchell M.  Singhs, Watanabes, Parks and Nguyens: A comparison of surname-list samples to probability samples using the California Health Interview Survey, 2001. AAPI Nexus: Asian Americans & Pacific Islanders Policy, Practice, and Community. 2006 4(1):61-79

12. Spencer BA, Babey SH, Etzioni DA, **Ponce NA**, Brown ER, Yu H, Chawla N, Litwin MS. A population-based survey of prostate-specific antigen testing among California men at higher risk for prostate carcinoma. Cancer. 2006 Feb 15; 106(4):765-74.

13. **Ponce NA**, Hays RD, Cunningham WE. Linguistic disparities in health care access and health status among older adults. J Gen Intern Med. 2006 Jul; 21(7):786-91.

14. **Ponce NA**, Ku L, Cunningham WE, Brown ER. Language barriers to health care access among Medicare beneficiaries. Inquiry. 2006 Spring; 43(1):66-76.

15. **Ponce NA**, Chawla N, Babey SH, Gatchell MS, Etzioni DA, Spencer BA, Brown ER, Breen N. Is there a language divide in Pap test use? Med Care. 2006 Nov; 44(11):998-1004.

16. Pourat N, **Ponce NA**, Wyn R. Assessment of the state of ethnic-specific health survey data. AAPI Nexus: Asian Americans & Pacific Islanders Policy, Practice, and Community. 2006 5(1):97-106.

17. Mojica C, Bastani R, Boscardin J, **Ponce NA**. Low-income women with breast abnormalities: system predictors of timely diagnostic resolution. Cancer Control. 2007 Apr; 14(2):176-82.

18. **Ponce NA**, Afable-Munsuz A, Nordyke RJ. Conceptualising the impact of genetic testing on cancer disparities in the United States. International Journal of Health Technology and Management. 2007;8:5:536-548.

19. Kagawa-Singer M, Pourat N, Breen N, Coughlin S, McLean TA, McNeel TS, **Ponce NA**. Breast and Cervical Cancer Screening Rates of Subgroups of Asian American Women in California. Med Care Res Rev. 2007 Dec, 64(6):706-30.

20. Mojica C, Bastani R, **Ponce NA**, Boscardin J. Latinas with abnormal breast findings: patient predictors of timely diagnostic resolution. Journal of Women's Health 2007 Dec;16(10):1468-77.

21. Hector RD, Anderson JP, Paul RCP, **Ponce N**, Hays RD, Weiss RE, Kaplan RM. Evaluation of the validity of the Quality of Well-being Scale in Trinidad and Tobago. West Indian Med J 2008 Mar; 57 (2): 135-140.

22. Kratz, RE, **Ponce NA**, Yancey A. Process evaluation of the Los Angeles Unified School District Nutrition Network. Preventing Chronic Diseases. 2008 Apr;5(2):A42.1-9.

23. **Ponce NA**, Cochran, SD, Mays VM, Chia J, Brown ER. Health coverage of low-income citizen and noncitizen wage earners: sources and disparities. Journal of Immigrant and Minority Health. 2008 Apr;10(2):167-76.

24. Lavarreda SA, Gatchell, MS, **Ponce, NA** Chia J, Brown ER Switching health insurance and its effects on access to physician services. Med Care. 2008 Oct;46(10):1055-63

25. Phillips KA, Liang, SY , Van Bebber S, The CANPERS (Cancer and Personalized Medicine) Research Group, Afable-Munsuz A, Elkin E, Haas J, Hassett M, Knight SJ, Kulin N, Kuppermann M, Ladabaum U, Marshall D, **Ponce N**, Walsh J. Challenges to the translation of genomic information into clinical practice and health policy: utilization, preferences, and economic value. Curr Opin Mol Ther. 2008 June; 10(3): 260–266. PMCID: PMC2910510

26. Afable-Munsuz A, Liang SY, **Ponce NA**, Walsh JM. Acculturation and colorectal cancer screening among older Latino adults: differential associations by national origin. J Gen Intern Med. 2009 Aug;24(8):963-70. PMCID: PMC2710471

27. Shariff-Marco S, Gee GC, Breen N, Willis G, Reeve BB, Grant D , **Ponce NA**, Krieger N, Landrine H, Williams DR, Alegria M, Mays VM, Johnson TP, Brown ER. A mixed-methods approach to developing a self-reported racial/ethnic discrimination measure for use in multiethnic health surveys. Ethnicity & Disease 2009 Autumn;19(4):447-53.

28. Gee GC, **Ponce N**. Associations between racial discrimination, limited English proficiency, and health-related quality of life among 6 Asian ethnic groups in California. Am J Public Health. 2010 May;100(5):888-95. PMCID: PMC2853608

29. Lee S, Satter DE, **Ponce NA**. Effect of race and ethnicity classification on survey estimates: Anomaly of the weighted totals of American Indians and Alaska Natives. Am Indian Alsk Native Ment Health Res. 2009;16(3):1-15.

30. D'Anna L, **Ponce, NA**, Siegel J. Racial and Ethnic Health Disparities:  Evidence of discrimination's effects across the SEP spectrum. Ethnicity and Health 2010 Feb 2:1-23. No federal funding for this study.

31. Afable-Munsuz A, **Ponce NA**, Rodriguez M, Perez-Stable EJ. Immigrant generation and physical activity among Mexican, Chinese & Filipino adults in the U.S. Soc Sci Med. 2010 Mar 16. PMCID: PMC3042273

32. Cummings, JC, **Ponce, NA**, Mays VM. Comparing racial/ethnic differences in mental health service use among high-need subpopulations across clinical and school-based settings. Journal of Adolescent Health. 2010 Jun;46(6):603-6. PMCID: PMC2872636

33. **Ponce NA**, Cochran SD, Pizer JC, Mays VM. The effects of unequal access to health insurance for same-sex couples in California. Health Aff (Millwood). 2010 Aug;29(8):1539-48.

34. Shetgiri R, Kataoka S, **Ponce N**, Flores G, Chung PJ. Adolescent fighting: racial/ethnic disparities and the importance of families and schools. AcadPediatr. 2010 Sep-Oct;10(5):323-9.

35. Cordasco, K, **Ponce NA**, Gatchell M, Traudt B, Escarce, J. English language proficiency and geographical proximity to a safety net clinic as a predictor of health care access. J Immigrant and Minority Health 13(2): 260–267. PMCID: PMC3056133

36. Shariff-Marco S, Breen N, Landrine H, Reeve B, Krieger N, Gee GC, Williams DR, Mays VM, **Ponce NA**, Alegria M, Liu B, Willis G, and Johnson TP.  Measuring everyday racial/ethnic discrimination in health surveys: how best to ask the questions, in one or two Stages, across multiple racial/ethnic groups?  Du Bois Review. Social Science Research on Race. 2011 ; 8(10) 159-178.

37. **Ponce NA.**  What a Difference a Dataset and Advocacy make for AAPI Health. AAPI Nexus, Special Issue on Forging the Future: The Role of New Research, Data, and Policies for Asian Americans, Native Hawaiians, and Pacific Islanders. (Invited Commentary) 2011 Oct; 9(1&2) 159-162.

38. Wang G, Beattie MS, **Ponce NA**, Phillips KA. Eligibility criteria in private and public coverage policies for BRCA genetic testing and genetic counseling, Genet Med. 2011 Dec;13(12):1045-50.

39. Lavarreda SA, **Ponce NA**, Cabezas L, Brown ER. Access to Job-Based Insurance for California's Workers and their Families: The effect of the Great Recession and double-digit unemployment in California. California Journal of Politics and Policy. 2011 Nov ;8(4) :1–13.

40. Odierna DH, Afable-Munsuz A, Ikediobi O, Beattie M, Knight S, Ko M, Wilson A, **Ponce NA**. Early developments in gene-expression profiling of breast tumors: potential for increasing black-white patient disparities in breast cancer outcomes? Per Med. 2011 Nov;8(6):669-679. PMCID: PMC3242007

41. **Ponce NA**, Tsui J, Knight SJ, Afable-Munsuz A, Ladabaum U, Hiatt RA, Haas JS. Disparities in cancer screening in individuals with a family history of breast or colorectal cancer. Cancer. 2012 Mar 15;118(6):1656-63. PMCID: PMC3262934

42. Russ LW, Takahashi LM, Ho W, Tseng W, **Ponce NA**.  Bridging academic-legislative divides: Models of policy-relevant health research and practice by the University of California. Progress in Community Health Partnerships: Research, Education, and Action Volume 6, Issue 1, Spring 2012, pp. 95-102.

43. Viruell-Fuentes E, **Ponce NA**, Alegría M.  Neighborhood context and hypertension outcomes among Latinos in Chicago. Journal of Immigrant and Minority Health, 2012 Apr 18.

44. Ko, M. and **Ponce, NA**. Community residential segregation and the local supply of federally qualified health centers. Health Services Research,  2013, 48: 253–270.

45. Lee CI, **Ponce NA,** Ettner SL, Kahn KL, Bassett LW, Forman HP.  Ordering of CT by emergency department provider type: analysis of a nationally representative sample.  American Journal of Roentgenology 2012 Nov;199(5):1054-9.

46. Phillips KA, Sakowski JA, Liang SY, **Ponce NA**. Economic perspectives on personalized health care and prevention. Forum for Health Economics and Policy. July 2013.16(2):2194-6191.

47. Ko M, Needleman J, Derose KP, Laugesen MJ, **Ponce NA**.  Residential segregation and the survival of U.S. urban public hospitals. Med Care Res Rev. 2014 Jun;71(3):243-60.

48. Shariff-Marco S, Yang J, John EM, Sangaramoorthy M, Hertz A, Koo J, Nelson DO, Schupp CW, Shema SJ, Cockburn M, Satariano WA, Yen IH, **Ponce NA,** Winkleby M, Keegan TH, Gomez SL. Impact of neighborhood and individual socioeconomic status on survival after breast cancer varies by race/ethnicity: the neighborhood and breast cancer study. Cancer Epidemiol Biomarkers Prev. 2014 May;23(5):793-811.

49. Shim S, Kagawa-Singer M**, Ponce NA.**  Federally Qualified Health Centers—A Prescription for Health Equity. (Editor's Note) Asian Americans & Pacific Islanders Policy, Practice, and Community. 2014: 12:1 & 2: xi-xiv.

50. Pourat N, Wallace SP, Hadler MW, **Ponce N**. Assessing Health Care Services Used By California's Undocumented Immigrant Population In 2010.  Health Aff (Millwood). 2014 May;33(5):840-7.

51. Gomez SL, Lichtensztajn DY, Parikh P, Hasnain-Wynia R,  **Ponce N**, Zingmond D.  Hospital Practices in the Collection of Patient Race, Ethnicity, and Language Data: A Statewide Survey, California, 2011. Journal of Hlth Care for the Poor and Underserved.  2014 Aug;25(3):1384-96.

52. Ko M, Needleman J, Derose KP, **Ponce NA**.  Whose social capital matters? The case of U.S. urban public hospital closures and conversions to private ownership. Social Science & Medicine 2014 Aug;114:188-96. doi: 10.1016/j.socscimed.2014.03.024. Epub 2014 Mar 25.

53. Johnson T, Shariff-Marco S,  Willis G, Ho C, Breen N, Gee G,  Krieger N, Grant D, Alegria M, Williams D,  Landrine H, Liu B, Reeve B, Takeuchi D, **Ponce NA.** Sources of interactional problems in a survey of racial and ethnic discrimination. International Journal of Public Opinion Research.  2015 Summer;27(2):244-263.

54. AuYoung M, Duru, MD, **Ponce NA**, Mangione CM, Rodriguez HP.  Frontline experiences of a practice redesign to improve self-management of obesity in safety net clinics. Journal of Ambulatory Care Management. 2015 Apr-Jun;38(2):153-63.

55. Kanzaria HK, Probst MA, **Ponce NA**, Hsia RY. The association between advanced diagnostic imaging and emergency department length of stay.  The American Journal of Emergency Medicine. 2014 Oct;32(10):1253-8

56. Scales CD Jr, Lin L, Saigal CS, Bennett CJ, **Ponce NA**, Mangione CM, Litwin MS; NIDDK Urologic diseases in America project. Emergency department revisits for patients with kidney stones in California. Acad Emerg Med. 2015 Apr; 22(4): 468-74.

57. Oneha, MF, DeCambra H, Ieong L, Song H, Quach T, Chang-Weir R, **Ponce NA**, Enos Sim S, Kagawa-Singer M. Creating community criteria for research participation at community health center. AAPI Nexus: Asian Americans & Pacific Islanders Policy, Practice, and Community.  2014: 12:1 & 2: 1-20.

58. Quach T, Gilmer TP,  Hirota S, , **Ponce NA**. Risk adjustment with social determinants of health and implications for federally qualified health centers under the Affordable Care Act.  AAPI Nexus: Asian Americans & Pacific Islanders Policy, Practice, and Community.  2014: 12:1 & 2: 73-82.

59. Li V, Song H, Meng YY, **Ponce NA**, Weir RC. The impact of enabling services on improving health outcomes at community health centers.  Harvard Asian American Policy Review. 25th volume 2015.

60. Almario CV, May FP, **Ponce, NA**, Spiegel BMR. Racial and ethnic disparities in colonoscopic examination of individuals with a family history of colorectal cancer. Clinical Gastroenterology and Hepatology. 2015 Feb 28.

61. Molitor F, Sugerman S, Biehl M, Yu H, Aydin M, Levy M, **Ponce NA**.  Reach of Supplemental Nutrition Assistance Program-Education (SNAP-Ed) interventions and nutrition and physical activity-related outcomes. Preventing Chronic Disease, Public Health Research, Practice and Policy. 2015 Mar 12;12:E33.

62. Jans M,  Viana J,  Grant D, Cochran SD,  Lee AC,  **Ponce NA**. Trends in sexual orientation missing data over a decade of the California Health Interview Survey. The American Journal of Public Health.  May 2015, Vol. 105, No. 5, pp. e43-e50.

63. Guerrero A, **Ponce NA**, Chung PJ. Obesogenic dietary practices of Latino and Asian subgroups of children in California: an analysis of the California Health Interview Survey, 2007-2012. American Journal of Public Health. 2015 Aug;105(8).  Epub 2015 Jun 11.

64. **Ponce NA**, Ko M, Coffinier-Chanfreau C, Liaing SY, Armstrong J, Toscano M, Haas JS. Early diffusion of gene expression profiling in breast cancer patients associated with areas of high income inequality. Health Affairs. April 2015 vol. 34 no. 4 609-615.

65. May FP, Almario CV, **Ponce N**, Spiegel BM. Racial minorities are more likely than whites to report lack of provider recommendation for colon cancer screening. Am J Gastroenterol. 2015 May 12. doi: 10.1038/ajg.2015.138. [Epub ahead of print]PMID: 25964227

66. Kim Y, Kleerup EC, **Ponce NA**, Ganz PA, Lorenz KA, Needleman J.  Medicare payment policy creates incentives for long-term care hospitals to time discharges for maximum reimbursement. Health Affairs.  2015 Jun;34(6):907-15.

67. Ortiz S, Perez D, **Ponce NA**.  The quality of diabetes management among Mexican Adults in California: does generational status matter?  Medical Care. 2015 Sep;53(9):792-9.

68. Zingmond DS, Parikh P, Louie R, Lichtensztajn DY, **Ponce N**, Hasnain-Wynia R, Gomez SL. Improving hospital reporting of patient race and ethnicity--approaches to data auditing.  Health Serv Res. 2015 Aug;50 Suppl 1:1372-89. Epub 2015 Jun 15.

69. Wang Y, **Ponce NA**, Wang P, Opsomer JD, Yu H. Generating health estimates by zip code: a semi-parametric small area estimation approach using the California Health Interview Survey.  Am J Public Health. 2015 Dec;105(12):2534-40.

70. **Ponce NA**, Bautista R, Sondik EJ, Rice D, Bau I, Ro MJ, Tseng W.  Championing partnerships for data equity. J Health Care Poor Underserved. 2015 May;26(2 Suppl):6-15.

71. Ko M, Cummings JR, **Ponce NA**. Changes in the supply of us rural health centers, 2000-2011: implications for rural minority communities. Journal of Rural Health. 2015 Sep 16. Epub ahead of print]

72. AuYoung M, **Ponce NA,** Duru, MD, Mangione CM, Rodriguez HP.  Patient activation is inconsistently associated with positive health behaviors among obese safety net patients. Journal of Immigrant and Minority Health 2015 Oct 1.

73. Siroka A, **Ponce NA**, Lönnroth K. Association between spending on social protection and tuberculosis burden: a global analysis.   Lancet Infectious Disease. 2016; 16(4): 473–479.

74. Garza JR, Glenn BA, Mistry RS, **Ponce NA**, Zimmerman FJ. Subjective social status and self-reported health among us-born and immigrant Latinos. J Immigr Minor Health. 2016 Feb 19. [Epub

ahead of print] PubMed PMID: 26895151.

75. Conklin AI, **Ponce NA**, Frank J, Nandi A, Heymann J. Minimum wage and overweight and obesity in adult women: a multilevel analysis of low and middle income countries. PLoS One. 2016 Mar 10;11(3):e0150736. doi:10.1371/journal.pone.0150736. eCollection 2016. PubMed PMID: 26963247; PubMed Central PMCID: PMC4786275.

76. Gase LN, Kuo T, Lai E, Stoll MA, **Ponce N**. The impact of two Los Angeles County teen courts on youth recidivism: comparing two informal probation programs. J Exp Criminol. 2016 Mar;12(1):105-126.

77. Charles SA, **Ponce N**, Ritley D, Guendelman S, Kempster J, Lewis, J, Melnikow J.  Health benefits mandates and their potential impacts on racial/ethnic group disparities in insurance markets.   J Immigr Minor Health. 2016 May 25. [Epub ahead of print]

78. Almario CV, May FP, Maxwell AE, Ren W, **Ponce NA**, Spiegel BM.  Persistent racial and ethnic disparities in flu vaccination coverage: Results from a population-based study.  Am J Infect Control. 2016 Sep 1;44(9):1004-9. Epub 2016 Jun 29.

79. Siroka A, Law I, Floyd K, Banda RP, Hoa N, Tsolmon B, Chanda-Kapata P, Gasana M, Thandar-Lwin, S, Mbazi TE, **Ponce NA**.  The effect of household poverty on tuberculosis. Int J Tuberc Lung Dis.  2016 Dec;20(12):1603-1608.

80. Gase LN, Glenn BA, Gomez LM, Juo T, Inkelas M, **Ponce NA**. Understanding racial and ethnic disparities in arrest: the role of individual, home, school, and community characteristics**.** Race Soc Probl. 2016 Nov06.

81. May F, Glenn BA, Crespi C, **Ponce N**, Spiegel B, Bastani R. Decreasing Black-White disparities in colorectal cancer incidence and stage at presentation in the United States. Cancer Epidemiol Biomarkers Prev. 2016 Dec 29. pii: cebp.0834.2016. doi: 10.1158/1055-9965.EPI-16-0834. [Epub ahead of print]

82. Gase LN, Glenn BA, Gomez LM, Juo T, Inkelas M, **Ponce NA.**  Relationships between student, staff, and administrative measures of school climate and student health and academic outcomes. J School Hlth. 2017 May;87(5)319–328

83. Narain K, Bitler M, **Ponce N**, Kominski G, Ettner S. The impact of welfare reform on the health insurance coverage, utilization and health of low education single mothers. Soc Sci Med. 2017 May;180:28-35. doi: 10.1016/j.socscimed.2017.03.021. Epub 2017 Mar 11.

84. Conroy SM, Shariff-Marco S, Koo J, Yang J, Keegan TH, Sangaramoorthy M, Hertz A, Nelson DO, Cockburn M, Satariano WA, Yen IH**, Ponce NA**, John EM, Gomez SL. Racial/Ethnic Differences in the impact of neighborhood social and built environment on breast cancer risk:  the Neighborhood and Breast Cancer Study. Cancer Epidemiol Biomarkers Prev. 2017 Apr;26(4):541-552. doi: 10.1158/1055-9965.EPI-16-0935. Epub 2017 Feb 14.

85. McMenamin SB, Shimkhada R, Hiller SP, Corbett G, **Ponce N**. Addressing discriminatory benefit design for people living with HIV: a California case study. AIDS Care. 2017 Apr 9:1-4. doi: 10.1080/09540121.2017.1313385. [Epub ahead of print]

86. Tran, LD, **Ponce, NA**.  Who Gets Needed Mental Health Care? Use of Mental Health Services among Adults with Mental Health Need in California.  Californian Journal of Health Promotion. 2017;15(1):36-45.

87. **Ponce, NA**, Glenn B, Shimkhada R, Scheitler AJ, Ko M. An examination of the barriers to breast cancer care in California. Am J Medical Res 2017;4(2): 73–126.

88. Villatoro, A, Mays V, **Ponce NA**, Aneshensel A. Perceived Need for Mental Health Care:  The Intersection of Race, Ethnicity, Gender, and Socioeconomic Status. Society and Mental Health. Aug

2017.

89. Hsuan C, Horowitz J, **Ponce NA**, Hsia R, Needleman J. Complying with the Emergency Medical Treatment and Labor Act (EMTALA): challenges and solutions.  Journal of Healthcare Risk Management. 2017 Nov 8. doi: 10.1002/jhrm.21288.

90. Holtby, S, Lordi N, Park R, **Ponce NA.** Families with young children in California: findings from the California Health Interview Survey, 2011-2014**.** American Journal of Medical Research.

91. **Ponce N**, Shimkhada R, Raub A, Daoud A, Nandi A, Richter L, Heymann J. The association of minimum wage change on child nutritional status in LMICs: A quasi-experimental multi-country study. Glob Public Health. 2017 Aug 2:1-15. doi: 10.1080/17441692.2017.1359327. [Epub ahead of print]

92. Cain C, Wallace SJ, **Ponce NA**. Helpfulness, trust, and safety of neighborhoods: social capital, household income, and self-reported health of older adults, The Gerontologist. 2017. gnx145, https://doi.org/10.1093/geront/gnx145

93. Conklin AI, **Ponce NA**, Crespi CM, Frank J, Nandi A, Heymann J. Economic policy and the double burden of malnutrition: cross-national longitudinal analysis of minimum wage and women's underweight and obesity. Public Health Nutr. 2017 Dec 6:1-8.

**94.** Yu H, Wang Y, Opsomer J, Wang P, **Ponce NA**. A design-based approach to small area estimation using semiparametric generalized linear mixed model.  Journal of the Royal Statistical Society. Volume181, Issue 4, October 2018 Pages 1151-1167.

95. Yue D, Rasmussen PW, **Ponce NA**. Racial/Ethnic Differential Effects of Medicaid Expansion on Health Care Access. Health Serv Res. 2018 Oct;53(5):3640-3656. doi: 10.1111/1475-6773.12834. Epub 2018 Feb 22. PubMed PMID: 29468669; PubMed Central PMCID: PMC6153163.

96. Anderson AC, O'Rourke E, Chin MH, **Ponce NA**, Bernheim SM, Burstin H. Promoting Health Equity and Eliminating Disparities Through Performance Measurement and Payment. Health Aff (Millwood). 2018 Mar;37(3):371-377. doi: 10.1377/hlthaff.2017.1301. PubMed PMID: 29505363.

97. Conklin AI, Daoud A, Shimkhada R, **Ponce NA**. The impact of rising food prices on obesity in women: a longitudinal analysis of 31 low-income and middle-income countries from 2000 to 2014. Int J Obes (Lond). 2018 Aug 17. doi: 10.1038/s41366-018-0178-y. [Epub ahead of print] PubMed PMID: 30120427.

98. Hoffman GJ, Hsuan C, Braun T, **Ponce N**. Health Equity and Hospital Readmissions: Does Inclusion of Patient Functional and Social Complexity Improve Predictiveness? J Gen Intern Med. 2018 Aug 24. doi: 10.1007/s11606-018-4635-z. [Epub ahead of print] PubMed PMID: 30143978.

99. Ko M, Sanders C, de Guia S, Shimkhada R, **Ponce NA**. Managing Diversity to Eliminate Disparities: A Framework for Health. Health Aff (Millwood). 2018 Sep;37(9):1383-1393. doi: 10.1377/hlthaff.2018.0438. PubMed PMID: 30179560.

100. Davis AC, Shen E, Shah NR, Glenn BA, **Ponce N**, Telesca D, Gould MK, Needleman, J. Segmentation of High-Cost Adults in an Integrated Healthcare System Based on Empirical Clustering of Acute and Chronic Conditions. J Gen Intern Med. 2018 Sep 4. doi: 10.1007/s11606-018-4626-0. [Epub ahead of print] PubMed PMID: 30182326.

101. Wang P, Meng YY, Lam V, **Ponce N**. Green space and serious psychological distress among adults and teens: A population-based study in California. Health & Place. 2019 Mar;56:184-190. doi: 10.1016/j.healthplace.2019.02.002. Epub 2019 Feb 21. PMID: 30797185.

102. Hsuan C, Hsia RY, Horwitz JR, **Ponce NA**, Rice T, Needleman J. Ambulance diversions following public hospital emergency department closures. Health Serv Res. 2019;00:1–10. https://doi.org/10.1111/1475-6773.13147.

*Peer-reviewed books, book chapters, Editor's Note & Invited Commentaries*

1. **Ponce NA** and Guillermo T. (1993). Health Policy Framework. in Zane, Takeuchi et al. Confronting Health Issues in the Asian and Pacific Islander American Community.   Sage Publications.

2. **Ponce NA**, Gertler P and Glewwe P. (1998). Will Viet Nam Grow Out of Malnutrition?  in Glewwe et al.  Viet Nam:  Household Welfare and Transition to a Market Economy.  World Bank, Policy Research Department.

3. Mays V, Cochran S, **Ponce NA**. (2004) Thinking About Race and Ethnicity in Population-Based Studies of Health. In Beech B, Goodman M. Race & Research, Perspectives on Minority Participation in Health Studies. Washington DC: American Public Health Association; 79-100.

4. **Ponce, NA.** (2009) Health Insurance. In Trinh-Shevrin, Islam and Rey. Asian American Communities and Health: Context, Research, Policy, and Action. New York University. Jossey–Bass publishers; 344-363.

5. **Ponce NA,** Ko M**.** (2013) Multilevel social determinants of health. In Gerald Kominski. Changing the U.S. Healthcare System, 4th ed.  Jossey–Bass publishers; 135-155.

*Published abstracts*

1. **Ponce N**. (1989) Public Health Statistics for Asian and Pacific Islander Americans. Challenges for Public Health Statistics in the 1990s. Proceedings of the 1989 Public Health Conference on Records and Statistics. July 17-19, 1989. Mayflower Hotel, Washington, DC November 1989. 500 pp. (PHS) 65-68.  available at *http://www.cdc.gov/nchs/products/pubs/pubd/other/phcrs/phcrs.htm*

2. Luck J, Peabody J, Nordyke R, Tozija F, Pecelj G, and **Ponce N**. (1999) A comparison of the quality of care between the U.S. and a developing country. Journal of General Internal Medicine; 14(Supp. 2):106.

*Monographs/Technical Reports at UCLA*

1. Rice T, **Ponce NA,** Teleki S, Brown ER.  "What Accounts for California's Low Job-Based Coverage?" UC Berkeley Center for Health and Public Policy Studies and UCLA Center for Health Policy Research, May 2000 Policy Alert.

2. Brown ER, **Ponce NA**, Rice, T, The State of Health Insurance in California, Recent Trends, Future Prospects.  UCLA Center for Health Policy Research, January 2001.

3. **Ponce NA**, Conner, T, Barrera P, Suh D, Advancing Universal Coverage in Alameda County  UCLA Center for Health Policy Research Summary Report, September 2001.

4. Brown ER, **Ponce NA**, Rice T, Lavarreda SA The State of Health Insurance in California, Findings from the California Health Interview Survey. UCLA Center for Health Policy Research, January 2002

5. **Ponce NA**, Black JT. The Role of Race, Ethnicity & Language in Access to Basic Health Care for Californians.  California Program on Access to Care.  University of California Office of the President. September 2003.

6. **Ponce NA**,  Gatchell M, Brown EB. Cancer Screening in California. UCLA Center for Health Policy Research. November 2003.

7. **Ponce NA**, Teleki S, Brown ER, "California's Uninsured Children: A Closer Look at the Local Level." UC Berkeley Center for Health and Public Policy Studies and UCLA Center for Health Policy Research, March 2000 Policy Alert.

8. Babey S, **Ponce NA**, Etzioni, D, Spencer B, Brown ER, Chawla N.  Cancer Screening in California. Racial and

Ethnic Disparities Persist.  UCLA Center for Health Policy Research.   September 2003.

9.  **Ponce NA**, Babey S, Etzioni D, Spencer B, Brown ER, Chawla N.   Cancer  Screening in California. UCLA Center for Health Policy Research. November 2003.

10. **Ponce NA**, Gatchell M, Brown ER.  Asian Cancer Screening in California.  UCLA Center for Health Policy Research. November 2003.

11. Lavarreda SA, Brown ER, **Ponce N.**  Insurance rates of Asian American and Pacific Islander Children Vary Widely.  UCLA Center for Health Policy Research. June 2005.

12. Brown ER, Lavarreda SA, **Ponce N**,  Yoon J, Cummings J, Rice T.  The State of Health Insurance in California: Findings from the 2005 California Health Interview Survey. Research Report. July 2007.

13. Brown ER, **Ponce N**, Lavarreda SA. Job-Based Insurance Declines for Moderate- and Low-Income Workers. UCLA Center for Health Policy Research. Policy Brief July 2007.

14. Gatchell M, Lavarreda SA, and **Ponce N**. 7.6 Million Californians Rely on the Safety Net of Health Care Providers for Regular Care. UCLA Center for Health Policy Research. Policy Brief September 2007.

15. **Ponce NA,** Tseng W, Ong P, Shek YL, Ortiz S, Gatchell MS. The state of Asian American, Native Hawaiian and Pacific Islander health in California report : prepared for the Honorable Mike Eng. Los Angeles : UC AAPI Policy Multi-Campus Research Program, April 2009.

16. Brown ER, Kronick R, **Ponce NA**, Kincheloe JR, Lavarreda SA, Peckham E. The State of Health Insurance in California: Findings from the 2007 California Health Interview Survey. UCLA Center for Health Policy Research. Policy Brief July 2009.

17. **Ponce N**, Lavarreda SA, Cabezas L. The impact of health care reform on California's children in immigrant families Policy Brief. UCLA Center for Health Policy Research.  2011 Jun;(PB2011-8):1-6.

18. Meng YY, Rahman T, Pickett MC, **Ponce NA**. Health and Health Behaviors of Japanese Americans in California: A Sign of Things to Come for Aging Americans? Los Angeles, CA: UCLA Center for Health Policy Research, 2015

19. Adebiyi A,  Alimat A, Chanfreau C, Haas J, **Ponce N.**  Missed Opportunity? Twenty Percent of Breast Cancer Patients Don't Know Their Recurrence Risk Status Los Angeles, CA: UCLA Center for Health Policy Research, May 2015

20. **Ponce N**, Scheitler AJ, Shimkhada R, Ko M. The Status of Evaluations and Research on Effective Interventions Serving Boys and Men of Color. A report for RISE for Boys and Men of Color. 2017

21. **Ponce N**, Glenn B, Shimkhada R, Scheitler AJ, Ko M. Barriers to Breast Cancer Care in California. A report presented to the California Breast Cancer Research Program. 2017.

22. **Ponce N**, Scheitler AJ, Shimkhada R. Understanding the Culture of Health for Asian American, Native Hawaiian and Pacific Islanders (AANHPIs): What Do Population-Based Health Surveys Across the Nation Tell Us About the State of Data Disaggregation for AANHPIs? A report presented to the Robert Wood Johnson Foundation. 2017

23. Holtby, S, Lordi N, Park R, **Ponce N.** Families with young children in California: findings from the California Health Interview Survey, by Geography and Home Language, 2011-2014**.** 2017 Los Angeles, CA: UCLA Center for Health Policy Research.

24. Becker T, McLaughlin K, Wang Y, Yu, H, Hughes T,  Ponce **NA**. Assessing community health over the first five years of Building Healthy Communities.  A report presented to the California Endowment. 2017.

25. Milevska-Kostova N, Chichevalieva S, **Ponce N**, van Ginneken E, Winkelmann J. The former Yugoslav Republic of Macedonia: Health system review. Health Syst Transit. 2017 May;19(3):1-160.

26. Becker T, McLaughlin K, Wang Y, Yu, H, Hughes T,  Ponce **NA**. Assessing community health over the first five years of Building Healthy Communities. Supplementary Analyses: A report presented to the California Endowment. 2018.

*Monographs predating UCLA*

1. **Ponce NA**, and Peabody JW, "Technical Assistance Packet for Communications Strategy for Health Care Reform in Macedonia." RAND, Santa Monica, CA, DRU 1642-WB, May 1997.

2. Peabody JW, **Ponce NA**, and Molyneaux JW, "Disease Burden and Costs of Treatment: Establishing Policy Priorities for Health Care Reform in Macedonia." RAND, Santa Monica, CA, DRU-1638-ADB, May 1997.

3. Cahill KR, **Ponce NA**, and Peabody JW, "Actuarial Analysis of Basic Benefits Package Options of Health Care Reform in Macedonia."  RAND, Santa Monica, CA, DRU-1616-1-WB, May 1997.

4. Paterson MA, **Ponce NA**, and Peabody JW, "Integrated Information Systems:  Managing Decisions, Informing Policy & Measuring Quality of Health Care Reform in Macedonia." RAND, Santa Monica, CA, DRU-1615-1-WB, May 1997.

5. Carter, GM, **Ponce NA**, and Peabody JW, "Considerations for a Capitation Payment System for Primary Care Providers in Macedonia:  Promoting Quality, Equity and Efficiency." RAND, Santa Monica, CA, DRU 1641-WB, May 1997.

6. Peabody JW, Gertler PJ, and **Ponce NA**, "Macedonia Health Sector Policy Reform:  Technical Assistance Inception Report." RAND, Santa Monica, CA, DRU-1460-WB, August 1997.

7. Carter GM, **Ponce NA**, and Peabody JW, "Implementing a Capitation System for Primary Care in Macedonia." RAND, Santa Monica, CA, DRU-1710-WB, September 1997.

8. Farley DOF, and Ponce NA, "Model of Basic Benefits Package and Options with Actuarial Analysis." RAND, Santa Monica, CA, DRU-1707-WB, September 1997.

9. **Ponce NA**, Peabody JW,  Dewallens F, "A Legislative Framework for Health Care Reform in Macedonia: Short and Long Term Solutions." RAND, Santa Monica, CA, DRU-1704-WB, June, 1998.

10. Lubick-Goldzweig C, **Ponce NA**, and Peabody JW, "Developing Primary Care Practice in a Transitional Economy." RAND, Santa Monica, CA, DRU-1911-WB, August 1998.

11. Carter GM, **Ponce NA,** and Peabody JW, "Options for Payment of Hospital and Services in Macedonia." Santa Monica, CA, DRU-1912-WB, August 1998.


**V.     GRANTS  (selected list)**


**Preserving Health Coverage for Immigrants: Economic & Health Implications of Proposed Public Charge Rules on California and Local Jurisdictions**
Ninez A. Ponce (PI)
09/01/18 – 12/31/18
(ACTIVE)
The UCLA Center for Health Policy Research (CHPR), with the UC Berkeley (UCB) Labor Center, and the California Food Policy Advocates (CFPA), proposes to estimate the health and economic impact of the proposed change in the public charge rules for California and its local jurisdictions.
**Funder:**  California Health Care Foundation

Total Amount:  $161,045

**Integrating non-communicable disease (NCD) management in primary health care: a population health survey and action initiative**
Ninez A. Ponce (PI)
10/1/2017 –9/30/ 2019
 (ACTIVE)
Synopsis:  With the University of the Philippines School of Public Health, Manila, the study will provide technical assistance for the design, conduct, and analysis of a population-based health survey on a national scale, and use these results to inform the development of a primary care tool on readiness of primary care centers to prevent and control non-communicable diseases.
**Funder:**  Republic of the Philippines, Philippine Commission on Higher Education
Total Amount:  $424,851

**Improving Data Capacity for American Indian/Alaska Native (AI/AN) Populations**
Ninez A. Ponce (PI)
9/30/2016 – 09/ 30/ 2018
(ACTIVE)
Synopsis:  Misclassification and undercount of AI/ANs in population based surveys is of particular importance and may affect sample size of this group, as this is a small population that is often dropped from analysis for lack of statistical significance, omitted from national reports, and subsequently overlooked as recipients of needed resources. The purpose of this project is to:  1) Identify the current approaches to code AI/AN participants for race and ethnicity in selected population-based HHS surveys and the California Health Interview Survey; 2) Examine the current coding used in selected surveys to analyze the percentage of AI/AN only, AI/AN mixed race, Hispanic AI/AN and any mention of AI/AN; 3) Examine variations in classifying, coding, and tabulating AI/ANs and the implications of variations in classification and tabulation for the development of survey weights and post stratification adjustments for the AI/AN population; 4) Evaluate how improper classification and post weight adjustments can affect rates and counts of key indicators of health status, health behaviors, utilization and access to healthcare for the AI/AN population.
Funder:  DHHS – Department of Health and Human Services, Office of the Assistant Secretary of Planning and Evaluation
Total Amount:  $318,000

**RWJ Health Policy Research Scholar Program**
Gail Wyatt (UCLA PI), Ninez A. Ponce-UCLA faculty;  Thomas La Veist (PI), Harolyn Belcher (Co-PI)
(ACTIVE)
4/1/2016 - 8/31/2017;  affiliated faculty in 2018
Synopsis:  The Health Policy Research Scholars program is a new national change leadership development opportunity for full-time doctoral students from underrepresented populations or historically disadvantaged backgrounds, entering the first or second year of their doctoral program, from any academic discipline who are training to be researchers and are interested in health policy research.  UCLA faculty—Drs. Gail Wyatt, Gilbert Gee and Ninez Ponce are core faculty from UCLA that advise the program Principal Investigators, Dr. Thomas LaVeist (George Washington University) and Dr. Harolyn Belcher (Johns Hopkins University).  UCLA is one of the field sites for the program.
Funder:  Robert Wood Johnson Foundation/Prime:  Johns Hopkins University
Total Amount:  $ $55,559

**California Health Interview Survey (CHIS)**
9/01/2013 – 08/31/2017; ~$9,000,000 annually
Ninez Ponce (PI)
(ACTIVE)
Synopsis: CHIS is a population-based health survey of over 50,000 Californians.  Currently, CHIS  is offered in English, Spanish Cantonese, Mandarin, Vietnamese, Korean and Tagalog.
Funders: California Department of Public Health, California Department of Health Care Services, The California Endowment, Kaiser Permanente Community Benefits, The California Wellness Foundation, Centers for Disease Control, The California Healthcare Foundation, First Five California, Agency for Health Care Research and Quality
Total Amount:   ~$9,000,000 annually; $18,000,000 for a 2-year survey cycle

**Completed Awards**

**Studying health data collection, analysis, and reporting for Asian Americans, Native Hawaiians, and Pacific Islanders to better explain disparities**
Ninez A. Ponce (PI)
9/15/2015 – 09/ 14/ 2017; total ~$100,000
Synopsis:  The study examined the state of data collection for Asian Americans, Native Hawaiians and Pacific Islanders in state and federal surveys nationwide.  We conducted key informant interviews of survey leaders and literature and legislative review to present recommendations on how survey leaders can implement more disaggregated data collection for the Asian American, Native Hawaiian and Pacific Islander population.
Funder:  Robert Wood Johnson Foundation

**Disparities in Utilization of Gene Expression Profiling and Subsequent Chemotherapy Decisions**
Ninez Ponce (PI); Patricia Ganz (Co-I); Jennifer Haas, Harvard University (Co-I)
July 15, 2012- December 31, 2017; direct ~$410,000
Synopsis: We conducted a mailed survey, with option of responding via a weblink, of women covered by Aetna who received GEP identified from 2010 claims data.  The target sample is 200 English-speaking white women and 200 English-speaking non-white women diagnosed in 2010 with early stage breast cancer and a paid claim for GEP testing. We hypothesize that key patient and provider characteristics that motivate the use of GEP differ for whites and nonwhite women, and that the use of GEP to inform treatment decisions also differ by race/ethnicity.  For example, the acceptability of GEP as a basis for forgoing adjuvant chemotherapy may be governed by issues of knowledge of and attitudes toward the test and chemotherapy, provider counseling, provider trust, healthcare satisfaction, perceived discrimination, and ability to communicate and self-advocate.  Among minority patients, these issues have been identified as major sources of disparities in receiving quality healthcare in general and in shaping attitudes towards genetic testing and therapeutic decisions in particular.
Funder:  Aetna Corporation

**Barriers to Breast Cancer Care**
Ninez Ponce (PI); Beth Glenn (Co-I)
November 1, 2015-May 30, 2018; direct ~$135,456
Synopsis:  Our study team of health policy and cancer researchers, in consultation with community advocates, answered the question: *What are the significant barriers or challenges to access to breast cancer oncology care in California if you are uninsured, underinsured, on public or private health insurance?*  Our team produced a report, a peer-reviewed article, fact sheets, a policy briefing in Sacramento and one-on-one visits with policy makers that presented our findings from 3 key tasks – (1) a synthesis of the peer reviewed literature, news media, reports and policy briefs, (2) an analysis of social media, and (3) case studies from key informant interviews.
Funder:  California Breast Cancer Research Program, University of California Office of the President

**Patient-Centered Outcomes Research in Community Health Centers**
Ninez Ponce (PI); Marjorie Kagawa-Singer (Co-I);
April 1, 2012- August 31, 2017; direct $95,000
Synopsis: The Association of Asian and Pacific Community Health Organizations  (AAPCHO) subcontracted with UCLA as an academic partner to help build the scientific infrastructure for its member community health centers to conduct patient-centered outcomes research. The key domains of the UCLA engagement were scientific leadership participation as a Steering Committee member, planning and development of research proposals with the community health center network espousing community based participatory research principles, and building human and scientific capital within AAPCHO community health centers through training, curriculum development, study design and statistical consultation, and research dissemination of results through publications.
Funder:   Association of Asian and Pacific Community Health Organizations (AAPCHO) /DHHS HRSA

**California Health Benefits Review Program**
Ninez Ponce, co-Vice Chair with Nadereh Pourat
September 2017-July 2018; Annual amount: $280,000
September 2014-July 2017; Annual amount: $240,000
Ninez Ponce, Vice Chair
September 2013-July 2014; Annual amount: $240,000
Synopsis:  Established in 2002 to implement the provisions of its authorizing statute, the California Health Benefits Review Program (CHBRP) responds to requests from the State Legislature to provide independent analysis of the medical, financial, and public health impacts of proposed health insurance benefit mandates and repeals. As the Vice Chair of cost, I led the cost team and worked with actuarial consultants to complete each analysis during a 60-day period, usually before the Legislature begins formal consideration of a mandate bill.
Funder:   University of California, Office of the President

**Field Scans on the Status of Evaluation and Research on Effective Interventions Serving Boys and Men of Color (BMOC)**
03/14/ 2016 – 12/ 16/ 2016; $40,000
Ninez A. Ponce (PI)
Synopsis:  Our project highlighted the current state of understanding of programs, policies and practices that target health and education outcomes in early and middle childhood, with a broader frame that these interventions will impact boys and men of color (BMOC) over the life course.  Drawing upon the Chandler framework, we will produce a literature synthesis that identifies promising solutions to disparities faced by BMOC and calls out the remaining gaps. We will pay close attention to how the literature on health and education programs addresses special populations - Native American, and sub-ethnic populations of Black, Latino, and Asian and Pacific Islanders. These findings will be key inputs to improving access to high quality literature on health and education programs for BMOC.
Funder:  Equal Measure: RISE for Boys and Men of Color

**National Healthcare Disparities Report (NHDR)**
Ninez Ponce (PI),
09/01/2013 – 08/31/2016; ~$50,000 annually
Synopsis: We provided California Health Interview Survey (CHIS) data for the 2014-2015 National Healthcare Disparities Report (NHDR) to show trends of health care quality and disparities for Pacific Islanders, American Indians and Alaska Natives, Asian and Hispanic subpopulations, populations with limited English proficiency and LGBT populations.
Funder:  Agency for Healthcare Research & Quality

**Improving Reporting of Race, Ethnicity, and Language in California**
David Zingmond (PI);  Ninez Ponce (Co-I)
September 1, 2010-August 31, 2013; direct ~$3,000,000
Synopsis:  A team of allied researchers led by investigators from the University of California in collaboration with the leadership of the California Office of Statewide Health Planning and Development, conducted a three-year programmatic intervention to improve the reliability, validity, and completeness of self-reported race, ethnicity, and primary language provided by hospitals in the three databases that are currently within OSHPD's regulatory mandate.
Funder:   Agency for Healthcare Research and Quality/ARRA


**Medi-Cal Monitoring with the California Health Interview Survey**
Ninez Ponce (PI)
Synopsis: We conducted a comparison of key access and utilization indicators between Medi-Cal enrollees and those with employment sponsored coverage.  We based our analysis on data collected in the California Health Interview Survey (CHIS). Utilizing a framework for monitoring access to care, we produced estimates in at least six different constructs to inform the use of, and areas of need for, Medi-Cal recipients.
March 1, 2014- March 31, 2016; direct ~$150,000
Funder: California HealthCare Foundation


**Personalized Medicine for Colorectal & Breast Cancer**
Kathryn Phillips (PI);  Ninez Ponce (Core Director & UCLA PI)
September 2008-August 2012; direct $31,171
Synopsis:  The program objective was to use an integrated, interdisciplinary approach to obtain evidence about key aspects of the translation of genomic information for breast and colorectal cancer into clinical practice and health policy.  As the principal investigator of the ***Measurement in Diverse Populations Core***, I provided the leadership to improve methods for conducting research, for measurement, for recruitment of research subjects, and for drawing statistical interpretations and conclusions for diverse populations.
Funder:   National Cancer Institute; UCSF School of Pharmacy (Subcontract)


**Do Safety Net Clinics Narrow the Disparity in Cervical Cancer Screening for Low-Income Women?**
Ninez Ponce (PI, Faculty Sponsor) Melissa Gatchell (co-PI)
September 2008-June 2009; direct ~$21,000
Synopsis:  This project determined whether closer proximity to a safety net clinic (measured by the distance to the closest safety net clinic providing pap tests) improves the likelihood that a low-income woman of appropriate age receives a pap test for detection of cervical cancer during the interval recommended by the Unites States Preventive Services Task Force (USPSTF).  We used CHIS 2005 data, along with data collected on safety net clinics in California to determine the association between distance to a safety net clinic and likelihood of cervical cancer screening.
Funder:  Jonsson Comprehensive Cancer Foundation


**Do socio-ecological variables influence cancer screening behaviors? A multi-level modeling study using the California Health Interview Survey (**1 K07 CA100097)
Ninez Ponce (PI); primary mentor: Roshan Bastani
September 2004-August 2010 $ 588,484 direct; $47,079 indirect, totaling $635,563
Synopsis: This study examined whether and to what extent socio-ecological predictors have an effect on population-based cancer screening behaviors, specifically for breast, cervix, colorectal and prostate cancers. The study sought to understand the relationship between individual and socio-ecological variables and to determine if and to what extent these socio-ecological variables mediate individual decisions to seek preventive cancer screening services, particularly among ethnic minority populations.   The K07 is a mentored career award program that provided 75% salary support over 5 years for the PI and additional research funds to hire a research assistant, to procure data, and to purchase/upgrade computing resources.
Funder:   National Cancer Institute K07 Award program

**Network on Multicultural Health & Healthcare Research**
William Vega and Michael Rodriguez (Directors), Ninez Ponce (Senior Investigator) ~$12,000/year for mentorship, of junior faculty and program leadership
November 2007-October 2010
Synopsis:  I was one of the Senior Investigators in this 3-year healthcare quality research network established at UCLA Department of Family Medicine to address the problem of healthcare disparities among minorities and underserved populations. The Network was composed of distinguished expert faculty from a variety of national universities. The Network will also support five Healthcare Quality Scholars each year to address the health and quality of care issues affecting people from underserved groups with a primary focus on diabetes/obesity, cardiovascular disease, and cancer. These findings were widely disseminated in order to inform strategies for eliminating healthcare disparities.  The Network prioritized research on intra-group determinants (acculturation, ethnic subgroup, language preference, demographic factors, etc.) of quality of care in Latino and American Indian populations.
Funder:  The Robert Wood Johnson Foundation

**California Health Interview Survey 2007 - CHIS 2007 - Subethnicity & Acculturation Module**
E. Richard Brown (PI), Ninez Ponce (co-PI)
April 2007-December 2009   Direct Costs: $211,312
Synopsis: Inclusion of questions on the 2007 California Health Interview Survey to gather detailed information from a very large ethnically, linguistically and geographically diverse sample of California adults, teens and children to examine how acculturation affects quality of care, health status, chronic diseases and conditions among ethnic subgroups.
Funder: The Robert Wood Johnson Foundation

**Policy Implications of the Role of Race, Ethnicity and Language for the Health of Californians**
Ninez Ponce (PI); Jeanne Black (Co-I)    April 2003- September 2003 ~$41,541.00
Synopsis:  The specific aim was to measure the extent to which race/ethnicity and English language proficiency contribute to disparities in health status, health care access and utilization, using data from the 2001 California Health Interview Survey (CHIS) and weighted multivariate logit or probit models. Findings from this analysis helped inform the policy agenda on language access policies, and Proposition 54, an initiative that would have eliminated the government's collection of race and ethnicity data.   Proposition 54 was defeated in the October 2003 recall election. We tested how the omission of race/ethnicity affects the predictive power of the models for health status, health care access, and utilization, and we will determine the extent of the bias on other predictor variables such as income or education. This analysis informed policy makers as to whether race/ethnicity information is necessary in order to obtain a true understanding of the factors that lead to health disparities.
Funder:  California Program on Access to Care, University of California Office of the President.

**California Health Interview Survey**
E. Richard Brown (PI), Ninez Ponce (co-PI), Jeff Luck (co-PI)
Synopsis: CHIS 2001 is a population-based health survey of over 55,000 California households.  CHIS 2001 was offered in English, Spanish Cantonese, Mandarin, Vietnamese, Korean and Khmer.  I chaired the Multicultural Health Technical Advisory Group and initially, the Survey and Sampling Technical Advisory Group.  As co-PI I led the conceptualization and implementation of oversampling, linguistic and cultural adaptation, and measurement of race/ethnicity, acculturation and discrimination.
Funders:        (1) National Cancer Institute, July 1999-June 2001; $2.5 million
                    (2) The California Endowment, July. 2001-Dec. 2002;  $3 million

**County of Alameda Uninsured Survey**
Ninez Ponce (PI), Michael Jang, Institute for Scientific Research (Co-PI), Sherry Hirota, Asian Health Services (Co-PI)                                                                 April 2000-April 2001; $200,000

Synopsis:  I developed the survey questionnaire, designed the sampling frame and contracted the survey research firm to conduct this random-digit dial telephone population-based survey on Alameda County's uninsured adults. Latinos and Asian American and Pacific Islanders (AAPI) were oversampled and the survey was conducted in Spanish, Cantonese, Mandarin, Vietnamese, Korean and Dari.  This activity was part of an evaluation study of an affordable health insurance product for low to moderate-income AAPI and Latino immigrants, regardless of documentation status, residing in Alameda County.

Funders: Community Voices/Asian Health Services/Kellogg Foundation/County of Alameda,

## VI.   AWARDS

AcademyHealth, Health Services Research Impact Award, 2019

Health Affairs Editor's pick for top ten articles of 2015 (see publication: Early diffusion of gene expression profiling in breast cancer patients associated with areas of high income inequality.)

Changemaker Award,  presented by the community organization CYPHER-Conscious Youth Promoting Health and Environmental Readiness, 2014

Favorite Professor Award, presented by the Public Health Student's Association, UCLA, 2013

Favorite Professor Award nominee, presented by the Public Health Student's Association, UCLA, 2012

AcademyHealth Dissertation Chair of Outstanding Dissertation (Janet Cummings, PhD), 2010

Filipino American Services Group, American Dream Award, 2010

National Finalist for the 2009 ASPH/Pfizer Award for Teaching Excellence.

Dean's Award for Distinguished Teaching, 2009

Graduate Division , Excellence in Summer Mentorship, 2009

Royal Morales Community Achievement Award, UCLA Pilipino Alumni Association, 2009

National Institutes of Health Merit Award for Multicultural Survey Research, 2008

Distinguished Professor Award, presented by the Public Health Student's Association, UCLA, 2008

Outstanding Abstract in Disparities, AcademyHealth Meeting, Boston, 2007

Outstanding Abstract in Disparities, AcademyHealth Meeting, Boston, 2005

Rising Star in Cancer Disparities Research, National Cancer Institute, National Institutes of Health, 2004

Chancellor's Faculty Career Development Award, UCLA, 2003

Outstanding Community Researcher Award, the Asian and Pacific Islander American Health Forum (a national health advocacy organization), 2001

Delta Omega Public Health Honor Society, 2001

Distinguished Professor Award, presented by the Public Health Student's Association, UCLA, 2000

Agency for Health Care Policy and Research Postdoctoral Fellowship, 1998-1999

Agency for Health Care Policy and Research Fellowship (now AHRQ), 1992-1995

University of California Dissertation Fellowship, 1996-1997

University of California Research Fellowship, 1995-1996

## VII. SCIENTIFIC CONFERENCES—PODIUM PRESENTATIONS (since 2007)

1. Ponce NA. "What do population-based health surveys across the nation tell us about the state of data disaggregation for AANHPIs?" American Public Health Association Annual Meeting, San Diego, CA. November 12, 2018.

2. Ponce NA.  "Capturing Racial/Ethnic Diversity in Population-Based Surveys: The Importance of Data Disaggregation."  American Public Health Association Annual Meeting, San Diego, CA. November 13, 2018.

3. Ponce NA. "Improving Data Capacity for American Indian/Alaska Native (AI/AN) Populations." AcademyHealth, Seattle, WA. June 24, 2018.

4. Ponce NA, "Opportunities for China-California Immigration Studies."  2017 Annual Symposium of the China-USA Research Center for Life Sciences on Interdisciplinary Research with Global Public Health, Chinese Academy of Sciences Beijing, China, November 13, 2017.

5. Ponce NA, session co-organizer: "Migration, Health and Health Systems: Frameworks Organized session"  presenter: "The California Health Interview Survey CHIS: A tool for Monitoring Immigrant Health". International Health Economics Association Meeting, Boston, MA, USA July 10, 2017.

6. Ponce NA, "So You've Earned a PhD."  AcademyHealth, New Orleans, CA, June 26, 2017.

7. Ponce NA, session organizer. "How Many People are Uninsured? Variation in National and State-level Survey Estimates." American Public Health Association, Denver, CO, November 1, 2016.

8. Ponce NA with David Grant, Royce Park, Gerald Kominski, Hongjian Yu, Yueyan Wang,  Matt Jans, Tara Becker, Kevin McLaughlin and Todd Hughes. "Do uninsured rates suffer from nonresponse bias? Evidence from the California Health Interview Survey (CHIS)" American Public Health Association, Denver, CO, November 1, 2016.

9. Ponce NA. "Minimum Wage Policies and Child Nutritional Status in Low to Middle Income Countries" International Health Economics Association Meeting, Milan, Italy July 15, 2015.

10. Ponce NA,  Shimkhada R. "Does Income Inequality Make Us Sick?"  Panel on Building a Social Movement to Become the Healthiest Nation in One Generation, American Public Health Association meeting, New Orleans, LA November 19, 2014.

11. Ponce NA,  Becker T. "Place Matters. Data Matters. AA & NHPI Hotspots" Panel on Becoming the healthiest nation in a generation, American Public Health Association meeting, New Orleans, LA November 18, 2014.

12. Ponce NA, Kil J.  "California Health Interview Survey: Meeting the demand for population-based health data on AA NHPIs"  Panel on Evidence-based research and policy for health equity among Asian and Pacific Islander communities.  American Public Health Association meeting, New Orleans, LA November 17, 2014.

13. Ponce NA. National Library of Medicine panelist. "Build, Don't Duplicate" AcademyHealth Research meeting , San Diego, CA June 08, 2014.

14. Ponce NA., Cancer Prevention and Control in the US: Learning from the Past and Moving into the Future, International Health Economics Association Meeting, Sydney, Australia July 9, 2013.

15. Ponce NA. Panel leader/organizer. "Use of State Population Health Survey Data to Inform Health Care Coverage Policy" AcademyHealth meeting ,Baltimore MD June 22, 2013

16. Ponce NA. Panel leader/organizer. "Hospital/Facility-Level Variations: Implications for Disparities" AcademyHealth meeting, Boston, MA June 28, 2010

17. Ponce NA. Panel leader/organizer. "Health Care System Interventions to Reduce Chronic Disease Disparities" AcademyHealth meeting, Boston, MA June 27, 2010

18. Ponce NA. Moderator and discussant. "Advances in Health Disparities Research Methods" Disparities Interest Group meeting, AcademyHealth meeting, Boston, MA June 26, 2010

19. Ponce NA, Cochran S, Mays V. "For richer or poorer, in sickness and in health:  do same-sex marriage bans increase health insurance disparities? AcademyHealth meeting, Washington, DC June 2009.

20. Ponce NA. "State of Health Insurance in Asian America."  NIH Summit:  The Science of Eliminating Health Disparities, National Harbor, MD, December 16, 2008.

21. Ponce NA. "Wealthier but not healthier: Latino enclave effects on cancer screening." American Public Health Association Meetings, San Diego, CA October 28, 2008.

22. Ponce NA. "Disparities in Health Insurance and Cancer Screening for Asian American Women. American Association for the Advancement of Science–Pacific Division Asian And Asian American Women: Health and Welfare Session. Waimea, Hawaii, June 15-19, 2008.

23. Ponce NA. "Measuring ethnic enclave to study associations with cancer screening among older adults." Gerontological Society of America, San Francisco, CA.  November 17, 2007.

24. Ponce NA. "Ethnic enclaves, safety net location and cancer screening:  Amenity or Penalty?" International Health Economics Meeting, 6th World Congress, Copenhagen, Denmark.  July 10, 2007.

25. Ponce NA. " In Sickness and in Health." 7th Annual Economic Research Initiative on the Uninsured (ERIU) Summer Research Conference, Ann Arbor, June 28-29, 2007.

26. Ponce NA. "Do safety net clinics reduce ethnic enclave risk in cancer screening?"  AcademyHealth meeting, Orlando, FL.  June 3, 2007  (Outstanding Abstract).

## VIII.   INVITED SPEAKING ENGAGEMENTS/ TESTIMONIES/WEBINARS/MEDIA (since 2007)

1. Ponce NA, Lucia L, Shimada, T. "How Proposed Changes to the **'Public Charge'** Rule Will. Affect Health, Hunger and the Economy in California." UCLA Center for Health Policy Research, Los Angeles, CA, November 7, 2016.

2. Ponce NA. "Immigration as Social Determinant of Health." Invited Speaker.  Health Services Research Colloquium. Center for Health Care and Policy Research. Department of Health Policy and Administration. Penn State. State College, PA, October 22, 2018**.**

3. Ponce NA.   "The California Health Interview Survey:  Science & Data for Public Health Action." 2018 Women in Science Conference. University of Notre Dame, October 6, 2018.

4. Ponce NA. "California Health Interview Survey, Population Health Data for Health Policy." Invited lecture. World Health Organization, Geneva.  July 4, 2018

5. Ponce NA, "Immigration as Social Determinant of Health." Keynote Speaker.  Los Angeles County Department of Public Health. The California Endowment**,** Los Angeles, CA, April 12, 2018**.**

6. Ponce NA, "Data for Policy Impact—California."  Invited Speaker for National Academy of Medicine Workshop, "Immigration as Social Determinant of Health." Oakland, CA, November 28, 2017.

7. Ponce NA.  Policy Café:  "Breaking Barriers:  Policy Implications from the California Health Interview Survey." Community Clinic Association of Los Angeles. December 1, 2017.

8. Ponce NA.  Research quoted in People Magazine. "Julia Louis-Dreyfus Said She's 'Lucky' to Have

Insurance — Here's What It's Like to Have Breast Cancer Without It". October 5, 2017.

9. Ponce NA. "Protecting Immigrants' Access to Vital Services:  The Impact of Public Charge on Our Immigrant Communities." California State Capitol, with Assembly members Rob Bonta and David Chiu 15 September 2017.

10. Ponce NA. "Using the results of the California Health Interview Survey." Managed Care Essentials, video hosted by the hosted by the American Journal of Managed Care." August 4, 2017 edition.

11. Ponce, NA. "ACA Repeal Panel."  Moderated by Cliff Goodman, with Avik Roy and Sally Pipes. ACO and Emerging Healthcare Delivery Coalition Spring Live Meeting, hosted by the American Journal of Managed Care, Scottsdale, Arizona, May 7, 2017.

12. Ponce NA.  Quoted in Self Magazine. "ICE Took an Undocumented Mom with a Brain Tumor from the Hospital." February 24, 2017.

13. Ponce NA, "Benefits of Data Warehousing Clinical and Social Determinants of Health." Association of Asian Pacific Community Health Organization, Washington, DC, 28 March 2017.

14. Ponce NA: "Improvements in the Health of Californians under the ACA: What's at Risk?"  in The Future of Health Reform in California:  The ACA at Risk. Plenary session. Insuring the Uninsured Project, Sacramento, CA, 7 February 2017.

15. Ponce NA, "Moving towards Population Health." Keynote Speaker, Keiro Inaugural Grants Luncheon, Japanese American National Museum, Los Angeles, CA, 22 April 2017.

16. Ponce NA. Research featured and quoted in Sacramento Bee. "What's blocking women from timely breast cancer treatment? UCLA study asks lawmakers to eliminate hurdles."  January 12, 2017.

17. Ponce NA. "Breaking the Barriers to Breast Cancer Care: Exploring Policy Options." Legislative Briefing with Senator Richard Pan, Sacramento, CA, 12 January 2017.

18. Ponce NA. "Socio-Economic Factors that Impact Health and Healthcare." Providence Holy Cross. Los Angeles, CA, 16 December 2016.

19. Ponce NA with Todd Hughes. ""CHIS 2015: What's New from the Nation's Largest State Health Survey." UCLA Center for Health Policy Research, Los Angeles, CA, December 14, 2016.

20. Ponce NA. "Race and Ethnicity Trends in California: 'What Is the 'Landscape of Opportunity?'" UCLA Center for Health Policy Research, Los Angeles, CA, November 29, 2016

21. Ponce NA. "Snapshot of Health in California." Opening Plenary. California Pan Ethnic Health Network Annual Conference: Voices for Change: Seizing the Momentum for Health Equity. Los Angeles, CA October 18, 2016.

22. Ponce NA with Brian Smedley. "Demographic Change, Health Equity, and a Culture of Health." Plenary session, Fall Leadership Institute, Robert Wood Johnson Foundation. Princeton, NJ September 27, 2016.

23. Ponce NA and Ying-Ying Meng. "CHIS Overview." Presentation to Keiro Foundation community advisors, Keiro Foundation. The California Endowment. Los Angeles, CA August 16, 2016.

24. Ponce NA, "Global Health @UCLA." Global Health Development Strategy Advisory Committee Meeting. Fudan University. Shanghai, China. June 20, 2016.

25. Ponce NA. "Global vs. Local:  A False Dichotomy?"  The Oldenborg Luncheon Colloquium and Medicine, Education, and Development for Low-Income Families Everywhere. Pomona College. April 7, 2016.

26. Ponce NA. "Value of In-Language Surveys for Public Health." in Social Determinants of Health— Public Health Minute with Bill Latimer. Lehrman College.  Audio available at:

http://wp.lehman.edu/public-health-minute-with-william-latimer/social-determinants-of-health-ninez-ponce-mph-phd-ucla-fielding-school-of-public-health/  9 December 2015.

27. Ponce NA. "Balancing Broad Dissemination and Respondent Confidentiality." National Science Foundation- National Center for Science and Engineering Statistics Expert Panel on Confidentiality Protection, Arlington, VA, September 17, 2015.

28. Ponce NA and Rau, Bogdan. "A Policy Tool to Assess Immigrant Health Access, Health and Integration."  10th Summer Institute on Migration and Global Health, The California Endowment, Oakland, CA June 22, 2015.

29. Ponce NA. "Immigrant Health." Global Health: Meeting the Greatest Challenges." UCLA Health Forum, Los Angeles, CA February 27, 2015.

30. Ponce NA. "Minimum Wage Policies and Child Nutritional Status in Low to Middle Income Countries." Division of GIM-HSR Friday Noon Seminar Series, UCLA, Los Angeles, CA, February 20, 2015.

31. Ponce NA. "Emerging Markets." Modernizing Healthcare for the New Age, Healthcare Business Association 1st Annual Conference, UCLA Anderson School of Management, Los Angeles, CA, February 13, 2015.

32. Ponce NA. "Disparities in Utilization of Gene Expression Profiling and Subsequent Chemotherapy Decisions." Grand Rounds, City of Hope, Duarte, CA, February 10, 2015.

33. Ponce NA. panelist "Pass or Fail in Cambodia Town." Moderated by Maria Hinojosa, National Public Radio series on "America by the Numbers."  The California Endowment. November 10, 2014.

34. Ponce NA. Panel leader/organizer. "Population Health & Health Equity." AcademyHealth pre-conference sessions, San Diego, CA June 06, 2014.

35. Ponce, NA, "Overview of CHIS and BRFSS Data Sources." California Department of Public Health. Webinar. May 14, 2014.

36. Ponce, NA, "Social Determinants and Health." Fielding School of Public Health "Continuing the Conversation" Webinar. March 13, 2013 .

37. Ponce, NA, "Social Determinants in Health." Plenary speaker invitation. "Advancing Equity: (Re)Emerging Perspectives on Health and Health Policy." The Robert Wood Johnson Foundation Center for Health Policy at the University of New Mexico: Fall 2012 Symposium.

38. Ponce NA, Invited Panelist, "Aging Across Cultures." 34th Annual Kaiser Permanente National Diversity Conference, October 27, 2011.

39. Ponce, NA. "Health Data needs for Asian Americans and Pacific Islanders." White House Asian American and Pacific Islander Initiative (invitation only event).  December 9, 2010.

40. Ponce NA. "Data and Policy Needs to advance Asian and Pacific Islander Health."  Panel organizer and moderator, November 13, 2008, California State Capitol, Room.

41. Ponce, NA. "What's the Buzz on AB 1195?"  Philippine Medical Association of Southern California. Healthcare & Illness of Filipino Immigrants in America.  Long Beach, CA. November 4, 2007. (Invited Speaker)

42. Ponce NA. "Health care reform and communities of color."  Meeting our Needs: Health Care Reform Briefing, August 21, 2007, California State Capitol, Room. (Invited Briefing)

## IX. SERVICE

UCLA Service

Campus-Wide

| | | |
|---|---|---|
| 1. | Member, Committee on International Education | 2016-2019 |
| 2. | Review Committee for Dean of Anderson School of Management | 2015-2016 |
| 3. | Committee member, Undergraduate Global Health Minor | 2015-present |
| 4. | Divisional representative on the Academic Assembly | 2014-2018 |
| 5. | Alternate divisional representative on the Academic Assembly | 2011-2014 |
| 6. | Hellman Fellows Fund Selection Committee | 2011-201 |
| 7. | Jonsson Comprehensive Cancer Center | |
| | • Member | 2001-present |
| | • Asian American Network for Cancer Awareness, Research and Training | 2000-2007 |
| | • Seed Grant Reviewer | 2005, 2007 |
| 8. | Asia Pacific Center, International Institute | |
| | • Executive Committee, Faculty Associate | 2016-present |
| 9. | Asian American Studies, Institute for American Cultures | |
| | • Associate Director | 2011-2012 |
| | • Faculty Associate, Asian American Studies program | 2000-present |
| | • Institute of American Cultures grant reviewer | 2002, 2005, 2007 |
| 10. | Center for Southeast Asian Studies, International Institute | |
| | • Faculty Associate | 2003-present |
| 11. | Center for the Study of Women | |
| | • Faculty Associate | 2007-present |
| 12. | UCLA Student Organizations (Faculty Advisor) | |
| | • Samahang Pilipino Education and Retention (SPEAR) 2008 | 2003- |
| | • Samahang Pilipino Advancing Community Empowerment (SPACE). | 2003-2008 |

Department of Health Policy and Management

| | | |
|---|---|---|
| 1. | Director, PhD Program | 2016-2018 |
| 2. | Chair, Admissions | 2014-2015 |
| 3. | Chair, Search Committee HPM | 2014-2015 |
| 4. | Chair, Search Committee HPM | 2013-2014 |
| 5. | Vice Chair | 2013-2014 |
| 6. | Standing Personnel Committee | 2012 |
| 7. | EMPH Advisory Committee | 2012 |
| 8. | Acting PhD Program Director (Spring Quarter) | 2011 |
| 9. | EMPH Steering committee | 2010-2011 |
| 10. | EMPH/EMHA Self-Sustaining Program Committee, Chair | 2010-2011 |

Fielding School of Public Health

| | | |
|---|---|---|
| 1. | Search Committee: Global Environmental Change & Health FSPH | 2018 |
| 2. | Undergraduate Programs Committee | 2016-2018 |
| 3. | Search Committee: Global Health Equity FSPH | 2015-2016 |
| 4. | Search Committee: Global Health Management FSPH | 2014-2015 |
| 5. | International Health Committee | 2014-2016 |
| 6. | Undergraduate Programs Committee | 2011-2014 |
| 7. | Global Health Task Force | 2010-2011 |
| 8. | International Health Committee | 2008-2009 |
| 9. | Committee for Alumni Hall of Fame | 2008 |

10. Search Committee: Director of the ERC (Education and Research Center)   2007-2008
11. Search Committee: Community Health Sciences/Health Education   2006-2007
12. Search Committee: Global Health   2003-2004
13. Student Affairs Committee, School of Public Health   2002-2003
14. Bixby Program grant reviewer, School of Public Health   2001
15. Faculty Executive Committee, Secretary, School of Public Health   1999-2000

**Center for Global and Immigrant Health**
1. Director   2014-9/2018
2. Faculty Affiliate   9/2018-present

**Center for Health Policy Research**
1. Center Director   7/2018-present
2. Associate Center Director   2014-6/2018
3. Programming Subcommittee   2001-2002
4. Research Management Committee   2000-2002

**Extramural Service**
1. Commissioner, One Nation AAPI   2019
2. National Advisory Board, Center for Health Policy, Meharry Medical College   2019
3. Member: World Health Organization Healthy Ageing Network   2018-2019
4. Technical Advisory Panel member   2018-2019
   RAND/ Center for Medicare and Medicaid Services Star Rating
5. Expert Advisory Panel member
   Brigham and Women's Center for Surgery and Public Health   2018-2019
   Metrics for Equitable Access and care in SURgery (MEASUR)
6. Technical Expert Panel member:   2018-2019
   Yale Center for Outcomes Research and Evaluation /
   Center for Medicare and Medicaid Services Hospital Outcome Measurement
   for Patients with Social Risk Factors
7. Advisory Board: California Program on Access to Care   2018-2019
8. Advisory Board: Insuring the Uninsured Project   2018-2019
9. Advisory Board: UC Center Sacramento Faculty Council   2018-2019
10. Health Affairs, planning panel on California Special Issue   2017
11. Board of Scientific Counselors, National Center for Health Statistics
    of the Centers for Disease Control and Prevention (CDC)   2017-present
12. Health Affairs invited panel on Health Equity Special Issue   2016
13. National Institutes of Minority Health and Health Disparities—Workgroup on
    Visioning Process on Health Disparities Measurement and Methods   2016-2018
14. California Vital Statistics Advisory Committee   2016-present
15. National Quality Forum, co-Chair with Marshall Chin, U of Chicago
    Disparities Standing Committee   2015-2019
16. National Quality Forum, Expert Committee on Risk Adjustment
    for Sociodemographic Factors   2014
17. Multicultural Advisory Board, Nielsen Inc.   2015-2019
18. Institute of Medicine, subcommittee on Race, Ethnicity, Language Data   2009
19. Blue Ribbon Commissioner, Los Angeles Alliance for a New Economy   2006
20. Executive Committee Board member, National Health Law Program   2005-2009
21. Trustee, New Heights Charter School, Los Angeles, CA   2006-2009
22. Academic Advisory Group, Asian Pacific American Legal Center   2005-2009
23. Policy Committee, California Pan Ethnic Health Network   2003-2009
24. Member of Methods, Measurement and Reporting Expert Panel:

|  | Trans-HHS Cancer Health Disparities Progress Review Group, National Cancer Institute, National Institutes of Health, U.S. DHHS | 2003 |
| 25. | Office of the Patient Advocate, Cultural/Linguistic Committee Member | 2002-2007 |
| 26. | Harvard Civil Rights Project, Advisory Committee | 2002-2003 |
| 27. | Core Committee to preserve race/ethnicity in public health data collection | 2001-2004 |
| 28. | Research Advisory Board member, Asian & Pacific Islander Health Forum | 1999-2000 |
| 29. | Asian American and Pacific Islander Health National Policy Committee | 2000-2002 |
| 30. | Member, Filipino Task Force on AIDS, San Francisco, CA | 1998-1999 |
| 31. | Grant  Reviewer, Office of Minority Health, USDHHS | 1992,1994, 1998 |
| 32. | Volunteer, South Central Los Angeles Women's Shelter | 1994-1996 |
| 33. | Board Member, Filipinos for Affirmative Action, Oakland, CA | 1990-1992 |
| 34. | Volunteer, Vacaville Prison Project, Vacaville, CA | 1982-1984 |
| 35. | Community Health Worker, Berkeley Free Clinic, Berkeley, CA | 1980-1984 |

## X.   PROFESSIONAL MEMBERSHIPS

1. AcademyHealth                                                                            1993-2019
   - Annual Meeting Chair 2020                                                     2019-2020
   - Planning Committee, National Health Policy Conference     2014-2015; 2019
   - Global Public Health Systems Innovations                          2014-2015
   - Aetna Foundation Scholars in Residence Mentor                 2014-2015
   - Executive Planning Committee for Annual Meeting             2014-2015
   - Disparities Theme Leader                                                     2013-2014
   - Aetna Minority Scholars Mentor                                          2010-2012
   - Executive Planning Committee for Annual Meeting             2009-2010
   - Disparities Theme Leader                                                     2009-2010
   - Outstanding Abstracts Judge                                               2009
   - Disparities Interest Group founding & co-Chair                  2006-2009
2. American Public Health Association                                       1988-2018
   - APHA Access to Care Workgroup
   - Asian and Pacific Islander American Caucus
     -Treasurer                                                                           2003-2007
     -Annual Meeting Scientific Program Abstract Reviewer     2004-2006
   - Medical Care Section (2004-2005)
   - Statistics Section member (1988-2003)

3. International Health Economics Association                          1998-2015
   - Scientific Abstract Reviewer                                                2015

## XI.   REVIEWER OF PEER REVIEWED JOURNALS/PROGRAM ABSTRACTS

| 1. | Health Services Research | 2003/2007-2015/2017/2019 |
| 2. | Journal of the American Medical Association | 2007/2018 |
| 3. | New England Journal of Medicine | 2017 |
| 4. | American Journal of Public Health | 1998/2005/2006/2015/2017 |
| 5. | Health Affairs | 2005/2007/2009-2011/2014/2015/2019 |
| 6. | Medical Care | 2004/2005/2006/2007/2017/2018 |
| 7. | BMC Public Health | 2008/2017/2018 |
| 8. | Journal of General Internal Medicine | 2005/2006/2019 |

9.   Medical Care Research & Review                                           2015/2018
10.  Social Science and Medicine                                             2008/2012/2018
11.  International Journal of Health Equity                                   2012
12.  Evaluation & the Health Professions                                     2011
13.  Journal of Policy Analysis and Management                               2011
14.  Annual Review of Public Health (Guest Editor)                           2008
15.  Cancer Epidemiology, Biomarkers and Prevention                          2007
16.  Social Science Quarterly                                                2006
17.  American Journal of Managed Care                                        2006
18.  Inquiry                                                                 2005
19.  Journal of Health Policy, Politics and Law                              2003
20.  Journal of Health Care for the Poor and Underserved                     2003
21.  Harvard Health Policy Review                                            2002
22.  Journal of Health and Social Behavior                                   2002/2016
23.  AcademyHealth  Scientific Program                                       2006-2010/2014
24.  American Public Health Association Scientific Program                   2005/2006
25.  International Health Economics Association                              2015
26.  UC Global Health Day                                                    2015

# Exhibit B

· · · · · **URBAN** · **INSTITUTE** · **ELEVATE** · **THE** · **DEBATE**

# Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform
### 1994-97
Michael E. Fix, Jeffrey S. Passel

This analysis was funded by the Ford and Andrew W. Mellon Foundations. Support has also been provided by the Office of the Assistant Secretary for Planning and Evaluation, the Administration for Children and Families, and the Health Care Financing Administration, U.S. Department of Health and Human Services; the Food, Nutrition, and Consumer Services and the Economic Research Service, U.S. Department of Agriculture; and the Immigration and Naturalization Service.

Document date: March 01, 1999
Released online: March 01, 1999

The authors would like to thank Scott Anderson for his excellent research support and Wendy Zimmermann, Leighton Ku, and Karen Tumlin for helpful comments.

*The nonpartisan Urban Institute publishes studies, reports, and books on timely topics worthy of public consideration. The views expressed are those of the authors, and should not be attributed to The Urban Institute, its trustees, or its funders.*

## Background

With the enactment of the 1996 welfare reform act,[1] Congress imposed broad new restrictions on legal immigrants' access to public benefits, set new time limits on refugees' eligibility for many federal benefits, and introduced new bars on the access of "unqualified immigrants" to services.[2] But perhaps more important than these changes in eligibility are welfare reform's chilling effects which may discourage immigrants from using health, nutrition, or other types of benefits, despite the fact that many remain eligible. These effects originate, among other things, in confusion on the part of immigrants and providers about who is eligible for benefits and in fears relating to the application of the public charge doctrine.[3]

An earlier study by the Urban Institute found evidence of such chilling effects in Los Angeles County.[4] In that study, approved applications of legal noncitizen families for Medi-Cal and Temporary Assistance for Needy Families (TANF) fell 71 percent between January 1996 and January 1998, while there was no decline among citizens. The drop occurred even though there was no change in legal immigrants' eligibility for these programs in California and denial rates in the county remained steady during the period examined.

In this brief report we use the Census Bureau's Current Population Survey (CPS) to document *national* trends in immigrants' use of public benefits in the period following welfare reform. Specifically, we examine changes in participation between 1994 and 1997 reflected by the March CPS.[5] During 1994 changes in welfare rules were just beginning to be broadly debated. By the end of 1997, welfare reform had been in place for a year and a half, although full implementation was not complete. In addition, the CPS for both years provides comparable data on benefit use for the entire nation.

The current analysis builds on methods developed by the Urban Institute over the past decade that permit us to distinguish refugees, naturalized citizens, and temporary immigrants from other legally present immigrants.[6] Such distinctions are important for two reasons. First, conventional comparisons between the benefit use rates of natives and the foreign born mask substantial variation in rates and trends among substantively different segments of the foreign-born population. Second, following welfare reform, citizenship status has become an increasingly important determinant of eligibility for public benefits.

We should emphasize that most legal immigrants and refugees remained eligible for welfare and Medicaid benefits throughout the period examined (1994 through 1997). The same cannot be said for federal food stamps, however: many legal immigrants' eligibility was supposed to end as of September 1997, while new noncitizen applicants became ineligible in October 1996. Finally, while most immigrants arriving after welfare reform's enactment are barred from federal means-tested public benefits for at least five years,[8] these "future" immigrants represented a small share of the noncitizen population at the time of the March 1998 CPS.

## Principal Findings

- When viewed against the backdrop of overall declines in welfare receipt for all households, *use of public benefits among noncitizen households [9] fell more sharply (35 percent) between 1994 and 1997 than among citizen households (14 percent)*. These patterns hold for welfare (defined here as TANF, SSI, and General

Assistance), food stamps, and Medicaid.

- *Refugees experienced declines (33 percent) that were at least as steep as those within the noncitizen population*--despite the protections for refugees incorporated into welfare reform and the fact that few refugees had lost their eligibility for benefits by March 1998.[10]
- *For low-income populations (i.e., with incomes below 200 percent of poverty), program usage also fell faster for noncitizen than citizen households*.
- *Welfare use in noncitizen households with children also fell faster (36 percent) than in households with children where all adults are citizens (23 percent).*
- One result of these trends is that *noncitizens accounted for a disproportionately large share of the overall decline in welfare caseloads that occurred between 1994 and 1997*. While 23 percent of the drop in welfare caseloads can be ascribed to noncitizens, they represented only 9 percent of households receiving welfare in 1994.
- *Welfare use among elderly immigrants and naturalized citizens did not appear to change between 1994 and 1997.*
- *When welfare use among all households is examined, noncitizen participation levels were higher than citizens' in both 1994 and 1997,* despite rapid declines in noncitizen use rates. But when we look at *poor households (i.e., with incomes under 200 percent of poverty), noncitizens' participation rates in 1994 were no different from those of citizens; by 1997, however, levels had declined so that noncitizens had lower participation rates than citizens* (14.5 versus 17.9 percent). When we examine *poor households with children, noncitizen rates were lower for both 1994 and 1997--falling to almost half of the level of citizens in 1997* (14.0 versus 25.8 percent).
- *Neither naturalization nor rising incomes accounted for a significant share of noncitizens' exits from public benefit use.*

In the following section we examine patterns of benefit use in three different ways. First, we examine benefit use by *household,* disaggregating by all households, by households with incomes below 200 percent of poverty, and by those containing children. We then present findings for *individuals,* distinguishing use patterns for working-age adults (age 18 to 64) and the elderly (age 65 and over). We conclude the section by disaggregating trends by *legal status*, most notably program participation by refugees and naturalized citizens. In each instance, differing units of observation reveal different relative levels and trends in benefit use by citizens and noncitizens.

The analysis examines the use of welfare, food stamps, and Medicaid. While complete results are set out in the figures and tables included in this report, selected outcomes are highlighted in the narrative below. Since trends in food stamp and Medicaid use generally parallel those for welfare, we usually report results for only welfare.

## DETAILED FINDINGS

### A. Household-Level Analyses

Relative benefit use rates for citizens and noncitizens differ greatly depending on whether we focus on all households, poor households, or households with children. The reasons for these differences are straightforward. Poor households are far more likely to be eligible for and use benefits, and noncitizens are more likely to be poor. Fifty-four percent of noncitizen households have incomes below 200 percent of poverty, compared with 31 percent of citizen households (Table 4).

While controls for poverty have occasionally been taken into account in discussions of immigrant welfare use,[11] differences between households with and without children have been less frequently invoked. Yet such differences are significant because households with children are considerably more likely to use benefits, and immigrant households are more likely to contain children. Of households headed by noncitizens of working age, 55 percent include children, compared with 35 percent of comparable citizen households. As we report below, when we separately control for poverty and the presence of children, differences in program use rates between citizens and noncitizens diminish and, in some instances, disappear altogether. When we control for both poverty and the presence of children, noncitizen use of benefits is consistently lower than that of citizens, both before and after welfare reform.

**All Households.** Welfare receipt by noncitizen households fell much faster (35 percent) than citizens' receipt (14 percent) between 1994 and 1997. However, despite these steeper declines, noncitizen use of welfare remained higher than citizens' in 1997--9.0 versus 6.7 percent (Table 1 and Figure 1). By 1997, far more immigrants had lost their eligibility for food stamps than welfare. But our data show that noncitizens' participation in each program declined at roughly the same rate, with a marginally faster decline in welfare than in food stamps (35 percent versus 30 percent).

**Households below 200 Percent of Poverty.** The picture of higher welfare use by noncitizens shifts significantly when we control for poverty. By 1997, noncitizens with incomes below 200 percent of poverty had use rates that were significantly *lower* than citizens' rates--14.5 versus 17.9 percent (Chart A). Here again, noncitizen participation rates dropped faster than citizens' between 1994 and 1997 (33 versus 10 percent). For both food stamps and Medicaid, noncitizens' use also fell faster than citizens' during the same period, so by 1997 relative participation levels within each program were effectively the same for both groups (Table 1 and Figure 1).

**Households with Children.** When we control for the presence of children, we also see declines to the point where noncitizen welfare usage rates in households with children are not significantly different from citizens'rates (8.9 versus 9.6 percent, in Table 3). Rates for both declined rapidly between 1994 and 1997--35 percent for noncitizens and 23 percent for



Chart A. Percent of Households Receiving Welfare: Income below 200 Percent of Poverty

Legend: 1994, 1997

19.9%, 17.9%, 21.7%, 14.5%

citizens--but the difference in the rate of decline is not statistically significant (Table 3 and Figure 3).





**Chart B. Percent of Households With Children Receiving Welfare: Income Below 200 Percent of Poverty**

In households with noncitizen adults, many of the children are citizens, in most cases because they were born in the United States. In fact, there is at least one citizen child in 85 percent of noncitizen households with children. These mixed-status households are of substantial demographic importance in the United States, as about one in 10 American children lives in a household where one or more of the parents is a noncitizen and one or more of the children is a citizen.(12)

**Households with Children and with Incomes below 200 Percent of Poverty.** Given the large share of noncitizen households that are poor and contain children, one approach to assessing relative benefits is to control for both poverty and the presence of children. When we do so, we see much lower use among noncitizen households, both before and after welfare reform. With the rapid declines that occurred for both groups, noncitizen welfare use in 1997 is about half the rate for citizens--14.0 versus 25.8 percent. (See Chart B, Table 3, and Figure 3.)

**B. Individual-Level Analyses**

Individual-level analyses of welfare use among citizens and noncitizens produce results that differ from results of aggregate household-level analyses because of patterns of welfare reporting in the CPS, differences in welfare use, and structural differences in the populations.(13) "Welfare use" for an individual in the CPS is defined as having income from TANF, General Assistance, or SSI; a household "uses welfare" if anyone in the household has welfare income. One issue in reconciling individual and household use rates, as well as comparing survey with administrative data, is the fact that income data in the CPS is collected only for persons age 15 and over. Thus, if a child is receiving public assistance income, the income will either be ascribed to the parent or missed.

This income-based measure of welfare use means that most households report welfare participation as though there were only a single welfare recipient. For example, a single mother with two children receiving TANF income is only counted as one welfare unit or recipient, not three. The individual-level analysis differs from the household approach by ascribing use to only the reported welfare recipient, not to other household members who are not reported as receiving welfare. One reason it is important to examine individual level benefit use is that noncitizen households are significantly larger than citizen households.

Because there are almost twice as many adults (197 million, see detailed table B) as households (103 million, see Detailed Table A), welfare use rates for individuals should be lower than for households. In addition, noncitizen households are larger than citizen households and are more likely to contain children. Thus, we would expect larger differences in usage rates between households and individuals among noncitizens; the data support this.

Our analysis below focuses on two important subpopulations: working-age adults, age 18 to 64, and the elderly, age 65 and over.

**Working-Age Adults.** Working-age noncitizens' use of welfare fell roughly three times faster than citizens' between 1994 and 1997--41 versus 15 percent (Table 2). A similar pattern is evident for Medicaid.(14) By 1997, there is no statistical difference between citizen and noncitizen participation rates for welfare (4.0 versus 3.3 percent) or Medicaid (6.7 versus 7.2 percent). See Table 2 and Figure 2.

**Elderly Immigrants.** In sharp contrast to most of the other components of the analysis reported here, we find no statistically significant decline in either welfare or Medicaid use on the part of elderly noncitizens. In fact, we find no significant change in welfare receipt among the elderly overall, regardless of citizenship status (Table 2 and Figure 2).

Elderly noncitizen use of welfare and other benefits is much higher than is the case for citizens. In 1997, only 3.7 percent of elderly citizens used welfare, compared to 19.0 percent of noncitizens (Table 2 and Figure 2). Higher use of welfare (primarily SSI) and Medicaid among elderly noncitizens can be attributed to the fact that many have not worked in the United States long enough to qualify for Social Security or Medicare. Moreover, the absence of a decline in usage since 1994 may be explained, at least in part, by the restoration of SSI benefits to pre-enactment immigrants.

One result that emerges from the analysis is an *apparent* rise between 1994 and 1997 in the number and share of *naturalized* elderly receiving welfare benefits--from 99,000 or 5.9 percent, to 167,000 or 9.0 percent (Detailed Table B). During the same period, there is a commensurate decline in the number of *noncitizen* elderly receiving benefits (from 213,000 to 163,000). One hypothesis is that the decline in noncitizen participation for this subpopulation may be attributable in part to naturalization. However, these numerical changes are not statistically significant, so the results cannot be treated as definitive.(15)

**C. Benefit Use by Immigrant Status**

Historically, immigration status has been a strong predictor of immigrant use of public benefits. This is partly because

the foreign-born population consists of groups with varied eligibility for benefits. While naturalized citizens and refugees are eligible for benefits on the same terms as native-born citizens, legal permanent residents' use of benefits has been conditioned by deeming and public charge restrictions; temporary immigrants and the undocumented are largely barred from services. Further, the socioeconomic characteristics of the groups differ substantially, resulting in different needs.(16) The importance of disaggregating the foreign-born population by status can be seen in the analysis of household use rates (Table 1).

**Foreign-Born Population.** Between 1994 and 1997, welfare use in households headed by all foreign-born persons fell by 21 percent or 2.5 percentage points (from 11.7 percent to 9.2 percent). However, this general trend masks very different levels and trends among the various immigrant groups.

**Refugees.** Refugees, who have historically had the highest levels of public benefit use among the foreign born, account for 8 percent of immigrant-headed households, but for 21 percent of immigrants' welfare use (Detailed Table A). Their use rate remained high--24.5 percent in 1997--but even this level represented a decline of 8.8 percentage points from the pre-reform level of 33 percent (Chart C).

**Naturalized Citizens.** Naturalized citizens, who have historically had the lowest levels of public benefit use among legally present immigrant populations, represent the other extreme. While naturalized citizens make up 41 percent of immigrant households, they account for only 31 percent of immigrants' welfare use. Their use of benefits was virtually identical to that of native citizens and did not change significantly between 1994 and 1997.

**Noncitizens.** The residual foreign-born subpopulation, noncitizens, had a large decline of 4.9 percentage points to 9.0 percent in 1997, but their use rate remained somewhat higher than that of citizens.



Chart C.  Percent of Immigrant Households Receiving Welfare, by Immigration Status

### General Observations

### Chilling Effects versus Eligibility Changes

- Because comparatively few legal immigrants were ineligible for public benefits as of December 1997, it appears that the steeper declines in noncitizens' than citizens' use of welfare, food stamps, and Medicaid owe more to the "chilling effect" of welfare reform and other policy changes than they do to actual eligibility changes. In addition, the fact that welfare use among noncitizens dropped as steeply as food stamp use (where new restrictions extended far more broadly) suggests that eligibility changes in one program may chill noncitizens' use of other programs. Over time, eligibility changes will become more important as most immigrants admitted after August 22, 1996, will be ineligible for most means-tested public benefits for at least five years after their entry to the country.

### Noncitizens Do Not Appear to Be Naturalizing to Retain Benefits

- The consistently low share and number of naturalized immigrants who receive benefits indicate that few immigrants are becoming citizens in order to retain benefits. If most immigrant benefit recipients were naturalizing to retain benefits, the number of naturalized citizens receiving benefits would have grown substantially more than it did. (17)

### Rising Incomes Do Not Explain Lower Program Participation Rates among Noncitizens

- One possible explanation for the faster declines in program participation among noncitizens than among citizens could be that incomes are rising faster for noncitizens. To address this issue, we use demographic standardization techniques (described below) to partition changes in program participation over the 1994-97 period into the share attributable to changes in income and the share attributable to changes in income-specific participation rates. Our analysis finds that most of the change is *not* due to rising incomes. Only 6 percent of the decline in welfare use among noncitizens, versus 30 percent of the decline among citizens, can be explained by rising incomes; similar results hold for food stamps and Medicaid (Table 4).

### Reduced Use of Health and Other Benefits among Populations Not the Focus of Welfare Reform

- While the apparent decline in welfare use among noncitizens of working age may be an intended and positive policy outcome, these data also reveal sharp declines in the use of health, nutritional, and cash assistance within populations that are thought to be more vulnerable and were not a focus of welfare reform. These vulnerable populations include refugees and the citizen children of noncitizens. As the data presented above indicate, there have been sharp declines in benefits use for both populations. At the same time, health uninsurance rates for noncitizens (46 percent) remain much higher than among citizens (16 percent).(18) Persistently high uninsurance rates, coupled with the decline in program participation documented here, have broad implications for targeting outreach efforts to expand enrollment in programs like California's Healthy Families initiative and for other state efforts to expand enrollment in Medicaid and the Child Health Insurance Program. (19)

### Noncitizens Do Not Demonstrate a Greater Propensity to Receive Benefits

- The data indicate that higher benefit use rates on the part of noncitizen versus citizen households are due to the fact that immigrant households are poorer and more likely to contain children, not because noncitizens have a greater

disposition towards receiving benefits. In fact, among poor households with children, immigrants have lower use rates for welfare, food stamps, and Medicaid both before and after welfare reform.

**Notes on the Analysis**

**Legal Status Distinction.** This analysis employs imputation techniques developed by the Urban Institute that make it possible to assign some legal statuses (notably refugee and nonimmigrant status) to foreign-born persons included in the Current Population Survey. These techniques enable us to disaggregate changes in immigrants' benefit use by legal status--despite the fact that the CPS only distinguishes citizens from noncitizens. Disaggregating the immigrant population in this manner is important because usage patterns vary considerably by legal status and, following welfare reform, legal status has become an increasingly important determinant of immigrants' eligibility for public benefits. Specifically, the rules below have applied following welfare reform:

- *Naturalized citizens* remain eligible for public benefits on the same terms as native-born citizens.
- *Noncitizen refugees* retain eligibility for means-tested federal benefits, including food stamps, Child Health Insurance Program (CHIP), Medicaid, TANF, and SSI, for five to seven years following their entry into the United States.
- *Legal immigrants entering before August 22, 1996,* retain eligibility for several major means-tested public benefit programs: Medicaid, TANF, and the Child Health Insurance Program. Each is jointly funded by the states and the federal government. Welfare reform gave the states the option to extend TANF and Medicaid to pre-enactment legal immigrants and virtually all states have chosen to do so.

Pre-enactment legal immigrants' eligibility for *federal* food stamps remains limited to the elderly, disabled, and children. California and other states have extended state-funded food stamps to working-age immigrants left out by the federal program.

While pre-enactment immigrants' eligibility for SSI was largely eliminated by the 1996 legislation, it has been restored to disabled or elderly immigrants who were receiving SSI when welfare reform passed or who subsequently become disabled.

- *Legal immigrants entering after August 22, 1996,* have been barred from receiving federal means-tested benefits, including TANF, Medicaid, CHIP, SSI, and food stamps, for at least five years after entry and effectively until they naturalize.
- *Undocumented immigrants* remain generally ineligible for most major public benefits.

**Partitioning the Change in Welfare Use.** The percentage of a group (e.g., citizens, noncitizens, natives) using welfare can be thought of as the product of two sets of percentages or rates: the income distribution of the group and the percentage of each specific income category who receive welfare. To cite a specific, but simplified, example using data from tables 1 and 4, 6.7 percent of citizen households received welfare in 1997. We arrived at this percentage from the following calculation: 17.9 percent of citizen households with incomes below 200 percent of poverty received welfare, and these households were 30.7 percent of citizen households; of the 69.3 percent of citizen households with incomes above 200 percent of poverty, only 1.7 percent receive welfare. Thus, $6.7 = 17.9 \times 0.307 + 1.7 \times 0.693$. For noncitizen households, 9.0 percent received welfare in 1997 ($9.0 = 14.5 \times 0.541 + 2.6 \times 0.459$). In other words, poor noncitizen households are less likely to use welfare than poor citizen households (14.5 percent versus 17.9 percent), but poor households are much more common among noncitizens than citizens (54.1 percent versus 30.7 percent), so overall noncitizen households are more likely to use welfare than are citizen households.

We can think of two extreme explanations for the change in welfare use between 1994 and 1997. At one extreme, the 35 percent reduction in use for noncitizens (from 13.9 to 9.0 percent) could occur because the rate of welfare use at every income level for noncitizens fell by 35 percent; were this to occur, the overall rate decline would be explained completely by changes in usage rates. On the other hand, the rate of welfare use could stay constant for each income group of noncitizens, but incomes could rise so that more of the noncitizen population fell into higher income groups which use less welfare. In this case, the overall rate decline would be due entirely to changes in income level. In practice, neither extreme occurs; a combination of the two accounts for the change.

A demographic technique called standardization permits us to partition the overall change in welfare use into a portion attributable to changes in usage rates and a portion attributable to changes in income distribution. The standardization requires four sets of percentages, two for each year: the percentage of the population falling into each income category in 1994 and 1997 (i.e., the income distributions), and the percentage of each income group receiving welfare in 1994 and 1997 (i.e., the use rates). For the partition results shown in Table 4, we use eight household income categories: incomes less than 50% of poverty, 50-74%, 75-99%, 100-124%, 125-149%, 150-174%, 175-199%, and 200% of poverty or more.

The 1997 income distribution multiplied by the 1994 detailed use rates gives the percentage that would have received welfare in 1997 if use rates had not changed (i.e., only incomes had shifted). Subtracting this hypothetical rate from the actual 1997 overall use rate gives a measure of change attributable to income changes. We can calculate another measure of the income effect by subtracting the actual 1994 overall use rate with the hypothetical rate computed with the 1994 income distribution and the 1997 detailed use rates. The average of these two estimates is the amount of change between 1994 and 1997 attributable to changes in income. Any remaining change is the share attributable to changes in welfare usage patterns.[20]

**Coverage of welfare use in the CPS.** Finally, we should note that the CPS data on benefits use employed in this analysis were reported by the Census Bureau. Both welfare use and welfare income are known to be underreported, possibly substantially, in the CPS. We do not correct for either type of underreporting in our analysis. Further, the data have not been adjusted to take into account program eligibility rules or the misreporting of public benefit use on the part of immigrants and native citizens. Our uncorrected comparisons assume, in effect, that reporting patterns did not change between the 1995 and 1998 CPS. Despite these limitations, CPS data are conventionally used to characterize trends in

benefit use. [21] There is no reason to believe that the trends documented in this report are biased or otherwise invalid.

## Tables and Figures

**Table 1. Percent of Households Receiving Welfare, Food Stamps, and Medicaid, by Citizenship of Household Head and by Poverty Status: 1994 and 1997**

| Population | *All Households* | | | | *Households Below 200% of Poverty* | | | |
|---|---|---|---|---|---|---|---|---|
| | Percent with Any Participation | | | | Percent with Any Participation | | | |
| | | | '94–'97 Change | | | | '94–'97 Change | |
| | 1994 | 1997 | Amt. | Pct. | 1994 | 1997 | Amt. | Pct. |
| **Welfare (AFDC/TANF, SSI, GA)** | | | | | | | | |
| Total | 8.3% | 6.9% | -1.4% * | -16% | 20.3% | 17.9% | -2.5% * | -12% |
| **Citizen** | **7.8%** | **6.7%** | **-1.1% *** | **-15%** | **19.9%** | **17.9%** | **-2.0% *** | **-10%** |
| Native | 7.9% | 6.6% | -1.2% * | -16% | 20.2% | 18.1% | -2.1% * | -10% |
| Naturalized** | 6.0% | 6.9% | 0.9% | -- | 13.5% | 14.9% | 1.4% | -- |
| **Noncitizen** | **13.9%** | **9.0%** | **-4.9% *** | **-35%** | **21.7%** | **14.5%** | **-7.2% *** | **-33%** |
| Refugee | 33.3% | 24.5% | -8.8% * | -27% | 49.1% | 40.2% | -9.0% | -- |
| Foreign-Born | 11.7% | 9.2% | -2.6% * | -22% | 21.2% | 16.6% | -4.6% * | -22% |
| Noncitizen --Citizen Difference | **6.1% *** | **2.4% *** | **-3.7% *** | (x) | **1.8%** | **-3.5% *** | **-5.2% *** | (x) |
| **Food Stamps** | | | | | | | | |
| Total | 9.0% | 7.1% | -1.9% * | -22% | 24.3% | 20.6% | -3.7% * | -15% |
| **Citizen** | **8.5%** | **6.8%** | **-1.8% *** | **-21%** | **23.8%** | **20.5%** | **-3.3% *** | **-14%** |
| Native | 8.7% | 6.8% | -1.8% * | -21% | 24.2% | 20.8% | -3.4% * | -14% |
| Naturalized** | 5.5% | 5.4% | 0.0% | -- | 15.0% | 14.8% | -0.2% | -- |
| **Noncitizen** | **15.4%** | **10.8%** | **-4.6% *** | **-30%** | **26.3%** | **19.1%** | **-7.1% *** | **-27%** |
| Refugee | 35.3% | 22.1% | -13.2% * | -37% | 52.0% | 41.9% | -10.1% | -- |
| Foreign-Born | 12.5% | 9.3% | -3.2% * | -26% | 24.7% | 19.4% | -5.2% * | -21% |
| Noncitizen --Citizen Difference | **6.8% *** | **4.0% *** | **-2.8% *** | (x) | **2.4% *** | **-1.4%** | **-3.8% *** | (x) |
| **Medicaid** | | | | | | | | |
| Total | 14.3% | 13.2% | -1.1% * | -8% | 31.3% | 30.5% | -0.8% | -- |
| **Citizen** | **13.5%** | **12.6%** | **-0.9% *** | **-7%** | **30.3%** | **30.0%** | **-0.3%** | **--** |
| Native | 13.5% | 12.5% | -1.0% * | -7% | 30.5% | 30.1% | -0.4% | -- |
| Naturalized** | 11.9% | 13.6% | 1.7% | -- | 23.8% | 28.3% | 4.5% | -- |
| **Noncitizen** | **26.5%** | **20.8%** | **-5.7% *** | **-22%** | **39.8%** | **32.0%** | **-7.8% *** | **-19%** |
| Refugee | 42.5% | 35.8% | -6.7% | -- | 58.8% | 58.5% | -0.3% | -- |
| Foreign-Born | 21.3% | 18.7% | -2.6% * | -12% | 36.1% | 32.7% | -3.4% * | -9% |
| Noncitizen --Citizen Difference | **13.0% *** | **8.2% *** | **-4.8% *** | (x) | **9.5% *** | **2.0%** | **-7.5% *** | (x) |

\* Significant at p < 0.10.
\*\* Excludes refugees and non-immigrants. See text for definition.
-- Change not significant.
(x) Not applicable.

Source: Urban Institute tabulations from March Current Population Surveys of 1995 and 1998, with imputations for refugees and non-immigrants. See Detailed Table A for population data.

**Table 2. Percent of Individuals Participating in Welfare and Medicaid, by Citizenship and Age: 1994 and 1997**

| | Age 18–64 | | | | Age 65 and Over | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Individuals with Program Participation | | | | Individuals with Program Participation | | | |
| | | | '94–'97 Change | | | | '94–'97 Change | |
| Population | 1994 | 1997 | Amt. | Pct. | 1994 | 1997 | Amt. | Pct. |
| **Welfare (AFDC/TANF, SSI, GA)** | | | | | | | | |
| Total | 4.9% | 4.0% | -0.9% * | -18% | 4.9% | 4.4% | -0.5% | -- |
| **Citizen** | **4.7%** | **4.0%** | **-0.7% *** | **-15%** | **4.2%** | **3.7%** | **-0.5%** | **--** |
| Native | 4.8% | 4.1% | -0.7% * | -15% | 4.1% | 3.4% | -0.7% | -- |
| Naturalized** | 2.5% | 2.1% | -0.4% | -- | 5.9% | 9.0% | 3.1% | -- |
| **Noncitizen**** | **5.6%** | **3.3%** | **-2.3% *** | **-41%** | **20.9%** | **19.0%** | **-1.8%** | **--** |
| Refugee | 19.2% | 10.4% | -8.8% * | -46% | 48.1% | 51.0% | 2.9% | -- |
| Foreign-Born | 5.5% | 3.5% | -2.1% * | -37% | 13.2% | 14.7% | 1.5% | -- |
| Noncitizen --Citizen Difference | **0.8%** | **-0.7%** | **-1.6%** | (x) | **16.6% *** | **15.3% *** | **-1.3%** | (x) |
| **Medicaid** | | | | | | | | |
| Total | 7.9% | 6.9% | -1.0% * | -13% | 9.3% | 9.0% | -0.3% | -- |
| **Citizen** | **7.5%** | **6.7%** | **-0.8% *** | **-10%** | **8.4%** | **8.1%** | **-0.3%** | **--** |
| Native | 7.6% | 6.8% | -0.8% * | -10% | 8.3% | 7.7% | -0.6% | -- |
| Naturalized** | 4.4% | 4.2% | -0.2% | -- | 11.1% | 14.9% | 3.8% | -- |
| **Noncitizen**** | **10.3%** | **7.2%** | **-3.1% *** | **-30%** | **28.2%** | **28.2%** | **0.1%** | **--** |
| Refugee | 33.1% | 17.8% | -15.3% * | -46% | 64.8% | 69.7% | 4.9% | -- |
| Foreign-Born | 10.2% | 7.1% | -3.0% * | -30% | 19.7% | 22.4% | 2.8% | -- |
| Noncitizen --Citizen Difference | **2.8% *** | **0.5%** | **-2.3% *** | (x) | **19.7% *** | **20.1% *** | **0.4%** | (x) |

\* Significant at p < 0.10.
\*\* Excludes refugees and non-immigrants. See text for definition.
-- Change not significant.
(x) Not applicable.

Source: Urban Institute tabulations from March Current Population Surveys of 1995 and 1998, with imputations for refugees and non-immigrants. See Detailed Table B for population data.

Note: Welfare use is defined by individual reports of welfare income from persons age 15 and over. The data do not represent cases or the full number of individuals on welfare rolls. For example, if a mother and two children are receiving TANF income, the income would be reported by the mother only and would appear in the table as one recipient, not three.

**Table 3. Percent of Households with Children Participating in Welfare, Food Stamps, and Medicaid, by Citizenship of Adults and Children and by Poverty Status: 1994 and 1997**

| Program and Household Composition (status of adults and children) | All Households | | | | Below 200 Percent of Poverty | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Percent with Any Participation | | | | Percent with Any Participation | | | |
| | | | '94–'97 Change | | | | '94–'97 Change | |
| | 1994 | 1997 | Amt. | Pct. | 1994 | 1997 | Amt. | Pct. |
| **Welfare (AFDC/TANF, SSI, GA)** | | | | | | | | |
| Households with children | 12.8% | 9.7% | -3.2% * | -25% | 30.1% | 24.0% | -6.1% * | -20% |
| **All citizen adults** | **12.4%** | **9.6%** | **-2.8% *** | **-23%** | **31.4%** | **25.8%** | **-5.6% *** | **-18%** |
| **Some noncitizen** adults** | **13.8%** | **8.9%** | **-4.9% *** | **-35%** | **20.8%** | **14.0%** | **-6.7% *** | **-32%** |
| All noncitizen** children | 8.5% | 4.2% | -4.2% * | -50% | 11.6% | 5.9% | -5.6% | -- |
| Some citizen children | 14.8% | 9.6% | -5.1% * | -35% | 22.5% | 15.3% | -7.2% * | -32% |
| Difference from "all citizen" households | | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Some noncitizen** adults** | **1.4%** | **-0.7%** | **-2.1%** | **(x)** | **-10.7% *** | **-11.8% *** | **-1.1%** | **(x)** |
| All noncitizen** children | -3.9% * | -5.4% * | -1.4% | (x) | -19.9% * | -19.9% * | 0.0% | (x) |
| Some citizen children | 2.4% * | 0.0% | -2.3% | (x) | -8.9% * | -10.5% * | -1.6% | (x) |
| **Food Stamps** | | | | | | | | |
| Households with children | 16.0% | 12.3% | -3.6% * | -23% | 39.6% | 32.9% | -6.7% * | -17% |
| **All citizen adults** | **15.3%** | **12.1%** | **-3.2% *** | **-21%** | **40.9%** | **34.7%** | **-6.2% *** | **-15%** |
| **Some noncitizen** adults** | **19.2%** | **13.6%** | **-5.6% *** | **-29%** | **30.7%** | **23.3%** | **-7.4% *** | **-24%** |
| All noncitizen** children | 9.8% | 7.4% | -2.4% | -- | 14.0% | 12.0% | -2.0% | -- |
| Some citizen children | 20.8% | 14.5% | -6.4% * | -31% | 33.9% | 25.1% | -8.8% * | -26% |
| Difference from "all citizen" households | | | | | | | | |
| **Some noncitizen** adults** | **3.9% *** | **1.5%** | **-2.4%** | **(x)** | **-10.2% *** | **-11.4% *** | **-1.2%** | **(x)** |
| All noncitizen** children | -5.5% * | -4.6% * | 0.9% | (x) | -26.9% * | -22.7% * | 4.2% | (x) |
| Some citizen children | 5.5% * | 2.4% * | -3.1% * | (x) | -7.0% * | -9.6% * | -2.6% | (x) |
| **Medicaid** | | | | | | | | |
| Households with children | 17.5% | 14.4% | -3.1% * | -18% | 38.4% | 33.5% | -4.8% * | -13% |
| **All citizen adults** | **16.8%** | **14.0%** | **-2.7% *** | **-16%** | **39.2%** | **35.1%** | **-4.1% *** | **-11%** |
| **Some noncitizen** adults** | **21.1%** | **16.2%** | **-4.8% *** | **-23%** | **31.1%** | **24.9%** | **-6.1% *** | **-20%** |
| All noncitizen** children | 15.7% | 10.7% | -4.9% | -- | 21.8% | 15.4% | -6.4% | -- |
| Some citizen children | 22.0% | 17.0% | -5.0% * | -23% | 32.8% | 26.5% | -6.4% * | -19% |
| Difference from "all citizen" households | | | | | | | | |
| **Some noncitizen** adults** | **4.3% *** | **2.2% *** | **-2.1%** | **(x)** | **-8.2% *** | **-10.2% *** | **-2.0%** | **(x)** |
| All noncitizen** children | -1.1% | -3.3% | -2.2% | (x) | -17.5% * | -19.7% * | -2.2% | (x) |
| Some citizen children | 5.2% * | 3.0% * | -2.2% | (x) | -6.4% * | -8.7% * | -2.2% | (x) |

\* Significant at p < 0.10. \*\* Excludes refugees and non-immigrants. See text for definition. -- Change not significant. (x) Not applicable. Source: Urban Institute tabulations from March Current Population Surveys of 1995 and 1998, with imputations for refugees and non-immigrants. Universe is households headed by persons 18–64 with children under age 18. See Detailed Table C for population data.

**Table 4. Partition of 1994–97 Change in Household Participation in Welfare, Food Stamps, and Medicaid into Portions Due to Changes in Poverty Prevalence and Welfare Use Rates, by Citizenship**

| Population | Percent of Households | | | | Partition of '94–'97 Change in Participation*** | | | |
|---|---|---|---|---|---|---|---|---|
| | **Below Specified Level of Poverty** | | **Participating in Program** | | Total Change | Due to Use Rates | Due to Poverty Rates | Pct. of Change from Usage |
| | 1994 | 1997 | 1994 | 1997 | | | | |
| **Welfare (AFDC/TANF, SSI, GA)** | | | | | | | | |
| **100 Percent of Poverty** | | | | | | | | |
| Total | 13.9% | 12.7% | 8.3% | 6.9% | -1.4% * | -0.9% | -0.5% | 66% |
| **Citizen** | **13.0%** | **11.8%** | **7.8%** | **6.7%** | **-1.1% *** | **-0.7%** | **-0.5%** | **60%** |
| Native | 13.0% | 11.7% | 7.9% | 6.6% | -1.2% * | -0.7% | -0.5% | 59% |
| Naturalized** | 11.0% | 12.5% | 6.0% | 6.9% | 0.9% | -- | -- | -- |
| **Noncitizen**** | **27.3%** | **25.9%** | **13.9%** | **9.0%** | **-4.9% *** | **-4.6%** | **-0.3%** | **94%** |
| Refugee | 31.9% | 25.4% | 33.3% | 24.5% | -8.8% * | -5.3% | -3.5% | 60% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Foreign-Born | 21.4% | 20.4% | 11.7% | 9.2% | -2.6% * | -2.2% | -0.3% | 87% |
| **Food Stamps** | | | | | | | | |
| **125 Percent of Poverty** | | | | | | | | |
| Total | 18.9% | 17.5% | 9.0% | 7.1% | -1.9% * | -1.4% | -0.6% | 70% |
| **Citizen** | **17.7%** | **16.4%** | **8.5%** | **6.8%** | **-1.8% *** | **-1.2%** | **-0.6%** | **68%** |
| Native | 17.8% | 16.3% | 8.7% | 6.8% | -1.8% * | -1.2% | -0.6% | 66% |
| Naturalized** | 16.2% | 17.6% | 5.5% | 5.4% | 0.0% | -- | -- | -- |
| **Noncitizen** | **35.7%** | **34.8%** | **15.4%** | **10.8%** | **-4.6% *** | **-4.1%** | **-0.5%** | **89%** |
| Refugee | 41.1% | 32.7% | 35.3% | 22.1% | -13.2% * | -8.4% | -4.8% | 64% |
| Foreign-Born | 28.5% | 27.5% | 12.5% | 9.3% | -3.2% * | -2.7% | -0.5% | 85% |
| **Medicaid** | | | | | | | | |
| **200 Percent of Poverty** | | | | | | | | |
| Total | 34.3% | 32.1% | 14.3% | 13.2% | -1.1% * | -0.5% | -0.7% | 42% |
| **Citizen** | **32.8%** | **30.7%** | **13.5%** | **12.6%** | **-0.9% *** | **-0.3%** | **-0.6%** | **28%** |
| Native | 32.9% | 30.5% | 13.5% | 12.5% | -1.0% * | -0.3% | -0.7% | 31% |
| Naturalized** | 32.2% | 33.6% | 11.9% | 13.6% | 1.7% | -- | -- | -- |
| **Noncitizen** | **55.9%** | **54.1%** | **26.5%** | **20.8%** | **-5.7% *** | **-5.1%** | **-0.6%** | **90%** |
| Refugee | 60.6% | 49.9% | 42.5% | 35.8% | -6.7% | -- | -- | -- |
| Foreign-Born | 47.1% | 45.0% | 21.3% | 18.7% | -2.6% * | -2.1% | -0.6% | 78% |

\* Significant at p < 0.10.
\*\* Excludes refugees and non-immigrants. See text for definition.
\*\*\* Partition uses poverty-specific welfare rates for intervals of 25 percentage points for 50–200 percent of poverty (i.e., <50%, 50–74%, 75–99%...175–199%, 200% or more). See text for details.
-- Total change not significant.

Source: Urban Institute tabulations from March Current Population Surveys of 1995 and 1998, with imputations for refugees and non-immigrants.

**Detailed Table A. Household Receipt of Welfare, Food Stamps, and Medicaid, by Citizenship of Household Head and by Poverty Status: 1994 and 1997**

(Populations in thousands)

| Population | *All Households* | | | | | | *Households Below 200 Percent of Poverty* | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Program Participation in Household? | | | | | | Program Participation in Household? | | | | | |
| | 1994 | | | 1997 | | | 1994 | | | 1997 | | |
| | Yes | Total | % Yes | Yes | Total | % Yes | Yes | Total | % Yes | Yes | Total | % Yes |
| **Welfare (AFDC/TANF, SSI, GA)** | | | | | | | | | | | | |
| Total | 8,188 | 99,106 | 8.3% | 7,091 | 102,584 | 6.9% | 6,903 | 33,960 | 20.3% | 5,877 | 32,888 | 17.9% |
| **Citizen** | **7,257** | **92,989** | **7.8%** | **6,400** | **96,169** | **6.7%** | **6,084** | **30,525** | **19.9%** | **5,287** | **29,493** | **17.9%** |
| Native | 7,031 | 89,248 | 7.9% | 6,096 | 91,748 | 6.6% | 5,920 | 29,320 | 20.2% | 5,065 | 28,007 | 18.1% |
| Naturalized* | 225 | 3,741 | 6.0% | 304 | 4,421 | 6.9% | 163 | 1,205 | 13.5% | 222 | 1,486 | 14.9% |
| **Noncitizen*** | **723** | **5,209** | **13.9%** | **474** | **5,246** | **9.0%** | **632** | **2,910** | **21.7%** | **411** | **2,841** | **14.5%** |
| Refugee | 202 | 606 | 33.3% | 213 | 872 | 24.5% | 180 | 367 | 49.1% | 175 | 435 | 40.2% |
| Foreign-Born | 1,157 | 9,858 | 11.7% | 995 | 10,837 | 9.2% | 983 | 4,640 | 21.2% | 811 | 4,881 | 16.6% |
| **Food Stamps** | | | | | | | | | | | | |
| Total | 8,949 | 99,106 | 9.0% | 7,263 | 102,584 | 7.1% | 8,240 | 33,960 | 24.3% | 6,773 | 32,888 | 20.6% |
| **Citizen** | **7,924** | **92,989** | **8.5%** | **6,500** | **96,169** | **6.8%** | **7,275** | **30,525** | **23.8%** | **6,044** | **29,493** | **20.5%** |
| Native | 7,720 | 89,248 | 8.7% | 6,261 | 91,748 | 6.8% | 7,095 | 29,320 | 24.2% | 5,824 | 28,007 | 20.8% |
| Naturalized* | 204 | 3,741 | 5.5% | 239 | 4,421 | 5.4% | 180 | 1,205 | 15.0% | 220 | 1,486 | 14.8% |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Noncitizen\*** | **801** | **5,209** | **15.4%** | **567** | **5,246** | **10.8%** | **764** | **2,910** | **26.3%** | **543** | **2,841** | **19.1%** |
| Refugee | 214 | 606 | 35.3% | 193 | 872 | 22.1% | 191 | 367 | 52.0% | 182 | 435 | 41.9% |
| Foreign-Born | 1,228 | 9,858 | 12.5% | 1,003 | 10,837 | 9.3% | 1,145 | 4,640 | 24.7% | 949 | 4,881 | 19.4% |
| **Medicaid** | | | | | | | | | | | | |
| Total | 14,189 | 99,106 | 14.3% | 13,523 | 102,584 | 13.2% | 10,630 | 33,960 | 31.3% | 10,027 | 32,888 | 30.5% |
| **Citizen** | **12,533** | **92,989** | **13.5%** | **12,102** | **96,169** | **12.6%** | **9,243** | **30,525** | **30.3%** | **8,852** | **29,493** | **30.0%** |
| Native | 12,088 | 89,248 | 13.5% | 11,499 | 91,748 | 12.5% | 8,956 | 29,320 | 30.5% | 8,432 | 28,007 | 30.1% |
| Naturalized\* | 445 | 3,741 | 11.9% | 603 | 4,421 | 13.6% | 287 | 1,205 | 23.8% | 420 | 1,486 | 28.3% |
| **Noncitizen\*** | **1,379** | **5,209** | **26.5%** | **1,090** | **5,246** | **20.8%** | **1,158** | **2,910** | **39.8%** | **910** | **2,841** | **32.0%** |
| Refugee | 258 | 606 | 42.5% | 312 | 872 | 35.8% | 216 | 367 | 58.8% | 254 | 435 | 58.5% |
| Foreign-Born | 2,101 | 9,858 | 21.3% | 2,024 | 10,837 | 18.7% | 1,674 | 4,640 | 36.1% | 1,595 | 4,881 | 32.7% |

\* Excludes refugees and non-immigrants. See text for definition.
Source: Urban Institute tabulations from March Current Population Surveys of 1995 and 1998, with imputations for refugees and non-immigrants.

### Detailed Table B. Individual Welfare and Medicaid Participation, by Citizenship and Age: 1994 and 1997

(Populations in thousands)

| Population | Individual Participation in Program, *Age 18–64* | | | | | | Individual Participation in Program, *Age 65 and Over* | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1994 | | | 1997 | | | 1994 | | | 1997 | | |
| | Yes | Total | % Yes | Yes | Total | % Yes | Yes | Total | % Yes | Yes | Total | % Yes |
| **Welfare (AFDC/TANF, SSI, GA)** | | | | | | | | | | | | |
| Total | 7,856 | 160,217 | 4.9% | 6,632 | 165,329 | 4.0% | 1,549 | 31,350 | 4.9% | 1,419 | 32,082 | 4.4% |
| **Citizen** | **6,939** | **146,620** | **4.7%** | **6,047** | **151,104** | **4.0%** | **1,277** | **30,207** | **4.2%** | **1,160** | **31,037** | **3.7%** |
| Native | 6,808 | 141,270 | 4.8% | 5,908 | 144,513 | 4.1% | 1,178 | 28,536 | 4.1% | 993 | 29,188 | 3.4% |
| Naturalized\* | 132 | 5,350 | 2.5% | 139 | 6,591 | 2.1% | 99 | 1,671 | 5.9% | 167 | 1,849 | 9.0% |
| **Noncitizen\*** | **651** | **11,713** | **5.6%** | **385** | **11,772** | **3.3%** | **213** | **1,019** | **20.9%** | **163** | **857** | **19.0%** |
| Refugee | 257 | 1,340 | 19.2% | 197 | 1,890 | 10.4% | 60 | 124 | 48.1% | 96 | 188 | 51.0% |
| Foreign-Born | 1,048 | 18,947 | 5.5% | 725 | 20,817 | 3.5% | 372 | 2,814 | 13.2% | 426 | 2,894 | 14.7% |
| **Medicaid** | | | | | | | | | | | | |
| Total | 12,698 | 160,217 | 7.9% | 11,372 | 165,329 | 6.9% | 2,919 | 31,350 | 9.3% | 2,901 | 32,082 | 9.0% |
| **Citizen** | **11,011** | **146,620** | **7.5%** | **10,165** | **151,104** | **6.7%** | **2,551** | **30,207** | **8.4%** | **2,528** | **31,037** | **8.1%** |
| Native | 10,773 | 141,270 | 7.6% | 9,886 | 144,513 | 6.8% | 2,364 | 28,536 | 8.3% | 2,251 | 29,188 | 7.7% |
| Naturalized\* | 238 | 5,350 | 4.4% | 279 | 6,591 | 4.2% | 186 | 1,671 | 11.1% | 276 | 1,849 | 14.9% |
| **Noncitizen\*** | **1,211** | **11,713** | **10.3%** | **853** | **11,772** | **7.2%** | **287** | **1,019** | **28.2%** | **242** | **857** | **28.2%** |
| Refugee | 443 | 1,340 | 33.1% | 336 | 1,890 | 17.8% | 81 | 124 | 64.8% | 131 | 188 | 69.7% |
| Foreign-Born | 1,925 | 18,947 | 10.2% | 1,486 | 20,817 | 7.1% | 554 | 2,814 | 19.7% | 650 | 2,894 | 22.4% |

\* Excludes refugees and non-immigrants. See text for definition.
Source: Urban Institute tabulations from March Current Population Surveys of 1995 and 1998, with imputations for refugees and non-immigrants.

### Detailed Table C. Welfare, Food Stamp, and Medicaid Participation of Households with Children, by Citizenship of Adults and Children and by Poverty Status: 1994 and 1997 (Populations in thousands)

| Program and Household Composition (Adults-Children) | *All Households* | | | | | | *Households Below 200 Percent of Poverty* | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1994 | | | 1997 | | | 1994 | | | 1997 | | |
| | Yes | Total | % Yes | Yes | Total | % Yes | Yes | Total | % Yes | Yes | Total | % Yes |
| **Welfare (AFDC/TANF, SSI, GA)** | | | | | | | | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Households with children | 4,713 | 36,784 | 12.8% | 3,600 | 37,286 | 9.7% | 4,160 | 13,818 | 30.1% | 3,156 | 13,138 | 24.0% |
| **All citizen adults** | **4,031** | **32,498** | **12.4%** | **3,142** | **32,747** | **9.6%** | **3,550** | **11,294** | **31.4%** | **2,755** | **10,670** | **25.8%** |
| One or more noncitizen* adults | 524 | 3,785 | 13.8% | 346 | 3,880 | 8.9% | 466 | 2,243 | 20.8% | 304 | 2,165 | 14.0% |
| All noncitizen* children | 47 | 560 | 8.5% | 21 | 497 | 4.2% | 42 | 359 | 11.6% | 18 | 297 | 5.9% |
| **One or more citizen children** | **476** | **3,225** | **14.8%** | **325** | **3,383** | **9.6%** | **424** | **1,885** | **22.5%** | **287** | **1,868** | **15.3%** |
| **Food Stamps** | | | | | | | | | | | | |
| Households with children | 5,872 | 36,784 | 16.0% | 4,601 | 37,286 | 12.3% | 5,477 | 13,818 | 39.6% | 4,323 | 13,138 | 32.9% |
| **All citizen adults** | **4,969** | **32,498** | **15.3%** | **3,949** | **32,747** | **12.1%** | **4,622** | **11,294** | **40.9%** | **3,702** | **10,670** | **34.7%** |
| One or more noncitizen* adults | 726 | 3,785 | 19.2% | 526 | 3,880 | 13.6% | 689 | 2,243 | 30.7% | 504 | 2,165 | 23.3% |
| All noncitizen* children | 55 | 560 | 9.8% | 37 | 497 | 7.4% | 50 | 359 | 14.0% | 36 | 297 | 12.0% |
| **One or more citizen children** | **671** | **3,225** | **20.8%** | **489** | **3,383** | **14.5%** | **639** | **1,885** | **33.9%** | **469** | **1,868** | **25.1%** |
| **Medicaid** | | | | | | | | | | | | |
| Households with children | 6,447 | 36,784 | 17.5% | 5,368 | 37,286 | 14.4% | 5,302 | 13,818 | 38.4% | 4,405 | 13,138 | 33.5% |
| **All citizen adults** | **5,453** | **32,498** | **16.8%** | **4,596** | **32,747** | **14.0%** | **4,433** | **11,294** | **39.2%** | **3,748** | **10,670** | **35.1%** |
| One or more noncitizen* adults | 797 | 3,785 | 21.1% | 630 | 3,880 | 16.2% | 697 | 2,243 | 31.1% | 540 | 2,165 | 24.9% |
| All noncitizen* children | 88 | 560 | 15.7% | 53 | 497 | 10.7% | 78 | 359 | 21.8% | 46 | 297 | 15.4% |
| **One or more citizen children** | **709** | **3,225** | **22.0%** | **576** | **3,383** | **17.0%** | **619** | **1,885** | **32.8%** | **495** | **1,868** | **26.5%** |

* Excludes refugees and non-immigrants. See text for definition.
Source: Urban Institute tabulations from March Current Population Surveys of 1995 and 1998, with imputations for refugees and non-immigrants.

**Figure 1. Percent of Households Receiving Welfare, Food Stamps, and Medicaid, by Nativity of Household Head and by Poverty Status**



A. Percent of Households Receiving Welfare

## B. Percent of Households Receiving Food Stamps



## C. Percent of Households Receiving Medicaid



Source: Table 1.
Note: Noncitizen group excludes refugees and non-immigrants. See text.
* 1994-97 change is significant at p < 0.10.

**Figure 2. Percent of Individuals Participating in Welfare and Medicaid, by Age and Citizenship: 1994 and 1997**

### A. Age 18-64



## B. Age 65 and Over



Source: Table 2.
Note: Noncitizen group excludes refugees and non-immigrants. See text.
* 1994-97 change is significant at p < 0.10.

**Figure 3. Percent of Households with Children Receiving Welfare, Food Stamps, and Medicaid, by Citizenship of Adults and Children and by Poverty Status: 1994 and 1997**

## A. Percentage of Households Receiving Welfare



## B. Percentage of Households Receiving Food Stamps





Source: Table 3. Includes only households with children headed by persons 18-64 years old.
Note: Noncitizen group excludes refugees and non-immigrants. See text ofr definition of groups.
* 1994-97 change is significant at p < 0.10.

## BIBLIOGRAPHY

Das Gupta, Prithwis. 1993. *Standardization and Decomposition of Rates: A User's Manual*. U.S. Bureau of the Census, Current Population Reports, Series P23-186. Washington, D.C.: U.S. Government Printing Office. September.

Ellwood, Marilyn R., and Leighton Ku. 1998. "Welfare and Immigration Reforms: Unintended Side Effects for Medicaid." *Health Affairs* 17 (3): 137-51. May/June.

Fix, Michael, and Wendy Zimmermann. 1998. "The Legacies of Welfare Reform's Immigrant Restrictions." *Interpreter Releases*. November 16.

Fronstin, P. 1998. "Sources of Health Insurance and Characteristics of the Uninsured: An Analysis of the March 1998 Current Population Survey." EBRI Issue Brief 204. December.

National Research Council. 1998. *From Generation to Generation, The Health and Well-Being of Children in Immigrant Families.* Washington, D.C.: Institute of Medicine, National Academy Press.

Passel, Jeffrey S., and Rebecca Clark. 1998. "Immigrants in New York: Their Legal Status, Incomes, and Taxes." Washington, D.C.: The Urban Institute. April.

Van Hook, Jennifer, Jennifer E. Glick, and Frank D. Bean. 1999. "Public Assistance Receipt Among Immigrants and Natives: How the Unit of Analysis Affects Research Findings." *Demography* 36 (1): 111-20. February.

Zimmermann, Wendy, and Michael Fix. 1998. "Declining Immigrant Applications for Medi-Cal and Welfare Benefits in Los Angeles County." Washington, D.C.: The Urban Institute. July.

## Notes

1. The Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. 104-193 (1996).

2. While most of these unqualified immigrants are undocumented immigrants, many unqualified immigrants are legally present in the United States and have work authorization. See, generally, Michael Fix and Wendy Zimmermann, "The Legacies of Welfare Reform's Immigrant Restrictions," *Interpreter Releases,* November 16, 1998.

3. "Public charge" is a term used by the Immigration and Naturalization Service (INS) and the State Department to describe someone who is, or is likely to become, dependent on public benefits. Public charge considerations have historically been a factor in the admissibility of aliens (i.e., grant of a green card) and, only rarely, in the deportation of aliens who have been in the United States less than five years.

In the past several years, public charge has been inappropriately invoked in some instances where noncitizens have attempted to reenter the United States and where immigrants have sought to naturalize. In some cases, noncitizens seeking to adjust status, naturalize, or reenter the country have been asked to repay public benefits. The legality of compelling repayment in these contexts is suspect.

4. See Wendy Zimmermann and Michael Fix, "Declining Immigrant Applications for Medi-Cal and Welfare Benefits in Los Angeles County," The Urban Institute, July 1998.

5. The CPS collects information on program use and income in March for the preceding *calendar* year. Thus, the information collected in the March 1995 CPS pertains to calendar year 1994; and the March 1998 CPS, to calendar year 1997. Throughout this document, we use the CPS data from March 1995 and 1998 for reference years 1994 and 1997. The data from the March 1995 CPS have been reweighted to correct for an error in the official weights (Jeffrey S. Passel and Rebecca Clark, "Immigrants in New York: Their Legal Status, Incomes, and Taxes," The Urban Institute, April 1998).

The CPS data used here are not corrected for underreporting of welfare use or welfare income. (See "Coverage of Welfare Use in the CPS.")

6. See Passel and Clark, 1998.

7. Welfare reform gave the states the option of barring legal immigrants in the United States before August 22, 1996, from TANF and Medicaid. However, virtually all states extended benefits to these pre-enactment immigrants. See Fix and Zimmermann, 1998.

8. "Federal means-tested public benefits" have been determined to be Temporary Assistance for Needy Families (TANF), Medicaid, the Child Health Insurance Program (CHIP), Supplemental Security Income (SSI), and food stamps.

9. Unless otherwise noted, the comparisons of citizens and noncitizens exclude refugees and temporary immigrants (i.e. "nonimmigrants" according to immigration law), which are treated separately. *Citizens* include natives, persons born in Puerto Rico and other outlying areas, and immigrants who have acquired citizenship through naturalization. *Noncitizens* include aliens admitted as lawful permanent residents and undocumented immigrants.

10. A refugee is defined legally as a person outside his/her country of nationality who is unable to return because of a well-founded fear of persecution. Because their departure from their home country is involuntary and unplanned and because many suffer physical or mental trauma, refugees have been made eligible for most public benefits from the date of their arrival.

We assign refugee status based on country of birth and period of entry to the United States. For persons entering after 1980, we define a "refugee country" as one where refugees and asylees account for more than 40 percent of total admissions of legal permanent residents, refugees, and asylees during any two-year period. See Passel and Clark, 1998.

11. See, for example, *From Generation to Generation, The Health and Well-Being of Children in Immigrant Families,* National Research Council, Institute of Medicine, National Academy Press, Washington D.C., 1998.

12. See Fix and Zimmermann, 1998.

13. See Jennifer Van Hook, Jennifer E. Glick, and Frank D. Bean, "Public Assistance Receipt Among Immigrants and Natives: How the Unit of Analysis Affects Research Findings," *Demography* 36 (1, February 1999): 111-20.

14. In the CPS, food stamp usage is a household-level variable, so we do not report individual usage patterns.

15. They are, however, consistent with administrative data, specifically the Food Stamp Program Quality Control data for fiscal years 1994 and 1997.

16. See, for example, Passel and Clark, 1998.

17. The data in Detailed Table B show that the number of naturalized citizens age 18 and over reporting welfare income rose by only 75,000 between 1994 and 1997, while the number of naturalized citizens increased by 1,419,000. During that period, the number of noncitizens reporting welfare use fell by 316,000.

18. P. Fronstin, "Sources of Health Insurance and Characteristics of the Uninsured: An Analysis of the March 1998 Current Population Survey," EBRI Issue Brief 204, December 1998.

19. We should note that declines in Medicaid caseloads affect more populations than just noncitizens and can also be viewed as an unintended effect of welfare reform. See Marilyn R. Ellwood and Leighton Ku, "Welfare and Immigration Reforms: Unintended Side Effects for Medicaid," *Health Affairs* 17 (3, May/June 1998): 137-51.

20. This second difference can be shown to be equivalent algebraically to the average of two separate estimates of change attributable to difference in usage rates. One measure compares the actual 1997 overall use rate with a hypothetical rate computed as the 1997 detailed use rates multiplied by the 1994 income distribution. The other subtracts actual 1994 overall use rate from the hypothetical rate based on the 1994 detailed use rates and the 1997 income distribution. For more information on standardization and partition, see Prithwis Das Gupta, *Standardization and Decomposition of Rates: A User's Manual,* U.S. Bureau of the Census, Current Population Reports, Series P23-186, Washington, D.C.: U.S. Government Printing Office, September 1993.

21. See, for example, Fronstin, 1998. Planned Urban Institute reports that take into account patterns of underreporting and program eligibility rules are expected in the summer of 1999.

## Other Publications by the Authors

- Michael E. Fix
- Jeffrey S. Passel

Usage and reprints: Most publications may be downloaded free of charge from the web site and may be used and copies made for research, academic, policy or other non-commercial purposes. Proper attribution is required. Posting UI research papers on other websites is permitted subject to prior approval from the Urban Institute—contact publicaffairs@urban.org.

If you are unable to access or print the PDF document please contact us or call the Publications Office at (202) 261-5687.

***Disclaimer:*** *The nonpartisan Urban Institute publishes studies, reports, and books on timely topics worthy of public consideration. The views expressed are*

*those of the authors and should not be attributed to the Urban Institute, its trustees, or its funders. Copyright of the written materials contained within the Urban Institute website is owned or controlled by the Urban Institute.*

Source: The Urban Institute, © 2012 | http://www.urban.org

# Exhibit C

Discussion Papers

The Scope and
Impact of Welfare
Reform's Immigrant
Provisions

Michael Fix
Jeffrey Passel
02–03

January
2002

Assessing
the New
Federalism

*An Urban Institute
Program to Assess
Changing Social
Policies*

*Assessing the New Federalism* is a multi-year Urban Institute project designed to analyze the devolution of responsibility for social programs from the federal government to the states.  It focuses primarily on health care, income security, employment and training programs, and social services.  Researchers monitor program changes and fiscal developments.  Alan Weil is the project director.  In collaboration with Child Trends, the project studies changes in family well-being. The project provides timely, nonpartisan information to inform public debate and to help state and local decisionmakers carry out their new responsibilities more effectively.

Key components of the project include a household survey, studies of policies in 13 states, and a database with information on all states and the District of Columbia.  Publications and database are available free of charge on the Urban Institute=s Web site:  http://www.urban.org. This paper is one in a series of discussion papers analyzing information from these and other sources.

The project has received funding from The Annie E. Casey Foundation, the W.K. Kellogg Foundation, The Robert Wood Johnson Foundation, The Henry J. Kaiser Family Foundation, The Ford Foundation, The John D. and Catherine T. MacArthur Foundation, the Charles Stewart Mott Foundation, The David and Lucile Packard Foundation, The McKnight Foundation, The Commonwealth Fund, the Stuart Foundation, the Weingart Foundation, The Fund for New Jersey, The Lynde and Harry Bradley Foundation, the Joyce Foundation, and The Rockefeller Foundation.

The nonpartisan Urban Institute publishes studies, reports, and books on timely topics worthy of public consideration. The views expressed are those of the authors and should not be attributed to the Urban Institute, its trustees, its funders, or other authors in the series..

The authors would like to thank Kenneth Finegold and Alan Weil for helpful comments.

Publisher: The Urban Institute, 2100 M Street, N.W., Washington, D.C. 20037
Copyright © 2002. Permission is granted for reproduction of this document, with attribution to the Urban Institute.

# THE SCOPE AND IMPACT OF
# WELFARE REFORM'S IMMIGRANT PROVISIONS

by

Michael Fix and Jeffrey S. Passel

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1
    Summary ...................................................................................................... 1
    Background .................................................................................................. 3

PRWORA's IMMIGRANT PROVISIONS: A BRIEF OVERVIEW ...................................... 5
    Comprehensive Revision of Immigrant Eligibility ................................... 5
    Differing Goals for Immigrants .................................................................. 5
    Eligible Immigrant Populations .................................................................. 6
    Sponsorship ................................................................................................ 7
    Shift in Responsibility to the States ............................................................ 8

MAJOR CHANGES SINCE ENACTMENT ....................................................................... 9
    Congressional Restorations ........................................................................ 9
    Administrative Responses ........................................................................... 9
    The States' Responses .............................................................................. 10
    The Courts' Responses ............................................................................. 11

PRWORA's IMPACT ON IMMIGRANT BENEFIT USE ................................................. 12
    Early Evidence — "Chilling" Effects ..................................................... 12
    New Analyses of Immigrant Program Participation ................................ 13
        Overall Declines .................................................................................. 14
        Low-Income Families with Children .................................................. 16
        Mixed Status Families ........................................................................ 17
        Refugees .............................................................................................. 18
        Change in TANF Caseloads and the Recipient Population ................ 19
        Medicaid Use and Health Insurance .................................................. 22
        State Level Changes ............................................................................ 26
    Explaining the Trends in Immigrant Program Participation .................... 28
        Naturalization Rates and Benefits Use ............................................... 29
        Income Changes .................................................................................. 31
        Citizen-LPR Differences in Program Participation ........................... 33

CONSIDERING REFORM ............................................................................................. 34

REFERENCES ............................................................................................................... 39

# FIGURES

1.  Participation in Means-Tested Benefit Programs for Legal Permanent Resident Alien Families:  1994 and 1999 .................................................................................15

2.  Participation in Means-Tested Benefit Programs for Low-Income Legal Permanent Resident Alien Families with Children:  1994 and 1999 ..............................................16

3.  Participation in Means-Tested Benefit Programs for Low-Income Legal Permanent Resident Alien and Citizen Families with Children:  1994 and 1999................................17

4.  Participation in Means-Tested Benefit Programs for Low-Income Families with Children: Refugee Aliens — 1994 and 1999; Citizens and LPR Aliens — 1999 ............................19

5.  Participation in Medicaid for Low-Income Working-Age Adults (18-64), by Nativity and Legal Status:  1994 and 1999 ..........................................................................23

6.  Participation in Medicaid for Low-Income Children (under 18), by Nativity and Status of Parents and Children:  1994 and 1999 ...........................................................25

7.  Health Insurance Coverage for Low-Income Children (under 18), by Status of Parents and Children: 1999...........................................................................................26

8.  Participation in TANF for Low-Income Legal Permanent Resident Alien Families with Children: U.S., California, and Selected Groups of States, 1994 and 1999 ....................27

# TABLES

1.  Number of Families and Families Receiving TANF, by Citizenship of Head and Spouse: 1994 and 1999 ................................................................................................ 41

2.  Partition of 1994-1999 Change in Use of Welfare, Food Stamps, and Medicaid into Effects of Poverty-Family-Specific Use Rates, Poverty Distribution, and Presence of Children Distribution, Using Standardization Techniques for Families in the United States, by Nativity and Status ........................................................................................... 42

3.  Partition of Citizen-LPR Difference in Use of Welfare, Food Stamps, and Medicaid into Effects of Poverty-Family-Specific Use Rates, Poverty Distribution, and Presence of Children Distribution, Using Standardization Techniques for Families in the United States: 1994, 1999.......................................................................................................... 44

# THE SCOPE AND IMPACT OF
# WELFARE REFORM'S IMMIGRANT PROVISIONS

by

Michael Fix and Jeffrey S. Passel

## INTRODUCTION

The 1996 Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) not only overhauled the nation's welfare system, it redefined immigrants' access to public benefits.  Indeed the law's immigrant provisions — to which an entire title is dedicated (Title IV) — can be viewed as a watershed in the related domains of immigrant integration and immigration policy, as well as the federalism issues the new provisions raise.[1]

In this paper, we discuss the background and character of the changes introduced by this comprehensive, far-reaching law and then sketch the post-enactment responses of the Congress, the states, and the courts.  We further explore the impacts that the law has had on benefit use among immigrants, highlighting the changes in usage among different immigrant groups and factors related to these changes, such as naturalization and rising incomes.  We conclude by discussing a number of issues that may be examined within the context of welfare reauthorization.

**Summary**

For immigrants, welfare reform went well beyond conditioning access to cash benefits on work.  Rather, the law set out a comprehensive scheme for determining immigrant eligibility for a wide range of social benefits that are provided by governments at all levels.  Reform

---

[1] The law's impacts on immigrants and their families are not confined to Title IV.  PRWORA's restructuring of TANF, the imposition of time limits, new incentives to work, and the many other changes introduced affect low-income immigrant families eligible to receive benefits.

represented a major departure from prior policy by making citizenship more central to the receipt

of benefits, by granting the states rather than the federal government the power to determine

immigrant eligibility for benefits, and by drawing a sharp distinction between immigrants

arriving before and after PRWORA's enactment on August 22, 1996.

Our recently completed analysis of the 1995 and 2000 Current Population Surveys (CPS)

reveals a number of striking trends in immigrants' use of public benefits:

> There were substantial declines between 1994 and 1999 in legal immigrants' use of all major benefit programs:  TANF (-60 percent), food stamps (-48 percent), SSI (-32 percent), and Medicaid (-15 percent).

> By 1999, low-income legal immigrant families with children had 1ower use rates for TANF and food stamps than their low-income citizen counterparts.  Medicaid use rates for these *families* did not vary by citizenship, testifying, perhaps, to the success of policies intended to broaden the health insurance coverage among children.

> Nonetheless, *individual-* level analyses reveal that low-income, working-age noncitizens had substantially larger declines in Medicaid use rates than their citizen counterparts.  Loss of  Medicaid is not being made up by other forms of health coverage, but rather is resulting in a total loss of health insurance.

> Benefit use rates among U.S. citizen children in low-income immigrant families (i.e., in poor mixed-status families) were substantially lower than for citizen children of native parents in poor families.

> Declines in benefit participation were especially steep among low-income refugee families whose use rates for TANF, food stamps, and Medicaid were comparable to citizens by 1999.

> Declines in immigrants' use of benefits are evident across all areas of the country. They are especially steep among poor families living in states that make few benefits available to immigrants, but which have rapidly rising immigrant populations.

> In general, the declining benefit use occurring between 1994 and 1999 was *not* accounted for by increased naturalizations or by rising incomes within immigrant families.

Despite reduced use of public benefits, half of immigrant families were poor in 1999;

poor legal immigrants were far more likely to be uninsured than their citizen counterparts; and

immigrant children were more likely to be food insecure than children of citizens (Capps 2001).

With a recession descending and welfare reform reauthorization looming, these precipitous declines in the face of continuing high poverty rates raise important questions.  As this is written, some participants in the reauthorization debate, concerned that that the reforms went too far, have proposed restoring food-stamp eligibility to legal immigrants and granting states the authority to extend Medicaid and the State Children's Health Insurance Program (SCHIP) to some post-enactment immigrants.  These measures would grant non-cash aid to many families and place immigrants arriving before and after welfare reform on a more equal footing.  Proposed restorations raise issues regarding the extent of sponsors' responsibility for immigrants, welfare reform's impact on successfully integrating immigrant residents into the broader society, substantially altered incentives to naturalize, equitable intergovernmental cost sharing, and the limits to delegating federal immigration control powers to the states, especially in an era of global competition.

**Background**

At the time of welfare reform's passage, some researchers contended that the availability of public benefits was increasingly influencing immigrants' migration decisions, explaining in part a perceived decline in the quality of new immigrants — that is, their education, incomes, and propensity to use benefits (Borjas and Hilton 1995).  In fact, the power of the so-called "welfare magnet," the perceived decline in the quality of immigrants, and even the disproportionately high use of benefits among noncitizen populations were all heavily contested in the literature (Duleep and Regets 1994; Fix and Passel 1994; Van Hook, Glick, and Bean 1999).  Nonetheless, the influence of this linkage of welfare to immigration flows can be seen in

PRWORA's departing premise that "self-sufficiency has been a basic principle of United States *immigration* policies"[2] (emphasis added).

While often associated with fiscally conservative Republicans, political interest in restricting immigrants' access to welfare evolved in a bipartisan manner through the mid-1990s. Initial proposals limiting noncitizens' access to SSI[3] and, eventually, to other public benefits originated in the Democratically-controlled House of Representatives and the Clinton Administration.  In due course, more far-reaching restrictions were written into The Contract With America (Gingrich and Armey 1994), the policy blueprint for the Republican Congress elected in 1994.  Finally, the redefinition of immigrants' rights to benefits that was eventually codified in Title IV of PRWORA, was drafted by a Republican Congress and signed into law on August 22, 1996 by a somewhat uneasy President Clinton who, despite his intent on "ending welfare as we know it," expressed reservations about the bill's immigrant provisions.

The political context within which PRWORA's immigrant restrictions were created should also be recalled.  The law was enacted during a period of anti-immigrant sentiment, one that witnessed the enactment of two broad laws — The 1996 Antiterrorism and Effective Death Penalty Act[4] and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996[5] — that, among other things, limited noncitizens' rights of residence and judicial appeal as well as the ability of undocumented immigrants to adjust to legal status.

---

[2] 8 U.S.C. Section 1601(1) (Supp. V 1999).

[3] The proposal was to extend the deeming period during which a sponsor's income is ascribed to the immigrant from 3 to 5 years.

[4] Pub.L. 104-132 (1996).

[5] Pub.L. 104-208 (1996).

## PRWORA's Immigrant Provisions: A Brief Overview

### Comprehensive Revision of Immigrant Eligibility

For immigrants, PRWORA represented more than a simple regulation of access to cash benefit programs. Rather, the law's immigrant provisions were a comprehensive revision of the nation's laws governing access by legal immigrants, refugees, and illegal immigrants to virtually all federal, state, and local benefits for which eligibility is in some ways restricted. In this respect, the law departed from the piecemeal, program-by-program establishment of immigrant eligibility that had been typical in the past.

### Differing Goals for Immigrants

The law's immigrant provisions were driven by a somewhat different logic than the rest of PRWORA. That is, there was little imperative to discourage out-of-wedlock births and to encourage able-bodied adults to work. After all, low-income immigrants were more likely to live in intact families and to be employed than natives.[6] Rather, PRWORA's immigrant restrictions incorporated other goals. One, alluded to above, was to alter immigration flows by discouraging immigrants likely to seek public benefits from entering the United States. A second was to shift responsibility for the support of immigrants away from the government and onto newcomers' sponsors. A third powerful goal was to realize a large, new stream of cost savings. Altogether, the Congressional Budget Office estimated that the immigrant restrictions would generate roughly 40 percent of welfare reform's overall savings of $54 billion — despite the fact that in 1996 immigrants represented only 15 percent of all welfare recipients in the United States. (Congressional Budget Office 1997)

---

[6] Among immigrants, 65 percent of low-income families with children were two-parent families in the 1996 CPS versus only 40 percent among natives. About 80 percent of working-age immigrant males in low-income families were in the labor force versus less than 70 percent for the corresponding group of natives.

**Eligible Immigrant Populations**

Prior to welfare reform, legal immigrants living in the United States were eligible for public benefits on more or less the same terms as citizens.  Following reform, eligibility for federal means-tested public benefits depends more on citizenship than in the past.  By rationing access to benefits in this way, the law elevates the importance of citizenship for societal membership in a manner that is unusual by international standards (Fix and Laglagaron 2001).

PRWORA's comprehensive redefinition of immigrant eligibility for benefits involved the creation of three separate "bright lines."  One divides "qualified" and "unqualified" immigrants. The class of unqualified aliens is composed mostly, but not exclusively, of undocumented immigrants who are eligible only for a small, enumerated set of federal and state benefits.[7] Qualified immigrants, by contrast, are eligible for a wide range of "federal public benefits" with restricted eligibility, including Social Security, Pell Grants for higher education, and the Earned Income Tax Credit.[8]

Title IV drew a second bright line between legal "qualified" immigrants and naturalized citizens.  Unlike the more restricted eligibility rules for qualified immigrants, PRWORA allowed naturalized citizens to maintain full access to all noncontributory programs defined as "means-tested federal benefits."  These programs include Temporary Assistance for Needy Families (TANF), Supplemental Security Income (SSI), food stamps, Medicaid, and SCHIP.

A third "bright line" was drawn between legal immigrants entering the United States before August 22, 1996 and those entering after.  The law granted states the option of extending

---

[7] These include emergency Medicaid, immunizations, diagnosis and treatment of communicable diseases, and the school lunch and breakfast programs.

[8] "Federal public benefits" include any retirement, welfare, health, disability, public or assisted housing, post-secondary education, food assistance, unemployment benefit, or any similar benefits to which payment or

TANF, Medicaid, and SCHIP to the former but not to the latter.  Over time, this distinction has meant that tougher restrictions are imposed on the rapidly-growing population of post-enactment immigrants.  There are, as of this writing, roughly 3 million post-enactment immigrants in the U.S., representing about one-third of all legal permanent resident (LPR) aliens in the country.

In drawing these lines, PRWORA's comprehensive new scheme of eligibility largely exempted three noncitizen populations with strong equitable claims on benefits: refugees during their first 5 to 7 years in the United States; immigrants with 40 quarters of work history[9]; and noncitizens who had served in the U.S. military.

**Sponsorship**

PRWORA required for the first time that immigrants' sponsors — whether legal immigrants or citizens — have incomes that exceed a minimum level, set at 125 percent of the federal poverty threshold.[10]  In addition, the law required that sponsors sign a legally-enforceable affidavit of support, pledging to support the entrant until they naturalize or work 40 quarters. Sponsors remain liable for reimbursing most public benefits used by the immigrant during this period.  While roughly similar support requirements were on the books prior to PRWORA, courts had found them legally unenforceable.  Sponsors' new income requirements and open-ended support obligations can be viewed as a back door reform of legal immigration intended to keep out the poorest and presumably most welfare-prone of immigrants, thereby reinforcing PRWORA's immigration control thrust.

---

assistance is provided to an individual, household, or family eligibility unit by an agency of the United States by appropriated funds of the United States (Pub. L. 104-193, Section 401c).

[9] Benefit claimants must be able to prove that they, their spouses, or their parents have collectively worked 40 quarters (ten years) in the United States.

[10] The poverty thresholds are defined, in part, on the basis of family size.  For assessing the sponsorship criteria, the threshold is based on the numbers of adults and children in the *combined* families of the sponsored immigrant and the sponsor, thus increasing the amount of income required of the sponsor.

**Shift in Responsibility to the States**

The law's redrawing of immigrant rights involved the devolution of broad new powers to the states. Following reform, states could choose to discriminate against legal immigrants in federal and state benefit programs, a power previously denied them by the courts.[11]  At the same time, the law authorized, but did not require, states to offer food, cash, and health-related benefit programs that might substitute for lost federal benefits, benefits that would have to be financed with state dollars. Finally, the law requires that state or local governments providing benefits to undocumented immigrants must pass a law after August 22, 1996, affirmatively establishing their eligibility, a mandate that is proving increasingly significant. This provision has proved to be a powerful tool in limiting undocumented immigrants' access to benefits. The federal government invoked the provision to strike down the State of New York's  extension of prenatal care to undocumented mothers[12] and the Texas State Attorney General used it to bar Houston's public hospitals from providing nonemergency services to undocumented immigrants.[13]

Taken together, then, PRWORA's immigrant provisions represent: (1) a comprehensive scheme of reform that goes beyond cash assistance to almost all programs extended by the welfare state; (2) a redefinition of the meaning of citizenship; (3) a sharp expansion in the states' power to determine legal immigrants' eligibility for public benefits; (4) a parallel reduction in states' authority to extend to state-funded benefits to the undocumented; and (5) a redefinition of the requirements for, and obligations of, sponsorship.

---

[11] See, generally, *Graham v. Richardson,* 403 U.S. 365 (1971) holding that state discrimination against legal noncitizens in welfare programs violates equal protection.

[12] *Lewis v. Grinker,* USCA 2d. May 22, 2001.  Docket No. 00-6104

[13] See, Office of the Attorney General, State of Texas, Opinion No. JC-0394, July 10, 2001.

## MAJOR CHANGES SINCE ENACTMENT

Following welfare reform, Congress, the states, and immigrants themselves actively sought to mitigate some of the law's potential impacts.  Nonetheless, many of the law's central provisions remain on the books, with far-reaching effects that may deepen in a recessionary economy.

**Congressional Restorations**

In 1997, Congress restored SSI and derivative Medicaid benefits to all elderly and disabled immigrants receiving SSI at the time reform was enacted and to all legal immigrants in the U.S. at the date of enactment who might become disabled in the future.[14]  Later that year, Congress extended food stamp benefits to legal immigrant children and to elderly and disabled immigrants in the U.S. at the time of PRWORA's signing.[15]  However, the food stamp restoration left out working-age adults, who constituted roughly three-quarters of the 935,000 noncitizens who lost benefits.  Moreover, neither the food stamp nor SSI restoration bills extended any benefits to the rapidly growing population of post-enactment immigrants, thereby deepening the divide between the legal endowments of pre- and post-enactment immigrants.

**Administrative Responses**

In 1999, the federal government released guidance that clarified for the first time the implication of noncitizen use of public benefits for becoming a public charge, i.e., an immigrant who has become dependent on public benefits and is therefore ineligible to receive a green card. The guidance established that public charge issues would apply to applicants for green cards, not

---

[14] The Balanced Budget Act of 1997, Pub. L. No. 105-33.

[15] The Agriculture, Research, Extension and Education Reform Act, P.L. 105-185 (1998).

to applicants for naturalization.  The guidance also established that public charge issues would arise primarily in the context of long-term dependence on cash assistance; they would not be tied to receipt of food stamps, Medicaid, or SCHIP.  In addition, public charge issues would not arise as a result of benefits use by a green card applicant's family members.[16]

**The States' Responses**

To the surprise of many observers, the states almost uniformly employed their newfound powers to extend Medicaid, SCHIP, and TANF to pre-enactment immigrants.  To the extent that a "race to the bottom" might have been feared, it did not develop through the 1990s.  At the same time, though, states have been more reluctant to extend benefits to post-enactment immigrants, with responses varying widely across states (Zimmermann and Tumlin 1999).

The limits of state generosity are evident when the responses of the seven states with the most immigrants are examined.  Together, seven large immigrant-receiving states (California, New York, Texas, Florida, Illinois, New Jersey, and Arizona) account for three quarters of the nation's foreign-born population.  California is alone among the seven in providing substitutes in the areas of health, cash assistance, and nutrition.  Of the other six  states, three now offer substitute health programs, but little else.  Even the most generous states in the nation, like Massachusetts, condition immigrants' access to substitute programs in ways that reduce their availability and, in some circumstances, would be illegal if applied to citizens.[17]

States' differential treatment of pre- and post-enactment immigrants reflects the fiscal incentives built into PRWORA.  Under the current law, the federal governments contributes to state expenditures on pre-enactment immigrants.  Expenditures on legal post-enactment

---

[16] See, 8 CFR Parts 212, 237, P.28676 (1999).

immigrants are fully financed with state tax dollars.  The patchwork of state responses that has evolved under this financing scheme has meant that noncitizen eligibility for public benefits has been reduced more than citizens' and that noncitizens face wider variation across states in their access to safety net services.

**The Courts' Responses**

While PRWORA's immigrant restrictions were initially somewhat unstable politically, they have generally fared better in courts, where they have withstood numerous legal challenges. This stability can be traced to their origins in the Congress' *immigration* powers.  As a result, the restrictions have been viewed by courts as involving questions of foreign policy and national sovereignty and within the special expertise of the Congress and the Executive.[18]  Some constitutional scholars have questioned whether the federal government's immigration powers are delegable to the states — an issue to which we return later (Wishnie 2001).

Legal challenges at the state court level have produced more mixed results.  In the most significant legal reversal of PRWORA's immigrant restrictions to date, a New York State Court of Appeals found that PRWORA does not authorize New York State to bar post-enactment immigrants from the state-funded Medicaid program.[19]  However, the ruling is based in large part on the New York State Constitution and may be of limited precedential value in other states.

---

[17] The new conditions include deeming and residency requirements; shorter time limits for receipt; and mandates that claimants pursue naturalization.

[18] This treatment is in sharp contrast to cases of alienage discrimination that do *not* raise immigration considerations and are, as a result, subject to higher levels of scrutiny.  An example is the new durational residency requirements applied to citizens and noncitizens alike that were introduced by PRWORA.  These requirements limited the amount of benefits available to welfare recipients who were new residents of a state to the amount they received in their prior state of residence.  These requirements were found to violate the right to travel and struck down by the U.S. Supreme Court (*Saenz v. Roe,* 526 U.S. 489, 1999).

[19] *Aliessa v. Novallo,* 20001 NY Int. 59. June 5, 2001.

Like their federal counterparts, however, the state courts have generally upheld new, PRWORA-derived immigrant restrictions.  For example, a Massachusetts court upheld the state's imposition of a six-month residency requirement for the state's immigrant-specific cash assistance program.  The court reasoned that the state was under no legal obligation to create this immigrant-only program in the first place and could condition its largesse in ways that were reasonable.[20]

In sum, federal restorations, coupled with generous state eligibility rules, provided pre-1996 immigrants with legal safeguards against many of PRWORA's new immigrant restrictions.  However, the rapidly growing population of post-1996 immigrants confronts a patchwork of widely varying state programs, with many states — including some of the largest immigrant-receiving states — offering few benefits.  Moreover, it is unclear whether the safety net erected by generous states will remain intact as the economy slows and state revenues fall.

## PRWORA'S IMPACT ON IMMIGRANT BENEFIT USE

### Early Evidence — "Chilling" Effects

PRWORA's framers clearly succeeded in reducing immigrants' overall use of public benefits.  Several early studies found that noncitizen use of public benefits not only declined, but did so at a faster rate than citizens'.  Zimmermann and Fix (1998) found that noncitizen use of public benefits in Los Angeles County fell precipitously following welfare reform and was declining at a faster rate than that of citizens.  Aggregate national data from the Current Population Survey also documented declines in welfare use for both citizens and noncitizens (Fix and Passel 1999).  Overall, the decreases for noncitizens were greater than for citizens.  While

---

[20] The judge in the case noted, "It may indeed be true in life that no good deed goes unpunished, but it need not be a principle of judicial review regarding legislative good deeds."  *Jane Doe et al. v. Claire McIntire,* Sup. Ct. of Mass. ,

decreases in use rates for citizens and noncitizens in households *with children* were roughly the same, by 1997, noncitizen families with children were only about two-thirds as likely to be receiving benefits as citizen families.

Subsequent studies, most notably by the Department of Agriculture, confirmed these results, finding that food stamp use among noncitizens fell 72 percent between 1994 and 1998 (Genser 1998). The Department of Agriculture study found that the effects of benefit cuts fell not just on the noncitizens who were the targets of welfare reform, but on the U.S. citizen children who live in their families. Between 1994 and 1998, food stamp use fell by 53 percent among citizen children in immigrant families (i.e., families with a noncitizen parent).

The declines documented in these various studies could not be accounted for by shifts in eligibility because most noncitizens in the studies had arrived before 1996 and retained their eligibility for the programs in question. Rising incomes also fail to explain the degree of change. We have contended that the greater drops in usage among noncitizens are attributable, in part, to welfare reform discouraging some immigrants from using benefits regardless of eligibility. These "chilling effects" likely reflect confusion among immigrants about who is eligible for benefits and fears about the legal consequences of seeking assistance.[21]

**New Analyses of Immigrant Program Participation**

In the balance of this section, we report the results of our most recent analyses that draw on the Current Population Surveys for March 1995 through 2000.[22] Our principal focus is on

---

2001 Mass. Super. Lexis 153, January 25, 2001.

[21] By this definition, "chilling effects" is simply used to connote steep benefit declines among an eligible population that are not accounted for by denials or by income gains.

[22] Compared with administrative data on caseloads, the March Supplements to the Current Population Survey are known to understate participation. Further, there has apparently been some deterioration in coverage in recent years (Wheaton and Giannarelli 2000). Nonetheless, the CPS data track overall trends in participation fairly well (O'Neill and Hill 2001). In general, our work compares immigrants with natives (or citizens), so that only differential

families of legal noncitizens in comparison with citizen families, but we draw attention to other

key groups including refugees, naturalized citizens, and undocumented immigrants.[23]

The analysis reported here differs from our earlier study of declining immigrant

participation rates (Fix and Passel 1999) in three critical ways.  First, while our earlier analysis

differentiated refugee from other immigrant households, we did not distinguish between legal

and undocumented immigrants, as we do here.  Second, unlike our earlier study, we focus most

of our analyses here on families with children whose incomes are below 200 percent of poverty,

comparing usage patterns of low-income legal noncitizen families with those of low-income

citizen families.  These families have substantial practical and policy import where TANF

reauthorization is concerned as they are the ones most likely to need and to be eligible for public

assistance.  (For Medicaid, however, we expand our analysis to focus on individuals in addition

to families.)  Third, this analysis updates our earlier study by relying on 1995–2000 CPSs *versus*

only the 1995–1998 CPSs, thus allowing for two additional years of welfare reform, and

importantly, SCHIP implementation.

*Overall Declines*

We first note that the broad patterns found in the early studies cited above are still

apparent.  Among families with one or more adult(s) who are legal noncitizens (also referred to

---

changes would affect our conclusions.  In that light, work on participation of immigrants in the CPS suggests that this group is much *better* covered in the March 2000 CPS than in earlier years (Passel 2001a).  Consequently, the conclusions based on CPS analyses of immigrant-native trends should not be affected by CPS undercoverage of program participation.  Note also that the CPS reports population numbers for the year of the survey, but asks about benefit use for the use preceding the survey.  Hence, the population and participation figures are for different years.

[23] The analyses employ Urban Institute-generated datasets that correct for over-reporting of naturalized citizens and identify four groups of noncitizens:  (1) refugee entrants based on country of birth and year of entry;  (2) legal nonimmigrants (i.e., temporary residents) based on occupation, year of entry, and other characteristics; (3) likely undocumented immigrants based on occupation, country of birth, year of entry, age, and state; and (4) legal permanent residents (LPRs).  See Passel and Clark (1998) for a description of the assignment methods.  Families are classified on the basis of the head and spouse (if present) as undocumented, refugee alien, LPR alien, naturalized citizen, native, and legal nonimmigrant.

as legal permanent resident aliens or LPR aliens), there was a notable decline in noncitizen use

of TANF, SSI, food stamps and Medicaid programs from 1994 through 1999.  The sharpest

decrease occurred in TANF use, with legal noncitizens' participation rate falling from 4.9 percent

in 1994 to 2.0 percent in 1999.[24]  The drop in Medicaid usage was the least dramatic, at

2.9 percent.   (See Figure 1.)  Further, the overall declines in participation rates for legal

noncitizen families exceeded the declines experienced by citizen families for TANF, SSI, and

food stamps, but not Medicaid.

### Figure 1.  Participation in Means-Tested Benefit Programs for Legal Permanent Resident Alien Families:  1994 and 1999



Percent Participating in Program Among LPR Alien Families

Percent Decrease in Use Rate, 1994 to 1999 (1995 & 2000 CPS)

■ 1994   □ 1999   ■ '94-'99 decrease (if significant)

| Program | 1994 | 1999 | '94-'99 decrease |
|---|---|---|---|
| Welfare* | 11.2% | 6.3% | -44% |
| TANF | 4.9% | 2.0% | -60% |
| SSI | 5.7% | 3.9% | -32% |
| Food Stamps | 14.8% | 7.7% | -48% |
| Medicaid | 19.9% | 17.0% | -15% |

* TANF, SSI, or GA

---

[24] The 60 percent decrease from 1994 to 1999 is computed as the difference in participation rates (2.9 percentage points—4.9 percent in 1994 minus 2.0 percent in 1999) divided by the 1994 participation rate (4.9 percent). We report one decimal place on participation rates and round the percentage decrease to whole percents. We use the terms "participation rate," "usage rate," and "use rate" interchangeably as the number of program participants divided by the population at issue. The terms are not meant to denote eligibility.

*Low-Income Families with Children*

When we focus on these low-income families with children, a somewhat different picture emerges than for the overall legal noncitizen population.  Low-income families with children experienced large declines in TANF and food stamp use between 1994 and 1999, with legal noncitizen families' use of  TANF falling 53 percent from 18.7 to 8.7 percent and food stamps 38 percent from 35.1 to 21.9 percent.  (See Figure 2.)  Participation in Medicaid — 46.0 percent in 1994 and 45.5 percent in 1999 — remained essentially (and statistically) unchanged.

**Figure 2.  Participation in Means-Tested Benefit Programs for Low-Income
Legal Permanent Resident Alien Families with Children:  1994 and 1999**



Percent Participating in Program Among LPR Families with Children Under 200% of Poverty
Percent Decrease in Use Rate, 1994 to 1999 (1995 & 2000 CPS)

* TANF, SSI, or GA

Declines for these low-income legal immigrant families with children were not significantly different from those experienced by similarly-situated citizen families.  Thus, the steep early declines that characterized the immigrant population are now evident for noncitizens and citizens alike.  However, we should also note that when we stratify in this way the program

participation rate for low-income legal noncitizen families is substantially lower than citizen benefit use for TANF, SSI, and food stamps; for Medicaid, the use rates are no different.  (See Figure 3.)  When we use individuals rather than families as the unit of analysis in Medicaid, however, use rates for noncitizens are lower.

**Figure 3.  Participation in Means-Tested Benefit Programs for Low-Income Legal Permanent Resident Alien and Citizen Families with Children:  1994 and 1999**



*Mixed Status Families*

PRWORA not only reduced benefit use among the noncitizens targeted by reform, it also reduced participation among the U.S.-citizen children who live in immigrant families.  The U.S.-citizen children of immigrants are a demographically important group.  About one in 10 American children live in a household where one or more of the parents is a noncitizen and one or more of the children is a citizen (Fix and Passel 1999); about three-quarters of all children living in immigrant-headed households are U.S. citizens (Fix and Zimmermann 2001).  By law,

children born in the United States to immigrant parents (even undocumented immigrants) qualify for public benefits on the same terms as children of native-born citizens. Yet, our analysis shows that U.S.-born children of immigrants are much less likely than children of native-born citizens to participate in public benefits programs.

Among low-income immigrant[25] families with children who are U.S. citizens, 7.8 percent received TANF in 1999 compared with 11.6 percent of low-income citizen families with children. Similarly, the mixed-status immigrant families are considerably less likely to receive food stamps than citizen families — 19.8 percent versus 27.9 percent. For both programs, the mixed-status families experienced significant declines in participation from 1994 to 1999. Medicaid is again an exception as the two groups of mixed status, low-income families did not experience a decline in usage and ended in 1999 with participation rates essentially equal to the citizen families — 42.7 versus 43.4 percent.

*Refugees*

Sharp declines in the use of public benefits have not been confined to legal permanent residents, they are also visible among refugees. Again, focusing on families with children and incomes under 200 percent of poverty, we see extraordinarily large decreases in participation among refugees[26] from 1994 to 1999: food stamps, -53 percent; TANF, -78 percent; and Medicaid, -36 percent. Before PWRORA, participation rates for low-income refugee families with children were much higher than the rates for either citizen or LPR alien families. For some

---

[25] We include here LPR aliens and undocumented aliens because the eligibility of their U.S.-born children is not affected by the status of the parents.

[26] We use the term "refugees" to refer to noncitizens who were admitted as refugees (in 1980 or later) without regard to their current immigration status or eligibility status. Almost all of the refugees adjust their legal status to legal permanent resident alien after one or two years in the country, but they retain their special access to benefits. In our refugee population, many have been in the United States longer than the period during which refugee arrivals have special access. (Persons admitted as refugees but who have acquired U.S. citizenship by naturalization are included in our citizen population.)

programs, refugee participation rates were more than double those for LPR families.  By 1999, the rates for refugee families had fallen to roughly the same level as those of citizens for TANF, food stamps, and Medicaid.  (See Figure 4.)  These results are especially striking because refugees are a protected population under PRWORA, as they are exempted for five to seven years from the law's bars on federal means-tested public benefits.

**Figure 4.  Participation in Means-Tested Benefit Programs for Low-Income Families with Children:  Refugee Aliens — 1994 and 1999; Citizens and LPR Aliens — 1999**



Percent Participating in Program Among Families with Children
Under 200% of Poverty  (1995 & 2000 CPS)



*Change in TANF Caseloads and the Recipient Population*

What have these changes in benefit use meant for the composition of the recipient population between 1994 and 1999?  Changes in both immigrant and citizen benefit usage between 1994 and 1999 have led to a large overall drop in families receiving TANF benefits.  These remaining families may prove to be difficult to move off TANF, especially if they face

barriers to work such as limited English language ability or low educational levels (Zimmermann and Tumlin 2001).

During this period, the CPS shows a drop of 55 percent in the number of all families receiving TANF benefits from 4.0 to 1.8 million (Table 1).  Among immigrants, two groups experienced extremely large decreases in recipients:  LPR families dropped by 216,000 or 62 percent and refugee alien families fell by 97,000 or 76 percent.  At the same time, the number of naturalized citizen families on TANF increased by 24,000 or 45 percent.  The number of undocumented families remained essentially unchanged.

As a result of these shifts, the composition of the immigrant population remaining on TANF has been substantially altered since the passage of welfare reform.  Naturalized citizens accounted for 9 percent of foreign-born recipient families in 1994 but 25 percent in 1999 (Table 1).  The share of immigrant TANF recipients in LPR and refugee alien families dropped from 80 to 53 percent;  as a share of *all* recipient families, these two groups dropped from 12 to 9 percent.  PRWORA seems to have succeeded in reducing both the number and share of legal immigrants on welfare.

To some degree, the changes in composition of immigrant TANF recipients reflect underlying dynamics in the immigrant population itself, but the large reductions in use have occurred in spite of substantial increases in some components of the immigrant population.  Overall, the foreign-born population grew by 16 percent from 24.5 million in the 1995 CPS to 28.4 million in the 2000 CPS.[27]  But the growth differed substantially across the different legal

---

[27] The results of Census 2000 have created considerable uncertainty about the size of the foreign-born population and, more specifically, the undocumented immigrant population.  The March 2000 CPS which shows 28.4 million immigrants is based on the 1990 Census.  The total population from Census 2000, 281.4 million, exceeded pre-census estimates by 5–7 million with much of the excess thought to be unmeasured immigration (Passel, 2001).  When the March 2000 CPS is re-weighted to agree with the results of Census 2000, it shows 30.1 million immigrants.  Another survey, the Census 2000 Supplementary Survey, taken during 2000 with a sample size

status categories.  The number of naturalized citizen families increased by 28 percent from 5.2 million to 6.7 million and now represent over one-third of all immigrant families (Table 1).

When new legal immigrants enter the country, they become part of the LPR alien population;  when they naturalize, however, they depart the LPR alien population.  In recent years, the number of new LPRs has been insufficient to replace those shifting into the naturalized citizen category.  As a result, the number of LPR alien families actually decreased by 400,000 or 6 percent to 6.6 million in the 2000 CPS.  In sum, shifts in the make-up of the immigrant TANF population are the products of:  (1) increases in the number of naturalized citizens; (2) a slight increase in the rate of benefit use by naturalized citizens; and (3) declines in benefit use among noncitizens.  These compositional changes are also driven by the fact that additions to the number of naturalized citizens come from the population of legal noncitizens, reducing its size.

The remaining two categories of immigrants—refugees and undocumented immigrants—show demographic changes that are dramatically at odds with the TANF use patterns.  The number of refugee alien families increased by 13 percent between the March 1995 and March 2000 CPSs in contrast to the 76 percent drop in refugee families on TANF.  For undocumented immigrants, the number of families increased by 1.2 million or 41 percent over the five-year period as a result of both a substantial influx of undocumented immigrants and better coverage of the group in the 2000 CPS.  Notwithstanding this very large increase in the undocumented population, the number of undocumented families on TANF (i.e., receiving benefits for their citizen children) remained essentially unchanged over the period as a result of substantially decreased usage.

---

14 times larger than the March 2000 CPS, showed an even larger foreign-born population of 30.5 million.  Almost all of the difference in the various measures of the foreign-born population can be attributed to the number of undocumented immigrants estimated to be represented in the different surveys (Passel 2001a).

*Medicaid Use and Health Insurance*

*Medicaid Participation of Families.*  Changes in Medicaid and SCHIP[28] participation follow quite different trajectories from the other programs.  Overall decreases in family Medicaid/SCHIP participation are smaller than for the other programs.  Moreover, among low-income families with children there was virtually no change in Medicaid use between 1994 and 1999 for either citizens or LPR aliens (e.g., Figure 2).  In addition, use of Medicaid among low-income LPR and refugee families with children was virtually identical to the use rates for equivalent citizen families.

There are a number of policy–related explanations for these stable Medicaid use rates among low-income immigrant families with children.  These include the  introduction of expanded health care coverage under SCHIP, stepped up state and local outreach for child health insurance, and the impact of new federal guidance clarifying that use of health benefits would not be a bar to obtaining a "green card" or citizenship.  In addition, Medicaid providers (doctors, hospitals, and clinics) have incentives to keep both immigrants and natives enrolled in government health programs to ensure the payment of medical bills.  Other welfare programs do not have third parties who have such direct incentives to make sure low-income families are signed up for welfare benefits. Another possible explanation for the fact that Medicaid did not decline among noncitizens may be increased use of emergency Medicaid by legal immigrant family members.

---

[28] The CPS data on Medicaid are based mainly on individual responses to questions on health insurance, but also include imputations based on other items (e.g., TANF recipients are assigned to Medicaid).  In part because of the data collection methods, CPS groups Medicaid, emergency Medicaid, state Medicaid-like programs and supplemental programs, and SCHIP together.  The data reported in this paper thus cover Medicaid, emergency Medicaid, and SCHIP.

*Individual Medicaid Participation and Lack of Health Insurance.*  Health care services are qualitatively different from the other benefits in that they can be delivered directly to the individual in ways that TANF, SSI, and food stamps cannot.  Health insurance can only be used by the individual beneficiary; cash and food stamps are fungible and can provide a benefit for the whole family.  Accordingly, we focus our Medicaid/SCHIP analysis on individuals, examining use patterns among low-income working-age individuals (18–64 years) and children (under 18 years).  With this view, a clearer picture of welfare reform's overall effects on immigrants' benefit usage emerges.  In particular, the generally high and sustained levels of participation observed for low-income *families* are not found for individuals.

Among low-income working-age adults, Medicaid use declined significantly between 1994 and 1999 for citizens (18.4 to 16.9 percent), LPR aliens (20.3 to 15.6 percent), and refugee aliens (51.3 to 21.5 percent).  (See Figure 5.)  In a departure from the pattern for families, the

**Figure 5.  Participation in Medicaid for Low-Income Working-Age Adults (18-64), by Nativity and Legal Status: 1994 and 1999**

Percent Participating in Medicaid, Adults 18-64 in Families Below 200% of Poverty
Percent Decrease in Use Rate, 1994 to 1999 (1995 & 2000 CPS)



■ 1994   ☐ 1999   ☐ '94-'99 % decrease (if significant)

Citizens        LPR Aliens        Undocumented        Refugees

\* Participation rate or change is
  significantly different from citizens.

decreases experienced by low-income LPR and refugee adults of working age were greater than for citizens

These declines in Medicaid participation did not occur because former recipients acquired other forms of health insurance.  In fact, the declines in Medicaid participation were offset almost entirely by increases in the proportion of the population without health insurance — 1.1 percentage points for citizens, 4.5 for LPRs, and 16.2 for refugees.  Thus, the reductions in Medicaid use are not being made up by other forms of health insurance, but rather are leading to the total loss of health insurance.  Further, notwithstanding equal or higher rates of participation in Medicaid among immigrants, every immigrant group has substantially higher proportions of low-income working-age adults who were uninsured in 1999 than do U.S. citizens.  Among citizens, 31.6 percent of working-age adults were uninsured in 1999 compared with 56.3 percent of legal permanent residents, 68.0 percent of undocumented immigrants, and 44.6 percent of refugees.

Children in low-income families have much higher rates of participation in Medicaid than working-age adults.  Of children in low-income U.S. citizen families, 42 percent were participating in Medicaid in 1999, a very slight decline from 43 percent in 1994.  (See Figure 6.) Children in low-income LPR alien families showed no significant decrease from 1994 to 1999, and had about the same degree of participation as children in citizen families regardless of their own citizenship (45.2 percent for U.S. citizen children and 41.6 percent for noncitizen children). Children of refugees, however, experienced a large decrease in Medicaid participation over the period from a level well above that of citizens in 1994 (69 percent) to roughly the same level in 1999 (39 percent).

**Figure 6.  Participation in Medicaid for Low-Income Children (under 18), by Nativity and Status of Parents and Children: 1994 and 1999**



Not surprisingly, given the steady, high levels of Medicaid participation, uninsurance rates for low-income children changed very little between 1994 and 1999.  However, the levels of uninsurance are much higher for children of immigrants than for children of citizens.  Less than 20 percent of low-income children of U.S. citizens were uninsured in 1994 and 1999 (Figure 7).  The U.S. citizen children of LPRs and undocumented immigrants experienced high uninsurance rates of 27.4 and 39.3 percent, respectively, in 1999.  The situation of noncitizen children was even worse as the noncitizen children for each immigrant group had even greater rates of uninsurance.

**Figure 7.  Health Insurance Coverage for Low-Income Children (under 18),
by Status of Parents and Children: 1999**

Percent Without Health Insurance Among Children (Under 18)
in Families with Incomes Under 200% of Poverty  (2000 CPS)

Note:  All categories are significantly different from citizen parents, except citizen children of refugees.

■ Citizen Children
□ Noncitizen Children

| | Citizen Parents | LPR Parents | Undocumented Parents | Refugee Parents |
|---|---|---|---|---|
| Citizen Children | 19.2% | 27.4% | 39.3% | 16.7% |
| Noncitizen Children | | 38.7% | 54.6% | 35.0% |

*State Level Changes*

The large declines in participation noted among legal immigrants and refugees are evident not just for the nation as a whole, but can generally be found in all parts of the country. Figure 8 shows TANF decreases for low-income LPR families for several groups of states. Substantial decreases occurred both in California (46 percent decrease) and outside of California (56 percent decrease).  Most striking, however, is the decrease that occurred  in states that the Urban Institute has identified as being among the least generous in providing benefits to immigrants[29] (Zimmermann and Tumlin 1999; Passel and Zimmermann 2001).  In this group of states, TANF participation by low-income LPR families with children dropped 73 percent

---

[29] In their analysis of state policies determining  immigrant eligibility for public benefits Zimmermann and Tumlin (1999) group the fifty states into four categories:  those where benefits are "most available," "somewhat available," "less available," and "least available."  For our purposes the less generous states are those that fall into

compared with the 45 percent decline in the other, more generous states. The larger percentage drop occurred despite initial participation rates in these less generous states being only about half the initial rate in the more generous states — 11.5 percent participation in 1994 compared with 23.1 percent for the more generous states. (See Figure 8.) Thus, immigrant participation levels across states widened following welfare reform.

**Figure 8. Participation in TANF for Low-Income Legal Permanent Resident Alien Families with Children: U.S., California, and Selected Groups of States, 1994 and 1999**



While benefit use rates have been falling sharply within these less generous states, their immigrant populations have been growing rapidly. Throughout the United States, the number of foreign-born families with children rose by 15 percent nationwide between 1995 and 2000. In the less generous states, they increased by 31 percent, but in the more generous states, they rose

the "less" and "least available" categories and the more generous states are those where benefits are "most" or "somewhat available."

by only 7 percent.  In California, which offers legal immigrants one of the most generous packages of public benefits, the number of foreign-born families grew by only 2 percent during this period.

These differential growth patterns are the result of two demographic trends.  First, more immigrant families moved out of the more generous states into less generous states than vice versa.  Second, the percentage of newly-arrived immigrants from abroad settling in the less generous states increased during the late 1990s, notwithstanding the states' more limited generosity.  (See Passel and Zimmermann 2001 for an exploration of these patterns.)  Taken together, these eligibility and migration trends call into question the theory underlying PRWORA's Title IV that welfare benefits play a large role in determining where immigrants choose to live.

Rapid growth in immigrant populations outside the traditional receiving communities may produce strains on state and local governments, particularly in the areas of education and health.  These strains may even be felt by states in comparatively strong economic shape.  Further, these new settlement patterns lead to questions about the potential effects of a recession and a tightening labor market on these noncitizen families, many of whom might find themselves excluded from increasingly localized safety nets.

**Explaining the Trends in Immigrant Program Participation**

How do we explain these steep declines in public benefit use among noncitizens?  To what extent are they attributable to increased naturalization and the transformation of noncitizen benefit users into citizen benefit users?  To rising incomes among immigrant families?  To behavioral shifts among noncitizens — i.e., that result from legal exclusions or to a reduced propensity to participate in benefits programs?

*Naturalization Rates and Benefits Use*

Between 1994 and 1999 there was a substantial increase in the number of naturalized citizen families in the United States.  Underlying the rapid increase is the demographic fact that 2. 7 million immigrants acquired legal immigrant status around 1990 under the 1986 Immigration Reform and Control Act and thus became eligible to naturalize in the mid-1990s.  In addition, rates of naturalization increased, but not just because of new, policy-driven incentives to acquire citizenship set in motion by welfare reform.  The increases also resulted from reactions to California's Proposition 187 (which barred illegal immigrants from public schools and other public benefits) and to limits on noncitizens' procedural rights embedded in the 1996 illegal immigration reform law.

The rise in naturalizations was accompanied by a proportionately greater increase in the number of naturalized families receiving some means-tested benefits, and a concomitant increase in the rate of benefits receipt in these programs.  For SSI, the number of naturalized citizen families receiving benefits increased from 133,000 in 1994 to 298,000 in 1999; the rate of SSI use by naturalized citizen families increased by 75 percent (from 2.5 percent to 4.5 percent).  Medicaid showed a more modest increase in use rates of 28 percent (from 8.1 percent to 10.4 percent).  The changes in TANF and food stamp participation by naturalized citizens were not statistically significant.

Notwithstanding the increases in usage by naturalized citizen families, the share of the naturalized population receiving benefits remains relatively modest and the increases account for a small fraction of the reductions in usage among legal noncitizens.  The CPS reports that while the number of families containing a naturalized citizen grew by 1.5 million between 1994 and

1999, the number of such families participating in welfare programs[30] rose by only 170,000. At the same time, the number of legal immigrant[31] families on welfare programs dropped by 480,000. Thus, while retention of benefits may be a factor motivating naturalization, it falls well short of offsetting decreases in usage among noncitizens.

The shift of individuals out of the legal alien categories through naturalization appears to play almost no role in the decreasing TANF use among legal immigrants. While the number of naturalized citizen families with children increased by 480,000 between 1994 and 1999, the number participating in TANF rose by only 16,000.[32] In contrast, the number of legal immigrant families receiving TANF dropped by 300,000.

Similar patterns can be seen in California, which experienced a sharp rise in naturalizations between 1994 and 1999. The CPS shows that the number of families with a naturalized citizen adult rose by over 60 percent (from 1.2 million to 1.9 million) during the period — more than three times the national rate (18 percent). While program participation rates for California's naturalized citizen families appear to be higher in 1999 than in 1994 for all programs, the measured changes are not statistically significant. Here, too, the increase in naturalized citizen families receiving welfare — 72,000 — is much smaller than declines in legal noncitizen families' participation — 238,000.

These trends in California and the United States suggest that, while an interest in retaining access to public benefits may have played a role in some naturalizations, their dramatic

---

[30] Defined as TANF, SSI or General Assistance (GA).

[31] Because the naturalized citizen population includes both refugee and LPR entrants, the legal noncitizen population for the comparisons here combines refugee aliens and LPR aliens.

[32] An alternative assumption might be that the use rate among naturalized citizen families might have decreased at the same rate as among native or noncitizen families. Compared with this alternative, the "additional" participation by naturalized citizen families in 1999 would be 40,000 — a figure still well short of the drop in TANF participation among legal noncitizen families.

increase was not broadly driven by the goal of retaining benefits. Moreover, the results indicate that naturalization rates did *not* vitiate the substantial declines in immigrants' benefit use that occurred in the wake of PRWORA, as some commentators have claimed (Borjas 2001).

*Income Changes*

If naturalizations account for at most a small part of the sharp decline in legal noncitizen use of public benefits, do increased incomes explain it? Nationwide, the share of foreign-born families with children whose incomes are below 200 percent of poverty fell by 5 percentage points between 1994 and 1999. While this drop, which amounted to a 10 percent decrease in the proportion with low incomes, could explain a drop in participation, it is unlikely to account for the much larger decreases in participation shown in Figure 1. The parallel declines in citizen participation noted earlier are mirrored by a 5 percentage point drop in low-income families among natives. Nonetheless, by 1999, at the peak of the nation's boom economy, 50 percent of all foreign-born families with children had incomes below 200 percent of the federal poverty line[33] versus 35 percent of citizen families.

We have already noted that overall participation rates drop faster among LPRs than citizens, while differences in rates of decline between *low-income* citizen and LPR families are not significant. Thus, differences and changes in income composition between LPR families and citizen families must play a role in affecting the overall trends, but how much? The demographic technique called standardization offers a means of answering such questions.

Standardization techniques permit the analyst to partition the change in a rate over time or the difference in rates between two populations into portions due to various factors (Das

---

[33] The share of foreign-born families with children with incomes below the poverty line falls to 42 percent when families with an undocumented adult are excluded.

Gupta 1993).  The method enables us to apportion differences in two groups' usage rates to differences in group income,[34] differences in family structure,[35] and differences in a group's propensity to participate in a benefit program.

When we partition the changes in overall participation rates for the various means-tested programs for each of the citizen and noncitizen groups, it becomes starkly apparent that PRWORA succeed in changing usage patterns, and presumably behavior, for all of the groups. For TANF and food stamps, only about one-quarter of the reduction in the participation rates for *both citizens and LPR families* is explained by changes in income between 1994 and 1999 (Table 2); an insignificant amount of the reduction -- about 10 percent -- is attributable to changes in family composition.  Remarkably, however, about two-thirds of the reduction between 1994 and 1999 for LPR families and citizen families is attributable to changes in their propensity to participate in the programs.

Behavioral changes show up for other groups and other programs as well.  For LPR aliens, the reduction in SSI use, albeit small, is largely (about two-thirds) due to a reduction in the propensity to use SSI rather than income improvements (Table 2).  For natives, there was no significant change in use from 1994 to 1999, but the propensity of native families to use SSI actually increased while income improvements led to an offsetting reduction in use.  Refugee families experienced both larger reductions in participation rates than the other groups and larger increases in incomes.  For refugees, too, however, the largest factor accounting for the usage decreases was the propensity to use the programs followed by income increases.

---

[34] For income, families are grouped according to (non-welfare) income relative to the federal poverty level in 8 categories: <50% of the federal poverty level, 50–74%, 75–99%, 100–124%, 125–149%, 150–174%, 175–199%, and 200% and above.

[35] Families are grouped into 5 exhaustive categories for family composition:  (1) couples (married or unmarried partners) with children;  (2) female-headed families with children; (3) other families with children; (4) couples without children; and (5) all other families without children.

The Medicaid program is, again, quite different from the others when we examine the factors behind the change, or lack thereof, between 1994 and 1999.  Income increases play a principal role here as three-quarters of the overall LPR reduction in participation and virtually all of the citizen reduction is attributable to income factors (Table 2).  The share due to change in usage patterns is not statistically significant for either group.  Therefore, we conclude on the basis of this analysis, too, that there was no change in the propensity of legal immigrants and citizens to use Medicaid.

*Citizen-LPR Differences in Program Participation*

Which group is more likely to participate in means-tested programs, LPR alien families or citizen families?  Superficially, it appears that LPRs are more likely to participate because their overall use rates are higher.  However, when we take into account the differences in income and family structure between the two groups, a quite different picture emerges.

In fact, the principal factor explaining differences in participation is income.  Because LPR families have lower incomes than citizen families, the overall participation rate in TANF, food stamps, and Medicaid for LPR alien families is higher than the rate for citizen families. However, the different income distributions account for *more* than the entire difference between the groups for TANF, SSI, and food stamps.  (See Table 3.)  On the other hand, differences in the propensity to participate in the programs leads to *lower* participation rates in 1999 on the part of LPR alien families for TANF, SSI, and food stamps.  Family structure differences play a much smaller, and generally insignificant, role.

Medicaid is again slightly different.  Income differences remain important factor, but account for only two-thirds of the difference in LPR and citizen family use rates.  Family structure makes more of a difference here than in any other case, accounting for about

— 33 —

one-quarter of the LPR-citizen difference.  The propensity to use Medicaid is not significantly different between the two groups and accounts for about 10 percent of the difference.

The analysis of participation rates subdivided by income and family distributions paints a clear picture of the factors leading to differences between citizen families and LPR alien families.  The overall participation rates for LPR alien families are higher almost entirely because the aliens have lower incomes than citizens.  In fact, if the two groups had the same income distributions and the same distributions by family type, then the LPR alien families would actually have slightly *lower* overall participation rates than citizens in TANF, SSI, and food stamps.

## CONSIDERING REFORM

Welfare reform's devolution of  immigrant policy to the states has led to a widening divide in both the generosity of state benefits and immigrants' participation levels in safety net programs.  The new divisions emerge at a time of rapid migration to states with the least, rather than the most, generous safety nets.  These migration patterns raise doubts about the continuing power of the welfare magnet  — the theory on which the PRWORA's immigrant restrictions were at least partially based, and upon which they have been defended in the courts as elements of the nation's *immigration* not *welfare* policies.  They also raise concerns that many immigrants will find themselves in places with extremely porous local safety nets in a recessionary period.

If the upcoming reauthorization of welfare reform directly addresses the law's impacts on immigrant populations, it seems likely that the debate will begin by revisiting the restoration of benefits to both pre- and post-enactment immigrants.  Proposals that continue to await action include the following:

*Restoring food stamps to working-age adults in the United States at the time of the law's enactment and to the families of post-enactment immigrants.*  Unlike the other means-tested federal programs, food stamps remain barred to working-age, *pre-enactment* immigrants who had no notice of the bars at the time they became legal permanent residents.  As a result of the restrictions' wide scope,  we have seen steep declines in immigrant use of food stamps.  Our analyses indicate that these declines are not, for the most part, accounted for by increases in income.  Like declines in other benefit programs, their effects have been felt by refugees and by citizen children — populations largely protected by the law.  Further, the restrictions' continuing impacts take place against the backdrop of high levels of disadvantage among the children of immigrants.  According to the 1999 National Survey of American Families (NSAF), children of immigrants are substantially more likely than children of natives to live in families that worried about, or encountered difficulties affording food — 37 percent versus 27 percent (Capps 2001).

*Granting states the same right to elect to provide post-enactment immigrants with Medicaid and SCHIP that the states have been granted for pre-enactment immigrants.*  Welfare reform's restrictions on Medicaid and SCHIP represented a particularly sharp departure from prior policy.  Unlike other means-tested federal programs, Medicaid was extended to legal immigrants from the date of their receipt of legal status, whereas the other programs were deemed for 3 to 5 years, essentially requiring that immigrants had to wait that long after admission to receive benefits.  Our individual-level analysis of immigrants' use of Medicaid benefits in the wake of welfare reform indicates that noncitizens' use declined faster than citizens' and that noncitizen use rates in 1999 were lower than those of citizens.  The analysis also shows that immigrants who left Medicaid did not do so because they found private insurance.  Rather, they became uninsured once they lost Medicaid coverage.

Again, these developments take place against a backdrop of comparative disadvantage for immigrant populations.  According to NSAF, 22 percent of immigrant children versus 10 percent of native children are uninsured (Capps 2001).  The impacts of uninsurance on children are well-documented — including fewer doctor visits and increased use of high-cost emergency health care — and can lead to long-term health problems for individuals and greater tax burdens for communities.

*Providing immigrants admitted after 1996 with SSI eligibility if they should become disabled after entry.*  Finally, the restoration of SSI to post-enactment immigrants who become disabled after their entry to the United States would provide benefits to individuals whose disabling conditions were clearly unanticipated at the time of entry immigration and who may find it difficult — if not impossible — to naturalize.  Proposals advanced at the close of the Clinton Administration would have extended SSI benefits to post-enactment immigrants who had lived in the United States for 5 years.

*Key Design Issues.*  All of these proposals to restore or expand benefits also raise a number of common, fundamental policy-design issues that may be debated at the time of reauthorization.  One is the merit of continuing to use citizenship, rather than legal residence, to ration access to important public benefits.  It could be argued that legal immigrants, like citizens, are compelled to pay taxes, serve in the military in dangerous times, obey all laws, and are subject to the vicissitudes of the market.  Making safety net and work-support services contingent on naturalization creates incentives to naturalize that depart from loyalty and other nation-building goals.  Further, to the extent that benefit restrictions are intended to affect the flow of incoming legal immigrants, it is arguably more efficient to introduce the desired criteria

directly into admissions standards — that is, to use the "front door" of immigration policy rather than the "back door" of immigrant policy to alter the characteristics of the immigrant stream.

Second, proposals to restore benefits to noncitizen families raise the important, if difficult, issue of how immigrant support obligations should be shared between sponsors and the government. Following PRWORA's enactment, the current system shifts the full burden onto sponsors. Does it go too far? The central issues raised are: (1) whether sponsor deeming and liability should be limited to a specific number of years and (2) whether sponsor deeming should be extended beyond cash transfer programs to health insurance. With regard to the former, it could be argued that the current law effectively extends the sponsor's support obligation until an immigrant attains citizenship, creating, in effect, a potentially open-ended liability for the sponsor. With regard to the second issue, we would note here that Australia and Britain introduced new sponsor-deeming requirements at the same time the U.S. did, but excluded health insurance from sponsor obligations (Fix and Laglagaron 2001).

Third, welfare reform has gone some distance toward remaking the welfare system into an engine of mobility rather than an agent of dependence. Yet working, low-income noncitizens are excluded, both from the safety net and from such work supports as health insurance, job training, and transportation subsidies. The successful adaptation of immigrants and the integration of immigrants and their children into American society are cherished American ideals and, arguably, are or should be the goals of immigrant and immigration policy. The exclusion of legal immigrant families from the reformed welfare system runs directly counter to this desired outcome.

Finally, immigration is increasingly an essential feature of national competitiveness in a global economic system where nations vie for talented immigrants. Determination of policies

related to immigration, like trade, are appropriately within the purview of the federal government.  In upholding PRWORA's immigrant restrictions, the courts have said that  states are making congressionally-authorized choices in immigration — not welfare — policy.  We suggest that in this global era, it does not make sense to shift the power to determine the incentives for entry and content of citizenship from the national government to the states.

# REFERENCES

Borjas, George, J.  2001.  "Welfare Reform and Immigration."  In Blank, Rebecca and Ron Haskins (eds.), *The New World of Welfare*.  Washington, DC: The Brookings Institute.

Borjas, George J. and Lynette Hilton. 1995. "Immigration and the Welfare State: Immigrant Participation in Means Tested Entitlement Programs."  Cambridge, MA: National Bureau of Economic Research.

Capps, Randy.  2001.  "Hardship among Children of Immigrants: Findings from the 1999 National Survey of America's Families."  Washington, DC: The Urban Institute.  *Assessing the New Federalism Policy Brief* Series B, No.  B-29.

Congressional Budget Office.  1997.  *Federal Budgetary Implications of The Personal Responsibility and Work Opportunity Reconciliation Act of 1996.*  Washington, DC.  December.

Das Gupta, Prithwis.  1993.  *Standardization and Decomposition of Rates: A User's Manual*.  Current Population Reports, Series P23-186.  Washington, DC: U.S. Bureau of the Census.

Duleep, Harriet Orcutt and Mark Regets.  1994.  "The Elusive Concept of Immigrant Quality."  Discussion Paper PRIP-UI-28, Program for Research on Immigration Policy.  Washington, DC: The Urban Institute.

Fix, Michael and Laureen Laglagaron.  2001.  "Report of the Working Group on Social Rights and Citizenship."  In Alienikoff, T. Alexander and Douglas Klusmeyer (eds.), *Citizenship Policies for an Age of Migration*.  Washington, DC: The Carnegie Endowment for International Peace.  Forthcoming, winter 2002.

Fix, Michael and Jeffrey S. Passel.  1994.  *Immigration and Immigrants: Setting the Record Straight*.  Washington, D.C.: The Urban Institute.

Fix, Michael and Jeffrey S. Passel.  1999.  "Trends in Citizens' and Noncitizens' Use of Public Benefits Following Welfare Reform, 1994–1997."  Washington, DC: The Urban Institute.

Fix, Michael and Wendy Zimmermann.  2001.  "All Under One Roof, Mixed Status Families in an Era of Reform."  *International Migration Review* 35 (134, Summer).

Genser, Jenny.  1998.  "Who is Leaving the Food Stamp Program: An Analysis of Caseload Changes from 1994 to 1997."  Office of Analysis, Nutrition and Evaluation, The Food and Nutrition Service.  Washington, DC: U.S. Department of Agriculture.

Gingrich, Newt and Richard Armey.  1994.  *Contract With America*.  New York City: Times Books, Random House.

O'Neill, June E. and M. Anne Hill.  2001.  "Gaining Ground?  Measuring the Impact of Welfare Reform on Welfare and Work."  *Civic Report* No. 17.  New York: Center for Civic Innovation, Manhattan Institute for Policy Research.

Passel, Jeffrey S.  2001.  "An Evaluation of Demographic Analysis in Census 2000."  In *Final Report of the Census 2000 Monitoring Board, President Members*.  Washington, DC.

Passel, Jeffrey S.  2002.  "Estimates of Undocumented Immigrants Living in the United States."  Washington, DC: The Urban Institute (forthcoming)

Passel, Jeffrey S. and Rebecca L. Clark.  1998.  "Immigrants in New York: Their Legal Status, Incomes, and Taxes."  Washington, DC: The Urban Institute.

Passel, Jeffrey S. and Wendy Zimmermann.  2001.  "Are Immigrants Leaving California? Settlement Patterns of Immigrants in the Late 1990s."  Washington D.C.: The Urban Institute.

Van Hook, Jennifer, Jennifer E. Glick and Frank D. Bean.  1999.  "Public Assistance Receipt Among Immigrants and Natives: How the Unit of Analysis Affects Research Findings." *Demography* 36 (1): 111-20.

Wheaton, Laura and Linda Giannarelli.  2000.  "Coverage of Social Benefit Programs in the Current Population Survey."  Paper presented at the annual meetings of the American Statistical Association.  August.

Wishnie, Michael.  2001.  "Laboratories of Bigotry? Devolution of the Immigration Power, Equal Protection and Federalism." 76 New York University Law Review. 493.

Zimmermann, Wendy and Michael Fix.  1998.  "Declining Immigrant Applications for Medi-Cal and Welfare Benefits in Los Angeles County."  Washington, DC: The Urban Institute.

Zimmermann, Wendy and Karen C. Tumlin.  1999. *Patchwork Policies: State Assistance for Immigrants Under Welfare Reform. Assessing the New Federalism* Occasional Paper No. 24.  Washington, DC: The Urban Institute.

Zimmermann, Wendy and Karen C. Tumlin.  2001.  "What Does *Work First* Mean for Immigrants on TANF in New York, Los Angeles, and Houston?"  Paper presented at the annual meeting of the Association for Public Policy and Management.  Washington, DC: The Urban Institute.  November.

## Table 1.  Number of Families and Families Receiving TANF, by Citizenship of Head and Spouse:  1994 and 1999

| Status of Family Head/Spouse | Families (in thousands) | | | | Percent Distribution | | | |
|---|---|---|---|---|---|---|---|---|
| | | | '94-'99 Change | | Of Total | | Of Foreign-Born | |
| | 1994 | 1999 | Amt. | Pct. | 1994 | 1999 | 1994 | 1999 |
| **Families Receiving TANF** | | | | | | | | |
| **Total** | **4,041** | **1,835** | **-2,206** | **-55%** | **100** | **100** | **(x)** | **(x)** |
| Citizen | 3,502 | 1,607 | -1,895 | -54% | 87 | 88 | (x) | (x) |
| Native | 3,450 | 1,531 | -1,918 | -56% | 85 | 83 | (x) | (x) |
| Naturalized | 52 | 76 | 24 | 45% | 1 | 4 | 9 | 25 |
| Noncitizen | 411 | 197 | -213 | -52% | 10 | 11 | 70 | 65 |
| Legal | 347 | 132 | -216 | -62% | 9 | 7 | 59 | 43 |
| Undocumented | 63 | 66 | 2 | 4% | 2 | 4 | 11 | 22 |
| Refugee Alien | 127 | 30 | -97 | -76% | 3 | 2 | 21 | 10 |
| **All Families** | | | | | | | | |
| **Total** | **132,000** | **138,813** | **6,812** | **5%** | **100** | **100** | **(x)** | **(x)** |
| Citizen | 120,828 | 126,591 | 5,763 | 5% | 92 | 91 | (x) | (x) |
| Native | 115,585 | 119,889 | 4,304 | 4% | 88 | 86 | (x) | (x) |
| Naturalized | 5,243 | 6,702 | 1,459 | 28% | 4 | 5 | 32 | 35 |
| Noncitizen | 9,927 | 10,734 | 807 | 8% | 8 | 8 | 60 | 57 |
| Legal | 7,019 | 6,626 | -394 | -6% | 5 | 5 | 43 | 35 |
| Undocumented | 2,908 | 4,108 | 1,201 | 41% | 2 | 3 | 18 | 22 |
| Refugee Alien | 846 | 952 | 106 | 13% | 1 | 1 | 5 | 5 |

(x) — not applicable.

*Source:*  Urban Institute tabulations from March 1995 and 2000 Current Population Surveys with immigration status imputed using methods based on Passel and Clark (1998).

*Note:*  "Refugee Alien" represents persons admitted as refugees since 1980 who have not become naturalized citizens regardless of current status.  "Legal" includes all persons who are not citizens and who were admitted as legal permanent residents (LPR) except those admitted as refugees. "Legal Nonimmigrants" or "Legal Temporary Residents" are persons with valid entry visas who are considered U.S. residents, such as foreign students, intracompany transfers, or H-1B "hi-tech" guest workers; to the extent that such persons are in the CPS, they appear in the totals but are not shown separately.

**Table 2.  Partition of 1994-1999 Change in Use of Welfare, Food Stamps, and Medicaid into Effects of Poverty-Family-Specific Use Rates, Poverty Distribution, and Presence of Children Distribution, Using Standardization Techniques for Families in the United States:  By Nativity and Status**

| Program and Group | Percent of Families Participating in Program | | | Amount of Change in Participation Due to … | | | Percent of Change Due to … | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1994 | 1999 | '94-'99 Change | Use Rates | Poverty Distrib. | Family Distrib. | Use Rates | Poverty Distrib. | Family Distrib. |
| By Nativity and Legal Status | | | | | | | | | |
| **Citizen** | | | | | | | | | |
| Welfare[1] | 6.5 | 4.8 | -1.7 * | -0.8 * | -0.8 * | -0.1 | 45 | 47 | 8 |
| TANF | 2.9 | 1.3 | -1.6 * | -1.1 * | -0.4 * | -0.2 * | 68 | 22 | 10 |
| SSI | 3.4 | 3.4 | 0.0 | 0.4 * | -0.4 * | 0.0 | -- | -- | -- |
| Food Stamps | 9.0 | 5.5 | -3.5 * | -2.3 * | -0.9 * | -0.2 | 68 | 27 | 6 |
| Medicaid | 11.6 | 10.4 | -1.2 * | 0.2 | -1.2 * | -0.3 | -21 | 98 | 23 |
| **LPR Alien** | | | | | | | | | |
| Welfare[1] | 11.2 | 6.3 | -4.9 * | -3.1 * | -1.5 * | -0.4 | 63 | 30 | 7 |
| TANF | 4.9 | 2.0 | -3.0 * | -1.8 * | -0.7 | -0.4 | 62 | 24 | 14 |
| SSI | 5.7 | 3.8 | -1.9 * | -1.2 * | -0.7 | 0.1 | 66 | 37 | -3 |
| Food Stamps | 14.8 | 7.7 | -7.1 * | -5.0 * | -1.6 * | -0.5 | 70 | 22 | 7 |
| Medicaid | 19.9 | 17.0 | -2.9 * | -0.3 | -2.1 * | -0.4 | 12 | 74 | 14 |
| **Undocumented Alien** | | | | | | | | | |
| Welfare[1] | 2.7 | 2.5 | -0.2 | -0.3 | 0.0 | 0.1 | -- | -- | -- |
| TANF | 2.2 | 1.6 | -0.6 | -0.6 | 0.0 | 0.0 | -- | -- | -- |
| SSI | 0.2 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | -- | -- | -- |
| Food Stamps | 8.3 | 5.9 | -2.3 * | -2.1 * | -0.3 | 0.1 | 89 | 13 | -2 |
| Medicaid | 13.2 | 12.9 | -0.3 | 0.1 | -0.6 | 0.3 | -- | -- | -- |
| **Refugee Alien** | | | | | | | | | |
| Welfare[1] | 29.6 | 14.4 | -15.1 * | -7.5 * | -7.0 * | -0.5 | 50 | 47 | 4 |
| TANF | 15.0 | 3.2 | -11.8 * | -5.2 * | -4.1 * | -2.5 | 44 | 35 | 21 |
| SSI | 13.4 | 9.2 | -4.2 | -2.7 | -3.1 | 1.6 | -- | -- | -- |
| Food Stamps | 38.0 | 17.2 | -20.8 * | -12.9 * | -6.7 * | -1.3 | 62 | 32 | 6 |
| Medicaid | 40.7 | 23.1 | -17.6 * | -8.9 * | -7.4 * | -1.3 | 51 | 42 | 8 |

(continued)

**Table 2.  Partition of 1994-1999 Change in Use of Welfare, Food Stamps, and
Medicaid into Effects of Poverty-Family-Specific Use Rates, Poverty Distribution, and
Presence of Children Distribution, Using Standardization Techniques
for Families in the United States:  By Nativity and Status**

| Program and Group | Percent of Families Participating in Program | | | Amount of Change in Participation Due to … | | | Percent of Change Due to … | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1994 | 1999 | '94-'99 Change | Use Rates | Poverty Distrib. | Family Distrib. | Use Rates | Poverty Distrib. | Family Distrib. |
| (continued) | | | | | | | | | |
| **By Program** | | | | | | | | | |
| **Welfare**[1] | | | | | | | | | |
| Citizen | 6.5 | 4.8 | -1.7 * | -0.8 * | -0.8 * | -0.1 | 45 | 47 | 8 |
| LPR Alien | 11.2 | 6.3 | -4.9 * | -3.1 * | -1.5 * | -0.4 | 63 | 30 | 7 |
| Undocumented | 2.7 | 2.5 | -0.2 | -0.3 | 0.0 | 0.1 | -- | -- | -- |
| Refugee | 29.6 | 14.4 | -15.1 * | -7.5 * | -7.0 * | -0.5 | 50 | 47 | 4 |
| **TANF** | | | | | | | | | |
| Citizen | 2.9 | 1.3 | -1.6 * | -1.1 * | -0.4 * | -0.2 * | 68 | 22 | 10 |
| LPR Alien | 4.9 | 2.0 | -3.0 * | -1.8 * | -0.7 | -0.4 | 62 | 24 | 14 |
| Undocumented | 2.2 | 1.6 | -0.6 | -0.6 | 0.0 | 0.0 | -- | -- | -- |
| Refugee | 15.0 | 3.2 | -11.8 * | -5.2 * | -4.1 * | -2.5 | 44 | 35 | 21 |
| **SSI** | | | | | | | | | |
| Citizen | 3.4 | 3.4 | 0.0 | 0.4 * | -0.4 * | | -- | -- | -- |
| LPR Alien | 5.7 | 3.8 | -1.9 * | -1.2 * | -0.7 | 0.1 | 66 | 37 | -3 |
| Undocumented | 0.2 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | -- | -- | -- |
| Refugee | 13.4 | 9.2 | -4.2 | -2.7 | -3.1 | 1.6 | -- | -- | -- |
| **Food Stamps** | | | | | | | | | |
| Citizen | 9.0 | 5.5 | -3.5 * | -2.3 * | -0.9 * | -0.2 | 68 | 27 | 6 |
| LPR Alien | 14.8 | 7.7 | -7.1 * | -5.0 * | -1.6 * | -0.5 | 70 | 22 | 7 |
| Undocumented | 8.3 | 5.9 | -2.3 * | -2.1 * | -0.3 | 0.1 | 89 | 13 | -2 |
| Refugee | 38.0 | 17.2 | -20.8 * | -12.9 * | -6.7 * | -1.3 | 62 | 32 | 6 |
| **Medicaid** | | | | | | | | | |
| Citizen | 11.6 | 10.4 | -1.2 * | 0.2 | -1.2 * | -0.3 | -21 | 98 | 23 |
| LPR Alien | 19.9 | 17.0 | -2.9 * | -0.3 | -2.1 * | -0.4 | 12 | 74 | 14 |
| Undocumented | 13.2 | 12.9 | -0.3 | 0.1 | -0.6 | 0.3 | -- | -- | -- |
| Refugee | 40.7 | 23.1 | -17.6 * | -8.9 * | -7.4 * | -1.3 | 51 | 42 | 8 |

\* Significant at p < 0.10
-- Total change not significant, so distribution not computed.
[1] Welfare receipt is defined as receipt of Temporary Assistance for Needy Families, Aid to Families with Dependent
    Children, Supplemental Security Income, *or* General Assistance.

*Source:*  Urban Institute tabulations from March 1995 and 2000 Current Population Surveys with immigration status
         imputed with methods based on Passel and Clark (1998).  See text for description of partition methods
         and definitions of categories of immigrants, poverty, and family status.

**Table 3.  Partition of Citizen-LPR Difference in Use of Welfare, Food Stamps, and Medicaid into Effects of Poverty-Family-Specific Use Rates, Poverty Distribution, and Presence of Children Distribution, Using Standardization Techniques for Families in the United States:  1994, 1999**

| Program and Date | Percent of Families Participating in Program | | | Amount of Difference in Participation Due to … | | | Percent of Difference Due to … | | |
|---|---|---|---|---|---|---|---|---|---|
| | Citizen | LPR Alien | Diff. | Use Rates | Poverty Distrib. | Family Distrib. | Use Rates | Poverty Distrib. | Family Distrib. |
| **By Year** | | | | | | | | | |
| **1999** | | | | | | | | | |
| Welfare[1] | 4.8 | 6.3 | 1.5 * | -1.1 * | 2.4 * | 0.2 | -77 | 164 | 13 |
| TANF | 1.3 | 2.0 | 0.7 * | -0.3 | 0.8 * | 0.2 | -35 | 109 | 26 |
| SSI | 3.4 | 3.8 | 0.4 | -1.2 * | 1.6 * | 0.0 | -- | -- | -- |
| Food Stamps | 5.5 | 7.7 | 2.2 * | -0.8 * | 2.6 * | 0.4 | -36 | 118 | 18 |
| Medicaid | 10.4 | 17.0 | 6.5 * | 0.7 | 4.3 * | 1.5 * | 10 | 67 | 23 |
| **1994** | | | | | | | | | |
| Welfare[1] | 6.5 | 11.2 | 4.7 * | 0.2 | 4.1 * | 0.4 | 4 | 87 | 9 |
| TANF | 2.9 | 4.9 | 2.0 * | -0.5 | 2.0 * | 0.6 | -26 | 98 | 27 |
| SSI | 3.4 | 5.7 | 2.3 * | 0.4 | 2.0 * | -0.1 | 19 | 86 | -5 |
| Food Stamps | 9.0 | 14.8 | 5.9 * | 0.3 | 4.8 * | 0.7 | 5 | 82 | 12 |
| Medicaid | 11.6 | 19.9 | 8.2 * | 1.3 * | 5.5 * | 1.5 * | 15 | 67 | 18 |
| **By Progam** | | | | | | | | | |
| **Welfare[1]** | | | | | | | | | |
| 1999 | 4.8 | 6.3 | 1.5 * | -1.1 * | 2.4 * | 0.2 | -77 | 164 | 13 |
| 1994 | 6.5 | 11.2 | 4.7 * | 0.2 | 4.1 * | 0.4 | 4 | 87 | 9 |
| **TANF** | | | | | | | | | |
| 1999 | 1.3 | 2.0 | 0.7 * | -0.3 | 0.8 * | 0.2 | -35 | 109 | 26 |
| 1994 | 2.9 | 4.9 | 2.0 * | -0.5 | 2.0 * | 0.6 | -26 | 98 | 27 |
| **SSI** | | | | | | | | | |
| 1999 | 3.4 | 3.8 | 0.4 | -1.2 * | 1.6 * | 0.0 | -- | -- | -- |
| 1994 | 3.4 | 5.7 | 2.3 * | 0.4 | 2.0 * | -0.1 | 19 | 86 | -5 |
| **Food Stamps** | | | | | | | | | |
| 1999 | 5.5 | 7.7 | 2.2 * | -0.8 * | 2.6 * | 0.4 | -36 | 118 | 18 |
| 1994 | 9.0 | 14.8 | 5.9 * | 0.3 | 4.8 * | 0.7 | 5 | 82 | 12 |
| **Medicaid** | | | | | | | | | |
| 1999 | 10.4 | 17.0 | 6.5 * | 0.7 | 4.3 * | 1.5 * | 10 | 67 | 23 |
| 1994 | 11.6 | 19.9 | 8.2 * | 1.3 * | 5.5 * | 1.5 * | 15 | 67 | 18 |

* Significant at $p < 0.10$

-- Total change not significant, so distribution not computed.

[1] Welfare receipt is defined as receipt of Temporary Assistance for Needy Families, Aid to Families with Dependent Children, Supplemental Security Income, **or** General Assistance.

*Source:*  Urban Institute tabulations from March 1995 and 2000 Current Population Surveys with immigration status imputed with methods based on Passel and Clark (1998).  See text for description of partition methods and definitions of categories of immigrants, poverty, and family status.

# Exhibit D

FROM SAFETY NET TO SOLID GROUND



# One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018

*Hamutal Bernstein, Dulce Gonzalez, Michael Karpman, and Stephen Zuckerman*
*May 2019*

**Immigration policy has been at the center of public debate for many years, but the debate has intensified since the 2016 presidential election. In October 2018, after months of anticipation, the administration published a proposed rule altering "public charge" determinations that would make it harder for immigrants to get a green card (i.e., establish permanent residency). After a public comment period that closed in December, the rule is being finalized. If implemented, the rule would make it more difficult for immigrants to get green cards if they have received certain noncash public benefits or have low incomes or other characteristics considered to increase their likelihood of using benefits in the future. Beyond reducing future immigration numbers, there is widespread concern this revised public charge rule would have "chilling effects" on low-income immigrant families by discouraging them from applying for and receiving public benefits for which they are eligible, for fear of risking future green card status.[1] This chilling effect could spill over to many people, including US citizen children.**

So far, evidence on this chilling effect has largely been based on anecdotal reports from service providers.[2] In this brief, we use unique data from a nationally representative, internet-based survey conducted in December 2018 to provide the first systematic evidence on the extent of chilling effects among immigrant families before release of a final public charge rule.[3] The survey included nearly 2,000 nonelderly adults who are foreign born or live with one or more foreign-born family members (hereafter called "adults in immigrant families"), who make up about one-quarter of all nonelderly adults in the US, according to the 2017 American Community Survey. We provide here the first estimates of self-

reported chilling effects on participation in public benefit programs associated with the proposed public charge rule. These findings complement projections that other researchers have developed to model expected chilling that will follow a final rule (Artiga, Damico, and Garfield et al. 2018; Artiga, Garfield, and Damico 2018; Batalova, Fix, and Greenberg 2018; Fiscal Policy Institute 2018; Kenney, Haley, and Wang 2018; Laird et al. 2019; Zallman and Finnegan 2018).[4]

We find the following:

- About one in seven adults in immigrant families (13.7 percent) reported "chilling effects," in which the respondent or a family member did not participate in a noncash government benefit program in 2018 for fear of risking future green card status. This figure was even higher, 20.7 percent, among adults in low-income immigrant families.

- Though the proposed rule would only directly affect adults who do not yet have a green card (i.e., lawful permanent residence), we observed chilling effects in families with various mixes of immigration and citizenship statuses, including 14.7 percent of adults in families where all noncitizen members had green cards and 9.3 percent of those in families where all foreign-born members were naturalized citizens.

- Hispanic adults in immigrant families were more than twice as likely (20.6 percent) as non-Hispanic white and non-Hispanic nonwhite adults in immigrant families (8.5 percent and 6.0 percent, respectively) to report chilling effects in their families.

- Though the proposed rule would only directly apply to adults, many households with children experienced chilling effects. Adults in immigrant families living with children under age 19 were more likely to report chilling effects (17.4 percent) than adults without children in the household (8.9 percent).

- Most adults in immigrant families reported awareness of the public charge rule (62.9 percent). Adults who had heard "a lot" about the proposed rule were the most likely to report chilling effects in their families (31.1 percent).

# Background on Public Charge

The administration has advanced sweeping changes to federal immigration policy, including heightened immigration enforcement, termination of temporary protections against deportation, and cuts to refugee and asylee admissions. In 2018, the administration also proposed expanding the criteria used in "public charge" determinations, in which immigration officials may deny applications for permanent residency (green cards) or temporary visas to immigrants who are deemed "likely to become a public charge."[5]

The new approach would make it more difficult for immigrants to get green cards or temporary visas if they received or are deemed likely to receive cash and noncash public benefits. Departing from past practice where only primary reliance on cash benefits or long-term medical institutionalization were considered in public charge determinations, under the proposed rule, officials would consider an

applicant's use of either cash or noncash benefits as "negative factors," as well as several personal characteristics, including income level, age, English proficiency, educational attainment, employment status, family size, health status, credit score, and other financial resources. The proposed rule, posted for public comment in October 2018, expanded the list of benefits to be considered in future public charge determinations to include the Supplementary Nutrition Assistance Program (SNAP, formerly known as food stamps), Medicaid, Section 8 housing assistance, public housing, and subsidies for drug benefits under Medicare Part D.

The proposed rule would affect applicants adjusting from another immigration status who already live in the US and people applying from abroad through family sponsorship or other pathways (Capps et al. 2018). The rule specifically excludes certain groups, such as refugees and other humanitarian entrants, and clarifies that benefits received by eligible children will not be considered in adults' future immigration applications. However, there remains confusion about when and how the final rule will be implemented and what aspects of the proposed rule will carry over to the final version. In the meantime, a parallel change to the public charge test in the Foreign Affairs Manual, used by consular officials considering visa applications filed abroad, was implemented in January 2018, and recent data show that admissions decisions have already been affected; refusals of applications on public charge grounds quadrupled to 13,500 during the 2018 fiscal year.[6] News outlets have also recently reported that the Department of Justice is preparing to publish a rule on deporting green card holders on public charge grounds.[7]

The proposed rule could have pervasive effects for immigrant families, given the complicated nature of the regulation and widespread uncertainty about how or when it will go into effect. Already many immigrant families are reportedly avoiding interaction with public authorities and dropping out of or being reluctant to enroll themselves or their children in critical safety net programs like Medicaid and the Children's Health Insurance Program (CHIP), SNAP, or the Special Supplemental Nutrition Program for Women, Infants, and Children, even though the latter is not on the list of benefits in the proposed rule.[8] Immigrant-serving organizations are reporting heightened reluctance and fear in immigrant communities to receive public benefits for which adults and children are eligible, including programs that would not be considered in public charge determinations (Greenberg, Feierstine, and Voltolini 2019). There is also evidence of far-reaching fear and insecurity among immigrant families in the context of the administration's immigration policy changes and rhetoric; for example, psychological effects are widespread not only for undocumented people or temporary visa holders but among naturalized US citizens (Cervantes, Ullrich, and Matthews 2018; Roche et al. 2018).

Though these reports help clarify the impact of the broader immigration climate, there is no information yet on systematic changes to participation in safety net programs among immigrant families in the context of the debate around the proposed public charge rule. This brief provides new insight into the extent to which immigrant families avoided participating in these programs because of concerns about future green card status in 2018, as this proposed rule was debated. This includes both people who would be directly affected by the rule and have not yet applied for a green card and would receive

the revised public charge test in the future, as well as others who perceive potential risk despite the rule not directly applying to them.

# Data and Methods

## Data and Sample

We draw on data from the December 2018 round of the Well-Being and Basic Needs Survey (WBNS), a nationally representative survey of adults ages 18 to 64 launched in December 2017. This analysis is based on the WBNS core sample and an oversample of noncitizens. For each round of the WBNS, the core sample is a stratified random sample drawn from Ipsos' KnowledgePanel, a probability-based online panel recruited primarily from an address-based sampling frame, and includes a large oversample of adults in low-income households.[9] In December 2018, the survey also included an oversample of noncitizens to support analyses of current policy issues affecting immigrant families. The panel includes only respondents who can complete surveys that are administered in English or Spanish, and adults without internet access are provided laptops and free internet access to facilitate participation.

To assess chilling effects and other immigration policy issues, we constructed a set of weights for analysis of the population of nonelderly adults who are foreign born or living with a foreign-born relative in their household. The weights are based on the probability of selection from the KnowledgePanel and benchmarks from the American Community Survey for nonelderly adults in immigrant families who are English proficient or primarily speak Spanish.[10] The language criterion is used in the weighting to reflect the nature of the survey sample, because the survey is only administered in English or Spanish.

Our final analytic sample consists of 1,950 adults in immigrant families. When assessing the types of programs for which respondents reported chilling, we limit the sample to the 314 adults in immigrant families who reported any chilling effect on participation in public programs.

## Measures

### SELF-REPORTED CHILLING EFFECTS WITHIN A FAMILY

Our main outcome is self-reported chilling effects on participation in public programs *within a family*. We  define these chilling effects as either not applying for or stopping participation in a noncash government benefit program, such as Medicaid/CHIP, SNAP, or housing subsidies, within the previous 12 months because of concerns that the respondent or a family member could be disqualified from obtaining a green card.[11] For this measure, a respondent could have defined family as both their immediate family and other relatives who may be living with them or in another household; we have learned from some initial qualitative follow-up work that some respondents took into account family members living in other households when they reported chilling effects. Respondents may also have reported chilling for a program for which they themselves may not have been eligible. For instance,

some parents may have reported chilling effects on the program participation of a citizen child, or a higher-income respondent may have reported chilling affecting a relative with lower income.

AWARENESS OF PROPOSED PUBLIC CHARGE RULE

To assess awareness of the proposed public charge rule published in October 2018, we asked respondents to report how familiar they were with a proposed rule that would make it harder for immigrants to enter the United States or become permanent residents of the US if they have low incomes or use public benefits such as Medicaid, SNAP, or housing subsidies. Respondents could make one selection from the options "a lot," "some," "only a little," or "nothing at all."[12]

## Limitations

One limitation of the WBNS is its low response rate, which is comparable to other panel surveys that account for nonresponse at each stage of recruitment. However, studies assessing recruitment for the KnowledgePanel have found little evidence of nonresponse bias for core demographic and socioeconomic measures (Garrett, Dennis, and DiSogra 2010; Heeren et al. 2008), and WBNS estimates are generally consistent with benchmarks from federal surveys (Karpman, Zuckerman, and Gonzalez 2018). WBNS survey weights reduce, but do not eliminate, the potential error associated with sample coverage and nonresponse, and this is likely to be larger for the subgroup of adults in immigrant families. Though the weights are designed to produce nationally representative estimates for adults in immigrant families, the survey's design implies that our analytic sample of 1,950 adults in immigrant families has precision comparable to a simple random sample of approximately 800 adults, increasing the sampling error around our estimates. We only report differences across subgroups of adults in immigrant families that are statistically significant at the 0.05 level or lower.

In addition, because the WBNS is only administered in English and Spanish, our analytic sample does not describe the experiences of the full spectrum of adults in immigrant families. Our study excludes adults with limited English proficiency whose primary language is not Spanish. We estimate that the excluded adults who do not speak English or Spanish represent between 5 and 15 percent of all nonelderly adults in immigrant households as defined for this brief; according to the 2017 American Community Survey, 5 percent of this group speaks English less than "well"[13] and speaks a primary language other than Spanish.

Some measurement error is likely for questions related to citizenship statuses of respondents  and relatives in the household, particularly among adults who are undocumented or have been in the US for a short time (Van Hook and Bachmeier 2012). It is also possible that respondents conflated awareness of the public charge rule with overall awareness of an increasingly hostile political climate toward immigrants, which may have resulted in overreported awareness of the proposed public charge rule. Moreover, follow-up qualitative interviews with respondents for a related project suggested that some respondents did not understand the distinction between two separate survey items: "not applying for a program" versus "stopping participating in a program." Consequently, we have opted to combine

responses to report on the questions in combination: either not applying for or dropping out of a noncash assistance program.

## Analysis

We assess chilling effects within a family, overall and by the following characteristics: annual family income as a percentage of the 2018 federal poverty level, citizenship and immigration status of family members living in the household, race and ethnicity of the respondent, presence of children under age 19 in the household, and respondents' awareness of the proposed public charge rule. We impute missing responses for family income, marital status, and number of children in the household using a multiple-imputation regression approach. We allocate missing citizenship status data for respondents using their responses to the Ipsos panel profile question on citizenship; absent that information, we impute respondent citizenship status. All estimates are weighted to be representative of the national population of nonelderly adults in immigrant families (as described above) and account for the complex survey design.

# Findings

*About one in seven adults in immigrant families (13.7 percent) reported "chilling effects," in which the respondent or a family member did not participate in a noncash government benefit program in 2018 for fear of risking future green card status. This figure was even higher, 20.7 percent, among adults in low-income immigrant families.*

Adults in immigrant families across the income distribution reported chilling effects on their participation in noncash public benefit programs for fear of disqualification from obtaining a green card. Overall, one in seven (13.7 percent) reported chilling effects in his or her family (figure 1). Among adults in low-income immigrant families (i.e., those with family incomes below 200 percent of the federal poverty level), over one in five (20.7 percent) reported chilling, compared with 8.6 percent of adults in immigrant families with higher incomes.



FIGURE 1

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, Overall and by Family Income, December 2018**

URBAN **INSTITUTE**

**Source**: Well-Being and Basic Needs Survey, December 2018.

**Notes**: FPL = federal poverty level. Adults are ages 18 to 64. Respondents reported that either they or someone in their family did not apply for *or* stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.

\*\*\* Estimate differs significantly from adults in immigrant families with family incomes below 200 percent of FPL at the 0.01 level, using two-tailed tests.

Among adults in immigrant families reporting any chilling effects, nearly half (46.0 percent) reported that someone in their family did not apply for or stopped participating in SNAP, making it the most common program for which chilling was reported among the programs assessed in this survey (figure 2). Medicaid or CHIP was second, with a share of 42.0 percent among adults in immigrant families who reported chilling. One in three (33.4 percent) adults reporting chilling within his or her family reported not applying for or stopping participation in housing subsidies. A smaller share of adults in immigrant families (8.6 percent) experiencing chilling reported stopping participation or not applying for other programs, offering responses such as federal Marketplace subsidies for health insurance and energy bill assistance programs (data not shown).

One in six (16.7 percent) adults who reported chilling effects indicated that the implicated program was specifically Medicaid or CHIP benefits for a child in their family (data not shown). Though this detail is not available for the other noncash programs, we know that SNAP and housing subsidies affect the entire household, and we found chilling effects disproportionately among households with children.

FIGURE 2

**Share of Adults in Immigrant Families in Which Someone Did Not Participate in SNAP, Medicaid/CHIP, or Housing Subsidies, among Those That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, December 2018**



URBAN **INSTITUTE**

**Source**: Well-Being and Basic Needs Survey, December 2018.
**Notes**: SNAP = Supplemental Nutrition Assistance Program. CHIP = Children's Health Insurance Program. Adults are ages 18 to 64. Because respondents could report multiple programs, the program categories displayed are not mutually exclusive. Respondents reported that either they or someone in their family did not apply for or stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.

*Though the proposed rule would only directly affect adults who do not yet have a green card (i.e., lawful permanent residence), we observed chilling effects in families with various mixes of immigration and citizenship statuses, including 14.7 percent of adults in families where all noncitizen members had green cards and 9.3 percent of those in families where all foreign-born members were naturalized citizens.*

Immigrant families often include a wide range of citizenship and immigration statuses, including US-born citizens, naturalized US citizens, green card holders, and foreign-born people without permanent residence. Among households where one or more noncitizen family members was not a permanent resident, 20.4 percent of adults reported chilling effects (figure 3). The share was slightly lower but still substantial (14.7 percent) for respondents in households where all noncitizen relatives were permanent residents.

Some respondents living in what should be the least vulnerable households, in which all foreign-born family members are naturalized US citizens, also seem to be affected, with 9.3 percent of these adults reporting chilling effects within their family in the previous year. This suggests spillover effects

on people who will not be subject to future public charge determinations but may be confused about the rule and who it applies to, or fear it could impair their ability to sponsor other family members for green cards.

FIGURE 3

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, by Household Citizenship and Immigration Status, December 2018**



URBAN **INSTITUTE**

**Source**: Well-Being and Basic Needs Survey, December 2018.
**Notes**: Adults are ages 18 to 64. Categories are constructed around the citizenship and immigration status of the foreign-born family members in the household, but each group may contain US-born family members (including the respondent). Respondents reported that either they or someone in their family did not apply for or stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.
** Estimate differs significantly from adults in households where all foreign-born family members are naturalized citizens at the 0.05 level, using two-tailed tests.

*Hispanic adults in immigrant families were more than twice as likely (20.6 percent) as non-Hispanic white and non-Hispanic nonwhite adults in immigrant families (8.5 percent and 6.0 percent, respectively) to report chilling effects in their families.*

About 1 in 5 Hispanic adults in immigrant families (20.6 percent) reported chilling effects within his or her family, compared with fewer than 1 in 10 non-Hispanic white adults in immigrant families (8.5 percent; figure 4). Hispanic adults also reported chilling effects at a higher rate than non-Hispanic nonwhite respondents, of whom only 6.0 percent reported that they or a family member experienced chilling effects on their use of noncash public benefits because of concern over future green card status.

However, we may underestimate reported chilling effects among non-Hispanic nonwhite adults because WBNS respondents do not include adults who do not speak Spanish or English well enough to

complete the survey. This means we cannot observe chilling effects that may have occurred within this group.

FIGURE 4

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of to Green Card Concerns, by Race and Ethnicity, December 2018**



**Source**: Well-Being and Basic Needs Survey, December 2018.
**Notes**: Adults are ages 18 to 64. The non-Hispanic nonwhite category includes non-Hispanic respondents who either do not identify as white or identify as more than one race. Respondents reported that either they or someone in their family did not apply for *or* stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.
*** Estimate differs significantly from Hispanic adults at the 0.01 level, using two-tailed tests.

*Though the proposed rule would only directly apply to adults, many households with children experienced chilling effects. Adults in immigrant families living with children under age 19 were more likely to report chilling effects than adults without children in the household.*

As shown in figure 5, about one in six (17.4 percent) adults in immigrant families living with children under age 19 reported chilling effects within his or her family, a share about twice as high as that of adults without children in the household (8.9 percent).[14]

FIGURE 5

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, by Presence of Children in the Household, December 2018**



URBAN **INSTITUTE**

**Source**: Well-Being and Basic Needs Survey, December 2018.
**Notes**: Adults are ages 18 to 64. Respondents reported that either they or someone in their family did not apply for *or* stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.
*** Estimate differs significantly from adults with any children under age 19 in the household at the 0.01 level, using two-tailed tests.

*Most adults in immigrant families reported awareness of the public charge rule (62.9 percent). Adults who had heard "a lot" about the proposed rule were the most likely to report chilling effects in their families (31.1 percent).*

Most adults in immigrant families reported awareness of the public charge rule, with 62.9 percent having heard at least "a little" about the rule (data not shown). Adults reporting greater awareness of the proposed rule were about five times more likely to report chilling effects on family members' use of public benefits than adults reporting no awareness. Among the adults in immigrant families who had heard a lot about the proposed rule, nearly one-third (31.1 percent) reported chilling, compared with only 6.2 percent among those who had heard nothing at all about the proposed policy. This suggests that more publicity about the rule when it becomes final could further increase chilling effects and avoidance of public benefits by immigrant families, including those not directly affected by the rule.

FIGURE 6

**Share of Adults in Immigrant Families That Avoided Noncash Public Benefits in the Past Year Because of Green Card Concerns, by Awareness of the 2018 Proposed Public Charge Rule, December 2018**



URBAN **INSTITUTE**

**Source**: Well-Being and Basic Needs Survey, December 2018.

**Notes**: Adults are ages 18 to 64. Respondents reported that either they or someone in their family did not apply for *or* stopped participating in noncash public benefits because they worried it would disqualify them or a family member from obtaining a green card.

*** Estimate differs significantly from adults who heard "a lot" about the proposed rule at the 0.01 level, using two-tailed tests.

# Discussion

This report provides the first national data on the scope of chilling effects related to the public charge policy debate in 2018, as the proposed rule was being developed, published, and commented on. The data were collected before the rule was finalized, and it is reasonable to expect that chilling effects will likely expand further if the rule is implemented. It is notable that even these early results show strong evidence of chilling effects, aligning with the on-the-ground perspectives reported by organizations working with immigrant families across the country (Greenberg, Feierstine, and Voltolini 2019) and new state-level data documenting increased reluctance to engage safety net resources (O'Rourke 2019). We find that one in seven nonelderly adults in immigrant families reported "chilling effects," in which the respondent or a family member did not participate in one or more noncash government benefit programs in 2018 for fear of risking future green card status. These decisions were more common among families most in need of safety net support, with one in five adults with family incomes below 200 percent of the federal poverty level reporting chilling effects. Though most research projections of potential chilling have assumed several scenarios, with drops in program participation of 15, 25, or 35 percent, those estimates project chilling rates after implementation of a final rule (Artiga, Damico, and

Garfield 2018; Artiga, Garfield, and Damico 2018; Batalova, Fix, and Greenberg 2018; Fiscal Policy Institute 2018; Kenney, Haley, and Wang 2018; Laird et al. 2019; Zallman and Finnegan 2018).[15] The evidence we collected showing high chilling rates even before release of the final rule suggests that rates could be even larger following implementation.[16]

The confusion and fear around when and how the proposed public charge rule could be finalized and who it would affect appear to be leading to spillover, extending beyond people directly affected by the rule, who have not yet applied for green cards and will receive the revised public charge test when they do. Immigrant households often include people with a variety of immigration, residency, and citizenship statuses, and the survey results show chilling effects in families including US-born citizens, naturalized US citizens, green card holders, and people who lack permanent residence.[17] Though chilling effects were highest in families where one or more noncitizen family members were not permanent residents (20.4 percent), rates were also high in less vulnerable families: 14.7 percent in families where all noncitizen members had green cards and 9.3 percent where all foreign-born members were naturalized citizens. Many people live in households with complex combinations of status and belong to family networks extending across households. These family interconnections are critical for understanding the impacts of the revised public charge rule and other restrictive immigration policy measures on the well-being of families across the US.

In December 2018, most adults in immigrant families reported awareness of the public charge rule (62.9 percent). And the survey results show that people with greater awareness were more likely to report chilling effects, reflecting the fear and confusion around the rule that advocates and service providers have observed. Reports from the field suggest widespread confusion about actual details of the rule (Greenberg, Feierstine, and Voltolini 2019). Under the previous public charge regulations, service providers could convey a clear message, because  all noncash benefits were excluded from consideration in public charge determinations. The proposed regulation poses new challenges of understanding and communication, both for the public and legal and other service providers.

Providing families accurate information and guidance as the debate on the proposed public charge rule continues could help mitigate further chilling effects. Investing in educating service providers who may interact with immigrant families could also combat misconceptions and ensure families receive the information they need to make informed choices on their and their children's behalves. This applies to government social services staff and practitioners in community-based organizations, as well as to staff at schools and early childhood education providers, faith leaders, employers, and other sites where families who are afraid of interacting with government authorities may be reached. Initiatives to support advocacy efforts and educate providers face the challenge of accessing vulnerable and hard-to-reach families on a national scale. Education through innovative channels, such as social media, faith-based institutions, and schools, may help reach scale.

Though these survey results provide new insight into the potential scope of chilling effects under the proposed public charge rule, a forthcoming brief drawing on interviews with adults in families that experienced chilling will provide additional qualitative information on the mechanisms and context in which these decisions were made. In addition, such self-reported evidence of chilling should be verified

in administrative data sources, if possible. Local and state government agencies could shed light on changing program participation numbers by examining their own data. Community-based organizations encountering immigrant families could also monitor family experiences. This real-time evidence on the impacts of anticipated and implemented policy changes on the ground is critical to inform policymakers and practitioners developing effective strategies to reduce harm.

Losing access to programs can affect not only adults but children in the household, many of whom are US citizens. Discouraging families from using benefits for which they are eligible will likely increase the risk of material hardship, which can have negative long-term effects on health and well-being, particularly among children.

Our evidence suggests that even without a final rule, chilling effects have already occurred, both in families who would be directly affected by the revised rule and in spillover to immigrant families more broadly. Potential consequences for health and well-being will be important to monitor. Educating service providers and immigrant families is one key strategy to combat misinformation and mitigate harm.

# Notes

[1] Hamutal Bernstein and Archana Pyati, "Expanding the 'Public Charge' Rule Jeopardizes the Well-Being of Immigrants and Citizens," *Urban Wire* (blog), Urban Institute, October 3, 2018, https://www.urban.org/urban-wire/expanding-public-charge-rule-jeopardizes-well-being-immigrants-and-citizens.

[2] Emily Baumgaertner, "Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services," *New York Times*, March 6, 2018, https://www.nytimes.com/2018/03/06/us/politics/trump-immigrants-public-nutrition-services.html; Caitlin Dewey, "Immigrants Are Going Hungry So Trump Won't Deport Them," *Washington Post*, March 16, 2017, https://www.washingtonpost.com/news/wonk/wp/2017/03/16/immigrants-are-now-canceling-their-food-stamps-for-fear-that-trump-will-deport-them/?utm_term=.6cc2529d5e00; Helena Bottemiller Evich, "Immigrants, Fearing Trump Crackdown, Drop out of Nutrition Programs," *Politico*, September 3, 2018, https://www.politico.com/story/2018/09/03/immigrants-nutrition-food-trump-crackdown-806292. One exception is recent research by Children's Health Watch (Bovell-Ammon et al. 2018), which collects data in emergency rooms and primary care clinics in Baltimore, Boston, Little Rock, Minneapolis, and Philadelphia. Their data collection showed reported SNAP receipt declined in the first half of 2018 for immigrant families, especially among recent arrivals. They note limitations in sample size, however, and given the time frame of the drop, from 2017 to the first half of 2018, the connection to the public charge debate is unclear. Some state-level data have also suggested drops in participation or increased reluctance to engage in safety net resources (O'Rourke 2019).

[3] In forthcoming work, we will analyze results from complementary qualitative data collection through semistructured interviews with a portion of survey respondents who reported chilling effects.

[4] "Potential Effects of Public Charge Changes on California Children," The Children's Partnership and KidsData.org, accessed May 15, 2019, https://www.childrenspartnership.org/wp-content/uploads/2018/11/Potential-Effects-of-Public-Charge-Changes-on-California-Children-Brief.pdf; "Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard," Manatt, October 11, 2018, https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population.

[5] Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51114 (Oct. 10, 2018).

[6] Yeganeh Torbati and Kristina Cooke, "Denials of US Immigrant Visas Skyrocket after Little-Heralded Rule Change," *Reuters*, April 15, 2019, https://www.reuters.com/article/us-usa-immigration-visas-insight-idUSKCN1RR0UX.

[7] Yeganeh Torbati, "Exclusive: Trump Administration Proposal Would Make It Easier to Deport Immigrants Who Use Public Benefits," *Reuters*, May 3, 2019, https://www.reuters.com/article/us-usa-immigration-benefits-exclusive/exclusive-trump-administration-proposal-would-make-it-easier-to-deport-immigrants-who-use-public-benefits-idUSKCN1S91UR.

[8] Emily Baumgaertner, "Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services," *New York Times*; Caitlin Dewey, "Immigrants Are Going Hungry So Trump Won't Deport Them," *Washington Post*; Helena Bottemiller Evich, "Immigrants, Fearing Trump Crackdown, Drop out of Nutrition Programs," *Politico*; Emily Moon, "Why Is Participation in Food Assistance Programs like WIC Declining?" *Pacific Standard*, May 8, 2019, https://psmag.com/news/why-is-participation-in-food-assistance-programs-like-wic-declining.

[9] For additional information on the survey design and weighting in the WBNS, see Karpman, Zuckerman, and Gonzalez (2018).

[10] We define adults with English proficiency as those who speak English at least "well," as classified in the American Community Survey. Adults with limited English proficiency are those who speak English less than "well." This is a broader measure than is commonly used to define English proficiency; in most analyses, a person must speak English "very well" to be classified as having English proficiency (Wilson 2014). We use the following measures for weighting: gender, age, race and ethnicity, educational attainment, presence of children under age 18 in the household, census region, homeownership status, family income as a percentage of the federal poverty level, access to the internet, and family composition. We benchmark non-Hispanic "other race" respondents by two categories: (1) other race born in Asia and (2) multiple races or other race not born in Asia.

[11] We draw on measures developed by researchers at the University of California, Los Angeles, for an immigrant follow-up survey to the California Health Interview Survey.

The exact wording of the two questions on chilling effects in the WBNS were as follows:

Question A: *Was there a time in the past 12 months when you or someone in your family **decided not to apply** for one or more non-cash government benefits, such as Medicaid or CHIP, SNAP (formerly known as food stamps), or housing subsidies, because you were worried it would disqualify you or a family member or relative from obtaining a green card?* [Response options: *yes/no*]

Question A1: *Which benefits did you or someone in your family decide not to apply for because you were worried it would disqualify you or a family member or relative from obtaining a green card? Check all that apply.* [Response options: *Medicaid or CHIP; SNAP (formerly known as food stamps); Housing subsidies; Other (please specify)*]

Question A2: *Did you decide not to apply for Medicaid or CHIP for **your children** because you were worried it would disqualify you or a family member or relative from obtaining a green card?* [Response options: *yes/no*]

Question B: *Was there a time in the past 12 months when you or someone in your family **stopped participating** in any non-cash government benefits, such as Medicaid or CHIP, SNAP (formerly known as food stamps), or housing subsidies, because you were worried it would disqualify you or a family member or relative from obtaining a green card?* [Response options: *yes/no*]

Question B1: *Which benefits did you or someone in your family stop participating in because you were worried it would disqualify you or a family member or relative from obtaining a green card? Check all that apply.* [Response options: *Medicaid or CHIP; SNAP (formerly known as food stamps); Housing subsidies; Other (please specify)*]

Question B2: *Did **your children** stop participating in Medicaid or CHIP because you were worried it would disqualify you or a family member or relative from obtaining a green card?* [Response options: *yes/no*]

[12] The exact wording for the question on awareness of the proposed public charge rule in the WBNS was as follows:

*A proposed rule would make it harder for immigrants to enter the United States or become permanent residents of the United States if they have low income or use public benefits such as Medicaid, the Supplemental Nutrition Assistance Program (SNAP, formerly known as food stamps), or housing subsidies. How much have you heard about this proposed rule?* [Response options: *a lot, some, only a little, nothing at all*]

This question was asked later in the survey than the questions on chilling effects.

[13] See endnote 10 for a definition of English proficiency.

[14] Though our analysis did not consider the eligibility of individuals or family members for different public programs, we know that in general, adults living in families with children are more likely to have a family member who is eligible for a public program, which increases their exposure to potential chilling effects relative to adults who do not live with children.

[15] "Potential Effects of Public Charge Changes on California Children," The Children's Partnership and KidsData.org; "Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard," Manatt.

[16] Those estimates drew on lessons from the 1996 Personal Responsibility and Work Authorization Act, which eliminated access to federal assistance for most immigrants during their first five years of residence (Fix and Passel 2002).

[17] In fact, amongst survey respondents, one in five respondents lived in a household where one or more noncitizen family members were not permanent residents (22.9 percent), one in three (33.8 percent) lived in households where all noncitizen family members were permanent residents, and around 43 percent lived with all naturalized US citizen, foreign-born relatives.

# References

Artiga, Samantha, Anthony Damico, and Rachel Garfield. 2018. "Potential Effects of Public Charge Changes on Health Coverage for Citizen Children." San Francisco: Henry J. Kaiser Family Foundation.

Artiga, Samantha, Rachel Garfield, and Anthony Damico. 2018. "Estimated Impacts of the Proposed Public Charge Rule on Immigrants and Medicaid." San Francisco: Henry J. Kaiser Family Foundation.

Batalova, Jeanne, Michael Fix, and Mark Greenberg. 2018. *Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use*. Washington, DC: Migration Policy Institute.

Bovell-Ammon, Allison, Stephanie Ettinger de Cuba, Diana Cutts, and Sharon Coleman. 2018. "Trends in Food Insecurity and SNAP Participation among Immigrant Families of US-Born Young Children." Presentation given at American Public Health Association Annual Meeting and Expo, San Diego, November 10–14.

Capps, Randy, Mark Greenberg, Michael Fix, and Jie Zong. 2018. "Gauging the Impact of DHS' Proposed Public-Charge Rule on US Immigration." Washington, DC: Migration Policy Institute.

Cervantes, Wendy, Rebecca Ullrich, and Hannah Matthews. 2018. *Our Children's Fear: Immigration Policy's Effects on Young Children*. Washington, DC: Center on Law and Social Policy.

Fiscal Policy Institute. 2018. "'Only Wealthy Immigrants Need Apply': How a Trump Rule's Chilling Effect Will Harm the US." Latham, NY: Fiscal Policy Institute.

Fix, Michael, and Jeffrey Passel. 2002. "The Scope and Impact of Welfare Reform's Immigrant Provisions." Washington, DC: Urban Institute.

Garrett, J. Joe, Michael Dennis, and Charles A. DiSogra. 2010. "Non-Response Bias: Recent Findings from Address-Based Panel Recruitment." Presented at the Annual Conference of the American Association for Public Opinion Research, Chicago, May 13–16.

Greenberg, David M., Sara Feierstein, and Patricia Voltolini. 2019. "Supporting the Resilience of America's Immigrant Communities: How Community Organizations Are Responding to Federal Policy Changes." Washington, DC: Local Initiatives Support Corporation.

Heeren, Timothy, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom. 2008. "A Comparison of Results from an Alcohol Survey of a Prerecruited Internet Panel and the National Epidemiologic Survey on Alcohol and Related Conditions." *Alcoholism: Clinical and Experimental Research* 32 (2): 222–9.

Kenney, Genevieve M., Jennifer M. Haley, and Robin Wang. 2018. "Proposed Public Charge Rule Could Jeopardize Recent Coverage Gains among Citizen Children." Washington, DC: Urban Institute.

Karpman, Michael, Stephen Zuckerman, and Dulce Gonzalez. 2018. "The Well-Being and Basic Needs Survey: A New Data Source for Monitoring the Health and Well-Being of Individuals and Families." Washington, DC: Urban Institute.

Laird, Jennifer, Isaac Santelli, Jane Waldfogel, and Christopher Wimer. 2019. "Forgoing Food Assistance out of Fear: Simulating the Child Poverty Impact of Making SNAP a Legal Liability for Immigrants." *Socius: Sociological Research for a Dynamic World* 5: 1–8.

O'Rourke, Lena. 2019. "Trump's Public Charge Proposal Is Hurting Immigrant Families Now, Even Though DHS' Proposed Regulation Is Not Final." Washington, DC: Protecting Immigrant Families Campaign.

Roche, Kathleen M., Elizabeth Vaquera, Rebecca M. B. White, and Maria Ivonne Rivera. 2018. "Impacts of Immigration Actions and News and the Psychological Distress of US Latino Parents Raising Adolescents." *Journal of Adolescent Health* 62 (5): 525–31.

Van Hook, Jennifer, and James D. Bachmeier. 2013. "How Well Does the American Community Survey Count Naturalized Citizens?" *Demographic Research* 29 (1): 1–32.

Wilson, Jill H. 2014. *Investing in English Skills: The Limited-English Proficient Workforce in US Metropolitan Areas*. Washington, DC: Brookings Institution.

Zallman, Leah, and Karen Finnegan. 2018. "Changing Public Charge Immigration Rules: The Potential Impact on Children Who Need Care." Oakland, CA: California Health Care Foundation.

# About the Authors

**Hamutal Bernstein** is a senior research associate in the Income and Benefits Policy Center at the Urban Institute, where her research focuses on immigration and integration, workforce development and education, and program evaluation. She has wide expertise in mixed-methods research, including original survey development, secondary data analysis, and qualitative data collection and analysis. She is a principal investigator on the Annual Survey of Refugees and Survey Redesign for the US Department of Health and Human Services. Her other areas of research focus on immigrant upskilling, immigrant inclusion at the local level, and other human services topics. Before joining Urban, Bernstein was a program officer at the German Marshall Fund of the United States and a research associate at the Institute for the Study of International Migration at Georgetown University. Bernstein received her BA in international relations from Brown University and her PhD in government from Georgetown University

**Dulce Gonzalez** is a research analyst in the Health Policy Center at the Urban Institute. Gonzalez has worked at Los Angeles-based organization Maternal and Child Health Access, where she evaluated health and well-being outcomes for its perinatal home visiting program. She currently supports quantitative analyses of the Urban Institute's Well-Being and Basic Needs Survey. Before joining Urban, she was a graduate intern at the Georgetown University Center for Children and Families. Gonzalez received her MPP from Georgetown University.

**Michael Karpman** is a senior research associate in the Health Policy Center. His work focuses primarily on the implications of the Affordable Care Act, including quantitative analysis related to health insurance coverage, access to and affordability of health care, use of health care services, and health status. His work includes efforts to help coordinate and analyze data from the Urban Institute's Health Reform Monitoring Survey and Well-Being and Basic Needs Survey. Before joining Urban in 2013, Karpman was a senior associate at the National League of Cities Institute for Youth, Education, and Families. He received his MPP from Georgetown University.

**Stephen Zuckerman** is a senior fellow and vice president of the Health Policy Center. He has studied health economics and health policy for 30 years and is a national expert on Medicare and Medicaid physician payment, including how payments affect enrollee access to care and the volume of services they receive. He is currently examining how payment and delivery system reforms can affect the availability of primary care services and studying the implementation and impact of the Affordable Care Act. Before joining Urban, Zuckerman worked at the American Medical Association's Center for Health Policy Research. He received his PhD in economics from Columbia University.

# Acknowledgments

This brief was funded by the Robert Wood Johnson Foundation and Heising-Simons Foundation through their support for Urban's From Safety Net to Solid Ground initiative. We are grateful to them and to all our funders, who make it possible for Urban to advance its mission.

The views expressed are those of the authors and should not be attributed to the Urban Institute, its trustees, or its funders. Funders do not determine research findings or the insights and recommendations of Urban experts. Further information on the Urban Institute's funding principles is available at urban.org/fundingprinciples.

We are grateful for advice from Ignatius Bau, Julia Gelatt, Katrina Goering, David Kallick, Francisco Pedraza, Katherine Roche, and Holly Straut-Eppsteiner. We also thank Ninez Ponce and Steven P. Wallace from the California Health Interview Survey. It has been immensely valuable to be included in conversations to convene researchers organized by Renato Rocha and David Kallick, through the Protecting Immigrant Families campaign cochaired by the National Immigration Law Center and the Center for Law and Social Policy. We also wish to thank our colleagues Genevieve M. Kenney, Rob Santos, Timothy Triplett, Elaine Waxman, and Doug Wissoker, as well as Randy Capps, Katherine Hempstead, Giridhar Mallya, and Jackie Vimo for their review of an earlier draft. We thank Rachel Kenney for editing.



500 L'Enfant Plaza SW
Washington, DC 20024

www.urban.org

## ABOUT THE URBAN INSTITUTE

The nonprofit Urban Institute is a leading research organization dedicated to developing evidence-based insights that improve people's lives and strengthen communities. For 50 years, Urban has been the trusted source for rigorous analysis of complex social and economic issues; strategic advice to policymakers, philanthropists, and practitioners; and new, promising ideas that expand opportunities for all. Our work inspires effective decisions that advance fairness and enhance the well-being of people and places.

Copyright © May 2019. Urban Institute. Permission is granted for reproduction of this file, with attribution to the Urban Institute.

Exhibit E

FROM SAFETY NET TO SOLID GROUND



# Adults in Immigrant Families Report Avoiding Routine Activities Because of Immigration Concerns

*Hamutal Bernstein, Dulce Gonzalez, Michael Karpman, and Stephen Zuckerman*
*July 2019*

**Changes in federal immigration policies and heightened immigration enforcement over the last several years have caused fear and insecurity for many immigrant families across the country. In addition to stories of rising fear among families reported in the press,[1] several studies have documented evidence of widespread anxiety and instability among immigrant families and children (Artiga and Ubri 2017; Cervantes, Ullrich, and Matthews 2018; The Children's Partnership and California Immigrant Policy Center 2018; Gándara and Ee 2018; Roche et al. 2018; Rogers 2017). A recent Urban Institute study shows that nearly one in seven adults in immigrant families report that they or a family member did not participate in a noncash government benefit program in 2018 for fear of risking future green card status as the administration considered changing rules for "public charge" determinations (Bernstein et al. 2019). Beyond avoiding participation in public programs, many immigrant families may be changing how they go about their daily lives. Reports show immigrant families increasingly avoiding routine activities, such as interacting with teachers or school officials, health care providers, and the police,[2] which poses risks for their well-being and the communities in which they live.**

In this brief, we use the Well-Being and Basic Needs Survey (WBNS), a nationally representative, internet-based survey conducted in December 2018, to examine immigrant families' reported avoidance of activities in various public settings (box 1). The survey included nearly 2,000 nonelderly

adults who are foreign born or live with one or more foreign-born family members (hereafter called "adults in immigrant families"), who make up about one-quarter of all nonelderly adults in the US, according to the American Community Survey. In addition to questions about "chilling effects" on participation in public assistance programs, the 2018 WBNS collected information on respondents' avoidance of routine activities because they did not want to be asked or bothered about citizenship status. This information allows us to document how adults in immigrant families are changing their daily lives within the current immigration policy context.

We find the following:

- About one in six adults in immigrant families (17.0 percent) reported that they or a family member avoided activities in which they could be asked or bothered about citizenship status during 2018. The activities avoided most were those that risk interaction with police or other public authorities, such as driving a car (9.9 percent), renewing or applying for a driver's license (9.0 percent), and talking to the police or reporting crime (8.3 percent). Other avoided activities included going to public places, like parks, libraries, or stores (7.8 percent); visiting a doctor or clinic (6.3 percent); using public transportation (5.8 percent); and talking with teachers or school officials (4.7 percent).

- About one in three adults in immigrant families with a more vulnerable visa and citizenship status—where one or more foreign-born relatives in the household do not have a green card (i.e., are not permanent residents) or US citizenship—reported that they or a family member avoided at least one routine activity. Meanwhile, over one in nine adults in families where all foreign-born family members have green cards or US citizenship reported this behavior.

- Among adults in immigrant families, Hispanic adults were nearly three times more likely (24.2 percent) than non-Hispanic white adults (8.5 percent) to report avoiding some activities.

- Controlling for observable characteristics, adults in immigrant families who avoided at least one activity were also more likely to report serious psychological distress.

BOX 1

**Activities Captured by the Survey**

For this measure, respondents were asked if they or someone in their family avoided any of the following activities in the past 12 months because they or the family member did not want to be asked or bothered about citizenship status:

- visiting a doctor or clinic
- talking with teachers or school officials
- talking to police or reporting crime
- renewing or applying for a driver's license
- driving a car
- using public transportation
- going to public places, such as parks, libraries, or stores

# Background

Evidence shows that immigration policy developments are leading to increased fear and anxiety and avoidance of public space and interaction with authorities to avoid potential immigration enforcement (Artiga and Ubri 2017; Cervantes, Ullrich, and Matthews 2018; The Children's Partnership and California Immigrant Policy Center 2018; Gándara and Ee 2018; Roche et al. 2018; Rogers 2017). Some families, especially those with undocumented members, are making significant changes in their day-to-day behavior, with some parents avoiding leaving the house and keeping their children home to avoid potential interaction with immigration authorities or police (Artiga and Ubri 2017). Findings from a survey of California parents highlight this fear: many respondents, especially parents of young children and Latinos, reported that they "feel unsafe no matter where they are" (The Children's Partnership and California Immigrant Policy Center 2018). In surveys of service providers, most report that families were expressing fear about taking their children to school or going to parks or participating in other recreational activities. Immigrant-serving organizations report rising fear in immigrant communities and have identified a need for enhanced engagement by community-based organizations to reassure families, because they often serve as trusted sources to bridge families to public institutions and programs (Greenberg et al. 2019).

# Data and Methods

## Data and Sample

We draw on data from the December 2018 round of the Well-Being and Basic Needs Survey, a nationally representative survey of adults ages 18 to 64 launched in December 2017. This analysis is based on the WBNS core sample, as well as an oversample of noncitizens. For each round of the WBNS, the core sample is a stratified random sample drawn from Ipsos's KnowledgePanel, a probability-based online panel recruited primarily from an address-based sampling frame, and includes a large oversample of adults in low-income households.[3] In December 2018, the survey also included an oversample of noncitizens to support analyses of current policy issues affecting immigrant families. The panel includes only respondents who can complete surveys administered in either English or Spanish, and adults without internet access are provided laptops and free internet access to facilitate participation.

We constructed a set of weights for analysis of the population of nonelderly adults who are foreign born or living with a foreign-born relative in their household. The weights are based on the probability of selection from the KnowledgePanel and benchmarks from the American Community Survey for nonelderly adults in immigrant families who are proficient in English or primarily speak Spanish.[4] The language criterion is used in the weighting to reflect the nature of the survey sample, because the survey is only administered in English or Spanish.

## Key Measures

### SHARE OF ADULTS AVOIDING SELECT ACTIVITIES

We focus on the share of adults in immigrant families reporting that they or someone in their family avoided routine activities in the past 12 months because they or a family member did not want to be asked or bothered about citizenship status. This survey question was drawn from the National Latino Health and Immigration Survey conducted by Latino Decisions, with some minor modifications.[5] Respondents could self-define family as either their immediate family or other relatives, who may or may not live with them in the same household.

### SERIOUS PSYCHOLOGICAL DISTRESS

We assess differences in reported serious psychological distress between respondents whose families avoided one or more activities asked about in the survey and respondents whose families did not avoid these activities, controlling for the individual and household characteristics of these two groups. Serious psychological distress is measured using the six-item Kessler Psychological Distress Scale (K6 scale), which was designed to assess prevalence of nonspecific psychological distress in population surveys (Kessler et al. 2002).[6]

## Analysis

We compare weighted estimates of the rate of self-reported avoidance of select activities across racial and ethnic groups and across types of households, defined according to the immigration and citizenship status of the family members living in the household. For analyses of psychological distress, we use multiple regression to adjust estimates for observable characteristics using the method of recycled predictions.[7]

We measure annual family incomes as a percentage of the 2018 federal poverty level. We impute missing responses for family income, marital status, and number of children in the household using a multiple-imputation regression approach. We allocate missing citizenship status data for respondents using their responses to the Ipsos panel profile question on citizenship and impute respondent citizenship status if that information is also missing. All estimates are weighted to be representative of the national population of nonelderly adults in immigrant families (as described above) and to account for the complex survey design.

## Limitations

One limitation of the WBNS is its low response rate, which is comparable to other panel surveys that account for nonresponse at each stage of recruitment. However, previous studies assessing recruitment for the KnowledgePanel have found little evidence of nonresponse bias for core demographic and socioeconomic measures (Garrett, Dennis, and DiSogra 2010; Heeren et al. 2008), and WBNS estimates are generally consistent with benchmarks from federal surveys (Karpman, Zuckerman, and Gonzalez 2018). WBNS survey weights reduce, but do not eliminate, the potential error associated with sample coverage and nonresponse, and this is likely larger for the subgroup of adults in immigrant families. Though the weights are designed to produce nationally representative estimates for adults in immigrant families, this weighting approach implies that our analytic sample of 1,950 adults in immigrant families has precision comparable to a simple random sample of approximately 800 adults because of the design effect, increasing the sampling error around our estimates.

In addition, because the WBNS is only administered in English and Spanish, our restricted analytic sample does not describe the experiences of the full spectrum of adults in immigrant families. Our study excludes adults with limited English proficiency whose primary language is not Spanish, so the experiences of adults with limited English proficiency who speak other languages are not captured. We estimate that the excluded adults who do not speak English or Spanish represent between 5 and 15 percent of all nonelderly adults in immigrant households, as defined for this brief; according to the 2017 American Community Survey, 5 percent of this group speaks English less than "well"[8] and speaks a primary language other than Spanish.

Some measurement error is likely for questions related to respondent citizenship status and that of relatives in the household, particularly among adults who are undocumented or have been in the US for a short time (Van Hook and Bachmeier 2013).

Because the question about avoidance of routine activities because of immigration concerns was not included in the previous round of the WBNS, we do not have a baseline from which to measure changes in these behaviors over time, nor can we directly assess the extent to which avoidance of these activities is caused by recent changes in immigration policy and enforcement.

# Findings

*About one in six adults in immigrant families (17.0 percent) reported that they or a family member avoided activities in which they could be asked or bothered about citizenship status during 2018. The activities avoided most were those that risk interaction with police or other public authorities, such as driving a car (9.9 percent), renewing or applying for a driver's license (9.0 percent), and talking to the police or reporting crime (8.3 percent). Other avoided activities included going to public places, like parks, libraries, or stores (7.8 percent); visiting a doctor or clinic (6.3 percent); using public transportation (5.8 percent); and talking with teachers or school officials (4.7 percent).*

Overall, 17.0 percent of adults in immigrant families reported that they or a family member avoided at least one of the activities identified in the survey during 2018 (figure 1). About one in eight (12.9 percent) reported avoiding more than one activity during the year.

FIGURE 1

**Share of Adults in Immigrant Families in Which Someone Avoided the Following Activities in the Past Year Because They Did Not Want to Be Asked or Bothered about Citizenship Status, December 2018**



**Source:** Well-Being and Basic Needs Survey, December 2018.
**Notes:** Adults are ages 18 to 64. Respondents could report avoidance of activities for themselves or someone else in their family.

*About one in three adults in immigrant families with a more vulnerable visa and citizenship status—where one or more foreign-born relatives in the household do not have a green card (i.e., are not permanent residents) or US citizenship—reported that they or a family member avoided at least one activity. Meanwhile, over one in nine adults in families where all foreign-born family members have green cards or US citizenship reported this behavior.*

Avoidance of some activities was especially common among adults in families in which one or more foreign-born relatives are not permanent residents or citizens, at 32.8 percent (figure 2). This group was nearly three times more likely to report avoiding these activities than adults in relatively secure families (where all foreign-born relatives have permanent residency or are naturalized US citizens).[9]

However, this retreat from public spaces also occurs among immigrant families with more secure immigration and citizenship statuses. Even within families where all foreign-born relatives have green cards or are naturalized, more than one in nine adults (11.7 percent) reported that they or their relatives had avoided specified activities in the previous year.

FIGURE 2

**Share of Adults in Immigrant Families in Which Someone Avoided At Least One Select Activity in the Past Year Because They Did Not Want to Be Asked or Bothered about Citizenship Status, by Household Immigration and Citizenship Status, December 2018**



**Source**: Well-Being and Basic Needs Survey, December 2018.
**Notes**: Adults are ages 18 to 64. Activities include visiting a doctor or clinic, talking with teachers or school officials, talking to police or reporting crime, renewing or applying for a driver's license, driving a car, using public transportation, or going to public places, such as parks, libraries, or stores. Respondents could report avoidance for themselves or for someone else in their family. Households are classified by the citizenship and immigration status of foreign-born members, and native-born members (including the respondent) may be included in each group.
*/**/*** Estimate differs significantly from adults in households where all foreign-born family members are permanent residents or naturalized citizens at the 0.10/0.05/0.01 level, using two-tailed tests.

Adults in families with less secure immigration statuses, where one or more foreign-born relatives do not have green cards or naturalized citizenship, reported avoiding certain activities at higher rates. Nearly one in five (19.7 percent) adults in this group reported that they or a family member avoided driving a car, almost three times the rate for adults whose foreign-born family members are all permanent residents or naturalized citizens (6.8 percent; figure 3).[10] Around one in five adults in the less secure group reported avoiding talking to the police (19.2 percent) or renewing or applying for a driver's license (18.2 percent); smaller shares reported avoiding going to public spaces (11.5 percent), using public transportation (10.1 percent), or talking to teachers or school officials (7.9 percent). For five of the seven activities, these rates were two to four times higher than those reported by adults in families with more secure statuses, where all foreign-born relatives are permanent residents or naturalized citizens.

FIGURE 3

**Share of Adults in Immigrant Families in Which Someone Avoided the Following Activities in the Past Year Because They Did Not Want to Be Asked or Bothered about Citizenship Status, by Household Immigration and Citizenship Status, December 2018**



- All foreign-born family members in the household are permanent residents or naturalized citizens
- One or more foreign-born family members are not permanent residents or naturalized citizens

**Source:** Well-Being and Basic Needs Survey, December 2018.

**Notes:** Adults are ages 18 to 64. Public places include parks, libraries, or stores. Respondents could report avoidance of activities for themselves or for someone else in their family. Households are classified by the citizenship and immigration status of foreign-born members, and native-born members (including the respondent) may be included in each group.

*/**/*** Estimate differs significantly from adults in households where all foreign-born family members are permanent residents or naturalized citizens at the 0.10/0.05/0.01 level, using two-tailed tests.

*Among adults in immigrant families, Hispanic adults were nearly three times more likely (24.2 percent) than non-Hispanic white adults (8.5 percent) to report avoiding some activities.*

Compared with other racial and ethnic groups, Hispanic adults were more likely to avoid some activities. About one in four Hispanic adults (24.2 percent) reported that they or a family member avoided the specified activities in the past year (figure 4). Hispanic adults were also more likely than their non-Hispanic, nonwhite counterparts to report avoiding these activities (24.2 percent versus 11.4 percent).

FIGURE 4

**Share of Adults in Immigrant Families in Which Someone Avoided At Least One Select Activity in the Past Year Because They Did Not Want to Be Asked or Bothered about Citizenship Status, by Respondent Race and Ethnicity, December 2018**



URBAN INSTITUTE

**Source:** Well-Being and Basic Needs Survey, December 2018.
**Notes:** Adults are ages 18 to 64. Activities include visiting a doctor or clinic, talking with teachers or school officials, talking to police or reporting crime, renewing or applying for a driver's license, driving a car, using public transportation, or going to public places, such as parks, libraries, or stores. Respondents could report avoidance of activities for themselves or for someone else in their family. Non-Hispanic, nonwhite includes respondents who are black and other or multiple races.
*/**/*** Estimate differs significantly from Hispanic adults at the 0.10/0.05/0.01 level, using two-tailed tests.

Among Hispanic adults in immigrant families, 14.3 percent reported avoiding driving a car, 13.0 percent reported avoiding renewing or applying for a driver's license, and 12.8 percent reported avoiding talking to the police or reporting crime (figure 5). Some also reported avoiding going to public spaces (10.2 percent), visiting a doctor or clinic (8.4 percent), using public transportation (6.0 percent), and talking to teachers or school officials (5.1 percent).

For three of the seven activities surveyed, Hispanic adults were more than twice as likely as non-Hispanic, nonwhite adults to report avoidance. For six of the seven, Hispanic adults were two to five times more likely than non-Hispanic white adults to report that someone in their family avoided such activities.

FIGURE 5

**Share of Adults in Immigrant Families in Which Someone Avoided the Following Activities in the Past Year Because They Did Not Want to Be Asked or Bothered about Citizenship Status, by Respondent Race and Ethnicity, December 2018**



**Source:** Well-Being and Basic Needs Survey, December 2018.
**Notes:** Adults are ages 18 to 64. Public places include parks, libraries, or stores. Respondents could report avoidance of activities for themselves or someone else in their family. Non-Hispanic, nonwhite includes respondents who are black or other or multiple races.
*/**/*** Estimate differs significantly from Hispanic adults at the 0.10/0.05/0.01 level, using two-tailed tests.
† Estimate for avoiding talking with teachers or school officials among non-Hispanic white adults does not differ significantly from zero.

*Controlling for observable characteristics, adults in immigrant families who avoided at least one activity were also more likely to report serious psychological distress.*

Adults in immigrant families that avoided surveyed activities were three times more likely to report experiencing serious psychological distress than adults in immigrant families who did not avoid these activities. Controlling for observable characteristics, one in five (20.0 percent) reported a score of 13 or higher on the K6 scale, indicating serious psychological distress (figure 6). In contrast, 6.3 percent of adults in immigrant families who did not report avoidance of such activities reported serious psychological distress.

FIGURE 6

**Share of Adults in Immigrant Families Reporting Serious Psychological Distress in the Past 30 Days, by Avoidance of Select Activities in the Past Year Because They Did Not Want to Be Asked or Bothered about Citizenship Status, December 2018**



**Source:** Well-Being and Basic Needs Survey, December 2018.

**Notes:** Adults are ages 18 to 64. Estimates are regression adjusted. Serious psychological distress means a respondent reported a score of 13 or higher on the K6 scale of psychological distress. Activities include visiting a doctor or clinic, talking with teachers or school officials, talking to police or reporting crime, renewing or applying for a driver's license, driving a car, using public transportation, or going to public places, such as parks, libraries, or stores. Respondents could report avoidance of activities for themselves or someone else in their family.

*/**/*** Estimate differs significantly from adults in families where someone avoided any activity at the 0.10/0.05/0.01 level, using two-tailed tests.

# Discussion

Our findings show that about one in six adults in immigrant families reported that in 2018, they or a family member avoided routine activities, such as driving a car, talking to police or reporting crime, or going to public places, because of concerns about being asked or bothered about their citizenship status. Respondents saying that their families avoided these activities were also more likely to report serious psychological distress, suggesting that the current immigration policy climate may be affecting people beyond such changes to their daily lives; however, it is not possible to draw a causal link from these data.

We find that nearly one-third of adults in families with less secure immigration statuses reported that they or a family member avoided one or more specified activities in the past year. However, the results for adults in families with relatively "safe" immigration status are even more striking: more than one in nine adults in immigrant families where all foreign-born family members in the household have green cards or are naturalized citizens reported that they or someone in their family avoided these

activities in 2018. This illustrates the ripple effects of immigration policies and the generalized fear within immigrant communities; even green card holders and naturalized citizens experience insecurity. In addition, many immigrant families contain multiple immigration and citizenship statuses, including a combination of US-born citizens, naturalized citizens, green card holders, and foreign-born people who lack permanent residency status. Individuals may perceive a threat to themselves or to their relatives: of immigration enforcement (i.e., deportation); risks to future visa adjustment, continuation of green card status, or naturalization; or harassment or discrimination along ethnic lines.

We find that Hispanic respondents are significantly more likely than non-Hispanic respondents to avoid these activities. This aligns with evidence that Hispanic people, regardless of immigration status, suffer mental and physical health impacts from immigration enforcement policies and experience fear around interaction with public authorities through "racialized legal status" (Asad and Clair 2018; Pedraza, Cruz Nichols, and LeBrón 2017; Perreira and Pedroza 2019).

Many reports show families avoiding seeking medical care or participating in public assistance programs for fear of immigration consequences, especially in the context of proposed changes to the "public charge" rule (Bernstein et al. 2019; New York City Department of Social Services and Mayor's Office of Immigrant Affairs 2019).[11] Health and well-being outcomes may be affected by this reluctance to interact with medical providers, schools, police, and other key institutional settings in communities where adults and children receive services and engage in routine activities. If people are afraid to leave their houses or drive their cars, it may threaten their access to jobs and a steady income, their children's schools and healthy development, necessary medical services, and social connections essential for well-being. This affects not only the members of immigrant families, but other community members who benefit from all residents having basic needs met, being able to work, and reporting crimes to support public safety.

Some states and localities have taken proactive steps to reassure immigrant families who feel vulnerable. Cities and counties have come together in coalitions like Cities for Action or Welcoming America that include an array of measures, including legal assistance programs, know-your-rights educational campaigns, citizenship promotion and education, and engagement and outreach efforts to strengthen relationships with police departments and local government agencies (New York City Mayor's Office of Immigrant Affairs 2019). At the local level, some school districts are advancing efforts to support students in immigrant families in school and early childhood care settings by creating safety plans, family education materials, and community dialogues.[12] States and attorneys general have enacted legislation or issued guidance or executive orders on protecting schools, hospitals and clinics, workplaces, and courts as spaces safe from immigration enforcement by specifying guidance for people working in those spaces on asking about immigration status and providing information to or otherwise cooperating with federal immigration enforcement authorities (National Immigration Law Center 2018). In addition, immigrant-serving providers, including medical professionals, educators, and business leaders, are taking steps to support immigrant communities by educating members, building public awareness, and adopting safe-space policies. Such efforts may help mitigate fear and patterns of withdrawal from public spaces caused by immigration policy developments.

Federal immigration policies appear to be having widespread ripple effects, with fear and retreat from routine activities occurring in immigrant families regardless of specific immigration and citizenship status. Our evidence suggests that many adults in immigrant families may be changing the way they live their daily lives in their communities. In future work, it would be valuable to assess whether immigrant families are less likely to avoid these everyday activities in places that have invested in efforts to create welcoming and safe communities and to assess which strategies prove most effective. Potential consequences and impacts for health and well-being, for immigrant families and the broader communities where they reside, will be important to monitor.

# Notes

[1] Sara Knuth, "They Stay Home for Days, Give Up Driving, and Won't Sign Their Name to Documents. For Immigrants and Refugees in Greeley, Life Can Be Defined by Fear," *Greeley (CO) Tribune*, February 17, 2019, https://www.greeleytribune.com/news/they-stay-home-for-days-give-up-driving-and-wont-sign-their-name-to-documents-for-immigrants-and-refugees-in-greeley-life-can-be-defined-by-fear/.

[2] Ike Swetlitz, "Immigrants, Fearing Trump's Deportation Policies, Avoid Doctor Visits," *Stat News*, February 24, 2017, https://www.statnews.com/2017/02/24/immigrants-doctors-medical-care/; Nicole Acevedo, "Immigration Policies, Deportation Threats Keep Kids out of School, Report States," *NBC News*, November 20, 2018, https://www.nbcnews.com/news/latino/immigration-policies-deportation-threats-keep-kids-out-school-report-states-n938566; Chantal Da Silva, "Immigration Group Sees Nearly 80 Percent Spike in Reports of 'Abusive Partners' Threatening to Call ICE to Stop Victims from Pressing Charges," *Newsweek*, April 16, 2019, https://www.newsweek.com/immigration-group-sees-nearly-80-spike-reports-abusive-partners-threatening-1398082.

[3] For additional information on the WBNS's design and weighting, see Karpman, Zuckerman, and Gonzalez (2018).

[4] We define adults with English proficiency as those who speak English at least "well," as classified in the American Community Survey. Adults with limited English proficiency are those who speak English less than "well." This is a broader measure than is commonly used to define English proficiency; in most analyses, a person must speak English "very well" to be classified as having English proficiency (Wilson 2014). We use the following measures for weighting: gender, age, race and ethnicity, educational attainment, presence of children under age 18 in the household, census region, homeownership status, family income as a percentage of the federal poverty level, access to the internet, and family composition. We benchmark non-Hispanic "other race" respondents by two categories: (1) other race born in Asia and (2) multiple or other races not born in Asia.

[5] "RWJF Center for Health Policy at UNM Releases Major National Survey of Latino Health and Immigration," Robert Wood Johnson Foundation Center for Health Policy at the University of New Mexico, accessed July 11, 2019, http://healthpolicy.unm.edu/node/570671. The exact phrasing of the survey question was: "We hear a lot these days about people getting questions about their immigration status just because of how they look or how they talk. For some people, this has changed how they go about their daily life. In the past 12 months, have you or anyone in your family ever avoided doing any of the following because you did not want to be bothered or asked about your citizenship status? Visiting a doctor or clinic; Talking with school teachers or officials; Talking to police or reporting crime; Renewing or applying for a driver's license; Driving a car; Using public transportation; Going to public places, such as parks, libraries, or stores."

[6] Though not diagnostic of any one disorder, psychological distress is often characterized by symptoms typical of depression and anxiety (Drapeau et al. 2012). The K6 scale includes a series of questions that asks respondents how often they felt the following in the past 30 days: nervous, hopeless, restless or fidgety, so sad that nothing could cheer them up, that everything was an effort, worthless. The scores for each response item range from 0 (low) to 4 (high), with a cumulative score ranging from 0 to 24. Scores of 13 to 24 indicate serious psychological distress. Some research suggests that achieving measurement equivalence across linguistically diverse groups is challenging when using the K6 scale (Kim et al. 2016).

[7] Characteristics include age, gender, race and ethnicity, urban or rural residence, census region, educational attainment, family income, family composition, family size, presence of children in the household, presence of noncitizens in the household, respondent citizenship status, chronic conditions, primary language, and self-reported health status.

[8] See endnote 4.

[9] Among survey respondents, about 76 percent lived in households where all foreign-born family members in the household are permanent residents or naturalized citizens, and about 23 percent lived in households where one or more foreign-born family members are not permanent residents or naturalized citizens.

[10] This group may include some undocumented immigrants. In most states, undocumented immigrants are not eligible for driver's licenses. Several states are considering changing this policy, as New York did recently. See Alexandra Villarreal, "States Consider Driver's Licenses for Undocumented Immigrants Amid Ramped Up Immigration Enforcement," *NBC*, April 23, 2019, https://www.nbcwashington.com/news/politics/States-Drivers-Licenses-Undocumented-Immigrants-Immigration-Enforcement-508824221.html; Vivian Wang, "Driver's Licenses for the Undocumented Are Approved in Win for Progressives," *New York Times*, June 27, 2019, https://www.nytimes.com/2019/06/17/nyregion/undocumented-immigrants-drivers-licenses-ny.html.

[11] Emily Baumgaertner, "Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services," *New York Times*, March 6, 2018, https://www.nytimes.com/2018/03/06/us/politics/trump-immigrants-public-nutrition-services.html; Caitlin Dewey, "Immigrants Are Going Hungry So Trump Won't Deport Them," *Washington Post*, March 16, 2017, https://www.washingtonpost.com/news/wonk/wp/2017/03/16/immigrants-are-now-canceling-their-food-stamps-for-fear-that-trump-will-deport-them/?utm_term=.1f0c672c0586; Helena Bottemiller Evich, "Immigrants, Fearing Trump Crackdown, Drop out of Nutrition Programs," *Politico*, September 3, 2018, https://www.politico.com/story/2018/09/03/immigrants-nutrition-food-trump-crackdown-806292.

[12] See reference materials supporting schools and educators on the Teaching Tolerance website: https://www.tolerance.org/moment/supporting-students-immigrant-families.

# References

Artiga, Samantha, and Petry Ubri. 2017. "Living in an Immigrant Family in America: How Fear and Toxic Stress Are Affecting Daily Life, Well-Being, and Health." Menlo Park, CA: Henry J. Kaiser Family Foundation.

Asad, Asad L., and Matthew Clair. 2018. "Racialized Legal Status As a Social Determinant of Health." *Social Science & Medicine* 199 (February 2018): 19–28.

Bernstein, Hamutal, Dulce Gonzalez, Michael Karpman, and Stephen Zuckerman. 2019. "One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018." Washington, DC: Urban Institute.

Cervantes, Wendy, Rebecca Ullrich, and Hannah Matthews. 2018. *Our Children's Fear: Immigration Policy's Effects on Young Children*. Washington, DC: Center for Law and Social Policy.

The Children's Partnership and California Immigrant Policy Center. 2018. *Healthy Mind, Healthy Future: Promoting the Mental Health and Wellbeing of Children in Immigrant Families in California*. Washington, DC: The Children's Partnership.

Drapeau, Aline, Alain Marchand, and Dominic Beaulieu-Prévost. 2012. "Epidemiology of Psychological Distress." In *Mental Illnesses: Understanding, Prediction and Control*, edited by Luciano L'Abate, 105–34. London: IntechOpen.

Gándara, Patricia, and Jongyeon Ee. 2018. "US Immigration Enforcement Policy and Its Impact on Teaching and Learning in the Nation's Schools." Los Angeles: University of Southern California Civil Rights Project.

Garrett, Joe, J. Michael Dennis, and Charles A. DiSogra. 2010. "Non-Response Bias: Recent Findings from Address-Based Panel Recruitment." Presented at the Annual Conference of the American Association for Public Opinion Research, Chicago, May 13–16.

Greenberg, David M., Sara Feierstein, and Patricia Voltolini. 2019. "Supporting the Resilience of America's Immigrant Communities: How Community Organizations Are Responding to Federal Policy Changes." Washington, DC: Local Initiatives Support Corporation.

Heeren, Timothy, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom. 2008. "A Comparison of Results from an Alcohol Survey of a Prerecruited Internet Panel and the National Epidemiologic Survey on Alcohol and Related Conditions." *Alcoholism: Clinical and Experimental Research* 32 (2): 222–9.

Karpman, Michael, Stephen Zuckerman, and Dulce Gonzalez. 2018. "The Well-Being and Basic Needs Survey: A New Data Source for Monitoring the Health and Well-Being of Individuals and Families." Washington, DC: Urban Institute.

Kessler, Ronald C., Gavin Andrews, Lisa J. Colpe, Eva Hiripi, Daniel K. Mroczek, Sharon-Lise T. Normand, et al. 2002. "Short Screening Scales to Monitor Population Prevalences and Trends in Nonspecific Psychological Distress." *Psychological Medicine* 32 (6): 959–76.

Kim, Giyeon, Jamie DeCoster, Ami N. Bryant, and Katy L. Ford. 2016. "Measurement Equivalence of the K6 Scale: The Effects of Race/Ethnicity and Language." *Assessment* 23 (6): 758–68.

National Immigration Law Center. 2018. "Flexing Their Executive Muscle: How Governors and Attorneys General Can Use Their Authority to Support and Protect Immigrants." Los Angeles: National Immigration Law Center.

New York City Department of Social Services and Mayor's Office of Immigrant Affairs. 2019. "SNAP Enrollment Trends in New York City." New York: Department of Social Services and Mayor's Office of Immigrant Affairs.

New York City Mayor's Office of Immigrant Affairs. 2019. *State of Our Immigrant City: MOIA Annual Report for Calendar Year 2018*. New York: New York City Mayor's Office of Immigrant Affairs.

Pedraza, Francisco I., Vanessa Cruz Nichols, and Alan M. W. LeBrón. 2017. "Cautious Citizenship: The Deterring Effect of Immigration Issue Salience on Health Care Use and Bureaucratic Interactions among Latino US Citizens." *Journal of Health Politics, Policy, and Law* 42 (5): 925–60.

Perreira, Krista, and Juan M. Pedroza. 2019. "Politics of Exclusion: Implications for the Health of Immigrants and their Children." *Annual Review of Public Health* 40: 147–66.

Roche, Kathleen M., Elizabeth Vaquera, Rebecca M. B. White, and Maria Ivonne Rivera. 2018. "Impacts of Immigration Actions and News and the Psychological Distress of US Latino Parents Raising Adolescents." *Journal of Adolescent Health* 62 (5): 525–31.

Rogers, John. 2017. *Teaching and Learning in the Age of Trump: Increasing Stress and Hostility in America's High Schools*. Los Angeles: University of Califorinia, Los Agneles, Institute for Democracy, Education, and Access.

Van Hook, Jennifer, and James D. Bachmeier. 2013. "How Well Does the American Community Survey Count Naturalized Citizens?" *Demographic Research* 29(1): 1–32.

Wilson, Jill H. 2014. *Investing in English Skills: The Limited-English Proficient Workforce in US Metropolitan Areas*. Washington, DC: The Brookings Institution.

# About the Authors

**Hamutal Bernstein** is a senior research associate in the Income and Benefits Policy Center at the Urban Institute, where her research focuses on immigration and integration, workforce development and education, and program evaluation. She has wide expertise in mixed-methods research, including original survey development, secondary data analysis, and qualitative data collection and analysis. She is a principal investigator on the Annual Survey of Refugees and Survey Redesign for the US Department of Health and Human Services. Her other areas of research focus on immigrant upskilling, immigrant inclusion at the local level, and other human services topics. Before joining Urban, Bernstein was a program officer at the German Marshall Fund of the United States and a research associate at the Institute for the Study of International Migration at Georgetown University. Bernstein received her BA in international relations from Brown University and her PhD in government from Georgetown University.

**Dulce Gonzalez** is a research analyst in the Health Policy Center at the Urban Institute. Gonzalez has worked at Los Angeles-based organization Maternal and Child Health Access, where she evaluated health and well-being outcomes for its perinatal home visiting program. She currently supports quantitative analyses of the Urban Institute's Well-Being and Basic Needs Survey. Before joining Urban, she was a graduate intern at the Georgetown University Center for Children and Families. Gonzalez received her MPP from Georgetown University.

**Michael Karpman** is a senior research associate in the Health Policy Center. His work focuses primarily on the implications of the Affordable Care Act, including quantitative analysis related to health insurance coverage, access to and affordability of health care, use of health care services, and health status. His work includes efforts to help coordinate and analyze data from the Urban Institute's Health Reform Monitoring Survey and Well-Being and Basic Needs Survey. Before joining Urban in 2013, Karpman was a senior associate at the National League of Cities Institute for Youth, Education, and Families. He received his MPP from Georgetown University.

**Stephen Zuckerman** is a senior fellow and vice president of the Health Policy Center. He has studied health economics and health policy for 30 years and is a national expert on Medicare and Medicaid physician payment, including how payments affect enrollee access to care and the volume of services they receive. He is currently examining how payment and delivery system reforms can affect the availability of primary care services and studying the implementation and impact of the Affordable Care Act. Before joining Urban, Zuckerman worked at the American Medical Association's Center for Health Policy Research. He received his PhD in economics from Columbia University.

# Acknowledgments

This brief was funded by the Robert Wood Johnson Foundation as part of their support for the From Safety Net to Solid Ground initiative. We are grateful to them and to all our funders, who make it possible for Urban to advance its mission.

The views expressed are those of the authors and should not be attributed to the Urban Institute, its trustees, or its funders. Funders do not determine research findings or the insights and recommendations of Urban experts. Further information on the Urban Institute's funding principles is available at urban.org/fundingprinciples.

We are grateful for advice from Francisco Pedraza and our colleagues Genevieve M. Kenney, Archana Pyati, and Elaine Waxman, as well as for David Kallick's and Mayra Alvarez's review of an earlier draft. It has also been valuable to be included in conversations to convene researchers organized by Renato Rocha and Jackie Vimo through the Protecting Immigrant Families campaign cochaired by the National Immigration Law Center and the Center for Law and Social Policy. We thank Rachel Kenney for editing.



500 L'Enfant Plaza SW
Washington, DC 20024

www.urban.org

## ABOUT THE URBAN INSTITUTE

The nonprofit Urban Institute is a leading research organization dedicated to developing evidence-based insights that improve people's lives and strengthen communities. For 50 years, Urban has been the trusted source for rigorous analysis of complex social and economic issues; strategic advice to policymakers, philanthropists, and practitioners; and new, promising ideas that expand opportunities for all. Our work inspires effective decisions that advance fairness and enhance the well-being of people and places.

Copyright © July 2019. Urban Institute. Permission is granted for reproduction of this file, with attribution to the Urban Institute.

Exhibit F



UCLA CENTER FOR
HEALTH POLICY RESEARCH

# Health Policy Fact Sheet

December 2018

# Proposed Changes to Immigration Rules Could Cost California Jobs, Harm Public Health

Ninez A. Ponce, Laurel Lucia and Tia Shimada

Changes to "public charge" rules proposed by the U.S. Department of Homeland Security could lead to losses of up to $1.67 billion in federal benefits for California and even greater economic losses across the state.



Photo credit: iStock.com/GOLFX

### What is the "Public Charge" Test?

When a person applies for lawful permanent residency (a "green card") or for a visa to enter the United States, U.S. immigration officials conduct what is called a "public charge" test to determine if that person may become primarily dependent on the government to meet their basic needs.

### What Changes are Proposed to the Public Charge Test?

Currently, only two public benefits—cash assistance and long-term institutional care—are considered for the public charge test. Under the proposed changes to federal immigration rules, people could be denied status as lawful permanent residents if they've received certain health care, housing or nutrition assistance benefits (Figure 1).

---

**Figure 1**

### Public Programs and Public Charge

Currently Considered



Cash assistance, e.g.
• CalWORKS
• SSI
• Local general assistance

Institutionalization for long-term care

Proposed Additions



CalFresh nutrition assistance



• Medi-Cal
• Medicare Part D



Housing assistance, e.g. Section 8 vouchers

## Take Action: Submit a Public Comment

Public comments about the proposed changes to the public charge test can be submitted through December 10, 2018; all comments must be counted and considered by public officials before a final rule is issued. Visit the Protecting Immigrant Families website at *https://protectingimmigrantfamilies.org/* to learn more. Any individual, agency, or organization can submit a comment, and commenting on the proposed rule is not considered lobbying.

In addition, the proposed rule adds harsher standards for personal circumstances that make someone less likely to receive a green card, such as having limited English proficiency, limited educational attainment, low income, being a child or being a senior.

### Negative Effects on Health and Hunger

The proposed changes to immigration rules are complex and could lead to misinformation, confusion and fear about enrollment in public programs. Analysis indicates that this "chilling effect" could impact up to 2.2 million Californians in immigrant families, most of whom would not actually be legally subject to the proposed new public charge test.

If just 15 to 35 percent of those Californians in immigrant families disenroll from public programs, that is a loss of federal benefits for up to 765,000 people across the state.

Disenrollment would increase poverty, hunger and poor health in communities statewide by reducing the resources that California residents have for health care, food and other basic necessities.

Regardless of employment, among California's immigrant adults potentially impacted by the proposed rule:

- Medi-Cal enrollees are 1.8 times more likely to have a usual place to get health care, and are 1.5 times more likely to have had a preventive care visit in the past year, compared with people who are uninsured, but eligible for Medi-Cal.

- More than 400,000 adults are food insecure, which means that they lacked consistent access to enough food at some point in the past year. Disenrollment from CalFresh could increase food insecurity in California.

Nearly 70 percent of California residents projected to disenroll from health care and nutrition assistance benefits would be children.

Across California, disenrollment from CalFresh and Medi-Cal would most significantly impact Latinos (88 percent) and Asians (8 percent).

*"California could lose up to $1.67 billion in federal benefits, yielding an even greater loss of spending throughout the broader state economy — $2.8 billion — as the loss of those federal dollars has an economic ripple effect across multiple industries."*

**Figure 2**

**Lost Jobs**



**If proposed changes to the 'public charge' test go into effect, up to 17,700 jobs across California will no longer exist.**

**Negative Economic Effects Across California**

Analysis shows that if just 35 percent of those touched by the "chilling effect" disenroll from Medi-Cal and CalFresh:

- California could lose up to $1.67 billion in federal benefits, yielding an even greater loss of spending throughout the broader state economy—$2.80 billion—as the loss of those federal dollars has an economic ripple effect across industries.

- As many as 17,700 jobs could be eliminated statewide (Figure 2). An estimated 57 percent of the job losses would come from California's health care sector (8,400 jobs) and food-related industries (1,800 jobs).

# Proposed Changes to Immigration Rules Could Cost California Jobs, Harm Public Health: Data Tables

The following data tables contain state, regional and county estimates from our analyses on the potential effects of proposed changes to the "public charge" test. These findings focus on potential effects to CalFresh nutrition assistance and Medi-Cal health insurance enrollment, related economic impacts, hunger and health.

**Chilling Effects of Proposed Changes to the Public Charge Test**

The proposed changes to immigration rules are complex and could lead to misinformation, confusion and fear about enrollment in public programs. Analysis indicates that this "chilling effect" could impact up to 2.2 million Californians in immigrant families enrolled in CalFresh nutrition assistance and/or Medi-Cal health insurance, most of whom would not actually be legally subject to the proposed new public charge test.

4

## Table 1. Chilling Effect Population

| Location | CalFresh | Medi-Cal | CalFresh and/or Medi-Cal |
|---|---|---|---|
| **California statewide** | **860,000** | **2,116,000** | **2,185,000** |
| **Northern and Sierra region*** | **12,000** | **39,000** | **39,000** |
| **Sacramento region** | **14,000** | **63,000** | **63,000** |
| Sacramento County | 11,000 | 38,000 | 39,000 |
| El Dorado, Placer and Yolo counties (grouped)** | 3,000 | 25,000 | 25,000 |
| **Bay Area region** | **131,000** | **279,000** | **289,000** |
| Alameda County | 25,000 | 46,000 | 46,000 |
| San Francisco County | 35,000 | 58,000 | 58,000 |
| San Mateo County | 17,000 | 43,000 | 43,000 |
| Santa Clara County | 28,000 | 58,000 | 58,000 |
| Solano County | 5,000 | 9,000 | 10,000 |
| Sonoma County | 12,000 | 21,000 | 30,000 |
| Contra Costa, Marin and Napa counties (grouped)** | 9,000 | 45,000 | 45,000 |
| **Central Coast region** | **42,000** | **134,000** | **141,000** |
| Monterey County | 11,000 | 39,000 | 39,000 |
| Ventura County | 22,000 | 37,000 | 44,000 |
| San Benito, San Luis Obispo, Santa Barbara and Santa Cruz counties (grouped)** | 9,000 | 58,000 | 58,000 |
| **San Joaquin region** | **152,000** | **361,000** | **366,000** |
| Fresno County | 55,000 | 120,000 | 121,000 |
| Kern County | 17,000 | 84,000 | 84,000 |
| Kings County | 6,000 | 12,000 | 13,000 |
| Madera County | 13,000 | 21,000 | 21,000 |
| Merced County | 8,000 | 22,000 | 22,000 |
| San Joaquin County | 8,000 | 27,000 | 27,000 |
| Stanislaus County | 10,000 | 30,000 | 33,000 |
| Tulare County | 35,000 | 45,000 | 46,000 |
| **Los Angeles County** | **283,000** | **708,000** | **727,000** |
| **Other Southern California region** | **227,000** | **532,000** | **559,000** |
| Imperial County | 6,000 | 28,000 | 28,000 |
| Orange County | 44,000 | 116,000 | 126,000 |
| Riverside County | 48,000 | 122,000 | 125,000 |
| San Bernardino County | 70,000 | 137,000 | 144,000 |
| San Diego County | 59,000 | 129,000 | 137,000 |

Population estimates are rounded to the closest 1,000 individuals. Estimates may not sum to totals due to rounding.

* Northern and Sierra region includes Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, Glenn, Humboldt, Inyo, Lake, Lassen, Mariposa, Mendocino, Modoc, Mono, Nevada, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Tuolumne and Yuba counties.

** We generated county-level estimates for counties with sufficient samples and statistically stable estimates. Counties for which estimates were not generated were grouped together by region.

## Demographics of the Populations Impacted by the Chilling Effect

Across California, children make up the majority of people who would be impacted by the chilling effect of proposed changes to the public charge test (Table 2). Among racial/ethnic groups, Latinos and Asians would be most significantly impacted (Table 3).

**Table 2. Percent of the Chilling Effect Population Who Are Children**

| Location | CalFresh | Medi-Cal | CalFresh and/or Medi-Cal |
|---|---|---|---|
| California statewide | 75% | 67% | 67% |
| Northern and Sierra region | 83% | 65% | 65% |
| Sacramento region | 80% | 78% | 78% |
| Bay Area region | 70% | 63% | 61% |
| Central Coast region | 50% | 68% | 64% |
| San Joaquin region | 76% | 66% | 66% |
| Los Angeles County | 80% | 69% | 69% |
| Other Southern California region | 76% | 66% | 66% |

**Table 3. Percent of the Chilling Effect Population Who Are Latino or Asian**

| Location | CalFresh | | Medi-Cal | | CalFresh and/or Medi-Cal | |
|---|---|---|---|---|---|---|
| | % Latino | % Asian | % Latino | % Asian | % Latino | % Asian |
| California statewide | 91% | 7% | 88% | 8% | 88% | 8% |
| Northern and Sierra region | 100% | 0% | 91% | 5% | 91% | 5% |
| Sacramento region | – | – | 47% | 38% | 47% | 39% |
| Bay Area region | 82% | 18% | 76% | 20% | 77% | 19% |
| Central Coast region | 99% | – | 92% | – | 93% | – |
| San Joaquin region | 97% | 3% | 93% | 4% | 93% | 5% |
| Los Angeles County | 91% | 6% | 90% | 8% | 90% | 8% |
| Other Southern California region | 95% | 2% | 93% | 4% | 93% | 4% |

– Suppressed due to insufficient sample size to make statistically reliable estimates

**Decreased access to food and health care as a result of proposed changes to the public charge test**

Analysis shows that if 35 percent of Californians impacted by the chilling effect disenroll from Medi-Cal and CalFresh, 765,000 people across the state will lose much-needed federal benefits that support health and fight hunger.

**Table 4. Changes in CalFresh and Medi-Cal Enrollment if 35 Percent of the Chilling Effect Population Disenrolls from CalFresh Nutrition Assistance and Medi-Cal Health Insurance Programs**

| Location | CalFresh | Medi-Cal | CalFresh and/or Medi-Cal |
|---|---|---|---|
| **California statewide** | **-301,000** | **-741,000** | **-765,000** |
| **Northern and Sierra region*** | **-4,000** | **-14,000** | **-14,000** |
| **Sacramento region** | **-5,000** | **-22,000** | **-22,000** |
| Sacramento County | -4,000 | -13,000 | -14,000 |
| El Dorado, Placer and Yolo counties (grouped)** | -1,000 | -9,000 | -9,000 |
| **Bay Area region** | **-46,000** | **-98,000** | **-101,000** |
| Alameda County | -9,000 | -16,000 | -16,000 |
| San Francisco County | -12,000 | -20,000 | -20,000 |
| San Mateo County | -6,000 | -15,000 | -15,000 |
| Santa Clara County | -10,000 | -20,000 | -20,000 |
| Solano County | -2,000 | -3,000 | -3,000 |
| Sonoma County | -4,000 | -8,000 | -10,000 |
| Contra Costa, Marin and Napa counties (grouped)** | -3,000 | -16,000 | -16,000 |
| **Central Coast region** | **-15,000** | **-47,000** | **-49,000** |
| Monterey County | -4,000 | -14,000 | -14,000 |
| Ventura County | -8,000 | -13,000 | -15,000 |
| San Benito, San Luis Obispo, Santa Barbara and Santa Cruz counties (grouped)** | -3,000 | -20,000 | -20,000 |
| **San Joaquin region** | **-53,000** | **-126,000** | **-128,000** |
| Fresno County | -19,000 | -42,000 | -42,000 |
| Kern County | -6,000 | -29,000 | -29,000 |
| Kings County | -2,000 | -4,000 | -4,000 |
| Madera County | -4,000 | -7,000 | -7,000 |
| Merced County | -3,000 | -8,000 | -8,000 |
| San Joaquin County | -3,000 | -9,000 | -9,000 |
| Stanislaus County | -4,000 | -11,000 | -11,000 |
| Tulare County | -12,000 | -16,000 | -16,000 |
| **Los Angeles County** | **-99,000** | **-248,000** | **-254,000** |
| **Other Southern California region** | **-80,000** | **-186,000** | **-196,000** |
| Imperial County | -2,000 | -10,000 | -10,000 |
| Orange County | -15,000 | -41,000 | -44,000 |
| Riverside County | -17,000 | -43,000 | -44,000 |
| San Bernardino County | -25,000 | -48,000 | -50,000 |
| San Diego County | -21,000 | -45,000 | -48,000 |

Disenrollment estimates are rounded to the closest 1,000 individuals. Estimates may not sum to totals due to rounding.

* Northern and Sierra region includes Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, Glenn, Humboldt, Inyo, Lake, Lassen, Mariposa, Mendocino, Modoc, Mono, Nevada, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Tuolumne and Yuba counties.

** We generated county-level estimates for counties with sufficient samples and statistically stable estimates. Counties for which estimates were not generated were grouped together by region.

## Economic losses from proposed changes to public charge test

Disenrollment from CalFresh and Medi-Cal will harm individuals, families and entire communities. California could lose up to $1.67 billion in federal benefits (Table 5), yielding an even greater loss of spending throughout the broader state economy—$2.80 billion—as the loss of those federal dollars has a negative economic ripple effect across industries (Table 6). State and local governments could lose up to $151 million in state and local tax revenue as fewer dollars circulate through the economy and less sales tax, income tax and other tax revenue is generated (Table 7).

**Table 5. Reduction in Federally-funded Benefits to California if 35 Percent of the Chilling Effect Population Disenrolls from CalFresh Nutrition Assistance and Medi-Cal Health Insurance Programs**

| Location | CalFresh | Medi-Cal | CalFresh and/or Medi-Cal |
|---|---|---|---|
| California statewide | $488 million | $1.19 billion | $1.67 billion |
| Northern and Sierra region* | $6 million | $20 million | $26 million |
| Sacramento region | $8 million | $34 million | $42 million |
| Sacramento County | $6 million | $21 million | $27 million |
| El Dorado, Placer and Yolo counties (grouped)** | $2 million | $13 million | $15 million |
| Bay Area region | $74 million | $157 million | $232 million |
| Alameda County | $14 million | $26 million | $40 million |
| San Francisco County | $20 million | $33 million | $52 million |
| San Mateo County | $10 million | $24 million | $34 million |
| Santa Clara County | $16 million | $33 million | $49 million |
| Solano County | $3 million | $5 million | $8 million |
| Sonoma County | $7 million | $12 million | $19 million |
| Contra Costa, Marin and Napa counties (grouped)** | $5 million | $25 million | $30 million |
| Central Coast region | $23 million | $77 million | $100 million |
| Monterey County | $2 million | $11 million | $13 million |
| Ventura County | $4 million | $10 million | $14 million |
| San Benito, San Luis Obispo, Santa Barbara and Santa Cruz counties (grouped)** | $18 million | $56 million | $73 million |
| San Joaquin region | $83 million | $204 million | $287 million |
| Fresno County | $30 million | $68 million | $98 million |
| Kern County | $10 million | $48 million | $57 million |
| Kings County | $3 million | $7 million | $10 million |
| Madera County | $7 million | $12 million | $19 million |
| Merced County | $4 million | $12 million | $16 million |
| San Joaquin County | $5 million | $15 million | $20 million |
| Stanislaus County | $6 million | $17 million | $23 million |
| Tulare County | $19 million | $25 million | $44 million |
| Los Angeles County | $165 million | $406 million | $571 million |
| Other Southern California region | $126 million | $289 million | $415 million |
| Imperial County | $4 million | $15 million | $19 million |
| Orange County | $24 million | $63 million | $88 million |
| Riverside County | $26 million | $66 million | $93 million |
| San Bernardino County | $39 million | $74 million | $113 million |
| San Diego County | $33 million | $70 million | $103 million |

Disenrollment estimates are rounded to the closest 1,000 individuals. Estimates may not sum to totals due to rounding.

* Northern and Sierra region includes Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, Glenn, Humboldt, Inyo, Lake, Lassen, Mariposa, Mendocino, Modoc, Mono, Nevada, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Tuolumne and Yuba counties.

** We generated county-level estimates for counties with sufficient samples and statistically stable estimates. Counties for which estimates were not generated were grouped together by region.

**Table 6. Lost Jobs and Lost Economic Output if 35 Percent of the Chilling Effect Population Disenrolls from CalFresh Nutrition Assistance and Medi-Cal Health Insurance Programs**

| Location | Jobs Eliminated | Lost Economic Output |
|---|---|---|
| **California statewide** | **17,700** | **$2.80 billion** |
| **Northern and Sierra region*** | **300** | **$37 million** |
| **Sacramento region** | **400** | **$73 million** |
| Sacramento County | 300 | $46 million |
| El Dorado, Placer and Yolo counties (grouped)** | 100 | $27 million |
| **Bay Area region** | **2,100** | **$397 million** |
| Alameda County | 400 | $68 million |
| San Francisco County | 500 | $89 million |
| San Mateo County | 300 | $58 million |
| Santa Clara County | 400 | $83 million |
| Solano County | 100 | $14 million |
| Sonoma County | 200 | $32 million |
| Contra Costa, Marin and Napa counties (grouped)** | 200 | $52 million |
| **Central Coast region** | **1,100** | **$159 million** |
| Monterey County | 100 | $20 million |
| Ventura County | 200 | $22 million |
| San Benito, San Luis Obispo, Santa Barbara and Santa Cruz counties (grouped)** | 800 | $117 million |
| **San Joaquin region** | **2,900** | **$432 million** |
| Fresno County | 1,000 | $147 million |
| Kern County | 600 | $89 million |
| Kings County | 100 | $15 million |
| Madera County | 200 | $28 million |
| Merced County | 200 | $25 million |
| San Joaquin County | 200 | $30 million |
| Stanislaus County | 200 | $34 million |
| Tulare County | 400 | $64 million |
| **Los Angeles County** | **6,200** | **$992 million** |
| **Other Southern California region** | **4,700** | **$714 million** |
| Imperial County | 200 | $33 million |
| Orange County | 1,000 | $151 million |
| Riverside County | 1,100 | $160 million |
| San Bernardino County | 1,300 | $193 million |
| San Diego County | 1,200 | $177 million |

Job loss estimates are rounded to the closest 100 jobs. Estimates may not sum to totals due to rounding.

* Northern and Sierra region includes Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, Glenn, Humboldt, Inyo, Lake, Lassen, Mariposa, Mendocino, Modoc, Mono, Nevada, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Tuolumne and Yuba counties.

** We generated county-level estimates for counties with sufficient samples and statistically stable estimates. Counties for which estimates were not generated were grouped together by region.

**Table 7. Lost State and Local Tax Revenue if 35 Percent of the Chilling Effect Population Disenrolls from CalFresh Nutrition Assistance and Medi-Cal Health Insurance Programs**

| Location | Lost State and Local Tax Revenue |
|---|---|
| California statewide | $151 million |
| Northern and Sierra region | $2 million |
| Sacramento region | $4 million |
| Bay Area region | $20 million |
| Central Coast region | $9 million |
| San Joaquin region | $24 million |
| Los Angeles County | $53 million |
| Other Southern California region | $39 million |

### Acknowledgments

The authors wish to thank the following contributors to this work: Riti Shimkhada, AJ Scheitler, Xiao Chen, Dahai Yue, Jared Call and Josue Chavarin.

These analyses were conducted by the UCLA Center for Health Policy Research in partnership with the UC Berkeley Labor Center and California Food Policy Advocates, with support from the California Health Care Foundation and The California Endowment.

### Suggested Citation

Ponce NA, Lucia L, Shimada T. December 2018. *Proposed Changes to Immigration Rules Could Cost California Jobs, Harm Public Health*. Los Angeles, CA: UCLA Center for Health Policy Research, UC Berkeley Labor Center & California Food Policy Advocates.

   

FS2018-6

Tab 3

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHEROKEE DM MELTON
Supervising Deputy Attorney General
JENNIFER C. BONILLA
LISA CISNEROS
JULIA HARUMI MASS
ANITA GARCIA VELASCO
BRENDA AYON VERDUZCO
ANNA RICH, State Bar No. 230195
Deputy Attorneys General
   1515 Clay Street, 20th Floor
   P.O. Box 70550
   Oakland, CA  94612-0550
   Telephone: 510-879-0296
   Fax: 510-622-2270
   E-mail:  Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF PENNSYLVANIA** and **STATE OF OREGON,**<br><br>                              Plaintiffs,<br><br>**v.**<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN McALEENAN,** in his official capacity as Acting Secretary of Homeland Security; **U.S. CITIZENSHIP AND IMMIGRATION SERVICES;** and **KENNETH T. CUCCINELLI,** in his official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br><br>                              Defendants. | CASE NO. 3:19-cv-04975<br><br>**DECLARATION OF LAUREL LUCIA IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

I, Laurel Lucia, declare as follows:

1.   I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

2.   I am the Director of the Healthcare Program at the Center for Labor Research and Education, Institute for Research on Labor and Employment (Center), at the University of California, Berkeley.  I have worked at the Center since 2009.  I was a Policy Analyst from 2009 to 2015, and the Healthcare Program Manager from 2015 to 2017.  I have held the Director position at the Center since 2017.

3.   I received a Master's in Public Policy from UC Berkeley and a Bachelor's in Public Policy from Stanford University.  Prior to obtaining my Master's degree, I was a Healthcare Analyst at Kaiser Permanente for three years.

4.   My research is focused on healthcare policy, with a particular focus on the Affordable Care Act (ACA), Medicaid, uninsured rates, and health care access for immigrants.  I have authored and co-authored numerous articles, policy briefs, blog posts and op-eds on healthcare policy.  I have also conducted research on the economic impact of public policies, including those impacting healthcare benefits.  Attached hereto as Exhibit A is a true and complete copy of my curriculum vitae, which includes a list of all of my recent published work.

5.   That work has included analyses of the regulation at issue in this lawsuit. For example, in December 2018, I published a study entitled "Proposed Changes to Immigration Rules Would Cost California Jobs, Harm Public Health" in collaboration with Dr. Ninez Ponce and Tia Shimada, a true and correct copy is attached hereto as Exhibit B.

### The Public Charge Rule

6.   I am aware that on August 14, 2019, the Department of Homeland Security (DHS) published a Rule in the Federal Register entitled "Inadmissibility on Public Charge Grounds" (Rule).

7.   I understand the Rule will expand the universe of public benefits that are considered for purposes of the "public charge" test (which currently only includes cash assistance and long-term institutional care) to include certain healthcare, housing and nutrition assistance benefits.

1

8.   My opinions in this declaration are based in part on the December 2018 report that I co-authored that is attached to the Declaration of Ninez Ponce, which I have also reviewed.

9.   As discussed in detail in the Ponce Declaration, the other authors of the December 2018 report and I generated disenrollment scenarios of 15 percent, 25 percent and 35 percent from the 1999 Fix study. [1]

10.   The Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA) made available a state option to offer federally funded Medicaid and CHIP to children and/or pregnant women who are lawfully present without a 5-year bar and regardless of date of entry into the U.S.  The "5-year bar" refers to federal restrictions on access by Legal Permanent Residents (LPRs) to federally-funded benefits programs, including Medicaid and CHIP, for five years from the date they enter the United States on or after August 22, 1996, as set forth in the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) of 1996.  Notwithstanding this bar on certain federally-funded benefits, states have discretion to expand Medicaid services to their noncitizen populations.

11.   Many states have attempted to fill some of the gaps in noncitizen coverage resulting from the 1996 laws by electing to cover more eligible noncitizens (as allowed by federal law), spending state funds to cover at least some of the immigrants who are ineligible for federally funded services, or both.

### Economic Impact of the Chilling Effect

12.   In the December 2018 study, my co-authors and I defined the chilling effect population as non-citizens who may be indirectly affected because of fear, confusion or worry over the regulation, including:

     a.   Non-citizens in California who are eligible for and enrolled in CalFresh and/or full-scope Medi-Cal with federal funding

          i.   LPR adults over the 5-year bar;

---

[1] Michael Fix et al., "Trends in Noncitizens' and Citizens' Use of Public Benefits Following Welfare Reform: 1994-1997," Urban Institute (1999).

      ii.  LPR children and pregnant women under the 5-year bar, because California gets federal funding for these groups;

     iii.  Other non-citizens eligible for full benefits; and

     iv.  Refugees and asylees who are exempt from the proposed Rule, but who are also likely to experience a chilling effect.

    b.  This chilling effect population also includes citizen children with at least one non-citizen parent.

13. Approximately 2.2 million Californians in immigrant families fit into the categories described in the preceding paragraph, and are potentially subject to a chilling effect.

14. As in the Ponce Declaration, my co-authors and I projected three disenrollment chilling effect scenarios—15 percent, 25 percent and 35 percent.

15. Using these percentages, the study showed the following annual projected losses in federal benefits to Californians through disenrollment due to the chilling effect:
- At a 15 percent rate, the loss would be $718 million;
- At a 25 percent rate, the loss would be nearly $1.2 billion; and
- At a 35 percent rate, the loss would be nearly $1.7 billion.

16. These lost funds affect the families who are no longer receiving these benefits meant to address life-critical needs as well as California's economy as a whole. For example, when low-income families lose CalFresh benefits, they not only reduce spending on food but also shift their spending on other necessities towards meeting their basic food needs, reducing economic activity and employment in food-related industries and other industries, Hansen, K., "The Food Assistance National Input-Output Multiplier (FANIOM) Model and Stimulus Effects of SNAP", U.S. Department of Agriculture, (October 2010), as well as tax collections for state and local governments.

17. Using the figures above regarding the loss of federal benefit funds to Californians, I project that the state's economy can be expected to lose the following amounts under each of the chilling effect disenrollment scenarios:
- At a 15 percent rate, $1.2 billion in economic output would be lost;
- At a 25 percent rate, $2 billion in economic output would be lost; and
- At a 35 percent rate, $2.8 billion in economic output would be lost.

3

18.  I estimate the following job losses in California under the three scenarios:
- At a 15 percent rate, 7,600 jobs would be lost;
- At a 25 percent rate, 12,700 jobs would be lost; and
- At a 35 percent rate, 17,700 jobs would be lost.

Of these estimated job reductions, 47 percent would be in the healthcare sector and 10 percent from food-related industries. *See*, Exhibit B.

19.  Finally, the study projects the following lost tax revenues to the state of California and its local governments:
- At a 15 percent rate, $65 million in tax revenue would be lost;
- At a 25 percent rate, $108 million in tax revenue would be lost; and
- At a 35 percent rate, $151 million in tax revenue would be lost.

20.  These estimates of economic harm are conservative.  They do not include the impact of reduced productivity among workers who have lost healthcare or who are food insecure as a result of disenrollment from Medicaid or SNAP.  Additionally, they do not account for any economic impact of increased medical debt, medical bankruptcy or risk of other financial insecurity that will likely result from disenrollment from Medicaid and SNAP.

### Impact on Public Hospitals and Community Clinics

21.  Recently, my co-author and collaborator, Dr. Ninez Ponce, Director of the Center for Health Policy Research at the UCLA Fielding School of Public Health, generated an expanded estimate of the population of Medi-Cal beneficiaries in California who are subject to the chilling effect.  In addition to the groups listed above which were part of the December 2018 study, this population includes:

    a.  Low-income undocumented children;

    b.  Adults who are protected from removal under the Deferred Action for Childhood Arrivals program; and

    c.  Non-pregnant adults with LPR status, who are subject to the five-year bar and are eligible for full Medi-Cal benefits using only state funds.

22.  Using these criteria, I calculate the population of Californians potentially subject to the chilling effect of the public charge rule to be 2.34 million individuals, more than 200,000 higher than the 2.12 million Medi-Cal chilling effect estimate used in the December 2018 study.

4

23. Using broader chilling effect population and adding in state funds, I concluded that the Rule could lead to the following losses in federal and state funding for Medi-Cal beneficiaries in California:

- At a 15 percent rate, $957 million loss;
- At a 25 percent rate, nearly $1.6 billion loss; and
- At a 35 percent rate, over $2.2 billion loss.

24. This reduction in funding for Medi-Cal benefits will disproportionately impact California's safety net providers, such as the public health care system and community clinics. These providers are designed to serve low-income populations, making them heavily reliant on Medi-Cal revenues. *See, e.g., California's Health Care Safety Net: A Patchwork of Programs and Providers*, California Health Care Foundation (Mar. 2019) (showing that in 2017 Medi-Cal accounted for 71 percent of revenues among California's city- or county-operated hospitals, compared to 30 percent of revenues at investor-owned hospitals and 23 percent of revenues at non-profit hospitals), a true and correct copy is a true and correct copy is attached hereto as Exhibit C.

25. Immigrants enrolled in Medi-Cal often rely on safety net providers as their usual source of health care. Data from the UCLA Center for Health Policy Research, California Health Interview Survey 2015-2016 show that immigrants enrolled in Medi-Cal use such providers at a higher rate than their low-income citizen counterparts.

26. Therefore, safety net providers are more vulnerable to the reduction in Medi-Cal payments that will be caused by disenrollment due to the "chilling effect" of the Rule. Because most of the individuals who disenroll or who choose not to enroll in Medi-Cal due to the Rule will be uninsured, these providers are likely to incur increased uncompensated care costs as these individuals will still need health care and some will continue to seek it from safety net providers.[2]

**Impact on Private Insurance Markets**

---

[2] Cindy Mann, et al., "Medicaid Payments at Risk for Hospitals Under the Public Charge Proposed Rule," Manatt (Nov. 2018); David Dranove, et al., "The Impact of the ACA's Medicaid Expansion on Hospitals' Uncompensated Care Burden and the Potential Effects of Repeal," Commonwealth Fund (May 3, 2017); "Uncompensated Hospital Care Costs in California Continued to Decline in 2016," Cal. Health Care Found. (Mar. 16, 2018).

27.  In addition to traditional benefits programs, the Rule's chilling effects will likely extend to subsidized private insurance as well. While the Rule does not include receipt of Premium Tax Credits (tax credits to reduce monthly health insurance premiums through the Health Exchanges established under the Affordable Care Act) as a negative factor in the public charge determination, some individuals in immigrant families are likely to believe that utilizing Premium Tax Credits might have an adverse impact on the public charge determination for themselves and/or their family members. *See* Covered California, "2019 Open Enrollment Early Observations and Analysis" (Jan. 30, 2019) (noting larger drop in enrollment for Spanish, Mandarin and Korean-speaking individuals compared to English-speaking individuals, a true and correct copy is attached hereto as Exhibit D.

28.  Reductions in immigrant enrollment in insurance will reduce the numbers of "actuarially desirable" people with private insurance, thereby worsening the risk pool and increasing average premiums overall.[3]

29.  It is my opinion that the Rule will not only harm the health and well-being of immigrant families but will also result in significant negative impacts for the California economy, public hospitals and community clinics, and private insurance markets.

30.  I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge and expert opinion.

Executed on August 26, 2019, in Berkeley, California.

_____
Laurel Lucia

---

[3] Leah Zallman, et al., "Immigrants Pay More in Private Insurance Premiums Than They Receive in Benefits," Health Affairs (Oct. 2018) (finding that immigrants accounted for 12.6 percent of premiums paid to private insurers in 2014, but only 9.1 percent of insurer expenditures).

6

# Exhibit A

# CURRICULUM VITAE
# LAUREL LUCIA

## June 2019

Center for Labor Research and Education
Institute for Research on Labor and Employment
University of California, Berkeley
2521 Channing Way #5555
Berkeley, CA 94702
510-642-1851
laurel.lucia@berkeley.edu

## CURRENT POSITION

**2017 - ___**    Director, Health Care Program, Center for Labor Research and Education, Institute for Research on Labor and Employment, University of California, Berkeley**.**

## EDUCATION

**2005**    University of California, Berkeley. Masters in Public Policy.

**2000**    Stanford University.  B.A. in Public Policy.

## EMPLOYMENT

**2009 - ___**    Center for Labor Research and Education, Institute for Research on Labor and Employment, University of California, Berkeley, *Health Care Program Director (Apr.2017- ___), Health Care Program Manager (Jul. 2015-Mar. 2017), Policy Analyst (Oct. 2009-Jun. 2015).*

**2005 - 2009**    Service Employees International Union, *Senior Researcher/Policy Analyst (2009), Researcher/Policy Analyst (2005-2009).*

**2000 - 2003**    Kaiser Permanente, *Senior Healthcare Analyst (2002-2003), Healthcare Analyst (2000-2002).*

## PUBLICATIONS

Miranda Dietz, Laurel Lucia, Srikanth Kadiyala, Petra W. Rasmussen, Ken Jacobs, Dylan H. Roby, Dave Graham-Squire, Jason Zhang, Greg Watson, Xiao Chen, and Gerald F. Kominski (2019). 3.6 Million Californians Would Benefit if State Takes Bold Action to Expand Coverage and Improve Affordability. UC Berkeley Center for Labor Research and Education and UCLA Center for Health Policy Research.

Marissa Raymond-Flesch, Laurel Lucia, Ken Jacobs, and Claire Brindis (2019). Improving Medicaid Access in Times of Health Policy Change: Solutions from Focus Groups with Frontline Enrollment Workers. *Journal of Health Care for the Poor and Underserved*, Volume 30, Number 1, 280-296.

Laurel Lucia (2019). Towards Universal Health Coverage: Expanding Medi-Cal to Low-Income Undocumented Adults. UC Berkeley Center for Labor Research.

Ninez Ponce, Laurel Lucia, and Tia Shimada (2018). Proposed Changes to Immigration Rules Would Cost California Jobs, Harm Public Health. UCLA Center for Health Policy Research, UC Berkeley Center for Labor Research and Education, and California Food Policy Advocates.

Miranda Dietz, Laurel Lucia, Dylan H. Roby, Ken Jacobs, Petra W. Rasmussen, Xiao Chen, Dave Graham-Squire, Greg Watson, Ian Eve Perry, and Gerald F. Kominski (2018). California's Health Coverage Benefits to Erode Without Further State Action. UC Berkeley Center for Labor Research and Education and UCLA Center for Health Policy Research.

Ken Jacobs and Laurel Lucia (2018). Universal Health Care: Lessons from San Francisco. *Health Affairs*, Volume 37, Number 9, 1375-1382.

Laurel Lucia and Ken Jacobs (2018). Towards Universal Health Coverage: California Policy Options for Improving Individual Market Affordability and Enrollment. UC Berkeley Center for Labor Research and Education.

Rachel Siemons, Laurel Lucia and Ken Jacobs (2017). California's Self-Employed and Small Business Employees Experienced Large Health Coverage Gains under ACA. UC Berkeley Center for Labor Research and Education.

Laurel Lucia, Ken Jacobs and Andrew Bindman (2017). Medi-Cal Expansion under AHCA: Severe Coverage and Funding Loss unless State Backfills Billions in Federal Cuts. UC Berkeley Center for Labor Research and Education.

Laurel Lucia, Miranda Dietz and Ken Jacobs (2017). Which California Industries would be Most Affected by ACA Repeal and Cuts to Medi-Cal? UC Berkeley Center for Labor Research and Education.

Laurel Lucia, Miranda Dietz, Gerald F. Kominski and Ken Jacobs (2017). Fact Sheets: What do California Counties Stand to Lose under ACA Repeal? UCLA Center for Health Policy Research, UC Berkeley Center for Labor Research and Education.

Laurel Lucia and Ken Jacobs (2016). California's Projected Economic Losses under ACA Repeal. UC Berkeley Center for Labor Research and Education.

Miranda Dietz, Laurel Lucia, Gerald F. Kominski and Ken Jacobs (2016). ACA Repeal in California: Who Stands to Lose? UCLA Center for Health Policy Research, UC Berkeley Center for Labor Research and Education.

Laurel Lucia, Xiao Chen, Ken Jacobs, and Nadereh Pourat (2016). "Health Insurance and Demographics of California Immigrants Eligible for Deferred Action." UCLA Luskin School of Public Affairs: *California Policy Options 2016*, Daniel J. B. Mitchell (editor), Chapter 4, 93-108.

Miranda Dietz, Dave Graham-Squire, Tara Becker, Xiao Chen, Laurel Lucia and Ken Jacobs (2016). Preliminary Regional Remaining Uninsured 2017 Data Book, California Simulation of Insurance Markets (CalSIM) version 2.0. UCLA Center for Health Policy Research, UC Berkeley Center for Labor Research and Education.

Laurel Lucia (2016). Balancing the Books: How Affordable is Health Insurance through Covered California When Local Cost of Living is Taken into Account? California Health Care Foundation.

Miranda Dietz, Nadereh Pourat, Max W. Hadler, Laurel Lucia, Dylan H. Roby and Ken Jacobs (2016). Affordability and Eligibility Barriers Remain for California's Uninsured. UCLA Center for Health Policy Research, UC Berkeley Center for Labor Research and Education.

Miranda Dietz, Nadereh Pourat, Max W. Hadler, Laurel Lucia, Dylan H. Roby and Ken Jacobs (2016). Who Had Medi-Cal and Who Remained Uninsured in the First Year of Expansion? UCLA Center for Health Policy Research, UC Berkeley Center for Labor Research and Education.

Marissa Raymond-Flesch, Laurel Lucia, Ken Jacobs, and Claire Brindis (2015). Lessons from the Medi-Cal Expansion Frontlines. UCSF Philip R. Lee Institute for Health Policy Studies, UC Berkeley Center for Labor Research and Education.

Mary June Flores and Laurel Lucia (2015). Maximizing Health Insurance Enrollment through Covered California during Work and Life Transitions. UC Berkeley Center for Labor Research and Education.

Laurel Lucia, Miranda Dietz, Ken Jacobs, Xiao Chen, and Gerald F. Kominski (2015). Which Californians will Lack Health Insurance under the Affordable Care Act? UC Berkeley Center for Labor Research and Education, UCLA Center for Health Policy Research.

Laurel Lucia, Ken Jacobs, Dave Graham-Squire, Greg Watson, Dylan H. Roby, Nadereh Pourat, and Gerald F. Kominski (2014). A Little Investment Goes a Long Way: Modest Cost to Expand Preventive and Routine Health Services to All Low-Income Californians. UC Berkeley Center for Labor Research and Education, UCLA Center for Health Policy Research.

Joanne Spetz, Bianca K. Frogner, Laurel Lucia, and Ken Jacobs (2014). The Impact of the Affordable Care Act on New Jobs. Big Ideas for Job Creation, UC Berkeley Institute for Research on Labor and Employment.

Claire D. Brindis, Max W. Hadler, Ken Jacobs, Laurel Lucia, Nadereh Pourat, Marissa Raymond-Flesch, Rachel Siemons, and Efrain Talamantes (2014). Realizing the Dream for

Californians Eligible for Deferred Action for Childhood Arrivals (DACA): Health Needs and Access to Health Care. UC Berkeley Center for Labor Research and Education, UCLA Center for Health Policy Research, UCSF Philip R. Lee Institute for Health Policy Studies.

Claire D. Brindis, Max W. Hadler, Ken Jacobs, Laurel Lucia, Nadereh Pourat, Marissa Raymond-Flesch, Rachel Siemons, and Efrain Talamantes (2014). Realizing the Dream for Californians Eligible for Deferred Action for Childhood Arrivals (DACA): Demographics and Health Coverage. UC Berkeley Center for Labor Research and Education, UCLA Center for Health Policy Research, UCSF Philip R. Lee Institute for Health Policy Studies.

Dave Graham-Squire, Ken Jacobs, and Laurel Lucia (2013). Predicted Medi-Cal Enrollment Among Californians Working for Large Firms. UC Berkeley Center for Labor Research and Education.

Elizabeth C. Lytle, Dylan H. Roby, Laurel Lucia, Ken Jacobs, Livier Cabezas, and Naderah Pourat (2013). Smooth Transitions into Medi-Cal: Ensuring Continuity of Coverage for Low Income Health Program Enrollees. UC Berkeley Center for Labor Research and Education, UCLA Center for Health Policy Research.

Elizabeth C. Lytle, Dylan H. Roby, Laurel Lucia, Ken Jacobs, Livier Cabezas, and Naderah Pourat (2013). Promoting Enrollment of Low Income Health Program Participants in Covered California. UC Berkeley Center for Labor Research and Education, UCLA Center for Health Policy Research.

Laurel Lucia, Ken Jacobs, Greg Watson, Miranda Dietz, and Dylan H Roby (2013). Medi-Cal Expansion under the Affordable Care Act: Significant Increase in Coverage with Minimal Cost to the State. UC Berkeley Center for Labor Research and Education, UCLA Center for Health Policy Research.

Laurel Lucia, Ken Jacobs, Miranda Dietz, Dave Graham-Squire, Nadereh Pourat, and Dylan H. Roby (2012). After Millions of Californians Gain Health Coverage Under the Affordable Care Act, Who Will Remain Uninsured? UC Berkeley Center for Labor Research and Education, UCLA Center for Health Policy Research.

Ann O'Leary, Elizabeth A. Capell, Ken Jacobs, and Laurel Lucia (2011). The Promise of Affordable Care: Maintaining Coverage During Life Transitions. California Journal of Politics and Policy, 3(4). DOI: 10.2202/1944-4370.1194

Sylvia A. Allegretto, Ken Jacobs, and Laurel Lucia (2011). The Wrong Target: Public Sector Unions and State Budget Deficits. UC Berkeley Center on Wage and Employment Dynamics.

Ken Jacobs, Laurel Lucia, Ann O'Leary, and Ann Marie Marciarille (2011). Maximizing Health Care Enrollment through Seamless Coverage for Families in Transition: Current Trends and Policy Implications. UC Berkeley Center for Labor Research and Education, UC Berkeley Center on Health, Economic & Family Security.

Laurel Lucia (2011). Economic Impact of Low Income Health Program Spending on Select California Counties. UC Berkeley Center for Labor Research and Education.
Jenifer MacGillvary and Laurel Lucia (2011). Economic Impacts of Early Care and Education in California. UC Berkeley Center for Labor Research and Education.

Laurel Lucia (2011). Fact Sheet: Analysis of Domestic Workers Bill of Rights (AB 889). UC Berkeley Center for Labor Research and Education.

Sylvia A. Allegretto and Laurel Lucia (2011). Unemployment Benefits Critical to Jobless Workers and Economic Recovery in California. UC Berkeley Center on Wage and Employment Dynamics.

Ken Jacobs, Laurel Lucia, and Dave Graham-Squire (2010). Eligibility for Medi-Cal and the Health Insurance Exchange in California under the Affordable Care Act. UC Berkeley Center for Labor Research and Education.

Ken Jacobs, Laurel Lucia, and T. William Lester (2010). Regional Economic Impacts of Proposed Health and Human Services Cuts. UC Berkeley Center for Labor Research and Education.

Laurel Lucia, Ken Jacobs, and Dave Graham-Squire (2010). Federal Health Reform: Impact on California Small Businesses, Their Employees and the Self-Employed. UC Berkeley Center for Labor Research and Education.

Ken Jacobs, Laurel Lucia, and T. William Lester (2010). The Economic Consequences of Proposed California Budget Cuts. UC Berkeley Center for Labor Research and Education.

Ken Jacobs, T. William Lester, and Laurel Tan (2010). Budget Solutions and Jobs. UC Berkeley Center for Labor Research and Education.

Ken Jacobs, Laurel Lucia (formerly Tan), Dave Graham-Squire, Jon Gabel, and Roland McDevitt (2010). The President's Health Reform Proposal: Impact on Access and Affordability in California. UC Berkeley Center for Labor Research and Education, NORC, Towers Watson.

Ken Jacobs, William H. Dow, Dave Graham-Squire, and Laurel Lucia (formerly Tan) (2010). Who Benefits from the Proposed Amendment to the Senate Excise Tax on Employer Health Premiums? UC Berkeley Center for Labor Research and Education.

Jon Gabel, Ken Jacobs, Laurel Lucia (formerly Tan), Roland McDevitt, Jeremy Pickreign, and Shova KC (2009). National Health Reform Requirements and California Employers. UC Berkeley Center for Labor Research and Education, NORC, Towers Watson.

Ken Jacobs, Laurel Lucia (formerly Tan), Roland McDevitt, Jon Gabel, and Ryan Lore (2009). How Would Health Care Reforms Change the Spending of California Families Without an Employer Plan? UC Berkeley Center for Labor Research and Education, NORC, Towers Watson.

**OP-EDS**

More than 500,000 Californians Estimated to be Eligible for Medi-Cal but Uninsured in 2015-2016. *Raising the Bar: UC Berkeley Labor Center blog*, March 19, 2019.

California's Policy Options: Making Individual Market Coverage More Affordable. *California Health Care Foundation blog*, March 5, 2018.

550,000 fewer California jobs projected under last-ditch GOP health bill in 2027. *Raising the Bar: UC Berkeley Labor Center blog*, September 26, 2017. With Ian Eve Perry and Ken Jacobs.

The GOP's last-ditch effort to repeal the Affordable Care Act is the worst one yet for California. *Raising the Bar: UC Berkeley Labor Center blog*, September 18, 2017. With Ian Eve Perry and Ken Jacobs.

Which Congressional Districts Face the Largest Medi-Cal Coverage Losses under the Senate Bill? *Raising the Bar: UC Berkeley Labor Center blog*, July 20, 2017. With Ian Eve Perry and Ken Jacobs.

How Big are the Projected Medi-Cal Cuts under the Senate Bill in Context of the State Budget? *Raising the Bar: UC Berkeley Labor Center blog*, July 5, 2017. With Ken Jacobs.

Senate Republicans' Health Bill Especially Hurts the Lowest-Income Californians. *Raising the Bar: UC Berkeley Labor Center blog*, June 22, 2017. With Ken Jacobs.

Californians with Employer-Sponsored Insurance would Lose Protections under ACA Repeal. *Raising the Bar: UC Berkeley Labor Center blog*, February 23, 2017. With Rachel Siemons.

ACA Repeal: Worse than the Drought for San Joaquin Valley Jobs. *Raising the Bar: UC Berkeley Labor Center blog*, January 13, 2017. With Ken Jacobs.

Hundreds of Thousands of Californians could Gain Health Insurance if Supreme Court Upholds Obama's Executive Action on Immigration. *Raising the Bar: UC Berkeley Labor Center blog*, June 9, 2016. With Miranda Dietz and Ken Jacobs.

How Do We Make Special Enrollment Periods Work? *Health Affairs blog*, February 16, 2016.

The ACA Excise Tax is not a Progressive Tax Policy. *Raising the Bar: UC Berkeley Labor Center blog*, December 21, 2015.

The ACA Excise Tax will Promote Cost Shift to Workers not Cost-Effectiveness. *Raising the Bar: UC Berkeley Labor Center blog*, December 2, 2015.

The ACA Excise Tax Targets Where You Live and Other Factors More than Benefit Levels. *Raising the Bar: UC Berkeley Labor Center blog*, November 17, 2015.

As Wages Go Up, State Health Care Spending will Decrease. *Raising the Bar: UC Berkeley Labor Center blog*, July 1, 2015.

Los Angeles Times Calls Out Fight for 15 Guy and Gets it All Wrong. *Capital and Main*, June 10, 2015.

The Market for Local Health Plans is Getting Bigger. *Zocalo Public Square,* November 10, 2014.

Medi-Cal Expansion: Covered More Californians for Less. *Labor's Edge Blog,* January 28, 2013.

AB101 Would Help Stabilize the Child Care System. *San Francisco Chronicle*, September 22, 2011.

Study: Early Care and Education Industry Strengthens Entire California Economy. *Labor's Edge Blog,* August 8, 2011.

Study: Unemployment Benefits Critical to California's Economic Recovery. *Labor's Edge Blog,* April 26, 2011.

Benefits Could Go Beyond Small Businesses. *California HealthLine*, July 1, 2010. With Ken Jacobs.


## SELECTED PRESENTATIONS

Uninsurance in California, *California Senate Budget Subcommittee 3*, March 2019.

Universal Coverage: Is 'Medicare for All' the Answer? *UC Berkeley School of Public Health panel*, March 2019.

California's Health Care Landscape, *USC Center for Health Journalism 2019 California Fellowship Program*, March 2019.

Expanding Medi-Cal to Undocumented Adults, *California Senate Budget Committee hearing*, February 2019.

Individual Market Affordability: Progress under ACA and Remaining Challenges, *California Senate-Assembly Informational/ Oversight hearing*, February 2019.

California's Uninsured: The Past, the Present, and the Future, *USC Center for Health Journalism Collaborative on the Uninsured*, January 2019.

California's Remaining Health Coverage Gaps: Causes and State Solutions, *UC Center Sacramento Lunchtime Speaker Series*, January 2019.

How Proposed Changes to the 'Public Charge' Rule Will Affect Health, Hunger, and the Economy in California, *UCLA Center for Health Policy Research Seminar*, November 2018.

Take-Up Among Individuals Eligible for Covered California and Affordability Challenges, *Covered California AB 1810 Affordability Workgroup Meeting*, October 2018.

Coverage Gaps in California and Health Care Cost Trends, *California State Association of Counties Health and Human Services Policy Committee Meeting*, May 2018.

Eligibility and Affordability Gaps for California's Uninsured, *California Budget and Policy Center Conference*, March 2018.

Uninsurance in California, *Insure the Uninsured Project Conference,* February 2018.

Uninsured in California, *California Assembly Select Committee on Healthcare Delivery Systems and Universal Coverage*, October 2017.

Economic Effects of Repeal and Replace, *UC Berkeley Public Health Course 290.8, Implementing Health Reform*, September 2017.

Health Care Reform: How Questions of Shared Risk and Responsibility Underlie the Current Federal Debates, *National Academy of Social Insurance, California Discussion Forum on Social Insurance and Inequality*, April 2017.

Loss of Coverage and Economic Impact under AHCA, *Joint Hearing: California Assembly Health and Assembly Budget Subcommittee 1*, March 2017.

Coverage and Economic Gains in California under ACA, *USC Center for Health Journalism Fellows*, March 2017

Presentation on ACA Repeal, *Affordable Care Act Town Hall with U.S. Reps. DeSaulnier, McNerney, and Thompson*, February 2017.

Cost Drivers in Health Care, *California Labor Federation Annual Legislative Conference*, March 2016.

Health Benefit Cost Trends and Impact, *Alameda Labor Council and the County of Alameda Public Sector Health Care Task Force*, February 2016.

Panelist: Transitions from Existing Programs, *Packard Foundation convening: Connecting Newly Eligible Immigrant Children to Medi-Cal*, November 2015.

Remaining Uninsured under the ACA & Health Coverage Implications of Minimum Wage Policies, *California Legislative Staff Education Institute*, November 2015.

Addressing Affordability of Health Insurance at the Local Level, *California Health Care Foundation webinar*, October 2015.

Undocumented Californians' Access to Health Care, *Latino Medical Students' Association*, June 2015.

California Low-Income Workers Projected to Lack Insurance, *California Program on Access to Care Legislative Briefing*, May 2015.

Health Coverage for Undocumented Californians, *Speaker's Commission on Labor Education*, May 2015.

Immigration Policy Changes and Their Effect on Medi-Cal and SB 4. Panelist, *California Latino Legislative Caucus Policy Conference,* February 2015.

Undocumented and Uninsured. Panelist, *Commonwealth Club,* November 2014.

Affordable Care Act: Latest updates, how it affects labor, you, and your retirement. *Working Assembly of Governmental Employees annual conference*, January 2014.

The Affordable Care Act in California. *Organizing for America – East Bay*, November 2013.

Testimony on the impact of child care on the California economy. *California Senate Committee on Business, Professions, & Economic Development Hearing*, May 2013.

The Affordable Care Act in California: What to Expect in 2014. *Berkeley Hillside Club*, April 2013.

The Affordable Care Act and Job-Based Coverage. *Jobs with Justice San Francisco forum*, January 2013.

Economic impacts of early care and education in California. *Child Care Planning Council of Alameda County meeting*, March 2012.

Maximizing Enrollment in Medicaid and the Exchange: Examples from California. *Economic Analysis and Research Network annual conference,* December 2012.

# Exhibit B



# Health Policy Fact Sheet

December 2018

# Proposed Changes to Immigration Rules Could Cost California Jobs, Harm Public Health

Ninez A. Ponce, Laurel Lucia and Tia Shimada

Changes to "public charge" rules proposed by the U.S. Department of Homeland Security could lead to losses of up to $1.67 billion in federal benefits for California and even greater economic losses across the state.



Photo credit: iStock.com/GOLFX

### What is the "Public Charge" Test?

When a person applies for lawful permanent residency (a "green card") or for a visa to enter the United States, U.S. immigration officials conduct what is called a "public charge" test to determine if that person may become primarily dependent on the government to meet their basic needs.

### What Changes are Proposed to the Public Charge Test?

Currently, only two public benefits—cash assistance and long-term institutional care—are considered for the public charge test. Under the proposed changes to federal immigration rules, people could be denied status as lawful permanent residents if they've received certain health care, housing or nutrition assistance benefits (Figure 1).

---

**Figure 1**          **Public Programs and Public Charge**

Currently Considered                    Proposed Additions

      

Cash assistance, e.g.
• CalWORKS
• SSI
• Local general
  assistance

Institutionalization
for long-term care

CalFresh
nutrition
assistance

• Medi-Cal
• Medicare Part D

Housing assistance, e.g.
Section 8 vouchers

## Take Action: Submit a Public Comment

Public comments about the proposed changes to the public charge test can be submitted through December 10, 2018; all comments must be counted and considered by public officials before a final rule is issued. Visit the Protecting Immigrant Families website at *https://protectingimmigrantfamilies.org/* to learn more. Any individual, agency, or organization can submit a comment, and commenting on the proposed rule is not considered lobbying.

In addition, the proposed rule adds harsher standards for personal circumstances that make someone less likely to receive a green card, such as having limited English proficiency, limited educational attainment, low income, being a child or being a senior.

### Negative Effects on Health and Hunger

The proposed changes to immigration rules are complex and could lead to misinformation, confusion and fear about enrollment in public programs. Analysis indicates that this "chilling effect" could impact up to 2.2 million Californians in immigrant families, most of whom would not actually be legally subject to the proposed new public charge test.

If just 15 to 35 percent of those Californians in immigrant families disenroll from public programs, that is a loss of federal benefits for up to 765,000 people across the state.

Disenrollment would increase poverty, hunger and poor health in communities statewide by reducing the resources that California residents have for health care, food and other basic necessities.

Regardless of employment, among California's immigrant adults potentially impacted by the proposed rule:

- Medi-Cal enrollees are 1.8 times more likely to have a usual place to get health care, and are 1.5 times more likely to have had a preventive care visit in the past year, compared with people who are uninsured, but eligible for Medi-Cal.

- More than 400,000 adults are food insecure, which means that they lacked consistent access to enough food at some point in the past year. Disenrollment from CalFresh could increase food insecurity in California.

Nearly 70 percent of California residents projected to disenroll from health care and nutrition assistance benefits would be children.

Across California, disenrollment from CalFresh and Medi-Cal would most significantly impact Latinos (88 percent) and Asians (8 percent).

*"California could lose up to $1.67 billion in federal benefits, yielding an even greater loss of spending throughout the broader state economy — $2.8 billion — as the loss of those federal dollars has an economic ripple effect across multiple industries."*

**Figure 2**

**Lost Jobs**



If proposed changes to the 'public charge' test go into effect, up to 17,700 jobs across California will no longer exist.

### Negative Economic Effects Across California

Analysis shows that if just 35 percent of those touched by the "chilling effect" disenroll from Medi-Cal and CalFresh:

- California could lose up to $1.67 billion in federal benefits, yielding an even greater loss of spending throughout the broader state economy—$2.80 billion—as the loss of those federal dollars has an economic ripple effect across industries.

- As many as 17,700 jobs could be eliminated statewide (Figure 2). An estimated 57 percent of the job losses would come from California's health care sector (8,400 jobs) and food-related industries (1,800 jobs).

# Proposed Changes to Immigration Rules Could Cost California Jobs, Harm Public Health: Data Tables

The following data tables contain state, regional and county estimates from our analyses on the potential effects of proposed changes to the "public charge" test. These findings focus on potential effects to CalFresh nutrition assistance and Medi-Cal health insurance enrollment, related economic impacts, hunger and health.

### Chilling Effects of Proposed Changes to the Public Charge Test

The proposed changes to immigration rules are complex and could lead to misinformation, confusion and fear about enrollment in public programs. Analysis indicates that this "chilling effect" could impact up to 2.2 million Californians in immigrant families enrolled in CalFresh nutrition assistance and/or Medi-Cal health insurance, most of whom would not actually be legally subject to the proposed new public charge test.

## Table 1. Chilling Effect Population

| Location | CalFresh | Medi-Cal | CalFresh and/or Medi-Cal |
|---|---|---|---|
| **California statewide** | **860,000** | **2,116,000** | **2,185,000** |
| **Northern and Sierra region\*** | **12,000** | **39,000** | **39,000** |
| **Sacramento region** | **14,000** | **63,000** | **63,000** |
| Sacramento County | 11,000 | 38,000 | 39,000 |
| El Dorado, Placer and Yolo counties (grouped)\*\* | 3,000 | 25,000 | 25,000 |
| **Bay Area region** | **131,000** | **279,000** | **289,000** |
| Alameda County | 25,000 | 46,000 | 46,000 |
| San Francisco County | 35,000 | 58,000 | 58,000 |
| San Mateo County | 17,000 | 43,000 | 43,000 |
| Santa Clara County | 28,000 | 58,000 | 58,000 |
| Solano County | 5,000 | 9,000 | 10,000 |
| Sonoma County | 12,000 | 21,000 | 30,000 |
| Contra Costa, Marin and Napa counties (grouped)\*\* | 9,000 | 45,000 | 45,000 |
| **Central Coast region** | **42,000** | **134,000** | **141,000** |
| Monterey County | 11,000 | 39,000 | 39,000 |
| Ventura County | 22,000 | 37,000 | 44,000 |
| San Benito, San Luis Obispo, Santa Barbara and Santa Cruz counties (grouped)\*\* | 9,000 | 58,000 | 58,000 |
| **San Joaquin region** | **152,000** | **361,000** | **366,000** |
| Fresno County | 55,000 | 120,000 | 121,000 |
| Kern County | 17,000 | 84,000 | 84,000 |
| Kings County | 6,000 | 12,000 | 13,000 |
| Madera County | 13,000 | 21,000 | 21,000 |
| Merced County | 8,000 | 22,000 | 22,000 |
| San Joaquin County | 8,000 | 27,000 | 27,000 |
| Stanislaus County | 10,000 | 30,000 | 33,000 |
| Tulare County | 35,000 | 45,000 | 46,000 |
| **Los Angeles County** | **283,000** | **708,000** | **727,000** |
| **Other Southern California region** | **227,000** | **532,000** | **559,000** |
| Imperial County | 6,000 | 28,000 | 28,000 |
| Orange County | 44,000 | 116,000 | 126,000 |
| Riverside County | 48,000 | 122,000 | 125,000 |
| San Bernardino County | 70,000 | 137,000 | 144,000 |
| San Diego County | 59,000 | 129,000 | 137,000 |

Population estimates are rounded to the closest 1,000 individuals. Estimates may not sum to totals due to rounding.

\* Northern and Sierra region includes Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, Glenn, Humboldt, Inyo, Lake, Lassen, Mariposa, Mendocino, Modoc, Mono, Nevada, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Tuolumne and Yuba counties.

\*\* We generated county-level estimates for counties with sufficient samples and statistically stable estimates. Counties for which estimates were not generated were grouped together by region.

5

## Demographics of the Populations Impacted by the Chilling Effect

Across California, children make up the majority of people who would be impacted by the chilling effect of proposed changes to the public charge test (Table 2). Among racial/ethnic groups, Latinos and Asians would be most significantly impacted (Table 3).

**Table 2. Percent of the Chilling Effect Population Who Are Children**

| Location | CalFresh | Medi-Cal | CalFresh and/or Medi-Cal |
|---|---|---|---|
| California statewide | 75% | 67% | 67% |
| Northern and Sierra region | 83% | 65% | 65% |
| Sacramento region | 80% | 78% | 78% |
| Bay Area region | 70% | 63% | 61% |
| Central Coast region | 50% | 68% | 64% |
| San Joaquin region | 76% | 66% | 66% |
| Los Angeles County | 80% | 69% | 69% |
| Other Southern California region | 76% | 66% | 66% |

**Table 3. Percent of the Chilling Effect Population Who Are Latino or Asian**

| Location | CalFresh | | Medi-Cal | | CalFresh and/or Medi-Cal | |
|---|---|---|---|---|---|---|
| | % Latino | % Asian | % Latino | % Asian | % Latino | % Asian |
| California statewide | 91% | 7% | 88% | 8% | 88% | 8% |
| Northern and Sierra region | 100% | 0% | 91% | 5% | 91% | 5% |
| Sacramento region | – | – | 47% | 38% | 47% | 39% |
| Bay Area region | 82% | 18% | 76% | 20% | 77% | 19% |
| Central Coast region | 99% | – | 92% | – | 93% | – |
| San Joaquin region | 97% | 3% | 93% | 4% | 93% | 5% |
| Los Angeles County | 91% | 6% | 90% | 8% | 90% | 8% |
| Other Southern California region | 95% | 2% | 93% | 4% | 93% | 4% |

– Suppressed due to insufficient sample size to make statistically reliable estimates

**Decreased access to food and health care as a result of proposed changes to the public charge test**

Analysis shows that if 35 percent of Californians impacted by the chilling effect disenroll from Medi-Cal and CalFresh, 765,000 people across the state will lose much-needed federal benefits that support health and fight hunger.

**Table 4. Changes in CalFresh and Medi-Cal Enrollment if 35 Percent of the Chilling Effect Population Disenrolls from CalFresh Nutrition Assistance and Medi-Cal Health Insurance Programs**

| Location | CalFresh | Medi-Cal | CalFresh and/or Medi-Cal |
|---|---|---|---|
| California statewide | -301,000 | -741,000 | -765,000 |
| Northern and Sierra region* | -4,000 | -14,000 | -14,000 |
| Sacramento region | -5,000 | -22,000 | -22,000 |
| Sacramento County | -4,000 | -13,000 | -14,000 |
| El Dorado, Placer and Yolo counties (grouped)** | -1,000 | -9,000 | -9,000 |
| Bay Area region | -46,000 | -98,000 | -101,000 |
| Alameda County | -9,000 | -16,000 | -16,000 |
| San Francisco County | -12,000 | -20,000 | -20,000 |
| San Mateo County | -6,000 | -15,000 | -15,000 |
| Santa Clara County | -10,000 | -20,000 | -20,000 |
| Solano County | -2,000 | -3,000 | -3,000 |
| Sonoma County | -4,000 | -8,000 | -10,000 |
| Contra Costa, Marin and Napa counties (grouped)** | -3,000 | -16,000 | -16,000 |
| Central Coast region | -15,000 | -47,000 | -49,000 |
| Monterey County | -4,000 | -14,000 | -14,000 |
| Ventura County | -8,000 | -13,000 | -15,000 |
| San Benito, San Luis Obispo, Santa Barbara and Santa Cruz counties (grouped)** | -3,000 | -20,000 | -20,000 |
| San Joaquin region | -53,000 | -126,000 | -128,000 |
| Fresno County | -19,000 | -42,000 | -42,000 |
| Kern County | -6,000 | -29,000 | -29,000 |
| Kings County | -2,000 | -4,000 | -4,000 |
| Madera County | -4,000 | -7,000 | -7,000 |
| Merced County | -3,000 | -8,000 | -8,000 |
| San Joaquin County | -3,000 | -9,000 | -9,000 |
| Stanislaus County | -4,000 | -11,000 | -11,000 |
| Tulare County | -12,000 | -16,000 | -16,000 |
| Los Angeles County | -99,000 | -248,000 | -254,000 |
| Other Southern California region | -80,000 | -186,000 | -196,000 |
| Imperial County | -2,000 | -10,000 | -10,000 |
| Orange County | -15,000 | -41,000 | -44,000 |
| Riverside County | -17,000 | -43,000 | -44,000 |
| San Bernardino County | -25,000 | -48,000 | -50,000 |
| San Diego County | -21,000 | -45,000 | -48,000 |

Disenrollment estimates are rounded to the closest 1,000 individuals. Estimates may not sum to totals due to rounding.

* Northern and Sierra region includes Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, Glenn, Humboldt, Inyo, Lake, Lassen, Mariposa, Mendocino, Modoc, Mono, Nevada, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Tuolumne and Yuba counties.

** We generated county-level estimates for counties with sufficient samples and statistically stable estimates. Counties for which estimates were not generated were grouped together by region.

### Economic losses from proposed changes to public charge test

Disenrollment from CalFresh and Medi-Cal will harm individuals, families and entire communities. California could lose up to $1.67 billion in federal benefits (Table 5), yielding an even greater loss of spending throughout the broader state economy—$2.80 billion—as the loss of those federal dollars has a negative economic ripple effect across industries (Table 6). State and local governments could lose up to $151 million in state and local tax revenue as fewer dollars circulate through the economy and less sales tax, income tax and other tax revenue is generated (Table 7).

**Table 5. Reduction in Federally-funded Benefits to California if 35 Percent of the Chilling Effect Population Disenrolls from CalFresh Nutrition Assistance and Medi-Cal Health Insurance Programs**

| Location | CalFresh | Medi-Cal | CalFresh and/or Medi-Cal |
|---|---|---|---|
| California statewide | $488 million | $1.19 billion | $1.67 billion |
| Northern and Sierra region* | $6 million | $20 million | $26 million |
| Sacramento region | $8 million | $34 million | $42 million |
| Sacramento County | $6 million | $21 million | $27 million |
| El Dorado, Placer and Yolo counties (grouped)** | $2 million | $13 million | $15 million |
| Bay Area region | $74 million | $157 million | $232 million |
| Alameda County | $14 million | $26 million | $40 million |
| San Francisco County | $20 million | $33 million | $52 million |
| San Mateo County | $10 million | $24 million | $34 million |
| Santa Clara County | $16 million | $33 million | $49 million |
| Solano County | $3 million | $5 million | $8 million |
| Sonoma County | $7 million | $12 million | $19 million |
| Contra Costa, Marin and Napa counties (grouped)** | $5 million | $25 million | $30 million |
| Central Coast region | $23 million | $77 million | $100 million |
| Monterey County | $2 million | $11 million | $13 million |
| Ventura County | $4 million | $10 million | $14 million |
| San Benito, San Luis Obispo, Santa Barbara and Santa Cruz counties (grouped)** | $18 million | $56 million | $73 million |
| San Joaquin region | $83 million | $204 million | $287 million |
| Fresno County | $30 million | $68 million | $98 million |
| Kern County | $10 million | $48 million | $57 million |
| Kings County | $3 million | $7 million | $10 million |
| Madera County | $7 million | $12 million | $19 million |
| Merced County | $4 million | $12 million | $16 million |
| San Joaquin County | $5 million | $15 million | $20 million |
| Stanislaus County | $6 million | $17 million | $23 million |
| Tulare County | $19 million | $25 million | $44 million |
| Los Angeles County | $165 million | $406 million | $571 million |
| Other Southern California region | $126 million | $289 million | $415 million |
| Imperial County | $4 million | $15 million | $19 million |
| Orange County | $24 million | $63 million | $88 million |
| Riverside County | $26 million | $66 million | $93 million |
| San Bernardino County | $39 million | $74 million | $113 million |
| San Diego County | $33 million | $70 million | $103 million |

Disenrollment estimates are rounded to the closest 1,000 individuals. Estimates may not sum to totals due to rounding.

* Northern and Sierra region includes Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, Glenn, Humboldt, Inyo, Lake, Lassen, Mariposa, Mendocino, Modoc, Mono, Nevada, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Tuolumne and Yuba counties.

** We generated county-level estimates for counties with sufficient samples and statistically stable estimates. Counties for which estimates were not generated were grouped together by region.

**Table 6. Lost Jobs and Lost Economic Output if 35 Percent of the Chilling Effect Population Disenrolls from CalFresh Nutrition Assistance and Medi-Cal Health Insurance Programs**

| Location | Jobs Eliminated | Lost Economic Output |
|---|---|---|
| **California statewide** | **17,700** | **$2.80 billion** |
| **Northern and Sierra region*** | **300** | **$37 million** |
| **Sacramento region** | **400** | **$73 million** |
| Sacramento County | 300 | $46 million |
| El Dorado, Placer and Yolo counties (grouped)** | 100 | $27 million |
| **Bay Area region** | **2,100** | **$397 million** |
| Alameda County | 400 | $68 million |
| San Francisco County | 500 | $89 million |
| San Mateo County | 300 | $58 million |
| Santa Clara County | 400 | $83 million |
| Solano County | 100 | $14 million |
| Sonoma County | 200 | $32 million |
| Contra Costa, Marin and Napa counties (grouped)** | 200 | $52 million |
| **Central Coast region** | **1,100** | **$159 million** |
| Monterey County | 100 | $20 million |
| Ventura County | 200 | $22 million |
| San Benito, San Luis Obispo, Santa Barbara and Santa Cruz counties (grouped)** | 800 | $117 million |
| **San Joaquin region** | **2,900** | **$432 million** |
| Fresno County | 1,000 | $147 million |
| Kern County | 600 | $89 million |
| Kings County | 100 | $15 million |
| Madera County | 200 | $28 million |
| Merced County | 200 | $25 million |
| San Joaquin County | 200 | $30 million |
| Stanislaus County | 200 | $34 million |
| Tulare County | 400 | $64 million |
| **Los Angeles County** | **6,200** | **$992 million** |
| **Other Southern California region** | **4,700** | **$714 million** |
| Imperial County | 200 | $33 million |
| Orange County | 1,000 | $151 million |
| Riverside County | 1,100 | $160 million |
| San Bernardino County | 1,300 | $193 million |
| San Diego County | 1,200 | $177 million |

Job loss estimates are rounded to the closest 100 jobs. Estimates may not sum to totals due to rounding.

* Northern and Sierra region includes Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, Glenn, Humboldt, Inyo, Lake, Lassen, Mariposa, Mendocino, Modoc, Mono, Nevada, Plumas, Shasta, Sierra, Siskiyou, Sutter, Tehama, Trinity, Tuolumne and Yuba counties.

** We generated county-level estimates for counties with sufficient samples and statistically stable estimates. Counties for which estimates were not generated were grouped together by region.

**Table 7. Lost State and Local Tax Revenue if 35 Percent of the Chilling Effect Population Disenrolls from CalFresh Nutrition Assistance and Medi-Cal Health Insurance Programs**

| Location | Lost State and Local Tax Revenue |
|---|---|
| California statewide | $151 million |
| Northern and Sierra region | $2 million |
| Sacramento region | $4 million |
| Bay Area region | $20 million |
| Central Coast region | $9 million |
| San Joaquin region | $24 million |
| Los Angeles County | $53 million |
| Other Southern California region | $39 million |

## Acknowledgments

The authors wish to thank the following contributors to this work: Riti Shimkhada, AJ Scheitler, Xiao Chen, Dahai Yue, Jared Call and Josue Chavarin.

These analyses were conducted by the UCLA Center for Health Policy Research in partnership with the UC Berkeley Labor Center and California Food Policy Advocates, with support from the California Health Care Foundation and The California Endowment.

## Suggested Citation

Ponce NA, Lucia L, Shimada T. December 2018. *Proposed Changes to Immigration Rules Could Cost California Jobs, Harm Public Health*. Los Angeles, CA: UCLA Center for Health Policy Research, UC Berkeley Labor Center & California Food Policy Advocates.

   

FS2018-6

# Exhibit C

# CALIFORNIA
# Health Care Almanac



CHCF



MARCH 2019

## California's Health Care Safety Net:
A Patchwork of Programs and Providers

# Executive Summary

The health care safety net is a patchwork of programs and providers that serves low-income Californians. The implementation of the Patient Protection and Affordable Care Act (ACA) in 2014 has transformed the safety-net landscape, largely through expansion of the Medi-Cal program. Most legal residents of the state earning less than 138% of the federal poverty level are now eligible for health care coverage through Medi-Cal. Many Californians earning more than this threshold have gained subsidized insurance through Covered California, California's health insurance exchange.

This coverage expansion has affected programs and providers as well as patients. For example, far fewer patients rely on county programs for the medically indigent relative to the pre-ACA period, as more people now have access to health insurance. Meanwhile, many providers have experienced increases in demand for their services.

*California's Health Care Safety Net: A Patchwork of Programs and Providers* presents data on the providers and programs that compose California's system for providing health care to people with low incomes.

**KEY FINDINGS INCLUDE:**

- Both the number of Federally Qualified Health Center (FQHC) organizations and the number of patients seen by them increased by 37% between 2013 and 2017. FQHCs saw 4.7 million patients in 2017, with Medi-Cal providing the majority of the funding for these patients.

- Many FQHCs are relatively small: The median clinic had about $14 million in revenue in 2017 and saw about 14,000 patients.

- Nonprofit hospitals remained the cornerstone of the state's hospital network in the study period, providing 62% of all hospital inpatient days and 72% of outpatient visits. Meanwhile, city/county hospitals provided a disproportionate share of services to Medi-Cal patients and those served by county indigent programs.

- Since 2013, the median operating margin improved for most hospital types. However, the median operating margin for city/county and district hospitals remained negative.

---

**California's Health Care Safety Net**

**CONTENTS**

Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Federally Qualified Health Centers . . . . . .   4

Community Clinics . . . . . . . . . . . . . . . . . . . .  11

Hospitals . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

# Defining Safety-Net Programs and Providers

**The Programs**

Safety-net programs, which typically use income to determine eligibility, include the following:

- **State.** Medi-Cal, Restricted-Scope Medi-Cal, and Children's Health Insurance Program (CHIP)

- **County indigent.** Also known as Medically Indigent Adult (MIA) programs

- **Episodic.** Breast and Cervical Cancer Treatment Program; Child Health and Disability Prevention Program; Family Planning, Access, Care and Treatment (PACT); and California Children's Services

- **Low-income, nongovernment insurance.** Kaiser Permanente Child Health Program

**The Providers**

The safety net includes health care providers that by legal mandate or explicit mission provide care for a proportionately greater share of poor and uninsured patients:

- **Hospitals.** City/county, nonprofit, investor, and district hospitals with county or Medi-Cal contracts and/or designated as critical access or disproportionate share (DSH)

- **Clinics.** Federally Qualified Health Centers (FQHCs), FQHC Look-Alikes, community clinics, county clinics, free clinics, and other non-FQHC clinics

- **Private doctors.** Contracted care and charity care

The safety net is comprised of diverse health care programs and providers.

Note: See Glossary on page 24 for more detailed information.

# Federally Qualified Health Centers
## Patients and Organizations, California, 2013 to 2017



■ Patients (in millions)          — Organizations

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Organizations | 129 | 151 | 176 | 176 | 177 |
| Patients | 3.4 | 3.7 | 4.1 | 4.4 | 4.7 |

Since 2013, the number of Federally Qualified Health Centers in California, and the number of patients seen by them, has risen steadily. Both increased by 37% between 2013 and 2017.

Note: Data do not include FQHC Look-Alikes.

Sources: Blue Sky Consulting Group analysis of the Uniform Data System (2015–17), Health Resources and Services Administration (HRSA), bphc.hrsa.gov; and Data Warehouse (2016–17), HRSA, data.hrsa.gov.

# Federally Qualified Health Center Patients
by Payer, California, 2013 to 2017

**NUMBER OF PATIENTS** (IN MILLIONS)



- ■ Other Third Party
- ■ Medicare/ Dual Eligible
- ■ Medi-Cal/CHIP
- ■ Uninsured

Between 2013 and 2017, the number of patients seen at Federally Qualified Health Centers increased from 3.4 million to 4.7 million. At the same time, the patient mix seen at these clinics also changed, with the share of Medi-Cal patients increasing from 47% of patients in 2013 to 66% in 2017.

Notes: Data do not include FQHC Look-Alikes. *CHIP* is the Children's Health Insurance Program. Segments may not total 100% due to rounding.
Source: Blue Sky Consulting Group analysis of the Uniform Data System (2015–17), Health Resources and Services Administration, **bphc.hrsa.gov.**

# Federally Qualified Health Center Patients
## by Service Type, California, 2015 to 2017

**California's Health Care Safety Net**
Federally Qualified Health Centers

With the exception of substance use services, Federally Qualified Health Centers have experienced growth in the number of patients in all service types.



NUMBER OF PATIENTS (IN MILLIONS)

GROWTH 2015 TO 2017

| Service Type | Growth |
|---|---|
| Enabling Services | 12% |
| Substance Use | 0% |
| Vision | 48% |
| Mental Health | 29% |
| Dental | 29% |
| Medical | 14% |

Notes: Data do not include FQHC Look-Alikes. *Growth* is the change in number of primary care patients from 2015 to 2017. *Enabling services* include case management, patient/community education, eligibility assistance, transportation, interpretation, and other services. Segments may not match totals due to rounding.

Source: Blue Sky Consulting Group analysis of the Uniform Data System (2015–17), Health Resources and Services Administration, bphc.hrsa.gov.

# Federally Qualified Health Center Patients
## Selected Populations, California, 2017

One in 10 patients served by Federally Qualified Health Centers was an agricultural worker or dependent, 7% were homeless, and 5% lived in low-income housing.

PERCENTAGE OF TOTAL PATIENT POPULATION

Agricultural Workers or Dependents

**10%**

Homeless

**7%**

Low-Income Housing Residents

**5%**

Students

**3%**

Veterans

**1%**

Notes: Data do not include FQHC Look-Alikes. The categories are not mutually exclusive — that is, a person could be included in multiple categories (e.g., veterans and low-income housing residents).

Source: Blue Sky Consulting Group analysis of the Uniform Data System (2017), Health Resources and Services Administration, bphc.hrsa.gov.

# Federally Qualified Health Center Patients
by Race/Ethnicity and Income, California, 2017

Of those patients whose race/ethnicity and income were known, the majority served by Federally Qualified Health Centers (FQHCs) were poor (73% earned less than 100% of the federal poverty level). Fifty-seven percent of FQHC patients were Hispanic/Latino.



**Race/Ethnicity**

Black/African American •
Other (2%)
Asian 9%
7%
White 25%
Hispanic/Latino 57%

**Federal Poverty Level**

>200% FPL
5%
100% to 200% FPL 22%
<100% FPL 73%

Notes: Data do not include FQHC Look-Alikes. *White, Black/African American, Asian,* and *other* exclude those reported as Hispanic/Latino. Data excludes population for which race/ethnicity (18%) and income (19%) were unknown. The *federal poverty level* (FPL) in 2017 was $12,060 for a single person and $24,600 for a family of four.

Source: Blue Sky Consulting Group analysis of the Uniform Data System (2017), Health Resources and Services Administration, bphc.hrsa.gov.

# Federally Qualified Health Center Revenue
## by Source, California, 2015 to 2017

TOTALS (IN BILLIONS)



■ Other Revenue
■ Federal Grants
■ Net Patient Service

While the number of Federally Qualified Health Center patients (see page 4) and the overall amount of revenue increased from 2015 to 2017, the proportion of revenue from each major source remained largely the same.

Notes: Data do not include FQHC Look-Alikes. *Other revenue* includes nonfederal grants and contracts and nonpatient related revenue. Segments may not total 100% due to rounding.
Source: Blue Sky Consulting Group analysis of the Uniform Data System (2015–17), Health Resources and Services Administration, bphc.hrsa.gov.

# Federally Qualified Health Center Percentile Rankings
## by Total Patients and Total Revenue, California, 2017

Federally Qualified Health Centers at the median had 13,882 patients and $14.1 million in annual revenue.

**TOTAL PATIENTS**



| | 25th Percentile | Median | 75th Percentile |
| --- | --- | --- | --- |
| Total Patients | 6,482 | 13,882 | 27,866 |

**TOTAL REVENUE** (IN MILLIONS)

| $6.9 | $14.1 | $34.9 |
| --- | --- | --- |

Note: Data do not include FQHC Look-Alikes.

Source: Blue Sky Consulting Group analysis of the Uniform Data System (2017), Health Resources and Services Administration, bphc.hrsa.gov.

# Community Clinic Visits and Net Patient Revenue
## by Payer, California, 2013 and 2016



**Encounters**  17.2 million • 17.3 million

| | 2013 | 2016 |
|---|---|---|
| Medi-Cal | 43% | 63% |
| Medicare | 7% | 9% |
| Uninsured and Indigent Programs | 24% | 10% |
| Private Insurance | 6% | 8% |
| Other Public | 19% | 10% |

**Net Patient Revenue**  $2.1 million • $2.8 million

| | 2013 | 2016 |
|---|---|---|
| Medi-Cal | 57% | 73% |
| Medicare | 8% | 9% |
| Uninsured and Indigent Programs | 14% | 3% |
| Private Insurance | 6% | 6% |
| Other Public | 15% | 8% |

Community clinics experienced significant growth in Medi-Cal visits and net patient revenue since the implementation of the Affordable Care Act in 2014. The percentage of Medi-Cal visits increased from 43% in 2013 to 63% in 2016. Both the proportion of visits and revenue from uninsured/indigent program patients declined, as more patients enrolled in Medi-Cal.

Notes: Includes Federally Qualified Health Centers (FQHCs), FQHC Look-Alikes, and other clinic types. Excludes clinics with no patient encounters and dental clinics (those where >90% of procedures are dental services). Uninsured and indigent coverage are combined due to data-reporting inconsistencies, and include self-pay / sliding scale, free, and county indigent program patients. *Other public* includes Alameda Alliance for Health, Family Pact, and all other payers. Excludes county clinics. Bars within eac group may not total 100% due to rounding.

Source: Blue Sky Consulting Group analysis of *2013 Pivot Table – Primary Care Clinic Utilization Data* and *2016 Pivot Table – Primary Care Clinic Utilization Data*, Office of Statewide Health Planning and Development, data.chhs.ca.gov.

# Community Clinic Visits and Net Patient Revenue
## by Payer and Clinic Type, California, 2016

For Federally Qualified Health Centers (FQHCs) and FQHC Look-Alike clinics, Medi-Cal patients contributed the most revenue and made up the most visits. Other clinics relied more on other public programs and private insurance.

**TOTALS** (IN MILLIONS)



Legend:
- Other Public
- Private Insurance
- Uninsured and Indigent Programs
- Medicare
- Medi-Cal

Notes: Excludes clinics with no patient encounters and dental clinics (those where >90% of procedures are dental services). Uninsured and indigent coverage are combined due to data-reporting inconsistencies, and include self-pay / sliding scale, free, and county indigent program patients. *Other public* includes Alameda Alliance for Health, Family Pact, and all other payers. Excludes county clinics. Segments may not total 100% due to rounding.

Source: Blue Sky Consulting Group analysis of *2016 Pivot Table — Primary Care Clinic Utilization Data*, Office of Statewide Health Planning and Development, data.chhs.ca.gov.

# Community Clinic Total Revenue
## by Source, California, 2016

**California's Health Care Safety Net**
Community Clinics



Contributions/Fundraising

State Programs (1%)

County and Local Programs

Other
7%

4%

3%

Federal
Funds
15%

Net Patient
Revenue
70%

Net patient revenue made up the majority of total revenue for community clinics. County and local programs, state programs, and contributions/fundraising combined made up just 8% of the total revenue for these clinics.

Notes: Includes Federally Qualified Health Centers (FQHCs), FQHC Look-Alikes, and other clinic types. Excludes clinics with no patient encounters and dental clinics (those where >90% of procedures are dental services). Uninsured and indigent coverage are combined due to data-reporting inconsistencies, and include self-pay / sliding scale, free, and county indigent program patients.

Source: Blue Sky Consulting Group analysis of *2016 Pivot Table — Primary Care Clinic Utilization Data*, Office of Statewide Health Planning and Development, data.chhs.ca.gov.

# Community Health Center Operating Margins
## by Quartile, California, 2013 to 2016



- 75th Percentile
- Median
- 25th Percentile

7.7%   10.0%   12.0%   13.5%

2.0%   3.0%   5.6%   6.3%

−1.3%   0.1%   1.6%   1.6%

2013   2014   2015   2016

Since 2013, operating margins have increased for community health centers. While community health centers in the lowest quartiles experienced zero or negative operating margins in 2013, by 2016 all quartiles had positive operating margins.

Notes: Data are based on audited financial statements of Federally Qualified Health Centers (FQHCs) and FQHC Look-Alikes as reported by fiscal year. *Operating margins* are calculated as operating income divided by revenue.

Source: *California Community Health Centers: Financial and Operational Performance Analysis, 2013–2016,* Capital Link, 2018, www.caplink.org (PDF).

# Inpatient Hospital Days
## by Hospital Ownership Type and Payer, California, 2017

**TOTALS** (IN MILLIONS)



Legend:
- **Investor** (114 hospitals)
- **District** (37 hospitals)
- **City/County** (18 hospitals)
- **Nonprofit** (199 hospitals)

| Payer | Total | Investor | District | City/County | Nonprofit |
|---|---|---|---|---|---|
| Medi-Cal | 6.1 | 22% | 8% | 15% | 55% |
| Medicare | 6.6 | 25% | 5% | 4% | 66% |
| County Indigent Programs | 0.2 | 15% | — | 21% | 64% |
| Other Payers | 3.7 | 20% | 5% | 6% | 69% |
| **All Payers** | 16.5 | 23% | 6% | 9% | 62% |

City/county hospitals are often the safety-net hospital in their community. The state's 18 city/county hospitals provided just 9% of all inpatient days, but provided 15% of Medi-Cal inpatient days. City/county hospitals also provided a large share of the care of the relatively small number of inpatients served by county indigent programs. The majority of hospitals in the state were nonprofit. These hospitals accounted for 62% of inpatient days in 2017.

Notes: Total number of inpatient days noted at top of bar. Data are only for hospitals classified as comparable and thus do not include state and Kaiser hospitals or facilities classified as psychiatric or long-term care. *Other payers* includes private insurance, hospital-provided charity care, self-pay, and all other payers not included elsewhere. *Investor* hospitals are operated by an investor-individual, investor-partnership, or investor-corporation.

Source: Blue Sky Consulting Group analysis of *2017 Pivot Table — Hospital Annual Selected File (September 2018 Extract)*, Office of Statewide Health Planning and Development, November 5, 2018, data.chhs.ca.gov.

# Outpatient Hospital Visits
## by Hospital Ownership Type and Payer, California, 2017

Nearly one in four, or 3.5 million, hospital outpatient visits by enrollees in Medi-Cal occurred at a city/county hospital.



TOTALS (IN MILLIONS)

| | Medi-Cal | Medicare | County Indigent Programs | Other Payers | All Payers |
|---|---|---|---|---|---|
| **Total** | 15.6 | 14.6 | 0.5 | 16.2 | 46.9 |
| Investor | 10% | 9% | 1% | 8% | 9% |
| District | 8% | 7% | | 7% | 7% |
| City/County | 23% | 6% | 77% | 5% | 12% |
| Nonprofit | 60% | 77% | 22% | 80% | 72% |

Legend:
- Investor (114 hospitals)
- District (37 hospitals)
- City/County (18 hospitals)
- Nonprofit (199 hospitals)

Notes: Total number of outpatient visits noted at top of bar. Data are only for hospitals classified as comparable and thus do not include state and Kaiser hospitals or facilities classified as psychiatric or long-term care. *Other payers* includes private insurance, hospital-provided charity care, self-pay, and all other payers not included elsewhere. *Investor* hospitals are operated by an investor-individual, investor-partnership, or investor-corporation. Segments may not total 100% due to rounding.

Source: Blue Sky Consulting Group analysis of *2017 Pivot Table — Hospital Annual Selected File (September 2018 Extract)*, Office of Statewide Health Planning and Development, November 5, 2018, data.chhs.ca.gov.

# Hospital Locations
## by Ownership Type, California, 2017

California has nearly 400 hospitals.

Many of these hospitals are located

in urban areas, where most of the

state's population is located.



● Investor
(114 hospitals)

● District
(37 hospitals)

● City/County
(18 hospitals)

● Nonprofit
(199 hospitals)

Notes: Data are only for hospitals classified as comparable and thus do not include state and Kaiser hospitals or facilities classified as psychiatric or long-term care. *Investor* hospitals are operated by an investor-individual, investor-partnership, or investor-corporation.

Source: Blue Sky Consulting Group analysis of *2017 Pivot Table — Hospital Annual Selected File (September 2018 Extract)*, Office of Statewide Health Planning and Development, November 5, 2018, data.chhs.ca.gov.

# Change in Inpatient Days and Outpatient Visits
## by Hospital Ownership Type and Payer, California, 2013 to 2017

| | INVESTOR | DISTRICT | CITY/COUNTY | NONPROFIT |
|---|---|---|---|---|
| **Inpatient Days** | | | | |
| Medi-Cal | 40% | − 14% | 32% | 18% |
| Medicare | 1% | − 18% | 40% | 4% |
| County Indigent Programs | − 73% | − 98% | − 87% | − 67% |
| Other Payers | − 2% | − 17% | − 12% | − 14% |
| **Outpatient Visits** | | | | |
| Medi-Cal | 73% | 25% | 58% | 39% |
| Medicare | − 8% | − 3% | 43% | 7% |
| County Indigent Programs | − 92% | − 99% | − 76% | − 85% |
| Other Payers | − 15% | − 15% | − 20% | − 12% |

**California's Health Care Safety Net**
Hospitals

Since the implementation of the Affordable Care Act in 2014, most hospital types have experienced an uptick in inpatient days paid for by Medi-Cal. All hospital types saw an increase in Medi-Cal outpatient visits. County indigent programs paid for significantly fewer days and visits in all hospital types during this period.

Notes: Data are only for hospitals classified as comparable and thus do not include state and Kaiser hospitals or facilities classified as psychiatric or long-term care. *Investor* hospitals are operated by an investor-individual, investor-partnership, or investor-corporation. *Other payers* includes private insurance, hospital-provided charity care, self-pay, and all other payers not included elsewhere.

Source: Blue Sky Consulting Group analysis *2013 Pivot Table — Hospital Annual Selected File* and *2017 Pivot Table — Hospital Annual Selected File (September 2018 Extract)*, Office of Statewide Health Planning and Development, November 5, 2018, data.chhs.ca.gov.

# Net Patient Revenue
## by Payer and Hospital Ownership Type, California, 2017

City/county hospitals were heavily reliant on Medi-Cal as a source of revenue, whereas other hospitals received a higher percentage of net patient revenue from Medicare and other payers (including privately insured patients).



**TOTALS** (IN BILLIONS)



Notes: Data are only for hospitals classified as comparable by the Office of Statewide Health Planning and Development (OSHPD) and thus do not include state and Kaiser hospitals or facilities classified as psychiatric or long-term care. *Other payers* includes private insurance, hospital-provided charity care, self-pay, and all other payers not included elsewhere. *Investor* hospitals are operated by an investor-individual, investor-partnership, or investor-corporation. Segments may not total 100% due to rounding.

Source: Blue Sky Consulting Group analysis of *2017 Pivot Table — Hospital Annual Selected File (September 2018 Extract)*, Office of Statewide Health Planning and Development, November 5, 2018, data.chhs.ca.gov.

# Change in Net Patient Revenue
## by Hospital Ownership Type and Payer, California, 2013 to 2017

All hospital types experienced an increase in net patient revenue from Medi-Cal and Medicare between 2013 and 2017. Fewer individuals received care paid for by county indigent programs, resulting in a decrease in net patient revenue from this source.



Notes: Data are only for hospitals classified as comparable and thus do not include state and Kaiser hospitals or facilities classified as psychiatric or long-term care. *Other payers* includes private insurance, hospital-provided charity care, self-pay, and all other payers not included elsewhere. *Investor* hospitals are operated by an investor-individual, investor-partnership, or investor-corporation.

Source: Blue Sky Consulting Group analysis *2013 Pivot Table — Hospital Annual Selected File* and *2017 Pivot Table — Hospital Annual Selected File  (September 2018 Extract)*, Office of Statewide Health Planning and Development, November 5, 2018, data.chhs.ca.gov.

# Total Revenue Sources
## by Hospital Ownership Type, California, 2017

California's Health Care Safety Net
Hospitals

Net patient revenue was the largest revenue source for all hospital types. County funds were an important source of revenue for city and county hospitals, accounting for 13% of their total revenue.

**TOTALS** (IN BILLIONS)



Legend:
- Other Nonoperating
- County Contribution
- Other Operating
- Net Patient

$10.6 — City/County: 2%, 13%, 8%, 77%
$4.7 — District: 4%, 4%, 92%
$80.2 — Nonprofit: 4%, 3%, 93%
$13.6 — Investor: 1%, 1%, 98%

Notes: *Other nonoperating* includes revenue not related to the provision of health care services, such as investment income and unrestricted contributions. *Other operating* includes revenue generated by health care operations from nonpatient care services, such as cafeteria and supplies sold to nonpatients. *Net patient* includes gross patient revenue plus capitation premium revenue less deductions from revenue such as provisions for bad debts and contractual adjustments. *Investor* hospitals are operated by an investor-individual, investor-partnership, or investor-corporation.

Source: Blue Sky Consulting Group analysis of *2017 Pivot Table — Hospital Annual Selected File (September 2018 Extract)*, Office of Statewide Health Planning and Development, November 5, 2018, data.chhs.ca.gov.

# Median Operating Margin
## by Hospital Ownership Type, California, 2013 and 2017

Between 2013 and 2017, the median operating margin improved for most hospital types. The median operating margin for city/county and district hospitals remained negative.



■ 2013  ■ 2017

City/County   District   Nonprofit   Investor

−17.6%   −13.4%   −10.3%   −2.0%   2.3%   1.8%   6.8%   8.3%

Notes: *Operating margin* equals net income from operations divided by operating revenue (net patient revenue plus other operating revenue). The operating margin does not take into account nonoperating revenue or expenses. Margin calculations include disproportionate share hospital funds. Hospital data are only on hospitals classified as comparable and thus do not include state and Kaiser hospitals, or facilities classified as psychiatric or long-term care. *Investor* hospitals are operated by an investor-individual, investor-partnership, or investor-corporation.

Source: Blue Sky Consulting Group analysis *2013 Pivot Table — Hospital Annual Selected File* and *2017 Pivot Table — Hospital Annual Selected File (September 2018 Extract)*, Office of Statewide Health Planning and Development, November 5, 2018, data.chhs.ca.gov.

# Median Net Income Margin
## by Hospital Ownership Type, California, 2013 and 2017

**California's Health Care Safety Net**
Hospitals

The median net income margins improved for district and investor-owned hospitals and remained stable for city/county hospitals between 2013 and 2017.



■ 2013   ■ 2017

| | | | |
|---|---|---|---|
| City/County | District | Nonprofit | Investor |
| 4.1% / 4.1% | −1.9% / 3.8% | 4.7% / 4.0% | 7.4% / 8.5% |

Notes: *Net income margin* equals total net income divided by total revenue (total operating revenue plus nonoperating revenue). Margin calculations include disproportionate share hospital funds. Hospital data are only on hospitals classified as comparable and thus do not include state and Kaiser hospitals, or facilities classified as psychiatric or long-term care. *Investor* hospitals are operated by an investor-individual, investor-partnership, or investor-corporation.

Source: Blue Sky Consulting Group analysis *2013 Pivot Table — Hospital Annual Selected File* and *2017 Pivot Table — Hospital Annual Selected File (September 2018 Extract)*, Office of Statewide Health Planning and Development, November 5, 2018, data.chhs.ca.gov.

# Glossary

**County Indigent Programs.** Programs serving medically indigent adults as required by Welfare and Institutions Code § 17000: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives and friends, by their own means, or by state hospitals or other state or private institutions."

**Episodic Programs**

- **The Breast and Cervical Cancer Treatment Program** provides cancer treatment to eligible low-income California residents diagnosed with breast and/or cervical cancer who are in need of treatment.

- **The Child Health and Disability Prevention Program** is a preventive program that delivers periodic health assessments and services to low-income children and youth in California.

- **The Family Planning, Access, Care, and Treatment Program** provides comprehensive family planning services to eligible (incomes of less than 200% of the federal poverty level) men and women.

- **California Children's Services (CCS)** is a state program for children up to 21 years old with certain diseases or health problems. CCS provides diagnostic and treatment services, medical case management, and physical and occupational therapy services.

**Disproportionate Share Hospital (DSH).** A Medi-Cal supplemental payment program established to reimburse hospitals for some of the uncompensated care costs associated with furnishing inpatient hospital services to Medi-Cal beneficiaries and uninsured people. The types of hospitals and/or health facilities that are eligible to participate in the DSH program consist of general acute care hospitals, acute psychiatric hospitals, and psychiatric health facilities.

**Federally Qualified Health Center (FQHC).** Community-based health care providers that receive funds from the Health Resources and Services Administration Health Center Program to provide primary care services in underserved areas. They must meet a stringent set of requirements, including providing care on a sliding fee scale based on ability to pay and operating under a governing board that includes patients. The defining legislation for FQHC (under the Consolidated Health Center Program) is § 1905(l)(2)(B) of the Social Security Act.

**FQHC Look-Alike.** Community-based health care providers that meet the requirements of the Health Resources and Services Adminisration Health Center Program but do not receive Health Center Program funding. They provide primary care services in underserved areas on a sliding fee scale based on ability to pay, and they operate under a governing board that includes patients.

**ABOUT THIS SERIES**

The California Health Care Almanac is an online clearinghouse for data and analysis examining the state's health care system. It focuses on issues of quality, affordability, insurance coverage and the uninsured, and the financial health of the system with the goal of supporting thoughtful planning and effective decisionmaking. Learn more at **www.chcf.org/almanac**.

Explore the full *California's Health Care Safety Net Almanac* series at **www.chcf.org**.

**AUTHORS**

Matthew Newman and Eunice Roh
Blue Sky Consulting Group

**FOR MORE INFORMATION**



California Health Care Foundation
1438 Webster Street, Suite 400
Oakland, CA 94612
510.238.1040
www.chcf.org

# Exhibit D

 COVERED CALIFORNIA™

## Covered California 2019 Open Enrollment Early Observations and Analysis

### Introduction

Since the launch of the Patient Protection and Affordable Care Act in 2014, states served by the federally facilitated marketplace (FFM), as well as states like California that operate state-based marketplaces (SBMs), have regularly relied on plan selection and enrollment data as an important early indicator for measuring the overall health of the individual market and the relative success of each year's open-enrollment period.

In recent years, those comparisons have been made more difficult by federal decisions to reduce enrollment periods, cut back on marketing and outreach and unnecessarily affect premiums — such as by removing direct funding of the cost-sharing reduction program. The open-enrollment period for the 2019 coverage year is no exception, in that it marked the first time the marketplaces sought to enroll eligible Americans following the federal removal of the individual mandate penalty.

California closed its three-month open-enrollment period for 2019 on Jan. 15, while states

### Highlights

- Covered California's total number of plan selections at the end of open enrollment for 2019 is virtually identical to 2018, reflecting both new enrollment and renewals.

- The number of consumers who had their coverage renewed for 2019 increased by 7.5 percent, primarily because Covered California had strong enrollment for the 2018 plan year, which resulted in more consumers who were eligible to renew their coverage for this year.

- New enrollment dropped about 23.8 percent, which appears to be largely the result of the federal removal of the individual mandate penalty. This drop in enrollment underscores the importance of the penalty and that even robust marketing cannot offset the negative impact of its removal.

- Covered California's drop in new enrollment is higher than the average 15.8 percent drop experienced by the 39 states served by the federally facilitated marketplace (FFM) this year. The difference is likely explained by the fact that the FFM states have already seen sharp decreases in new enrollment in each of the past four years, putting their 2019 decrease on top of an already greatly diminished pool since many healthy consumers have already opted out of coverage. California has maintained strong new enrollment in each of the prior four years, leaving it more susceptible to drops in new enrollment due to the loss of the penalty and other factors.

- Early analysis also indicates that the level of new enrollment for consumers seeking unsubsidized and Bronze plans experienced larger drops, indicating that affordability remains a key obstacle for many.

- The analysis also found that the reduced level of new enrollment for 2019 did not vary significantly for most other demographics, including age and income level for those receiving subsidies. However, consumers who preferred to speak a language other than English experienced a larger drop for 2019 than other groups did.

*This analysis was prepared by Covered California for its ongoing planning and to inform policy making in California and nationally.*

Covered California 2019 Open Enrollment Early Observations and Analysis

served by the federal marketplace maintained their truncated 45-day period and closed their open enrollment on Dec. 15.

The impact on enrollment nationally for the 2019 plan year has already been documented in reports on enrollment through the FFM, with overall plan selections dropping 4 percent, driven largely by a 16 percent decrease in the number of new consumers signing up during open enrollment. The drop in enrollment for 2019 builds on large decreases experienced by states served by the FFM in the 2016, 2017 and 2018 open-enrollment periods. Taken together, during the three years leading up to the 2019 open-enrollment period, states served by the FFM experienced a 39 percent decline in new enrollments, decreasing from 4 million to 2.5 million. In contrast, during the same three years, California saw a modest decrease in new enrollment, going from 425,000 to 388,000 (a 9 percent drop).

This issue brief examines Covered California's final open-enrollment plan selection totals, how Covered California compares to the FFM, the estimates experts and Covered California made prior to open enrollment regarding how the federal removal of the individual mandate penalty would affect consumers, whether any additional issues played a role in signing up consumers and critical areas for additional research.

**Preliminary Results and Projections of the Federal Penalty Removal**
The preliminary results of Covered California's open-enrollment period show the exchange finished with a total of 1,513,833 plan selections, composed of existing consumers whose coverage was renewed for the coming year and new consumers (see Table 1: Preliminary Analysis of Covered California 2019 Plan Selections). Overall, there is a difference of 7,641 fewer plan selections compared to 2018 — a drop of 0.5 percent.

TABLE 1
*Preliminary Analysis of Covered California 2019 Plan Selections*

| Category | 2018 | 2019 | Change |
|---|---|---|---|
| New sign-ups[1] | 388,344 | 295,980 | − 23.8% |
| Renewals | 1,133,180 | 1,217,903 | + 7.5% |
| Total | 1,521,524 | 1,513,883 | − 0.5% |

Taking a closer look at the data, Covered California's enrollment comprises 1,217,903 plan renewals, which is 7.5 percent higher than last year. The increase in renewals reflects the growth Covered California experienced from the 2018 open-enrollment and special-enrollment periods, leading to more members who were eligible to renew their coverage for 2019 than were eligible to renew in the prior year.

The increase in renewals was offset by a sharp reduction in the number of new consumers enrolling in coverage. During the open-enrollment period, 295,980 consumers signed up for coverage, which represents a 23.8 percent decrease from last year.

Prior to the start of the open-enrollment period for the 2019 coverage year, Covered California worked with policy experts from Harvard University and Pricewaterhouse Coopers to study the potential impact that the federal removal of the individual mandate penalty could have on enrollment.

In addition, Covered California examined published studies of independent experts who projected an enrollment drop of anywhere from 7 and 26 percent, with different predictions on the impact of new enrollment and renewing consumers.[2]

Covered California 2019 Open Enrollment Early Observations and Analysis

For planning purposes, Covered California projected that the removal of the penalty could reduce effectuated enrollment at the end of fiscal year 2018-19 by between 7 and 18 percent, with a midpoint base projection of a 12 percent reduction. A reduction of 12 percent would have resulted in approximately 162,000 fewer consumers enrolled in coverage and an effectuated enrollment of 1.2 million at the beginning of July 2019.[3]

While Covered California's budget projections did not specifically address the end of open enrollment, if the 12 percent reduction is applied to the current plan selection data, Covered California's total enrollment is currently 174,942 higher than would have been expected using this methodology (see Table 2: Comparison of Covered California Net Plan Selections to Base Projection).

TABLE 2
*Comparison of Covered California Net Plan Selections to Base Projection*

| Category | 2019 | Approximate Forecast[4] (using 12%) | Actual Versus Forecast | Difference |
|----------|------|-------------------------------------|------------------------|------------|
| New sign-ups | 295,980 | 341,743 | (45,763) | − 13.4% |
| Renewals | 1,217,903 | 997,198 | 220,705 | 22.1% |
| Total | 1,513,883 | 1,338,941 | 174,942 | 13.1% |

**Covered California's 2019 Open-Enrollment Results: Early Analysis Comparing California to States Served by the Federally Facilitated Marketplace**

The federal removal of the individual mandate penalty appears to have had a more substantial impact on Covered California's new enrollment than projected, exceeding both Covered California's "base" projection of a 12 percent reduction and the apparent impact on new enrollment in states served by the federally facilitated marketplace (FFM), which saw a 16 percent drop from the previous year. However, Covered California's overall plan selection totals remain steady in comparison to the FFM, where enrollment dropped by 4 percent (see Table 3: Comparing Net Plan Selections, Covered California and FFM, 2019).

TABLE 3
*Comparing Net Plan Selections, Covered California and FFM, 2019 Open Enrollment*

| Category | Marketplace | 2018 | 2019 | Change |
|----------|-------------|------|------|--------|
| New sign-ups[5] | FFM | 2,460,431 | 2,072,115 | − 15.8% |
| | Covered California | 388,344 | 295,980 | − 23.8% |
| Renewals | FFM | 6,283,211 | 6,339,499 | + 0.9% |
| | Covered California | 1,133,180 | 1,217,903 | + 7.5% |
| Total | FFM | 8,743,642 | 8,411,614 | − 3.8% |
| | Covered California | 1,521,524 | 1,513,883 | − 0.5% |

Covered California 2019 Open Enrollment Early Observations and Analysis

Looking at year-to-year changes, however, masks the more important trends in the individual market, which should be assessed based on multi-year trends of coverage, the changes to the rate of the uninsured and changes in the health status of those enrolling in coverage. Over the past four years, Covered California's total plan selections at the end of open enrollment have hovered near 1.5 million, while enrollment in the FFM has declined by 13 percent from 2016 to 2019 (see Figure 1: Comparing Net Plan Selections, Covered California and FFM, 2016-19).

FIGURE 1
Comparing Net Plan Selections, Covered California and FFM, 2016-19, in millions [6,7]



The primary driving factor in the loss among FFM enrollment has been a consistent and dramatic reduction in the number of people newly signing up for coverage. In the past four years, the FFM has seen a 49 percent reduction in open-enrollment plan selections (see Figure 2: Comparing New Sign-ups, Covered California and FFM, 2016-19).

FIGURE 2
Comparing New Sign-ups, Covered California and FFM, 2016-19, in millions [8,9]



As a result, while Covered California's drop in new enrollees who signed up during the 2019 open-enrollment period surpassed what states served by the FFM experienced, the decline in the FFM is compounded by the fact that those markets have already experienced several sharp decreases in new enrollment.

Covered California 2019 Open Enrollment Early Observations and Analysis

Looking at new enrollment for plan years 2016 through 2018, FFM states suffered a 39 percent drop in the number of new enrollees (see Table 4: Comparing Net Plan Selections, Covered California and FFM, 2016 to 2018). In essence, going into 2019 almost 1.5 million Americans who could have enrolled in FFM states were already priced out of coverage or had opted not to enroll. By comparison, Covered California saw a 9 percent drop in new sign-ups during the same time.

TABLE 4

Comparing Net Plan Selections, Covered California and FFM, 2016 to 2018

| Category | Marketplace | 2016 | 2017 | 2018 | Cumulative Change 2016-2018 | 2019 | % Change 2018-2019 | Cumulative Change 2016-2019 |
|---|---|---|---|---|---|---|---|---|
| New sign-ups | FFM | 4,025,637 | 3,013,107 | 2,460,431 | − 38.9% | 2,072,115 | − 15.8% | − 48.5% |
| | Covered California | 425,484 | 368,368 | 388,344 | − 8.7% | 295,980 | − 23.8% | − 30.4% |
| Renewals | FFM | 5,600,345 | 6,188,698 | 6,283,211 | 12.2% | 6,339,499 | 0.9% | 13.2% |
| | Covered California | 1,149,856 | 1,188,308 | 1,133,180 | − 1.5% | 1,217,903 | 7.5% | 5.9% |
| Total | FFM | 9,625,982 | 9,201,805 | 8,743,642 | − 9.2% | 8,411,614 | − 3.8% | − 12.6% |
| | Covered California | 1,575,340 | 1,556,676 | 1,521,524 | − 3.4% | 1,513,883 | -0.5% | − 3.9% |

California appears to be experiencing a greater impact from the removal of the penalty than other markets have — such as states served by the FFM, which have already lost significant numbers of "healthy" enrollees and whose enrollees were likelier to be less healthy before the federal removal of the penalty went into effect this year. This observation is consistent with the reductions in California's new sign-ups being relatively evenly spread across demographics, except for consumers who select Bronze-tier plans (see Figure 3: Covered California 2019 Open-Enrollment Bronze Plan Selections) and the fact that California has enrolled one of the healthiest population profiles in the country.

Statewide risk scores compiled by the Centers for Medicare and Medicaid Services consistently show California with one of the lowest risk scores in the nation, with an average risk mix of consumers in the individual market in California being 20 percent healthier than those enrolled in states served by the FFM. This low risk score has resulted in premiums being about 20 percent lower than the national average.

The Wakely Consulting Group also found that Covered California's better than average risk mix is not driven by demographics (i.e., not driven by having a younger average age), but by the better health profile of the individuals who enrolled across demographic groups.[10]

While Covered California has remained committed to reaching all eligible consumers in the state, federal policies that have affected states served by the FFM have not reflected such a commitment. These policies include the removal of the penalty in 2019, cutbacks in marketing and outreach, promotion of short-term and other non-Affordable Care Act-compliant health plans that pull consumers out of the common risk pool, as well as other policies in prior years.  Taken together, these policies and affirmative steps put FFM states on a path to having an individual market that is made up of subsidized individuals who find their way to coverage and a virtual high-risk pool for unsubsidized consumers with poor health conditions.

Covered California 2019 Open Enrollment Early Observations and Analysis

With each subsequent year in decline, the FFM is left with a sicker pool of enrollees who are more likely to purchase coverage because they need health care — regardless of the penalty — and rising costs that price out anyone who does not get a subsidy or have a major health condition. The consequence of such a path would be higher premiums for unsubsidized consumers nationwide who will be forced out of the individual market while the federal government is forced to spend more on tax credits to protect subsidized consumers who have coverage through the exchange. While California and other SBMs can take steps that reflect their commitment to promote enrollment and lower health care costs, the federal removal of the penalty has had significant effects across the entire nation.

**Covered California's 2019 Open Enrollment Results: Early California Specific Analysis**
Covered California reviewed enrollment demographics for new enrollees for 2019 and compared them on the same dimensions to new enrollees for 2018 to see if the reduction in new plan selections is different in any specific areas.

Survey research published in 2018 indicated that the following groups were more likely to report that they would not have gotten covered if there had not been a penalty.[11]

- Consumers in Bronze plans.
- Latinos.
- Lower-income consumers, especially those under 250 percent of the federal poverty level and eligible for cost-sharing reductions.
- Younger consumers (primarily under 50 years of age).
- Consumers with no chronic conditions.
- Previously uninsured (in the prior year).
- Consumers without a college education.

While Covered California data is not available on all of these dimensions, this early analysis provides a review of new plan selections during open enrollment for several of the key categories of interest.

The enrollment tables that follow show that the share of consumers enrolled across demographic groups is relatively stable, with similar declines in enrollment, with a few notable exceptions.

***Age Does Not Appear to Be a Factor in Consumers' Being More or Less Likely to Enroll With the Federal Removal of the Penalty***
Many observers and estimates, including the survey results cited earlier, forecasted that younger enrollees would be less likely to enroll without a penalty. Covered California's analysis of new plan selection results for 2019 does not show large differences in the decreases in enrollment across age brackets. In fact, the largest variation occurred in consumers between the ages of 26 and 34, where the share of enrollees increased by 1.1 percent (see Table 5: New Plan Selections in 2019 Compared to 2018, by Age Bracket), but this change in share is within the swings observed in typical open-enrollment periods from one year to the next. This preliminary view suggests that the federal removal of the penalty did not have a more pronounced effect on the share of young consumers enrolling.

Covered California 2019 Open Enrollment Early Observations and Analysis

TABLE 5
New Plan Selections in 2019 Compared to 2018, by Age Bracket[12]

| Age | Covered California Enrollees | | | 2019 Compared to 2018 | | |
| | 2018 Open Enrollment | | 2019 Open Enrollment | | Difference | % Change | Share Difference |

| Age | 2018 Open Enrollment | | 2019 Open Enrollment | | Difference | % Change | Share Difference |
|---|---|---|---|---|---|---|---|
| 17 or less | 38,560 | **9.1%** | 28,490 | **8.8%** | (10,070) | **− 26.1%** | **− 0.4%** |
| 18-25 | 57,240 | **13.5%** | 43,630 | **13.4%** | (13,610) | **− 23.8%** | **− 0.1%** |
| 26-34 | 95,360 | **22.5%** | 76,860 | **23.6%** | (18,500) | **− 19.4%** | **1.1%** |
| 35-44 | 71,360 | **16.9%** | 53,540 | **16.5%** | (17,820) | **− 25.0%** | **− 0.4%** |
| 45-54 | 81,650 | **19.3%** | 59,700 | **18.4%** | (21,950) | **− 26.9%** | **− 0.9%** |
| 55-64 | 76,580 | **18.1%** | 61,150 | **18.8%** | (15,430) | **− 20.1%** | **0.7%** |
| 65 or older | 2,450 | **0.6%** | 1,810 | **0.6%** | (640) | **− 26.1%** | **0.0%** |
| TOTAL | 423,200 | **100.0%** | 325,190 | **100.0%** | (98,010) | **− 23.2%** | **0.0%** |

*Fewer Bronze Consumers Indicates a Likely Disproportionate Impact of Removal of Penalty on Healthy Individuals and the Importance of Affordability to Healthy Individuals*

New plan selections into Bronze enrollment, which offers Covered California's lowest premium option, fell from 143,000 to 100,000, a reduction of 30.5 percent compared to 23.2 percent overall. The decline was even higher among the unsubsidized, for whom Bronze enrollment dropped 38.1 percent compared to 28.6 percent on average (see Figure 3: Covered California 2019 Bronze Plan Selections).

This higher drop in enrollment is consistent with projections from experts that consumers who typically select Bronze plans are on average healthier than their counterparts are and are more apt to be affected by the removal of the penalty. Trends in decreasing enrollment in Bronze plans are worrisome indicators of the potential decline in the average health status of remaining enrollees and could foreshadow further premium increases by carriers across the nation.

In California, carriers serving the individual market assumed that the federal removal of the mandate penalty would lead to a less-healthy risk mix, which led to a substantial portion of the rate change for 2019. Covered California will be closely watching preliminary risk mix data for plan year 2019 when it is released and will stand ready to conduct analysis to study whether additional premium increases are warranted for the 2020 coverage year, absent reinstituting the individual mandate penalty at either the federal or state level.

Covered California 2019 Open Enrollment Early Observations and Analysis

FIGURE 3
Covered California 2019 Open-Enrollment Bronze Plan Selections



### Enrollment Changes Based on Ethnicity and Language Preference Are Limited, but Do Not Appear to Show Large Variation Due to Federal Removal of the Penalty

Overall, the decrease in new plan selections during open enrollment was spread evenly across racial and ethnic groups, and there does not appear to be any specific group in which the share of enrollees reflected differential drops in enrollment when viewed in light of the typical shifts in new sign-ups from one year to the next. (See Appendix Table C: Covered California New Plan Selection by Race/Ethnicity, 2018-19.)

However, Covered California's analysis found a substantial differential impact among some populations where English is not the preferred spoken language. In particular, the number of Mandarin speakers dropped 28 percent, Spanish speakers dropped 29 percent and Korean speakers dropped 46 percent. By comparison, the number of English speakers dropped 22 percent.

Covered California believes this is an area of concern that warrants further study and may be the result of factors outside of the federal removal of penalty, such as concerns over whether receiving financial help for health coverage would designate someone a "public charge" and affect their immigration status — an issue that received substantial press coverage in "in-language" media.

### Income Level and Subsidy Eligibility: Little Differential Impact for Those Eligible for Subsidies, While Those Ineligible for Subsidies May Be More Likely to Be Affected by the Penalty Removal

Price appears to remain the number one issue for consumers enrolling in coverage. The initial analysis shows that it appears there was not a substantial difference in the share of consumers who enrolled across income levels who were eligible for financial help (those earning less than 400 percent of the federal poverty level). This indicates that the financial support provided by subsidies remains a critically important element in persuading consumers to sign up for coverage.

Covered California 2019 Open Enrollment Early Observations and Analysis

There was, however, a substantial difference in the number of unsubsidized consumers who signed up during open enrollment, with plan selections dropping 31 percent, compared to 21.9 percent of those subsidized (see Appendix Table D: Covered California New Plan Selection by Income, 2018-19).

While this differential drop in enrollment is large, it is possible that some of the decline in unsubsidized consumers is not based on their foregoing coverage, in that they could be moving off-exchange and buying coverage directly from a carrier. This issue is complicated by the changes instituted after the cancellation of direct federal funding of the required cost-sharing reduction reimbursements, leaving California and many states with different premiums for unsubsidized consumers who purchase the same coverage on- versus off-exchange.

### *Differences in Enrollment by Service Channel May Indicate That Healthier Individuals Are Less Likely to Actively Seek In-Person Assistance and More Likely to Be Affected by the Federal Penalty Removal*

New plan selections among consumers who signed up without assistance were 28.4 percent lower than in 2017, compared to 20.3 percent for those who got help from an agent, navigator or other Covered California representative (see Appendix Table E: Covered California New Plan Selection by Service Channel, 2018-19). The data suggests that consumers who seek assistance, perhaps due to greater health needs or questions about extenuating issues, were more likely to enroll in coverage. Conversely, healthier consumers may be those who enroll on their own and are more apt to be affected by the removal of the penalty. Again, this area deserves more study as the changes from 2018 to 2019 build on changes also observed in the transition from 2017 to 2018, and thus may not be solely due to changes in the penalty.

A complete set of demographic comparisons is provided in the Appendix: Detailed New Sign-up Data for Covered California's Open Enrollment.

### Enrollment Data in Context: Understanding the Individual Market

The enrollment in any state's individual market is made up of two groups: (1) those who enroll in their Affordable Care Act marketplace, whether through a state-based marketplace (SBM) or the FFM, commonly referred to as "on-exchange" and (2) consumers who enroll "off-exchange" directly through a health insurance carrier.

California's individual market covers more than 2 million people, and just as with those who enroll in Covered California and sign up "off-exchange" by enrolling directly with a health plan issuer, comprises existing consumers who renew their coverage for the coming year and new consumers who sign up during open enrollment. At this time, we do not have a clear picture of current enrollment in the off-exchange market in California or the rest of the nation.

Since off-exchange enrollment is entirely unsubsidized, one early indicator of off-exchange enrollment may be the experience of unsubsidized consumers who are on-exchange, which is discussed above. However, there are reasons to be cautious about making direct comparisons given factors such as health plans' pricing off-exchange products lower to avoid unnecessary cost-sharing reduction surcharges to cover the costs of that required program in the absence of direct federal funding.

Given these uncertainties, how the federal removal of the penalty affected the off-exchange market and whether it will change the trend of existing consumers who complete their renewal and effectuate their coverage is currently unknown.

While the data in this issue brief is California-specific, what is both known and unknown should apply to other state and federal marketplaces.

## Covered California 2019 Open Enrollment Early Observations and Analysis

*On-Exchange Populations*

**New Enrollment:** A preliminary analysis of new plan selections during Covered California's 2019 open-enrollment period suggests the removal of the individual mandate penalty had a substantial impact on the number of new enrollees. The drop in new plan selections from 2018 to 2019 was nearly 24 percent, which is above Covered California's base projection and near the high end of published projections. The relative health of these newly enrolled consumers could be cause for concern since it relates to a state's risk mix and would affirm health plans' decisions to raise premiums in California for all consumers to offset the costs of a generally less-healthy covered population.

**Renewals:** Overall, the number of renewal candidates is strong and reflects the growth Covered California experienced in 2018, as noted earlier. However, while the number of consumers in renewal is higher than in the previous year, it is too early to tell how many of these consumers will complete their renewal and effectuate their coverage, either in California or nationally, for months to come.[13] Considering that renewing members comprise nearly two thirds of the total membership for a given plan year, Covered California is closely watching this segment for indications of how the federal removal of the mandate penalty may alter consumer behavior. This issue also deserves scrutiny at the national level, where the portion of those who effectuate coverage after enrolling may also be affected.

*Off-Exchange Population*

In addition to Covered California's enrollment, approximately 800,000 Californians have enrolled in unsubsidized health care coverage directly from private health insurance carriers. Data on California's off-exchange enrollment is not available at this time, and we do not yet know whether it is experiencing the same trends as enrollment through Covered California. However, it is important to note that nationally the most recent data shows that off-exchange enrollment dropped 38 percent in the first quarter of 2018, compared to the same period from just one year earlier, indicating large drops in coverage based on consumers' being priced out of coverage.[14]

**Areas for Further Analysis**

Given the important policy discussions taking place at the national and state level, Covered California provides this issue brief to share the experiences following the open-enrollment period for 2019. While this issue brief shares numerous data points available at this time, there is still much we do not yet know about what it means for the future of the individual market. Some of the issues that demand further attention are:

Effectuated enrollment: Covered California's data shows that while net plan selections have declined slightly over the past four years, total effectuated enrollment has remained steady with actual growth each year. However, since this is the first year without an individual mandate penalty in place, a closer look should be taken at how many plan selections convert into effectuated enrollees at both the state and federal level and whether the removal of the penalty has an impact on historical conversion trends. This data should be available within two to four months. At the national level, it will be important to analyze rates of effectuated renewals and new enrollment to assess the impact of the penalty.

Off-exchange enrollment: While a significant amount of attention is paid to what is happening to on-exchange enrollment, it is also important to assess what is happening in the off-exchange market. Unfortunately, data on the millions of people enrolled directly through health insurance carriers is not as easily accessible. More needs to be known about how premium increases (for which consumers earning more than 400 percent of FPL receive no financial help) and the federal removal of the mandate penalty are affecting these primarily middle-class consumers.

Covered California 2019 Open Enrollment Early Observations and Analysis

Change in enrollee health status: The drop in new enrollees could have a profound impact on the overall risk scores of each state's individual market. A state with a deteriorating risk mix means it has a less-healthy population enrolled, and consumers will see higher premiums as a result. As stated earlier, preliminary data on the health of 2019 consumers will not be known until later this year.

Impact of the economy on enrollment and retention in the individual market: The nation continues to reap the benefits of an economy that has been going strong for several years. In California, the state has gained more than 3 million jobs since the economic expansion began in 2010. This economic boom has happened at the same time as the dramatic coverage expansions supported by the Affordable Care Act, and together they have contributed to the state having an uninsured rate at a historic low level.[15] More research needs to be done into how the economy is affecting enrollment and whether newly employed consumers are moving into job-based coverage.

Econometric analysis: This brief relies on observable differences in summary statistics for the newly enrolled population, but these early findings based on open enrollment data are not definitive and invite further study. First, many of the categories reviewed in this brief (such as income and tier choice) are likely correlated. Additionally, other trends in the market outside the mandate could be influencing the results described in this brief. A deeper analysis using econometric techniques is warranted to attempt to disentangle the impacts of the mandate from other market dynamics.

The changes in California's individual market — namely the removal of the federal penalty for being uninsured in 2019 and concerns of the impact of "public charge" — appear to be driving large and larger-than-forecasted impacts on new plan selections in California. Preliminary demographic analysis does not indicate a severe drop-off in any particular group; rather, it indicates that enrollees from across the demographic spectrum reduced their take-up of coverage. Covered California will continue to study the impacts of the policy change on the retention of existing consumers and on the risk profile of new and renewing consumers that result from the federal policy change.

**About Covered California**

Covered California is an independent part of the state government whose job is to make the health insurance marketplace work for California's consumers. It is overseen by a five-member board appointed by the governor and the Legislature. For more information about Covered California, please visit CoveredCA.com.

---

[1] Open enrollment totals are based on gross plan selections of 423,484 for 2018 and 325,458 for 2019 allowed for comparable comparison over previous years.

[2] PwC. "Impact of Individual Mandate Penalty Elimination and Other Market Factors on Coverage Nationally and in California," Presentation to Covered California Board of Directors (May 17, 2018). https://board.coveredca.com/meetings/2018/05-17/PWC%20Slide%20Deck%20-%20pdf.pdf

[3] Covered California. "Fiscal Year 2018-2019 Budget" (Final, June 15, 2018). https://hbex.coveredca.com/financial-reports/PDFs/CoveredCA_2018-19_Budget-6-15-18.pdf

[4] Calculated using 2018 net plan selection totals.

[5] Open enrollment totals are based on gross plan selections of 423,484 for 2018 and 325,458 for 2019, allowing for comparable comparison over previous years.

[6] Table 2 displays "net" plan selections, as per FFM reports. Effectuated enrollment for 2019 is estimated using 2019 reported net plan selections and the 2018 ratio of reported net plan selections to eventual average effectuated enrollment, as reported by ASPE.

[7] https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/index.html and https://www.cms.gov/newsroom/fact-sheets/final-weekly-enrollment-snapshot-2019-enrollment-period and https://www.kff.org/other/state-indicator/effectuated-marketplace-enrollment-and-financial-assistance/ and https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/Effectuated_Quarterly_Snapshots.html.

[8] Table 2 displays "net" plan selections, as per FFM reports. Effectuated enrollment for 2019 is estimated using 2019 reported net plan selections and 2018 ratio of reported net plan selections to eventual average effectuated enrollment, as reported by ASPE.

[9] CMS. https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/index.html and https://www.cms.gov/newsroom/fact-sheets/final-weekly-enrollment-snapshot-2019-enrollment-period and https://www.kff.org/other/state-indicator/effectuated-marketplace-enrollment-and-financial-assistance/ and https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/Effectuated_Quarterly_Snapshots.html.

[10] Health Affairs. "National vs. California Comparison: Detailed Data Help Explain The Risk Differences Which Drive Covered California's Success." (July 2018.) https://www.healthaffairs.org/do/10.1377/hblog20180710.459445/full/

[11] See results as published at Fung, Vicki, et al. "Potential Effects of Eliminating the Individual Mandate Penalty in California." Health Affairs, 38 No. 1 (2019): 147–154. Preliminary results were published in March 2018 on the Health Affairs Blog. https://www.healthaffairs.org/do/10.1377/hblog20180223.551552/full/.

[12] These profiles are based on the gross plan selections, and as a result, the totals in the tables that follow are higher than the "net" totals shown on Table 1.

[13] This is true even for renewing members, because premium payment data from qualified health plan issuers typically lags two to three months due to appeal windows.

[14] Kaiser Family Foundation, "Enrollment in the Individual Insurance Market Continued to Fall in the First Quarter of 2018, With the 12 Percent Overall Decline Concentrated in Off-Exchange Plans." https://www.kff.org/health-reform/press-release/enrollment-in-the-individual-insurance-market-continued-to-fall-in-the-first-quarter-of-2018-with-the-12-percent-overall-decline-concentrated-in-off-exchange-plans/.

[15] EDD. "California unemployment rate rises to 4.2 percent in December." (Jan. 18, 2019.) https://www.edd.ca.gov/About_EDD/pdf/urate201901.pdf

# APPENDIX:
## Detailed New Sign-up Data for Covered California's Open Enrollment

Table A: Covered California New Plan Selection by Metal Tier, 2018-19

| Metal Tier (Total) | OE 2018 TOTAL | | OE 2019 TOTAL | | 2019 compared to 2018 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Count Difference | Percentage Change | Share Difference |
| Metal Tier (Total) | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| Minimum Coverage | 9,910 | 2.3% | 10,230 | 3.1% | 320 | 3.2% | 0.8% |
| Bronze | 143,700 | 34.0% | 99,860 | 30.7% | -43,840 | -30.5% | -3.2% |
| Silver | 187,850 | 44.4% | 164,540 | 50.6% | -23,310 | -12.4% | 6.2% |
| Silver - 70 | 42,690 | 10.1% | 38,000 | 11.7% | -4,690 | -11.0% | 1.6% |
| Silver - Enhanced 73 | 23,980 | 5.7% | 22,950 | 7.1% | -1,030 | -4.3% | 1.4% |
| Silver - Enhanced 87 | 71,690 | 16.9% | 62,730 | 19.3% | -8,960 | -12.5% | 2.4% |
| Silver - Enhanced 94 | 49,490 | 11.7% | 40,860 | 12.6% | -8,630 | -17.4% | 0.9% |
| Gold | 64,610 | 15.3% | 38,300 | 11.8% | -26,310 | -40.7% | -3.5% |
| Platinum | 17,120 | 4.0% | 12,270 | 3.8% | -4,850 | -28.3% | -0.3% |
| Grand Total | 423,200 | 100.0% | 325,190 | 100.0% | -98,010 | -23.2% | 0.0% |

| Metal Tier (Subsidy Eligible) | OE 2018 Subsidy Eligible | | OE 2019 Subsidy Eligible | | 2019 compared to 2018 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Count Change | Percentage Change | Share Difference |
| Metal Tier (Subsidy Eligible) | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| Minimum Coverage | 2,940 | 0.8% | 2,980 | 1.1% | 40 | 1.4% | 0.2% |
| Bronze | 113,060 | 31.5% | 80,890 | 28.9% | -32,170 | -28.5% | -2.5% |
| Silver | 177,730 | 49.4% | 156,520 | 56.0% | -21,210 | -11.9% | 6.5% |
| Silver - 70 | 32,570 | 9.1% | 29,980 | 10.7% | -2,590 | -8.0% | 1.7% |
| Silver - Enhanced 73 | 23,980 | 6.7% | 22,950 | 8.2% | -1,030 | -4.3% | 1.5% |
| Silver - Enhanced 87 | 71,690 | 19.9% | 62,730 | 22.4% | -8,960 | -12.5% | 2.5% |
| Silver - Enhanced 94 | 49,490 | 13.8% | 40,860 | 14.6% | -8,630 | -17.4% | 0.8% |
| Gold | 52,920 | 14.7% | 30,340 | 10.8% | -22,580 | -42.7% | -3.9% |
| Platinum | 12,830 | 3.6% | 8,970 | 3.2% | -3,860 | -30.1% | -0.4% |
| Grand Total | 359,480 | 100.0% | 279,690 | 100.0% | -79,790 | -22.2% | 0.0% |

| Metal Tier (Not Subsidy Eligible) | OE 2018 Unsubsidized | | OE 2019 Unsubsidized | | 2019 compared to 2018 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Count Difference | Percentage Change | Share Difference |
| Metal Tier (Not Subsidy Eligible) | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| Minimum Coverage | 6,970 | 10.9% | 7,250 | 15.9% | 280 | 4.0% | 5.0% |
| Bronze | 30,650 | 48.1% | 18,980 | 41.7% | -11,670 | -38.1% | -6.4% |
| Silver | 10,140 | 15.9% | 8,020 | 17.6% | -2,120 | -20.9% | 1.7% |
| Silver - 70 | 10,120 | 15.9% | 8,020 | 17.6% | -2,100 | -20.8% | 1.7% |
| Silver - Enhanced 73 | 10 | 0.0% | 0 | 0.0% | -10 | -100.0% | 0.0% |
| Silver - Enhanced 87 | 10 | 0.0% | 0 | 0.0% | -10 | -100.0% | 0.0% |
| Silver - Enhanced 94 | 0 | 0.0% | 0 | 0.0% | 0 | N/A | 0.0% |
| Gold | 11,690 | 18.3% | 7,960 | 17.5% | -3,730 | -31.9% | -0.9% |
| Platinum | 4,290 | 6.7% | 3,300 | 7.3% | -990 | -23.1% | 0.5% |
| Grand Total | 63,720 | 100.0% | 45,500 | 100.0% | -18,220 | -28.6% | 0.0% |

## Table B: Covered California New Plan Selection by Age, 2018-19

| Age | | | | | 2019 compared to 2018 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | OE 2018 TOTAL | | OE 2019 TOTAL | | Count Difference | Percentage Change | Share Difference |
| Age | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| Age 17 or less | 38,560 | 9.1% | 28,490 | 8.8% | -10,070 | -26.1% | -0.4% |
| Age 18 to 25 | 57,240 | 13.5% | 43,630 | 13.4% | -13,610 | -23.8% | -0.1% |
| Age 26 to 34 | 95,360 | 22.5% | 76,860 | 23.6% | -18,500 | -19.4% | 1.1% |
| Age 35 to 44 | 71,360 | 16.9% | 53,540 | 16.5% | -17,820 | -25.0% | -0.4% |
| Age 45 to 54 | 81,650 | 19.3% | 59,700 | 18.4% | -21,950 | -26.9% | -0.9% |
| Age 55 to 64 | 76,580 | 18.1% | 61,150 | 18.8% | -15,430 | -20.1% | 0.7% |
| Age 65+ | 2,450 | 0.6% | 1,810 | 0.6% | -640 | -26.1% | 0.0% |
| Grand Total | 423,200 | 100.0% | 325,190 | 100.0% | -98,010 | -23.2% | 0.0% |

## Table C: Covered California New Plan Selection by Race/Ethnicity, 2018-19

Race/Ethnicity is a roll-up dimension that combines CalHEERS application questions on race and ethnicity, where a consumer who reports a Latino, Hispanic, or Spanish origin is counted as "Latino" in Race/Ethnicity, while races of Native Hawaiian or Pacific Islander are counted as "Asian" and "Other" comprises all non-Latino selections other than "Black or African American", "White", or "Asian" from the Race/Ethnicity dimension (including Multiple Races).

| Race / Ethnicity | | | | | 2019 compared to 2018 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | OE 2018 TOTAL | | OE 2019 TOTAL | | Count Difference | Percentage Change | Share Difference |
| Race / Ethnicity | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| Asian | 66,150 | 20.3% | 51,660 | 20.2% | -14,490 | -21.9% | -0.1% |
| Black or African American | 11,330 | 3.5% | 10,040 | 3.9% | -1,290 | -11.4% | 0.4% |
| Latino | 101,360 | 31.0% | 78,400 | 30.6% | -22,960 | -22.7% | -0.5% |
| Other | 34,470 | 10.6% | 27,680 | 10.8% | -6,790 | -19.7% | 0.2% |
| White | 112,630 | 34.5% | 88,070 | 34.4% | -24,560 | -21.8% | -0.1% |
| Grand Total | 326,470 | 100.0% | 256,240 | 100.0% | -70,230 | -21.5% | 0.0% |
| (nonrespondent) | 96,730 | 22.9% | 68,950 | 21.2% | -27,780 | -28.7% | -1.7% |

Race/Ethnicity is a roll-up dimension that combines CalHEERS application questions on race and ethnicity, where a consumer who reports a Latino, Hispanic, or Spanish origin is counted as "Latino" in Race/Ethnicity, while races of Native Hawaiian or Pacific Islander are counted as "Asian" and "Other" comprises all non-Latino selections other than "Black or African American", "White", or "Asian" from the Race/Ethnicity dimension (including Multiple Races).

| Race / Ethnicity | | | | | 2019 compared to 2018 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | OE 2018 TOTAL | | OE 2019 TOTAL | | Count Difference | Percentage Change | Share Difference |
| Race / Ethnicity | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| American Indian/Alaska Native | 870 | 0.3% | 630 | 0.2% | -240 | -27.6% | 0.0% |
| Asian | 66,150 | 20.3% | 51,660 | 20.2% | -14,490 | -21.9% | -0.1% |
| Black or African American | 11,330 | 3.5% | 10,040 | 3.9% | -1,290 | -11.4% | 0.4% |
| Latino | 101,360 | 31.0% | 78,400 | 30.6% | -22,960 | -22.7% | -0.5% |
| Multiple Races | 8,480 | 2.6% | 6,950 | 2.7% | -1,530 | -18.0% | 0.1% |
| Native Hawaiian or Pacific Islander | 530 | 0.2% | 400 | 0.2% | -130 | -24.5% | 0.0% |
| Other | 25,120 | 7.7% | 20,100 | 7.8% | -5,020 | -20.0% | 0.1% |
| White | 112,630 | 34.5% | 88,070 | 34.4% | -24,560 | -21.8% | -0.1% |
| Grand Total | 326,470 | 100.0% | 256,240 | 100.0% | -70,230 | -21.5% | 0.0% |
| (nonrespondent) | 96,730 | 22.9% | 68,950 | 21.2% | -27,780 | -28.7% | -1.7% |

All % calculations except the non- respondents calculated out of respondents only. Non- respondent % is of total population of enrollees.

## Table C (continued): Covered California New Plan Selection by Race/Ethnicity, 2018-19

| Race | | OE 2018 TOTAL | | OE 2019 TOTAL | | 2019 compared to 2018 | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Count Difference | Percentage Change | Share Difference |
| Race | | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| American Indian or Alaska Native | | 1,500 | 0.6% | 1,120 | 0.5% | -380 | -25.3% | 0.0% |
| Asian Indian | | 8,650 | 3.2% | 8,100 | 3.8% | -550 | -6.4% | 0.6% |
| Black or African American | | 11,860 | 4.4% | 10,480 | 5.0% | -1,380 | -11.6% | 0.6% |
| Cambodian | | 550 | 0.2% | 500 | 0.2% | -50 | -9.1% | 0.0% |
| Chinese | | 25,390 | 9.4% | 19,460 | 9.2% | -5,930 | -23.4% | -0.1% |
| Filipino | | 10,410 | 3.8% | 8,540 | 4.1% | -1,870 | -18.0% | 0.2% |
| Guamanian or Chamorro | | 140 | 0.1% | 110 | 0.1% | -30 | -21.4% | 0.0% |
| Hmong | | 290 | 0.1% | 260 | 0.1% | -30 | -10.3% | 0.0% |
| Japanese | | 2,040 | 0.8% | 1,390 | 0.7% | -650 | -31.9% | -0.1% |
| Korean | | 9,680 | 3.6% | 5,950 | 2.8% | -3,730 | -38.5% | -0.8% |
| Laotian | | 270 | 0.1% | 270 | 0.1% | 0 | 0.0% | 0.0% |
| Multiple Races | | 11,160 | 4.1% | 9,060 | 4.3% | -2,100 | -18.8% | 0.2% |
| Native Hawaiian | | 150 | 0.1% | 120 | 0.1% | -30 | -20.0% | 0.0% |
| Other | | 44,140 | 16.3% | 33,440 | 15.9% | -10,700 | -24.2% | -0.4% |
| Other Asian | | 1,250 | 0.5% | 610 | 0.3% | -640 | -51.2% | -0.2% |
| Other Pacific Islander | | 150 | 0.1% | 80 | 0.0% | -70 | -46.7% | 0.0% |
| Samoan | | 170 | 0.1% | 150 | 0.1% | -20 | -11.8% | 0.0% |
| Vietnamese | | 8,310 | 3.1% | 7,150 | 3.4% | -1,160 | -14.0% | 0.3% |
| White | | 134,420 | 49.7% | 103,870 | 49.3% | -30,550 | -22.7% | -0.4% |
| Grand Total | | 270,510 | 100.0% | 210,620 | 100.0% | -59,890 | -22.1% | 0.0% |
| (nonrespondent) | | 152,690 | 36.1% | 114,570 | 35.2% | -38,120 | -25.0% | -0.8% |

All % calculations except the non-respondents calculated out of respondents only. Non-respondent % is of total population of enrollees.

| Ethnicity | | OE 2018 TOTAL | | OE 2019 TOTAL | | 2019 compared to 2018 | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Count Difference | Percentage Change | Share Difference |
| Ethnicity | | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| (Hispanic/Latino/Spanish origin)* | | 19,270 | 5.5% | 14,530 | 5.3% | -4,740 | -24.6% | -0.2% |
| (Not Hispanic/Latino/Spanish origin)** | | 246,010 | 70.8% | 194,380 | 71.3% | -51,630 | -21.0% | 0.4% |
| Cuban | | 570 | 0.2% | 460 | 0.2% | -110 | -19.3% | 0.0% |
| Guatemalan | | 1,200 | 0.3% | 950 | 0.3% | -250 | -20.8% | 0.0% |
| Mexican/Mexican American/Chicano | | 55,320 | 15.9% | 41,770 | 15.3% | -13,550 | -24.5% | -0.6% |
| Multiple Ethnicities | | 2,540 | 0.7% | 2,280 | 0.8% | -260 | -10.2% | 0.1% |
| Other | | 19,090 | 5.5% | 15,620 | 5.7% | -3,470 | -18.2% | 0.2% |
| Puerto Rican | | 1,080 | 0.3% | 890 | 0.3% | -190 | -17.6% | 0.0% |
| Salvadoran | | 2,290 | 0.7% | 1,900 | 0.7% | -390 | -17.0% | 0.0% |
| Grand Total | | 347,370 | 100.0% | 272,780 | 100.0% | -74,590 | -21.5% | 0.0% |
| (nonrespondent) | | 75,830 | 17.9% | 52,410 | 16.1% | -23,420 | -30.9% | -1.8% |

All % calculations except the non-respondents calculated out of respondents only. Non-respondent % is of total population of enrollees.

*"Hispanic/Latino/Spanish origin" respondents answered "Yes" to application question "Are you of Hispanic, Latino, or Spanish origin?" but did not indicate a specific ethnicity.

**"Not Hispanic/Latino/Spanish origin" respondents answered "No" to application question "Are you of Hispanic, Latino, or Spanish origin?" but did not indicate a specific ethnicity.

## Table D: Covered California New Plan Selection by Income, 2018-19

| FPL | OE 2018 TOTAL | | OE 2019 TOTAL | | 2019 compared to 2018 | | |
|---|---|---|---|---|---|---|---|
| | | | | | Count Difference | Percentage Change | Share Difference |
| FPL | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| 138% FPL or less | 11,430 | 2.7% | 7,000 | 2.2% | -4,430 | -38.8% | -0.5% |
| 138% FPL to 150% FPL | 55,810 | 13.2% | 44,870 | 13.8% | -10,940 | -19.6% | 0.6% |
| 150% FPL to 200% FPL | 112,380 | 26.6% | 87,890 | 27.0% | -24,490 | -21.8% | 0.5% |
| 200% FPL to 250% FPL | 71,640 | 16.9% | 54,850 | 16.9% | -16,790 | -23.4% | -0.1% |
| 250% FPL to 400% FPL | 113,010 | 26.7% | 89,900 | 27.6% | -23,110 | -20.4% | 0.9% |
| 400% FPL or greater & Unsubsidized | 58,940 | 13.9% | 40,690 | 12.5% | -18,250 | -31.0% | -1.4% |
| Grand Total | 423,200 | 100.0% | 325,190 | 100.0% | -98,010 | -23.2% | 0.0% |

| FPL Roll-Up | OE 2018 TOTAL | | OE 2019 TOTAL | | 2019 compared to 2018 | | |
|---|---|---|---|---|---|---|---|
| | | | | | Count Difference | Percentage Change | Share Difference |
| FPL Roll-Up | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| Subsidized | 364,270 | 86.1% | 284,510 | 87.5% | -79,760 | -21.9% | 1.4% |
| Less than 250% FPL | 251,260 | 59.4% | 194,610 | 59.8% | -56,650 | -22.5% | 0.5% |
| 250% FPL to 400% FPL | 113,010 | 26.7% | 89,900 | 27.6% | -23,110 | -20.4% | 0.9% |
| Unsubsidized | 58,940 | 13.9% | 40,690 | 12.5% | -18,250 | -31.0% | -1.4% |
| 400% FPL or greater & Unsubsidized | 58,940 | 13.9% | 40,690 | 12.5% | -18,250 | -31.0% | -1.4% |
| Grand Total | 423,200 | 100.0% | 325,190 | 100.0% | -98,010 | -23.2% | 0.0% |

## Table E: Covered California New Plan Selection by Service Channel, 2018-19

| Service Channel | OE 2018 TOTAL | | OE 2019 TOTAL | | 2019 compared to 2018 | | |
|---|---|---|---|---|---|---|---|
| | | | | | Count Difference | Percentage Change | Share Difference |
| Service Channel | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| Assisted | 274,880 | 65.0% | 218,950 | 67.3% | -55,930 | -20.3% | 2.4% |
| Certified Enrollment Counselor | 21,110 | 5.0% | 17,410 | 5.4% | -3,700 | -17.5% | 0.4% |
| Certified Insurance Agent | 193,550 | 45.7% | 157,100 | 48.3% | -36,450 | -18.8% | 2.6% |
| Certified Plan-based Enroller | 2,230 | 0.5% | 2,550 | 0.8% | 320 | 14.3% | 0.3% |
| County Eligibility Worker | 2,020 | 0.5% | 1,400 | 0.4% | -620 | -30.7% | 0.0% |
| Service Center Representative | 55,970 | 13.2% | 40,490 | 12.5% | -15,480 | -27.7% | -0.8% |
| Unassisted | 148,320 | 35.0% | 106,250 | 32.7% | -42,070 | -28.4% | -2.4% |
| Grand Total | 423,200 | 100.0% | 325,190 | 100.0% | -98,010 | -23.2% | 0.0% |

Service Channel reflects the latest assister type to submit an application or enroll a consumer, including change reports.

For this measure, prior contact with a CEC, PBE, or agent overwrites a more recent activity that was unassisted or performed by SCRs.

# Table F: Covered California New Plan Selection by Preferred Spoken Language, 2018-19

| Language Spoken Roll-Up | | | | | 2019 compared to 2018 | | |
|---|---|---|---|---|---|---|---|
| | OE 2018 TOTAL | | OE 2019 TOTAL | | Count Difference | Percentage Change | Share Difference |
| Preferred Spoken Language | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| English | 349,590 | 84.0% | 273,900 | 85.2% | -75,690 | -21.7% | 1.2% |
| Spanish | 41,360 | 9.9% | 29,280 | 9.1% | -12,080 | -29.2% | -0.8% |
| Asian and Pacific Islander | 23,670 | 5.7% | 16,880 | 5.3% | -6,790 | -28.7% | -0.4% |
| Other | 1,650 | 0.4% | 1,470 | 0.5% | -180 | -10.9% | 0.1% |
| Grand Total | 416,260 | 100.0% | 321,520 | 100.0% | -94,740 | -22.8% | 0.0% |
| (nonrespondent) | 6,940 | 1.6% | 3,670 | 1.1% | -3,270 | -47.1% | -0.5% |

All % calculations except the non-respondents calculated out of respondents only. Non-respondent % is of total population of enrollees.

Some individuals do not have a preferred language because language preference is only required for primary applicants, and may be blank for other members of the household.

| Language Spoken | | | | | 2019 compared to 2018 | | |
|---|---|---|---|---|---|---|---|
| | OE 2018 TOTAL | | OE 2019 TOTAL | | Count Difference | Percentage Change | Share Difference |
| Preferred Spoken Language | Enrollees | (column %) | Enrollees | (column %) | Enrollees | ( Δ %) | (column %) |
| Arabic | 350 | 0.1% | 280 | 0.1% | -70 | -20.0% | 0.0% |
| Armenian | 240 | 0.1% | 200 | 0.1% | -40 | -16.7% | 0.0% |
| Cambodian | 130 | 0.0% | 120 | 0.0% | -10 | -7.7% | 0.0% |
| Cantonese | 3,650 | 0.9% | 2,830 | 0.9% | -820 | -22.5% | 0.0% |
| English | 349,590 | 84.0% | 273,900 | 85.2% | -75,690 | -21.7% | 1.2% |
| Farsi | 460 | 0.1% | 440 | 0.1% | -20 | -4.3% | 0.0% |
| Hmong | 70 | 0.0% | 40 | 0.0% | -30 | -42.9% | 0.0% |
| Korean | 4,320 | 1.0% | 2,320 | 0.7% | -2,000 | -46.3% | -0.3% |
| Mandarin | 11,690 | 2.8% | 8,450 | 2.6% | -3,240 | -27.7% | -0.2% |
| Russian | 600 | 0.1% | 550 | 0.2% | -50 | -8.3% | 0.0% |
| Spanish | 41,360 | 9.9% | 29,280 | 9.1% | -12,080 | -29.2% | -0.8% |
| Tagalog | 660 | 0.2% | 550 | 0.2% | -110 | -16.7% | 0.0% |
| Vietnamese | 3,150 | 0.8% | 2,570 | 0.8% | -580 | -18.4% | 0.0% |
| Grand Total | 416,260 | 100.0% | 321,520 | 100.0% | -94,740 | -22.8% | 0.0% |
| (nonrespondent) | 6,940 | 1.6% | 3,670 | 1.1% | -3,270 | -47.1% | -0.5% |

All % calculations except the non-respondents calculated out of respondents only. Non-respondent % is of total population of enrollees.

Some individuals do not have a preferred language because language preference is only required for primary applicants, and may be blank for other members of the household.

Tab 4

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   CHEROKEE DM MELTON
    Supervising Deputy Attorney General
4   JENNIFER C. BONILLA
    LISA CISNEROS
5   JULIA HARUMI MASS
    ANITA GARCIA VELASCO
6   BRENDA AYON VERDUZCO
    ANNA RICH, State Bar No. 230195
7   Deputy Attorneys General
      1515 Clay Street, 20th Floor
8     P.O. Box 70550
      Oakland, CA  94612-0550
9     Telephone: 510-879-0296
      Fax: 510-622-2270
10    E-mail:  Anna.Rich@doj.ca.gov
    *Attorneys for Plaintiff State of California, by and*
11  *through Attorney General Xavier Becerra*

12              IN THE UNITED STATES DISTRICT COURT

13           FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16  **STATE OF CALIFORNIA, DISTRICT OF**     CASE NO. 3:19-cv-04975
    **COLUMBIA, STATE OF MAINE,**
17  **COMMONWEALTH OF**                       **DECLARATION OF TOM K. WONG IN**
    **PENNSYLVANIA** and **STATE OF**         **SUPPORT OF PLAINTIFF'S MOTION**
18  **OREGON,**                               **FOR PRELIMINARY INJUNCTION**

19                              Plaintiffs,

20        v.

21

22  **U.S. DEPARTMENT OF HOMELAND**
    **SECURITY; KEVIN McALEENAN,** in his
23  official capacity as Acting Secretary of
    Homeland Security; **U.S. CITIZENSHIP**
24  **AND IMMIGRATION SERVICES;** and
    **KENNETH T. CUCCINELLI**, in his official
25  capacity as Acting Director of U.S. Citizenship
    and Immigration Services**,**

26                              Defendants.

27

28

I, Tom K. Wong, declare as follows:

1.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am a tenured Associate Professor at the University of California, San Diego (UCSD).  I work in the Political Science Department, which U.S. News & World Report consistently ranks as one of the top ten political science departments nationally.  I first joined the Department at UCSD in 2012, and became an Associate Professor with tenure in 2016.  At UCSD, I am the Director of the U.S. Immigration Policy Center (USIPC), which I founded in 2018, and the Director of the International Migration Studies Program Minor.

3.      Prior to this, I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year.  I received a Ph.D. in Political Science from the University of California, Riverside in 2011.

**PROFESSIONAL BACKGROUND**

4.      I am an expert on U.S. immigration policy.  I have written two peer-reviewed books and several peer-reviewed journal articles, book chapters, and reports on this subject.  My most recent book analyzes 31,193 roll call votes on immigration-related legislation in Congress from 2005 to present, which makes it the most comprehensive analysis to date on contemporary immigration policies in the United States.

5.      I have expertise in the conceptualization, design, and implementation of survey research, including surveying hard-to-reach undocumented populations.  Several of the peer-reviewed academic journal articles and reports that I have published are based on survey research that I conceptualized, designed, and implemented. This includes embedding survey experiments into questionnaires in order to randomize respondents to different experimental conditions to identify causal treatment effects.  The survey and data presented here represent a survey experiment administered to a probability-based sample of undocumented immigrants to identify the causal treatment effect of the then-Proposed Rule.

1

6.     I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration, which includes a list of all of my publications over the past ten years.

## PUBLIC CHARGE INADMISSIBILITY

7.     The Immigration and Nationality Act (INA) states that a person seeking admission into the U.S. or seeking to adjust status to that of a person lawfully admitted for permanent residence (i.e., a green-card holder) is inadmissible if the person is determined likely to become a public charge.[1]

8.     Under the INA's Section 212(a)(4), inadmissibility based on public charge is determined by the statute's "totality of the circumstances" test, which includes, at minimum, consideration of the following factors: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills.[2]

9.     Under this framework, an official from the United States Citizenship and Immigration Services (USCIS) operating under authority from the Department of Homeland Security (DHS) and pursuant to DHS regulations, evaluates these factors to determine if the noncitizen applicant is "likely to become primarily dependent on the government for subsistence as demonstrated by either the receipt of public cash assistance for income maintenance or institutionalization for long-term care at government expense."[3]  Generally, the Department of Homeland Security (DHS) does not take into account non-cash assistance and special-purpose cash assistance for the purposes of public charge determinations.[4]

10.     DHS explains that, "Non-cash or special-purpose cash benefits are generally supplemental in nature and do not make a person primarily dependent on the government for subsistence."[5]

---

[1] Section 212(a)(4) of the Immigration and Nationality Act (INA); 8 U.S.C. 1182(a)(4)
[2] U.S. Citizenship and Immigration Services (USCIS) (last accessed August 5, 2019), https://www.uscis.gov/greencard/public-charge; Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676, 28, 677 (May 26, 1999).
[3] U.S. Citizenship and Immigration Services (USCIS) (last accessed August 5, 2019), https://www.uscis.gov/greencard/public-charge.
[4] *Ibid*.
[5] *Ibid*.

2

11.     According to DHS guidance, non-cash assistance and special-purpose cash assistance, includes:

- Medicaid and other health insurance and health services (including public assistance for immunizations and for testing and treatment of symptoms of communicable diseases, use of health clinics, short-term rehabilitation services, and emergency medical services) other than support for long-term institutional care;
- Children's Health Insurance Program (CHIP);
- Nutrition programs, including Supplemental Nutrition Assistance Program (SNAP, formerly "Food Stamps"), the Special Supplemental Nutrition Program for Women, Infants and Children (WIC), the National School Lunch and School Breakfast Program, and "other supplementary and emergency food assistance programs";
- Housing benefits;
- Child care services;
- Energy assistance;
- Emergency disaster relief;
- Foster care and adoption assistance;
- Educational assistance;
- Job-training programs; and
- In-kind, community-based programs, services, or assistance, including soup kitchens, crisis counseling and intervention, and short-term shelter.[6]

12.     DHS guidance currently maintains the same listed programs in a section entitled, "What publicly funded benefits may not be considered for public charge purposes," in its Frequently Asked Questions (FAQ) about public charge.[7]

## I.     DHS's Proposed Public Charge Rule

13.     On October 10, 2018, DHS published a Notice of Proposed Rulemaking in the Federal Register entitled "Inadmissibility on Public Charge Grounds" (the Proposed Rule).[8]  The Proposed Rule stated that, "[a]liens who seek adjustment of status or a visa, or who are applicants for admission, must establish that they are not likely at any time to become a public charge."[9] Additionally, under this Proposed Rule, "DHS propose[d] to require all aliens seeking an

---

[6] *Ibid.*
[7] *Ibid.*
[8] DHS, "Inadmissibility on Public Charge Grounds," October 10, 2018, p. 51114.
[9] *Ibid.*

3

extension of stay or change of status to demonstrate that they have not received, are not currently receiving, nor are likely to receive, public benefits as defined in the proposed rule."[10]

14.    Among other changes, the Proposed Rule aimed to create significant new definitions:

- Public Charge would mean "an alien who receives one or more public benefit"[11];

- Public Benefits would be expanded to include new programs:  Medicaid, Supplemental Nutrition Assistance Program (SNAP), Medicare Part D Low Income Subsidy, Section 8 housing, Section 8 Project-Based rental assistance, and federal Public Housing.

- Benefits would be quantified in a number of ways:[12]

    (1) Monetizable benefits are benefits that can be quantified.  The threshold for use of monetizable benefits would determined by the cumulative value of the benefits exceeds 15 percent of the Federal Poverty Guidelines (FPG) for a household of one within any period of 12 consecutive months;

    (2) Non-Monetizable benefits are benefits with an undetermined value. The threshold for use of non-monetizable benefits would be limited to 12 months in the aggregate within a three-year period;

    (3) If both monetizable and non-monetizable benefits are used, the use of Non-Monetizable benefit received is limited to 9 months in the aggregate within a three-year period.

## II.    NONCITIZENS IN THE U.S. AND THE PROPOSED PUBLIC CHARGE RULE

15.    The public charge test applies to a person "who is applying for admission to the United States or is applying for adjustment of status to that of lawful permanent resident before DHS."[13]  However, the statute exempts select categories of immigrants, such as refugees and asylum seekers, from the public charge test.  Under the Proposed Rule, this would include not only noncitizen immigrants currently living in the U.S. seeking to adjust their status to that of a permanent resident, but also noncitizens seeking to extend their visas or change their visa category.

---

[10] *Ibid.*
[11] *Ibid,* p. 51289.
[12] *Ibid,* pp. 51289-51290.
[13] *Ibid,* p. 51134.

4

16.     According to the Proposed Rule, DHS's purpose is to promote self-sufficiency among immigrants seeking admission.

17.     Nevertheless, DHS acknowledges a past policy of public charge determinations based only on the consideration of cash assistance.  For example, the Proposed Rule discusses the implementation of the Immigration Reform and Control Act (IRCA) of 1986, which made noncitizens who had arrived in the country prior to January 1, 1982 eligible for legal permanent residency.  IRCA waived a noncitizen's inadmissibility under Section 212(a)(4), so long as the "applicant demonstrated a history of self-support through employment and without receiving public cash assistance, he or she would not be ineligible for adjustment of status on public charge grounds." [14]

## III.   EVALUATING THE IMPACT OF THE PROPOSED PUBLIC CHARGE RULE

### A.     Survey Methodology

18.     To evaluate the impact of the Proposed Rule, I recently conducted a representative survey of undocumented Mexican nationals in San Diego County.  Between January 2019 and May 2019, I fielded a survey that included 506 respondents.

19.     Through a partnership between the US Immigration Policy Center (USIPC) and the Mexican Consulate in San Diego (the Consulate), I created a sample frame of undocumented Mexican nationals in San Diego County.

20.     The sample frame is comprised of individuals who receive consular services unique to those living in the U.S. without authorization.  Consulates provide a broad range of services to their nationals abroad.  The sample frame, which includes approximately 73,000 people, accounts for nearly the entire universe of undocumented Mexican nationals who currently live in San Diego County.  The Center for Migration Studies (CMS), for example, estimates that there are currently 82,406 undocumented immigrants who were born in Mexico who live in San Diego County (CMS 2015).

21.     Working with staff at the Consulate, I assigned random ID numbers to each record and then cut the sample frame into random draws of approximately 5,000 records for each survey

---

[14] *Ibid,* p. 51125.

5

module in the "Undocumented in America" project.  The Undocumented in America project is based out of the USIPC at UC San Diego.  Call sheets with limited information about each respondent—the random ID number assigned to each record, first name, and phone number—are then printed out.  Phone numbers are manually dialed by enumerators trained by myself.  Phone numbers are dialed once with no additional follow up.  After each paper call sheet is completed, it is immediately reviewed and then destroyed.  All surveys are conducted in Spanish, unless the respondent prefers to speak in English.

22.     I tested respondents' concerns over the Proposed Rule and its impact on their behavior regarding accessing public benefits using a survey experiment.  In the survey experiment, I randomly assigned respondents to one of two groups.  In one group ($n = 256$ respondents), I prefaced questions with language about the DHS' existing public charge rule.  In the second group ($n = 250$ respondents), I prefaced questions with language about the existing public charge rule and additional language about the Proposed Rule change.  The exact survey text is below:

---

Currently, immigration officials can deny an application to become a legal permanent resident (i.e., get a green card) if they think that someone is likely to become a public charge, meaning someone who is primarily dependent on the government for support. To determine whether someone is likely to become a public charge, immigration officials look at whether green card applicants have received cash assistance from the government, among other factors...

**[There is currently a proposal to add more programs to the list of programs that immigration officials look at to determine whether someone is likely to become a public charge. This includes using food stamps (in California, this is called CalFresh), receiving rental assistance for low-income families (these are called Section 8 Housing Vouchers), and obtaining some healthcare services using Medicaid (in California, this is called Medi-Cal).**

---

For each of the following, please tell me how likely you are to do the following if needed...
- Get emergency healthcare services
- Get preventative healthcare services, such as regular doctor's visits
- Get free immunization services, such as flu shots, at County Public Health Centers
- Use food stamps (in California, this is called CalFreh)
- Use the welfare-to-work program, which helps parents obtain employment and provides services such as childcare and transportation

(for those with children)
- Get emergency healthcare services for your children
- Get preventative healthcare services, such as regular doctor's visits, for your children
- Get free immunization services, such as flu shots, at County Public Health Centers for your children

(for those with children in public K-12 education)
- Get free or reduced price school meals for your children

---

6

23.     All respondents were asked about their likelihood of using the following:

- Emergency health services;
- Preventive health services, such as doctor's visits;
- Free immunization services, such as flu shots, at County Public Health Centers;
- Food stamps (in California, this is called CalFresh); and
- Welfare-to-Work program (which helps parents obtain employment and provides services such as childcare and transportation).

24.     Those with children were also asked about their likelihood of using the following:

- Emergency healthcare services for your children;
- Preventive healthcare services, such as regular doctor's visits, for your children;
- Free immunization services, such as flu shots, at County Public Health Centers for your children; and
- Free or reduced price school meals for their children (for respondents with children in public K-12 education).

25.     An experiment such as this is superior to analyzing observational survey data (i.e., survey data that is not based on an experimental design) because asking respondents about one scenario is insufficient for determining how their behavior may or may not change based on the second scenario.  Asking respondents about one scenario and then the second scenario would likely produce biased results because responses related to the first scenario would likely influence responses to the second scenario (e.g., "I said I would do this in the first scenario, so maybe I should say I wouldn't do that in the second scenario").  Random assignment to one of the two groups balances the two groups across the broad range of covariates (e.g., age, gender, etc.) that need to be controlled for in observational analysis.  Additionally, random assignment to one of the two groups means that differences in responses can be casually attributed to the variation in the two scenarios (i.e., the treatment effect that results because of the Proposed Rule). Survey experiments embedded into representative probability-based samples of broader populations have "become an ostensible 'gold standard' for generalizable causal inferences."[15]

---

[15] Mullinix, Kevin J., Thomas J. Leeper, James N. Druckman, and Jeremy Freese. "The generalizability of survey experiments." *Journal of Experimental Political Science* 2, no. 2 (2015): 109-138.  The authors further find that results obtained from convenience samples, that is, samples of populations that may not be representative, also "provide causal effects comparable to those found on population-based samples."

7

**SURVEY RESULTS**

26.     I found the following results regarding the impact of the Proposed Rule on respondents' future benefit use.

**I.   ALL RESPONDENTS**

*Emergency Health Services*

27.     When respondents are told about the existing public charge rule, 71.5 percent are "likely" or "very likely" to get emergency healthcare services when needed.  When respondents are told about the existing public charge rule and the Proposed Rule, 56.5 percent are "likely" or "very likely" to get emergency healthcare services when needed.  In other words, respondents are 15.1 percent *less likely* to get emergency healthcare services when needed when they are told about the Proposed Rule change ($p < .001$).  This result is highly statistically significant.

*Preventive Health Services*

28.     When respondents are told about the existing public charge rule, 50.6 percent are "likely" or "very likely" to get preventive healthcare services.  When respondents are told about the existing public charge rule and the proposed changes, 32.3 percent are "likely" or "very likely" to get preventive healthcare services.  In other words, respondents are 18.3 percent *less likely* to get preventive healthcare services when they are told about the Proposed Rule change ($p < .001$).  This result is highly statistically significant.

*Immunization Services*

29.     When respondents are told about the existing public charge rule, 48.6 percent are "likely" or "very likely" to get free immunization services, such as flu shots, at County Public Health Centers.  When respondents are told about the existing public charge rule and the proposed changes, 39.5 percent are "likely" or "very likely" to get free immunization services, such as flu shots, at County Public Health Centers.  In other words, respondents are 9.1 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers when they are told about the Proposed Rule change ($p = .040$).  This result is also statistically significant.

8

*Food Stamps (CalFresh)*

30.     When respondents are told about the existing public charge rule, 24.1 percent are "likely" or "very likely" to use food stamps (in California, this is called CalFresh).  When respondents are told about the existing public charge rule and the proposed changes, 17.7 percent are "likely" or "very likely" to use food stamps (in California, this is called CalFresh).  In other words, respondents are 6.4 percent *less likely* to use food stamps (in California, this is called CalFresh) when they are told about the Proposed Rule change ($p = .080$).

**II.    RESPONDENTS WITH CHILDREN**

*Emergency Health Services*

31.     When respondents with children are told about the existing public charge rule, 88.7 percent are "likely" or "very likely" to get emergency healthcare services for their children when needed. When respondents with children are told about the existing public charge rule and the proposed changes, 82.1 percent are "likely" or "very likely" to get emergency healthcare services for their children when needed. In other words, respondents with children are 6.6 percent *less likely* to get emergency healthcare services for their children when needed when they are told about the Proposed Rule change ($p = .058$). This result borders on statistical significance.

*Preventive Health Services*

32.     When respondents with children are told about the existing public charge rule, 79.8 percent are "likely" or "very likely" to get preventive healthcare services for their children. When respondents with children are told about the existing public charge rule and the proposed changes, 71.2 percent are "likely" or "very likely" to get preventive healthcare services for their children. In other words, respondents with children are 8.6 percent *less likely* to get preventive healthcare services for their children when they are told about the Proposed Rule change ($p = .043$). This result is statistically significant.

*Immunization Services*

33.     When respondents with children are told about the existing public charge rule, 81.8 percent are "likely" or "very likely" to get free immunization services, such as flu shots, at County Public Health Centers for their children. When respondents with children are told about

9

the existing public charge rule and the proposed changes, 69.3 percent are "likely" or "very likely" to get free immunization services, such as flu shots, at County Public Health Centers for their children. In other words, respondents with children are 12.4 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers for their children when they are told about the Proposed Rule change ($p$ = .003). This result is highly statistically significant.

### *Free or Reduced Priced School Meals*

34.    When respondents with children in public K-12 education are told about the existing public charge rule, 81.2 percent are "likely" or "very likely" to get free or reduced price school meals for their children. When respondents with children in public K-12 education are told about the existing public charge rule and the proposed changes, 72.1 percent are "likely" or "very likely" to get free or reduced price school meals for their children. In other words, respondents with children are 9.1 percent *less likely* to get free or reduced price school meals for their children when they are told about the Proposed Rule change ($p$ = .049). This result is statistically significant.

**Table Summary**

|  | Existing Rule | Existing + Proposed Rule | Difference | p-value |
|---|---|---|---|---|
| Emergency Health Services | 71.5% | 56.5% | -15.1% | <.001 |
| Preventive Healthcare Services | 50.6% | 32.3% | -18.3% | <.001 |
| Free Immunization Services | 48.6% | 39.5% | -9.1% | .040 |
| Food Stamps | 24.1% | 17.7% | -6.4% | .080 |
| Welfare-to-Work | 18.6% | 18.9% | 0.3% | .915 |
| (w/children) |  |  |  |  |
| Emergency Health Services for children | 88.7% | 82.1% | -6.6% | .058 |
| Preventive Healthcare for your children | 79.8% | 71.2% | -8.6% | .043 |
| Free Immunizations for your children | 81.8% | 69.3% | -12.4% | .003 |
| (w/children in K-12 education) |  |  |  |  |
| Free or reduced-price school meals | 81.2% | 72.1% | -9.1% | .049 |

### III. RESULTS FOR RESPONDENTS WITH U.S. CITIZEN CHILDREN

35.     A total of 370 respondents have U.S. citizen children.  Respondents with U.S. citizen children are 7.7 percent *less likely* to get emergency healthcare services for their children when needed when they are told about the Proposed Rule change (*p* = .032).  Respondents with U.S. citizen children are 9.6 percent *less likely* to get preventive healthcare services for their children when they are told about the Proposed Rule change (*p* = .032).  Respondents with U.S. citizen children are also 12.8 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers for their children when they are told about the Proposed Rule change (*p* = .004).

36.     A total of 318 respondents have U.S. citizen children in public K-12 education. Respondents with U.S. citizen children in public K-12 education are 9.5 percent *less likely* to get free or reduced price school meals for their children when they are told about the Proposed Rule change (*p* = .041).

### SUMMARY OF RESULTS

37.     Altogether, my data show:
- Undocumented immigrants are 15.1 percent *less likely* to get emergency healthcare services for themselves when needed when they are told about the Proposed Rule change (*p* < .001);

- Undocumented immigrants are 18.3 percent *less likely* to get preventive healthcare services for themselves when they are told about the Proposed Rule change (*p* < .001);

- Undocumented immigrants are 9.1 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers when they are told about the Proposed Rule change (*p* = .040);

- Undocumented immigrants with children are 6.6 percent *less likely* to get emergency healthcare services for their children when needed when they are told about the Proposed Rule change (*p* = .058);

- Undocumented immigrants with children are 8.6 percent *less likely* to get preventive healthcare services for their children when they are told about the Proposed Rule change (*p* = .043);

- Undocumented immigrants with children are 12.4 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers for their children when they are told about the Proposed Rule change (*p* = .003);

11

- Undocumented immigrants with children are 9.1 percent *less likely* to get free or reduced price school meals for their children when they are told about the Proposed Rule change ($p = .049$);

- Undocumented immigrants with U.S. citizen children are 7.7 percent *less likely* to get emergency healthcare services for their children when needed when they are told about the Proposed Rule change ($p = .032$);

- Undocumented immigrants with U.S. citizen children are 9.6 percent *less likely* to get preventive healthcare services for their children when they are told about the Proposed Rule change ($p = .032$);

- Undocumented immigrants with U.S. citizen children are 12.8 percent *less likely* to get free immunization services, such as flu shots, at County Public Health Centers for their children when they are told about the Proposed Rule change ($p = .004$); and

- Undocumented immigrants with U.S. citizen children in public K-12 education are 9.5 percent *less likely* to get free or reduced price school meals for their children when they are told about the Proposed Rule change ($p = .041$)

## CONCLUSION

38.     My survey results show that the changes to public charge, contained in the Proposed Rule, would have had a significant chilling effect on noncitizen families', including families with U.S. citizen children, use of public benefits.

39.     When undocumented immigrants are told about the Proposed Rule change, they are significantly less likely to get emergency healthcare services for themselves when needed, are significantly less likely to get preventive healthcare services, and are significantly less likely to get free immunization services. These patterns hold when focusing the analysis on respondents with U.S. citizen children. Undocumented immigrants with U.S. citizen children are significantly less likely to get emergency healthcare services for their children when needed, are significantly less likely to get preventive healthcare services for their children, and are significantly less likely to get free immunization services, such as flu shots, at County Public Health Centers for their children when they are told about the Proposed Rule change. Respondents with U.S. citizen children in public K-12 education are significantly less likely to get free or reduced-price school meals for their children when they are told about the Proposed Rule change.

12

*Cross Analysis Comparisons on the Proposed Rule*

40.    My survey results also complement other research anticipating the chilling effect, or lack of participation by immigrant groups in public benefit programs because of the Proposed Rule.  For example, using in-depth qualitative interviews with twenty-five adults in immigrant families, the Urban Institute similarly found that interviewees avoided participation in SNAP (formerly "Food Stamps") and Medicaid because of the Proposed Rule, and also raised concerns about additional programs not listed in the Proposed Rule.[16]  My survey results show that the experiences of the individuals who were interviewed are shared more broadly among noncitizens.

*DHS's Final Rule*

41.    It is important to note that these results likely underestimate the impact of DHS's Final Rule, which was published in the Federal Register on August 14, 2019.[17]  When describing the Proposed Rule, the survey experiment used language stating, "There is currently a proposal."

42.    The Final Rule, contains many of the same factors and changes contained in the Proposed Rule, with slight differences and exceptions that I anticipate will not cure the chilling effect that my survey results demonstrated.  Like the Proposed Rule, the Final Rule establishes a list of new enumerated public benefit programs, and a set of positive and negative factors that are considered when determining a noncitizen's inadmissibility on public charge grounds.

43.    The Final Rule includes:  Medicaid, with certain exceptions; SNAP (Supplemental Nutrition Assistance Program); Section 8 housing, Section 8 Project-Based rental assistance, Federal Public Housing; Cash benefits for income maintenance, Social Security Income (SSI), and Temporary Assistance for Needy Families (TANF).  Unlike the various ways used to quantify benefits in the Proposed Rule (Monetizable and Non-Monetizable benefits discussed above), the

---

[16] Urban Institute. 2019. *Safety Net Access in the Context of the Public Charge Rule: Voices of Immigrant Families*. Washington, DC: Urban Institute.
[17] 84 Fed. Reg. 41,292.

13

Final Rule would count use of these benefits as a negative factors when used for more than 12 months in the aggregate within any 36 month period.

44.     The Final Rule excludes programs such as, the Medicare Part D Low Income Subsidy previously included in the Proposed Rule and marketplace coverage subsidies made available under the Affordable Care Act (ACA), and declines to include the Children's Health Insurance Program, which it was still considering at the Proposed Rule stage.  The Final Rule also carves out as exempted, Medicaid use by children under 21 years old and women during pregnancy, including 60 days after pregnancy ends.

45.     The changes to the Final Rule, do not amount to a significant or meaningful change in direction from those public benefit programs included in the Proposed Rule.  Therefore, I anticipate that the Final Rule will have similar if not more acute negative effects among undocumented immigrant groups.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on August 26, 2019, in San Diego, California.

_____
Tom K. Wong
Associate Professor
University of California at San Diego

# EXHIBIT A

# TOM K. WONG, PH.D.

Email: tomkwong@ucsd.edu | Google Voice: (619) 354-9913
Website: www.tomwongphd.com | bit.ly/tomkwong_citations

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2017 - | **ASSOCIATE PROFESSOR, POLITICAL SCIENCE**<br>University of California, San Diego |
| 2012 - 2017 | **ASSISTANT PROFESSOR, POLITICAL SCIENCE**<br>University of California, San Diego |

## OTHER POSITIONS

| | |
|---|---|
| 2019 - | **DIRECTOR, U.S. IMMIGRATION POLICY CENTER (USIPC)**<br>University of California, San Diego |
| 2018 - | **APPOINTED MEMBER (GUBERNATORIAL APPOINTMENT)**<br>**STATE OF CALIFORNIA CENSUS COMPLETE COUNT COMMITTEE** |
| 2016 | **ADVISOR, IMMIGRATION PORTFOLIO**<br>**WHITE HOUSE INITIATIVE ON ASIAN AMERICANS AND PACIFIC ISLANDERS** |
| 2013 - | **DIRECTOR, INTERNATIONAL MIGRATION STUDIES PROGRAM MINOR**<br>University of California, San Diego |

## EDUCATION

| | |
|---|---|
| 2011 | **PH.D. IN POLITICAL SCIENCE**<br>University of California, Riverside |
| 2005 | **B.A. IN POLITICAL SCIENCE**<br>University of California, Riverside<br>*Magna Cum Laude* |

## BOOKS

(2) Tom K. Wong. 2017. *The Politics of Immigration: Partisanship, Changing Demographics, and American National Identity.* Oxford University Press.
NPR, ABC News/Yahoo.com, LA Times, Univision, Monkey Cage

(1) Tom K. Wong. 2015. *Rights, Deportation, and Detention in the Age of Immigration Control.* Stanford University Press.

## JOURNAL ARTICLES

(7) Tom K. Wong, Angela Garcia, and Carolina Valdivia. *2018.* "The Political Incorporation of Undocumented Youth," *Social Problems* vol. 66 no. 3: 356-372.

(6) Tom K. Wong and Hillary Kosnac. 2017. "Does the Legalization of Undocumented Immigrants in the US Encourage Unauthorized Immigration from Mexico? An Empirical Analysis of the Moral Hazard of Legalization," *International Migration* vol. 55 no. 2: 159-173.

(5) Tom K. Wong and Angela Garcia. 2016. "Does Where I Live Affect Whether I Apply? The Contextual Determinants of Applying for Deferred Action for Childhood Arrivals (DACA)," *International Migration Review* vol. 50 no. 3: 699-727.
C-Span, Associated Press

(4) Tom K. Wong, Donald Kerwin, Jeanne M. Atkinson, and Mary Meg McCarthy. 2014. "Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey," *Journal of Migration and Human Security* vol. 2 no 4: 287-304.
NBC News.com

(3) Tom K. Wong. 2014. "The Politics of Interior Immigration Enforcement," *California Journal of Politics and Policy* vol. 6 no 3: 381-399.

(2) Tom K. Wong and Justin Gest. 2013. "Organizing Disorder: Indexing Migrants' Rights and International Migration Policy," *Georgetown Immigration Law Journal* vol. 28 no 1: 257-269.

(1) Tom K. Wong. 2012. "The Politics of Interior Immigration Control in the United States: Explaining Local Cooperation with Federal Immigration Authorities," *Journal of Ethnic and Migration Studies* vol. 38 no. 5: 737-756.

## POLICY AND DATA REPORTS

(9) Tom K. Wong, Jeremiah Cha, and Erika Villareal-Garcia. 2019. *The Impact of Changes to the Public Charge Rule on Undocumented Immigrants Living in the U.S.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego.

(8) Tom K. Wong et al. 2018. *Do Family Separation and Detention Deter Immigration?* Washington, D.C.: Center for American Progress.

(7) Tom K. Wong et al. 2018. *Amid Legal and Political Uncertainty DACA Remains More Important Than Ever.* Washington, D.C.: Center for American Progress.

(6) Tom K. Wong et al. 2017. *DACA Recipients' Economic and Educational Gains Continue to Grow.* Washington, D.C.: Center for American Progress.

(5) Tom K. Wong. 2017. *The Effects of Sanctuary Policies on Crime and the Economy.* Washington, D.C.: Center for American Progress.

(4) Tom K. Wong et al. 2016. *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes.* Washington, D.C.: Center for American Progress.

(3) Tom K. Wong et al. 2015. *Results from a Nationwide Survey of DACA Recipients Illustrate the Program's Impact.* Washington, D.C.: Center for American Progress.

(2) Tom K. Wong. 2014. *Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border.* Washington, D.C.: Center for American Progress.

(1) Tom K. Wong et al. 2013. *Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals (DACA).* Washington, D.C.: Center for American Progress.

## BOOK CHAPTERS

(4) Tom K. Wong. 2014. "Conceptual Challenges and Contemporary Trends in Immigration Control." In *Controlling Immigration: A Global Perspective* (3rd edition), edited by James F. Hollifield, Philip Martin, and Pia Orrenius. Stanford University Press.

(3) Tom K. Wong. 2014. "Nation of Immigrants or Deportation Nation? Analyzing Deportations and Returns in the United States, 1892-2010." In *The Nation and Its Peoples: Citizens, Denizens, and Migrants*, edited by John S.W. Park and Shannon Gleeson. Routledge.

(2) James F. Hollifield and Tom K. Wong. 2014. "The Politics of International Migration: How Can We 'Bring the State Back In'?" In *Migration Theory: Talking Across Disciplines* (3rd edition), edited by Caroline B. Brettell and James F. Hollifield. Routledge.

(1) Karthick Ramakrishnan and Tom K. Wong. 2010. "Partisanship, Not Spanish: Explaining Municipal Ordinances Affecting Undocumented Immigrants." In *Taking Local Control: Immigration Policy Activism in U.S. Cities and States*, edited by Monica W. Varsanyi. Stanford University Press.

## WORKS UNDER REVIEW/IN PROGRESS (SELECTED LIST)

(Book Project: 2019) DACA: Undocumented Youth and the Politics of Immigrant Illegality
This project leverages five consecutive years of surveying DACA recipients about their economic, societal, and civic integration. These surveys span the Obama and Trump administrations, and include both the periods before and after the rescission of DACA. NPR, CNN, Washington Post, New York Times, NBC News, CNBC, Atlantic, Vox, Forbes, 538, Politifact, WNYC, C-Span, Associated Press

(Book Project: 2019) The Impact of Immigration Enforcement on Undocumented Immigrants.
This project draws from a first-of-its-kind probability-based survey of undocumented immigrants. This project includes several survey experiments that uncover how the day-to-day behaviors of undocumented immigrants, as well as the trust that they have in public institutions, is affected by differential levels of local law enforcement cooperation with federal immigration enforcement officials. Washington Post, NPR, KPBS, USA Today, City Lab, Chicago Tribune, Factcheck.org

(Book Project: 2020) Tom K. Wong. "Mobilizing Low-Propensity Voters of Color." This project examine how demographic changes are reshaping the American electorate and how policymakers are responding. The project includes multiple voter mobilization experiments utilizing direct voter contact run during the 2016 presidential cycle, as well as voter mobilization experiments that will be run during the 2018 midterm cycle.

(Database: ongoing) w/Justin Gest. "International Migrants Bill of Rights." This project aims to create cross-national indicators on government respect for and recognition of the human rights of migrants. Funding from the World Bank (obtained by Gest) will be used to pilot a 58 item index across 5 countries. A pilot of five countries was published by the World Bank (see here)

(Article: 2019) Tom K. Wong and Justin Gest. "Looks Skin Deep: Do Immigrant Legislators Better Represent Immigrant Interests?"

## RESEARCH GRANTS (AS A FACULTY MEMBER)

- $341,127, Multiple Funders, "U.S. Immigration Policy in the 21st Century," 2017-2019
- $22,500, UCSD USMEX Fellowship, 2016-2017
- $16,000, UCLA Institute for Research on Labor and Employment, 2015-2016

- $365,000, MacArthur Foundation, 2015-2017 (partially awarded, terminated after the DAPA program was enjoined by the U.S. Supreme Court)
- $25,000, UCSD Frontiers of Innovation Scholars Program Grant, 2015-2016
- $15,000, UCSD Faculty Career Development Program Grant, 2014-2015
- $30,000, Unbound Philanthropy, 2014
- $100,000, Department of Homeland Security, 2013
- $30,000, Center for American Progress, 2013
- $10,000, UCSD Center for International, Comparative, and Area Studies Grant, 2013
- $10,000, UCSD Academic Senate, 2013
- $1,500, UCSD Diversity, Equity, and Inclusion Grant, 2013

## TEACHING AT UCSD

- Diversity, Equity, and Inclusion Teaching Award, 2014-2015
- The Politics of Immigration (upper-division, 280 students)
- International Human Rights Law: Rights of Migrants (upper-division, 200 students)
- The Politics of Multiculturalism (upper-division, 100 students)
- Immigration Politics and Policy (graduate seminar, 4 students)
- Undergraduate Honors Seminar (upper-division, 15 students)

## INVITED PRESENTATIONS — LAST 5 YEARS (SELECTED)

**2018** | "Surveying Undocumented Immigrants." UC Berkeley, June 12, 2018.

"The Integration of DACA Recipients." Scripps College, May 3, 2018.

"The Impact of the Trump Administration's Immigration Policies on Undocumented Immigrants: Evidence from Survey Experiments." Race, Ethnicity, and Politics Workshop, Northwestern University, April 13, 2018.

"Immigrant Political Incorporation." UC Migration Conference, UCSD, March 2, 2018.

"The Future of DACA." Columbia University, February 22, 2018.

"Immigration and DACA in the Age of Uncertainty, Middlebury College, February 20, 2018.

**2017** | "The Future of U.S. Immigration Policy in the Age of Trump." Citizenship and Equality Colloquium, University of Colorado, November 16, 2017.

"The Determinants and Effects of Sanctuary Policies." Cornell University, November 9-10, 2017.

"The Determinants and Effects of Sanctuary Policies." Presentation at the 2017 APPAM Fall Research Conference, Chicago, IL, November 2-4, 2017.

"Immigration and the U.S. Constitution." Seminar at the Robert H. Smith Center for the Constitution at James Madison's Montpelier, Orange, VA, July 31-August 2, 2017.

"The Determinants of U.S. Immigration Policy." University of California, Santa Barbara, June 1, 2017.

"Paths to Legal Status for Undocumented Immigrants." Presentation at the CLINIC annual conference, Atlanta, GA, May 25, 2017.

"The Effects of Sanctuary Policies on Crime and the Economy." Presentation at the Sanctuary Cities Convening, New York City Council, New York, NY, March 27-28, 2017.

"The Future of U.S. Immigration Policy in the Age of Trump." Yankelovich Center for Social Science Research, University of California, San Diego, March 15, 2017.

"Child Migration." World Migration Report workshop, International Organization for Migration (IOM) Geneva, Switzerland, March 9-10, 2017.

"The Politics of Immigration." American Academy of Arts and Sciences, San Diego Program Committee, University of California, San Diego, February 9, 2017.

**2016 |**    "Post-Election Panel." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, November 21, 2016.

"Mobilizing Immigrant Communities in the Age of Trump." Tulane University, October 14, 2016.

"Immigrant Integration and the Obama Administration: DACA, DAPA, and Implications for the 2016 Presidential Election." Institute for Research on Labor and Employment, UCLA, April 28, 2016.

"Mobilizing Low-Propensity Voters of Color: Towards an Electorate That Reflects a Changing America." Presentation at the Asian Americans Advancing Justice conference, Los Angeles, CA, March 31, 2016.

"Immigrants in American Society." Presentation at KPBS, San Diego, CA, March 21, 2016.

"Immigration Policy." Presentation to Mi Familia Vota, Riverside, CA, January 14, 2016.

**2015 |**    "The European Refugee Crisis." Center for Comparative Immigration Studies (CCIS), the European Studies Program, the Lifelong Learning Program of the EU, and the Scholars Strategy Network (SSN), University of California, San Diego, October 27, 2015.

"U.S. Immigration Politics and the 2016 Presidential Election." Presentation at the Wilson Center, Washington DC, October 26, 2015.

"The Political Incorporation of Undocumented Youth." Presentation at the "Challenging Borders" conference, University of California, Riverside, October 23, 2015.

"The Consequences of Inequality: Why Does it Matter and How." Symposium on Capital in the 21st Century with Thomas Piketty, University of California, San Diego, October 22, 2015.

"U.S. Immigration Politics and Policy." Presentation at the U.S. Consulate in Tijuana, October 13, 2015.

"UC National Summit on Undocumented Students." University of California Office of the President, May 7-8, 2015.

"Irregular Migration." Presentation at the "Politics and Policies of International Migration: Europe and the U.S." conference, Université Libre de Bruxelles, Belgium, April 28-29, 2015.

"Opportunities and Limits of the Executive Actions Proposed by President Obama." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, April 13-14, 2015.

"Administrative Relief Implementation and Impact Project." Presentation at the Center for Migration Studies (CMS), New York, NY, March 25, 2015.

"Research Roundtable." Presentation at the "Ready America: Implementing Immigration Action" conference, Washington DC, February 9-11, 2015.

**2014** | "Insights from Implementing DACA for Administrative Relief." Presentation at the National Immigrant Integration Conference, Los Angeles, CA, December 16, 2014.

"Deferred Action for Childhood Arrivals." American Immigration Council (AIC), Washington, D.C., November 7, 2014.

"Immigration Policy and the November 2014 Midterm Elections." California Immigrant Policy Center (CIPC), October 29, 2014.

"The Many Paths to Legal Status: Results and Implications from the PERSON Survey." Presentation to the Center for Migration Studies (CMS), New York, NY, September 29, 2014.

"The Congressional Politics of Interior Immigration Enforcement." Presentation at the "Migration During Economic Downturns" workshop, German Historical Institute, Washington, DC, April 4-5, 2014.

"Mapping DACA Renewals." Presentation to U.S. Citizenship and Immigration Services (USCIS), March 13, 2014.

"Latino Politics: Left, Right, or Down the Middle?" Presentation at the Hispanic Radio annual conference, San Diego, CA, March 10, 2014.

**2013** | "Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, October 2, 2013.

"DACA Turns 1." Presentation at the Center for American Progress, Washington, DC, August 15, 2013. **[Televised on CSPAN]**

"The Prospects for Comprehensive Immigration Reform." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, August 12, 2013.

"A Look at the Stats: How Will Congressional Representatives Vote on Comprehensive Immigration Reform?" Presentation at the "Changing Face of America" conference, University of California, Berkeley, May 3, 2013.

"Will Comprehensive Immigration Reform Pass? Predicting Legislative Support and Opposition to CIR." Center for Comparative Immigration Studies (CCIS), Univeristy of California, San Diego, April 29, 2013.

"Race, Ethnicity, the 2012 Elections, and the Politics of Comprehensive Immigration Reform." Presentation at the *Beyond the Headlines* speaker series, UCLA, February 26, 2013.

"International Migrants Bill of Rights (IMBR) Initiative." Georgetown Law School, Washington, DC, February 8-9, 2013.

## PROFESSIONAL ACTIVITIES

- Reviewer: *American Journal of Political Science, American Politics Research, American Sociological Review, British Journal of Political Science, Citizenship Studies, Du Bois Review, International Migration, International Migration Review, International Studies Quarterly, Journal of Ethnic & Migration Studies, Journal of Peace Research, Journal of Politics, Journal of Race, Ethnicity, and Politics, Law & Social Inquiry, Migration Studies, National Science Foundation, Oxford University Press, Politics, Groups, and Identities, Political Research Quarterly, Russell Sage Foundation, Social Identities, Social Problems*
- Advisory Board, Center for Comparative Immigration Studies (CCIS), 2012-2018
- Advisory Board, Integrated Voter Engagement study, 2016
- Advisory Board, Unbound Philanthropy, 2015-2017
- APSA, Executive Committee, Migration and Citizenship Section, Treasurer, 2012-2015
- APSA, Migration and Citizenship Section Program Co-Chair, 2018
- Editorial Board, Journal of Migration and Human Security (JMHS), 2014-present
- Editorial Board, Politics, Groups, and Identities (PGI), 2016-present
- Executive Committee, Center for Comparative Immigration Studies (CCIS), 2015-2018
- MPSA, International Relations and Domestic Politics Section Program Chair, 2016
- WPSA, (Im)Migration and Citizenship Section Program Chair, 2015, 2017
- WPSA, Dissertation award committee, 2016