Tab 5

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  CHEROKEE DM MELTON
   Supervising Deputy Attorney General
4  JENNIFER C. BONILLA
   LISA CISNEROS
5  JULIA HARUMI MASS
   ANITA GARCIA VELASCO
6  BRENDA AYON VERDUZCO
   ANNA RICH, State Bar No. 230195
7  Deputy Attorneys General
     1515 Clay Street, 20th Floor
8    P.O. Box 70550
     Oakland, CA  94612-0550
9    Telephone: 510-879-0296
     Fax: 510-622-2270
10   E-mail: Anna.Rich@doj.ca.gov
   *Attorneys for Plaintiff State of California, by and*
11 *through Attorney General Xavier Becerra*

12                    IN THE UNITED STATES DISTRICT COURT

13                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16

17 | **STATE OF CALIFORNIA, DISTRICT OF** | CASE NO. 3:19-cv-04975
   | **COLUMBIA, STATE OF MAINE,** |
18 | **COMMONWEALTH OF** | **DECLARATION OF SARAH NEVILLE-**
   | **PENNSYLVANIA** and **STATE OF** | **MORGAN IN SUPPORT OF**
19 | **OREGON,** | **PLAINTIFFS' MOTION FOR A**
   | | **PRELIMINARY INJUNCTION**
20 |                                    Plaintiffs, |

21         v.

22

23 **U.S. DEPARTMENT OF HOMELAND**
   **SECURITY; KEVIN McALEENAN,** in his
24 official capacity as Acting Secretary of
   Homeland Security; **U.S. CITIZENSHIP**
25 **AND IMMIGRATION SERVICES;** and
   **KENNETH T. CUCCINELLI,** in his official
26 capacity as Acting Director of U.S. Citizenship
   and Immigration Services,

27                             Defendants.

28

I, Sarah Neville-Morgan declare as follows:

1.      I am a resident of the State of California.  I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Deputy Superintendent of Public Instruction for the Opportunities For All Branch (OFAB) at the California Department of Education (CDE).  As the Deputy Superintendent for OFAB, I oversee a branch that is responsible for helping all students reach their academic potential and goals by providing the necessary support to early educators and providers, teachers, administrators, school and district leaders, and community-based organizations.

3.      Prior to being named Deputy Superintendent, I served for two years as Director of CDE's Early Learning and Care Division (ELCD) and provided leadership and support to the early learning and care community, providers, and contractors statewide, ensuring high-quality early education programs for young children and their families.  In this role, I oversaw over $4 billion in early learning and care investments and acted as the State Administrator for the federal Child Care and Development Fund and California's Child Care and Development Fund State Plan, as well as the California State Preschool Program.

4.      I am aware that the federal government recently issued a final rule "Inadmissibility on Public Charge Grounds," 83 Fed. Reg. 51114 (the Rule), that will broaden the definition of "public charge" and redefine the criteria for admissibility into the United States and adjustment to lawful permanent resident status.  I understand that this lawsuit challenges the Rule.

5.      California guarantees all K-12 children in our state a free public education.  This includes all school-age children who reside in California regardless of their citizenship status.

6.      Each year, California public schools serve approximately 6,200,000 students attending grades K-12.  In compliance with state and federal law, California does not require disclosure of a student's immigration status to attend school and participate in public education programs.

1

7.      CDE administers several state and federal education programs to support students potentially at risk for later academic achievement, including immigrant minors.  These include programs designed to assist students in learning English, migrant education programs, child development programs for low-income families, assistance with nutrition by way of free and reduced cost lunch programs, before and after school programming, and health programs.

8.      CDE administers English language learner programs and services to improve the English language skills of English learner students, immigrant students, and migrant students to ensure that these students can participate meaningfully and equally in all educational programs and services.

9.      In the 2018-2019 school year, approximately 1.196 million English learners attended public schools in California, constituting 19.3 percent of the total public school enrollment in the State.  The majority of English learners (70.2 percent) are enrolled in kindergarten through grade six.  During the 2017-2018 school year, California's total K-12 funding included approximately $2,400 additional funding per student for students in English learner programs.  In addition, CDE sub-granted to eligible local educational agencies $103.65 per eligible English learner student through the Title III English Learner Student Program.

10.     California also administers a federal Migrant Education Program (MEP) grant as it has the largest migrant student population in the United States; one out of every three migrant students in the United States lives in California.  During the 2017-18 school year, over 81,000 migrant students attended California public schools.

11.     The federal MEP is for families that work in agriculture, fishing or agriculture related work.  Due to the large agricultural sector in California, migrant families mostly stay within the state and migrate up and down the state following harvests.  The MEP provides primarily academic services, but federal law also requires that health needs be addressed through program funding.  As such, local subgrantees provide referrals and assistance with health and nutrition education, food security, meals for children enrolled in migrant education programs, and parent engagement activities to access healthcare.

2

12.     Immigrant minors also may be eligible for child development programs administered by CDE.  CDE's general child care and development programs, which are state and federally funded, include child development services for children from birth through 12 years of age and an educational component that is developmentally, culturally, and linguistically appropriate for the children served.  These programs also provide meals and snacks to children, parent education, referrals to health and social services for families, and staff development opportunities to employees.  California has budgeted a total of $5.1 billion for child development programs during Fiscal Year 2019.  Of this total, approximately 77 percent is from state funds.

13.     Immigrant students, like all students, need comprehensive student supportive services that promote academic success and address the whole child.  CDE, in collaboration with the State Mental Health Policy Workgroup and other stakeholders, advocates for increased services, resources, funding, training, and policy change to better support the mental health and wellness of all students, including immigrant students.  CDE also provides mental health first aid training to help school staff identify and support students who may be experiencing a mental health challenge or are in crisis.

14.     Based on my experience administering and overseeing CDE and school district programs, I have serious concerns that an action like the Rule can deter parents from sending their children to school or allowing them to participate in certain programs.  The deterrent effect can impact individuals who may actually be subject to the Rule, as well as those who are not subject to the Rule (for example, they are already legal permanent residents or citizens), but they are confused or fear the negative immigration consequences.

15.     In fact, local MEP subgrantee programs that provide referrals and assistance with health and nutrition education, food security, and meals for children have already reported declines in program enrollment and a fear of accessing health services due to future ramifications regarding legal status.

16.     As I have worked with program administrators, district, and school site staff across the state, I have heard reports about parents not sending their children to school, and declining to

3

1    access benefits and programs that they are eligible for, and which do not trigger a negative

2    immigration consequence.

3         17.    School funding is a mix of federal, state, and local funding streams, and the

4    particular blend can depend on the particular expense at issue—teacher staffing, social, health, or

5    nutritional services, certain curricular programs, and field trips. Often front-line staff do not

6    understand the intricacies of whether programs are publicly or privately funded, or have a

7    working knowledge of immigration laws. It will be difficult for staff at the local level to discern

8    what programs an individual may or may not participate in because of their immigration status or

9    because of a perceived notion that it will affect family members if such services are received by

10   the immigrant student or a U.S. citizen whose parents are seeking to immigrate.

11        18.    In many instances, due to language barriers, immigrant parents are not able to

12   communicate directly with teachers, school, or district staff. Many immigrant parents and adults

13   rely on their children to translate for them. Because discussing the issue of immigration can be so

14   fraught and stressful for families, parents sometimes do not raise the issue with their children.

15   Although schools send written notices and materials to families, illiteracy can prevent some adult

16   family members from fully understanding the written communication even if it is provided in

17   their home language.

18        19.    I anticipate a significant burden on CDE to equip our school systems across the

19   state to adopt strategies to mitigate the chilling effect that the Rule brings. I believe there is a

20   serious risk that the Rule will undermine our administration of educational and support services

21   so that immigrant children and U.S. citizen children with immigrant parents have equal access to

22   quality education.

23        20.    To counter misinformation, educate the public, and reduce fear and confusion for

24   families statewide, CDE will need to invest millions of dollars to train staff, and develop and

25   disseminate trainings and technical assistance for Local Educational Agencies (LEAs), e.g.

26   county offices of education and school districts, schools, and community-based organizations

27   across the state.

28

                                        4

21.     Because the school system is so decentralized, and many management and training decisions are made at the LEA level, CDE is not well positioned to ensure that training initiatives and public education programs are broadly and uniformly implemented across the state. Therefore, in the realm of public education, it will be difficult to mitigate the Rule's chilling effect in an expedient and comprehensive way.  Even as CDE invests significant resources in a broad response to the Rule, in some communities the LEAs may be strong partners in these efforts, while in other communities the LEAs may be less responsive, depending on the community's climate overall for immigrant families.

22.     In addition, I believe the Rule will have a significant impact on the School Lunch Programs throughout the State.  California currently certifies over 2.6 million children for free and reduced price meals due to their household's participation in the Supplemental Nutrition Assistance Program (SNAP) and Medi-Cal (California's Medicaid program). Since the announcement of the Rule, the number of families applying for SNAP and Medi-Cal has already decreased.  Children living in mixed immigration-status households where parents choose not to participate in SNAP and Medi-Cal, or disenroll their children, will not be deemed automatically eligible for free or reduced price school meals.  Although families may apply for free and reduced-price school meals separately, the paperwork is more burdensome for those without an automatic qualification through Medi-Cal or SNAP, and immigrant eligible families are less likely to obtain school lunch benefits in this way.

23.     It is a general understanding within CDE, that access to school meals helps reduce food insecurity for low-income families.  Furthermore, CDE seeks to support nutrition programs such as school meal benefits, based on existing research that hunger and poor nutrition can lead to poor performance in school and problems in socialization.

24.     Additionally, the federally funded School Nutrition Programs mandates direct certification of school-aged recipients for free school meals.  Due to a provision in the school meals programs, called the Community Eligibility Provision, all students in eligible communities can obtain free school meals without an individual showing of eligibility.  In many low-income

5

school districts and neighborhoods, this provision allows for other children to access nutritious foods.

25.    If children in immigrant families are chilled from accessing critical nutrition services, either because they fail to enroll in SNAP or Medi-Cal, the impact on nutrition for low-income districts may also extend more broadly.  If the percentage of students directly certified for free school meals drops below the required level, then the school will no longer be able to offer free school meals to all students.  This would have a negative impact on students in low-income areas who are not themselves eligible for nutritional assistance based on higher household income—but who may nevertheless be struggling with hunger—as these students will also lose access to healthy meals provided by their local school to all children.


I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on August 23, 2019, in Sacramento, California.


Sarah Neville-Morgan
Deputy Superintendent of Public Instruction
Opportunities For All Branch
California Department of Education

6

Tab 6

1    XAVIER BECERRA
     Attorney General of California
2    MICHAEL L. NEWMAN
     Senior Assistant Attorney General
3    CHEROKEE DM MELTON
     Supervising Deputy Attorney General
4    JENNIFER C. BONILLA
     LISA CISNEROS
5    JULIA HARUMI MASS
     ANITA GARCIA VELASCO
6    BRENDA AYON VERDUZCO
     ANNA RICH, State Bar No. 230195
7    Deputy Attorneys General
        1515 Clay Street, 20th Floor
8       P.O. Box 70550
        Oakland, CA  94612-0550
9       Telephone: 510-879-0296
        Fax: 510-622-2270
10      E-mail:  Anna.Rich@doj.ca.gov
     *Attorneys for Plaintiff State of California, by and*
11   *through Attorney General Xavier Becerra*

12

13                    IN THE UNITED STATES DISTRICT COURT

14                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16   | **STATE OF CALIFORNIA, DISTRICT OF** | CASE NO. 3:19-cv-04975 |
17   **COLUMBIA, STATE OF MAINE,**
     **COMMONWEALTH OF**                      **DECLARATION OF SUSAN FANELLI**
18   **PENNSYLVANIA** and **STATE OF**         **IN SUPPORT OF PLAINTIFFS'**
     **OREGON,**                               **MOTION FOR A PRELIMINARY**
                                               **INJUNCTION**
19                             Plaintiffs,

20        v.

21

22   **U.S. DEPARTMENT OF HOMELAND**
     **SECURITY; KEVIN MCALEENAN,** in his
23   official capacity as Acting Secretary of
     Homeland Security; **U.S. CITIZENSHIP**
24   **AND IMMIGRATION SERVICES;** and
     **KENNETH T. CUCCINELLI,** in his official
25   capacity as Acting Director of U.S. Citizenship
     and Immigration Services,

26                             Defendants.

27

28

I, Susan Fanelli, declare as follows:

1. I am the Acting Director and Chief Deputy Director of Policy and Programs for the California Department of Public Health (CDPH).

2. As both the Acting Director and Chief Deputy Director of Policy and Programs, I oversee the work of the various Centers within CDPH, including the Center for Family Health, which administers the California Special Supplemental Nutrition Program for Women, Infants, and Children, commonly known as WIC. I was appointed to the position of Chief Deputy Director in March 2018 and have served as CDPH's Acting Director since July 2019. In this capacity, I work with Center Deputies to set policy direction, identify and remove barriers to program implementation, and evaluate program performance.

3. As CDPH's Assistant Director between May 2015 and March 2018, I oversaw several cross-cutting functions including public affairs, quality improvement and public health accreditation, emergency preparedness, and CDPH's Fusion Center. The Fusion Center is the focal point for exploring new models and approaches to public health and seeks to align public health, the healthcare delivery system, and community-based innovations to improve population health and address social determinants of health. In this role, I also served as an executive team member in the Director's Office.

4. Having spent more than ten years in CDPH's Emergency Preparedness Office, including several years as the Deputy Director and Assistant Deputy Director, I have been involved in the public health and medical response to a large number of emergencies including H1N1, wildfires, Ebola, earthquakes, Zika, and mass shootings. In coordinating planning and response efforts, I have worked closely with nearly all programs in CDPH and have developed an understanding of not only their day-to-day activities but also how these activities must shift during emergencies.

5. CDPH aims to optimize the health and wellbeing of all people in California. CDPH works with other State departments, local health departments, and public and private partners to implement policies and programs that advance public health. As part of this work, our Center for Family Health (CFH) leads and supports efforts to promote health, improve birth outcomes, and

1

reduce health disparities for California's growing, diverse population. CFH has three divisions focused on a variety of programs that serve women, children, adolescents, and families.

6. CFH's largest program is the California Special Supplemental Nutrition Program for Women, Infants, and Children (WIC Program or WIC), a 100 percent federally-funded nutrition program administered by the United States Department of Agriculture (USDA).

7. In May 2019, the California WIC Program served nearly one million women, infants, and children, referred to as "participants."

8. During that same time period, about 720,000 of these participants were infants and children under age five.

9. The remaining WIC participants during this time period were pregnant, breastfeeding, and non-breastfeeding postpartum women.

10. The WIC Program has been a key component of this country's nutrition safety net for more than 40 years. Congress established WIC as a permanent program based on its finding that "substantial numbers of pregnant women, infants, and young children are at special risk in respect to their physical and mental health by reason of poor or inadequate nutrition or healthcare, or both."

11. Similarly, California's State Legislature has found that "medical, educational[,] and psychological evidence increasingly points to adequate nutrition as a determinant not only of good physical health but also of full intellectual development and educational achievement . . . ."

12. Today, the WIC Program provides targeted, time-limited benefits to pregnant and postpartum women, infants, and children under age five who are low income and found to be at nutritional risk in the form of nutritious supplemental foods, nutrition education, and referrals to healthcare and other services. To promote breastfeeding and its related benefits, the WIC Program also provides breastfeeding education and support services to eligible women.

13. CDPH provides these services through coordination and collaboration with 83 WIC local agencies, which include local health departments and non-profit organizations, operating more than 500 sites throughout California. WIC local agencies work with applicants and participants to certify participant eligibility, issue food instruments for obtaining

2

supplemental foods, offer nutrition education and breastfeeding support, and provide referrals to healthcare and other community resources. Participants can then redeem their food instruments for nutritious food items—including fruits and vegetables, milk, eggs, and baby food—at nearly 4,000 WIC-authorized grocery stores.

14. Extensive research shows that WIC is a successful public health program and helps: reduce fetal and infant deaths; reduce premature births; reduce the incidence of low birth weights; improve children's diet quality; increase pregnant women's consumption of key nutrients; increase immunization rates; and increase access to regular healthcare.

15. To be eligible for participation in the WIC Program, applicants must:

      a. Have an income at or below 185 percent of the U.S. Poverty Income Guidelines or, as explained below, be adjunctively eligible for WIC benefits based on certification to receive other government benefits; and

      b. Be found to be at nutritional risk.

16. Applicants can demonstrate adjunctive income eligibility for WIC benefits by showing proof of participation in the Supplemental Nutrition Assistance Program (SNAP) (known as CalFresh in California), Medicaid (known as Medi-Cal in California), or the Temporary Assistance for Needy Families (TANF) program (known as CalWORKs in California). Congress established adjunctive eligibility between WIC and these other social services and healthcare programs in 1989. Adjunctive eligibility reduces administrative burdens for both applicants and WIC local agencies, promotes efficiency, and increases coordination between WIC and related benefits programs.

17. In 2009, Congress also created the option for States to establish "Express Lanes" for fast-tracking the enrollment of eligible children in Medicaid and the Children's Health Insurance Program (CHIP) using eligibility information already collected by what are known as "Express Lane agencies." Express Lane agencies include public agencies that determine eligibility for WIC, SNAP, and Medicaid.

18. Like Congress, California's State Legislature is making proactive efforts to increase coordination between the WIC Program, which is administered by CDPH, and California's SNAP

3

1   and Medicaid programs, which are administered by the California Department of Social Services

2   (CDSS) and California Department of Health Care Services (DHCS), respectively.[1]

3       19.  CDPH, CDSS, and DHCS enroll individuals and families in the WIC, SNAP, and

4   Medicaid programs in accordance with the eligibility criteria established by Congress.

5       20.  I am aware that in California, SNAP (CalFresh) provides monthly benefits to millions

6   of low-income individuals and families, including approximately two million children, to help

7   them afford nutritious foods. USDA administers both WIC and SNAP at the federal level. As of

8   August 21, 2019, the USDA website stated: "SNAP provides nutrition benefits to supplement the

9   food budget of needy families so they can purchase healthy food and *move towards*

10  *self-sufficiency*."

11      21.  I am aware that in California, Medicaid (Medi-Cal), which is administered by the

12  United States Department of Health and Human Services (HHS) at the federal level, provides

13  much-needed healthcare services to millions of low-income individuals and families.

14      22.  I understand that in California, there is significant overlap between the individuals

15  and families enrolled in the WIC Program and the individuals and families enrolled in the SNAP

16  and Medicaid programs.

17      23.  As of May 2019, approximately 31 percent of WIC certified individuals[2] were

18  enrolled in SNAP (CalFresh) and 78 percent of WIC certified individuals were enrolled in

19  Medicaid (Medi-Cal). Approximately 30 percent of WIC certified individuals were enrolled in

20  both SNAP (CalFresh) and Medicaid (Medi-Cal).

21      24.  During the same time period, approximately 36 percent of WIC families had one or

22  more members enrolled in SNAP (CalFresh) and 85 percent of WIC families had one or more

23  members enrolled in Medicaid (Medi-Cal). Approximately 35 percent of WIC families had one or

24  more members enrolled in both SNAP (CalFresh) and Medicaid (Medi-Cal).

25

26      [1] *See, e.g.*, S. 285, 2019–2020 Leg., Reg. Sess. (Cal. 2019).
        [2] WIC certified individuals are women, infants, and children under age 5 who have been
27  certified as eligible to receive WIC benefits (i.e., enrolled in WIC), whether or not they received
    supplemental food or food instruments (i.e., "participated") in the WIC Program during the
28  relevant time period.

4

25.  In California, the need to promote health and public health for a diverse population makes broad-based access to the services provided through WIC, SNAP, and Medicaid critical to achieving California's health and public health goals.

