JOSEPH H. HUNT
Assistant Attorney General
DAVID L. ANDERSON
United States Attorney
ALEXANDER K. HAAS, SBN 220932
Branch Director
ERIC J. SOSKIN
Senior Trial Counsel
KERI L. BERMAN
KUNTAL V. CHOLERA
JOSHUA M. KOLSKY, DC Bar No. 993430
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch

P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 305-7664
Facsimile: (202) 616-8470
Email: Joshua.kolsky@usdoj.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.* | Case No. 3:19-cv-04975-PJH |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | **DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | |
| | Date: October 2, 2019 |
| | Time: 9:00 a.m. |
| | Dept: Courtroom 3, 3rd Floor |
| | Judge: Hon. Phyllis Hamilton |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT ................................................................................................................... 5

I.     Plaintiffs Are Unlikely to Succeed on the Merits ............................................... 5

    A.     Plaintiffs Lack Article III Standing And Their Claims Are Unripe ................................ 5

    B.     Plaintiffs Are Outside the Zone of Interests Regulated by the Rule ........................... 10

    C.     Plaintiffs Have No Likelihood of Success On The Merits ............................................ 12

        1.     The Rule Is Consistent With the Plain Meaning Of "Public Charge" ........... 12

        2.     The Plain Meaning Of Public Charge Does Not Require Permanent Receipt Of Government Benefits ............................................................ 16

        3.     The Rule Properly Exercises Interpretive Authority That Congress Delegated, Implicitly and Explicitly, To The Executive Branch ................... 18

        4.     The Rule Preserves The Totality Of The Circumstances Test ....................... 19

        5.     The Rule Does Not Violate The Rehabilitation Act. ....................................... 20

        6.     The Rule is Not Arbitrary and Capricious. ..................................................... 22

            a.     The Rule Advances The Goals Of Ensuring That Aliens Do Not Rely On Public Resources To Meet Their Needs And Are Self-Sufficient. ....................................................... 22

            b.     The Rule Reasonably Weighs Both Positive And Negative Factors. .......................................................................... 25

            c.     Plaintiffs' Arguments Concerning Affidavits of Support and Bonds Are Based on Their Misreading of the Rule. ............... 26

            d.     DHS Adequately Justified the Rule. ....................................... 27

i

e.      DHS Adequately Considered the Potential Effects of the Rule. .......29

f.      DHS Adequately Responded to Comments. ........................................31

g.      Plaintiffs' Claim Regarding Form I-944 Fails As A Matter
         Of Law. ..................................................................................................32

II.    Plaintiffs Fail to Establish Irreparable Harm ...........................................................32

III.   The Remaining Equitable Factors Require Denial of Plaintiffs' Motion...................34

IV.    The Court Should Not Grant a Nationwide Injunction ..........................................35

# TABLE OF AUTHORITIES

**CASES**

*Aguayo v. Jewell,*
  827 F.3d 1213 (9th Cir. 2016) ........................................................................22

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,*
  724 F.3d 243 (D.C. Cir. 2013) ......................................................................30

*American Sec. & Trust Co. v. Utley,*
  382 F.2d 451 (D.C. Cir. 1967) ......................................................................15

*Application for Temporary Resident Status,*
  USCIS AAO, 2009 WL 4983092 (Sept. 14, 2009) ......................................21

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012) ......................................................................31

*Batalla Vidal v. Duke,*
  295 F. Supp. 3d 127 (E.D.N.Y. 2017) .............................................................7

*Bishop Paiute Tribe v. Inyo Cty.,*
  863 F.3d 1144 (9th Cir. 2017) ......................................................................10

*Boardman v. Pac. Seafood Grp.,*
  822 F.3d 1011 (9th Cir. 2016) ................................................................ 33, 34

*Cachillo v. Insmed,*
  638 F.3d 401 (2d Cir. 2011) ...........................................................................6

*California by and through Becerra v. Azar,*
  927 F.3d 1068 (9th Cir.),
  *reh'g en banc granted,* 927 F.3d 1045 (9th Cir. 2019) ..............................22

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ........................................................................35

*Caribbean Marine Servs. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988) ................................................................ 33, 35

*Chevron, U.S.A., Inc. v. NRDC,*
  467 U.S. 837 (1984) ............................................................................... 18, 25

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ........................................................................... 7, 9, 10

*State of Cal., et al. v. DHS, et al.,* Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.

*Clark v. Seattle*,
  899 F.3d 802 (9th Cir. 2018) ................................................................................10

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) .................................................................................... 11, 12

*Colwell v. HHS*,
  558 F.3d 1112 (9th Cir. 2009) ..............................................................................10

*Competitive Enter. Inst. v. DOT*,
  863 F.3d 911 (D.C. Cir. 2017) ..............................................................................17

*Consumer Elecs. Ass'n v. FCC*,
  347 F.3d 291 (D.C. Cir. 2003) ..............................................................................30

*Crane v. Johnson*,
  783 F.3d 244 (5th Cir. 2015) ..................................................................................9

*Ctr. For Auto Safety v. Peck*,
  751 F.2d 1336 (D.C. Cir. 1985) ............................................................................30

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018) ................................................................................32

*Davis v. PBGC*,
  571 F.3d 1288 (D.C. Cir. 2009) ............................................................................32

*De Beers Consol. Mines v. U.S.*,
  325 U.S. 212 (1945) ..............................................................................................32

*Defs. of Wildlife v. Zinke*,
  856 F.3d 1248 (9th Cir. 2017) ..............................................................................29

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ............................................................................................8

*Does 1-5 v. Chandler*,
  83 F.3d 1150 (9th Cir. 1996) ................................................................................21

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ..............................................................................34

*East Bay Sanctuary Covenant v. Barr*,
  No. 19-16487, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) ................................35

*Envtl. Def. Fund v. EPA*,
  922 F.3d 446 (D.C. Cir. 2019) ..............................................................................31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

*Ex Parte Horn*,
  292 F. 455 (W.D. Wash. 1923) ..................................................................................14

*Ex Parte Pugliese*,
  209 F. 720 (W.D.N.Y. 1913) ......................................................................................18

*FAA v. Robertson*,
  422 U.S. 255 (1975) ..................................................................................................17

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...........................................................................................25, 29

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
  93 F.3d 897 (D.C. Cir. 1996) ....................................................................................12

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.*,
  19 F. Supp. 3d 111 (D.D.C. 2014) .............................................................................30

*For The Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ..............................................................................32, 34

*Gegiow v. Uhl*,
  239 U.S. 3 (1915) ................................................................................................13, 33

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ...............................................................................................35

*Habeas Corpus Res. Ctr. v. U.S. DOJ*,
  816 F.3d 1241 (9th Cir. 2016) ...................................................................................10

*Harris v. FCC*,
  776 F.3d 21 (D.C. Cir. 2015) ...............................................................................20, 31

*Hellon & Associates v. Phoenix Resort Corp.*,
  958 F.2d 295 (9th Cir. 1992) .....................................................................................21

*Hillsdale Envtl. Loss Prevention v. U.S. Army Corps of Eng'rs*,
  702 F.3d 1156 (10th Cir. 2012) .................................................................................30

*In re Feinknopf*,
  47 F. 447 (E.D.N.Y. 1891) .........................................................................................14

*INS v. Jong Ha Wang*,
  450 U.S. 139 (1981) ..................................................................................................18

*INS v. Legalization Assistance Proj.*,
  510 U.S. 1301 (1993) .................................................................................................11

v

*Inv. Co. Inst. v. CFTC*,
    720 F.3d 370 (D.C. Cir. 2013) ................................................................29

*Iowa v. Block*,
    771 F.2d 347 (8th Cir. 1985) .................................................................9

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ...............................................................5

*Knutzen v. Eben Ezer Lutheran Hous. Ctr.*,
    815 F.2d 1343 (10th Cir. 1987) .............................................................21

*Lam Fung Yen v. Frick*,
    233 F. 393 (6th Cir. 1916) ........................................................13, 16, 17

*Lewis v. Thompson*,
    252 F.3d 567 (2d Cir. 2001) ................................................................23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ..........................................................................11

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ...............................................................5

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................5, 6

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ..........................................................................35

*Martin v. California Dep't of Veterans Affairs*,
    560 F.3d 1042 (9th Cir. 2009) ...............................................................21

*Martinez-Farias v. Holder*,
    338 F. App'x 729 (9th Cir. 2009) ...........................................................20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ..........................................................................11

*Matter of Harutunian*,
    14 I. & N. Dec. 583 (1974) ..............................................................18, 19

*Matter of Perez*,
    15 I. & N. Dec. 136 (BIA 1974) .............................................................18

*Meyer v. Bush*,
    981 F.2d 1288 (D.C. Cir. 1993) .............................................................30

vi

*Munaf v. Geren,*
   553 U.S. 674 (2008) ...................................................................................5

*Native Vill. of Kivalina v. ExxonMobil Corp.,*
   696 F.3d 849 (9th Cir. 2012) ....................................................................7

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
   545 U.S. 967 (2005) .................................................................................24

*Nat'l Restaurant Ass'n v. Solis,*
   870 F. Supp. 2d 42 (D.D.C. 2012) .........................................................32

*New York v. U.S. Dep't of Labor,*
   363 F. Supp. 3d 109 (D.D.C. 2019) .........................................................9

*Ohio Forestry Ass'n v. Sierra Club,*
   523 U.S. 726 (1998) .................................................................................10

*Overseers of Princeton Tp. v. Overseers of South Brunswick Tp.,*
   23 N.J.L. 169 (N.J. 1851) .......................................................................14

*Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust,*
   636 F.3d 1150 (9th Cir. 2011) .................................................................33

*Pennsylvania v. New Jersey,*
   426 U.S. 660 (1976) .................................................................................10

*People ex rel. Durfee v. Comm'rs of,*
   *Emigrat.*, 27 Barb. 562 (N.Y. Sup. Ct. 1858) .......................................16

*Poor Dist. of Edenburg v. Poor Dist. of Strattanville,*
   5 Pa. Super. Ct. 516 (1897) .....................................................................16

*ProtectMarriage.com – Yes on 8 v. Bowen,*
   752 F.3d 827 (9th Cir. 2014) ...................................................................10

*Pub. Citizen, Inc. v. FAA,*
   988 F.2d 186 (D.C. Cir. 1993) ................................................................31

*Ranchers Cattlemen Action v. USDA,*
   499 F. 3d 1108 (9th Cir. 2007) ................................................................27

*Regents of Univ. of Cal. v. DHS,*
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ....................................................7

*San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ..................................................................8

*SIFMA v. CFTC,*
　67 F. Supp. 3d 373, 432 (D.D.C. 2014) ............................................................29

*Skaff v. Meridien N. Am. Beverly Hills, LLC,*
　506 F.3d 832 (9th Cir. 2007) ...........................................................................9

*Summers v. Earth Island Inst.,*
　555 U.S. 488 (2009) .........................................................................................6

*Sutton v. Providence St. Joseph Med. Ctr.,*
　192 F.3d 826 (9th Cir. 1999) ...........................................................................32

*Thomas v. Anchorage Equal Rights Comm'n,*
　220 F.3d 1134 (9th Cir. 2000) .........................................................................10

*Town of Chester v. Laroe Estates, Inc.,*
　137 S. Ct. 1645 (2017) ..............................................................................7, 35

*Trump v. Hawaii,*
　138 S. Ct. 2392 (2018) ..............................................................................7, 22

*U.S. v. Carona,*
　660 F.3d 360 (9th Cir. 2011) ...........................................................................12

*U.S. v. Lipkis,*
　56 F. 427 (S.D.N.Y. 1893) ..............................................................................14

*Ventura Christian H.S. v. San Buenaventura,*
　233 F. Supp. 2d 1241 (C.D. Cal. 2002) ...........................................................34

