1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  CHEROKEE DM MELTON
   Supervising Deputy Attorney General
4  JENNIFER C. BONILLA
   LISA CISNEROS
5  JULIA HARUMI MASS
   ANITA GARCIA VELASCO
6  BRENDA AYON VERDUZCO
   ANNA RICH, State Bar No. 230195
7  Deputy Attorneys General
     1515 Clay Street, 20th Floor
8    P.O. Box 70550
     Oakland, CA  94612-0550
9    Telephone: 510-879-0296
     Fax: 510-622-2270
10   E-mail:  Anna.Rich@doj.ca.gov
   *Attorneys for Plaintiff State of California, by and*
11 *through Attorney General Xavier Becerra*

12                IN THE UNITED STATES DISTRICT COURT

13              FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16 | **STATE OF CALIFORNIA, DISTRICT OF COLUMBIA, STATE OF MAINE, COMMONWEALTH OF PENNSYLVANIA** and **STATE OF OREGON,** | Case No. 4:19-cv-04975-PJH |
|---|---|

17                                                    **AMENDED DECLARATION OF
18                                                    JENNIFER VAN HOOK IN SUPPORT
                                                      OF PLAINTIFFS' MOTION FOR A
                                                      PRELIMINARY INJUNCTION**
19                                  Plaintiffs,

20       v.

21 **U.S. DEPARTMENT OF HOMELAND
22 SECURITY; KEVIN MCALEENAN,** in his
   official capacity as Acting Secretary of
23 Homeland Security; **U.S. CITIZENSHIP
   AND IMMIGRATION SERVICES;** and
24 **KENNETH T. CUCCINELLI**, in his official
   capacity as Acting Director of U.S. Citizenship
25 and Immigration Services**,**

26                                  Defendants.

27

28

_____
AMEND. DECL. OF JENNIFER VAN HOOK IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 4:19-cv-04975-PJH

I, Jennifer L. Van Hook, declare as follows:

1.      I am Roy C. Buck Professor of Sociology and Demography at the Pennsylvania State University.  I served as director of the Population Research Institute at Penn State from 2011 through 2016 and co-editor of *Demography,* the official journal of the Population Association of America, from 2016-2019.  Currently, I am the director of graduate studies in Sociology at Penn State.  I am also a non-resident fellow at the Migration Policy Institute.

2.      The facts stated herein are of my own personal knowledge, and I could and would competently testify to them.

## EXPERT BACKGROUND

3.      I am trained as a sociologist and demographer.  I obtained a PhD in Sociology in 1996 from the University of Texas at Austin.  I have an M.S. in Sociology from the University of Wisconsin at Madison and B.A. from Carleton College.  After obtaining my PhD, I worked at the Urban Institute on projects related to education and program participation among immigrants.  In 1999, I joined the faculty at Bowling Green State University, and then moved to Penn State University in 2007.

4.      I have over 20 years of research experience analyzing large demographic data sources on topics related to immigration.  My publications have appeared in major sociology and demography journals, including *Demography*, *Journal of Health* and *Social Behavior*, *Social Science and Medicine*, *Sociology of Education*, *Social Forces*, and *American Sociological Review*, and I have received external funding for my work from the National Institutes of Health, the National Science Foundation, the Foundation for Child Development, the Russell Sage Foundation, and the U.S. Census Bureau.  In recognition of my contributions to research, I was awarded the Clifford C. Clogg Award for Mid-Career Achievement in 2016 by the Population Association of America, and I was elected to the Sociological Research Association in 2019.

5.      My work uses demographic methods to estimate the size, characteristics, and dynamics of the foreign-born population.  Since the mid-1990s, my research has focused on the socioeconomic incorporation of immigrants, particularly on public assistance use, poverty, food insecurity, school segregation, and family-level strategies for managing these challenges.  Across

1

multiple journal articles and book chapters, my colleagues and I documented the patterns and trends in public benefit use among immigrant groups in the United States.  One study found that Mexican immigrant women who receive welfare tend to have shorter welfare spells and are more likely to exit welfare for work than their U.S.-born counterparts (Van Hook and Bean 2009).  This study was published in *American Sociology Review*, the flagship journal of the American Sociological Association.  I have attached a true and complete list of all of my publications over the past ten years as Exhibit B to this Declaration (those referenced here are bolded entries in my publication list).

6.      My colleagues and I have also evaluated and improved estimates of the unauthorized foreign-born population.  This line of research resulted in several high-profile publications, including new estimates of the size and heterogeneity of the unauthorized Mexican-born population (Bean et al. 2001); the development of a new method and estimates of foreign-born emigration (Van Hook et al. 2006; Van Hook & Zhang 2011) and coverage error (Van Hook et al. 2014); new assessments of the quality of self-reported data on citizenship and legal status (Van Hook and Bachmeier 2013; Bachmeier, Van Hook and Bean 2014); and monte carlo simulations that tested a variety of legal status imputation approaches (Van Hook et al. 2015).  The work on legal status led to important innovations that have enabled researchers at the Migration Policy Institute and elsewhere to produce estimates of the characteristics and geographic distribution of the unauthorized population in greater detail than possible with earlier methods.  Attached is a true and correct copy of my curriculum vitae as Exhibit C to this Declaration, which includes a complete list of my professional publications.

7.      I served as a member of the Census Advisory Committee of Professional Organizations, PAA, from 2008 to 2011.  I also served as an expert for the 2010 Census Demographic Analysis Program (Net International Migration Team) and am currently serving on the 2020 Census Demographic Analysis Program (Net International Migration Team).  In such capacities, I advise the Census Bureau on various issues related to the measurement of population trends and immigrant characteristics.

2

8.      I have also served as an expert witness in *State of New York v. United States Department of Commerce* at the Federal District Court for the Southern District of New York, November 5, 2018.  I provided a written report and live testimony regarding the impact the addition of a question on citizenship will have on the accuracy of the 2020 U.S. Census.

9.      I was asked by Counsel to bring my scientific expertise and experience to bear on the question of the disparate impacts of the Public Charge Rule issued by the Department of Homeland Security on August 14, 2019 (the "Public Charge Rule" or "Rule").  84 Fed. Reg. 41,292.  Based on my experience, training, knowledge, and education, I offer expert opinions on the disparate impact of the Public Charge Rule.  I hold my opinions in this case to a strong degree of professional certainty.

## SUMMARY OF OPINIONS

10.     My analyses of the disparate impact of the public charge Rule focuses primarily on the aspects of the Rule related to the Totality of Circumstances (TOC) test, omitting any public benefit use as a factor.  I use recently-adjusted Lawful permanent residents (LPRs) and legal nonimmigrants (LNI) as a proxy for assessing what their risk level would be were they to adjust under the new public charge Rule.  My analyses point to a number of key findings regarding these noncitizen groups:

## THE UNITED STATES

- Latinos are more likely to be at risk of being deemed inadmissible by the TOC test than Asians and Whites.  Blacks are also more likely to be at risk but to a lesser degree than Latinos.

- Mexicans/Central Americans and, to a lesser degree, those from the Caribbean are much more likely to be at high risk of being deemed inadmissible by the TOC test than those of European origin.  Other groups (South Americans, Middle Easterners/Central Asians, sub-Saharan Africans, and South/East Asians) are also at significantly higher risk than those of European origin, but lower risk than Mexicans/Central Americans and those from the Caribbean.

## STATE OF CALIFORNIA

- Latinos are more likely to be at risk of being deemed inadmissible by the TOC test than Whites.  Blacks and Asians also are more likely to be at risk than Whites, but to a lesser degree than Latinos.

- Mexicans/Central Americans are much more likely to be at risk of being deemed inadmissible by the TOC test than those of European origin. Other groups (South Americans, Middle Easterners/Central Asians, sub-Saharan Africans, and South/East Asians) are also significantly more likely to be at risk than those of European origin, but less likely than Mexicans/Central Americans.

- Members of vulnerable groups (namely the working poor, the disabled, those with limited English proficiency, those living in large households, and the elderly) would face very high risks of being deemed inadmissible by the TOC test. By definition, nearly all would be at least some risk and two out of five or more may be at high risk because they often have multiple negative factors and few positive factors. The DACA-eligible population is also more likely to be at risk of being deemed inadmissible than the average applicant, but to lesser degree than the groups listed above.

11.  I conducted several sensitivity analyses and found that my findings were robust to alternative measures and specifications. First, I found that the findings about the disparate impacts of the Rule were consistent regardless of whether or not I included public benefit use as a negative factor in the TOC test. This suggests that even if potential applicants use public benefits prior to admission (which is unlikely due to non-LPR's ineligibility for most federally funded public benefits), my conclusions are unlikely to be different.

12.  Second, I found that the conclusions regarding the disparate impacts of the Rule are consistent across measures of the risk of inadmissibility. The share of potential applicants defined to be at "high" risk does vary across measures due to the ambiguousness of the Rule regarding the precise number and combination of factors required for a public charge designation. It is precisely because of this ambiguity that I do not attempt to predict the precise share of individuals who would be deemed inadmissible. Instead, I confine my opinion to comparisons of the relative risks of inadmissibility designations between groups, and my conclusions about relative risks are consistent regardless of how I measured risk.

13.  Third, I found that the conclusions are robust to the inclusion of other foreign-born groups such as new arrivals LPRs and unauthorized immigrants, in the analysis. While I found that the share with high, medium, and low risk of inadmissibility differs somewhat depending on which groups are in the analysis, the key findings reported here concerning Latino-White disparities in risk of inadmissibility are consistent regardless of whether I included or excluded

4

the other foreign-born groups in the analysis.  In fact, the Latino-White disparities reported here are conservative relative to the disparities that would be observed had I included the other foreign-born groups in the analysis.

14.  Overall, I have a high degree of confidence in the conclusions that Latinos, Mexicans/Central Americans, and to a lesser degree other non-White and non-European origin groups, are more likely to experience risk of being deemed inadmissible by the TOC test than are Whites and applicants of European origin.  This finding holds for the entire United States and for California.  Vulnerable groups in California—the working poor, the disabled, those with limited English proficiency, those living in large families, the elderly—also face an elevated risk of inadmissibility determinations (I did not provide estimates for these groups for the entire United States).

## OVERVIEW OF ANALYSIS

15.    Under the Immigration and Nationality Act (INA) Section 212(a)(4), inadmissibility based on public charge grounds is currently determined by the statute's "totality of the circumstances" test (TOC), which includes, at minimum, consideration of the following factors: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills.  8 U.S.C. § 1182(a)(4)(B).  The public charge inadmissibility grounds applies when noncitizens are applying for admission to the United States or to adjust to a LPR status.  In addition, DHS currently considers public benefits in public charge determinations that include cash benefits for income maintenance or institutionalization for long-term care, such as General Assistance, Temporary Assistance for Needy Families (TANF), and Social Security Income (SSI).[1]

16.    On October 10, 2018, the U.S. Department of Homeland Security (DHS) issued a Notice of Proposed Rulemaking that proposed to expand the definition of public charge.[2]

17.    On August 14, 2019, the Department for Homeland Security issued the final Rule.[3]

---

[1] Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999).
[2] 83 Fed. Reg. 51,114.
[3] 84 Fed. Reg. 41,292.