26.  I am aware that in 2017, about 11 million people living in California were born outside of the United States.

27.  In addition, I am aware that nearly five million Californians—or 12 percent of the State's total population—live in mixed immigration-status households with at least one undocumented family member, also known as mixed-status families. In fact, one in two children in California have at least one immigrant parent.

28.  I am aware that the Department of Homeland Security (DHS) recently issued a final rule on the public charge ground of inadmissibility: "Inadmissibility on Public Charge Grounds," 84 Fed. Reg. 41292 (Aug. 14, 2019) (hereinafter "the Rule"). It is my understanding that the Rule introduces an alternative definition of "public charge" to include "an alien who receives one or more" of the newly enumerated public benefits identified in the Rule "for more than 12 months in the aggregate within any 36-month period." The Rule also specifies that the receipt of two benefits in one month will be counted as two months for purposes of reaching the 12-month threshold.

29.  The Rule's new definition of "public benefit" expands the types of public benefits that immigration officers consider when determining whether an immigrant is a public charge based on his or her receipt of public benefits. The expanded definition includes a number of non-cash benefit programs that address the health and nutrition needs of individuals and their families.

30.  As part of the Rule's *preamble*, DHS stated that WIC is not an enumerated public benefit and indicated that the receipt of WIC benefits cannot be considered in public charge determinations.

31.  By contrast, the Rule makes clear that an immigrant's receipt of SNAP and Medicaid benefits "for more than 12 months in the aggregate within any 36-month period" "*will weigh heavily in favor* of a finding that an alien is likely at any time in the future to become a public charge."

5

32. In the Rule's *preamble*, DHS acknowledges the eligibility criteria for these programs, which are set by Congress, are not changing.

33. DHS also recognizes that it lacks the *authority* to change the eligibility criteria for public benefits programs.

34. I am aware that in 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), which imposed new restrictions on immigrant participation in public benefit programs. Within approximately one month of passing PRWORA, Congress also passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which amended the public charge statute (8 U.S.C. § 1182(a)(4)), but did not define the term "public charge."

35. I understand that following PRWORA's and IIRIRA's passage in 1996, refugees and asylees were not subject to the public charge ground of inadmissibility and that refugees and asylees continue to be exempt from public charge to this day. Nonetheless, I am aware that in the aftermath of PRWORA's and IIRIRA's passage, asylees and refugees were "chilled"[3] from accessing public benefits—including Medicaid and cash assistance benefits—even though they remained statutorily eligible for these benefits and, by law, could not be subject to a finding of inadmissibility on public charge grounds. U.S. citizen children in mixed-status families, who are also not subject to the public charge ground of inadmissibility, were also documented to have lower rates of program participation following PRWORA's passage.

36. In light of this history, I am aware that there is a real risk that the inclusion of non-cash public benefit programs in the Rule will cause fear and confusion among immigrants who are subject to the public charge ground of inadmissibility as well as their lawful permanent resident (LPR) or U.S. citizen family members to whom the Rule does not apply. This fear and confusion is likely to discourage immigrants from using benefits for which they or their family members remain statutorily eligible under the laws passed by Congress—including benefits like

---

[3] I am using the terms "chill" and "chilling effect" to describe situations in which people are inhibited or discouraged from legitimately exercising their rights. In this context, immigrants who are eligible for public benefits under the laws passed by Congress are being discouraged from using those benefits because, under DHS's new Rule, using those benefits may lead to a determination that they are inadmissible on public charge grounds.

6

SNAP and Medicaid that will be considered as part of a public charge determination as well as benefits like WIC that will not—due to concerns about negative immigration consequences for their families.

37. The Rule expressly anticipates these consequences. With regard to U.S. citizens who are not subject to the Rule, DHS states that the federal government expects a reduction in transfer payments due to decreased enrollment in public benefits programs, in part due to disenrollment or forgone enrollment by U.S. citizen children in mixed-status households. With regard to noncitizens who are subject to the Rule, DHS acknowledges these individuals "may decline to enroll in, or may choose to disenroll from," public benefits programs for which they remain eligible under the laws passed by Congress "in order to avoid negative consequences as a result of this final rule."

38. I am aware that between March 2017—which was shortly after several news outlets reported on a draft Executive Order that would have directed DHS to propose new rules on public charge—and the release of the final public charge Rule in August 2019, WIC local agencies in California have documented more than a dozen incidents of WIC applicants and participants expressing fear and confusion about how their receipt of WIC benefits could be impacted by public charge. Specifically, applicants and participants have communicated concerns to WIC local agency staff that applying for or receiving WIC benefits will jeopardize their immigration status, including their ability to be lawfully admitted for permanent residence, i.e., obtain "green cards." During these conversations, WIC applicants and participants have asked to be disenrolled from WIC, sought to return WIC food instruments, and said that they were warned not to apply for WIC benefits. Some applicants and participants indicated that these concerns were based on discussions with legal counsel.

39. These incidents strongly suggest that WIC families in California are already experiencing the Rule's chilling effects and are afraid to apply for or use WIC benefits even though the receipt of WIC benefits would not be considered under the proposed or final versions of the Rule.

40. Due to the fear and confusion created by the Rule, staff time and other resources have been and will continue to be diverted from meeting current CDPH, WIC Program, and WIC local agency priorities to address inquiries and concerns from applicants and participants about whether participation in WIC might bring about negative immigration consequences. Many of the costs and administrative burdens of addressing longstanding confusion and misinformation about WIC and public charge—including clarifying that WIC benefits will not be considered in public charge determinations—will fall to the WIC Program and the WIC local agencies.

41. In addition to the Rule's chilling effect on immigrants' willingness to apply for and use WIC benefits, given the substantial overlap between WIC, SNAP (CalFresh), and Medicaid (Medi-Cal) families in California, I am concerned that WIC families will be harmed due to fears about accessing the CalFresh and Medi-Cal benefits for which they remain statutorily eligible under the laws passed by Congress.

42. These programs have been driven by federally supported initiatives and statutes that recognize the importance of providing supplementary support to working families, including those immigrant families that are statutorily eligible for public benefits, to achieve nationwide goals.

43. I am aware that under the current public charge standard issued by the former Immigration and Naturalization Services (INS) in 1999, and applied by DHS to this day, an immigrant's receipt of non-cash benefits like SNAP or Medicaid is not considered for purposes of a public charge determination.

44. I am also aware that when issuing the current public charge standard in 1999, INS documented that it had engaged in "extensive consultation" with federal benefit-granting agencies and "relied on the[ir] expertise" in developing the existing definition of public charge. Such benefit-granting agencies included USDA and HHS.

45. In support, INS provided letters authored by high-level officials in HHS, USDA, and the Social Security Administration.

46. In the USDA letter, the agency's Under Secretary stated: "We believe that neither the receipt of food stamps nor nutrition assistance provided under the Special Nutrition Programs

8

administered by this Agency should be considered in making a public charge determination for purposes of admission, deportation, or adjustment of an alien's status."

47.  In the HHS letter, the agency's Deputy Secretary stated: "Non-cash support benefits and services are generally designed to supplement and support the diet, health, and living conditions of recipients, many of whom are low- to middle-income working families."

48.  Both letters advised that non-cash public benefits—including WIC, SNAP, and Medicaid—should not be considered for public charge purposes.

49.  I am aware that in our public comment letter dated December 10, 2018, CDPH, CDSS, DHCS, and the California Health and Human Services Agency (1) requested that DHS affirmatively address whether it had consulted federal benefit-granting agencies such as USDA and HHS when developing the Rule's proposed definition of "public charge" and abandoning the current standard promulgated by INS and (2) asked DHS to publicly disclose copies of any written feedback DHS received from these agencies.

50.  DHS declined both requests, stating: "Interagency discussions are a part of the internal deliberative process associated with the rulemaking."

51.  I am not aware of any official statement from DHS indicating whether the Rule's definition of public charge was developed in consultation with federal benefit-granting agencies.

52.  As CDPH's Acting Director and Chief Deputy of Policy and Programs, I understand that protecting public health requires broad-based access to essential support services for families. CDPH, CDSS, and DHCS work to administer the WIC, SNAP, and Medicaid programs in compliance with the laws passed by Congress, including congressionally mandated eligibility requirements. If the Rule is implemented and immigrants and their families are chilled from using the benefits and services for which they remain eligible under the laws passed by Congress, including non-enumerated benefits like WIC and enumerated benefits like SNAP and Medicaid, this will have adverse impacts throughout California for citizens and noncitizens alike.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

9

1    Executed on August 22, 2019, in Sacramento, California.

2

3

     Susan Fanelli
4    Acting Director
     Chief Deputy Director of Policy and Programs
5    California Department of Public Health

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        10

Tab 7

1    XAVIER BECERRA
     Attorney General of California
2    MICHAEL L. NEWMAN
     Senior Assistant Attorney General
3    CHEROKEE DM MELTON
     Supervising Deputy Attorney General
4    JENNIFER C. BONILLA
     LISA CISNEROS
5    JULIA HARUMI MASS
     ANITA GARCIA VELASCO
6    BRENDA AYON VERDUZCO
     ANNA RICH, State Bar No. 230195
7    Deputy Attorneys General
        1515 Clay Street, 20th Floor
8       P.O. Box 70550
        Oakland, CA  94612-0550
9       Telephone: 510-879-0296
        Fax: 510-622-2270
10      E-mail:  Anna.Rich@doj.ca.gov
     *Attorneys for Plaintiff State of California, by and
11   through Attorney General Xavier Becerra*

12                      IN THE UNITED STATES DISTRICT COURT

13                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16   **STATE OF CALIFORNIA, DISTRICT OF**          CASE NO. 3:19-cv-04975
     **COLUMBIA, STATE OF MAINE,**
17   **COMMONWEALTH OF**                           **DECLARATION OF CHARITY DEAN IN**
     **PENNSYLVANIA** and **STATE OF**             **SUPPORT OF PLAINTIFFS' MOTION**
18   **OREGON,**                                   **FOR A PRELIMINARY INJUNCTION**

19                                    Plaintiffs,

20          **v.**

21   **U.S. DEPARTMENT OF HOMELAND**
     **SECURITY; KEVIN MCALEENAN,** in his
22   official capacity as Acting Secretary of
     Homeland Security; **U.S. CITIZENSHIP**
23   **AND IMMIGRATION SERVICES;** and
     **KENNETH T. CUCCINELLI**, in his official
24   capacity as Acting Director of U.S. Citizenship
     and Immigration Services,
25
                                     Defendants.
26

27

28

I, Charity Dean, declare as follows:

1.    I am the Acting State Public Health Officer and Assistant Director for the California Department of Public Health (CDPH). I have served as Assistant Director since November 2018 and Acting State Public Health Officer since July 2019.

2.    I hold a Bachelor of Science degree in Microbiology, a Master of Public Health and Tropical Medicine degree, and a Doctor of Medicine degree. I treated patients in a Federally Qualified Health Center (FQHC) for 12 years and held the positions of Communicable Disease Controller, Tuberculosis Controller, and local Health Officer in a California county for over seven years. At the county level and now at the State level, I have overseen the coordinated public health response to communicable disease outbreaks, immunization campaigns, and prevention efforts.

3.    CDPH aims to optimize the health and wellbeing of all people in California. CDPH works with local health departments, as well as public and private partners, to implement policies and programs that advance public health. As part of this work, CDPH's Center for Infectious Diseases (CID) leads and supports efforts to protect the people in California against vaccine-preventable diseases and assists individuals and their families with securing prompt and appropriate access to healthcare, medications, and support services.

4.    CID includes a number of divisions, branches, and offices focused on various aspects of infectious disease control and prevention. The Division of Communicable Disease Control works to promptly identify, prevent, and control infectious diseases that pose a threat to public health. The Office of Refugee Health helps newly arrived refugees, asylees, and other eligible immigrants stay healthy and achieve self-sufficiency by providing comprehensive health assessments and time-limited medical services. These services are supported by federal funds and designed to help these specific immigrant groups achieve economic self-sufficiency as quickly as possible after their arrival to the United States. The Immunization Branch administers California's Vaccines for Children Program, a program spearheaded by the federal Centers for Disease Control and Prevention (CDC) that helps families stay healthy by partnering with providers to offer no-cost vaccines to eligible children from birth to age 18.

1

5.   Broad-based access to CDPH's programs and services is critical to protecting the public's health in California and achieving our State's public health goals. When California residents do not use these programs and services as intended, or when utilization of these critical service declines, it puts the health of others—citizens and noncitizens alike—at increasing risk.

6.   Vaccinations are a key example. There is significant empirical evidence demonstrating that herd immunity is vital to protecting public health. Herd immunity refers to the percentage of the population that needs to be immune to a specific infectious disease in order to make the disease's spread from person to person unlikely. Increased vaccination rates help achieve herd immunity by ensuring that enough people are immunized to make an outbreak unlikely. When herd immunity is in place, it means that even if one person gets sick, the odds of the disease spreading to other people is significantly lower.

7.   Herd immunity not only provides direct protection to those who are vaccinated, but also provides indirect protection to those who cannot be vaccinated. Those who cannot be vaccinated include individuals with compromised immune systems (including newborns and infants), some individuals living with chronic illnesses, and some elderly persons. We protect those who cannot be immunized by ensuring that the rest of the population is immunized.  Lower vaccination rates weaken herd immunity, which in turn increases the risk of serious and widespread infectious disease outbreaks.

8.   The coordinated public health response to such outbreaks requires significant fiscal and human resources from CDPH, local health departments, and the State. If large groups of people are prevented or discouraged from using immunization benefits and services, it will become increasingly difficult to maintain herd immunity throughout California and there will be tangible costs to the State.

9.   In reliance on the statutory eligibility standards set by Congress, CDPH makes many public health services and benefits broadly accessible to all California residents, regardless of immigration status. Some of these programs, like the Vaccines for Children (VFC) Program, have been driven by federally supported initiatives and statutes that recognize the importance of

2

promoting public health through broad-based access to programs and services as well as the indisputable return on investment of vaccines in children.

10.  Because California is home to millions of immigrants—about 11 million people living in California were foreign born in 2017—ensuring that immigrants and their families use immunization benefits and other preventive services regardless of their situation or status is critically important to protecting public health in California.

11.  I understand that, from 2001 to 2017, California received 105,000 resettled refugees, accounting for one-tenth of all refugee arrivals to the United States.

12.  In addition, I am aware that nearly five million Californians—12 percent of the State's total population—live in mixed immigration-status households with at least one undocumented family member, also known as "mixed-status" families or households.  In fact, one in two children in California have at least one immigrant parent.

13.  In my years of experience as an FQHC provider, I have had the opportunity to care for hundreds of such families, many of whom were under my care because of a communicable disease in a child, like tuberculosis. The onus of seeking care for that child was on the parent, many of whom were undocumented and afraid to seek treatment because of their status. I have personally overseen the response efforts to tuberculosis outbreaks, which grew, in part, because undocumented immigrant parents were hesitant to seek diagnosis and treatment for their U.S. citizen children due to fears of deportation. This environment of fear not only harmed their children, but the community around them.

14.  I am aware that the Department of Homeland Security (DHS) recently issued a final rule on the public charge ground of inadmissibility: "Inadmissibility on Public Charge Grounds," 84 Fed. Reg. 41292 (Aug. 14, 2019) (hereinafter "the Rule").  It is my understanding that the Rule introduces an alternative definition of "public charge" to include "an alien who receives one or more" of the newly enumerated public benefits identified in the Rule "for more than 12 months in the aggregate within any 36-month period." The Rule also specifies that the receipt of two benefits in one month will be counted as two months for purposes of reaching the 12-month threshold.

3

15.  The Rule's new definition of "public benefit" expands the types of public benefits that immigration officers consider when determining whether an immigrant is a public charge based on his or her receipt of public benefits. The expanded definition includes a number of non-cash benefit programs that address the health, nutrition, and housing needs of individuals and their families.

16.  I anticipate that implementation of the Rule will have serious, negative impacts on public health in California by making it more difficult to reach and provide essential vaccination and immunization services to the State's many diverse populations, particularly immigrants and their families.

17.  In the Rule's *preamble*, DHS states that some vaccination services fall outside of the scope of the Rule while others do not. One the one hand, vaccinations provided through the VFC Program, or other non-Medicaid programs, would not be considered for purposes of public charge. On the other hand, the receipt of vaccination services through Medicaid would be considered.

18.  I am not aware of any DHS plans to provide clear guidance to the public about what vaccination services will and will not be subject to the Rule.

19.  I am aware that in 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), which imposed new restrictions on immigrant participation in public benefit programs. Within approximately one month of passing PRWORA, Congress also passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which amended the public charge statute (8 U.S.C. § 1182(a)(4)), but did not define the term "public charge."

20.  I understand that even after PRWORA's and IIRIRA's passage in 1996, refugees and asylees were exempt from the public charge ground of inadmissibility and that refugees and asylees continue to be exempt from public charge to this day. Nonetheless, I am aware that in the aftermath of PRWORA's and IIRIRA's passage, asylees and refugees were "chilled"[1] from

---

[1] I am using the terms "chill" and "chilling effect" to describe situations in which people are inhibited or discouraged from exercising their rights. In this context, immigrants who are

4

accessing public benefits—including Medicaid and cash assistance benefits—even though they remained statutorily eligible for these benefits and, by law, could not be subject to a finding of inadmissibility on public charge grounds. U.S. citizen children in mixed-status families, who are also not subject to the public charge ground of inadmissibility, were also documented to have lower rates of program participation following PRWORA's passage.

21.  In light of this history, and based on my professional experiences as an FQHC provider, local Public Health Officer, and State Public Health Officer, I believe that the inclusion of non-cash public benefit programs in the Rule will cause fear and confusion among immigrants who are subject to the public charge ground of inadmissibility as well as their lawful permanent resident (LPR) or U.S. citizen family members to whom the Rule does not apply.  This fear and confusion is likely to discourage immigrants from using benefits for which they or their family members remain statutorily eligible under the laws passed by Congress—including non-enumerated benefits that are outside the scope of the new Rule—due to concerns about negative immigration consequences for their families.

22.  The Rule expressly anticipates these consequences. With regard to U.S. citizens who are not subject to the Rule, DHS states that the federal government expects a reduction in transfer payments due to decreased enrollment in public benefits programs, in part due to disenrollment or forgone enrollment by U.S. citizen children in mixed-status households. With regard to noncitizens who are subject to the Rule, DHS acknowledges these individuals "may decline to enroll in, or may choose to disenroll from," public benefits programs for which they remain eligible under the laws passed by Congress "in order to avoid negative consequences as a result of this final rule."

23.  Based on my experience overseeing the administration of public health programs, and due to the complexity of government benefits programs more generally, I expect that immigrants will be unable to readily determine which programs and services they can safely use without risking a negative public charge determination. For example, individuals receiving publicly

---

eligible for public benefits under the laws passed by Congress are being discouraged from using those benefits because, under DHS's new Rule, using those benefits may lead to a determination that they are inadmissible on public charge grounds.

funded immunizations, including through the VFC Program funded by the CDC, ordinarily cannot discern whether the vaccinations are being funded by a program that is an enumerated public benefit, such as Medicaid, or another non-enumerated program like the VFC Program. Therefore, they will likely be unable to evaluate the impact that receiving vaccines or treatment could have on the likelihood of a public charge determination and may avoid seeking or using these benefits altogether.

24.   DHS's statement in the *preamble* that the Rule will not be applied to non-Medicaid vaccinations is insufficient to inform and reassure immigrants that using these services will not be counted against them in public charge proceedings. These exceptions are not explicitly identified in the Rule's regulation text and DHS has not stated what concrete steps it will be taking to educate immigrants about the public health benefits, including vaccination benefits, that they can access without fear of immigration consequences.

25.   Without clear, official communications from the federal government about when immigrants will and will not be penalized under the Rule for using public benefits for which they are eligible, immigrants and their families will likely avoid testing or treatment for dangerous, communicable diseases regardless of the Rule's exceptions. This is especially problematic with communicable diseases like measles and tuberculosis (TB).