*Wallis v. U.S. ex rel. Mannara,*
　273 F. 509 (2d Cir. 1921) ................................................................................18

*Whitmore v. Arkansas,*
　495 U.S. 149 (1990) .........................................................................................6

*Winter v. NRDC,*
　555 U.S. 7 (2008) ..............................................................................5, 6, 33, 35

**STATUTES**

5 U.S.C. § 706(2)(A) ...........................................................................................22

6 U.S.C. § 542 ....................................................................................................3

6 U.S.C. § 557 ....................................................................................................3

8 U.S.C. § 1551 ..................................................................................................3

8 U.S.C. § 1182(a) ..................................................................................................*passim*

8 U.S.C. § 1252 ....................................................................................................................11

8 U.S.C. § 1601 ......................................................................................................*passim*

8 U.S.C. § 1613(a) .............................................................................................................27

29 U.S.C. § 794(a) ...........................................................................................................20

Immigration Act of 1882,
    22 Stat. 214 ..................................................................................................................3

1891 Immigration Act,
    26 Stat. 1084 ........................................................................................................ 3, 13

Immigration Act of 1903,
    32 Stat. 1213 .................................................................................................................3

Immigration Act of 1917,
    39 Stat. 874 .......................................................................................................... 3, 13

INA of 1952,
    66 Stat. 163 ...................................................................................................................3

Illegal Immigration Reform and Immigrant Responsibility Act,
    Pub. L. 104-208 (1996) .............................................................................................1

Personal Responsibility and Work Opportunity Reconciliation Act,
    Pub. L. 104-193 (1996) .............................................................................................4

Homeland Security Act of 2002,
    Pub. L. No. 107-296 ..................................................................................................3


**REGULATIONS**

6 C.F.R. § 15.30 .................................................................................................................20

8 C.F.R. § 103.7(c) ...........................................................................................................28

*Inadmissibility and Deportability on Public Charge Grounds*,
    64 Fed. Reg. 28676 (May 26, 1999) ....................................................................4

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*,
    64 Fed. Reg. 28689 (May 26, 1999) ....................................................................4

*Inadmissibility on Public Charge Grounds*,
    83 Fed. Reg. 51114 (Oct. 10, 2018) ....................................................................4

ix

*Inadmissibility on Public Charge Grounds*,
   84 Fed. Reg. 41292 (Aug. 14, 2019) ...........................................................................1


**OTHER AUTHORITIES**

H.R. Rep. No. 104-469 (1996) ...........................................................................19

H.R. Rep. 104-828 (1996) (Conf. Rep.) ...............................................................1

Letter from the Sec. of Labor, 64 Cong. (1st Sess.) Doc. 886 (Mar. 11, 1916) ...................................14

S. Rept. 81-1515, 81st Cong. 2d (1950) .............................................................18

Arthur Cook, *et al.*, Immigration Laws of the U.S. (1929) ...................................14

E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 (1981) ...............3

Frederic Jesup Stimson, Glossary of the Common Law (1881) ...........................................12

Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ..........................................12

Webster's Third New Int'l Dict. (1996) ...............................................................12

x

*State of Cal., et al. v. DHS, et al.*, Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.

### INTRODUCTION

For over 135 years, Congress has restricted the admissibility of aliens that are likely, in the judgment of the Executive Branch, to become "public charges." Congress has never defined the term "public charge," but it has long been understood to mean a person who cannot provide himself with the basic needs of subsistence, and therefore imposes a burden on the public fisc to provide him with aid in obtaining the necessities of daily life. A major purpose of the public charge ground of inadmissibility is to set the expectation for immigrants that they be self-sufficient and refrain from entering the United States with the expectation of receiving public benefits, thereby ensuring that persons unable or unwilling to provide for themselves do not impose an ongoing burden on the American public. For the past two decades, the public charge ground of inadmissibility, which applies in various ways to both applications for admission to the United States and for adjustments of status to that of a lawful permanent resident, has been governed by interim field guidance adopted without the benefit of notice-and-comment procedures.

On August 14, 2019, the Department of Homeland Security ("DHS") published *Inadmissibility on Public Charge Grounds* ("Rule") in the Federal Register. 84 Fed. Reg. 41292. This final rule is the culmination of an extensive, multi-year process to adopt regulations that prescribe how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible under section 212(a)(4) of the Immigration and Nationality Act ("INA") because he is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A). This Rule is long overdue: in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104-208, "to expand the public charge ground of inadmissibility" after concluding that "only a negligible number of aliens who become public charges have been deported in the last decade." H.R. Rep. 104-828, at 241 (1996) (Conf. Rep.); *see also* IIRIRA § 531 (enumerating "minimum" factors to be considered in every public charge determination). Congress therefore provided the Immigration and Naturalization Service ("INS," DHS's predecessor agency) with a list of factors to consider "at a minimum" in forming an "opinion" about whether an alien is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A-B). Yet for two decades, DHS has provided its officers, current and prospective immigrants, and the public with nothing more than an interim guidance document to specify how the

1

factors are being implemented.

The Rule revises an anomalous definition of "public charge" set forth in interim guidance from 1999 to better reflect Congress's legislated policy making aliens who are likely to require public support to obtain their basic needs inadmissible. The Rule also reflects Congress's delegation of broad authority to the Executive Branch concerning the meaning of "public charge" and the establishment of procedures for forming an "opinion" about whether individual aliens are "likely at any time to become a public charge." The Rule is the product of a well-reasoned process that considered the plain text of the statute, legislative intent, statistical evidence, and the substance of hundreds of thousands of comments submitted by the public. Finally, the Rule has a limited scope: it does not apply to naturalization applications for lawful permanent residents ("LPRs"), or lead to public charge inadmissibility determinations based on the receipt of Emergency Medicaid, disaster assistance, school lunches, or benefits received by U.S.-born children. Nor does it apply to refugees or asylum recipients.

Plaintiffs—four States and the District of Columbia—nevertheless seek a nationwide preliminary injunction against the Rule. This Court should deny the motion. Plaintiffs, who are States rather than aliens actually governed by the Rule, cannot meet basic jurisdictional requirements, and their claims in any event are meritless. The Rule accords with the longstanding meaning of "public charge" and complies with the APA and other relevant statutes. In short, Plaintiffs provide no basis for turning their abstract policy disagreement with the Executive Branch into a nationwide injunction.

## BACKGROUND

"Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601(1). "[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs." *Id.* § 1601(2)(A). Rather, aliens must "rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id.* Relatedly, "the availability of public benefits [is] not [to] constitute an incentive for immigration to the United States." *Id.* § 1601(2)(B).

These statutorily enumerated policies are effectuated in part through the public charge ground of inadmissibility in the INA. With certain exceptions, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney

General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A).[1] An unbroken line of predecessor statutes going back to at least 1882 have contained a similar inadmissibility ground for public charges, and those statutes have, without exception, delegated to the Executive Branch the authority to determine who constitutes a public charge for purposes of that provision. *See* Immigration Act of 1882, ch. 376, §§ 1-2, 22 Stat. 214 ("1882 Act"); 1891 Immigration Act, 51 Cong. ch. 551, sec. 1, 26 Stat. 1084 ("1891 Act"); Immigration Act of 1903, 57 Cong. ch. 1012, sec. 2, 32 Stat. 1213, 1214; Immigration Act of 1917, 64 Cong. ch. 29, sec. 3, 39 Stat. 874, 876 ("1917 Act"); INA of 1952, ch. 477, sec. 212(a)(15), 66 Stat. 163, 183. In IIRIRA, Congress added to these predecessor statutes by instructing that, in making public charge determinations, "the consular officer or the Attorney General shall at a minimum consider the alien's: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills," 8 U.S.C. § 1182(a)(4)(B) (Arabic numerals substituted), but otherwise left in place the broad delegation of authority to the Executive Branch.

The longstanding denial of admission for aliens believed likely to become public charges dates from the colonial era, when a principal "concern [in] provincial and state regulation of immigration was with the coming of persons who might become a burden to the community," and "colonies and states sought to protect themselves by [the] exclusion of potential public charges." E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 at 410 (1981). Provisions requiring the exclusion and deportation of public charges emerged in federal law in the late 19th century. *See, e.g.*, 1882 Act (excluding any immigrant "unable to take care of himself or herself without becoming a public charge"); 1891 Act § 11 (providing for deportation of "any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing").

In 1996, Congress enacted immigration and welfare reform statutes that bear on the public charge determination. IIRIRA strengthened the enforcement of the public charge inadmissibility ground in several ways. Besides codifying mandatory factors for immigration officers to consider, it

---

[1] As of March 1, 2003, references to the Attorney General in the INA "shall be deemed to refer to the Secretary" of DHS where they describe functions transferred to DHS by the Homeland Security Act of 2002, Pub. L. No. 107-296.  *See* 6 U.S.C. § 557 (2003); 6 U.S.C. § 542 note; 8 U.S.C. § 1551 note.

3

*State of Cal., et al. v. DHS, et al.*, Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.

raised the standards and responsibilities for persons who must "sponsor" an alien by pledging to bear financial responsibility for that immigrant and requiring that sponsors demonstrate sufficient means to support the alien. Contemporaneously, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. 104-193, restricted most aliens from accessing many public support programs, including Supplemental Security Income ("SSI") and nutrition programs. PRWORA also made the sponsorship requirements in IIRIRA legally enforceable against sponsors.

In light of the 1996 legislative developments, the INS attempted in 1999 to engage in rulemaking to guide immigration officers, aliens, and the public in understanding the public charge determinations. *See Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28676 (May 26, 1999) ("1999 NPRM"). No final rule was ever issued, however. Instead, the agency adopted the 1999 NPRM interpretation on an interim basis by publishing *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28689 (May 26, 1999) ("Field Guidance"). The Field Guidance dramatically narrowed the public charge inadmissibility ground by defining "public charge" as a person "primarily dependent on the government for subsistence," *id.*, and barring immigration officers from considering any non-cash public benefits, regardless of the value or length of receipt, as part of the public charge determination. *See id.* at 28678. Under that standard, an alien receiving Medicaid, food stamps, and public housing, but no cash assistance, would have been treated as no more likely to become a public charge than an alien who was entirely self-sufficient.

The Rule revises this approach and adopts, through notice-and-comment rulemaking, a well-reasoned definition of public charge, providing practical guidance to officials making public charge determinations. DHS began by publishing a Notice of Proposed Rulemaking on October 10, 2018, comprising 182 pages of description, evidence, and analysis. *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51114 ("NPRM"). The NPRM provided a 60-day public comment period, during which 266,077 comments were collected. *See* Rule at 41297. After considering these comments, DHS published the Rule, addressing comments, making several revisions to the proposed rule, and providing over 200 pages of analysis in support of its decision. Among the Rule's major components are provisions defining "public charge" and "public benefit," which are not defined in the statute, an enumeration of factors to be considered in the totality of the circumstances when making a public

4

charge determination, and a requirement that aliens seeking an extension of stay or a change of status show that they have not received public support in excess of the Rule's threshold since obtaining nonimmigrant status. The Rule supersedes the Interim Field Guidance definition of "public charge," establishing a new definition based on a minimum time threshold for the receipt of public benefits. Under this "12/36 standard," a public charge is an alien who receives designated public benefits for more than 12 months in the aggregate within a 36-month period. The "public benefits" included are extended by the Rule to include many non-cash benefits: with some exceptions, an alien's participation in the Supplemental Nutrition Assistance Program ("SNAP"), Section 8 Housing Programs, Medicaid, and Public Housing may now be considered as part of the public charge inadmissibility determination. Rule at 41501-02. The Rule also enumerates a non-exclusive list of factors and explains how DHS officers should apply these factors as part of a totality-of-the-circumstances determination of whether an alien is likely at any time to become a public charge. *Id.* at 41295.