5

I.    **THE RULE'S ENUMERATED PUBLIC BENEFITS AND FACTORS**

18.    The Rule, among other things, establishes a list of new enumerated public benefit programs (in addition to the previously considered cash benefits) and a set of positive and negative factors that are considered when determining a noncitizen's inadmissibility on public charge grounds.  The Rule is forward-looking and seeks to determine, through the TOC test, not only whether an applicant used an expanded set of public benefits, but also whether they are more likely than not to use public benefits in the future.

A.    **Federally-funded Programs**

19.    New federally-funded programs include: (1) Medicaid, with certain exceptions; (2) Supplemental Nutrition Assistance Program (SNAP); (3) Section 8 housing; (4) Section 8 Housing Assistance under the Housing Choice Voucher Program; (5) Section 8 Project-Based Rental Assistance; and (6) Federal Public Housing.

B.    **Heavily-weighted negative factors**

(1) Economic Inactivity:  The noncitizen is "not a full-time student and is authorized to work, but is unable to demonstrate current employment, recent employment history, or a reasonable prospect of future employment;"[4]

(2) Public Benefit Use:  The noncitizen has "received or has been certified or approved to receive one or more public benefits, as defined in § 212.21(b) [including Medicaid, Supplemental Nutrition Assistance Program (SNAP), Section 8 housing, Section 8 Project-Based rental assistance, Federal public housing, SSI, and TANF or other state income-support means-tested programs] for more than 12 months in the aggregate within any 36 month period prior to the…application;"[5]

(3) Health Condition:  The noncitizen "has been diagnosed with a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide for himself or herself, attend school, or work; and…is uninsured and has neither the prospect of obtaining private health insurance, or the financial resources to pay for reasonably foreseeable medical costs;"[6] and

(4) Previous Public Charge Finding:  The noncitizen "was previously found inadmissible or deportable on public charge grounds."[7]

---

[4] 8 C.F.R. §212.22(c)(1)(i).
[5] 8 C.F.R. §212.22(c)(1)(ii).
[6] 8 C.F.R. §212.22(c)(1)(iii).
[7] 8 C.F.R. §212.22(c)(1)(iv).

6

**C.    Heavily-weighted positive factors**

(1) Household Income:  The noncitizen has a "household income, assets, or resources, and support…of at least 250 percent of the Federal Poverty Guidelines [(FPG)];"[8]

(2) Employment Income:  The noncitizen is authorized to work and is currently employed in a legal industry with an annual income…250 percent of the Federal Poverty Guidelines [(FPG)] for the [applicant's] household size;";[9] and

(3) Private Insurance:  The noncitizen "has private health insurance…private health must be appropriate for the expected period of admission, and does not include health insurance for which the [applicant] receives subsidies in the form of premium tax credits under the [ACA]."Coverage by private health insurance, not purchased with ACA subsidies like premium tax credits.[10]

**D.    Additional Factors & Considerations**

20.    Additionally, pursuant to the statute, age, health, family status, assets, resources, and financial status, and education and skills must also be considered when determining whether an applicant is "more likely than not" to become a public charge in the future.[11]  The weight given to these factors when compared to the new list of heavily weighted negative/positive factors is unclear.

21.    The Rule is ambiguous about the precise number or combination of positive and negative factors that will lead to an applicant being deemed inadmissible, or the degree to which heavily weighted factors are likely to override several other negative or positive factors.  It states: "The presence of a single positive or negative factor, or heavily weighted negative or positive factor, will never, on its own, create a presumption that an applicant is inadmissible as likely to become a public charge or determine the outcome of the public charge inadmissibility determination.  Rather, a public charge inadmissibility determination must be based on the totality of the circumstances presented in an applicant's case."  84 Fed. Reg. 41,295.

**E.    Factors Exempted from Consideration Under Rule[12]**

(1) Public benefits received by family members

---

[8] 8 C.F.R. §212.22(c)(2)(i).
[9] 8 C.F.R. §212.22(c)(2)(ii).
[10] 8 C.F.R. §212.22(c)(2)(iii).
[11] 8 C.F.R. §212.22(b).
[12] The final Rule exempts from consideration the following public benefit programs and

7

(2) Medicaid use by Children under 21 or Pregnant women, including 60 days after[13]

(3) Children's Health Insurance Program (CHIP)

(4) Women, Infants, and Children (WIC) Program

(5) Medicare Part D Low Income Subsidy

(6) ACA Marketplace coverage subsidies[14]

22.     Finally, pursuant to §§207(c)(3) and 209(c) of the Act, 8 U.S.C. §§1157(c)(3), 1159(c), certain categories of noncitizens are exempt from the public charge test, such as refugees and asylees.  The complete list of noncitizens who are not affected by the public charge test is included and attached to this Declaration as Exhibit D.

## II.   STRUCTURE OF ANALYSIS

23.     I was asked by Counsel to bring my scientific expertise and experience to bear on the question of the disparate impacts of the new Rule, particularly its impact on the share of applicants for LPR status who would be at risk of being denied admission (i.e. adjustment) due to the Rule's expanded definition of the meaning of public charge, by race/ethnicity and nationality, for the entire United States and separately for the State of California.  I was also asked to assess the impact on certain vulnerable groups in California:  the elderly, working poor, disabled, limited English proficient, those with large household size, and the DACA-eligible population.

## III.   METHODOLOGY

24.     To assess the likely impact of the Rule on the number of immigrants granted LPR status, I followed the approach taken by Capps and his colleagues at the *Migration Policy Institute* (2018) (hereafter the "Capps study").[15]  They analyzed recently-arrived LPRs in the

---

receipt thereof. Some of these benefits were to be considered in the Department's proposed rulemaking issued on October 10, 2018.  In the final Rule, the Department determined that these benefits would not in fact be considered.

[13] 8 C.F.R. §212.21(b)(5)(iv).  Additionally, Emergency Medicaid, Medicaid services provided under the Individuals with Disabilities Education Act (IDEA) and school-based services are also exempt.

[14] With respect to purchase of private insurance as a heavily weighted positive factor, the Rule requires this not be purchased with any ACA premium tax credits.  *See* 84 Fed. Reg. 41,506; 8 C.F.R. §213.1(c)(2).

[15] Capps, Randy, Mark Greenberg, Michael Fix, and Jie Zong.  2018. "Gauging the

8

American Community Survey (ACS) to answer this question.  When they conducted their study, the final Rule had not yet been made public, so they evaluated the likely impacts of the draft of the proposed public charge rule that was leaked in January and March 2018 by *Vox*.[16]  They found that the leaked public charge rule could dramatically change the national origin make-up of immigrants who are granted LPR status.  This would happen because the application of negative and positive factors according to the leaked rule could lead to Latinos being deemed inadmissible more often than other groups.

### A.   Test Group: Potential Applicants

25.   Counsel asked me to analyze the share of LPR applicants who may be deemed inadmissible due to the application of the Rule.  To do this, I examined the characteristics of those who adjusted as LPRs ("adjustees") over the last five years.  I also included legal nonimmigrants (LNI) in my analysis, which includes temporary visas holders, such as student or special skilled worker visas.  Under the new Rule, LNIs must demonstrate a new condition—that they have not accepted public benefits since their initial admission into the country—when they are seeking to extend their visa status or change their visa category.  Under the old rule, when extending or changing their visas, LNI members were not subject to any public charge determination or condition.  I estimated the percentage of these noncitizens who would be vulnerable to being deemed inadmissible if their case were evaluated under the expanded criteria of the Public Charge Rule, specifically focusing on the TOC test and its several factors, regardless of any public benefits use.  This percentage represents the additional impact of the Public Charge Rule above and beyond any pre-existing admission criteria before 2019.

---

Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration."  Migration Policy Institute: Washington, DC.  https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration.

[16] https://docs.google.com/viewerng/viewer?url=https://cdn.vox-cdn.com/uploads/chorus_asset/file/10188201/DRAFT_NPRM_public_charge.0.pdf and https://apps.washingtonpost.com/g/documents/world/read-the-trump-administrations-draft-proposal-penalizing-immigrants-who-accept-almost-any-public-benefit/2841/

9

### B.    American Community Survey Dataset

26.    I rely primarily on data obtained from the 2013-2017 years of the ACS[17].  The ACS is a very large survey that is continuously conducted by the U.S. Census Bureau across all communities in the United States.  An important strength of the ACS is that it has a very large sample size and therefore supports analyses of recently-adjusted LPRs for the nation as well as for California for small-sized national origin groups. The Capps study also relied on the ACS for this reason.

27.    I limit my analysis to adults age 18 years and older, who compose 90 percent of the sample of adjustees and LNIs[18].  I also limited my analysis to those adjustees who adjusted status in the last five years and had lived in the country no more than ten years, or in the case of LNIs, arrived in the country in the previous five years.  In addition, I exclude from my analysis foreign-born persons who are unlikely to be LPR applicants (i.e., unauthorized immigrants, although there may exist pathways to adjustment for this group under family-based petitions), and those who are exempt from the Public Charge Rule (refugees, asylees, parolees, those admitted under a Special Immigrant Visa, Cuban and Haitian entrants and asylum seekers, TPS, NACARA, American Indians born in Canada, and qualified aliens who had worked in the U.S. for 40 or more quarters).  I was unable to remove other exempt categories (e.g., VAWA, Ameriasians, Special Immigrant Juveniles) because the ACS lacks the information necessary to identify them.  I use the same methodology and computer algorithms as the Migration Policy Institute developed and uses for identifying these groups.[19]  These methods are well documented

---

[17] I downloaded the ACS data from the IPUMS-USA archive (Steven Ruggles, Sarah Flood, Ronald Goeken, Josiah Grover, Erin Meyer, Jose Pacas and Matthew Sobek. IPUMS USA: Version 9.0 [dataset]. Minneapolis, MN: IPUMS, 2019. https://doi.org/10.18128/D010.V9.0).

[18] Sensitivity analyses show no substantive differences in the results for adults versus both children and adults (see Figure 11)

[19] Many of the exempt categories are dropped from my analysis by virtue of the fact that I include only recently-arrived immigrants in my analysis; by definition, this means that most TPS, NACARA, Ameriasians, and qualified aliens are excluded from my sample.  Refugees and asylees are identified as individuals who were born in countries and arrived in years during which over 40% of the immigrants from those country-year combinations were admitted as refugees or over 20% are admitted as asylees, special immigrant visa holders, and Cuban and Haitian entrants (prior to 2017).  Non-immigrants are identified as noncitizens who arrived in the last six years

and validated.  I assessed how sensitive the results are to the decision to exclude these groups in supplementary analyses by comparing the results with results that do not exclude the likely unauthorized and exempted groups from the sample.  These analyses show that analyses that exclude these individuals produces conservative estimates of Latino-White disparate impacts of the Rule.