26.   Measles is a highly contagious, vaccine-preventable virus that can lead to dangerous complications or death, especially for young children.

27.   In 2019, we have seen the highest number of measles cases reported across the country in any year since 1992: 1,164.  As of August 14, 2019, CDPH received 65 confirmed reports of measles cases, including 38 outbreak-associated cases. Measles outbreaks in the United States are always triggered by persons who are exposed during international travel.

28.   TB is a highly contagious disease that is spread through the air when a person with active TB coughs or sneezes.

29.   In 2018, California reported 2,092 new active TB cases, and 83 percent of affected persons were born outside of the United States.

30.   Research indicates that an individual with undiagnosed and untreated TB may infect

6

between two and 43 individuals before their disease is so severe that they are forced to seek care. Those at greatest risk for infection are family members, particularly children. Children infected with TB progress to active disease much more rapidly than adults and are at very high risk for severe, lifelong disability and death. I have personally diagnosed and treated many such children, some of whom sustained lifelong disability as a result and some of whom died.

31.  California's Medicaid program, known as Medi-Cal, is an essential tool for getting uninsured patients, including immigrants, into treatment quickly, limiting both the severity of the patient's illness and the time the patient is infectious in the community. Without this option, patients are likely to wait to seek care until they are severely ill, more infectious, have more advanced disease, and require more complex treatment options. These effects could lead to increasing spread and more cases of TB in California.

32.  To eliminate TB, the CDC recommends that public health departments like CDPH maintain and strengthen current TB control priorities while increasing efforts to identify and treat latent TB infection among high-risk populations.  Due to the high numbers of non-U.S.-born individuals at risk, the CDC has prioritized collaborating with other national and international public health organizations to improve screening of immigrants and refugees.

33.  Barriers to early diagnosis and treatment of TB, and decreased vaccination rates against measles, are likely to reverse the progress made in recent years in decreasing the number of infectious disease cases and deaths in California.

34.  Ultimately, if the Rule deters individuals from using public health services administered or promoted by CDPH, and results in lower vaccination rates and higher infectious disease rates, CDPH will be required to expend additional public health resources to counter new outbreaks and other negative public health outcomes.

35.  In addition to these costs, CDPH will need to expend additional administrative resources to attempt to dispel unwarranted fears about the receipt and use of non-enumerated public health benefits like immunizations. CDPH administers numerous programs throughout the State's 58 counties and has more than 4,000 immunization providers participating in the VFC Program. As a result, it will be costly and administratively burdensome to mobilize resources and

7

provide new information and materials to reduce fear and confusion about using programs and services that are not covered by the Rule. Staff time and other resources will need to be diverted from meeting current CDPH and local health department priorities to address inquiries and concerns from clients and program recipients about how or whether participation in these programs might bring about negative immigration consequences.

36. As Acting State Public Health Officer and Assistant Director, I understand that protecting public health requires broad-based access to services for all California residents. If the Rule is implemented and immigrants and their families are chilled from using the benefits and services for which they remain eligible under the laws passed by Congress, including public health programs not directly implicated by the Rule, this will create significant public health consequences for California. Decreased vaccination rates, lower diagnosis and treatment rates among infected persons, and compromised herd immunity will have adverse impacts throughout California, for citizens and noncitizens alike.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on August 21, 2019, in Sacramento, California.

_____
Charity Dean MD, MPH
Acting State Public Health Officer
Assistant Director
California Department of Public Health

Tab 8

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   CHEROKEE DM MELTON
    Supervising Deputy Attorney General
4   JENNIFER C. BONILLA
    LISA CISNEROS
5   JULIA HARUMI MASS
    ANITA GARCIA VELASCO
6   BRENDA AYON VERDUZCO
    ANNA RICH, State Bar No. 230195
7   Deputy Attorneys General
       1515 Clay Street, 20th Floor
8      P.O. Box 70550
       Oakland, CA  94612-0550
9      Telephone: 510-879-0296
       Fax: 510-622-2270
10     E-mail:  Anna.Rich@doj.ca.gov
    *Attorneys for Plaintiff State of California, by and*
11  *through Attorney General Xavier Becerra*

12                    IN THE UNITED STATES DISTRICT COURT

13                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16

| 17 | **STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF PENNSYLVANIA** and **STATE OF OREGON,** | CASE NO. 3:19-cv-04975 |
|----|----|----|
| 18 | | **DECLARATION OF DOUG McKEEVER IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| 19 | | |
| 20 | Plaintiffs, | |
| 21 | v. | |
| 22 | | |
| 23 | **U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN McALEENAN,** in his official capacity as Acting Secretary of Homeland Security; **U.S. CITIZENSHIP AND IMMIGRATION SERVICES;** and **KENNETH T. CUCCINELLI,** in his official capacity as Acting Director of U.S. Citizenship and Immigration Services, | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | Defendants. | |
| 28 | | |

I, Doug McKeever, declare as follows:

1.    I am the Chief Deputy Executive Director, Program of Covered California, the state's health insurance marketplace exchange.  I have held this position since 2017.  The facts stated herein are of my own personal knowledge, and I could and would competently testify to them.

2.    Covered California is the state agency that was created pursuant to the Affordable Care Act (ACA) to administer a Health Benefit Exchange in California.

3.    The ACA increased access to affordable coverage in the State of California.  The ACA expanded coverage through federal health subsidies to purchase coverage in new health insurance Exchanges for those individuals with low to moderate incomes.

4.    California built its own state-based Exchange, Covered California, for the individual and small group markets.  Through Covered California, the public can find affordable, high-quality insurance plans from private insurance companies or apply for federal programs such as Medicaid.  Since its creation, over 4 million individuals have been enrolled in a health insurance plan through Covered California.

5.    Since passage of the ACA, California has experienced a historic decrease in the number of uninsured residents—the uninsured rate dropped from 17 percent in 2013 to 6.8 percent in 2017— predominantly attributable to the expansion of eligibility in the Medi-Cal program and the availability of health coverage through Covered California made more affordable through federal premium tax credits and cost-sharing assistance.

6.    Covered California has always recognized the need to tailor outreach and education efforts to ensure they meet the needs of eligible immigrants in California.  Since the initial open enrollment in 2013, Covered California has spent approximately $91,575,000 on targeted marketing campaigns designed to educate communities with high populations of eligible immigrants about the benefits of enrolling in health insurance coverage, including Spanish-speaking and Asian communities.  In addition to our robust state-wide marketing campaigns, these targeted campaigns have bolstered eligible immigrant enrollment and built a culture of trust between hard-to-reach populations and Covered California.  Covered California has also

dedicated approximately $7,780,000 since 2013 to health consumer advocates at legal aid programs statewide to ensure full access to the newly created insurance programs.

7.    In addition, Covered California instituted Navigator grants to work with experienced and trusted agencies, which represent the diversity of the State, to make sure every individual knows about the financial help and quality coverage that is available through Covered California. Today, we have 114 organizations that have 579 enrollment locations across California.  This means that 87 percent of people in the State live within a 15-minute drive of a Navigator.  To date, Covered California has invested approximately $44,764,000 in training and supporting community navigators to do outreach and enrollment in underserved communities across California, including focused efforts in areas with high populations of eligible immigrants.  In this way, Covered California is more effective helping hard-to-reach populations understand the many health plans and options available for securing affordable high-quality care.

8.    Covered California estimates that approximately 230,000 lawfully present individuals were enrolled in coverage through Covered California in September 2018.  Since 2014, approximately 650,000 lawfully present individuals have received coverage through Covered California.

9.    I am aware that the Department of Homeland Security (DHS) issued a rule: "Inadmissibility on Public Charge Grounds," 84 Fed. Reg. 41,292 (hereinafter "Rule") on August 14, 2019.  I understand that the Rule aims to redefine "public charge" for immigration purposes, and penalizes certain immigrant applicants for receipt of any of the enumerated public benefits identified in the Rule.  The Rule includes benefits such as Medicaid, Supplemental Security Income, Supplemental Nutrition Assistance Program, and federal housing.

10.   The Rule contains complex provisions that will likely undercut Covered California's efforts to promote continued enrollment of all eligible individuals into health insurance coverage. For instance, the Rule penalizes applicants for admission to the United States and applicants for adjustment to lawful permanent resident status who have "applied for, [or] been certified to receive" public benefits by considering the application as a negative factor in the evaluation of their financial status because the application may suggest a likelihood of future receipt.  8 C.F.R.

2

§ 212.22(b)(4)(i)(E); 8 C.F.R. § 212.21(e).  This in itself undermines the system California has established to administer enrollment in health care programs under the ACA.

11.  The Covered California enrollment system offers a streamlined mechanism for all Californians to research, compare, check eligibility for, and purchase health coverage.  The California Healthcare Eligibility, Enrollment, and Retention System (CalHEERS), is Covered California's automated system for determining healthcare eligibility.  The system is jointly administered by Covered California and the Department of Health Care Services (DHCS), and serves as a consolidated system for state eligibility, enrollment, and retention for both Covered California and Medi-Cal.  The system is designed to allow individuals to apply directly through the website, which integrates federal and state-funded health programs.  Through the background system of CalHEERS, applications are automatically processed and sorted into either eligibility for Covered California or for one of the Medi-Cal programs.

12.  The Rule's inclusion of Medicaid coverage will likely deter noncitizens from applying for, enrolling in, or participating in public health insurance programs beyond Medicaid, including applying for or receiving federal subsidies.  As a result, I expect it will negatively affect the number of immigrants and their family members' willing to seek out and apply for health insurance, likely leading to drops in enrollment of eligible immigrants, which will subsequently leave them without health insurance coverage.

13.  Every individual who uses Covered California's enrollment system, CalHEERS, must apply for all Insurance Affordability Programs if they are seeking advanced federal tax credits.  Insurance Affordability Programs include Medicaid, CHIP, advance payments of the Premium Tax Credit, and Cost Sharing Reductions.  Because federal law requires Covered California to use a single streamlined application, every individual who applies for subsidized coverage through CalHEERS must be evaluated for Medicaid prior to determining their eligibility for federal tax credits.

14.  It is my understanding that under the Rule, DHS will look at whether or not an alien applied for public benefits when making a public charge determination, so the Rule will likely chill noncitizens from applying for federal tax credits available through Covered California

3

because all applications for subsidized coverage submitted through CalHEERS are also applications for Medicaid.  In addition, individuals are automatically reevaluated for all programs, including Medicaid, during their annual renewal period and if they report changes to their application information during the year.  Individuals who are enrolled in coverage through Covered California are automatically transitioned to Medicaid coverage if they become newly eligible after their initial application.

15.  I believe it is reasonable to assume that the Rule will likely deter individuals from applying for health coverage benefits for which they are legally eligible and are not included in the definition of public benefits considered in a public charge admissibility determination.  This is particularly dangerous for individuals who are undergoing treatment that requires uninterrupted care.

16.  As part of the implementation of the ACA, California engaged in an extensive marketing and outreach effort to inform and educate the public about the availability of healthcare plans and financial assistance through Covered California, including paid media, social media, customer service centers, dissemination of information at community hubs, clinics, hospitals, schools, institutions of higher education and more.

17.  Despite Covered California's 2018-2019 substantial budget investment of $107 million for outreach and marketing and $105 million for customer service to inform eligible individuals about coverage options and help them enroll, each immigrant family will have to carefully weigh the risk of applying for coverage based on their own unique circumstances. If people are chilled from using Covered California's exchange enrollment system, this may negatively impact the uninsured rate in California.

18.  Finally, when noncitizens drop out of coverage, it hurts everyone in the market for individual insurance.  Based on an analysis of hospital discharges and emergency room visits, Covered California estimates that noncitizens are 10 percent less costly to insure.  Having these healthier enrollees in the market helps to lower premiums for all Californians.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on August 22, 2019, in Sacramento, California.

Doug McKeever
Chief Deputy Executive Director, Program
Covered California

5

Tab 9

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHEROKEE DM MELTON
Supervising Deputy Attorney General
JENNIFER C. BONILLA
LISA CISNEROS
JULIA HARUMI MASS
ANITA GARCIA VELASCO
BRENDA AYON VERDUZCO
ANNA RICH, State Bar No. 230195
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone: 510-879-0296
 Fax: 510-622-2270
 E-mail:  Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California, by and*
*through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF PENNSYLVANIA** and **STATE OF OREGON,**<br><br>Plaintiffs,<br><br>v.<br><br>**ACTING SECRETARY KEVIN K. MCALEENAN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY; DOES 1-100,**<br><br>Defendants. | CASE NO. 3:19-cv-04975<br><br>**DECLARATION OF KEVIN KISH IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Administrative Procedure Act Case |

1    I, Kevin Kish, declare as follows:

2    1.    I am the Director of the California Department of Fair Employment and Housing

3  (DFEH). I was appointed to lead DFEH by Governor Edmund G. Brown Jr. in February 2015,

4  and subsequently confirmed by the California Senate. I have held the position since then. Prior to

5  my appointment, I served as the director of an employment rights project at a premier legal aid,

6  public interest organization in Los Angeles County. I was responsible for the organization's

7  employment litigation, policy, and outreach initiatives, and focused on combatting labor

8  violations and trafficking across numerous low-wage sectors, including the garment, warehouse,

9  carwash, restaurant and janitorial industries, among others.

10  **DFEH's Mandate**

11    2.    The Legislature has entrusted the Department of Fair Employment and Housing to

12  enforce California's civil rights laws and to uphold California's policy of eradicating

13  discrimination in employment, housing, and public accommodations. The mission of DFEH is to

14  protect the people of California from unlawful discrimination in employment, housing, and public

15  accommodations and from hate violence and human trafficking. Cal. Gov't Code § 12930.

16    3.    DFEH is the largest state civil rights agency in the nation and is the institutional

17  centerpiece of California's commitment to protecting its residents' civil rights. As the DFEH

18  Director, I oversee a staff of 239 employees that engages in public outreach, provides technical

19  assistance, investigates complaints of discrimination, both individual and systemic, facilitates

20  mediation, and prosecutes civil rights violations in court.

21    4.    DFEH is responsible for enforcing state laws that make it illegal to discriminate

22  against or to harass any person because of certain protected categories that include national origin

23  (including primary language), ancestry, and immigration or citizenship status or perceived status,

24  gender or sex, among many other bases. Among other laws, DFEH enforces the California Fair

25  Employment and Housing Act (FEHA) (Cal. Gov't Code § 12900 et seq.), the Unruh Civil Rights

26  Act (Cal. Civil Code § 51), the Ralph Civil Rights Act (Cal. Civil Code § 51.7), Cal. Gov't Code

27  § 11135, and the Trafficking Victims Protection Act, (Cal. Civil Code § 52.5).

28  /////

1

**DFEH's Complaint System, And Investigations and Enforcement Activity Related to Immigrant Complainants**

5.      To carry out its responsibilities, DFEH facilitates a complaint process, whereby individuals who believe that they were the victim of a civil rights violation, including discrimination, may file a complaint with DFEH. If a complaint alleges facts within DFEH's jurisdiction, then the complaint will be formally accepted for investigation. DFEH does not have discretion to decline to investigate cases within its jurisdiction.

6.      When a complaint is accepted for investigation, DFEH will prepare a complaint form for the individual's signature under penalty of perjury and when the individual returns the complaint, it is delivered to the person or entity that the person believes discriminated against him/her/them, who is the respondent.

7.      After a complaint is signed and issued, DFEH conducts an independent investigation of the facts and encourages the parties to resolve the dispute in appropriate cases. When parties cannot resolve a complaint or DFEH determines that a case is not appropriate for voluntary resolution, DFEH continues an investigation to determine if evidence supports a finding that a violation of California law occurred.

8.      If the dispute is not resolved and DFEH finds there were probable violations of the law, there is a cause finding and the case moves into DFEH's Legal Division. At that time, DFEH is required to conduct a mediation to give the parties an opportunity to reach an agreement to resolve the dispute and close the case. If mediation fails, DFEH may file a lawsuit in court.

9.      When DFEH files a lawsuit based on the allegations in an individual complaint, DFEH represents the interests of the State, and the individual complainant is identified in DFEH's civil complaint as the real party in interest. The real party in interest is not a party to DFEH's lawsuit, but has the right to intervene as a plaintiff. Absent intervention, the real party in interest is a witness to the discrimination and may be subpoenaed to testify at deposition or in court.

10.      In addition to individual complaints, the Director may also initiate a Director's Complaint pursuant to 2 C.C.R. § 10012 on behalf of a group or class of persons adversely affected in a similar manner by an unlawful practice under FEHA. DFEH utilizes Director Complaints, group or class allegations to address systemic discrimination, and uses fictitious

2

names ("Jane/John Doe") to protect the identity of vulnerable real parties in interest, especially people who have been sexually harassed or assaulted, or because of actual or perceived immigration or citizenship status.

11.    Individual complainants are central to enforcement of California's civil rights laws. Each individual complaint provides DFEH with notice of potential discrimination and enables the investigation and prosecution of violations. Without individual complainants and witnesses, DFEH would be unable to identify and address many instances of discrimination, harassment, trafficking and hate violence.

12.    Furthermore, as part of its strategic planning, DFEH assesses trends in individual complaints submitted and the results of complaint investigations. These assessments have allowed DFEH to identify industries that have high complaint report and violation rates. DFEH has identified patterns of discrimination within various industries, jobs, and regions. Certain industries are known to have high rates of violations and particularly egregious violations, but low complaint rates.

13.    DFEH is aware of low complaint/high violation rates in the agriculture and janitorial sectors. These sectors are also known to rely heavily on immigrant labor.

14.    To address these concerns, DFEH has targeted additional outreach, investigative and enforcement resources to reach immigrant communities and industries and occupations with the most vulnerable immigrant workforce.

15.    Each year DFEH also receives hundreds of complaints alleging employment and housing discrimination or hate violence or threats based on national origin, and has filed several lawsuits to prosecute these allegations on behalf of individuals or groups whose vulnerability to discriminatory treatment is frequently compounded by immigration concerns.

16.    During the approximately past two years, heightened immigration fears have impacted a broad range of cases, from health service employees to farmworkers. In litigating these cases, DFEH has encountered citizenship and immigration-related intimidation tactics directed at both real parties in interest and third-party witnesses. For example, defendants have attempted to elicit deposition testimony about the citizenship or immigration status of the

3

deponent, in contravention of the public policy of the State of California. *See* Cal. Civil Code § 3339) (generally restricting employer access to citizenship and immigration information, except as needed to enforce federal immigration law). The resultant discovery disputes also increase litigation costs to the state. DFEH has also encountered increasing difficulty in fulfilling its mission stemming from witnesses' apparent reluctance to provide information to any government entity for fear of retaliation by immigration authorities. The legal staff time required to prepare witnesses and assure them of their rights to proceed with litigation and remedy discrimination is increasing as a result of community fears and defense intimidation tactics. This frustrates DFEH's ability to fulfil its mission to eradicate discrimination in the State of California.

**FINAL RULE AND ITS IMPACT**

17.    I have reviewed and am familiar with the content of the final rule on Inadmissibility on Public Charge Grounds, submitted for publication in the Federal Register on August 14, 2019 (the Rule), 84 Fed. Reg. 41,292, RIN 1615-AA22.

18.    After considering the Rule, I believe that it will negatively impact the outreach, investigation and enforcement activities that DFEH must conduct to fulfill its responsibilities under California law. Based on my understanding of its intended scope and effect, the Rule will drive a deeper wedge between immigrants and governmental entities, including DFEH, that offer services and support to the general public, including immigrants whose rights have been violated. Having worked closely on civil rights issues impacting low-income immigrants, including those who are low-wage workers, I am well aware of the general distrust and fear that many immigrants have towards government agents and officials.