## ARGUMENT

A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)); *see Munaf v. Geren*, 553 U.S. 674, 690 (2008) (likelihood of success requires far more than identifying "serious, substantial, difficult, and doubtful" questions, including as to jurisdiction). Plaintiffs fail to meet any of these requirements.

### I.    Plaintiffs Are Unlikely to Succeed on the Merits.

#### A.    Plaintiffs Lack Article III Standing And Their Claims Are Unripe.

As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing standing, "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "To seek injunctive relief, a plaintiff must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and

imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action . . . ; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be certainly impending to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990). Where, as here, "the plaintiff is not [itself] the object of the government action," standing "is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562.

The States have not met, or even tried to meet, this burden. Neither their Complaint nor their preliminary injunction motion makes any serious effort to establish standing. The former brushes past standing with a conclusory, eight-word *ipse dixit* referencing unspecified "sovereign, quasi-sovereign, and/or proprietary interests." Compl. ¶ 21. The motion offers even less: a single parenthetical invoking a doctrine of standing specific to organizations, not States. *See* Mot. at 30. It is Plaintiffs' burden to establish standing, and they have failed to do so. *Lujan*, 504 U.S. at 560.

Plaintiffs' claims of irreparable harm do not establish standing because those claims consist of potential future harms that, if they ever came to pass, would be spurred by decisions of third-parties not before the Court. Such speculative allegations are insufficient to establish Article III standing, particularly at the preliminary injunction stage. *See Cachillo v. Insmed*, 638 F.3d 401, 404 (2d Cir. 2011) ("When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment") (internal quotation marks omitted). Here, the Rule governs DHS personnel and certain aliens. It "neither require[s] nor forbid[s] any action on the part of" Plaintiffs, *Summers*, 555 U.S. at 493, nor does it expressly interfere with any of their programs applicable to aliens. To be sure, Plaintiffs allege irreparable harms of (i) a theoretical economic impact that might arise should aliens choose to rely more on State services; (ii) speculation that a public health episode could occur should noncitizens choose to forgo health services altogether; and (iii) interference with certain State administrative programs. But none of these alleged harms would be sufficient to confer standing on any State Plaintiff.[2]  Indeed, finding standing under these

---

[2] Even if any of these impacts were sufficient to establish Article III injury, they could only establish standing for claims related to that specific harm, and Plaintiffs seek injunctive relief based on claims that have no conceivable connection to any of these impacts, such as their challenge to the burden on

circumstances would blow the courthouse door open to virtually any conceivable suit by States against the federal government, given that virtually any administration of federal law by a federal agency could be cast as creating such derivative effects.

For this reason, even when courts have found State standing to challenge federal immigration policies, they have limited it to circumstances in which the States' claims arise out of their proprietary interests as employers or operators of state universities. *See, e.g.*, *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 160-62 (E.D.N.Y. 2017) (rejecting state standing under "quasi-sovereign interests" and "injur[y] [to] a State's economy" theories where state proprietary interests were unidentified).[3] And unlike other recent cases concerning immigration policy, no private parties directly affected by the Rule are named as plaintiffs here. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (plaintiffs included individuals claiming they were "separated from certain relatives who seek to enter the country"); *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1027 (N.D. Cal. 2018) (plaintiffs challenging DACA rescission included several "Individual DACA recipients").

Plaintiffs' purported economic harms from the possibility that certain aliens may unnecessarily choose to forgo *all* federal health benefits (thereby resulting in greater state health expenses) also do not establish standing. Mot. at 30. As an initial matter, this theory is inconsistent with Plaintiffs' assertion that "participants do not distinguish between federally and state-funded health and social services" and that the Rule therefore would reduce "utilization of *all services*." Mot. at 12; Compl. ¶ 149 (emphasis added). Further, a "causal chain involv[ing] numerous third parties whose independent decisions collectively" create injuries is "too weak to support standing." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 867 (9th Cir. 2012); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 (2013) (courts are "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors"). For any Plaintiff to suffer a net-increase in health benefit expenditures (i) a material number of aliens in the State must unnecessarily choose to forgo all federal

---

aliens completing the Form I-944. There is no jurisdiction over such claims that are entirely untethered to any of Plaintiffs' allegations of purported harm. *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("a plaintiff must demonstrate standing for each claim . . . press[ed]").

[3] Defendants disagree with the substantive merits of the Court's decision in *Vidal*, and the Supreme Court has granted certiorari. *See McAleenan v. Vidal*, No. 18-589, cert granted 139 S.Ct. 2773.

7

health benefits (a result not required by the Rule); (ii) these aliens must then either apply for, and receive, additional state health benefits, or use emergency room services ultimately financed by the state; and (iii) the increased state expenses for these aliens must be greater than the costs the State would have incurred for aliens who would have resided in the State, and consumed State resources, but for the Rule.[4]

Plaintiffs' allegation that the Rule may harm the States' economies because fewer aliens may receive and then spend federal funds within the Plaintiff States is equally speculative. Relying on a declarant, Plaintiffs claim that "disenrollments due to the . . . effect [of the Rule] could lead to $1.2 billion in reduced economic output, and loss of 7,600 jobs." Mot. at 34. But the declarant concedes that she is speculating, and that these are only *hypothetical* losses, relying on (i) the number of "[n]on-citizens in California who are eligible for and enrolled in" certain state benefit programs, and (ii) the claim that these individuals merely "are *potentially* subject to a chilling effect" (not that all, or even any specific portion, will forgo these benefits). Lucia Decl. ¶¶ 12-13 (emphasis added). She then cites one of a number of potential "disenrollment chilling effect scenarios," but provides no analysis—in either the brief or the declaration—regarding the likelihood of this scenario. In any event, Plaintiffs do not even allege that this speculative injury would noticeably affect their total state economies.[5]

Numerous courts have concluded that analogous indirect economic effects are insufficient to confer standing on a State. In *Wyoming v. U.S. Department of Interior*, for example, the National Park Service set a cap on the number of snowmobiles permitted in certain national parks. 674 F.3d 1220

---

[4] This is distinct from New York's standing theory in *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019). There, plaintiff did not rely on an elongated causal chain of independent third-party decisions. The Court noted that plaintiff relied on a single, "predictable" reaction to a new federal policy (lower census response rates) resulting in definitive injuries to the State itself. *Id.* at 2565-66.

[5] Plaintiffs also claim that the Rule "will cause a reduction in payments from the federal government due to disenrollment or forgone enrollment by eligible individuals," which will supposedly "impact . . . state and local agencies which depend on federal funding." Mot. at 29-30; Compl. ¶¶ 5, 170. But Plaintiffs do not explain, either in their motion or their Complaint, how this would create a harm, given that such a reduction in funding would be commensurate with a reduction in benefit enrollment such that the States should still receive appropriate federal funding for remaining enrollees. This is distinct from the alleged "federal funds" injury deemed sufficient in *San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), where the challenged executive order withheld federal funds from the plaintiffs that were not linked to enrollment levels. *See id.* at 1242.

(10th Cir. 2012). The Tenth Circuit held that Wyoming's "speculative economic data" alleging "economic detriment" through reduced tourism and tax revenues was "conclusory" and "failed to . . . show[] direct injury to their . . . proprietary interests." *Id.* at 1231 & n.5, 1233-34. Nor could Iowa challenge USDA's refusal to implement disaster relief programs, because the State's allegation that it would "face increased responsibility for the welfare and support of its" citizens was "insufficiently proximate to the actions at issue." *Iowa v. Block*, 771 F.2d 347, 353-54 (8th Cir. 1985); *see also Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (no standing for state challenge to DACA).

In their discussion of purported irreparable harms, Plaintiffs also speculate that the Rule could cause some aliens to forgo all health care, possibly causing the spread of "communicable diseases." Mot. at 31. But this alleged harm does not suffice as a basis for standing, because such health effects would be borne by affected individuals, not States. *See New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 124 (D.D.C. 2019) ("[T]he States' general responsibility for their citizens' health and welfare . . . cannot directly support State standing because the underlying harms would be suffered by the States' citizens."). Further, like the alleged economic impacts, this allegation is too speculative to support standing—it turns on individual choices by aliens to forgo *all* federal health benefits and, as a result, contract and spread "communicable diseases," or otherwise cause a public health crisis. *See Clapper*, 568 U.S. 410 (rejecting "highly attenuated chain" theory of standing).

The alleged irreparable harm from "Interference with State Programs," Mot. at 29, also is insufficient for standing. Plaintiffs claim that the Rule will affect certain protocols and decisions implemented by their agencies concerning "public benefit programs." Mot. at 30. For example, Plaintiffs claim that they have established "single, accessible, statewide applications" for public benefit programs that may need to be modified in light of the Rule. *Id.*; Compl. ¶¶ 173-85. Bureaucratic inconvenience occasioned by a change in federal policy, however, is insufficient to confer standing. *See, e.g.*, *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 840 (9th Cir. 2007) (certain injuries are "too trifling . . . to support constitutional standing"); *Crane*, 783 F.3d at 253 (rejecting government officials' claim that they have standing since DACA would require that them to "alter their current processes to ensure" compliance). Nor could standing exist from "additional administrative burdens" Plaintiffs might incur if they choose to help "noncitizens navigate" the Rule. Mot. at 30; Compl.

9

¶¶ 191-97. Plaintiffs' voluntary expenditures in response to the Rule do not give rise to standing. *See Clapper*, 568 U.S. at 416 ("respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm"); *Penn. v. N.J.*, 426 U.S. 660, 664 (1976) (rejecting state standing where states could not "demonstrate that the injury . . . was directly caused by the actions" challenged because "nothing prevent[ed]" states from structuring their laws to prevent the harms). "If the law were otherwise, an enterprising plaintiff" could construct standing to challenge virtually *any* new federal statute or regulation. *Clapper*, 568 U.S. at 416.

"Constitutional ripeness," another prerequisite of justiciability, "is often treated under the rubric of standing because 'ripeness coincides squarely with standing's injury in fact prong.'" *Bishop Paiute Tribe v. Inyo Cty.*, 863 F.3d 1144, 1153 (9th Cir. 2017) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc)). "[R]ipeness can be characterized as standing on a timeline," *Thomas*, 220 F.3d at 1138, and ripeness precludes "premature" review where the injury at issue is speculative or may never occur." *ProtectMarriage.com – Yes on 8 v. Bowen*, 752 F.3d 827, 838 (9th Cir. 2014). For the same reasons stated above regarding lack of standing, Plaintiffs' claims fail to demonstrate constitutional ripeness. *See, e.g., Clark v. Seattle*, 899 F.3d 802, 809 (9th Cir. 2018).

Prudential ripeness also counsels against consideration of Plaintiffs' claims. This doctrine "protect[s] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Habeas Corpus Res. Ctr. v. U.S. DOJ*, 816 F.3d 1241, 1252 (9th Cir. 2016). Ripeness is generally lacking where the reviewing court "would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Here, Plaintiffs' claims are all premised on speculation about the potential future effects of the Rule and disagreement with DHS's predictions based on the available evidence. *See, e.g.*, Mot. at 16-17, 22 (speculation about impact of the public charge totality of the circumstances test); *id.* at 20-21, 26-27 (speculation about choices to disenroll from public benefits). Thus, judicial appraisal of these [questions]" should await the "surer footing [of] the context of a specific application of this regulation." *Colwell v. HHS*, 558 F.3d 1112, 1127 (9th Cir. 2009).