28.     After excluding the aforementioned groups, the sample includes a large number of LPRs who adjusted status in the last five years, or in the case of LNI adults, arrived in the United States in the past five years:  106,572 in the entire United States and 26,815 in California.  For brevity, I refer to this group as "potential applicants" as they constitute the pool of people who are likely to have recently adjusted status or who could seek to adjust their status in the near future (such as LNIs).  The large sample sizes make it possible to examine the impact of the Rule with precision by race/ethnicity and national origin for the nation as a whole and for California separately.

**C.     Public Charge Factors Identified**

29.     I created measures that indicate whether potential applicants would be at risk of being classified as having negative and positive factors according to the 2019 Public Charge Rule if they were to apply for LPR status.

---

whose occupations and family/household characteristics are congruent with the eligibility criteria for specific nonimmigrant visa categories, such as foreign-student, diplomat, au pair, and high-tech worker.  For example, foreign students must be enrolled in post-secondary school, not working, not on public assistance, and if married, their spouse must not be employed.  Adjustees, new arrivals, and other (residual) foreign-born are identified using a unique imputation methodology as developed and validated by myself and James D. Bachmeier and used by the Migration Policy Institute for their estimates (Van Hook et al. 2015; Capps, Bachmeier, and Van Hook 2018).  This methodology assigns noncitizens in the ACS an immigration status (adjustee, new arrival, other) by linking the ACS data to the Survey of Income and Program Participation, which includes a question on immigrants' legal status, using multiple imputation methods.  For a more detailed description of this methodology, see Batalova, Jeanne, Sarah Hooker, and Randy Capps.  2014.  "DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action." Migration Policy Institute:  Washington, DC, available online at https://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

30.     Using the ACS data, I am able to measure the following factors.[20]  It is important to note that ACS survey data is limited by how the questions have been posed or categorized.  I note these parameters below.

### 1.     Heavily-weighted negative factors

(1) The ACS included measures of means-tested public assistance receipt in the past year (TANF or other means-tested income assistance,[21] SSI, and current receipt of Medicaid, or other means-tested health benefits[22]).  Women who gave birth in the past year are not counted as having a negative factor if they receive Medicaid;[23] I did not include food assistance (e.g, SNAP) because the ACS measures food assistance at the household level rather than individual level[24] and the Public Charge Rule specifies that individual receipt—not receipt of benefits by family members—is to be considered. *Because most noncitizen applicants are ineligible for all of the federally funded public benefits programs listed in the Rule, and the limitations of the ACS measures of public assistance that I describe further below, I exclude public benefit use from my main assessment of risk but I do consider SSI,*

---

[20] I exclude the heavily weighted negative factor of having been previously found to be inadmissible or deportable on public charge grounds, as these individuals are not identified in the data sample.

[21]Individuals were asked whether they received "Any public assistance or welfare payments from the state or local welfare office."

[22]The ACS questionnaire asks respondents, whether they received "Medicaid, Medical Assistance, or any kind of government- assistance plan for those with low incomes or a disability."  The ACS data does not provide a breakdown of federally funded Medicaid coverage alone, only whether respondents answered yes or no to that question (subpart d.).  NOTE:  The public charge Rule does not consider state-funded Medicaid receipt or emergency Medicaid as a negative factor, only federally-funded Medicaid.  In addition, Medicaid programs vary across states, and individuals may not be aware of what type of coverage program they are enrolled in— whether it is a state-only or federally-funded program—when responding to this question.  For example, in California, all Medicaid is known as "Medi-Cal," both federally funded Medicaid and state-funded Medicaid.  State-funded Medicaid is made available for undocumented noncitizens under Medi-Cal.

[23] ACS available data does not capture women's pregnancy term or length of coverage during pregnancy.  Data indicate whether a woman gave birth in past year and the age of the child only in years, not months.

[24] The ACS questionnaire asks: "did you or any member of this household receive benefits from the Food Stamp Program or SNAP"?  In contrast, the TANF, SSI, and Medicaid measures are more clearly ascribed to the individual rather than to the individual's family, asking:  When reporting SSI and TANF income, individuals are instructed to report only the share of income that they personally received.  With regard to Medicaid, ACS respondents are asked "is *this person* CURRENTLY covered by…Medicaid, Medical Assistance, or any kind of government-assistance plan for those with low incomes or a disability" (italics added).

12

*TANF, and Medicaid benefit use in my sensitivity analyses below. The Capps study omitted public benefit use in their analysis for the same reason.*

(2) Health condition (having at least one chronic condition or functional limitation[25] and not having private health insurance or an income that is 250% of FPG or greater, not counting public assistance income); and

(3) Economic inactivity (not attending school and not employed or in the armed forces among adults age 16+, excluding persons age 18+ who are the parent of a pre-school child or who live with a parent with one or more functional limitations (primary care givers under the Rule)).

**2.    Other negative factors:**

(1) Low income (<125% of FPG; <100% of FPG for active armed forces personnel and their spouse and children; this measure excludes public assistance income). The Rule indicates that assets for low income applicants would be considered, so I excluded low-income immigrants with assets that could possibly be liquidated in times of need, namely those who own a home free and clear and those who reported more than $2,500 income from investments (at a 4% interest rate, this implies a principle greater than $60,000, which is more than 250% of the FPG for a family of four);

(2) Low skills (having less than a high school degree);

(3) Low English proficiency (speaking English "not well" or "not at all")[26]; the Rule is unclear about the definition of low English proficiency; I used the definition used in the Capps study;

(4) Age-related criteria (being 62 or older and having an income that is less than 125% of the FPG, not counting public assistance income; 100% FPG is used as cut-off for armed services personnel and their spouse and children); and

(5) Large household size (the Rule is unclear about the meaning of large household. I defined large household size as 6 or more persons, which is more than twice the average U.S. household size in 2017, 2.54).

---

[25]These conditions include whether individuals have serious difficulty "concentrating, remembering, or making decisions" (cognitive difficulty), "walking or climbing stairs" (ambulatory difficulty), "doing errands alone such as visiting a doctor's office or shopping" (independent living difficulty), "dressing or bathing" (self-care difficulty), "seeing even when wearing glasses" (vision difficulty), and being deaf or having a hearing difficulty.

[26] ACS measures limited English proficiency by asking respondents who report speaking a language other than English at home to indicate how well they speak English:  "very well," "well," "not well" or "not at all."  Based on these responses, I consider "not well" or "not at all" to indicate low English proficiency.

13

### 3.    Heavily weighted positive factors:

(1) High household income (250% of FPG or higher, excluding public assistance income);

(2) Currently working with individual earnings greater than 250% of FPG for a single adult; and

(3) Private health insurance coverage[27].

### 4.    Three-Tier Inadmissibility Risk Scale

31.     Because the Rule is ambiguous about the number or combination of factors that would lead to an inadmissibility designation, I provide variety of estimates to gauge the disparate impact of the Rule.  First, I present the percentage of each group that would be classified as having each of the negative and positive factors separately.  Second, I developed a three-tiered risk scale (high, medium, low) to summarize the number and weight of positive and negative factors.  This scale gives greater weight to strongly-weighted negative and positive factors than the other negative factors.  It also takes into consideration how positive factors may offset negative factors, and it accounts for the statement in the Rule that a single negative factor would be insufficient for a public charge designation.  The high-risk group is defined as having a combination of at least one heavily weighted negative factor or two more other negative factors, and having no positive factors at all.  As shown in Supplemental Table S1, 10.7 percent of the potential applicants in the high-risk group have a health condition, 31.3 percent are economically inactive, 63.5% are low income, 64.3% are low skilled, and 78.5% have low English proficiency. The medium risk group is defined as having a combination of negative and positive factors or having only one non-heavily-weighted negative factor.  It is unclear whether their positive factors are enough to outweigh their negative factors, so their risk level is uncertain.   This group is less likely to have heavily-weighted negative factors and other negative factors than the high-risk group and has at least one positive factor (38.5% have high household income, 3.9% are working with high earnings, and 70.6% have private health insurance).  Finally, the low-risk group is defined as having no negative factors at all.  This group is also the most likely to have positive

---

[27] With regard to private insurance, ACS data provides when respondent is covered by "Insurance purchased directly from an insurance company (by this person or another family member)."

14

factors (77.7% high household income, 49.0% working with high earnings, and 88.2% have

private health insurance).

32.     This three-tiered risk scale has broad categories that are simply intended to

differentiate low, medium, and high risk.  Due to the ambiguity of the Rule, it is difficult to

predict the share of individuals within each risk category that would be deemed inadmissible by

the TOC test.  Because the Rule is unclear about the ways in which negative and positive factors

would be considered in combination, however, I also tested alternative measures in sensitivity

analyses.

## IV.   ANALYSIS LIMITATIONS

33.     It is important to note the limitations of the ACS measures.  I was unable to

examine credit scores, whether the applicant received a fee waiver, or their relationship to their

sponsor, or their sponsor's financial information, because this information was not collected in

the ACS.  The ACS also does not contain measures of public benefit use that are consistent with

those used by Rule for making a public charge determination.  I was also unable to measure

participation in SNAP because, as noted in ¶ 30 above, ACS measures food assistance at the

household level rather than individual level.  Additionally, I was unable to measure participation

in public housing or rental assistance because the ACS does not collect data on these programs.

34.     Notably important, is that the public assistance/benefits measures do not capture

participation in these programs during the 36-month period prior to when noncitizens applied for

LPR status.  Instead, the TANF and SSI measures pertain to the 12 months prior to the interview,

and the Medicaid measure reflects current health insurance coverage (and is further limited by its

grouping with other public health insurance benefits).  This distinction is important because very

few adjustees or LNIs would have been eligible to receive federal public assistance prior to their

adjustment to LPRs, or under a LNI status.  In fact, it is highly likely that federal public benefit

use for the potential applicants in my sample was very low in the 36 months prior to their

application.  Apart from refugees and asylees (whom I exclude from my analysis), this group is

ineligible for most federally public assistance programs newly listed in the Rule, including all

federally funded cash assistance programs (SSI, TANF, General Assistance), SNAP, and

15

1  Medicaid (although non-LPRs may receive emergency medical services), and federal public

2  housing assistance.  In short, and as noted in the Rule, most potential applicants become eligible

3  for these federal programs enumerated in the Rule only after obtaining LPR status, and even then,

4  many must wait several years before becoming eligible (the specific rules vary by program and

5  state).