19.    Furthermore, there is likely to be confusion and questions from many about whether assistance from DFEH in connection with a discrimination, harassment, trafficking, or hate violence complaint constitutes a public benefit within the meaning of the Rule. Some immigrants are likely to be inclined to avoid all government offices, altogether. DFEH will need to make clear that seeking support from our offices, whether through filing a complaint, cooperating with an investigation or a prosecution, does not trigger the public charge test.

20.    I believe the Rule will discourage individuals from filing complaints with DFEH or cooperating with DFEH's investigations, hindering DFEH's ability to discharge its duties. The

4

Rule burdens DFEH in carrying out its statutory mandates by contributing to a climate of intimidation and intensifying fears of retaliation or adverse immigration consequences among California residents.

21.     DFEH is already evaluating and preparing measures to mitigate the impact of the Rule. I am considering the modification and the creation of additional educational materials for employees and employers, tenants and landlords, and the general public to alert them that seeking the assistance of DFEH does not constitute a public benefit under the Rule. DFEH will need to devote additional resources to public education, outreach, and staff training to counteract these adverse effects on DFEH's ability to achieve its statutory mission to prevent, remedy, and deter discrimination statewide.

22.     DFEH estimates a broad based multilingual public education and outreach campaign to counteract the harmful impact of the Rule would require at least $150,000-$200,000 for two regions within the state, the Central Valley (Fresno/Bakersfield) and the Inland Empire (Riverside/San Bernardino). These costs will increase proportionately to expand the public education and outreach campaign throughout the state. This estimate is based on approximately $95,000 in costs needed to hire a contractor to work with DFEH to create a broad-based multilingual (English, Spanish, Simplified Chinese, Tagalog, Vietnamese, and Korean) public education and outreach campaign utilizing social media, radio, television public service messages, and outdoor media. In addition, DFEH staff time needed to create and oversee an education and outreach campaign would equate 20 work days for two staff members separately. Additionally, DFEH would need to hold public educational forums throughout California to clarify civil rights protections for immigrants, which would entail DFEH staff time equating 25 works days and travel costs.

/////
/////
/////
/////
/////

5

1    I declare under penalty of perjury that the foregoing is true and correct and of my own

2    personal knowledge.

3        Executed on August 23, 2019, in Los Angeles, California.

4

5

6    _____

7    Kevin Kish
     Director
8    California Department of Fair Employment and
     Housing
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL. OF KEVIN KISH IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-04975

# Tab 10

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  CHEROKEE DM MELTON
   Supervising Deputy Attorney General
4  JENNIFER C. BONILLA
   LISA CISNEROS
5  JULIA HARUMI MASS
   ANITA GARCIA VELASCO
6  BRENDA AYON VERDUZCO
   ANNA RICH, State Bar No. 230195
7  Deputy Attorneys General
     1515 Clay Street, 20th Floor
8    P.O. Box 70550
     Oakland, CA  94612-0550
9    Telephone: 510-879-0296
     Fax: 510-622-2270
10   E-mail:  Anna.Rich@doj.ca.gov
   *Attorneys for Plaintiff State of California*

11

12                  IN THE UNITED STATES DISTRICT COURT

13              FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16  | **STATE OF CALIFORNIA, DISTRICT OF** | CASE NO. 3:19-cv-04975 |
17  **COLUMBIA, STATE OF MAINE,**
    **COMMONWEALTH OF**                    **DECLARATION OF MARI CANTWELL**
18  **PENNSYLVANIA** and **STATE OF**      **IN SUPPORT OF PLAINTIFFS'**
    **OREGON,**                            **MOTION FOR A PRELIMINARY**
19                                         **INJUNCTION**
                              Plaintiffs,
20
         **v.**
21

22  **U.S. DEPARTMENT OF HOMELAND**
    **SECURITY; KEVIN MCALEENAN,** in his
23  official capacity as Acting Secretary of
    Homeland Security; **U.S. CITIZENSHIP**
24  **AND IMMIGRATION SERVICES;** and
    **KENNETH T. CUCCINELLI,**
25  in his official capacity as Acting Director of U.S. Citizenship
    and Immigration Services,
26
                              Defendants.
27

28

---

I, Mari Cantwell, declare as follows:

1.     I am the Medicaid Director for the State of California and Chief Deputy Director of Health Care Programs at the California Department of Health Care Services (DHCS).  I have held the Chief Deputy position since 2013 and the State Medicaid Director position since 2015.  I have worked in the field of health care policy and finance for almost 20 years.  Prior to the positions I hold now, I served as the Deputy Director of Health Care Financing for DHCS, and previously as the Vice President of Finance Policy for the California Association of Public Hospitals and Health Systems.  I hold a B.A. in Public Policy from Brown University, and a Masters in Public Policy with a focus in Health Policy from the University of California, Los Angeles.

2.     As the State Medicaid Director and Chief Deputy Director of Health Care Programs at DHCS, my responsibilities include the management of California's Medicaid program under title XIX of the federal Social Security Act, referred to in California as "Medi-Cal."

3.     Medi-Cal has an annual budget of more than $100 billion in public funds, which supports the health of more than 13 million Californians.

4.     DHCS is the single state agency authorized to administer California's Medi-Cal program.  Approximately one-third of California's population receives healthcare services through coverage financed or administered by DHCS, making the department the largest healthcare purchaser in California.

5.     The mission of DHCS is to provide Californians with access to affordable, integrated, high-quality health care including medical, dental, mental health, substance abuse treatment services, and long-term care.  We aim to preserve and improve the overall health and well-being of all Californians.  In that effort, DHCS oversees the healthcare of citizen and noncitizen low-income families, children, women, seniors, and persons with disabilities.

6.     The state's Medi-Cal program is a federal/state partnership that provides comprehensive healthcare to individuals and families who meet defined eligibility requirements.

7.     DHCS recognizes that meaningful access to affordable and quality healthcare requires statewide efforts to increase coverage for more Californians.

8.    Effective January 1, 2014, California elected to implement the Medicaid expansion made available under the Affordable Care Act (ACA), which extended eligibility to new populations, most notably to adults without children with incomes up to 138 percent above the federal poverty level (FPL).  This expansion and other program changes since 2013 have increased Medi-Cal enrollment by approximately five million individuals.

9.    The state's Medi-Cal population is diverse and is inclusive of noncitizens.  Among Medi-Cal's noncitizen population, there are individuals in multiple eligibility categories, which offer different levels of healthcare coverage based on age, income, disability status and pregnancy status.

10.    For some noncitizen subgroups, only emergency and/or pregnancy-related and long-term care services are available.  This coverage is referred to as "restricted scope" Medi-Cal.  For others, they qualify for all health services covered under California's Medicaid State Plan are available, which is referred to as "full scope" coverage.

11.    To better address the state's coverage needs, in 2015, California expanded full-scope Medi-Cal to all low-income children through age eighteen, regardless of immigration status.

12.    Building on this expansion and its positive health outcomes, the Governor enacted his 2019-2020 Budget, which extended full scope Medi-Cal benefits to individuals from ages 19 through 25 who meet all other eligibility criteria, including income standards, regardless of immigration status.

13.    I am familiar with the Public Charge Rule, "Inadmissibility on Public Charge Grounds," (hereinafter "the Rule") issued on August 14, 2019, by the Department of Homeland Security (DHS).  It is my understanding that the Rule expands the benefits that must be considered in public charge determinations to include federally-funded Medicaid benefits, with some exceptions.

14.    More than 2.5 million Medi-Cal beneficiaries have noncitizen status.  If these individuals are discouraged from enrolling in either state-only or federal-state funded Medi-Cal programs out of fear of negative consequences to adjusting their immigration status, this will impede California's ability to enroll these eligible, low-income Californians in Medi-Cal.

2

## I.    THE CHILLING EFFECT

15.  The Rule's inclusion of federally-funded Medicaid in the list of enumerated public benefits that could affect an individual's public charge determination is likely to chill immigrants and their family members—including lawful permanent residents and U.S. citizens—from using no-cost or low-cost health coverage for which they are eligible.

16.  The Rule is complex and will be difficult for Medi-Cal beneficiaries to understand.  It requires immigrant applicants and beneficiaries to be able to discern the differences between funding source(s) for the many benefits the state administers.

17.  The Rule's inclusion of noncash benefits, such as federally-funded Medicaid, which cannot be monetized, requires individuals to determine if they have received benefits for more than 12 months in the aggregate, within a 36-month period.  However, the way benefits are received varies, and beneficiaries will encounter great difficulties trying to track receipt of benefits.  In fee-for-service Medi-Cal, payments are only made when services are rendered.  But many populations are in managed care, for which DHCS makes a monthly plan payment regardless of whether an individual actually accesses services.  These variations could cause confusion regarding whether a beneficiary has "received benefits" for more than 12 months in the aggregate, within a 36-month period, and DHCS has no system in place for informing individuals whether they have "received benefits" in a particular month.

18.  Additionally, the Rule's inclusion of the income threshold of 125% above the federal poverty guidelines as a factor in the public charge determination will include a significant proportion of the state's Medi-Cal population, who are generally eligible to receive coverage when they fall below 138% of the federal poverty level, though some Medi-Cal populations are eligible at even higher federal poverty levels.  The Rule's determination that it would take up to 250% of the FPL to overcome a public charge determination could further undermine the mission of DHCS and the many positive advances made through recent expansions in Medi-Cal.

19.  I understand that the Rule contains exceptions for certain uses of federally-funded Medicaid such as emergency Medicaid, the Individuals with Disabilities Education Act (IDEA), school-based services or benefits, and benefits received by either an individual under 21 years of

age or by a woman during pregnancy and up to 60 days post-partum.   In my experience, these complex nuances result in confusion among participants who will have no way of knowing whether their or their child's particular Medi-Cal coverage pathway will affect their family's immigration status without engaging legal counsel.

20.   Ultimately, program applicants and beneficiaries will be unable to evaluate the risks that receiving Medi-Cal benefits will have on their or their family members' likelihood of being determined to be a public charge for any significant period.

21.   The Rule expressly anticipates that persons other than those individuals subject to public charge determinations will be chilled and disenroll from or decline to enroll in public benefits programs for which they and their family members remain eligible under the law.  Any drops in enrollment due to a chilling effect are likely to affect U.S. citizens as well, including U.S. citizen children in mixed immigration-status households.  For example, because of the complexity of the Rule, a parent concerned about the effects of the Rule on their own status may fear having their children in Medi-Cal, even if their children are U.S. citizens.

22.   Immigrants and their families who forgo Medi-Cal benefits, or seek to disenroll their children from Medi-Cal programs, despite their continued eligibility and the Rule's carved out exceptions, could result in low-income individuals going without critical preventive care and necessary medical treatment.  This will include families with children, seniors, persons with disabilities, foster care recipients, pregnant women and other vulnerable Californians.

## II.   IMPACT ON ADMINISTRATION OF HEALTHCARE SERVICES

23.   Medi-Cal is the pillar of the state's healthcare safety net, providing access and meaningful coverage to millions of low-income Californians.  If implemented, the Rule's drastic changes will interfere with the administration of Medi-Cal and other health programs operated by DHCS, reducing California's healthcare coverage gains.

24.   In my experience administering DHCS, before implementation of the ACA and its Medicaid expansion, immigrants and the uninsured resorted to costlier and less effective emergency room treatment.  I anticipate that under the Rule—once again—immigrants and now their U.S. citizen children and family members who fear immigration consequences will avoid the

4

use of pregnancy related and full scope Medi-Cal services altogether, choosing instead to resort to episodic emergency room treatment.  Further, it affects California's ability to administer and operate Medi-Cal's programs aimed at serving the immigrant population.

25.  Under California's Medi-Cal State Plan, a key benefit afforded to Medi-Cal participants with full scope coverage is family planning services which include access to comprehensive reproductive education, contraceptive counseling, emergency contraceptives, long-acting reversible contraception, and the screening and treatment of sexually transmitted infections or diseases.

26.  DHCS leverages Medi-Cal resources to make pregnancy health services accessible to the largest number of women possible.  Medi-Cal includes full scope coverage for eligible pregnant women up to 138% of the FPL, while pregnant women with incomes between 138% of the FPL up to 213% of the FPL are eligible for pregnancy-related Medi-Cal coverage. Pregnancy-related services include prenatal care, all Medi-Cal services for conditions that might complicate pregnancy (such as high blood pressure and diabetes), labor, delivery, postpartum care (such as urinary problems, hemorrhaging and vaginal soreness), and other family planning services.  Additionally, these services directly affect maternal and child health outcomes.

27.  Pregnant women and women up to 60 days post-partum who have income between 213% of the FPL and up to 322% of the FPL may be eligible for the Medi-Cal Access Program (MCAP).  Pregnant women who are not eligible for full-scope or pregnancy-related Medi-Cal may qualify for the MCAP, regardless of immigration status.  The MCAP offers low-cost comprehensive coverage, with no copayments, deductibles or coinsurance beyond a fee equal to 1.5% of the yearly family income for its covered services.  Pregnant women may qualify for either subsidized coverage via Covered California or MCAP, but may only enroll in one program.

28.  In addition to family planning services for traditional Medi-Cal eligible individuals, DHCS also administers the Family Planning, Access, Care, and Treatment (Family PACT) program.  Family PACT is California's innovative approach to providing comprehensive family planning services to eligible low-income men and women who do not otherwise qualify for full scope Medi-Cal coverage.  In 2017-18, the most recent fiscal year for which data is available,

5

Family PACT served approximately 940,000 income eligible men and women of childbearing age at no cost through a network of approximately 2,200 providers.

29.  Similar to coverage offerings for pregnant women, DHCS also leverages Medi-Cal resources to extend meaningful coverage to a wide range of children.  This is accomplished with federal funds available under titles XIX and XXI (Children's Health Insurance Program or CHIP).

30.  Under title XXI, states have multiple options for how to structure CHIP administration: (1) claim title XXI funds under a Medicaid expansion model extending Medicaid benefits to income eligible children; (2) implement a standalone model to extend separate CHIP benefits to income eligible children; or (3) a combination of the first two options.

31.  DHCS employs the combination model, but the vast majority of the State's title XXI allotment is used to expand Medicaid coverage under the first option to children in working families whose parent(s) or guardians(s) exceed the income eligibility thresholds for traditional title XIX based Medi-Cal.  Under the Medi-Cal State plan, children with incomes through 266% of the FPL are eligible for full scope Medi-Cal benefits, with premiums applied to incomes above 160% of the FPL.

32.  DHCS uses title XXI funds to further extend coverage to children with income up to 322% of the FPL under its standalone CHIP model.

33.  Almost half of California children have at least one immigrant parent.  Of these children, over 4 million are U.S. citizens, and 2 million are enrolled in Medi-Cal and CHIP.

34.  Beneficiaries of other DHCS programs include recipients of breast and cervical cancer screening and treatment, genetically handicapped services, and prostate cancer treatment. These programs serve as a safety net for those who are otherwise not eligible for full-scope Medi-Cal, covering over 1.5 million individuals collectively.

35.  I know from my experience overseeing various DHCS programs that the need for public safety net programs varies within income levels, and our programs have been built to address the different needs of Californian families.

6

36.  If individuals avoid the preventive care and treatment provided by these programs, it will increase an individual's risk for adverse health impacts including late stage disease detection, unintended pregnancy, poor birth outcomes, and increased morbidity and mortality for late stage disease-unwinding years of investment into these interwoven health services.  Additionally, poorer health outcomes for these populations will also affect the overall health of all Californians by both putting strain on the overall health care delivery system as well as increasing the potential risks of the spread of infection and illness.

### A.    Uninsured Rates and Uncompensated Costs

37.  In addition to the individual and larger public health impact, the Rule will result in new economic burdens for California's healthcare safety net system.

38.  Since passage of the ACA and the expansion of eligibility in the Medi-Cal program, California has experienced a considerable decrease in the number of uninsured residents—the uninsured rate dropped from 17% in 2013 to 6.8% in 2017.  These enrollment achievements, have led to increased healthcare coverage, better health, and lower costs for all.

39.  Reducing access to preventative and timely healthcare services leads to increased state costs resulting from emergency room visits and the consequences of unmet healthcare needs. In my experience at DHCS, I know deferred care often leads to more complex medical conditions, which are more expensive to treat at the emergency room or may not be treatable at all resulting in serious injury or premature death.  DHS recognizes the Rule could lead to "increased use of emergency rooms and emergent care as a method of primary health care due to delayed treatment," and "increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient."  84 Fed. Reg. 41384.

40.  If the number of insured in California were to decrease and overall public health declines, California would experience an increase in uncompensated costs for emergency room services and hospitalizations.  The cost of uncompensated care would be shifted to the broader healthcare delivery system resulting in higher costs for the state, local entities, and private healthcare payers.

7

**B.**     **Administrative Burden**

41.  If implemented, the Rule likely will interfere with and complicate DHCS'
administration of programs.  For example, county health departments and hospitals have
requested guidance on how to respond and adapt enrollment processes to the Rule.  In
anticipation of this Rule, staff have spent time reviewing the Rule, as well as planning and
implementing efforts to provide technical assistance and guidance in response to these questions
and attempt to avoid confusion.

42.  Further, the Rule will sow confusion about immigrants' ability to access essential
health benefits, for which they remain eligible under both state and federal laws, without
jeopardizing their ability to adjust their immigration status.

43.  The Rule undermines the substantial progress that DHCS has made to increase access
to healthcare, harming families and communities, weakening the public health, and creating
public distrust in the State's social welfare institutions.

I declare under penalty of perjury that the foregoing is true and correct and of my own
personal knowledge.

Executed on August 23, 2019, in Sacramento, California.

Mari Cantwell
Medicaid Director
California Department of Healthcare Services

8

Tab 11

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  CHEROKEE DM MELTON
   Supervising Deputy Attorney General
4  JENNIFER C. BONILLA
   LISA CISNEROS
5  JULIA HARUMI MASS
   ANITA GARCIA VELASCO
6  BRENDA AYON VERDUZCO
   ANNA RICH, State Bar No. 230195
7  Deputy Attorneys General
     1515 Clay Street, 20th Floor
8    P.O. Box 70550
     Oakland, CA  94612-0550
9    Telephone: 510-879-0296
     Fax: 510-622-2270
10   E-mail:  Anna.Rich@doj.ca.gov

11  *Attorneys for Plaintiff State of California*

12

13                    IN THE UNITED STATES DISTRICT COURT

14                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16

17  | **STATE OF CALIFORNIA, DISTRICT OF** | CASE NO. 3:19-cv-04975 |
    | **COLUMBIA, STATE OF MAINE,** | |
18  | **COMMONWEALTH OF** | **DECLARATION OF ALEXIS CARMEN** |
    | **PENNSYLVANIA** and **STATE OF** | **FERNÁNDEZ IN SUPPORT OF** |
19  | **OREGON,** | **PLAINTIFFS' MOTION FOR A** |
    | | **PRELIMINARY INJUNCTION** |
20  |                          Plaintiffs, | |
21  |           v. | |
22  | **U.S. DEPARTMENT OF HOMELAND** | |
23  | **SECURITY; KEVIN MCALEENAN,** in his | |
    | official capacity as Acting Secretary of | |
24  | Homeland Security; **U.S. CITIZENSHIP** | |
    | **AND IMMIGRATION SERVICES;** and | |
25  | **KENNETH T. CUCCINELLI**, in his official | |
    | capacity as Acting Director of U.S. Citizenship | |
26  | and Immigration Services, | |
27  |                          Defendants. | |

28

1    I, Alexis Carmen Fernández, declare as follows:

2    1.   I am Acting Chief of the CalFresh & Nutrition Branch within the California

3    Department of Social Services (CDSS).  I have held this position since July 2019. Prior to the

4    position I hold now, I served as Chief of the CalFresh Policy Bureau, previously known as the

5    CalFresh Policy Section, within the CalFresh and Nutrition Branch at CDSS, from June 2016 to

6    July 2019. Before joining state service, I was the Policy Director at First 5 Association of

7    California and Director of Legislation at California Food Policy Advocates. I have a Master's

8    degree in Social Welfare, with a specialization in Management and Planning, from University of

9    California, Berkeley.

10    2.   In my current position, I oversee the administration of the CalFresh program for the

11    state of California. I supervise a staff of 110 state employees, who oversee CalFresh policy,

12    operations, outreach, quality control, and various other aspects of CalFresh and other nutrition

13    programs. In my previous position of Chief of the CalFresh Policy Bureau, I oversaw all nutrition

14    policy for CDSS and worked directly with both counties and advocacy organizations to increase

15    enrollment amongst eligible Californians and address any significant concerns.