### B. Plaintiffs Are Outside the Zone of Interests Regulated by the Rule.

Even if Plaintiffs could meet their standing and ripeness burdens, Plaintiffs' claims would still

10

fail because they are outside the zone of interests served by the limits of the "public charge" inadmissibility provision in § 1182(a)(4)(A) and related sections. The "zone-of-interests" requirement limits the plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision or its limits. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014). Under the APA, a plaintiff falls outside this zone when its "interest[s] are … marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399 (1987). This standard applies with equal force where, as here, Plaintiffs seek to challenge the government's adherence to statutory provisions in the guise of an APA claim. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs plainly fall outside the zone of interests served by interpretations of the limits of the meaning of public charge in the inadmissibility statute. At issue in this litigation is whether DHS will deny admission or adjustment of status to aliens who are deemed likely at any time to become "public charges." By using the term "public charge" rather than a broader term like "non-affluent," Congress ensured that only certain aliens could be determined inadmissible on the public charge ground. It is aliens improperly determined inadmissible, not state governments, who "fall within the zone of interests protected" by any limitations implicit in § 1182(a)(4)(A), § 1183, and the Rehabilitation Act, because they are the "reasonable—indeed, predictable—challengers" to DHS's inadmissibility decisions. *Patchak*, 567 U.S. at 227; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on a public charge determination an opportunity in proceedings before an immigration judge to contest the definition of public charge and its application to them). Likewise, States are not conceivably in the category of those served by judicial review of, for example, the time it takes an alien to fill out a federal form or the burdens on DHS itself in processing such forms. *See* Mot. at 27-28. The purported administrative, economic, and health interests asserted by the States are not even "marginally related" to those of an alien seeking to demonstrate that the "public charge" inadmissibility ground has been improperly applied to his detriment. *Cf. INS v. Legalization Assistance Proj.*, 510 U.S. 1301, 1304-05 (1993) (O'Connor, J., in chambers) (concluding that relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of organizations [that provide legal help to immigrants]," and that the fact that a "regulation

may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests test a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).[6]

## C. Plaintiffs Have No Likelihood of Success On The Merits.

### 1. The Rule Is Consistent With the Plain Meaning Of "Public Charge."

The definition of "public charge" in the Rule is consistent with the plain meaning of the statutory text, which is to be "be determined with reference to its dictionary definition at the time the statute was enacted." *U.S. v. Carona*, 660 F.3d 360, 367 (9th Cir. 2011). Here, it is undisputed that, since 1882, Congress has consistently provided for the exclusion of indigent aliens determined by the Executive Branch as likely to become, "public charges." *Compare* Compl. ¶ 33, *with* NPRM at 51125.

Contemporary dictionaries from the 1880s define "charge" as "an obligation or liability," such as "a pauper being chargeable to the parish or town." Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ("Rapalje 1888"); *accord* Frederic Jesup Stimson, Glossary of the Common Law (1881) (defining "charge" as "[a] burden, incumbrance, or lien; as when land is charged with a debt") ("Stimson 1881"). As to the term "public," these dictionaries explain the term "public" as meaning "not any corporation like a city, town or county, but the body of the people at large." Stimson 1881; *accord* Rapalje 1888 ("The whole body of citizens of a nation, or of a particular district or city, [or] [a]ffecting the entire community"). Together, these early definitions make clear that an alien becomes a "public charge" when that individual's inability to achieve self-sufficiency imposes an "obligation" or "liability" on "the body of the people at large" to provide for his basic necessities.[7]

---

[6] Plaintiffs' Fifth Amendment claims fail the zone of interests test even more baldly. The Supreme Court has suggested that a heightened zone-of-interests requirement must be met by a plaintiff seeking to enforce the law through an implied cause of action in equity and that the plaintiff must show the provision is intended for his "*especial*" benefit." *Clarke*, 479 U.S. at 396 & n.16.

[7] The original public meaning of "public charge," as derived from the definitions of "public" and "charge," is consistent with modern dictionary definitions of the term "public charge." For example, the online version "of the Merriam-Webster Dictionary defines public charge as 'one that is supported at public expense.'" NPRM at 51158 (quoting Definintion of Public Charge, http://www.merriamwebster.com/dictionary/public%20charge (last visited Sept. 11, 2019)).

*State of Cal., et al. v. DHS, et al.*, Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.

Nothing about the plain meaning of this term suggests that a person must be completely destitute or entirely dependent on public support—*i.e.*, a "pauper"—to qualify as a public charge. *See, e.g.*, Century Dictionary & Cyclopedia (1911) (defining "pauper" as "[a] very poor person; a person entirely destitute"). Indeed, early versions of the statute make "clear that the term 'persons likely to become a public charge' is not limited to paupers or those liable to become such; 'paupers' are mentioned as in a separate class." *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916); *see, e.g.*, 1891 Act; 1917 Act.[8] And in response to a 1916 Supreme Court opinion reasoning that the term "public charge" must be read as "generically similar" to terms "mentioned before and after" (such as "pauper"), *Gegiow v. Uhl*, 239 U.S. 3 (1915), Congress relocated the term "public charge" in the statute. *See* 1917 Act § 3 n.1 ("This clause . . . has been shifted . . . to indicate the intention of Congress that aliens shall be excluded upon said ground for economic as well as other reasons" and "overcoming the decision of the Supreme Court in *Gegiow*"); *Gegiow*, 239 U.S. at 9 (rejecting reliance on the "overstocked" "state of the labor market" in plaintiffs' destination city as basis for exclusion). Subsequent precedent recognized that this alteration negated the Court's interpretation in *Gegiow* by

---

Similarly, "Black's Law Dictionary (6th ed.) . . . defines public charge as 'an indigent; a person whom it is necessary to support at public expense by reason of poverty alone or illness and poverty.'" *Id.* Plaintiffs misleadingly contend that the 1999 NPRM adopted the "plain meaning" of the term "public charge" from a 1986 dictionary. Mot. at 13 (describing dictionary as "defining public charge"). As the 1999 NPRM makes clear, however, that dictionary *does not* define the term "public charge," and the definition that Plaintiffs quote is one of the "many meanings" of "[t]he word 'charge'" contained in that dictionary. 1999 NPRM at 28677; *see generally Webster's Third New Int'l Dict.* (1996).

[8] The 1891 Act provided "[t]hat the following classes of aliens shall be excluded from admission . . . : "All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome . . . disease, [those] convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another . . . unless it is affirmatively . . . shown . . . that such person does not belong to one of the forgoing excluded classes." The 1917 Act listed, *inter alia*, "idiots; imbeciles; feeble-minded persons; epileptics; insane persons; . . . persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a . . . disease; persons . . . certified by the examining surgeon as being mentally or physically defective . . . of a nature which may affect the ability to earn a living; [felons]; polygamists . . . ; anarchists; persons . . . who advocate . . . the unlawful destruction of property; prostitutes . . . ; persons . . . induced, assisted, encouraged, or solicited to migrate . . . by offers . . . of employment [or] . . . advertisements for laborers . . . in a foreign country; persons likely to become a public charge; persons deported [within the previous year]; stowaways," and others.

underscoring that the term "public charge" is "not associated with paupers or professional beggars." *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) (explaining that "public charge" in the 1917 Act "is differentiated from the application in *Gegiow*"); *accord* Arthur Cook, *et al.*, Immigration Laws of the U.S., §§ 128-34 (1929).[9]

Remarkably, although Plaintiffs urge that the "term public charge has always meant primary dependency on the government," Mot. at 4, they identify no source—and Defendants are aware of none—that defines "public charge" in these terms (or using the similar phrase "primarily dependent") prior to 1999, when INS issued the nonbinding, interim field guidance. In contrast, there is longstanding evidence that the term "[p]ublic charge means any maintenance, or financial assistance, rendered from public funds." Cook, Immigration Laws, § 285; *see In re Feinknopf*, 47 F. 447 (E.D.N.Y. 1891) (determining an alien not likely to become a public charge, after considering, as distinct evidence, whether an alien "received public aid or support "or had been an "inmate of an almshouse"). Courts have also suggested that the exclusion of public charges extended to those who, although earning a modest living, might need assistance with "the ordinary liabilities to sickness, or . . . any other additional charges . . . beyond the barest needs of existence." *U.S. v. Lipkis*, 56 F. 427, 428 (S.D.N.Y. 1893) (holding that immigration officers properly required a bond from a poor family on account of poverty, even though the ultimate reliance on public aid occurred through commitment to an insane asylum); *see also Overseers of Princeton Tp. v. Overseers of South Brunswick Tp.*, 23 N.J.L. 169, 172 (N.J. 1851) (treating "a pauper" and "a person likely to become chargeable" as two separate classes). Such individuals impose a "liability" on "the body of the people at large," even if they are not fully destitute. This interpretation of "public charge" conforms with Congress's explicit instruction that "the immigration policy of the United States [is] that . . . [a]liens within the Nation's borders [should] not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A).

---

[9] During the drafting of the 1917 Act, in a letter to the House Committee on Immigration and Naturalization, the Secretary of Labor defined "public charge" as "the fact that such applicant may be a charge (an economic burden) upon the community to which he is going." He then requested that Congress amend the statute to address the "defect in . . . the arrangement of the wording" identified in *Gegiow*, which, if maintained, would "materially reduce[] the effect of the clause" as the "chief measure of protection in the law . . . intended to reach economic . . . objections to the admission" of aliens. Letter from the Sec. of Labor, 64 Cong. (1st Sess.) Doc. 886 (Mar. 11, 1916).

14

Nor does anything in the plain meaning of "public charge" suggest a distinction between benefits provided in cash and benefits provided as services. Both types of assistance create an obligation on the part of the public and both equally relieve recipients from the conditions of poverty. For this reason, consideration of an alien's reliance on public programs for "housing, food and medical care," as "examples of the obvious basic necessities of life," falls within the parameters of determining whether that person creates a liability on the body of the public. *American Sec. & Trust Co. v. Utley*, 382 F.2d 451, 453 (D.C. Cir. 1967). Plaintiffs acknowledge that early practice in this country recognized that in-kind services such as health care, food, and housing were among the types of public support that rendered a person a public charge. *See* Compl. ¶ 33 (identifying "almshouses, asylums, [and] charitable hospitals" as examples of the services provided to public charges under the 1882 Act). The fact that the modern mores governing public assistance have beneficially deinstitutionalized the poor by providing assistance through subsidies for private housing, private food purchases, and the like does not in any way change the fact that the receipt of such subsidies imposes an "obligation" or "burden" on the body of the public.

The public benefits enumerated in the Rule as components of the public charge definition all fall well within this plain meaning of the statutory text by providing that both cash and in-kind support for "the basic necessities of life"—food, shelter, medical treatment, and the like, *Utley*, 382 F.2d at 453—qualify as predicates for a public charge determination. Medicaid, SSI, public housing, SNAP, and other enumerated programs all obligate the public to assist with the basic necessities of life, such that recipients fall within the category of those historically identified as public charges.[10]

---

[10] Although the Interim Field Guidance and the 1999 NPRM adopted a different interpretation, those documents provide further support for DHS's determination that the Rule is consistent with the plain meaning of "public charge." Both documents describe the exclusion of "non-cash public benefits" at that time as "reasonable," confirming that although they did not conclude that the meaning of "public charge" *required* consideration of such benefits, they also did not conclude that meaning of public charge *foreclosed* their consideration. 1999 NPRM at 28677; *see also id.* at 28678 ("It has never been [the] policy that the receipt of any public service or benefit *must* be considered") (emphasis added). Indeed, the only examples of prior exclusion of non-cash benefits from consideration that the drafters of the interim guidance could identify were: (1) broadly-available public benefits such as "public schools"; and (2) the exclusion of food stamps (i.e., "SNAP") under State Department guidance that apparently did not exclude other forms of non-cash benefits. *See, e.g.*, Interim Field Guidance at 28692.