6        **A.**    **Survey of Income and Program Participation**

7        35.     I conducted supplementary analyses of the 2008 Survey of Income and Program

8  Participation (SIPP) to help illustrate this point.  The SIPP is a small-sized Census survey[28]

9  designed in part to measure public assistance trends for the U.S. population.  I rely on the ACS

10  rather than the SIPP for my main analysis because of ACS's greater sample size.  Nevertheless,

11  the SIPP can provide useful insights about immigrants' welfare history.  One unique feature of

12  the SIPP is that it collects data on when an individual started receiving SNAP, TANF/AFDC, and

13  SSI.  Additionally, the 2008 SIPP included information on whether and when LPRs adjusted

14  status.  I examined the 2008 SIPP to see what percentage of adjustees reported having received

15  any of these types of assistance prior to their year of adjustment to LPR status.  The results

16  confirm that very few adjustees received cash assistance prior to the time of adjustment (0.6

17  percent AFDC/TANF and 0.9 percent SSI, and neither estimate is significantly different from

18  zero).  A small but statistically significant share reported receiving SNAP (4 percent), which may

19  reflect receipt by eligible household members rather than receipt by the LPR applicant.

20        **B.**    **Sensitivity Analysis**

21        36.     I evaluated the sensitivity of the results to the inclusion of public benefit use as a

22  negative factor.  On the one hand, public benefit use is weighted heavily in the Rule, and the Rule

23  will consider whether immigrants have not just received but also "applied for, [or] been certified

24  to receive" public benefits as evidence suggesting a likelihood of future receipt, as well as utilize

25  —————————————

26      [28] For example, the 2008 SIPP interviewed 10,501 foreign-born individuals in its first
wave.  While this sample size is typical among social science surveys (and large compared with

27  most public opinion polls), it is small relative to the ACS, which samples about 1 percent of the
U.S. population, over 3 million individuals, every year. The large sample size of the ACS is the

28  primary reason I use it for my primary analyses.

16

this as a negative evaluation of their financial status, 8 C.F.R. § 212.22(b)(4)(i)(E); 8 C.F.R. § 212.21(e).  On the other hand, the ACS does not adequately capture public benefit receipt in the precise time period specified by the Rule and is therefore not a good data source to evaluate the share of applicants who would be found to have used public benefits for 12 months of the last 36 months prior to application.  It is for this reason that I confine my analysis to the disparate impacts of the forward-looking TOC portion of the Rule.  Moreover, my analysis of the SIPP data suggests that immigrants' use of federal public benefits prior to their adjustment, was very rare, and future immigrants are likely to avoid using all public benefits in response to the Rule, including food assistance, public health insurance, and housing assistance, which should drive public benefit use down further still.

37.     Considering the flaws of the ACS public benefits measures, the fact that immigrants are ineligible for public benefits prior to adjustment, and that their use of public benefits during the most relevant time period is likely to be very low, I decided to exclude public benefits use as one of the negative factors in my main assessment of risk.  The Capps study omitted public benefits from their analysis for the same reason.  My estimates therefore represent *conservative* estimates of risk.  However, in supplemental analyses, I provide some estimates of risk that account for immigrants' current use Medicaid and use of TANF and SSI in the previous year in order to test how different the results would be if I were incorrect in my assumption that immigrants do not use public programs prior to their adjustment as LPRs.  These estimates represent *upper-bound* estimates of the impact of the Rule.

38.     As noted above, I also tested the sensitivity of the results to the inclusion of different immigrant status groups in the analysis, and I assessed the sensitivity of the results across different measures of risk of inadmissibility.

C.     **Groups Identified**

39.     Among the noncitizen population sample identified, I distinguish among the following racial-ethnic groups:  Latino, and non-Latino White, Black, and Asian, based on Census racial and ethnic classifications (which does not currently include a category for Middle Eastern/North African).  I also distinguish among the following national origin groups based on

17

the respondent's place of birth:  Mexicans and Central Americans, Caribbeans, South Americans, those from Middle East and Central Asia[29], sub-Saharan Africans, South/East Asians, and those from Europe or countries that were predominately settled by Europeans (Canada and Oceania– i.e., mostly Australia and New Zealand), whom I refer to as "European-origin."  It should be understood that my analysis pertains to groups of noncitizens, as I have identified them above.

40.     Counsel also requested estimates for the following vulnerable groups:  working poor (defined as those in families with at least one fulltime worker yet a family income less than 125% FPG), the disabled (having at least one functional limitation), those with limited English proficiency (speaking English "not very well" or "not at all"), those living in large households (>=6 persons), the elderly (age 65+), and DACA-eligible persons (I used the same definition as used by MPI in their report on the DACA-eligible population[30]).

**D.    Data Sampling**

41.     All estimates generated from randomly-selected samples such as the ACS are subject to uncertainty due to sampling variability.  This means that if we were to draw another independent sample of equal size, there is a chance that we would obtain different results. However, we can quantify how much the estimates are likely to vary by calculating standard errors (SE).  Larger standard errors signal more uncertainty about the estimates than smaller standard errors.  I provide standard errors for all of the estimates in a set of appendix tables (A1-A9).[31]

---

[29]Afghanistan, Armenia, Azerbaijan, Bahrain, Cyprus, Iran, Iraq, Israel, Jordan, Kuwait, Lebanon, Oman, Palestine, Gaza Strip, West Bank, Qatar, Saudi Arabia, Syria, Turkey, United Arab Emirates, Yemen, Pakistan, Republic of Georgia, Kazakhstan, Kirghizia, Tadzhik, Turkmenistan, Uzbekistan, Algeria, Egypt, Libya, Morocco, Sudan, Tunisia, and Western Sahara.

[30] Batalova, Jeanne, Sarah Hooker, and Randy Capps.  2014. "DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action." Migration Policy Institute:  Washington, DC, available online at https://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

[31] I estimated the standard errors using the 80 replicate weights as recommended by the U.S. Census Bureau for the ACS (https://usa.ipums.org/usa/repwt.shtml). I also adjust for uncertainty related to the multiple imputation of immigrants' LPR status using Reuben's Rules (Rubin, D. B. 1987. *Multiple imputation for nonresponse in surveys*. New York, NY: John Wiley and Sons).

18

42.     I use the standard errors to estimate 95 percent confidence intervals, which provide a more intuitive indicator of how much the estimates are likely to vary.  95% confidence intervals can be interpreted as the range within which we are 95% confident that the true value falls.  If we were to draw 100 equal-sized samples, the true value would fall within the 95% confidence interval about 95 times.  I indicate the 95% confidence intervals with error bars for all the estimates shown in Figures 1-9.

43.     I also use the standard errors to compare the characteristics of two groups by conducting "t-tests."  These tests assess the likelihood that two groups are significantly different from one another on a given characteristic and that the difference observed between the groups is not due to sampling variability.  A difference between two groups is considered to be statistically significant if the absolute difference in the estimate is greater than 1.96 times the standard error of the difference, where $SE_{diff} = \sqrt{SE_{group\,1}^2 + SE_{group\,1}^2}$.  I denote with asterisks (*) in the tables the results of t-tests to signify the instances whereby groups are significantly different from a reference group (i.e., Whites in analyses of racial/ethnic differences, and European-origin in analyses of national origin differences).  In analyses of the vulnerable groups (e.g., working poor, disabled, elderly, etc.), I tested whether each group was significantly different from the average applicant given that the different groups overlapped in their membership and there was therefore no common reference group for those analyses.

## RESULTS

### I.   RESULTS FOR THE ENTIRE UNITED STATES POPULATION

44.     Excluding refugees, asylees, and parolees, an average of 383 thousand people adjusted to LPR status each year,[32] cumulating to 1.9 million, over the last five years.  Two-thirds of these adjustees qualified under family-sponsored or immediate relatives of U.S. citizens preferences.  About 37% come from Asia, 19% from Mexico, 22% from other Latin American countries, 15% from Europe, Canada, or Oceania, and 6% from Africa. Additionally, as of FY2016, there were about 2.3 million legal nonimmigrants living in the country.[33]  In what

---

[32]Office of Immigration Statistics, Immigration Yearbook (various years), Table 6.

[33] Baker, Bryan.  2018. Nonimmigrants residing in the United States: Fiscal Year 2016.

19

follows, I provide an assessment of disparate risk posed to these groups of noncitizens posed by the implementation of the Rule.

45.    I first present estimates of the percentage with negative and positive factors by race/ethnicity for potential applicants in Table 1 and Figure 1a.  Recall that the term "potential applicants" here refers to recently-arrived adjustees and LNIs.  Looking first at the heavily weighted negative factors, we see only small racial/ethnic differences.  Latino and Black potential applicants are significantly more likely to have a health condition although the share with a health condition is low for all groups (3.4%, 2.2%, and 1.1% for Latino, Blacks, and Whites, respectively).

46.    Turning next to the other negative factors, Latino, Black, and Asian potential applicants are significantly more likely to have low income, be low skilled, low English proficiency, and a large household size compared with Whites.  Latinos are the most likely of the four groups to have these negative factors: 35.7% are low income, 42.3% are low skilled, 53.7% have low English proficiency, and 20.5% have large households; comparable estimates for Whites are, respectively: 21.2%, 4.9%, 10.6%, and 5.1%.  The only negative factor for which racial/ethnic minorities have a significant advantage relative to Whites is that Asians are less likely to be 62 or older, but the share with this age-related negative factor is very low—1.6% or less—for all groups.

47.    With respect to the heavily-weighted positive factors, Latino and Black potential applicants are significantly less likely than Whites to have a household income greater than 250% of FPG (28.6%, 40.6% for Latino and Blacks, respectively, compared with 61.1% among Whites), to work and have earnings above 250% FPG (7.6%, 12.5%, and 33.2% for Latino, Blacks, and Whites, respectively), and to have private health insurance (33.2%, 57.7%, and 80.3% for Latino, Blacks, and Whites, respectively).  Asians are much more similar to Whites on these characteristics than are Latinos and Blacks, and are even significantly more likely than Whites to have private health insurance.

Office of Immigration Statistics, Department of Homeland Security.

20

48.     Looking next at the three-tiered inadmissibility risk scale at the bottom of Table 1 and in Figure 1a, 40% of Latino potential applicants are in the high-risk category, meaning that they have no positive factors combined with at least one heavily-weighted negative factor or at least two other negative factors.  This is over three times as high as among Blacks (13%), and about eight times higher as among Asians (5%) and Whites (6%).  Only 22% of Latino potential applicants are in the low-risk category (having no negative factors), compared with 47% among Blacks, 52% among Asians, and 59% among Whites.  This means that about four out of five Latinos would experience at least some risk of being deemed inadmissible, and about two out of five would face high risk.

49.     To summarize, the data presented in Table 1 and Figure 1a suggests that, even without considering public benefits use, Latino potential applicants would experience the greatest risk of being deemed inadmissible due the implementation of the Rule.  Latino's higher risk is due to their higher likelihood of having other negative factors such as low income, low skills, and low English proficiency, and less often having positive factors to offset the negative factors.  Black potential applicants would experience the next highest risk.  Compared with Latino applicants, they are less likely to be low-skilled and to have low English proficiency, and more often have high incomes and private health insurance.  Finally, Asian and White applicants would experience the lowest risks due to a combination of less often having negative factors and more often having positive factors.