16    I.   OVERVIEW OF THE CALFRESH & NUTRITION BRANCH AT CDSS

17    3.   CDSS' CalFresh & Nutrition Branch (Branch) administers and provides state

18    oversight to a variety of nutrition focused programs. Major programs include the CalFresh

19    Program, which is the public name for both the Supplemental Nutrition Assistance Program

20    (SNAP) in California and the state-funded California Food Assistance Program (CFAP); CalFresh

21    Employment & Training (CalFresh E&T); CalFresh Healthy Living (known federally as SNAP-

22    Ed); CalFresh Outreach (known federally as SNAP Outreach); and two food distribution

23    programs. CDSS' programs help Californians access nutritious foods for a better diet. CalFresh

24    benefits stretch food budgets, allowing individuals and families to afford nutritious food,

25    including more fruits, vegetables and other healthy foods.

26    4.   In order to fulfill its mission of helping Californians access nutritious foods, CDSS

27    has a responsibility to ensure that eligible individuals are aware of and have access to benefits. In

28    an effort to raise participation rates as much as possible, CDSS has invested significant time and

1

resources in both outreach and the development of tools and operational processes that provide greater access to benefits.

## II.   RELEVANT PROGRAMS

5.   As noted earlier, in California, SNAP is called CalFresh.  CalFresh provides nutrition benefits that assist households with low income in purchasing the food they need to maintain adequate nutrition.

6.   SNAP is a federal program, and its eligibility standards and benefit levels are established by Congress.  In 2016, SNAP provided an average of $288.09 per CalFresh household per month and $138.97 per individual California recipient per month in benefits.  The US Department of Agriculture Food and Nutrition Service administers SNAP nationally and funds 100 percent of the benefits and half of the administrative costs. States pay the remaining 50 percent of administrative costs

7.   In California, CalFresh is administered at the county level, with oversight provided by CDSS.  To cover California's share of administrative costs, the state pays 35 percent of administrative costs and counties pay the remaining 15 percent.

8.   CFAP provides state-funded nutrition benefits for immigrants who are not eligible for SNAP due to the immigration requirements under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA).  This type of supplemental state program is permitted under PRWORA. Although the funding source and eligibility criteria differ for CFAP and SNAP, both programs are administered together by the counties and referred to publicly as CalFresh, in an effort to simplify the processes and provide easy access for applicants and recipients. As a result, applicants do not apply for SNAP or CFAP, but for CalFresh generally. Similarly, a CalFresh household whose members have varying immigration statuses, may receive both SNAP and CFAP funded CalFresh benefits, but the recipients only know that they are receiving CalFresh.

9.   In June 2019, California had 1,985,609 participating CalFresh households, and 3,811,841 individual recipients within those households. Nearly half of CalFresh recipients each month are under the age of 18.

2

10. CalFresh benefits are critical to Californians in need, particularly for low-income communities, communities of color who face significant disparities, those working low-wage jobs, and older adults on fixed-incomes. In addition to improving access to healthier foods, CalFresh serves as an anti-poverty program. Receipt of nutrition benefits allow Californians to use their limited financial resources to cover other necessary expenses including housing, healthcare, and child care.

11. CalFresh recipients, who are deemed eligible under federal SNAP rules, are also eligible to participate in CalFresh Employment & Training (CalFresh E&T) services. The goal of CalFresh E&T is to increase the employment and earning capacity of CalFresh recipients by maximizing their access to job placement, supportive services, skills trainings, and credentialing.

12. CDSS also administers CalFresh Healthy Living (known federally as SNAP-Ed). CalFresh Healthy Living facilitates behaviorally focused, evidence-based, nutrition and physical activity education interventions to improve food security and prevent nutrition related chronic diseases. CalFresh Healthy Living services are targeted to Californians of all ages who live in households with incomes at or below 185% of the Federal Poverty Level (FPL). Participants need not be receiving CalFresh benefits.

13. CDSS also administers CalFresh Outreach (known federally as SNAP Outreach), which promotes awareness of and participation in SNAP amongst eligible Californians. CalFresh Outreach seeks to ensure that all eligible individuals are aware of and receiving CalFresh. The CalFresh Outreach Program oversees a network of statewide contractors conducting targeted outreach and application assistance.

14. Receipt of SNAP is also used to certify children for receipt of free school meals. The California Department of Education (CDE) has established a statewide Direct Certification system that matches student data against the CDSS statewide data on CalFresh recipients to streamline school meal eligibility and enrollment.

III. CALFRESH & IMMIGRANT ACCESS

15. The administration of CalFresh requires strict adherence to the immigration eligibility criteria established as a result of PRWORA, compliance with all federal and state anti-

3

discrimination laws, and outreach efforts to increase participation amongst all eligible Californians.

16.   Addressing these requirements simultaneously requires significant resources and staff attention to program administration and outreach. Before the Rule, it was already challenging to inform and gain trust in immigrant communities to encourage full participation in CalFresh among eligible individuals.  For years, CDSS has provided outreach materials and policy guidance to increase awareness of the limited scope of the prior public charge rule, i.e. that it does not apply to nutrition benefits, and thereby increase participation among eligible immigrants.

## IV.   U.S. DEPARTMENT OF HOMELAND SECURITY'S PUBLIC CHARGE RULE

17.   I am familiar with the rule, "Inadmissibility on Public Charge Grounds," 84 Fed. Reg. 41292 (hereinafter "Rule") issued on August 14, 2019 by the Department of Homeland Security. I understand that the Rule redefines "public charge" and "public benefit" for immigration purposes.

18.   The Rule exacerbates the challenges that I described above by dramatically expanding the public charge test, and escalating fears and confusion in immigrant communities.

19.   Since drafts of the proposed Rule were leaked in early 2018, I have received reports and inquiries from county partners and stakeholders concerning the fear and confusion that immigrants and individuals in mixed-status families are experiencing with regard to their current or potential use of public benefits and the consequences for an individual's legal immigration status.  County administrators have conveyed concerns they received from both potential applicants for benefits and current recipients of benefits.

20.   It is evident from the complex language in the Rule, that it requires a level of expertise in both public benefits and immigration law that CalFresh applicants and recipients do not possess under typical circumstances.  Under the Rule, immigrant families relying on public assistance programs will face much more complex and difficult decisions about which programs and services they can safely use without jeopardizing their present or future potential legal status.

4

The Rule's expanded list of benefits included in the public charge test and its complex provisions will be extraordinarily difficult to communicate clearly and effectively to program participants.

21.  Based on the reports I have received from counties and stakeholders, I believe the mere idea of this Rule caused misinformation, fear and confusion, has led individuals to disenroll from CalFresh, and to decline to apply for CalFresh in the first instance.  I believe the Rule will continue to discourage not only immigrants who are subject to the Public Charge statute, but also those to whom the Rule does not apply.  I refer to this as the chilling effect.

22.  I am aware that the proposed Rule expressly anticipated that persons other than those individuals subject to public charge determinations will experience the chilling effect and disenroll from or decline to enroll in public benefit programs for which they and their family members remain eligible under the law.  I am also aware that DHS states that these drops in enrollment may affect U.S. citizens, including U.S. citizen children in mixed-immigration status households.

23.  In my experience, the misinformation around this type of complex and confusing policy has lasting, long term impacts, including amongst families and communities who will share their understanding of program rules and exacerbate misconceptions. If the Rule is implemented, CDSS and the counties may never be able to fully address the fear and misconceptions resulting from the inclusion of SNAP. These misconceptions will impact participation among eligible Californians and influence CDSS' messaging in outreach and policy materials for years to come.

## V.   CALFRESH & NUTRITION BRANCH'S IMPACTED INITIATIVES

24.  I believe the Rule will negatively impact CalFresh Outreach's ongoing campaigns. Currently we are working on several initiatives to improve participation amongst Californians who are eligible for CalFresh. These include outreach to college students, older adults, and people with disabilities.

25.  As California is an incredibly diverse state with a large immigrant population, any demographic group targeted for outreach will include some non-U.S. citizens as well as some citizens who are in mixed-status households. Therefore, both broad and targeted outreach efforts

5

will need to be reviewed and potentially altered to address the impacts and misconceptions resulting from the Rule.

26.   Over the past year, at the direction of the California State Legislature, CDSS has participated in a Food for All workgroup with governmental and non-governmental stakeholders. The purpose of the workgroup was to identify accessibility issues and determine ways to increase participation in nutrition programs amongst eligible immigrant and mixed-status households here in California. In many ways, the work of that group will be frustrated by this Rule, as any and all outreach to immigrant and mixed-status households will now need to focus on clarifying the implications of the Rule.

27.   In June 2019, California began a major expansion of SNAP eligibility to hundreds of thousands of older adults and people with disabilities with low income.  Prior to June, recipients of Supplemental Security Income (SSI) were ineligible for SNAP in California. This change in eligibility policy is known as the CalFresh Expansion. The CalFresh Expansion included, and continues to include, substantial outreach efforts. Given the fact that SSI and SNAP recipients include lawful permanent residents, naturalized U.S. Citizens, and members of mixed-status households, we are concerned that the confusion surrounding SNAP's inclusion in the Rule will stop many SSI recipients from applying for CalFresh out of fear that it might negatively impact their status or the status of a family member. In this case, our outreach efforts will now need to be amended in an effort to stem the chilling effect amongst these particularly vulnerable populations of eligible individuals.

28.   The CalFresh E&T program has been working to expand participation in an effort to improve access to employment and higher-wages. While this goal is in line with the stated purpose of the Rule, the Rule itself will lead individuals to disenroll from CalFresh (SNAP), which will subsequently bar them from participating in CalFresh E&T.

29.   Unlike CalFresh E&T, CalFresh Healthy Living does not require SNAP eligibility or participation. Instead, CalFresh Healthy Living provides classes, materials, and education to low-income communities more broadly. These programs provide great tools for individuals and families to stay healthy, eat well on a budget, and mitigate future diet related health concerns.

6

While all of those outcomes would make an individual less likely to become a public charge, I believe that the Rule has created such fear and confusion that many individuals will avoid these services out of misplaced concern that participation could be counted against them at a future date.

30. As previously explained, SNAP recipient data is used to directly certify children for free school meals by the California Department of Education. Based on their receipt of SNAP, these children and their families are known to have low income and are likely to have unmet nutrition needs. As children disenroll from CalFresh as a result of this Rule, there may be a decline in the number of children directly certified for free school meals. This will require those children to be directly certified based on participation in some other program, assuming they haven't also disenrolled from all other public benefits, or the child's family to submit an application through the school.  The impact here is not only a potential decline in school meal program participation, but also a loss of administrative streamlining and efficiency.

31. Disenrollment from CalFresh will lead to a strain on California's emergency food safety net, provided through a network of primarily privately funded foodbanks and pantries across the state.  Households in need of food will turn to CDSS' food distribution programs when they could be receiving CalFresh instead.  Due to the limited funding provided for CDSS' food distribution programs, increased demand will certainly not be met by these programs alone. The emergency food safety net is meant to be a last resort or emergency provision.  Instead, families afraid of the implications of the Rule will become reliant on the foodbanks and pantries, thus limiting their ability to serve those experiencing dire need or emergency.

## VI.   ADMINISTRATIVE IMPACTS OF DHS' PUBLIC CHARGE RULE

32. If the Rule is implemented, CDSS will need to study and understand the Rule's impact on the communities they serve and train employees on these changes, as detailed below.

33. Based on the risk of disenrollment and avoidance of programs, the CalFresh Outreach staff within CDSS have begun preparing outreach and communication strategies specific to the Rule.  This is in addition to the revisions to our existing outreach campaigns on other topics. CDSS will be required to commit significant resources to inform and educate immigrant

7

populations and their families about the Rule and its impact on our nutrition programs to counteract and mitigate fear and misinformation.

34.  CalFresh Outreach contracts with 145 contractors and subcontractors and works with local government agencies, community-based organizations, the California State University system, and many other State Implementing Agencies to encourage CalFresh enrollment.  CDSS anticipates that we will need to provide training and technical assistance, as well as new outreach materials, to all of our contractors, subcontractors, and partners.

35.  The Branch has designated a team of staff members, including myself, who will be working to address the impacts of the Rule. We have begun to identify past policy guidance for both our federal and state programs, all of which was developed in accordance with federal laws, rules, and guidance, which will now need to be reviewed and revised. New guidance will need to be issued to the counties so that county eligibility workers do not inadvertently provide inaccurate information to potential applicants or current recipients.

36.  Our designated staff members will also be working to provide responses to county partners and stakeholders on the impacts of the Rule. Given the previous reports received from both counties and stakeholders, it is likely that the Branch, and CDSS more broadly, will receive significant inquiries and requests for interpretation or explanation.

## VII.  BROADER POTENTIAL IMPACTS OF DHS' PUBLIC CHARGE RULE

37.  As noted earlier, in 2016, SNAP provided an average of $288.09 per CalFresh household per month and $138.97 per individual California recipient per month in benefits.  In addition, because every $1 in SNAP benefits generates an estimated $1.79 in economic activity, decisions by California's immigrant families to forgo critical nutrition benefits will result in lost economic activity statewide.  In 2018, 26,599 grocers, farmers' markets, and other merchants in California accepted EBT as a method of payment for goods and services.

38.  If the Rule is implemented, I expect that it will increase food insecurity in California, adversely affecting people's ability to buy nutritious food while also covering other essential costs, such as housing, healthcare and child care.  Growing food insecurity, depending on the

8

extent, could increase other costs for the state, such as those related to treating illnesses and other health conditions, and responding to other hardships that result from lack of adequate nutrition.

39.   In my experience, policies like the Rule will discourage eligible immigrants from seeking both federally and state-funded nutrition assistance, thwarting California's goal of curtailing hunger.   The CDSS has gone to great lengths to overcome both structural barriers and individualized fear of immigration consequences.   This investment in the states' people and future is an investment that is both compassionate and prudent, as it pays off in lower poverty and suffering in the short term and in California's global prosperity long term.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on the 22nd day of August, 2019, in Sacramento, California.

Alexis Carmen Fernández
Acting Chief, CalFresh & Nutrition Branch
California Department of Social Services

9

Tab 12

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   CHEROKEE DM MELTON
    Supervising Deputy Attorney General
4   JENNIFER C. BONILLA
    LISA CISNEROS
5   JULIA HARUMI MASS
    ANITA GARCIA VELASCO
6   BRENDA AYON VERDUZCO
    ANNA RICH, State Bar No. 230195
7   Deputy Attorneys General
      1515 Clay Street, 20th Floor
8     P.O. Box 70550
      Oakland, CA  94612-0550
9     Telephone: 510-879-0296
      Fax: 510-622-2270
10    E-mail:  Anna.Rich@doj.ca.gov
    *Attorneys for Plaintiff State of California, by and*
11  *through Attorney General Xavier Becerra*

12

13

14                    IN THE UNITED STATES DISTRICT COURT

15                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

16

17

18   **STATE OF CALIFORNIA, DISTRICT OF**         CASE NO. 3:19-cv-04975
     **COLUMBIA, STATE OF MAINE,**
19   **COMMONWEALTH OF**                           **DECLARATION OF DEBBI THOMSON**
     **PENNSYLVANIA and STATE OF**                 **IN SUPPORT OF PLAINTIFFS'**
20   **OREGON,**                                   **MOTION FOR A PRELIMINARY**
                                                   **INJUNCTION**
21
                                    Plaintiffs,    Administrative Procedure Act Case
22
23                    v.

24   **ACTING SECRETARY KEVIN K.**
     **MCALEENAN, IN HIS OFFICIAL CAPACITY**
25   **AS SECRETARY OF THE U.S. DEPARTMENT OF**
     **HOMELAND SECURITY; U.S. DEPARTMENT**
26   **OF HOMELAND SECURITY; DOES 1-100,**

27                                    Defendants.

28

I, Debra (Debbi) Thomson, declare as follows:

1.   I am the Deputy Director of the Adult Programs Division (APD) for the California Department of Social Services (CDSS).  I have held this position since 2016.  Prior to the position I hold now, I served as the Division Manager for Senior and Adult Services for the Sacramento County Department of Health and Human Services.  In that capacity, I was responsible for managing Sacramento County's Senior and Adult Services Programs, including IHSS, APS, Public Guardian Programs and Senior Volunteer Services.  I was the IHSS Program Manager for Senior and Adult Services for the Sacramento County Department of Health and Human Services from September 2012 to February 2016.  Prior to September 2012, I was employed with CDSS as the Chief of the Fiscal/Administrative, Systems and Quality Assurance Branch of APD.

2.   In my capacity as Deputy Director, I am responsible for state oversight, policy, regulations, operations, litigation, and related matters for the Adult Programs Division, including the In-Home Supportive Services (IHSS) program and the Cash Assistance Program for Immigrants.

3.   The CDSS administers the In-Home Supportive Services (IHSS) program, which is a federal, state, and locally funded program.  As part of a complex partnership, CDSS administers the program by working with Department of Health Care Services (DHCS), counties, public authorities, program advocates, providers, and provider unions.

4.   The IHSS program provides in-home assistance exclusively to individuals who are aged, blind, or who have disabilities so they can remain safely in their own homes as an alternative to out-of-home care.

5.   California's IHSS program is the largest Medicaid personal care services program in the country, with over 506,000 IHSS providers serving more than 593,000 Californians with disabilities.

6.   IHSS is comprised of four programs in California:  the Personal Care Services Program; the Community First Choice Option; and the IHSS Plus Option, all of which are paid for through a combination of federal, state and county funds, and IHSS-Residual, which is state and county funded.

1

7. Services to IHSS recipients are determined according to the recipient's ability to perform essential daily activities, and may include feeding, bathing, dressing, respiration, bowel & bladder care, moving in and out of bed, rubbing the skin to prevent skin breakdown, housekeeping, laundry, shopping, meal preparation and clean up, accompaniment to medical appointments, paramedical services, and protective supervision.

8. There are circumstances in which individuals receiving IHSS are permitted to use services while working. For example, individuals enrolled in Medi-Cal's Working Disabled Program are placed in an eligibility category that allows them to have countable income up to 250% of the Federal Poverty Level. Similarly, the Medically Needy Medi-Cal program provides services to aged, blind, or disabled people with income above the eligibility levels for no-cost Medi-Cal programs. Through these programs individuals with disabilities may receive supportive services while earning income.

9. I am familiar with the rule, "Inadmissibility on Public Charge Grounds," 84 Fed. Reg. 41,292 (hereinafter "Rule") issued on August 14, 2019 by the Department of Homeland Security. I understand that the Rule redefines "public charge" for immigration purposes.

10. The Rule includes federally-funded Medicaid in its list of enumerated public benefits programs for purposes of public charge determinations. In order to be eligible for the federally-funded IHSS programs, recipients are required to be a qualified alien, within the meaning of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) eligible for Medi-Cal (California's Medicaid program).

11. I am aware that the Rule expressly anticipates that persons other than those individuals subject to public charge determinations will be chilled and disenroll from or decline to enroll in public benefits programs for which they and their family members remain eligible under the law. I am also aware that DHS states that these drops in enrollment may affect U.S. citizens, including U.S. citizen children in mixed-immigration status households. *See* 84 Fed. Reg. 41,300.