### 2. The Plain Meaning Of Public Charge Does Not Require Permanent Receipt Of Government Benefits.

An alien's temporary receipt of public benefits, as reflected in the Rule's 12/36 standard, also constitutes an obligation on the public to support the basic necessities of life, and is therefore encompassed by the plain meaning of public charge. Early cases recognized that "the modes in which the poor become chargeable upon the public" extend to "all expenses lawfully incurred," including "temporary relief." *People ex rel. Durfee v. Comm'rs of Emigrat.*, 27 Barb. 562, 569-70 (N.Y. Sup. Ct. 1858). Similarly, in *Poor Dist. of Edenburg v. Poor Dist. of Strattanville*, a Pennsylvania appellate court recognized that even a landowner with a long track record of supporting herself as a teacher, artist, and writer, could become "chargeable to" the public by temporarily receiving "some assistance" while ill, despite having "plenty of necessaries to meet her immediate wants." 5 Pa. Super. Ct. 516, 520-23, 527 (1897). Although the court ultimately rejected the landowner's classification as a pauper, it did so not because her later earnings or payment of taxes barred this conclusion, but because, under the specific facts of the case, she was "without notice or knowledge" that receipt even of limited assistance would "place[] [her] on the poor book." *Id* at 527-28; *cf. Frick*, 233 F. at 397 (recognizing potential to become "at least intermittently, public charges" among those engaged in criminal pursuits). As the NPRM in this case explained, moreover, short-term receipt has been "a relevant factor under the [previous] guidance with respect to covered benefits." NPRM at 51165 & n. 304 ("In assessing the probative value of past receipt of public benefits, 'the length of time . . . is a significant factor.") (quoting Interim Field Guidance at 28690). In fact, the 1999 Field Guidance made no suggestion that an alien needed to receive cash benefits for an extended period for the totality of the circumstance to indicate a requirement of inadmissibility as a public charge and set no minimum period below which the receipt of such benefits would be less meaningful. Field Guidance at 28690.

Consistent with the plain-text meaning, Congress has instructed Executive Branch officers to determine whether an individual is "likely *at any time* to become a public charge," 8 U.S.C. § 1182(a)(4) (italics added) and leaving undefined the minimum period that would qualify an individual as a public charge. As the Rule explains, "public benefit receipt for more than 12 cumulative months over a 36-month period is indicative of a lack of self-sufficiency." Rule at 41359. Such a person has demonstrated a sustained "inability to rely on his or her own capabilities," or even "the resources of family, sponsors,

16

and private organizations" for some of the most "basic living needs," such as food and shelter. *Id.*[11] There is no conflict between this 12/36 standard and the meaning of the term "public charge."

Nor does Congress's failure in 1996 to adopt a "provision generally defining public charge" to include a recipient of benefits for "at least 12 months within 7 years after the date of entry" cut against the 12/36 standard. *See* Mot. at 15. Not only was the proposed provision "significantly different" from the Rule, *see* Rule at 41318, but congressional adoption of such a standard would have repealed the latitude long granted by Congress to the Executive Branch to define the term "public charge." *See infra* Part D.3. In light of the competing, reasonable inference—that Congress intended to leave its delegation of interpretive authority to the Executive Branch in force—Plaintiffs' argument that Congress has precluded the 12/36 standard carries no weight. *See Competitive Enter. Inst. v. DOT*, 863 F.3d 911, 917 (D.C. Cir. 2017) ("Congressional inaction lacks persuasive significance" where competing "inferences may be drawn from such inaction"); *see also FAA v. Robertson*, 422 U.S. 255, 265 (1975) (implicit repeal of delegated authority disfavored).

Significantly, Plaintiffs attempt to read out of the statute three key words: the Executive Branch is to determine whether an individual is "likely *at any time* to become a public charge." 8 U.S.C. § 1182(a)(4)(A) (emphasis added). At the very outset of their motion, they misquote this provision as "'likely to become a public charge.'" Mot. at 2. Furthermore, not only do Plaintiffs fail to quote this provision correctly *anywhere* in the motion, *see generally id.*, but, remarkably, the words "at any time" appear nowhere in Plaintiffs' 63-page, 347 paragraph complaint (although the three immediately surrounding words—"likely to become"—are used repeatedly). The upshot of Plaintiffs' omission of those three words is to thoroughly distort the operation of the Rule's 12/36 standard, leading them to contend that the 12/36 standard provides a "new construction of the term 'public charge'" by including "immigrants who may at some point in their lives" receive public aid. Mot. at 16. But when viewed in light of Congress's use of the term "at any time," DHS's adoption of the 12/36 standard is *less strict* than what the statute arguably contemplates. The standard allows aliens to receive up to *12*

---

[11] The Rule provides data from the Census Bureau that further confirms the contrast between the "significant portion of the benefits-receiving population [who] ended their participation within a year [31.2 percent]," and the much larger share of those who could not achieve self-sufficiency in the long run, remaining as public charges for three years or longer. Rule at 41360.

*months* of public support and still potentially be outside the definition of "public charge." Thus, Plaintiffs' argument that this standard conflicts with the plain meaning of the statute is meritless.

### 3. The Rule Properly Exercises Interpretive Authority That Congress Delegated, Implicitly and Explicitly, To The Executive Branch.

The statutory term "public charge" has "never been [explicitly] defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws." Rule at 41308. Congress implicitly delegates interpretive authority to the Executive Branch when it omits definitions of key statutory terms, thereby "commit[ting] their definition in the first instance to" the agency. *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981); *see also Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984).[12] In the case of "public charge," this delegation is reinforced by Congress's explicit directive that the determination be made "in the opinion of the Attorney General" or a "consular officer." 8 U.S.C. § 1182(a)(4)(A). Indeed, Plaintiffs themselves appear to acknowledge this delegation in seeking to require adherence to the "primary dependency" standard originating in a *prior* exercise of this delegated authority in the 1999 Interim Field Guidance. *See* Part C.I; Mot. at 4-6, 14-15. And the expansiveness of this delegation is widely established in precedent dating back to the early public charge statutes. *See Ex Parte Pugliese*, 209 F. 720 (W.D.N.Y. 1913) (affirming the Secretary of Labor's authority "to determine [the] validity, weight, and sufficiency" of evidence going to whether an individual was "likely to become a public charge"); *Wallis v. U.S. ex rel. Mannara*, 273 F. 509, 510 (2d Cir. 1921) (deference required even if "evidence to the contrary [is] very strong").[13]

The long history of congressional delegation of definitional authority over the meaning of "public charge" refutes Plaintiffs' claim that Congress has implicitly adopted a particular definition of

---

[12] Congress has long recognized the fact of this implicit delegation of the definition of public charge. *See, e.g.*, S. Rept. 81-1515 at 349, 81st Cong. 2d (1950) (recognizing that because "there is no definition of the term . . . in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts").

[13] The Executive Branch has long applied this delegated authority in the manner provided for by the Rule: through analysis of the "totality of the alien's circumstances" to make "a prediction." *Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974); *see also Matter of Harutunian*, 14 I. & N. Dec. 583, 589-90 (1974). In *Harutunian*, the BIA concluded that receipt of "old age assistance benefits" in California was sufficient to render an immigrant a "public charge," and explained that Congress's broad delegation of authority in this area was necessary because "the elements constituting likelihood of becoming a public charge are varied." *Id.* at 588 (quoting S. Rep. 81-1515 at 349, 81 Cong. 2d (Apr. 20, 1950)).

"public charge" such as the standards described in the Interim Field Guidance. *See* Mot. at 14 (purporting to apply canon that "Congress is presumed to legislate with knowledge of existing case law"). Under Plaintiffs' theory, Congress's failure to adopt specific definitions of "public charge" excludes those definitions from the scope of proper interpretation. *See id.* (citing, *e.g.*, H.R. Rep. No. 104-469 (1996)). Not so. Plaintiffs themselves acknowledge that this canon provides that "common understandings" of the operation of statutory schemes "are presumed to remain in force." *Id.* Here, Congress's rejection of legislative efforts to create a first-ever *statutory* definition of "public charge" should be interpreted as leaving in force the commonly understood delegation of definitional authority to the Executive Branch to create such a definition through agency action.

### 4. The Rule Preserves The Totality Of The Circumstances Test.

The Rule could not be more clear that it retains the "totality of the circumstances" approach under which Executive Branch officials make individualized determinations regarding whether "in the opinion of [the officer] at the time of application for admission or adjustment of status, [the alien] is likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4). In contending otherwise, *see* Mot. at 16, Plaintiffs disregard the plain text of the Rule.

The Rule, by its terms, "contains a list of negative and positive factors that DHS will consider as part of [the public charge] determination, and directs officers to consider these factors in the totality of the alien's circumstances." Rule at 41295. "The presence of a single positive or negative factor, or heavily weighted negative or positive factor, *will never*, on its own, create a presumption that an applicant is inadmissible . . . or determine the outcome of the . . . inadmissibility determination. Rather, a public charge inadmissibility determination must be based on the totality of the circumstances presented." *Id.* (emphasis added); *see also id.* at 41309 ("DHS has established a systematic approach to implement Congress' totality of the circumstances standard"). In fact, DHS made changes between the NPRM and the final version of the Rule to emphasize that the "totality of the circumstances" approach is retained—for example, by "amend[ing] the definition of 'likely at any time to become a public charge'" by clarifying that this means "more likely than not at any time in the future . . . as determined based on the totality of the alien's circumstances." *Id.* at 41297.

19

Plaintiffs' assertion that the Rule's income thresholds are improper "[b]right-line aspects of the Rule" does not identify any instance where the totality of the circumstances test has been abandoned. These income thresholds, like the 12/36 standard, are simply hallmarks for when officials must *weigh heavily* certain facts about an alien in *applying* the totality-of-the-circumstances test. This is not improper. *Cf. Harris v. FCC,* 776 F.3d 21, 28–29 (D.C. Cir. 2015) ("An agency does not abuse its discretion by applying a bright-line rule").  Nor is the weighting provided for incomes below or above certain thresholds anything more than "one factor in the totality of the circumstances." *Compare* Mot. at 16, *with* Rule at 41446 (positive factor for high-income aliens is "not a requirement"); *id.* at 41423 (negative income factor "not necessarily determinative . . . in the totality of the circumstances").[14]  The guidance provided by these weightings is entirely consistent with Congress's direction that the Executive Branch "shall, at a minimum, consider the alien's . . . financial status." 8 U.S.C. §1182(a)(4)(B)(i)(IV); *see* Rule at 41309 (the Rule gives "mandatory statutory factors meaning, value, and weight strictly in relationship to . . . whether or not an alien . . . is likely at any time in the future to become a public charge").

### 5.   The Rule Does Not Violate The Rehabilitation Act.

Plaintiffs further argue that the Rule identifies "disability" as a factor relevant to a public charge inadmissibility inquiry, and claim, incorrectly, that it will thus "deny applicants with disabilities meaningful access to admission or adjustment of status in violation of Section 504" of the Rehabilitation Act.  Mot. at 18. That section provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a) (emphasis added); *see also* 6 C.F.R. § 15.30 (DHS implementing regulation). "The causal standard" for such a claim—that a plaintiff "show that [a

---

[14] Plaintiffs are also wrong to suggest that the income thresholds combine with other factors to create a bright line that "render[s] *any* indigent person 'likely to become a public charge.'" Mot. at 17 (emphasis added). Rather, as the Rule explains, evidence that an alien "is fundamentally a young and healthy person [] of a working age, with an employment history and education," and other factors could tip the determination the other way. *Id.* A "single . . . negative factor . . . will never . . . determine the outcome," Rule at 41296, an approach completely consistent with the language Plaintiffs cite. *See* Mot. at 17 ("existence or absence of a particular factor should never be the sole criteria") (quoting *Martinez-Farias v. Holder,* 338 F. App'x 729, 730-31 (9th Cir. 2009)).

disabled person] was denied services 'by reason of' her disability"—is a "strict[]" one, *Martin v. California Dep't of Veterans Affairs*, 560 F.3d 1042, 1049 (9th Cir. 2009), and Plaintiffs cannot satisfy it.