50.     I next present estimates of risk by national origin for the entire United States in Table 2 and Figure 2a.  The patterns are similar to the results for racial-ethnic groups because of the way that racial/ethnic categories tend to overlap with world regions.  One benefit of breaking out the results by national origin, however, is that it permits a separate evaluation of Middle Eastern and South Asian potential applicants, many of whom are classified as "White" in the ACS's racial-ethnic classification.

51.     With regard to the heavily-weighted negative factors, and like the results in Table 1, very few potential applicants have health conditions, and all non-European groups, except those from the Caribbean, are either less likely than European-origin applicants to be economic

21

inactive or are no different from them.  Those from the Caribbean are more likely than European-origin applicants to be economically inactive by about five percentage points.  Additionally, all non-European groups are significantly more likely to have low income, low skills, low English proficiency (except sub-Saharan Africans, many of whom come from English-speaking countries), and a large household size compared with applicants of European origin.  Applicants from Mexico/Central America stand out as particularly low income (38.2%), low skilled (49.5%), low English proficient (58.1%), and likely to live in large households (23.0%).  For European-origin applicants, these figures are, respectively:  16.2%, 4.2%, 7.5%, and 4.9%.  Middle Eastern/Central Asian applicants also are likely to have low household income (36.3%).

52.     Non-European-origin groups are also significantly less likely than potential applicants of European origins to have heavily-weighted positive factors.  Applicants from Mexico/Central America and the Caribbean stand out as among the least likely to have a household income greater than 250% of FPG, to work with earnings above 250% FPG, and to have private health insurance.  South/East Asians are the most advantaged among the non-European groups (for example, their rate of private health insurance coverage is not statistically different from European-origin applicants), but they are still significantly less likely to have high household income and earnings than European-origin applicants.

53.     Considering the three-tiered risk scale (Figure 2a), all of the non-European-origin groups are significantly more likely to be at the high-risk categories of being deemed inadmissible, and significantly less likely to be in the low-risk category, compared with European-origin applicants.  Mexicans/Central Americans would face the highest risks under the Rule.  45% are in the high-risk category and only 17% are in the low-risk category.  Caribbean applicants also experience high risk of being deemed inadmissible; 26% are in the high-risk category, and only 31% are in the low-risk category.  Applicants from South/East Asia experience lower risk (5% are high-risk and 53% are low-risk).  Finally, European-origin applicants face the lowest risk (4% are high-risk and 64% are low-risk).

54.     Overall, the results in Table 2 and Figure 2a suggest that potential applicants from Europe, Canada, or Oceania (i.e., Australia and New Zealand) would experience the least risk of

22

being deemed inadmissible due the implementation of the Rule due to the TOC test.  In contrast, Mexicans and Central Americans would experience the greatest risk.

55.     To summarize, my analysis finds that in the United States, even without accounting for public benefit use, Latinos and Mexican/Central Americans are at substantially higher risk for being deemed inadmissible under the Rule compared with Whites and European-origin applicants.  They are at higher risk not so much because they are more likely to have heavily-weighted negative factors, but rather because they are more likely to have multiple "other" negative factors and they have few heavily-weighted positive factors to offset these negative factors.  Other groups would also be impacted by the Rule, but to a lesser degree, including Blacks, Asians, Caribbeans, South Americans, sub-Saharan Africans, and Middle Easterners and Central Asians.  The risks faced by these groups may be even higher than depicted here because the ACS does not permit me to measure all of the positive and negative factors.

## II.   RESULTS FOR CALIFORNIA

56.     Over the past five years, about 432 thousand Californians adjusted to LPR status, not counting refugees and asylees.[34]  About 52% come from Latin America and 37% from Asia. Additionally, as of FY2016, there were about 410 thousand legal nonimmigrants living in the state.[35]  Below, I provide an assessment of disparate risk posed to these groups by the Rule.

57.     Table 4 and Figure 4a shows the percentages of potential applicants in California with negative and positive factors by race/ethnicity.  There are small racial/ethnic differences on the heavily weighted negative factors that I was able to measure.  Latinos potential applicants are significantly more likely to have a health condition although the share with a health condition is 4% or less for all groups.  Also, Latinos and Asians are significantly more likely than Whites to be economically inactive, but the differences (about 3 percentage points in each case) are substantively small.

---

[34] Office of Immigration Statistics. Profiles on Legal Permanent Residents: State (2013-2014, 2015, 2016, and 2017)
[35] Baker, Bryan.  2018. Nonimmigrants residing in the United States: Fiscal Year 2016. Office of Immigration Statistics, Department of Homeland Security.

23



Figure 4a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule* By Race/Ethnicity, California

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.

58.     Turning next to the other negative factors, Latino, Black, and Asian potential applicants tend to be more likely to have other negative factors compared with Whites, including low income (Latinos and Blacks), low skills (Latinos, Blacks, and Asians), low English proficiency (Latinos and Asians), and large households (Latinos, Blacks, and Asians).  Latinos are the most likely of the four groups to have these negative factors:  40.5% are low income, 52.4% are low skilled, 61.6% have low English proficiency, and 28.0% have large households; comparable estimates for Whites are, respectively: 21.8%, 3.9%, 9.0%, and 4.8%.  There were no significant racial/ethnic differences in the share with the age-related negative factor.

59.     Of all four racial/ethnic groups, Latinos are also the least likely to have heavily-weighted positive factors.  They are significantly less likely than Whites to have a household

24

income greater than 250% of FPG (23.4% versus 64.2% among Whites), to work and have earnings above 250% FPG (3.9% versus 36.9% among Whites), and to have private health insurance (26.0% versus 80.0% among Whites).  Blacks are the second-most disadvantaged group and Asians are more similar Whites on these characteristics, although they too show significant disadvantages relative to Whites on all three positive factors.

60.     Looking next at the three-tiered risk scale (Figure 4a), 48% of Latino potential applicants are in the high-risk category, meaning that they have no positive factors combined with at least one heavily-weighted negative factor or at least two other negative factors.  This is over four times as high as among Blacks (11%), Asians (8%) and Whites (6%).  Only 15% of Latino potential applicants are in the low-risk category (having no negative factors), compared with 50% among Blacks, 49% among Asians, and 61% among Whites.  This means that about 85% of Latinos would experience at least some risk of being deemed inadmissible, and about half would face high risk due to the application of the TOC test.

61.     To summarize, the data presented in Table 4 and Figure 4a suggests that in California, Latino potential applicants would experience the greatest risk of being deemed inadmissible due the implementation of the Rule.  Latino's higher risk is due not because they are more likely to have heavily-weighted negative factors, but rather because they are more likely to have multiple other negative factors such as low income, low skills, and low English proficiency, and they less often have positive factors to offset the negative factors.

62.     I next present estimates of risk by national origin for California in Table 5 and Figure 5a.  With regard to the heavily-weighted negative factors, Mexican/Central American and Middle Eastern/Central Asian and South/East Asian applications are more likely to have health conditions than European-origin potential applicants (4.1%, 4.6%, and 1.2% versus 0.6%, respectively), although these differences are substantive small. Also, Mexicans/Central Americans, Middle Eastern/Central Asian, and South/East Asians are more likely—by about four to five percentage points – to be economic inactive than European-origin potential applicants.



Figure 5a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule* By National Origin, California

*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.

63.     All non-European groups are also significantly more likely to have low income, low skills, low English proficiency (except sub-Saharan Africans, many of whom come from English-speaking countries).  Applicants from Mexico/Central America stand out as particularly low income (41.7%), low skilled (54.8%), low English proficient (63.6%), and likely to live in large households (29.0%).  For European-origin applicants, these figures are quite a bit lower, 17.1%, 2.8%, 4.7%, and 4.8%, respectively.  Middle Eastern/Central Asian applicants also are the most likely to have low household income (33.9%, versus 17.1% among European-origin applicants).

64.     The non-European-origin groups are also significantly less likely than European-origin potential applicants to have heavily-weighted positive factors.  Applicants from

Mexico/Central America and Middle East/Central Asia are among the least likely to have a household income greater than 250% of FPG, to work with earnings above 250% FPG, and to have private health insurance.

65.     Considering the three-tiered risk scale, all of the non-European-origin groups are significantly more likely to be at the high-risk category of being deemed inadmissible, and significantly less likely to be in the low-risk category, compared with European-origin applicants. Mexicans/Central Americans would face the highest risks under the Rule.  Half are in the high-risk category and only 13% are in the low-risk category.  European-origin applicants face the lowest risk (only 3% are high-risk and 67% are low-risk).

66.     Overall, the results in Table 5 and Figure 5a suggest that in California, European-origin potential applicants would experience the least risk of being deemed inadmissible due the implementation of the TOC portion of the Rule, and Mexicans and Central Americans would experience the largest impact.

67.     Finally, I present results for vulnerable groups in California, as requested by Counsel in Table 6 and Figure 6a, namely the working poor, the disabled, those with limited English proficiency, those living in large households, the elderly, and DACA-eligible.  I also included estimates for all potential applicants for comparison purposes.  With respect to the heavily-weighted negative factors, the disabled are very likely to have a health condition combined with the lack of health insurance or low income (53.3%), and both the disabled (59.5%) and elderly (87.9%) have very high rates of economic inactivity.

///

///

///

27



Figure 6a.  Estimated Risk of Being Deemed Inadmissible by the Public Charge Rule\* For Designated Groups in California

\*High risk = No heavily weighted positive factors, and at least 1 heavily weighted negative factor or 2 or more other negative factors; Medium risk = At least 1 heavily weighted positive factor and at least 1 negative factor; Low risk = no negative factors. Public program use is not included as a negative factor in this analysis, so these are conservative estimates.  95% confidence intervals are shown with the error bars.

68.    These groups are also likely to have other negative factors, sometimes by definition.  For example, 95.7% working poor have low income (the figure is not 100% because certain groups with household incomes less than 125% FPG are not treated as having a negative factor, such as those in the armed forces and those with assets), 100% of limited English proficient have a "limited English proficiency" negative factor, and 100% of those in a large household have a "large household" negative factor.  Yet many people in these groups have other negative factors too, which further compounds their risk.  For example, 61.6% of the working poor, 66.3% of the disabled, and 56.3% of those in large households have other negative factors, which further compounds their risk.  For example, 61.6% of the working poor, 66.3% of the disabled, and 56.3% of those in large households, and 70.6% of the elderly also have low English proficiency.

69.     These groups are also less likely to have a positive factor relative to the average applicant, which makes it more difficult to offset their negative factors.  Among the working poor, for example, only 23.2% have private health insurance.  The other groups tend to be somewhat more likely to have high household income, especially the elderly (52.7%, which is higher than the average applicant at 48.3%), but the share who have private health insurance is 31% or less in all cases, compared with 58.9% for the average applicant.