12. The state has substantially invested in IHSS programs in part to allow recipients to avoid unnecessary and costly institutionalization, to seek to improve health outcomes, and to

2

protect the legal rights of Californians with disabilities.

13.  Based on my experience implementing large-scale changes to the IHSS program, I expect that if the Rule is implemented, it will cause confusion and thereby have a significant impact on aged and blind individuals and individuals with disabilities who rely on the IHSS program.  There may be some families who need and are eligible for IHSS and are not included within the public charge definition who may nonetheless forego receipt of critical care for themselves or their children in order to avoid perceived negative treatment in a public charge determination.  This has been referred to as the "chilling effect."

14.  Individuals who need IHSS but do not receive services due to the fear of either their families' or their own immigration status being negatively affected, will risk their health and safety when they do not receive assistance with their essential daily activities.  Not only will this impact the individuals and their families, but it could also result in costly emergency room treatment and/or hospitalization or another in-patient placement.  This chilling effect will place a burden on California's healthcare system and will also result in higher costs for the healthcare system at large.

15.  CDSS will need to provide outreach and information to recipients and their providers to ensure that those in need do not forgo these essential services due to an erroneous fear about the impact the receipt of IHSS will have on their, or their family members', immigration status.

16.  If the Rule is implemented, CDSS will need to expend time and resources intended to counteract misinformation about the receipt and use of IHSS.  This may include posting electronic messages to IHSS recipients, posting messages on the Department's website, publishing webcasts, or sending individual mailings to the over 1 million Californians that receive or provide IHSS.

17.  Additionally, CDSS will need to respond to inquiries from counties and stakeholders concerning the Rule and will need to issue new guidance to counties so that their eligibility workers do not inadvertently provide inaccurate information to potential IHSS applicants, current IHSS recipients, and IHSS providers.

18. The Rule may also negatively impact California's ability to meet the needs of these individuals with disabilities and their families. There are many mixed-status households throughout California. This includes families with parents who are not U.S. Citizens but have children with disabilities who are U.S. Citizens and qualify for IHSS. Based on the chilling effect, these parents may refrain from applying for essential IHSS services for their children due to confusion about the potential negative impact it may have on their immigration status, even though these services for children do not count as part of a public charge determination.

19. Additionally, individuals with disabilities who have permanent residency and are currently receiving IHSS may mistakenly disenroll from the program due to fear and an erroneous belief that it will necessarily impact their status as a permanent resident or their eligibility for naturalization in the future. Individuals who are elderly or who have disabilities are especially susceptible to misunderstanding the applicability of the Rule. For these individuals, choosing to discontinue these essential benefits will result in a significant health and safety risk.

20. The Rule may also create a shortage of IHSS providers. IHSS providers who are not citizens may not understand the applicability of the Rule and whether their work for a social service program such as IHSS will impact their immigration status. IHSS providers may mistake their pay check for a benefit check because it comes from IHSS. This type of confusion will have direct application to mixed immigration status households and/or where the provider is providing IHSS to a family member. Currently, approximately 5% of all IHSS recipients do not have a provider enrolled on their case and are not receiving services. This may increase number if providers are deterred from continuing to provide services in the IHSS program.

21. I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on the 23rd day of August, 2019, in Sacramento, California.

DEBBI THOMSON
Deputy Director of the Adult Programs Division
California Department of Social Services

4

Tab 13

1  Xavier Becerra
   Attorney General of California
2  Michael L. Newman
   Senior Assistant Attorney General
3  Cherokee DM Melton
   Supervising Deputy Attorney General
4  Jennifer C. Bonilla
   Lisa Cisneros
5  Julia Harumi Mass
   Anita Garcia Velasco
6  Brenda Ayon Verduzco
   Anna Rich, State Bar No. 230195
7  Deputy Attorneys General
     1515 Clay Street, 20th Floor
8    P.O. Box 70550
     Oakland, CA  94612-0550
9    Telephone: 510-879-0296
     Fax: 510-622-2270
10   E-mail:  Anna.Rich@doj.ca.gov

11 *Attorneys for Plaintiff State of California*

12

13                  IN THE UNITED STATES DISTRICT COURT

14                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

15

16

17 | **STATE OF CALIFORNIA, DISTRICT OF** | CASE NO. 3:19-cv-04975 |
   | **COLUMBIA, STATE OF MAINE,** | |
18 | **COMMONWEALTH OF** | **DECLARATION OF M. MARCELA** |
   | **PENNSYLVANIA** and **STATE OF** | **RUIZ IN SUPPORT OF PLAINTIFFS'** |
19 | **OREGON,** | **MOTION FOR A PRELIMINARY** |
   | | **INJUNCTION** |
20 | Plaintiffs, | |

21    v.

22
23 **U.S. DEPARTMENT OF HOMELAND**
   **SECURITY; KEVIN McALEENAN,** in his
   official capacity as Acting Secretary of
24 Homeland Security; **U.S. CITIZENSHIP**
   **AND IMMIGRATION SERVICES;** and
25 **KENNETH T. CUCCINELLI**, in his official
   capacity as Acting Director of U.S. Citizenship
26 and Immigration Services,

27                              Defendants.

28

I, M. Marcela Ruiz, declare as follows:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by the California Department of Social Services (CDSS). The mission of CDSS is to serve, aid and protect needy and vulnerable children and adults in ways that strengthen and preserve families, encourage personal responsibility, and foster independence.

3. I have served as Chief of the Immigration and Refugee Programs Branch since July 2017.  Before assuming my current role, I was Chief of the Immigration and Civil Rights Branch since May 2016. Prior to joining the California Department of Social Services, I worked with California Rural Legal Assistance, Inc. (CRLA) as an attorney and program manager. During my tenure with CRLA, I represented hundreds of immigrant clients in employment, education, housing, public benefits, immigration and civil rights matters and administered programs that primarily served rural communities with significant immigrant populations.

4. I am responsible for oversight of the Immigration and Refugee Programs Branch, which includes the Immigration Services and Refugee Programs Bureaus.  The Immigration Services Bureau administers funds for legal and other related services for immigrants. The Refugee Program Bureau operates on behalf of CDSS to assist refugees and other eligible populations in California.

5. The Refugee Programs Bureau administers the Refugee Resettlement Program, the purpose of which is to assist refugees and other eligible immigrants, such as asylees, Cuban and Haitian entrants, Special Immigrant Visa arrivals, and trafficking victims, to become employed and self-sufficient as quickly as possible and to integrate successfully into their receiving communities.  Under the program, refugees and eligible individuals can receive refugee cash assistance and refugee medical assistance during their first eight months in the U.S., as well as a broad range of social services intended to help refugees obtain employment, achieve economic

1

self-sufficiency, and further their social integration.  The refugee social services programs include programs for elder care, school impact services, youth mentoring programs, employment training and English language acquisition services.  Service providers offer a range of support to eligible recipients to further their social integration, including counseling focused on communication, stress management, and conflict resolution; employment case management; interpretation and translation; assistance with citizenship and naturalization; and assistance in connecting with health care providers.

6.  The Refugee Programs Bureau also has oversight responsibility for the following programs: Trafficking Crime Victims Assistance Program, California Newcomer Education and Well-Being, Refugee School Impact, Refugee Cash Assistance, Refugee Social Services/Targeted Assistance, Services to Older Refugees, and Unaccompanied Refugee Minors Program.  The Unaccompanied Refugee Minors Program, Refugee School Impact Program and the California Newcomer Education and Well-Being Program are the three programs that exclusively serve minors.

7.  The Immigration Services Bureau administers state funding for pro bono immigration legal services and other services for immigrants. Since 2014, California has appropriated $292 million to support legal and other supportive services for immigrants.  The Immigration Services Bureau awards funding to approximately 100 nonprofit legal services providers throughout the State, who provide immigration legal services including education and outreach, training and technical assistance, and legal representation as well as other supportive services.

8.  My duties as the Chief of the Immigration and Refugee Branch frequently require that I interact with local partners, stakeholders, nonprofit organizations, public interest advocates, counties, and other organizations which administer CDSS funding and programs.  The programs that I oversee serve vast numbers of immigrants.  These individuals and organizations work extensively with immigrants, who may or may not receive public social services funded by CDSS.

9.  I am familiar with the federal rule, "Inadmissibility on Public Charge Grounds," 84

2

Fed. Reg. 41,292 (hereinafter "Rule") issued on August 14, 2019 by the Department of Homeland Security. I understand that the Rule redefines "public charge" for immigration purposes.

10.     Since the Rule was announced in proposed form in October 2018 (Proposed Rule), I have received information from local partners and stakeholders concerning the fear and confusion that immigrants and immigrant families are experiencing with regards to applying for and use of public benefits and the potential negative impact to immigration status. Through my conversations, I have been informed that immigrants are hesitant and afraid to apply for benefits or are thinking of disenrolling from public benefits due to their fear that it could detrimentally affect their immigration status, both now and in the future.

11.     I have had conversations with county administrators, who have informed me that counties have devoted additional administrative and fiscal resources to accurately educate and inform immigrants of the impact of the Rule on their eligibility for and participation in public benefits. I was informed that counties have had to divert fiscal resources to develop and produce informational materials to explain the status of the public charge policy, which benefits could potentially trigger a public charge determination, public benefit eligibility, and the potential impacts to immigration status or changes in status based on the multiple versions of the Rule, both official and unofficial, prior to the adoption of the Rule.

12.     The Department's overall understanding is that individuals who are eligible for public benefits have refused those benefits for fear that receipt of public benefits would detrimentally impact their immigration status or result in deportation. Based on my observations and work with immigrant services, I believe that misinformation, fear and anxiety associated with the Rule has negatively impacted this vulnerable population for over a year.

13.     I am aware that nonprofit stakeholders have also diverted sparse resources and funding to provide guidance and counseling regarding the Rule that has initiated and sustained fear and a lack of trust in both federal, state and local governments. These outcomes are in direct conflict with CDSS's statutory mission to serve, aid, and protect needy children and adults and have undermined the State's ability to effectively enroll and provide needed benefits to eligible individuals in the essential public service programs.

3

14.     CDSS administers disaster services.  I am aware of instances, prior to the issuance of the proposed and Rule, in which immigrants refused to access State and county programs during critical periods after a natural disaster due to fear that the application or receipt of benefits would detrimentally impact their immigration status or result in an enforcement action.  Thus, the Rule only further validates distrust of federal, state and local government entities, which in turn prompts additional funding to properly inform applicants and recipients, who are legally eligible to receive public benefits, of accurate information and the true application of the Rule.

15.     I am aware that the Rule expressly anticipated, consistent with my personal information and observation, that individuals, other than those individuals subject to public charge determinations, will be deterred from applying for or disenrolling from available public benefit programs for which they and their family members remain eligible under the law.  I refer to this dynamic as the chilling effect.  I am also aware that Department of Homeland Security (DHS) states that these drops in enrollment may affect U.S. citizens, including U.S. citizen children in mixed-immigration status households.

16.     It is evident from the Rule and my experience managing the delivery of services to immigrants, that immigrant families relying on public assistance programs will face much more complex and difficult decisions about which public programs and services they may safely apply for and receive without jeopardizing their present or future choices in changing or applying for legal status for themselves or that of a family member.

17.     The chilling effect of the Rule will detrimentally impact the immigration populations served by CDSS, potentially resulting in increasing poverty across the State and rolling back the progress that has been made to provide a safety net for the State's most vulnerable populations, which these major federal and state programs have as their stated purposes and goals.

18.     Confusion and fear regarding the Rule may cause some individuals to be afraid to legally sponsor a relative, regardless of whether they are covered by this Rule. The ability to sponsor a family member is crucial to supporting and uniting immigrant families while supporting an immigrant's well-being.

4

19.     The Rule has also required the State of California to redirect funding appropriated for legal service providers to instead focus on providing education and outreach for individuals who may be impacted by the Rule.  Approximately $1.2 million is now required to be dedicated to the development and delivery of webinar trainings, tools, education and messaging to educate and inform immigrant communities throughout California.  An additional amount of approximately $200,000 will be granted to legal service providers to provide technical assistance to county workers regarding the Rule.  CDSS expects that it will incur $2,000,0000 in immigration and public benefits training resources needed to mitigate the anticipated impact and chilling effects of the Rule, as well as additional administrative costs for oversight and implementation.  This estimate is based on the specific investment allocated to fund training, information and legal services for consumers, providers and government agencies.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.


DATED this ___ day of August, 2019 at _Sacramento_, California.


M. MARCELA RUIZ
Branch Chief
Immigration and Refugee Programs
Branch of the California Department of
Social Services

DECL. OF M. MARCELA RUIZ ISO PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-04975

# Tab 14

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHEROKEE DM MELTON
Supervising Deputy Attorney General
JENNIFER C. BONILLA
LISA CISNEROS
JULIA HARUMI MASS
ANITA GARCIA VELASCO
BRENDA AYON VERDUZCO
ANNA RICH, State Bar No. 230195
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone: 510-879-0296
 Fax: 510-622-2270
 E-mail:  Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF PENNSYLVANIA and STATE OF OREGON,**<br><br>Plaintiffs,<br><br>v.<br><br>**ACTING SECRETARY KEVIN K. MCALEENAN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY; DOES 1-100,**<br><br>Defendants. | CASE NO. 3:19-cv-04975<br><br>**DECLARATION OF SASHA R. KERGAN (WISOTSKY) IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Administrative Procedure Act Case |

1    I, Sasha R. Kergan (Wisotsky), declare as follows:

2    1.    I am the Data and Research Manager for Housing Policy for the California

3    Department of Housing and Community Development (HCD or the Department).  I have held this

4    position since October 2018.  Before this, I was an HCD housing policy specialist since June

5    2017.  Prior to these roles, I was the asset manager for the Oakland Housing Authority from June

6    2015 through June 2017 where I oversaw third party management of several public housing

7    communities.  Additionally, I worked for a non-profit affordable housing developer, and for a

8    consulting firm that served as a Performance Based Contract Administrator of HUD-assisted

9    properties from 2003 to 2008.  I earned a Master of Arts degree in urban planning, with a

10   concentration in design and development from the University of California, Los Angeles, and a

11   Bachelor of Arts in interdisciplinary studies with a concentration in urban and community

12   development.

13   2.    As the Data and Research Manager for Housing Policy, I am responsible for the

14   development of complex policy reports, technical assistance and guidance to governmental

15   partners and the public, processes to improve data collection and ensure data integrity, and

16   support of other department efforts related to research and reporting obligations. I serve as a

17   Department expert on research and data analysis, representing HCD as needed with external

18   partners and in intergovernmental partnerships.

19   **OVERVIEW OF HCD**

20   3.    HCD's mission is to promote safe, affordable housing and strong vibrant

21   communities throughout California.  To fulfill its mission, HCD administers programs that

22   provide grants and loans for development of affordable housing and associated infrastructure,

23   engages in planning and community development throughout the State, helps to ensure that

24   mobile home parks are safe places to live, enforces standards for housing construction and

25   maintenance of farmworker housing and manufactured homes, conducts research and analysis,

26   and implements policies for housing and community development.

27   /////

28   /////

1

1    4.   HCD collaborates with numerous stakeholders that work with the agency directly or

2    indirectly, including federal, state, tribal, and local governments; other public agencies; advocacy

3    groups; and contractors, developers, investors, and others involved in the housing industry.

4    5.   The investments HCD makes allow for the development of new, affordable housing

5    and preservation of existing housing.  HCD administers programs that provide grants and loans

6    from both state and federal housing programs and monitors developments to ensure the continued

7    provision of safe and affordable homes.  In so doing, HCD creates rental and homeownership

8    opportunities for Californians of all incomes including veterans, seniors, families, people with

9    disabilities, farmworkers, individuals and families who are experiencing homelessness and

10   individuals and families who are at risk of experiencing homelessness.  Over the last thirty years,

11   HCD has provided more than $5 billion of funding for the development of affordable housing and

12   associated infrastructure.  Recipients of those loans use revenues from federal housing benefits to

13   repay the State and cover ongoing operating and maintenance costs.

14   6.   HCD assesses challenges to affordable housing and its impact on quality of life in

15   California, including for families.  HCD's assessments have noted that families with high portions

16   of household income spent on rent or mortgages are often unable to afford nutritious food, which

17   is critical for both children's physical and mental development.  Unstable housing also impacts

18   children's educational outcomes.  Families who struggle to find an affordable place to rent are

19   often forced to move when rents increase.  These frequent moves have a huge impact on their

20   children, who often have to change schools.  It not only disrupts children's school work, it also

21   breaks important connections between the children and their teachers and classmates that have

22   been linked to educational success.  Federal rental assistance, like Section 8 Housing Choice

23   Vouchers, helps reduce market rate rents to more affordable levels, thereby promoting more

24   positive health and educational outcomes for households.

25   7.   In furtherance of HCD's efforts to meet California's affordable housing needs, for

26   fiscal year 2018-2019, the agency has awarded 189 grants and loans totaling more than $921

27   million.  During fiscal year 2017-2018, the agency awarded 205 grants and loans totaling more

28   than $140 million, assisting 4,527 units.  HCD projected that the awards made in 2015-2016

2

1    would preserve 3,736 affordable homes and apartments; rehabilitate 696 substandard homes and

2    apartments; create 2,742 new, affordable places to live; and create or rehabilitate 1,880 migrant

3    farmworker rental homes operated during harvest season.

4           8.    Affordable housing finance requires multiple sources of public and private funding to

5    preserve, develop and/or operate buildings while serving lower-income households.  HCD grants

6    and loans have leveraged much more support for affordable-home developments, bringing in

7    hundreds of millions in additional federal, local and private funds.

8           9.    HCD also conducts research and analysis of California's housing markets and needs

9    to inform policies that support housing and community development.  The agency produces

10   special reports, including California's Statewide Housing Assessment, required by state law, and

11   California's Consolidated Plan required by federal law for California to receive millions of

12   federal dollars for housing and community development.  HCD analyzes the impact and

13   intersection of housing affordability with other important issues, such as health, education,

14   transportation, economic well-being, and climate change.

15          10.  HCD is required to administer its programs in a manner consistent with state and

16   federal fair housing law.  Fair housing choice entails the ability of persons, regardless of race,

17   color, religion, sex, disability, familial status or national origin, to have available to them the

18   same range of housing choices.  Among other things, HCD must develop a comprehensive

19   strategy designed to help ensure a broad range of affordable housing opportunities and promote

20   public awareness of fair housing laws and rights.  To affirmatively further fair housing choice,

21   HCD conducts analyses to identify groups least likely to participate in administered programs,

22   such as through the development of the Analysis of Impediments to Fair Housing Choice, as

23   discussed further below.

24   **HCD PROGRAMS AND OBLIGATIONS – MULTIFAMILY HOUSING PROGRAMS,
     INVESTMENTS RELYING ON FEDERAL RENTAL ASSISTANCE PROGRAMS, FARMWORKER**

25   **HOUSING PROGRAMS, HOUSING ELEMENTS REVIEW, AND FAIR HOUSING**

26          11.  In 2018, HCD's Multifamily Housing Program (MHP) projects included 24,160

27   households in 2018, of which 9,248 (38%) indicated receipt of an operating subsidy, as reported

28   by property owners.  Of these, HCD's MHP projects included 6,563 households (27%) that

3

received a federal operating subsidy enumerated by the below-cited public charge rule (1,958 Section 8 Housing Choice Voucher households and 4,605 project-based Section 8 households), as reported by property owners.

12. In addressing California's diverse needs, HCD's policy and investment efforts pay particular attention to specific populations that face acute challenges finding affordable homes. Permanent and migrant farmworkers are one such vulnerable group. Accordingly, HCD funds two grant programs to help develop housing for agricultural employees, including immigrant farmworkers, which are contingent upon occupant income. First, the Joe Serna, Jr. Farmworker Grant Program (Serna) provides grants and loans to assist development for rehabilitation of housing projects for agricultural worker households. Similarly, a second program administered by HCD's Office of Migrant Services (OMS) has provided grants to local government agencies that contract with HCD to operate OMS centers throughout the state, mostly in rural locations. The OMS is not presently administering grants but continues its functions in monitoring OMS sites. This housing has been critical to allow farmworker families to obtain affordable, safe housing in California's expensive and competitive housing markets.