As a threshold matter, the INA explicitly lists "health" as a factor that an officer "shall . . . consider" in making a public charge determination. 8 U.S.C. § 1182(a)(4)(B)(i). "Health" certainly includes an alien's disability, and it is therefore Congress, not the Rule, that requires DHS to take this factor into account. *See, e.g.*, *In Re: Application for Temporary Resident Status*, USCIS AAO, 2009 WL 4983092, at *5 (Sept. 14, 2009) (considered application for disability benefits in public charge inquiry). A specific, later statutory command, such as that contained the INA, supersedes section 504's general proscription to the extent the two are in conflict (which they are not, as explained below). *See, e.g.*, *Knutzen v. Eben Ezer Lutheran Hous. Ctr.*, 815 F.2d 1343, 1353 (10th Cir. 1987) ("[A] general . . . statute, § 504" may not "revoke or repeal . . . a much more specific statute . . . absent express language by Congress[.]" (internal quotation marks omitted)); *Hellon & Associates v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir. 1992) ("in case of an irreconcilable inconsistency between them the later and more specific statute usually controls the earlier and more general one").

In any event, the Rule is fully consistent with section 504 of the Rehabilitation Act. The Rule does not deny any alien admission into the United States, or adjustment of status, "solely by reason of" disability. All covered aliens, disabled or not, are subject to the same inquiry: whether they are likely to use one or more covered federal benefits for the specified period of time. Although disability is one factor (among many) that may be considered, it is not dispositive, and is relevant only to the extent that an alien's particular disability tends to show that he is "more likely than not to become a public charge" at any time. Rule at 41368. Further, any weight assigned to this factor may be counterbalanced by other factors, including "[an] affidavit of support," "employ[ment]," "income, assets, and resources," and "private health insurance." *Id.* It is well established that such a general standard does not violate the Rehabilitation Act simply because certain persons may not meet it, in part, because of a disability. *See Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996) (citing, with approval, a Sixth Circuit case concluding that a generally applicable standard "making 19-year-olds ineligible to compete in high school sports did not violate" the "Rehabilitation Act," even though it

affected "learning disabled 19-year-olds who had been kept back in school").[15]

### 6.   The Rule is Not Arbitrary and Capricious.

Many of Plaintiffs' arguments are raised as claims that the Rule is "arbitrary and capricious" under the APA, but Plaintiffs fail to meet this demanding standard. *See* 5 U.S.C. § 706(2)(A). Arbitrary and capricious review "is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Aguayo v. Jewell*, 827 F.3d 1213, 1226 (9th Cir. 2016) (cleaned up). Plaintiffs' arguments repeatedly suffer from the same flaw: a disregard for the explanations presented in the NPRM and Rule. But the Court may not disregard DHS's "explanations, reasoning, and predictions" simply because Plaintiffs "disagree[] with the policy conclusions that flowed therefrom." *California by and through Becerra v. Azar*, 927 F.3d 1068, 1079 (9th Cir.), *reh'g en banc granted*, 927 F.3d 1045 (9th Cir. 2019). And if review here is warranted at all, *see* Part I.D, *supra*, an especially high degree of deference is required given that admission and exclusion of aliens is historically committed to the political branches. *See Hawaii*, 138 S. Ct. at 2418.

### a.   The Rule Advances The Goals Of Ensuring That Aliens Do Not Rely On Public Resources To Meet Their Needs And Are Self-Sufficient.

The Rule explains that its purpose is to advance the goal set forth by Congress: that aliens within the Nation's borders "not depend on public resources to meet their needs, but rather rely on their own capabilities"—*i.e.*, that they be "self-sufficient." Rule at 41295 (citing 8 U.S.C. § 1601). DHS adduced ample evidence during the rulemaking process that the Rule will advance Congress's goal.

At a general level, DHS quantified in the NPRM the "significant federal expenditure on low-income individuals" associated with "[c]ash aid and non-cash benefits directed toward food, housing and healthcare." NPRM at 51160; *see id.* at Table 10. Recognizing that these benefits are provided to citizens and aliens alike, DHS also examined the substantial participation rate among foreign-born aliens for these programs. *See id.* at 51161 & Table 11. These statistics establish that "non-cash benefits,

---

[15] For the same reason, Plaintiffs have not made out a Rehabilitation Act claim by alleging that an alien's disability may negatively implicate certain other factors, "skew[ing] the public charge analysis" against disabled persons. Mot. at 18. When considered in light of *all* factors, including those unrelated to disability, there is no evidence that disabled persons are likely to be found to be public charges because of their disability. To assume that factors such as education and professional skills disfavor the disabled is to attach the precise "stigma" to disabled persons that Plaintiffs chastise. Mot. at 19.

22

just like cash benefits," provide, on average, thousands of dollars of "assistance to those who are not self-sufficient" and who are aliens, *id.* at 51163, belying Plaintiffs' contention that those "subject to the public charge determination . . . are largely ineligible for the newly included federal benefits" at any future time. Mot. at 20.[16]  As the NPRM explained, millions of aliens receive such benefits: 3.1 million receive Medicaid alone. *Id.* at 51161-62 & Table 12. It is not irrational for the Rule to recognize that this population supports inclusion of such benefits in future public charge decisions.

For similar reasons, the Rule reasonably advances the purpose of "implement[ing] the public charge ground of inadmissibility consistent with . . . [Congress's goal of] minimiz[ing] the incentive of aliens to attempt to immigrate to, or to adjust status in, the United States due to the availability of public benefits." Rule at 41305 (citing 8 U.S.C. § 1601(2)(B)).  Although aliens may face a five-year waiting period prior to eligibility for public benefits, they can be expected to base their present decisions on the availability of those future benefits. *Cf. Lewis v. Thompson*, 252 F.3d 567, 583-84 (2d Cir. 2001) (Congress could reasonably "believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits"). Using the 3%-7% discount rates applied elsewhere in the Rule, an individual could value the first year of a non-cash public benefit at between 65% and 85% of the annual value, or over $5,000 for the first year of federal rental assistance alone. *See* NPRM at 51160, 51270. Taking into account such incentives at the stage of admission thereby relates directly to the incentive of aliens to immigrate based on the availability of public benefits. 8 U.S.C. 1601; *see* Rule at 41309.

In response, Plaintiffs contend that the ways in which the Rule advances Congress's goals are outweighed by "chilling effects," the label Plaintiffs assign to the potential independent choices by aliens "to disenroll from or forgo enrollment in benefits for which they are eligible." Mot. at 9, 20. At the outset, Defendants note that, although it is "difficult to predict the rule's disenrollment impacts," DHS "has attempted to do so in the accompanying Final Regulatory Impact Analysis" of the Rule. Rule at 41312. DHS's conclusions about those impacts are entitled to deference, and Plaintiffs' mere

---

[16] Even on its face, Plaintiffs' argument lacks logic: "qualified aliens" are not "ineligible" for such benefits, only delayed in eligibility for "five years from their date of entry." Mot. at 9, n.7. Congress has imposed the public charge exclusion on aliens likely "at any time" to become public charges, not merely those who might become public charges in the next five years.

*State of Cal., et al. v. DHS, et al.,* Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.

contrary analysis asserting that those impacts are understated is an insufficient basis to find the Rule arbitrary and capricious. In addition, as the Rule explains, the fact that some aliens may place a higher value on an "immigration status they are seeking" than on receipt of a particular public benefit, and thereby make "purposeful and well-informed decisions" to disenroll from the benefit, does not interfere with "the rule's ultimate aim" of ensuring self-sufficiency among aliens seeking admission or a status change. *Id.* at 41312-13. DHS has acted permissibly by adopting a rule that comports with both Congress's decision to provide public-support eligibility for certain aliens *and* Congress's decision to make such aliens ineligible for admission or change in status or extension of stay.[17]

Plaintiffs also object that the Rule extends the definition of "public charge" to enrollees in a number of programs that serve the goal of self-sufficiency, and assert that this renders the Rule "internally inconsistent." Mot. at 21. This argument ignores that Congress's goal of ensuring that aliens do not rely on public resources in the admissibility context is not identical to the goal of self-sufficiency for those enrolled in public benefit programs. For specific purposes of the public charge inadmissibility ground, Congress's intent is "that aliens should be self-sufficient before they seek admission or adjustment of status," not that they should someday attain self-sufficiency by drawing on public resources to improve their financial condition. Rule at 41308; *see* 8 U.S.C. § 1601. Nothing about the existence of such programs, which also help indigent citizens or aliens who are here but do not intend to later adjust status or seek admission, obligates Congress or DHS to admit to the United States other persons who have not achieved self-sufficiency, even if they aspire to do so.

Finally, the fact that the Rule changes course from the Interim Field Guidance does not render the Rule irrational. Nonbinding guidance could not possibly foreclose DHS from adopting a different reasonable interpretation through notice-and-comment rulemaking. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005). Rather, all that DHS was required to do to

---

[17] To the extent that Plaintiffs assert that DHS should base the Rule on the possibility that individuals *exempt* from inadmissibility on public charge grounds may disenroll or forgo enrollment in public benefit programs, the Rule reasonably addressed comments of a similar type, noting that "such unwarranted choices" by individuals exempted from the statute are not a proper basis for making determinations about how to apply the statute to individuals covered by the statute. Rule at 41313. Moreover, the Rule explained that DHS will attempt to help "individuals who are not subject to this Rule" make enrollment decisions by "issu[ing] clear guidance" that such individuals can consult. *Id.*

permissibly change course was to acknowledge that the Rule does change course, provide a reasoned explanation for the change, and explain how it believes the new interpretation is reasonable. *See generally FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009). The Rule did all of these things. *See, e.g.*, Rule at 41308, 41319 (explaining that the prior guidance "failed to offer meaningful guidance for purposes of considering the mandatory factors and was therefore ineffective"). Having addressed these issues, DHS is entitled to full deference to its changed interpretations, consistent with its obligation to "consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863-64 (recognizing agencies receive deference to a "changed . . . interpretation of [a] term").

### b.  The Rule Reasonably Weighs Both Positive And Negative Factors.

Plaintiffs wrongly contend that the "three heavily weighted negative factors" enumerated in the Rule are "unreasonably skewed," asserting that "[any] of the [three] is likely to be determinative in practice." Mot. at 22. The plain text of the Rule requires a consideration of the totality of the circumstances in assessing whether an individual is likely at any time to become a public charge. *See* Part D.4, *supra*. In other words, heavily weighted factors are *not* necessarily dispositive. For example, the Rule is explicit that "depending on the alien's specific circumstances, a heavily weighted negative factor can be outweighed by a heavily weighted positive factor." Rule at 41397. An immigration officer could find that an alien who currently receives a public benefit such as SNAP would, under the totality of the circumstances, be unlikely to become a public charge because that alien has offsetting positive factors, such as an advanced degree, household assets, steady employment, and/or private health insurance.

Plaintiffs' flawed argument that the Rule is arbitrary and capricious because, "in practice," the Rule "strongly favor[s] high-income individuals" through factors likely to "significantly overlap," Mot. at 22, must also be rejected. This is not an objection to the Rule's mechanics, but rather, to the statute itself: it is of course the case that the "financial status" of "high-income individuals" is likely to be substantially better than that of low-income individuals. Many of the specific factors that the statute requires DHS to consider—*e.g.*, education, skills, and assets—correlate with financial status.[18]

---

[18] Contrary to Plaintiffs' unsupported statement that the Rule "offer[s] no explanation" regarding the weighting provided to private health insurance policies, the Rule specifically explains the likelihood

25

*State of Cal., et al. v. DHS, et al.*, Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.