70.     Considering the three-tiered risk scale, members of all of the vulnerable groups are significantly more likely to be in the high-risk category of being deemed inadmissible, and significantly less likely to be in the low-risk category, compared with the average applicant.  The working poor would face the highest risks under the Rule.  Two-thirds are in the high-risk category and virtually none are in the low-risk category.  The disabled, the limited English proficient, those in large families, and the elderly also face high risks, with the share in the high-risk category ranging from 41% to 53%.  DACA-eligible persons are slightly less likely to be in the high-risk category (28%) and much more likely to be in the low-risk category (30%).

71.     To summarize, my analysis finds that in California, Latinos, Mexicans/Central Americans, the working poor, disabled, limited English proficient, those with large families, and the elderly are all at significantly higher risk for being deemed inadmissible under the Rule than other groups, particularly Whites and European-origin applicants.  These disadvantages are largely due to the fact that many of these groups are more likely to have multiple other negative factors such as low income, low skills, low English proficiency and large families, and are less likely to have positive factors such as high household income, high earnings, and private health insurance to offset the negative factors.  Of all the racial/ethnic and national origin groups examined, Latinos and Mexicans/Central Americans would be most impacted by the Rule.

### III.   SENSITIVITY ANALYSIS

72.     The proceeding analyses assessed the risk of being deemed inadmissible due to the Rule posed to recently-adjusted LPRs and legal nonimmigrants because they represent the pool of people who are most likely to be impacted by the Rule.  How would the assessment change if other groups were included the assessment, namely new arrivals—who could face similar scrutiny

29

when they apply for admission at a foreign consulate—and the unauthorized—some of whom could also seek to adjust their status?  Supplemental Table S2 shows the share in each risk category (excluding public benefit use) by race/ethnicity for three groups:

Group 1:   recently-adjusted LPRs and legal nonimmigrants (just as used in the analyses presented above);

Group 2:   recently-adjusted LPRs, legal nonimmigrants, and new arrivals; and

Group 3:   all recently-arrived foreign-born except for those exempt from the Rule (e.g., refugees and asylees).

73.      Results show some variations across the groups.  Among Latinos, the group for whom I observe the greatest levels of risk, the share in the high-risk category increases as the analysis expands to include new arrivals and other (likely unauthorized) foreign born (39.7%, 41.1%, and 45.0% in Groups 1, 2, and 3, respectively).  Additionally, the difference between Latinos and Whites in the share in the high-risk group increases across groups (24.9%, 31.5%, and 33.3% for Groups 1, 2, and 3, respectively).  This suggests that the results presented in Tables 1-9 and Figures 1-9 represent conservative estimates of the disparate impacts of the Rule.  Had I expanded the analysis to include other potentially-impacted groups rather than focus only on adjustees and LNIs, I would have found even larger shares of Latinos in the high-risk category and even larger disparities between Latinos and Whites in the level of risk.

74.  I also evaluated the sensitivity of the results to the way that risk of inadmissibility is measured, that is, whether current public benefit use is considered and how the positive and negative factors are summarized.  I tested four different measures in Figure 10.  The measures I tested include:

Measure 1:   Number of negative factors (e.g., 1, 2, 3 or more).  This is a simple count of the number of negative factors and is similar to the risk measure in the Capps study.

Measure 2:   Number of negative factors while having no positive factors.  This measure is an elaboration of the first risk measure.  It considers whether the applicant has a positive factor, which could balance out a negative factor. Persons are coded as having no heavily weighted positive factors while having 1, 2, or 3 or more negative factors.

30

Measure 3    <u>No positive factors and at least one heavily negative factor</u>.  This measure focuses only on the heavily weighted factors and ignores the other factors in the TOC test.

Measure 4    <u>Three-tiered risk scale</u> (high, medium, low).  This is the scale developed and used in my analysis.

75.  I constructed two versions of each risk measure, one that includes current public benefit use as a heavily-weighted negative factor, and another that excludes it.  As shown in Figure 10 and Supplemental Table S3, the share of individuals designated as being at risk differs depending on which risk measure is used.  The measures that account for the number of negative factors (measures 1, 2, and 4) tend to show more gradations and higher levels of risk than the dichotomous measure that focuses only on the heavily-weighted factors (Risk Measure 3a and 3b).  Additionally, the measures that account for current public benefit use tend to show higher shares in the high-risk category.  For example, 39.7% of Latinos are classified as being at high risk when public program use is not considered, and this increases to 42.1% when it is.

76.  Nevertheless, all measures – whether they account for public program use or not – show statistically significantly higher levels of risk among Latinos than Whites.  Additionally, Blacks are consistently shown to face moderate levels of risk (more than Whites but less than Latinos), regardless of which measure is used.  Notably, the difference between Whites and Latinos in the share in the high-risk group is nearly identical when public programs are excluded and when they are included.  For example, the Latino-White gap in the high-risk category of the three-tiered risk scale is 34.8 percentage points when public benefits are considered, and 34.1 percentage points when they are not.

## IV.    CONCLUSIONS

77.  My analyses of the disparate impact of the public charge Rule, focusing on the TOC test, on recently-adjusted LPRs and legal nonimmigrants point to a number of key findings:

**The United States:**

- Latinos are more likely to be at risk of being deemed inadmissible by the TOC test than Asians and Whites.  Blacks are also more likely to be at risk but to a lesser degree than Latinos.

- Mexicans/Central Americans and, to a lesser degree, those from the Caribbean, are much more likely to be at high risk of being deemed inadmissible by the TOC test than those of European origin. Other groups (South Americans, Middle Easterners/Central Asians, sub-Saharan Africans, and South/East Asians) are also at significantly higher risk than those of European origin, but lower risk than Mexicans/Central Americans and those from the Caribbean.

**State of California:**

- Latinos are more likely to be at risk of being deemed inadmissible by the TOC test than Whites. Blacks and Asians also are more likely to be at risk than Whites, but to a lesser degree than Latinos.

- Mexicans/Central Americans are much more likely to be at risk of being deemed inadmissible by the TOC test than those of European origin. Other groups (South Americans, Middle Easterners/Central Asians, sub-Saharan Africans, and South/East Asians) are also significantly more likely to be at risk than those of European origin, but less likely than Mexicans/Central Americans.

- Members of vulnerable groups (namely the working poor, the disabled, those with limited English proficiency, those living in large households, the elderly) would face very high risks of being deemed inadmissible by the TOC test. By definition, nearly all would be at least some risk and two out of five or more may be at high risk because they often have multiple negative factors and few positive factors. The DACA-eligible population is also more likely to be at risk of being deemed inadmissible than the average applicant, but to lesser degree than the groups listed above.

78. I conducted several sensitivity analyses and found that my findings were robust to alternative measures and specifications. First, I found that the conclusions are robust to the inclusion of other foreign-born groups such as new arrivals LPRs and unauthorized immigrants, in the analysis. In fact, the Latino-White disparities reported here are conservative relative to the disparities that would be observed had I included the other foreign-born groups in the analysis. Second, I found that the findings about the disparate impacts of the Rule were consistent regardless of whether or not I included public benefit use as a negative factor. This suggests that even if potential applicants use public benefits prior to LPR adjustment (an unlikely possibility given their ineligibility for most federally funded public benefits), the share in the high-risk group would be slightly larger for most groups and large disparities in inadmissibility would still occur. This also suggests that my assessments of the risk of inadmissibility—which omit public benefit

32

use—are conservative.  Third, I found that the conclusions regarding the disparate impacts of the Rule are consistent regardless of how I summarized the negative and positive factors to measure the risk of inadmissibility.

79.  Overall, I have a high degree of confidence in the conclusions that applicants who are Latinos, Mexicans/Central Americans, and to a lesser degree other non-White and non-European origin groups, are more likely to experience risk of being deemed inadmissible due to the application of totality of circumstances test as described in the Rule than are applicants who are White and of European origin.  This finding holds for the entire United States and for California. Vulnerable groups in California—the working poor, the disabled, those with limited English proficiency, those living in large families, the elderly—also face an elevated risk of inadmissibility determinations (I did not provide estimates for these groups for the entire United States).

80.  A complete list of Figures and Tables corresponding to this analysis and discussed in this report are attached to this Declaration as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on September 18, 2019, in State College, Pennsylvania.


Jennifer L. Van Hook
Roy C. Buck Professor of Sociology
Director, Graduate Program in Sociology
Pennsylvania State University

33

# EXHIBIT B

## PUBLICATIONS OF JENNIFER L. VAN HOOK

1. Van Hook, Jennifer. Forthcoming. "Nominal versus Variable Approaches for Understanding Group Differences." *Ethnic and Racial Studies Review.*

2. Bélanger, Alain, Patrick Sabourin, Guillaume Marois, and Jennifer Van Hook, and Samuel Vézina. 2019. "A Framework for the Prospective Analysis of Ethno-Cultural Super-Diversity." *Demographic Research.*

3. Frisco, Michelle L., Jennifer Van Hook, and Robert Hummer. 2019. "Would the Elimination of Obesity and Smoking Reduce U.S. Racial/Ethnic/Nativity Disparities in Total and Healthy Life Expectancy?" *Social Science and Medicine: Population Health.*

4. Frisco, Michelle L., Molly A. Martin, and Jennifer Van Hook. 2019. "Socioeconomic Status and Acculturation: Why Mexican-Americans are Heavier than Mexican Immigrants and Whites." *Advances in Medical Sociology*, "Immigration and Health". Emerald Publishing Limited, pp. 71-96.

5. Frisco, Michelle L, Jennifer Van Hook, and Erin Baumgartner. 2019. "The weight of school entry: Weight gain among Latino children of immigrants during the early elementary school years." *Demographic Research* 40 (article 5): 95-120.

6. Van Hook, Jennifer. 2019. "Counting 11 Million Undocumented Immigrants is Easier Than Trump Thinks." The Conversation, July 18, 2019. https://theconversation.com/counting-11-million-undocumented-immigrants-is-easier-than-trump-thinks-120459.

7. Van Hook, Jennifer, Susan McHale, and Valarie King. (Eds.). 2018. *Families and Technology.* New York: Springer.

8. Dondero, Molly, Jennifer Van Hook, Michelle Frisco and Molly Martin. 2018. "Dietary Assimilation among Mexican Children in Immigrant Households: Code-switching and Healthy Eating across Social Institutions." *Journal of Health and Social Behavior* 59(4): 601-624. (PMCID: PMC6495556)

9. Capps, Randy, Julia Gelatt, Jennifer Van Hook, and Michael Fix. 2018. "Commentary on 'The Number of Undocumented Immigrants in the United States: Estimates Based on Demographic Modeling with Data from 1990-2016.'" PLOS-ONE *13*(9), e0204199. (PMCID: PMC6150498)

10. Gelatt, Julia, Michael Fix, and Jennifer Van Hook. 2018. "People Leave Footprints: Millions More Unauthorized Immigrants Cannot Be 'Hidden' in Data Estimates." Migration Policy Institute, September 20, 2018. https://www.migrationpolicy.org/news/people-leave-footprints-millions-more-unauthorized-immigrants-cannot-be-hidden

11. Van Hook, Jennifer. 2018. "Why the 2020 Census Shouldn't Ask About Your Citizenship Status." The Conversation, February 22, 2018. https://theconversation.com/why-the-2020-census-shouldnt-ask-about-your-citizenship-status-91036

12.     Van Hook, Jennifer, Susana Quiros, Molly Dondero, and Claire Altman. 2018. "Healthy Eating Among Mexican Immigrants: Migration in Childhood and Time in the U.S." *Journal of Health and Social Behavior* 59(3): 391-410. (PMCID: PMC6416786).