13. California's local governments are required by law to adopt housing plans as part of their "general plan," *i.e.*, the local government's "blueprint" for how the city and/or county will grow and develop. The general plan includes eight elements: land use, transportation, conservation, noise, open space, safety, environmental justice, and housing. The law mandating that housing be included as an element of each jurisdiction's general plan is known as "housing-element law." HCD also plays a critical role in the planning process for housing and community development pursuant to housing-element law, which was designed to ensure that communities plan housing that meet the needs of everyone in California's communities across all income categories. To that end, HCD monitors each of the 539 local governments to ensure compliance with the housing element of each jurisdiction's general plan.

14. HCD also carries out various responsibilities in administering programs consistent with state and federal fair housing law. The Department is a direct recipient of Community Planning and Development (CPD) funds through the U.S. Department of Housing and Urban

4

Development (HUD).  CPD programs include Home Investment Partnerships (HOME) and the Community Development Block Grant (CDBG) program.  As program participants, HCD must certify annually that the Department is affirmatively furthering fair housing for individuals and groups protected by the federal Fair Housing Act of 1968.

15.  This certification occurs in accordance with the requirements of Title 24 CFR section 91.225 and specifically, section (a)(1) requires jurisdictions to take meaningful actions to further the goals identified in the Assessment of Fair Housing and that it will take no action that is materially inconsistent with its obligation to affirmatively further fair housing.  Under these federal regulations, HCD is obligated to perform an Analysis of Impediments to Fair Housing Choice (AI) as part of its consolidated planning process for HUD's Community Planning and Development.

16.  The AI is the state's plan to affirmatively further fair housing and is used to identify barriers to housing choice for persons in protected classes and identify actions to overcome these impediments.  The AI assesses the extent of housing needs among persons in protected classes, including race, color, religion, national origin, sex, disability and familial status, and evaluates the availability of a range of housing choices for residents.  The AI then analyzes the conditions in the private market and public sector that may limit the range of housing choices or impede a person's access to housing.

17.  HCD makes recommendations to overcome the impediments and the AI serves as the basis for fair housing planning, providing essential information to staff, policy makers, housing providers, lenders, and fair housing advocates, and mobilizing community support for fair housing.

**DHS Public Charge Rule**

18.  I am familiar with the Rule, "Inadmissibility on Public Charge Grounds," 84 Federal Register 41,292 (hereinafter "Rule") issued on August 14, 2019 by the Department of Homeland Security (DHS).  I understand that the Rule aims to redefine "public charge" for immigration purposes, and penalizes immigrant applicants for use of any of the enumerated public benefits identified in the Rule.

5

19.  The Rule includes federal rental assistance programs, defined to include Section 8 Housing Choice Vouchers (Section 8 HCV), Section 8 Project-Based Rental Assistance (Section 8 PBRA), and HUD public housing.  HCD funds and monitors projects that receive Section 8 HCV and PBRA federal subsidies.

20.  I have received reports from state and national affordable housing stakeholders indicating that individuals who are eligible for public benefits, including housing programs, are declining to participate due to the chilling effect of the public charge rule. I have also reviewed related media reports.

21.  My understanding is that these chilling effects spill over to individuals not directly impacted by the Rule, such as eligible citizens and legal permanent residents. When the Rule's chilling effect leads an individual to disenroll from, or not apply for housing subsidy, this affects the entire household, not just an individual, thereby compounding the effects of the Rule. The chilling effect might be more likely to impact a household's decision to apply for a housing subsidy when one becomes available, as the household will be required to provide personally identifiable information, including citizenship status, for each household member, at initial certification for the subsidy.

22.  Moreover, the Rule expressly anticipates that persons other than those individuals subject to public charge determinations will be chilled and disenroll from or forego enrollment in public benefits programs for which they and their family members remain eligible under the law. DHS expects that these drops in enrollment may affect U.S. citizens, including U.S. citizen children in mixed-immigration status households.  84 Fed. Reg. at 41,485.

23.  Accordingly, I have serious concerns that the Rule will result in immigrants foregoing application for and receipt of Section 8 Housing Choice Vouchers and other federal rental assistance, including programs not enumerated by the Rule such as farmworker housing, described below.  Having considered the Rule and HCD programs, I believe that the Rule's inclusion of the enumerated federal housing programs in the public benefits definition will likely impact HCD with respect to its current investments, and its ability to advance fair and affordable housing for all Californians.

6

### HCD FUNDED HOUSING PROJECTS AND UNDERWRITING

24. Section 8 rental assistance program entails privately owned housing developments in which the owner contracts with HUD for long-term subsidies. Section 8 rental assistance plays a vital role in HCD's financing of affordable housing. Section 8 rental assistance impacts HCD's long-term projections to evaluate the solvency of a property. HCD's decision to underwrite a property frequently relies on attestations from the property owner regarding sizeable Section 8 awards. In HCD's investments, HCD underwrites based on financial assumptions to ensure solvency and sustainability for more than 15, 30, or 55 years.

25. The Section 8 Housing Choice Voucher Program (HCVP) is the largest federal government program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market. Some privately owned affordable housing developments access tenants who are participants in the HCVP.

26. According to the Center on Budget and Policy Priorities' analysis of HUD and USDA administrative data, federal rental assistance programs provided California with $5.8 billion in 2018. This included 301,100 Section 8 HCV households and 98,100 Section 8 PBRA households. In 2015, 33.75% of HUD rental assistance went to families with children under the age of 18 (145,855 households) (including all HUD programs with subsidies based on the tenant income except Housing Opportunities for People with AIDS/HIV and McKinney-Vento permanent housing). Over half of the privately owned federally assisted stock in California is Section 8 housing.

27. HCD currently funds, finances, and monitors projects that receive federal rental subsidies, including Section 8 Project-Based subsidies and Section 8 Housing Choice Vouchers. The Rule will impact HCD funded projects that receive these subsidies where immigrant or mixed-status households, in an attempt to avoid a negative public charge determination, decline to apply for subsidized housing or forego acceptance of the subsidies once they become available, or decide to vacate the subsidized unit. Even when an HCD funded property does not receive any form of Section 8 subsidies, the households may be discouraged from receiving any form of assisted housing due to misinformation, confusion, or fear caused by the Rule.

7

28.  An increase unit housing turnover or delays in filling housing vacancies can create an economic burden for housing providers.  Regardless of whether a termination of tenancy is voluntary or involuntary, unit turnover procedures require property maintenance staff to prepare the unit for the next household.  Depending on the number of households that decide to forego federal rental assistance and move from each site, unit turnovers could put a strain on maintenance staff time that could otherwise be spent maintaining the buildings and responding to maintenance concerns of households.

29.  Unit turnover costs, such as maintenance and legal expenses that cannot be absorbed by operating income will still need to be paid.  Properties may need to access replacement reserves or operating reserves to cover expenses caused by the increase in unit turnovers.  Therefore, HCD staff may see an increase in the number of reserve requests from properties when operating income cannot cover ongoing expenses.  If cash flow issues cause projects to go into reserves or to default, significant state funds could be at risk.

30.  HCD funded housing projects in neighborhoods with high concentrations of immigrants could face a higher risk of significant unit turnover due to the Rule.  That turnover creates burdens on their replacement or operating reserves, which, if significant, could impact their solvency.  Insolvency poses the risk that HCD loses the investments that it has made in certain housing projects.

31.  The potential negative impacts of turnover and housing destabilization run contrary to HCD's mission and work to promote safe, affordable homes and strong communities throughout California.

32.  Though HCD does not administer HUD's Section 8 Housing Choice Voucher program and Section 8 Project-Based Rental Assistance program, HCD's investment formulas often rely on assumptions that HUD funding from Section 8 commitments will be received.  Reliance on Section 8 funding for low-income housing in projects administered by HCD continues to increase and replenish the role of traditional public housing.  When a private or non-profit affordable housing developer has a Section 8 Project-Based rental assistance contract, HCD and its partners (such as other public lenders and private equity investment groups), underwrite

8

with the assumption that the subsidy contract will play a role in supporting the financial stability of the property. The financial sustainability of the property has direct bearing on the physical and operational health of the building.

33. As a result, HCD's underwriting decisions relied on the exclusion of rental assistance programs from the definition of public benefit under the prior, longstanding public charge rule, and planned for immigrant participation in those programs. Any change to that revenue stream will have a disruptive effect on such projects. HCD may have to take steps ensure the financial stability of projects due to delays or irregularities in the Section 8 subsidy. Fewer units may be occupied since less subsidy may be available in administered projects and this may lead to a shortfall in operating funds.

**FARMWORKER HOUSING**

34. As described earlier, Serna and OMS provides affordable housing for farmworkers. Based on HCD's experience with the farmworker population, I anticipate that if the Rule is implemented, it will create fear and confusion among this population that may chill participation in the Serna and OMS housing programs.

35. If eligible immigrant agricultural workers withdraw from, or decline to use these programs, those immigrant agricultural workers may be at risk of becoming homeless, living in severely overcrowded housing, or being displaced from the region. Increasing vacancy rates in the occupant restricted agricultural housing units will disrupt future funding streams for agricultural worker/migrant housing grants and destabilize the workforce upon which local businesses rely. The Serna Program is currently undersubscribed because of the smaller pool of willing and eligible developers available to advance farmworker housing projects. The Rule is likely to exacerbate this undersubscription by deterring developers from applying for funding due to the perceived and actual vacancy rates caused by the Rule. If occupancy rates significantly decrease, the data supporting the necessity for such housing will be skewed and funding resources will dwindle for this important aspect of HCD's work.

36. Indeed, HCD has identified farmworkers as one of California's vulnerable population groups that tends to experience barriers to housing. Farmworkers make up a significant

9

1  proportion of the state's population in certain regions, and tend to have low incomes; higher risk
2  of living in poverty; and limited access to safe, healthy, and affordable housing choices.
3  Addressing farmworker housing needs requires targeted policy and programmatic responses, and
4  given the complexity of housing needs, housing solutions should be flexible and provide a mix of
5  housing opportunities to address a variety of needs.  However, the chilling effect of the Rule may
6  limit housing opportunities by creating additional perceived barriers that further undermine access
7  to farmworker housing through the OMS Serna programs.

8  **HOUSING ELEMENT AND FAIR HOUSING COMPLIANCE**

9  37.  HCD is required by law to review and approve the housing elements of 539 local
10  governments, as described above.  Recent amendments in state law expanded HCD's mandate to
11  enforce a local government's housing element compliance.

12  38.  Substantial compliance with housing element law requires cities and counties to adopt
13  as part of their general plans, a housing element that makes adequate provision for the housing
14  needs of all income groups.  Specifically, a housing element must provide the local government's
15  share of the Regional Housing Need Allocation through the identification of development
16  capacity in its jurisdiction.  Development capacity is achieved through the process of zoning,
17  namely zoning that provides an incentive to develop housing for a locality's lower income
18  residents and workforce.

19  39.  Compliance with housing element law also requires each jurisdiction to make
20  adequate provision to affirmatively further fair housing opportunities and communities for all
21  persons regardless of race, religion, sex, marital status, ancestry, national origin, color, familial
22  status, or disability, and other characteristics protected by the California Fair Employment and
23  Housing Act (Part 2.8 (commencing with Section 12900) of Division 3 of Title 2), Section 65008,
24  and any other state and federal fair housing and planning law. Programs to affirmatively further
25  fair housing are required to include, among other components, an analysis of the factors that limit
26  or deny fair housing choice, access to opportunity or negatively impact fair housing by
27  identifying metrics and milestones for determining how fair housing goals and results will be
28  achieved.

10

40.  HCD's review of housing element compliance is based on an array of data, including existing demographics for the region, and employment, housing, and federal assistance trends. These analyses and the documentation of household characteristics, including level of payment compared to ability to pay, housing overcrowding and housing stock condition, form the basis of a local government's housing element.  The housing element adopted in the General Plan is a commitment to develop housing based on demand and demographics.  The data and information used derive from the Census and other sources.

41.  I have serious concerns that, depending on the extent of the chilling effect, including whether it drives many immigrants, and immigrant and mixed-status households, away from participating in surveys and data collection projects, and the extent of displacement caused by the Rule, the reliability of various types of data may become compromised, and thereby undermine the purpose advanced by California's housing element law and HCD's review and approval processes.  Administrative Burdens on HCD

42.  In light of the concerns regarding the impact of the Rule, including the chilling effect, a team of 12 HCD staff members has convened to review the proposed rule, and now the final Rule.  This team is in the process of developing strategies and plans for implementation in the relevant HCDs programs to mitigate the impact of the Rule.  The strategies and plans under consideration involve guidance, technical assistance, and outreach to housing partners, stakeholders, and members of the public.  I anticipate HCD will need to expend staff time and resources to respond to questions from the public, within state government, and from state, regional, and local partners.  We are considering what technical assistance to provide, how to modify training and outreach materials, and expect to conduct workshops and calls to explain the Rule's very complex provisions.

49. Ultimately, if implemented, the Rule will jeopardize California's investment in promoting affordable housing and access to such housing for all of its residents.  By targeting low-income immigrants, the Rule imposes greater barriers on populations of color, undermining HCD's ability to meet its mandate to support affordable and fair housing opportunities.

/////

11

1    I declare under penalty of perjury that the foregoing is true and correct and of my own

2  personal knowledge.

3

4    Executed on August 22, 2019, in Sacramento, California.

5

6

7

8

*Sasha R. Kergan (Wisotsky)*
Data and Research Manager, Housing Policy
California Department of Housing and
Community Development

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

Tab 15

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHEROKEE D.M. MELTON
Supervising Deputy Attorney General
JENNIFER C. BONILLA
LISA CISNEROS
JULIA HARUMI MASS
ANITA GARCIA VELASCO
BRENDA AYON VERDUZCO
ANNA RICH, State Bar No. 230195
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone: 510-879-0296
  Fax: 510-622-2270
  E-mail:  Anna.Rich@doj.ca.gov
*Attorneys for Plaintiff State of California, by and
through Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF PENNSYLVANIA and STATE OF OREGON,**<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN,** in his official capacity as Acting Secretary of Homeland Security; **U.S. CITIZENSHIP AND IMMIGRATION SERVICES;** and **KENNETH T. CUCCINELLI,** in his official capacity as Acting Director of U.S. Citizenship and Immigration Services**,**<br><br>Defendants. | CASE NO. 3:19-cv-04975<br><br>**DECLARATION OF JENNIFER HERNANDEZ IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Administrative Procedure Act Case |

I, Jennifer Hernandez, declare as follows:

1.   I am an Associate Secretary for the California Labor and Workforce Development Agency (LWDA or Agency). I have held this position since 2015.  Prior to the position I hold now, I served as Western Regional Director for the American Federation of Labor, Congress of Industrial Organizations. Prior to that role, I worked for various non-profit organizations and labor unions where I worked with immigrant and other vulnerable populations. Through this professional experience, and by working directly with communities to advocate on and implement policies related to low-wage workers, immigrants and underserved communities, I have gained first-hand knowledge regarding effective education, outreach and provision of services to these communities.

**OVERVIEW OF LWDA AND EDD**

2.   Created in 2002 to coordinate workforce programs across California, the LWDA is a state executive branch agency charged with protecting and improving the well-being of California's current and future workforce.

3.   As Associate Secretary for the LWDA, I am knowledgeable regarding the Agency's structure, including the departments that operate under its oversight, in particular the Employment Development Department (EDD).  I work across multiple departments under the LWDA, including the EDD, and with other agencies, to boost collaborations and leverage programs to better serve immigrants and English Language Learners (ELLs) in California.

4.   EDD's mission is to enhance California's economic growth and prosperity by collaboratively delivering services to meet the evolving needs of employers, workers, and job seekers.  EDD provides a variety of services to Californians, including connecting Californian job seekers with employment opportunities; administering federally funded programs for adults, dislocated workers, and youth under the Workforce Innovation and Opportunity Act (WIOA) of 2014; assisting disadvantaged individuals in becoming self-sufficient; helping unemployed, disabled and other workers through our state's Unemployment Insurance (UI), Paid Family Leave (PFL) and State Disability Insurance (SDI) programs; and supporting California employers with their labor needs.

1

5.     The Workforce Services Branch within EDD provides publicly funded employment services.  Many of these services are federally funded through the Wagner-Peyser Act, in Title III of WIOA.

6.     WIOA is the primary federal investment in workforce services for all populations, including immigrants and refugees.  Accordingly, WIOA is a major source of support for a comprehensive range of workforce development activities through statewide and local partnerships and organizations.

7.     WIOA services benefit job seekers through the provision of advice, guidance, and assistance with career planning, access to labor market statistics information, and opportunities for skills upgrade through education and training.  Participating youth receive assistance with completion of a high school diploma or its equivalent, as well as leadership development opportunities, including paid or unpaid work experience.  Through education and job training services, adults and youth have greater potential for higher wages and increased self-sufficiency. Employers benefit from WIOA services because job-seekers are trained to meet their local labor needs, existing employees receive trainings and upgrade their skills, and layoff aversion and rapid response employment and training services are available for dislocated workers.

8.     Workforce development services are generally provided via America's Job Centers of California (AJCC) sites based in local communities.  In California, there are over 200 AJCC sites. The AJCC sites provide critical services to job seekers and employers, laid-off workers, youth, incumbent workers, new entrants to the workforce, veterans, and persons with disabilities.  These activities range from self-assisted access to employment-related information, as well as job referrals, employment search workshops, placement services, and job skills training programs.

9.     Overall, these services are aimed at promoting and increasing employment, job retention, earnings, and occupational skills of participants, helping to meet labor force needs, and, in turn, supporting California's economy.

//

//

//

2

**IMPROVING WORKFORCE DEVELOPMENT SERVICES FOR ELLS AND IMMIGRANTS**

10.   One of my primary responsibilities as Associate Secretary has been to implement policies and programs to better serve ELLs, many of whom are immigrants.

11.   LWDA and EDD have implemented policies and practices to support access of ELLs and immigrants to services and benefits through the EDD workforce system.

12.   California's EDD programs serve eligible ELLs consistent with state and federal law. EDD views its programs serving ELLs as a critical means of providing hard to reach populations, including immigrant populations, with the skills necessary to achieve self-sufficiency.

13.   Section 188 of WIOA incorporates Title VI and Title VII of the Civil Rights Act of 1964 and other federal and state nondiscrimination statutes and regulations.  These provisions require all EDD programs to refrain from discrimination against otherwise eligible individuals on the basis of national origin or limited English proficiency.  EDD promulgated Directive WSD17-01 (August 1, 2017) to establish nondiscrimination and equal opportunity procedures to comply with these laws.  EDD has also instituted training for compliance with the United States Department of Labor's Training and Employment Guidance Letter WIOA No. 19-16, Operating Guidance for Workforce Innovation and Opportunity Act, TEGL 19-16.

14.   In California, EDD workforce programs historically have been underutilized by ELLs.

15.   To address this, EDD has supported initiatives to ensure that its programs are accessible to ELLs and immigrants.  Along with greater collaboration with community-based organizations, EDD and LWDA have trained staff and engaged community partners to increase access to workforce services to ELLs, including immigrant communities, and thereby support their economic advancement and self-sufficiency.

16.   To prepare and implement these trainings, EDD and LWDA have invested staff time and resources, including working with community groups and national non-profit organizations with expertise in serving immigrants.

17.   EDD's Monitor Advocate Office is responsible for ensuring that equitable employment services are available to all job seekers, with a special focus on farmworkers.