### c. Plaintiffs' Arguments Concerning Affidavits of Support and Bonds Are Based on Their Misreading of the Rule.

Plaintiffs also challenge supposed changes to affidavits of support and bonds, but they misunderstand the Rule. First, Plaintiffs claim that the Rule "no longer treats sponsors' properly completed, non-fraudulent Affidavits of Support [under INA § 213A] as sufficient assurance that . . . applicants will not become overly dependent on public benefits." Mot. at 23. But the plain language of the statute requires that certain mandatory factors be considered and provides only that DHS "may" consider the affidavit of support. 8 U.S.C. § 1182(a)(4)(B)(ii). This demonstrates that Congress did not make or intend for a sufficient/properly-filed affidavit of support to be outcome determinative when it could have done so. DHS explained these conclusions in the Rule. *See* Rule at 41320, 41415-16 (explaining that DHS must, by statute, consider certain specified factors in public charge determination). Further, this is not a departure from the 1999 guidance, which states that "an alien may be found to be inadmissible" on public charge grounds "[n]otwithstanding the filing of a sufficient affidavit of support[.]" *See* 64 Fed. Reg. at 28690 (1999 Field Guidance stating that an affidavit of support is one factor "taken into account under the totality of the circumstances test").

Next, Plaintiffs perceive an alleged inconsistency in the Rule, claiming that "[n]oncitizens are penalized for reaching only 125 percent [Federal Poverty Level ("FPL")], even though a sponsor who can promise to maintain a noncitizen at 125 percent FPL is satisfactory to demonstrate self-sufficiency." Mot. at 23. But Plaintiffs misread the Rule, which does not penalize aliens for incomes at 125% of Federal Poverty Guidelines. On the contrary, "[a]ny household income between 125 percent and 250 percent of the FPG is considered a *positive* factor in the totality of the circumstances." Rule at 41448 (emphasis added); *see also id.* at 41503 (public charge test must consider, *inter alia*, whether the "alien's household's annual gross income is at least 125 percent of the most recent Federal Poverty Guideline"). Accordingly, income in the public charge inadmissibility analysis is treated consistently with income in the affidavit context. *See* Rule at 41415 ("DHS chose the 125 percent of FPG threshold

---

that "costs related to a medical condition" may "interfere with the alien's ability to provide care for himself or herself, to attend school, or to work." Rule at 41299. Also, DHS identified data showing that "[t]he rate of receipt of public benefits among those covered by private health insurance" was 80-90% lower than "those not covered by private health insurance." Rule at 41449. This demonstrates that the weighting given to private health insurance is data-driven, not arbitrary and capricious.

*State of Cal., et al. v. DHS, et al.*, Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.

. . . standard because Congress imposed it as part of the affidavit of support"); *id.* at 41415-16.

Last, Plaintiffs misstate the Rule by claiming that it "disallows public charge bonds in instances where an individual has one heavily weighted negative factor[.]" Mot. at 23. The Rule is explicit that "the presence of heavily weighted negative factors will not automatically preclude USCIS from offering a public charge bond." Rule at 41450. While a bond *generally* will not be permitted in such circumstances, "USCIS could also find that the heavily weighted negative factor(s) are outweighed by certain positive factors." *Id.* Plaintiffs are simply incorrect to assert that DHS failed to respond to comments on this topic. *See id.* at 41451; NPRM at 51221.

### d.   DHS Adequately Justified the Rule.

Plaintiffs also argue that various judgments made by DHS and reflected in the Rule are otherwise unreasonable. But Plaintiffs' mere disagreement with DHS's reasonable policy choices is not sufficient to invalidate the Rule under the APA. All that is required is for DHS to adequately "'consider[] the relevant factors and articulate[] a rational connection between the facts found and the choices made.'" *Ranchers Cattlemen Action v. USDA*, 499 F. 3d 1108, 1115 (9th Cir. 2007).

First, Plaintiffs note that DHS exempted Medicaid benefits received by individuals under the age of 21 but not SNAP benefits. Mot. at 24. DHS, however, cited "strong legal and policy reasons to assume that Congress did not intend DHS to treat receipt of Medicaid by alien children under the age of 21 in the same way as receipt of Medicaid by adult aliens." Rule at 41380. For example, Congress expressly provided that receipt of Medicaid by aliens under the age of 21 would not trigger a reimbursement requirement for the alien's sponsor under an Affidavit of Support, but made no similar provision for SNAP. *Id.* at 41375 n.431, 41380; *see also id.* at 41374 (describing reasons for the Rule's inclusion of SNAP benefits). Moreover, Congress authorized states to expand Medicaid eligibility to aliens under the age of 21 without a waiting period, *id.* at 41380, whereas the INA's waiver of the waiting period for SNAP applies only to "qualified aliens," 8 U.S.C. § 1613(a), (c)(2)(L), who are generally not subject to the public charge test, *see id.* § 1641(b). As to Plaintiffs' argument that DHS's rationales for the Rule do not apply to children because children do not make decisions regarding whether to immigrate or use public benefits, Mot. at 24, DHS addressed that point too, noting that Congress explicitly required DHS to consider age in public charge determinations and that Congress

27

has made children subject to the public charge ground of inadmissibility even while carving out other exceptions. *See* Rule at 41371.

Plaintiffs also insist that the Rule "only specifies consideration of whether an individual has a high school diploma (or its equivalent) or has a . . . degree," whereas the INA "requires consideration of 'education and skills'" generally. Mot. at 24. This argument fails because Plaintiffs again misinterpret the Rule. Regarding an alien's education and skills, the Rule states that "USCIS' consideration includes *but is not limited to*" various factors such as "[w]hether the alien has a high school diploma (or its equivalent) or has a higher education degree[.]" Rule at 41503 (emphasis added). Thus, the Rule expressly allows USCIS to consider other evidence of education and skills beyond those specified.

Plaintiffs also argue that it is unreasonable for the Rule to consider past immigration-related fee waivers for employment authorization document ("EAD") applications. Mot. at 25. But DHS explained this, too. "[R]equesting or receiving a fee waiver for an immigration benefit suggests a weak financial status," because "fee waivers are based on an inability to pay, [and] seeking or obtaining a fee waiver for an immigration benefit suggests an inability to be self-sufficient." Rule at 41424-25; *see also* 8 C.F.R. § 103.7(c) (USCIS may waive fees for EAD applications based on "inability to pay"). DHS also discussed a Senate Appropriations Report that noted that "those unable to pay USCIS fees are less likely to live in the United States independent of government assistance." Rule at 41425. Thus, DHS reasonably substantiated its decision to consider certain fee waivers as part of the public charge analysis, and DHS's reasoning applies equally to fee waivers for EAD applications.

DHS's decision to exclude certain servicemembers and their spouses and children from certain aspects of the Rule also is supported by adequate reasons. Following consultation with the Department of Defense, DHS added the exclusion to avoid "reduc[ing] troop readiness and interfer[ing] significantly with U.S. Armed Forces recruitment efforts." Rule at 41372. The "exclusion is consistent with DHS's longstanding policy of ensuring support for our military personnel who serve and sacrifice for our nation, and their families, as well as supporting military readiness and recruitment." *Id.* Plaintiffs would like to apply the same exclusion to other sectors, namely, agriculture and homecare providers. Mot. at 25-26. But those sectors do not implicate the same national-security concerns about troop readiness and U.S. Armed Forces recruitment. And as DHS explained, "Armed Forces members

28

and their spouses and children are uniquely positioned in this context, and . . . DHS should not extend similar treatment to other categories of applicants based on their employment or public service." Rule at 41372. Given the unique status of the U.S. military, it was entirely reasonable for DHS to limit this exclusion to certain servicemembers and their spouses and children.

### e.   DHS Adequately Considered the Potential Effects of the Rule.

Plaintiffs effectively concede, as they must, that DHS *did* consider the likelihood that the Rule will cause some individuals to disenroll from public benefits or forgo enrollment. Mot. at 26. Indeed, DHS provided a detailed and lengthy response to comments concerning this asserted "chilling effect." *See* Rule at 41310-14, 41463, 41481. Nevertheless, Plaintiffs fault DHS for allegedly underestimating the magnitude of the chilling effect and for not separately quantifying the degree to which certain populations may be subject to a chilling effect. Mot. at 26. But Plaintiffs cite no cases holding that, to comply with the APA, an agency must "quantify" all potential effects of a rule. *Id.* Nor could they. The APA does not require agencies to "obtain[] the unobtainable," *Fox*, 556 U.S. at 519, or "measure the immeasurable," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013), and Plaintiffs fail to identify any methodology DHS could have followed to reliably measure, for example, the number of immigrants not subject to the Rule who will disenroll from public benefits. The answer to that question would depend on facts that were not only unknown, but unknowable, such as how many immigrants will mistakenly believe they are subject to the Rule, how many of those individuals will disenroll, and so on. "As predicting costs and benefits without reliable data is a 'primarily predictive' exercise, the [agency] need[s] only to acknowledge [the] factual uncertainties and identify the considerations it found persuasive in reaching its conclusions." *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 432 (D.D.C. 2014). DHS did so here, explaining why data limitations and other factors made it difficult to predict disenrollment and discussing why the Rule was nevertheless justified. *See* Rule at 41312-13 ("[T]he rule's overriding consideration, *i.e.*, the Government's interest . . . is a sufficient basis to move forward.").   And, contrary to Plaintiffs' claim, Mot. at 26, DHS did consider disenrollment by U.S. citizens and aliens exempt from the Rule.  *Id.* at 41313; *see also* Decl. of Lisa Cisneros, Ex. A, at 83-102, Dkt. No 20-1 (calculating disenrollment impact on households that include at least one alien). It was neither arbitrary nor capricious for DHS to conclude that the Rule's unquantifiable effects were

insufficient to override its policy objectives. *See, e.g., Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (finding agency action not arbitrary-and-capricious notwithstanding "failure to quantify" effects); *Hillsdale Envtl. Loss Prevention v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1176 (10th Cir. 2012) (agency's "decision not to quantify . . . impact, was not arbitrary and capricious").

Plaintiffs also take issue with DHS's estimate that the number of individuals who are likely to disenroll from or forgo enrollment in a public benefit program is equal to 2.5% of the number of members of households that include aliens. Mot. at 9-10. DHS calculated that number to estimate the total transfer payments from the federal government to individuals who may choose to disenroll from or forgo enrollment in a public benefits program, as part of DHS's regulatory impact analysis required by Executive Orders 12866, 13563, and 13771. NPRM at 51227, 51266. Any claim alleging a failure to adequately perform that analysis is precluded because "Executive Orders cannot give rise to a cause of action" under the APA. *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not subject to judicial review.").

But even if DHS's cost-benefit analysis were subject to review, it would withstand scrutiny. The principle that "a court is not to substitute its judgment for that of the agency" is "especially true when the agency is called upon to weigh the costs and benefits of alternative polices." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003). Courts must be deferential when reviewing "an agency's cost/benefit analysis," *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013), and review is limited to deciding whether DHS's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Ctr. For Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985). Plaintiffs fail to identify a sufficient basis to overcome the deference due to DHS's cost-benefit analysis. At bottom, their arguments amount to nothing more than the observation that disenrollment rates above 2.5% occurred two decades ago when Congress, through PRWORA, dramatically limited the eligibility of many aliens for public benefits. Mot. at 10. But DHS acknowledged that higher disenrollment rates were measured following PRWORA and explained why that situation differed from this one. Cisneros Decl., Ex. A, at 91-93.