13.     Randy Capps, James D. Bachmeier, and Jennifer Van Hook. 2018. "Estimating the Characteristics of Unauthorized Immigrants using US Census Data: Combined Sample Multiple Imputation." *The Annals of the American Academy of Political and Social Science 677*(1), 165-179.

14.     Burton, Linda, Damian Burton, Susan McHale, Valarie King, and Jennifer Van Hook. (Eds.). 2017. *Boys and Men in African American Families*. New York: Springer.

15.     Van Hook, Jennifer and Barrett Lee. 2017. "Diversity is on the Rise in Urban and Rural Communities, and it's Here to Stay." The Conversation, February 20, 2017. https://theconversation.com/diversity-is-on-the-rise-in-urban-and-rural-communities-and-its-here-to-stay-69095

16.     Altman, Claire E., Jennifer Van Hook, and Jonathan Gonzalez. 2017. "Becoming Overweight Without Gaining a Pound: Weight Evaluations and the Social Integration of Mexicans in the United States." *International Migration Review* 51(1): 3-36.

17.     McHale, Susan M., Valarie King, Jennifer Van Hook, and Alan Booth. (Eds.). 2016. *Gender and Couple Relationships*. New York: Springer.

18.     Van Hook, Jennifer. 2016. "Counting 11 Million Undocumented Immigrants is Easier Than You Think." The Conversation, November 1, 2016. https://theconversation.com/counting-11-million-undocumented-immigrants-is-easier-than-you-think-67921

19.     Frisco, Michelle L., Susana Quiros, and Jennifer Van Hook. 2016. "One Size May Not Fit All: How Obesity among Mexican-Origin Youth Varies by Generation, Gender, and Age." *Demography* 53(6): 2031–2043. (PMCID: PMC5138860)

20.     Van Hook, Jennifer, Susana Quiros, Michelle Frisco, and Emnet Fikru. 2016. "It is Hard to Swim Upstream: Dietary Acculturation among Mexican-origin Children." *Population Research and Policy Review* 35(2): 177-196. (PMCID: PMC4852553)

21.     Dondero, Molly and Jennifer Van Hook. 2016. "Generational Status, Neighborhood Context, and Mother-Child Resemblance in Dietary Quality in Mexican-origin Families." *Social Science and Medicine* 150: 212-220. (PMCID: PMC4733591)

22.     Altman, Claire E., Jennifer Van Hook, and Marianne Hillemeier. 2016. "What does self-rated health mean? Changes and variations in the association of obesity with objective and subjective components of self-rated health." *Journal of Health and Social Behavior* 57(1): 39-58.

23.     Amato, Paul R., Booth, Alan, McHale, Susan M., & Van Hook, Jennifer (Eds.). 2015. *Families in an Era of Increasing Inequality: Diverging Destinies*. New York: Springer.

24.     Zhou, Nan, Charrisa Cheah, Jennifer Van Hook, Darcy A. Thompson, Shelby S. Jones. 2015. "A Cultural Understanding of Chinese Immigrant Mothers' Feeding Practices: A Qualitative Study." *Appetite* 87: 160-167.

25.     Martin, Molly A., Jennifer Van Hook, and Susana Quiros. 2015. "Is Socioeconomic Incorporation Associated with a Healthier Diet? Dietary Patterns among

Mexican-origin Children in the United States." *Social Science and Medicine* 147: 20-29 (PMCID: PMC4689621).

26.     **Van Hook, Jennifer, James D. Bachmeier, Donna Coffman, and Ofer Harel. 2015. "Can We Spin Straw Into Gold? An Evaluation of Immigrant Legal Status Imputation Approaches".** *Demography* **52(1): 329-354. (PMCID: PMC4318768)**

27.     Van Hook, Jennifer, Susana Quiros, and Michelle Frisco. 2015. "The Food Similarity Index: A Dimension of Dietary Acculturation Based on Dietary Recall Data". *Journal of Immigrant and Minority Health* 17(2): 441-449 (PMCID: PMC4378569)

28.     **Bachmeier, James D., Jennifer Van Hook, and Frank D. Bean. 2014. "Can We Measure Immigrants' Legal Status? Lessons from Two U.S. Surveys."** *International Migration Review* **48(2), 538-566. (PMCID:PMC4267286)**

29.     **Van Hook, Jennifer, Frank D. Bean, James D. Bachmeier, and Catherine Tucker. 2014. "Recent Trends in Coverage of the Mexican-Born Population of the United States: Results from Applying Multiple Methods Across Time."** *Demography* **51(2): 699-726. (PMCID: PMC24570373)**

30.     Gubernskaya, Zoya, Frank D. Bean, and Jennifer Van Hook. 2013. "(Un)Healthy Immigrant Citizens: Naturalization and Activity Limitations in Older Age" *Journal of Health and Social Behavior* 54(4): 427-443. (PMCID: PMC3969823)

31.     **Van Hook, Jennifer, and James D. Bachmeier. 2013. "How Well Does the American Community Survey Count Naturalized Citizens?"** *Demographic Research* **29(1), 1-32. (PMCID: PMC3783022)**

32.     Van Hook, Jennifer and Claire E. Altman. 2013. "Using Discrete-time Event History Fertility Models to Simulate Total Fertility Rates and Other Fertility Measures." *Population Research and Policy Review* 32(4), 585-610. (PMCID: PMC3734869)

33.     Tucker, Catherine, and Jennifer Van Hook. 2013. "Surplus Chinese Men: Demographic Determinants of the Sex Ratio at Marriageable Ages in China." *Population and Development Review* 39(2): 209-230. (PMCID: PMC3734869)

34.     Van Hook, Jennifer, Claire Altman, and Kelly Balistreri. 2013. "Global Patterns in Overweight Among Children and Mothers in Less Developed Countries." *Public Health Nutrition* 16(4): 573-581. (PMCID: PMC3422412)

35.     Capps, Randy, Bachmeier, James D., Fix, Michael, & Van Hook, Jennifer. 2013. A demographic, socioeconomic, and health coverage profile of unauthorized immigrants in the United States. Washington, DC: Migration Policy Institute.

36.     Bean, Frank D., Susan K. Brown, Mark A. Leach, James D. Bachmeier, and Jennifer Van Hook. 2013. "Unauthorized Mexican migration and the socioeconomic integration of Mexican Americans." Pp 341-374 in *Diversity and disparities: America enters a new century* (John Logan, Editor). New York: Russell Sage Foundation.

37.     Van Hook, Jennifer, Nancy S. Landale, and Marianne M. Hillemeier. 2013. Is the United States Bad for Children's Health? Risk and Resilience Among Young Children of Immigrants. Washington, DC: Migration Policy Institute.

38.     Bean, Frank D, Brown, Susan K, Leach, Mark A, Bachmeier, James D, & Van Hook, Jennifer. 2013. Unauthorized Mexican Migration and the Socioeconomic Integration of

Mexican Americans: research report, US2010: Discover America in a New Century, Russell Sage Foundation.

39.     Cheah, Charissa and Jennifer Van Hook. 2012. "Chinese and Korean Immigrants' Early Life Deprivation: An Important Factor for Child Feeding Practices and Children's Body Weight in the United States." *Social Science and Medicine* 74(5): 744–752. (PMCID: PMC22265872)

40.     Van Hook, Jennifer, Elizabeth Baker, Claire E. Altman, and Michelle Frisco. 2012. "Canaries in a Coalmine: Immigration and Obesity among Mexican-origin Children.**"** *Social Science and Medicine* 74(2): 125–134. (PMCID: PMC3259272)

41.     Van Hook, Jennifer and Claire Altman. 2012. "Competitive Food Sales in Schools and Childhood Obesity: A Longitudinal Study." *Sociology of Education* 85(1): 23-39. **(**PMCID: PMC3352595**)**

42.     Glick, Jennifer E. and Jennifer Van Hook. 2011. "Does a house divided stand? Kinship and continuity of shared living arrangements." *Journal of Marriage and the Family* 73(5): 1149–1164. (PMCID: PMC3258516)

43.     Scheitle, Chris, Jenn Buher-Kane, and Jennifer Van Hook. 2011. "Demographic Imperatives and Religious Markets: Considering the Individual and Interactive Roles of Fertility and Switching in Group Growth." *Journal for the Scientific Study of Religion* 50(3): 470-482. (PMCID: PMC3267579)

44.     Balistreri, Kelly Stamper and Jennifer Van Hook. 2011. "Trajectories of Overweight among US School Children: A focus on social and economic characteristics." *Maternal and Child Health Journal* 15(5): 610-619. (PMCID: PMC3193986)

45.     Landale, Nancy S., Kevin J. A. Thomas, and Jennifer Van Hook. 2011. "The Living Arrangements of Children of Immigrants." *The Future of Children* 21(1): 43-70. (PMCID: PMC3241619)

46.     **Van Hook, Jennifer and Weiwei Zhang. 2011. "Who Stays? Who Goes? Selective Emigration Among the Foreign Born."** *Population Research and Policy Review* **30(1): 1-24. (PMCID: PMC3367327)**

47.     Van Hook, Jennifer and Michael Fix. 2011. "The Demographic Impacts of Repealing Birthright Citizenship." Pp. 173-186 in *Legal Briefs on Immigration Reform from 25 of the Top Legal Minds in the Country, Volume 1,* edited by Deborah Robinson and Mona Parsa. Robinson Omnimedia Publishing & Studios.

48.     Van Hook, Jennifer and Elizabeth Baker. 2010. "Big Boys, Little Girls: Gender, Acculturation, and Weight among Young Children of Immigrants." *Journal of Health and Social Behavior* 51: 200-214. (PMCID: PMC3245318)

49.     Van Hook, Jennifer. 2010. "Structure and Acculturation: Explaining Outcomes for Children in Mexican American Families " pp. 145-154 in *Growing up Latino: Health and Development of Children of Immigrants*, edited by Nancy S. Landale, Susan M. McHale, and Alan Booth. Washington, DC: Urban Institute Press.