3

Because there are particular challenges associated with reaching migrant and seasonal farmworkers, most of whom are immigrants, the Monitor Advocate Office's Migrant and Seasonal Farmworker Outreach Program is the Agency's primary outreach effort to provide information and education to the farmworker population about how to access employment services and their rights under applicable laws.

18.   EDD has approximately 57 primary and alternate outreach workers.  These workers contact migrant and seasonal farmworkers, community-based organizations, and employers on a daily basis to promote the outreach program.  The Office's work supporting these farmworkers relies on collaboration with external and internal stakeholders, as well as EDD outreach workers. Partners include state and federal agencies, community-based organizations, the National Farmworker Jobs Program (NFJP) providers, employers, and AJCCs.

19.   One of my primary responsibilities as Associate Secretary has been the development and implementation of the English Language Learner Navigator Pilot Program ("Pilot Program"). This initiative led by the Agency has directly engaged with front line providers of services, non-profit organizations, and other partners that serve immigrants and ELLs, in order to increase their access to employment, job training, and other supportive services.  The Pilot Program serves ELLs with education levels at or lower than high school levels and cultural barriers to participation in general workforce services.

20.   In 2017, EDD and LWDA invested approximately $3 million to establish the Pilot Program.

21.   Through the Pilot Program, participants have been provided with a wide range of support functions that have led to program and participant success.  Pilot Program participants in some instances have achieved more positive results than state and local populations participating in traditional workforce programs, including higher measurable gains in skills, as reflected in educational functioning levels, secondary transcripts and report cards, and skills progression. Many Pilot Program participants also achieved their high school diploma/equivalency and occupational certification credentials at higher rates.  In their employment following exit from the Pilot Program, participants performed comparably with the general population of workforce

4

program participants. Given the success of this program, a second round of funding was awarded in 2019, totaling approximately $1.7 million.

**FINAL RULE**

22.  I am aware that on August 14, 2019, the Department of Homeland Security (DHS) issued a final rule entitled "Inadmissibility on Public Charge Grounds," 84 Fed. Reg. 41,292 (hereinafter "Rule" or "Public Charge Rule").  It is my understanding that under the Rule, a new definition of "public benefit" expands the list of enumerated benefits that immigration officers can consider as part of a public charge determination to deny an individual's admission to the United States.  The list includes a number of noncash benefit programs targeting the health, nutrition, and housing needs of people.  The Rule also makes incomes below 125% of the Federal Poverty Guidelines a heavily weighted, negative factor in public charge admissibility determinations.

23.  I understand that EDD's workforce development services, including job training and other employment services made available through WIOA, are not included under the Rule's "public benefits" definition.  I also understand that payments through our UI, PFL, and SDI programs are not within the Rule's list of enumerated public benefits.

24.  While the Rule does not include EDD programs and services, I am deeply concerned that the Rule will nonetheless have a negative chilling effect by deterring immigrants from utilizing the workforce development and insurance programs that are available through EDD to support them in times of need.  The reasons for my concerns are described further below.

25.  During the course of my work providing direction to EDD programs, I meet and engage regularly with stakeholder groups, including community-based organizations and advocates who interface directly with EDD program participants.  Through this stakeholder engagement, I receive feedback regarding a variety of matters related to EDD programing, and I have received reports concerning the Rule and its impacts on immigrant communities.

//

//

//

5

26.  The reports raised concerns that immigrants are becoming increasingly confused and fearful regarding the use of public benefits and participation in government programs due to changes to the public charge rule.  Stakeholders have informed me that immigrant community members with whom they work/serve, have inquired about the impact of the rule given their personal situation, or have expressed hesitation about enrolling in government programs for which they are eligible due to fear regarding the immigration consequences to themselves and their families if they access government services or benefits in general.  AJCC sites and community-based organizations have asked for guidance and support to reduce fear and confusion among immigrants regarding the public charge rule.

27.  To further understand the issues related to public charge, I have also read related media articles and academic studies and analyses. This information has reinforced the concerns raised by stakeholders.

28.   Based on the foregoing, I have serious concerns that the dramatic expansion of the public charge definition, and the stark consequences associated with losing legal status or being denied legal permanent residency, will prompt some immigrants to avoid government-provided services, support and benefits generally – particularly if they lack accurate information about the Rule and their fear of accessing services is based on misinformation.  From an EDD service delivery perspective, I am concerned that some immigrants may forgo use of EDD services and benefits for which they remain eligible and avoid AJCCs altogether because the sites are government-run or supported.  This could result in decreased enrollment in EDD programs and services.

29.  One of the largest immigrant populations that EDD serves is farmworkers. The 2018 National Agricultural Worker Survey showed that 60% of farmworkers nationally had less than a 9th grade education, and the average level of education was 8th grade.  The report also found that a majority of farmworkers speak Spanish, and that 30 percent could not speak English at all, while 41 percent spoke "a little" English.  These language and literacy barriers present significant challenges related to implementation of public education regarding the Rule.

//

6

30.  Finally, EDD programs help build bridges to self-sufficiency. In light of my experiences, I view the Rule as threatening to undermine the goal of self-sufficiency if it deters immigrant participation in workforce services and training that increase individuals' employability, that educate workers about their rights, and that contribute to the development of critical vocational skills.

31.  As described above, EDD has engaged in vital efforts to connect immigrant communities with workforce development services and training.  A chilling effect caused by the Rule would undercut EDD and LWDA's investments of staff time and resources over multiple years to connect immigrants with services.

32.  EDD will need to invest resources to develop and implement new and accessible public education campaigns and materials to combat misinformation, improve public knowledge, and train staff who communicate information and provide services to the public – all of which the Agency views as necessary measures in order to reduce confusion and fear in the wake of the Rule.

33.  Furthermore, EDD promotes referrals and co-enrollment to other programs at AJCC sites, increasing the need for staff who are knowledgeable about the Rule.  Staff at AJCC sites may assess an individual's eligibility for Medi-Cal and CalFresh programs.  Medi-Cal and CalFresh are included in the new expanded definition of a public charge, but employment and training services, and unemployment and family leave insurance payments are not.  Yet information about and access to all of these support programs are often facilitated through the same AJCC sites, particularly where offices are co-located.  Thus, because confusion about the impact of the Rule may be particularly likely among participants at AJCC sites, the need for training and technical assistance for AJCC site staff is expected to be critical.

34.  LWDA and EDD are evaluating training options to address the Rule, counteract misinformation and mitigate the anticipated chilling effect in the communities we serve.

35.  Our approach would likely involve developing and implementing training for employees, including front line staff and supervisors, with a focus on AJCC sites.  EDD and LWDA would need to invest time to prepare the appropriate trainings for different categories of

7

1  staff who fill specific functions related to the provision of our services and benefits.  The

2  implementation of training could not take a "cookie cutter" approach.

3        I declare under penalty of perjury that the foregoing is true and correct and of my own

4  personal knowledge.  Executed on August 23, 2019, in Sacramento, California.

5

6

7  Jennifer Hernandez
   Associate Secretary
8  Labor Workforce Development Agency

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                8

Tab 16

1    XAVIER BECERRA
     Attorney General of California
2    MICHAEL L. NEWMAN
     Senior Assistant Attorney General
3    CHEROKEE DM MELTON
     Supervising Deputy Attorney General
4    JENNIFER C. BONILLA
     LISA CISNEROS
5    JULIA HARUMI MASS
     ANITA GARCIA VELASCO
6    BRENDA AYON VERDUZCO
     ANNA RICH, State Bar No. 230195
7    Deputy Attorneys General
        1515 Clay Street, 20th Floor
8       P.O. Box 70550
        Oakland, CA 94612-0550
9       Telephone: 510-879-0296
        Fax: 510-622-2270
10      E-mail: Anna.Rich@doj.ca.gov
     *Attorneys for Plaintiff State of California*

11

12                    IN THE UNITED STATES DISTRICT COURT

13                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15   | **STATE OF CALIFORNIA, DISTRICT OF** | CASE NO. 3:19-cv-04975 |

16   **COLUMBIA, STATE OF MAINE,**
     **COMMONWEALTH OF**                    **DECLARATION OF JOHN D. STOBO,**
17   **PENNSYLVANIA** and **STATE OF**      **M.D., IN SUPPORT OF PLAINTIFF'S**
     **OREGON,**                            **MOTION FOR A PRELIMINARY**
18                                          **INJUNCTION**
                                Plaintiff,
19
                  v.
20
21   **U.S. DEPARTMENT OF HOMELAND**
     **SECURITY; KEVIN MCALEENAN,** in his
22   official capacity as Acting Secretary of
     Homeland Security; **U.S. CITIZENSHIP**
23   **AND IMMIGRATION SERVICES;** and
     **KENNETH T. CUCCINELLI,** in his official
24   capacity as Acting Director of U.S. Citizenship
     and Immigration Services,
25
                                Defendants.
26

27

28

─────────────────────────────────────────────
DECLARATION OF JOHN STOBO, M.D. ISO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-04975

I, John D. Stobo, MD, declare as follows:

1.   I am the Executive Vice President-UC Health in the University of California Office of the President.

2.   In my role as Executive Vice President-UC Health, I am responsible for system-wide coordination and communication among the University of California (UC) health sciences schools and medical centers, which collectively are referred to as UC Health. I am responsible for developing policies and mechanisms for monitoring performance for UC's 18 health sciences schools, nine licensed general acute care hospitals and acute care psychiatric hospitals, which are spread across seven of UC's ten campuses. I oversee strategic planning and advocacy efforts as well as the development of system-wide initiatives for UC Health.

3.   I have more than 40 years of leadership experience in the clinical and academic health science fields. Prior to my current position, I served as president at the University of Texas Medical branch from 1997 to 2007. Before that, I was the William Osler Professor of Medicine and Physician-in-Chief of the Johns Hopkins Hospital. From 1976 to 1985, I served as head of the Section of Rheumatology and Clinical Immunology at the University of California, San Francisco, where I was also an investigator with the Howard Hughes Medical Institute.

4.   The facts stated herein are of my own personal knowledge, and I could and would competently testify to them.

5.   UC is a public university system of 10 campuses. UC Health comprises UC's 18 health sciences schools and nine licensed general acute care hospitals and acute care psychiatric hospitals, all of which are located on seven of UC's ten campuses. UC educates more than 280,000 undergraduate, graduate and health sciences professional students and has more than 2.0 million living alumni.

6.   UC Health is the division within the UC Office of the President that provides leadership and strategic direction to UC's five academic medical centers and 18 health professional schools. UC Health supports operational initiatives at individual campuses and development of system-wide initiatives, promoting collaboration among the university's health

1

1   professional schools and providing oversight on the business and financial activities of the

2   clinical enterprise.

3          7.     UC operates the largest health sciences instructional program in the country,

4   enrolling nearly 15,000 students annually. The program includes six schools of medicine; four

5   schools of nursing; two schools each of dentistry, pharmacy and public health; and one school

6   each of optometry and veterinary medicine. According to U.S. News & World Report 2019

7   rankings, UC's medical, nursing, pharmacy, public health, optometry and veterinary medicine

8   schools are among the best in the nation.

9          8.     UC Schools of Medicine and academic medical centers are critical to advances in

10   medicine through research and to producing the next generation of physicians in California. In

11   fact, approximately 50 percent of medical students and medical residents in California are trained

12   at UC. The UC medical centers sponsor Graduate Medical Education (GME) or residency

13   programs, which provide in-depth training in a medical specialty or sub-specialty and which are

14   necessary for a physician to become licensed to practice independently in California.

15          9.     The impact of residency training extends far beyond the walls of hospitals

16   operated by UC. Medical residents rotate among different sites of care as part of their exposure to

17   a variety of patient populations and needs. Residents, working under the supervision of a licensed

18   physician, provide care at county hospitals, Veterans Affairs hospitals, community hospitals, and

19   specialty clinics.

20         10.    UC's health professional schools are all committed to public service and caring for

21   the underserved regions and populations that exist across California. For example, PRIME

22   (Programs in Medical Education) is a unique program at UC's six medical schools that

23   supplements standard training with additional curriculum tailored to meet the needs of various

24   underserved populations. Each program has a dedicated area of focus, targeted student

25   recruitment, supplemental criteria for admission, relevant curricular content, and dedicated

26   faculty mentorship. Since its inception, PRIME has produced 470 medical school graduates. In

27   2018–2019, UC Health had 354 medical students enrolled in PRIME, with 64 percent coming

28   from groups underrepresented in medicine.

2

11.     Today, more than 25 percent of physicians currently practicing in the United States are foreign-born. UC Health similarly attracts—and benefits from—great diversity, including residents and medical students from all over the world. For example, 2017-2018 academic year enrollment data for California's medical schools shows that UC Health's medical schools enrolled 223 of the state's 326 first-year medical students who belong to ethnic groups deemed under-represented in medicine.

12.     UC Health's investment in medical students and residents, immigrant and non-immigrants, is a long-term investment that directly benefits Californians, because approximately 70 percent of physicians trained in California are expected to remain in California to independently practice medicine once licensed.

13.     UC is the world's largest academic research system and conducts approximately one-tenth of all academic research in the United States. UC's direct research expenditures during 2017–2018 were approximately $4.8 billion, nearly half (46 percent) of which came directly from federal agencies. Approximately three-quarters of this federal research support was provided by the National Institutes of Health and the National Science Foundation. Biomedical and clinical research conducted by UC faculty and students at UC's health sciences schools and academic medical centers represents a significant proportion of UC's direct research expenditures and of UC's research publications.

14.     UC also operates the fourth largest health care delivery system in California, including five comprehensive academic medical centers located at the Davis, Irvine, Los Angeles, San Diego, and San Francisco campuses. Three of the five UC medical centers are Level 1 Trauma Centers and UCSF Benioff Children's Hospital—Oakland is a Level I Pediatric Trauma Center. UC medical centers provide half of all transplant surgeries and one-fourth of extensive burn care in the State.

15.     In fiscal year 2017-2018, UC medical centers admitted approximately 174,839 patients for an inpatient stay, managed approximately 375,105 emergency department visits, and provided approximately 4.7 million outpatient visits. The UC Schools of Medicine also provided more than 2.5 million outpatient visits to patients.

3

16.     The five UC medical centers employ approximately 42,000 people, including approximately 12,000 nurses.

17.     The UC medical centers also catalyze major advances in biomedical and clinical research. For example, UCSF is involved in more than 1,300 clinical trials and many more clinical and public health research studies. Some of these studies are specifically designed to test culturally and linguistically appropriate interventions that promote public health behaviors, such as preventive health screenings among immigrant communities or populations with limited English proficiency.

18.     Each of the five UC medical centers is a vital safety net health care provider and operates a disproportionate share hospital for purposes of both the Medicare and Medi-Cal (California's Medicaid program) programs, based on the large percentages of low-income patients who have Medicare or Medi-Cal insurance coverage or who do not have insurance that receive inpatient services at the UC medical centers. System-wide, 36 percent of UC medical centers' inpatient days are provided to Medi-Cal patients, 31 percent to Medicare patients, and 32 percent to patients with commercial health insurance, and approximately one percent uninsured or self-pay patients.

19.     UC medical centers annually deliver hundreds millions of dollars in charity care and undercompensated care (meaning care for which the estimated cost exceeds the reimbursement received for patients under publicly sponsored programs like Medi-Cal). For example, in fiscal year 2017-2018 alone, UC medical centers provided more than $258 million in charity care and more than $1.7 billion in undercompensated care.

20.     I am familiar with the rule "Inadmissibility on Public Charge Grounds," 84 Fed. Reg. 41292 (the Rule), published on August 14, 2019. I understand that the Rule aims to redefine "public charge" for immigration purposes, and penalizes certain immigrant applicants for receipt of any of the enumerated public benefits identified in the Rule. The Rule includes new public benefits such as non-emergency Medicaid, Supplemental Security Income, Supplemental Nutrition Assistance Program, and federal housing.

4

21.     The Rule is antithetical to UC's mission as a public institution and contradicts and undermines the capacity of the UC Health system to fulfill its tripartite mission of providing high-quality patient care, training the next generation of clinicians, and innovating medical cures. UC health professional schools, medical centers, and clinicians are committed to improving the health of all Californians, regardless of immigration status.

22.     I am concerned about the impact the Rule will have on UC patients, students, residents and staff, as well as UC medical centers' operations and employees, health professional education programs, and biomedical, clinical, and public health research.

23.     The Rule's inclusion of Medicaid is particularly problematic. Adding non-emergency Medicaid to the expanded list of benefits to be considered in a public charge determination creates restrictive barriers for immigrant patients, or patients who are the children of immigrants, to seeking treatment at UC Health medical centers. I am concerned that the Rule will increase fears about theirs or their family members' immigration status when considering whether to enroll in Medi-Cal or whether to even seek services at hospitals or clinics like UC's.

24.     Given my experience at UC Health and in my prior positions, I know that immigrant patients often do not understand the different publicly funded programs available to them and the Rule creates further confusion about which programs are implicated by the new definition of public benefits. Added to this, are other Administration actions and initiatives targeting immigrants' use of public benefits, including the guidance issued by the Centers for Medicare & Medicaid Services (CMS) on August 23, 2019 concerning immigrant sponsor deeming and repayment requirements arising from submissions of affidavits of support on behalf of intending noncitizens.

25.     Therefore, I expect that patients will forgo enrolling in or using Medi-Cal insurance programs for fear that receiving medical care paid by Medi-Cal might count against them or their family members in a public charge determination, even in circumstances where the Rule would not require Medi-Cal benefits to be included in a public charge determination. For example, the Rule's carve out for Medicaid—coverage used by children under 21 and for women who are pregnant, including 60 days after pregnancy—is an inadequate exception for the

5

1  significant consequences that DHS itself anticipates and the patient confusion this will provoke.

2  This chilling effect will likely result in more patients who are uninsured or who are left to resort

3  to emergency room care.

4       26.    As a physician, I am particularly concerned that the Rule could discourage many

5  patients from obtaining medically necessary, non-emergency treatment for physical and

6  behavioral health conditions, or could cause patients to interrupt or discontinue a required

7  ongoing course of treatment. As acknowledged by DHS in its commentary to the Rule, delaying

8  or foregoing care could ultimately lead to adverse and costly health outcomes for patients,

9  including greater prevalence of communicable diseases and increased usage of emergency rooms

10  and emergent care arising from a delay in treatment.

11       27.    In addition, Medi-Cal reimbursement is critical to the UC Health system. Medi-Cal

12  is the most common payor for inpatient hospital services at UC Health medical centers.

13  Therefore, any reduced use of Medi-Cal will likely result in UC medical centers providing even

14  more uncompensated care to low-income self-pay or uninsured patients.

15       28.    I am also concerned that the Rule's drastic changes and new conditions will

16  undermine UC Health's efforts to attract the best and brightest students to study, train, and

17  research at its health professional schools and hospitals. UC Health is a magnet for the world's

18  most talented health science students, biomedical researchers, and physicians, many of whom

19  seek to stay in the United States to advance biomedical research and practice medicine.

20       29.    Lastly, I am also concerned that the chilling effects of the Rule could discourage

21  immigrants or their family members from participating in the thousands of clinical trials and other

22  research studies that UC medical centers, health sciences schools, faculty, residents, staff and

23  students are involved in. For the same reasons that I believe that the Rule will cause confusion

24  and fear that may discourage patients from seeking treatment, I am concerned that patients will be

25  discouraged or fearful from participating in research studies that are critical to advancing

26  medicine and developing cures that benefit all Americans, and individuals around the world.

27

28

DECLARATION OF JOHN STOBO, M.D ISO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-04975

30.     If implemented, I anticipate the Rule will weaken the ability of UC Health to treat vulnerable patient populations and undercut UC Health's academic and research programs' international leadership.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on August 26, 2019, in Oakland, California.

_____
JOHN D. STOBO, M.D.
EXECUTIVE VICE PRESIDENT, UC HEALTH
University of California, Office of the President

7

DECLARATION OF JOHN STOBO, M.D ISO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:19-cv-04975