30

DHS also acknowledged that "it is unclear how many individuals would actually disenroll from or forgo enrollment in public benefits programs due to the final rule," and noted the possibility of alternative scenarios in which the rate could be higher. *Id.* at 92, 100-02. Thus, DHS's decision to promulgate the Rule does not turn on the disenrollment rate being 2.5%. Particularly given DHS's discretion and expertise in this area, its projections were not arbitrary or capricious.

### f.   DHS Adequately Responded to Comments.

Plaintiffs insist that DHS did not adequately respond to certain comments, but fail to show any deficiency in DHS's responses. An agency's obligation to respond to comments on a proposed rulemaking is "not 'particularly demanding.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C. Cir. 2012). "[T]he agency's response to public comments need only 'enable [courts] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'" *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993); *see also Envtl. Def. Fund v. EPA*, 922 F.3d 446, 458 (D.C. Cir. 2019) ("[n]othing in the APA saddles agencies with the crushing task of responding to every single example cited in every single comment").

The comments that Plaintiffs cite raise concerns about the Rule's complexity, Cisneros Decl., Ex. I at 7, administrative burdens on states and localities, *id.*, Ex. AA at 4, Ex. K at 57, and impacts on immunization coverage, *id.*, Ex. B at 2.[19] DHS responded to each of those commented-upon issues. As to complexity, DHS noted that it made changes to reduce the complexity of the applicable standard, Rule at 41364, and that it would issue guidance to alleviate such concerns, *id.* at 41396; *see also id.* at 41465 (DHS updated a form for clarity in response to comments). As for the asserted administrative burdens, DHS extensively discussed impacts on states and localities and therefore considered and responded to those concerns. *Id.* at 41469-71. Finally, DHS responded to comments concerning vaccinations, explaining that outside the Medicaid context, "[v]accinations obtained through public benefits programs are not considered public benefits," and that "local health centers and state health departments provide preventive services that include vaccines that may be offered on a sliding scale fee based on income." *Id.* at 41384-85. Accordingly, "DHS believes that vaccines would

---

[19] Plaintiffs cite various declarations, but those declarations were not submitted as comments to DHS, so they are beside the point. *See* Mot. at 27.

31

still be available for children and adults even if they disenroll from Medicaid." *Id.*; *see also id.* at 41471 (describing changes made to Rule to address concerns about worse healthcare outcomes). DHS's responses easily meet its APA obligations.

### g.   Plaintiffs' Claim Regarding Form I-944 Fails As A Matter Of Law.

Plaintiffs also assert that they are entitled to preliminary relief based on their disagreement with the "estimate of the time and cost burden" for the new Form I-944. There is no likelihood of success on this claim. As an initial matter, Plaintiffs' claim that the time to complete an I-944 "is implausible" does not even appear in the Complaint, which makes no allegations about the burden required for intending immigrants to complete paperwork associated with their applications. A district court may not enter a preliminary injunction "deal[ing] with a matter lying wholly outside the issues in the suit." *De Beers Consol. Mines v. U.S.*, 325 U.S. 212, 220 (1945). Nor can the Court read the passing reference to Defendants' "compl[iance] with Executive Orders 12866 and 13563," Compl. ¶ 334, as somehow encompassing this claim, because those Executive Orders do not create any enforceable rights.  *See supra* Part D.6.e.[20] In any event, DHS considered and responded to comments regarding "the time commitment" required by Form I-944, providing reasonable examples of individuals who may need "more or less time than the reported estimated average time burden." Rule at 41484.

### II.   Plaintiffs Fail to Establish Irreparable Harm.

Plaintiffs identify ephemeral, speculative harms that—if they ever occurred—would be traceable to the independent choices of third parties. But "plaintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction." *All. For The Wild Rockies* ["AFWR"] *v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).[21]  To

---

[20] Nor would such a claim be cognizable under either the Paperwork Reduction Act ("PRA") or the Regulatory Flexibility Act ("RFA"), the requirements of which are "purely procedural" and do not create a "private right of action." *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999) ("PRA does not create a private right of action"); *Nat'l Restaurant Ass'n v. Solis*, 870 F. Supp. 2d 42, 60 (D.D.C. 2012) (rejecting claim under RFA).

[21] Contrary to Plaintiffs' implication, Mot. at 12, the Ninth Circuit's "sliding-scale" approach to the preliminary injunction factors permits a reduced showing of likelihood of success on the merits only, and only when the balance of hardships tips sharply in Plaintiffs' favor. *See AFWR*, 632 F.3d at 1135. Plaintiffs must make full showings of a likelihood of irreparable injury and that the injunction is in the public interest in order to prevail. *Id.; see also Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 615 (9th Cir. 2018). The sliding-scale approach is also erroneous, and the government preserves that issue for

*State of Cal., et al. v. DHS, et al.*, Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.

establish a likelihood of irreparable harm, plaintiffs "must do more than merely allege imminent harm sufficient to establish standing; [they] must *demonstrate* immediate threatened injury." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (citation omitted). Plaintiffs have failed to carry this burden because their alleged injuries are speculative and they have provided no evidence that such harms will occur immediately. Indeed, as explained above, Plaintiffs have not even established standing. *See supra* I.A.

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). As discussed in Part I, these alleged harms are speculative, founded on an attenuated chain of inferences, and contingent on the aggregate decisions of independent third parties to take action not required by the Rule. Even assuming Plaintiffs are correct that some individuals will forgo enrollment or disenroll from federal benefits as a result of the Rule, Plaintiffs must still demonstrate a likelihood that such disenrollment will occur at a sufficiently high rate and magnitude and be associated with a concomitant take-up of state benefits to cause harm to state-level, as opposed to individual, interests. Given the size of the States' programs, the number of individuals involved, and the many other reasons that individuals (aliens or citizens) might choose to forgo or disenroll from federal benefits, Plaintiffs' assertions of significant harmful effects are unsupported.

Beyond failing to demonstrate the accuracy of this underlying premise, Plaintiffs have provided no evidence of, and in fact have not even speculated about, the number of disenrollments necessary to produce the effects they allege, nor have they provided any projections for the number of people they expect to choose disenrollment or non-enrollment as a direct effect of the Rule. This falls far short of the showing necessary to obtain a preliminary injunction. *See Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility of some remote future injury.'" (quoting *Winter*, 555 U.S. at 22)). Indeed, Plaintiffs' own motion and supporting declarations belie their assertion that they have alleged sufficient harms, as these filings explicitly use the language of possibility rather than probability. *See, e.g.*, Mot. at 30 ("If individuals disenroll from or forgo

further review. *See Davis v. PBGC*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

*State of Cal., et al. v. DHS, et al.*, Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.

enrollment in Medicaid . . . medical costs *may* be borne by the state due to a loss of federal" aid (emphasis added)); Buhrig II (Medicaid) Decl. ¶ 40 ("This *could* result in beneficiaries deciding to drop out of the program periodically in order to limit their use of Medicaid") (emphasis added).

Plaintiffs have also failed to demonstrate that the alleged harms will be "sufficiently immediate to warrant" preliminary relief because they will occur before "a decision on the merits can be rendered." *Boardman*, 822 F.3d at 1023. Plaintiffs have alleged no facts in support of their conclusory statements that the economic or public health harms they claim would likely develop so quickly. Any such harms, if they ever emerged, would be the cumulative effect of independent decisions of thousands of third-party aliens over the course of years. Plaintiffs offer no prediction about when these harms might arise and why the Rule's effective date must be enjoined when record-review briefing could occur in a matter of months. Indeed, Plaintiffs' own motion and declarations acknowledge the logical conclusion that the speculative and attenuated alleged public health impacts of the Rule, such as worse health outcomes caused by avoidance of preventative care, would develop over time. *See, e.g.,* Mot. at 31 ("[R]eductions in utilization of publicly-funded healthcare services . . . will have a direct long-term negative effect on Plaintiffs' ability to protect public health."); *id.* at 33 ("As with healthcare, the interests of the States are *ultimately* harmed by poorer nutrition.") (emphasis added); Ferrer Decl. ¶ 14 (similar). The absence of evidence of *imminent* alleged harms to public health or state economies is still another factor showing the States are not entitled to preliminary relief.[22]

## III.   The Remaining Equitable Factors Require Denial of Plaintiffs' Motion.

Even if Plaintiffs had made a sufficient showing on either likelihood of success on the merits or likelihood of irreparable injury, and they have not, they would still be obligated to make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors injunction. *AFWR*, 632 F.3d at 1135. These two factors merge when the government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), but Plaintiffs have not made a sufficient showing to meet the standard for either one—particularly under Plaintiffs' formulation of

---

[22] The only arguably immediate harms properly alleged by Plaintiffs, increased administrative burdens caused by Plaintiffs' alleged intent to provide explanations of the regulation to state residents, are self-inflicted. *See* Mot. at 30. But "[i]f the harm complained of is self-inflicted, it does not qualify as irreparable." *Ventura Christian H.S. v. San Buenaventura*, 233 F. Supp. 2d 1241, 1253 (C.D. Cal. 2002).

34

the test, under which they must show that the balance of equities tips *sharply* in their favor. *AFWR*, 632 F.3d at 1132. Here, Plaintiffs have not made any arguments about the balance of interests at all, but have merely stated that they allege a type of harm that could permit preliminary relief. Mot. at 34. By contrast, there can be no doubt that the Defendants have a substantial interest in administering the national immigration system, a *solely federal* prerogative, according to the expert guidance of the responsible agencies, and that they will be harmed by an injunction preventing them from applying their expertise in this case. Conversely, Plaintiffs' purported harms are wholly speculative, and there is no support for the assertions that those harms will be either immediate or irreparable. Plaintiffs' alleged harms thus have no weight in the balance of hardships compared to DHS's interest in avoiding roadblocks to administering the national immigration system, *see Baldrige*, 844 F.2d at 674, and cannot demonstrate that the balance of hardships tips sharply in their favor. *See Winter*, 555 U.S. at 22.

## IV.   The Court Should Not Grant a Nationwide Injunction.

Were the Court to order a preliminary injunction here, it should be limited to redressing only any established injuries to Plaintiff States.  Under Article III, a plaintiff must "demonstrate standing . . . for each form of relief that is sought."  *Chester*, 137 S. Ct. at 1650; *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Equitable principles likewise require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Accordingly, the Ninth Circuit has repeatedly vacated or stayed the nationwide scope of injunctions, including in a challenge to a federal immigration rule. *See, e.g.*, *East Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2019 WL 3850928, at *2 (9th Cir. Aug. 16, 2019) ("Under our case law, however, all injunctions—even ones involving national policies—must be 'narrowly tailored to remedy the specific harm shown.'"); *see also California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (collecting cases). Here, Plaintiffs have not established that nationwide relief is necessary to remedy their alleged harms.  Although they refer to the possibility of confusion among immigrants who have moved between jurisdictions and households that span state lines, Mot. at 35, they fail to show how that confusion would harm *Plaintiffs*, as opposed to non-parties.

Dated: September 13, 2019                    Respectfully submitted,


                                             JOSEPH H. HUNT
                                             Assistant Attorney General


                                             ALEXANDER K. HAAS, SBN 220932
                                             Branch Director

                                             */s/ Joshua Kolsky*
                                             KERI L. BERMAN
                                             KUNTAL V. CHOLERA
                                             JOSHUA M. KOLSKY, DC Bar 993430
                                             ERIC J. SOSKIN
                                             Trial Attorneys
                                             U.S. Department of Justice
                                             Civil Division, Federal Programs Branch
                                             P.O. Box 883
                                             Washington, D.C. 20044
                                             joshua.kolsky@usdoj.gov

                                             *Attorneys for Defendants*

*State of Cal., et al. v. DHS, et al.*, Case No. 19-cv-4975-PJH
Opp'n to Mot. for Prelim. Inj.