50.     Balistreri, Kelly S. and Jennifer Van Hook. 2009. "Socioeconomic Status and Body Mass Index Among Latino Children of Immigrants and Children of Natives." *American Journal of Public Health* 99(12): 2238-2246. (PMCID: PMC2775779)

37

51.     Zhang, Yuanting and Jennifer Van Hook. 2009. "Marital Dissolution among Interracial Couples." *Journal of Marriage and the Family* 71: 95-107. (PMCID: PMC4183451)

52.     Van Hook, Jennifer and Frank D. Bean. 2009. "Explaining Mexican-Immigrant Welfare Behaviors: The Importance of Employment Related Cultural Repertoires." *American Sociological Review* 74(3): 423-444. (PMCID: PMC3906684)

53.     Bean, Frank D., Cynthia Feliciano, Jennifer Lee, and Jennifer Van Hook. 2009. "The New U.S. Immigrants: How do they affect our Understanding of the African-American Experience?" *The Annals 621: 202 – 220. (*PMCID: PMC3244721)

54.     Baker, Elizabeth, Kelly S. Balistreri, and Jennifer Van Hook. 2009. "Maternal Employment and Overweight among Latino Children of Immigrants and Children of Natives." *Journal of Immigrant and Minority Health* 11(3): 158-167 (PMCID: PMC3305809).

55.     Van Hook, Jennifer, Elizabeth Baker, and Claire Altman. 2009. "Does it begin at school or home? The institutional origins of overweight among young children of immigrants." Pp. 205-224 in *Immigration, Diversity, and Education*, edited by Elena L. Grigorenko and Ruby Takanishi. New York: Routledge/Taylor and Francis Group.

56.     Van Hook, Jennifer and Frank D. Bean. 2009. "Immigrant Welfare Receipt: Implications for Immigrant Settlement and Integration." Pp. 93-122 in *Immigrants and Welfare: The Impact of Welfare Reform on America's Newcomers,* Michael Fix and Kirin Kalia (eds.). Russell Sage Foundation: New York.

57.     Buelow, Victoria and Jennifer Van Hook. 2008. "Timely Immunization Series Completion Among Children of Immigrants." *Journal of Immigrant and Minority Health* 10(1): 37-44 (PMCID: PMC3298969).

*58.*     Brown, Susan L., Jennifer Van Hook, and Jennifer E. Glick. 2008. "Generational Differences in Cohabitation and Marriage in the U.S." *Population Research and Policy Review* 27(5): 531-550. (PMCID: PMC3242441)

*59.*     Glick, Jennifer E. and Jennifer Van Hook. 2008. "Through Children's Eyes: Families and Households of Latino Children in the United States," pp. 72-86 in *Latinos/as in the United States: Changing the Face of América,* edited by Havidán Rodríguez and Cecilia Menjivar. New York: Springer.

*60.*     Van Hook, Jennifer, and Jennifer E. Glick. 2007. "Immigration and Living Arrangements: Moving Beyond Economic Need Versus Acculturation." *Demography* 44(2): 225-249.

*61.*     Van Hook, Jennifer, and Jason Snyder. 2007. "Immigration, Ethnicity, and the Loss of White Students From California Public Schools, 1990-2000." *Population Research and Policy Review* 26: 259-277.

*62.*     Van Hook, Jennifer and Kelly S. Balistreri. 2007. "Immigrant Generation, Socioeconomic Status, and Economic Development of Countries of Origin: A Longitudinal Study of BMI among Children." *Social Science and Medicine* 65: 976-989.

*63.*     Ryabov, Igor K. and Jennifer Van Hook. 2007. "School Segregation and Academic Achievement among Latino Adolescents." *Social Science Research* 36(2): 767-788.

*64.*     **Van Hook, Jennifer, Weiwei Zhang, Frank D. Bean, and Jeffrey Passel. 2006. "Foreign-born Emigration: A New Approach and Estimates Based on Matched CPS Files." *Demography* 43(2): 361-382.**

38

65.     Van Hook, Jennifer, Susan K. Brown, and Frank D. Bean. 2006. "For Love or Money? Welfare Reform and Immigrant Naturalization." *Social Forces* 85(2): 643-666.

66.     Van Hook, Jennifer and Kelly Stamper Balistreri. 2006. "Ineligible Parents, Eligible Children: Food Stamps Receipt, Allotments and Food Insecurity among Children of Immigrants." *Social Science Research* 35(1): 228-251.

67.     Van Hook, Jennifer, Susan L. Brown, and Maxwell Kwenda. 2004. "A Decomposition of Trends in Poverty Among Children of Immigrants." *Demography* 41(4): 649-670.

68.     Balistreri, Kelly and Jennifer Van Hook. 2004. "The more things change the more they stay the same: Mexican Naturalization Before and After Welfare Reform." *International Migration Review* 38(Spring): 113-130.

69.     Van Hook, Jennifer. 2003. "Welfare Reform's Chilling Effects on Non-citizens: Changes in Non-citizen Recipiency or Shifts in Citizenship Status?" *Social Science Quarterly* 84(3): 613-631.

70.     Van Hook, Jennifer. 2003. "Easier Said Than Done: A Review of *Migration Theory: Talking Across Disciplines*." *Journal of American Ethnic History* 22(3): 92-93.

71.     Bean, Frank D., Gillian Stevens, and Jennifer Van Hook. 2003. "Immigration and Immigrant Welfare Receipt." In Frank D. Bean and Gillian Stevens, *Americas Newcomers and the Dynamics of Diversity*. New York: Russell Sage and ASA Arnold Rose Monograph Series. (winner of the American Sociological Association's 2003 Otis Dudley Duncan book award)

72.     Van Hook, Jennifer. 2002. "Immigration and African American Educational Opportunity: The Transformation of Minority Schools" *Sociology of Education* 75(2): 169-189.

73.     Van Hook, Jennifer, and Kelly Balistreri. 2002. "Diversity and Change in the Institutional Context of Immigrant Adaptation: California Schools 1985-2000." *Demography* 39(4): 639-654.

74.     Glick, Jennifer E. and Jennifer Van Hook. 2002. "Parents' Coresidence with Adult Children: Can Immigration Explain Racial and Ethnic Variation?" *Journal of Marriage and the Family* 64: 240-253.

75.     **Bean, Frank D., Rodolfo Corona, Rodolfo Tuiran, Karen Woodrow-Lafield, and Jennifer Van Hook. 2001. "Circular, Invisible, and Ambiguous Migrants: Components of Difference in Estimates of the Number of Unauthorized Mexican Migrants in the United States." *Demography* 38(3): 411-422.**

76.     Van Hook, Jennifer. 2000. "SSI Eligibility and Participation Among Elderly Naturalized Citizens and Noncitizens," *Social Science Research* 29: 51-69.

77.     Van Hook, Jennifer and Michael Fix. 2000. "A Profile of the Immigrant Student Population." Pp. 9-33 in Jorge Ruiz DeVelasco, Michael Fix and Toni Clewell (eds.), *Overlooked and Underserved: Immigrant Children in U.S. Secondary Schools*. The Urban Institute Press: Washington, D.C.

78.     Van Hook, Jennifer, Jennifer E. Glick, and Frank D. Bean. 1999. "Public Assistance Receipt among Immigrants and Natives: How the Unit of Analysis Affects Research Findings," *Demography* 36(1): 111-120.

   *a.*   2007.   Reprinted in Diane Kholos Wysocki (ed.), *Readings in Social Research Methods, third edition*. Stamford, CT: Wadsworth Group.

   *b.*   2001.   Reprinted pp. 84-98 in Diane Kholos Wysocki (ed.), *Readings in Social Research Methods*. Stamford, CT: Wadsworth Group.

   *79.*   Van Hook, Jennifer and Frank D. Bean. 1999. "The Growth in Noncitizen SSI Caseloads 1979-1996: Aging Versus New Immigrant Effects," *Journal of Gerontology: Social Sciences* 54(1): S16-S23.

   *80.*   Bean, Frank D., Jennifer Van Hook and Mark Fossett. 1999. "Immigration, Spatial and Economic Change, and African American Employment," pp. 31-63 in Frank D. Bean and Stephanie Bell-Rose (eds.), *Immigration and Opportunity: Race, Ethnicity, and Employment in the United States*. New York: Russell Sage Foundation.

   *81.*   Glick, Jennifer E. and Jennifer Van Hook. 1998. "The Mexican Origin Population of the United States in the Twentieth Century," pp. 571-586 in *Migration Between Mexico and the United States, Research Reports and Background Materials*, Mexico City and Washington, D.C.: Mexican Ministry of Foreign Affairs and U.S. Commission on Immigration Reform.

   *82.*   Van Hook, Jennifer and Frank D. Bean. 1998. "Estimating Unauthorized Migration to the United States: Issues and Results," pp. 511-550 in *Migration Between Mexico and the United States, Research Reports and Background Materials*, Mexico City and Washington, D.C.: Mexican Ministry of Foreign Affairs and U.S. Commission on Immigration Reform.

   *83.*   Van Hook, Jennifer and Frank D. Bean. 1998. "Estimating Underenumeration among Unauthorized Mexican Migrants to the United States: Applications of Mortality Analyses," pp. 551-570 in *Migration Between Mexico and the United States, Research Reports and Background Materials*, Mexico City and Washington, D.C.: Mexican Ministry of Foreign Affairs and U.S. Commission on Immigration Reform.

   *84.*   Van Hook, Jennifer V. W. and Frank D. Bean. 1998. "Welfare Reform and SSI Receipt among Immigrants in the United States," pp. 139-158 in H. Kurthen, J. Fijalkowski, and G. Wagner (eds.), *Immigration, Citizenship, and the Welfare State*. Greenwich, CT: JAI Press.

   *85.*   Glick, Jennifer E., Frank D. Bean, and Jennifer V.W. Van Hook. 1997. "Immigration and Changing Patterns of Extended Family Household Structure in the United States: 1970-1990," *Journal of Marriage and the Family* 59 (February): 177-191.

   *86.*   Bean, Frank D., Robert G. Cushing, Charles Haynes, and Jennifer V.W. Van Hook. 1997. "Immigration and the Social Contract," *Social Science Quarterly* 78(2): 249-268.

   *a.*   1999.   Reprinted in C. Zelinsky (ed.), *Readings: Racial and Ethnic Groups in America*. Dubuque, Iowa: Kendall Hunt Publishing.

   *b.*   1999.   Reprinted in C. Ellison and A. Martin (eds.), *Race and Ethnic Relations in the United States: Readings for the 21st Century*. Los Angeles: Roxbury Publishing Company.

   *87.*   Bean, Frank D., Jennifer V.W. Van Hook and Jennifer E. Glick. 1997. "Country of Origin, Type of Public Assistance and Patterns of Welfare Recipiency Among U.S. Immigrants and Natives," *Social Science Quarterly* 78(2): 432-451.

*88.* Van Hook, Jennifer V.W., Frank D. Bean and Jennifer E. Glick. 1996. "The Development and Assessment of Census-Based Measures of AFDC and SSI Recipiency," *Journal of Economic and Social Measurement* 22(1): 1-23.

*89.* Bean, Frank D., Ruth R. Berg, and Jennifer V. W. Van Hook. 1996. "Socioeconomic and Cultural Incorporation and Marital Disruption Among Mexican Americans," *Social Forces* 75(2): 593-617.

41