**FILED**

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

DEC 5 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO; COUNTY OF SANTA CLARA, <br><br>         Plaintiffs-Appellees, <br><br> v. <br><br> UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, a federal agency; U.S. DEPARTMENT OF HOMELAND SECURITY, a federal agency; KEVIN K. MCALEENAN, in his official capacity as Acting Secretary of the United States Department of Homeland Security; KENNETH T. CUCCINELLI, in his official capacity as Acting Director of United States Citizenship and Immigration Services, <br><br>         Defendants-Appellants. | No.   19-17213 <br><br> D.C. No. 4:19-cv-04717-PJH <br> Northern District of California, Oakland <br><br><br> ORDER |
| STATE OF CALIFORNIA; DISTRICT OF COLUMBIA; STATE OF MAINE; COMMONWEALTH OF PENNSYLVANIA; STATE OF OREGON, <br><br>         Plaintiffs-Appellees, | No.   19-17214 <br><br> D.C. No. 4:19-cv-04975-PJH <br> Northern District of California, Oakland |

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, a federal agency; UNITED
STATES CITIZENSHIP AND
IMMIGRATION SERVICES, a federal
agency; KEVIN K. MCALEENAN, in his
official capacity as Acting Secretary of the
United States Department of Homeland
Security; KENNETH T. CUCCINELLI, in
his official capacity as Acting Director of
United States Citizenship and Immigration
Services,

                    Defendants-Appellants.

---

STATE OF WASHINGTON;
COMMONWEALTH OF VIRGINIA;
STATE OF COLORADO; STATE OF
DELAWARE; STATE OF ILLINOIS;
STATE OF MARYLAND;
COMMONWEALTH OF
MASSACHUSETTS; DANA NESSEL,
Attorney General on behalf of the People
of Michigan; STATE OF MINNESOTA;
STATE OF NEVADA; STATE OF NEW
JERSEY; STATE OF NEW MEXICO;
STATE OF RHODE ISLAND; STATE
OF HAWAI'I,

                    Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND

No.    19-35914

D.C. No. 4:19-cv-05210-RMP
Eastern District of Washington,
Richland

2

SECURITY, a federal agency; KEVIN K.
MCALEENAN, in his official capacity as
Acting Secretary of the United States
Department of Homeland Security;
UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, a federal
agency; KENNETH T. CUCCINELLI, in
his official capacity as Acting Director of
United States Citizenship and Immigration
Services,

Defendants-Appellants.

Before:  BYBEE, IKUTA, and OWENS, Circuit Judges.

BYBEE, Circuit Judge:

Since 1882, when the Congress enacted the first comprehensive immigration
statute, U.S. law has prohibited the admission to the United States of "any person
unable to take care of himself or herself without becoming a public charge."  Act
of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214 (1882).  Although the precise
formulation of this provision has been amended regularly in the succeeding century
and a quarter, the basic prohibition and the phrase "public charge" remains.  Most
recently, in the Illegal Immigration Reform and Immigrant Responsibility Act of
1996 (IIRIRA), Congress amended the Immigration and Nationality Act (INA) to
provide that "[a]ny alien who, in the opinion of the consular officer at the time of
application for a visa, or in the opinion of the Attorney General at the time of

application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A).  In making this determination, "the consular officer or the Attorney General shall at a minimum" take five factors into account: age; health; family status; assets, resources, and financial status; and education and skills.  *Id.* § 1182(a)(4)(B)(i).  Under long-standing practice, consular officers and the Attorney General consider these factors under a "totality of the circumstances" test.

In 1999, the Immigration and Naturalization Service (INS), providing guidance to the public and INS field officers, defined "public charge" as an "alien . . . who is likely to become . . . primarily dependent on the government for subsistence" as demonstrated by either "institutionalization for long-term care at government expense" or "receipt of public cash assistance for income maintenance."  Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689, 28,689 (May 26, 1999) (*1999 Field Guidance*) (internal quotation marks omitted).  Although INS determined that the receipt of *cash* benefits received under a public program would be considered a factor in determining whether an alien was likely to become a public charge, it stated that *non-cash* benefits would not be taken into account for public-charge purposes.  *Id.*

4

In August 2019, following notice and comment, the Department of Homeland Security adopted a new rule, redefining the term "public charge" to require a consideration of not only *cash* benefits, but also certain *non-cash* benefits.  Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292, 41,292 (Aug. 14, 2019) (Final Rule).  Under DHS's Final Rule a public charge is "an alien who receives one or more public benefits . . .  for more than 12 months in the aggregate within any 36-month period." *Id.* at 41,501.  In turn, DHS defined "public benefits."  Consistent with the *1999 Field Guidance*, DHS still considers receipt of cash assistance from Supplemental Security Income (SSI); Temporary Assistance for Needy Families (TANF); and federal, state, or local general assistance programs to be public benefits.  To that list, DHS added non-cash assistance received through the Supplemental Nutrition Assistance Program (SNAP), Section 8 housing assistance, Section 8 project-based rental assistance, Medicaid (with certain exceptions), and Section 9 public housing. *Id.*  DHS's rule exempts public benefits received for emergency medical conditions, benefits received under the Individuals with Disabilities Education Act, and school-based services or benefits. *Id.*  It also exempts those benefits received by aliens under 21 years of age, women during pregnancy, and members of the armed forces and their families. *Id.*  DHS repeated that "[t]he determination of an alien's likelihood of

becoming a public charge at any time in the future must be based on the totality of the alien's circumstances." *Id*. at 41,502.

Prior to the Final Rule taking effect in October 2019, various states, municipalities and organizations brought suits in California and Washington seeking a preliminary injunction against the implementation of the rule.  In Nos. 19-17213 and 19-17214, California, Maine, Oregon, Pennsylvania, and the District of Columbia; the City and County of San Francisco and the County of Santa Clara; and various organizations brought suit in the Northern District of California against the United States under the Due Process Clause of the Fifth Amendment; the Administrative Procedure Act (APA), 5 U.S.C. § 706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.  The district court granted a preliminary injunction on the basis of the APA, effective against implementation of the rule in the plaintiff states. *City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, 2019 WL 5100718 (N.D. Cal. Oct. 11, 2019).  In No. 19-35914, thirteen states—Washington, Virginia, Colorado, Delaware, Hawaiʻi, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, and Rhode Island—filed suit in the Eastern District of Washington against DHS under the Due Process Clause of the Fifth Amendment and the APA.  The district court granted a preliminary injunction on the basis of the APA claims and issued a

nationwide injunction.  *Washington v. U.S. Dep't of Homeland Sec.*, 2019 WL 5100717 (E.D. Wash. Oct. 11, 2019).

DHS seeks a stay of both preliminary injunctions.[1]  Our authority to issue a stay of a preliminary injunction is circumscribed.  Nevertheless, for the reasons explained below, we will grant the stay.  DHS has shown a strong likelihood of success on the merits, that it will suffer irreparable harm, and that the balance of the equities and public interest favor a stay.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

## I. BACKGROUND AND PROCEDURE

We begin with the governing statutory framework, the proposed change to this framework, and the proceedings below.

A.    *Statutory Framework*

The INA requires all aliens who seek lawful admission to the United States, or those already present but seeking to become lawful permanent residents (LPRs), to prove that they are "not inadmissible."  8 U.S.C. § 1361; *see also id.* §§ 1225(a), 1255(a).  Section 212 of the INA lists the grounds on which an alien may be adjudged inadmissible.  *Id*. § 1182(a)(1)–(10).  One of the grounds for

---

[1] For clarity, we will refer to the plaintiffs below as "the States" and the defendants as "DHS."

7

inadmissibility is a determination that the alien is likely to become a "public

charge." *Id*. § 1182(a)(4).  Section 212(a)(4) of the INA reads as follows:

(4) PUBLIC CHARGE. —

> (A) IN GENERAL.—Any alien who, in the opinion of
> the consular officer at the time of application for a visa,
> or in the opinion of the Attorney General at the time of
> application for admission or adjustment of status, is
> likely at any time to become a public charge is
> inadmissible.

> (B) FACTORS TO BE TAKEN INTO ACCOUNT.—

>> (i) In determining whether an alien is inadmissible under
>> this paragraph, the consular officer or the Attorney
>> General[2] shall at a minimum consider the alien's—

>>> (I) age;
>>> (II) health;
>>> (III) family status;
>>> (IV) assets, resources, and financial status; and
>>> (V) education and skills.

>> (ii) In addition to the factors under clause (i), the consular
>> officer or the Attorney General may also consider any

---

[2] The Homeland Security Act of 2002 transferred much of the Attorney General's immigration authority to the newly created office of the Secretary of Homeland Security.  *See In re D-J-*,  23 I. & N. Dec. 572, 573–74 & n.2 (Op. Att'y Gen. 2003) (citing Homeland Security Act of 2002, Pub. L. No. 108-7, 117 Stat. 531 (2003)).  Though the Attorney General retains authority over the Executive Office for Immigration Review, *id*. n.3, the Secretary of Homeland Security is now responsible with the general administration and enforcement of immigration law, *id*. n.2.

> affidavit of support[3] under section 1183a of this title for purposes of exclusion under this paragraph.

*Id*.

This provision is applied at different times by different government agencies.  When an alien seeks a visa to travel to the United States, a Department of State (DOS) consular officer must make an admissibility determination.  *See* 84 Fed. Reg. at 41,294 n.3.  When an alien arrives at a port of entry without a visa, DHS makes that determination.  *Id*.  An alien may also be deemed "inadmissible" even when the alien is already in the country.  For example, when an alien seeks an adjustment of status from non-immigrant to LPR, DHS must determine that the alien is not inadmissible.  *See id*.  And when an alien is processed in immigration court, the Department of Justice (DOJ) through immigration judges and the Board of Immigration Appeals (BIA) must determine whether that alien is inadmissible. *Id*.

Though § 212 of the INA lays out the factors an immigration official must consider "at a minimum" when making a public-charge determination, the INA does not define the term "public charge," or restrict how officials are to consider

---

[3] An affidavit of support is a binding pledge, often made by an employer or family member of the alien, to financially support the alien at 125 percent of the Federal poverty line.  8 U.S.C. § 1183.

9

age, health, family status, financial resources, and education.  Indeed, as explained in more detail below, in the context of immigration law, the term "public charge" has had several meanings.  Since 1999, however, the term has been defined according to guidelines issued by the INS Field Guidance on the matter.  *See 1999 Field Guidance*, 64 Fed. Reg. at 28,689.  The *1999 Field Guidance* defined a public charge as an alien who "is likely to become (for admission/adjustment purposes) primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense."  *Id.* (internal quotation marks omitted).  The *1999 Field Guidance* did not permit immigration officers to "place any weight on the receipt of non-cash public benefits," *id.*, and allowed consideration of only cash-benefit programs like SSI, TANF, and "[s]tate and local cash assistance programs that provide benefits for income maintenance," *id.* at 28,692.

B.    *The Proposed Rule*

On October 10, 2018, DHS published a Notice of Proposed Rulemaking (NPRM) indicating its intent to abandon the *1999 Field Guidance* and redefine the term "public charge."  *See* Inadmissibility on Public Charge Grounds, 83 Fed. Reg.

10

51,114 (proposed Oct. 10, 2018).[4]  It did so acting under the authority vested in the

Secretary of Homeland Security to establish immigration regulations and enforce

immigration law.  *See* 8 U.S.C. § 1103(a)(3) ("[The Secretary of Homeland

Security] shall establish such regulations . . . as he deems necessary for carrying

out his authority under the provisions of this chapter.").  The proposed rule

redefined the term "public charge" in two ways.

  First, the proposed rule for the first time established a required length of

time for which the alien would have to rely on public benefits before being labeled

a public charge. Under the *1999 Field Guidance*, a public charge was defined as an

individual "primarily dependent" on government benefits, but the *1999 Field

Guidance* prescribed no specific time period for which this determination should

be made.  *See* 64 Fed. Reg. at 28,689, 28,692.  Under the new rule, an alien would

be considered a public charge if he or she "receives one or more [designated]

public benefits . . . for more than 12 months in the aggregate within a 36-month

period."  83 Fed. Reg. at 51,157–58.  Moreover, the proposed rule counts each

---

  [4] The proposed rule would not change the definition of public charge for
removability determinations, only for determinations of inadmissibility.  83 Fed.
Reg. at 51,134.  And though the rule only applies to DHS, DHS is currently
working with DOS and DOJ to ensure that all three agencies apply a consistent
definition of the term in their admissibility inquiries.  84 Fed. Reg. at 41,294 n.3.

public benefit received, so that "receipt of two different non-monetizable benefits in one month counts as two months." *Id.* at 51,166.

Second, the proposed rule expanded which benefits contributed to a public-charge determination. The proposed rule still included those cash-benefit programs that were listed in the *1999 Field Guidance*, but now also includes various in-kind programs, such as:

> (A) Supplemental Nutrition Assistance Program (SNAP, formerly called ''Food Stamps''), 7 U.S.C. 2011 to 2036c;
>
> (B) Section 8 Housing Assistance under the Housing Choice Voucher Program, as administered by HUD under 24 CFR part 984; 42 U.S.C. 1437f and 1437u;
>
> (C) Section 8 Project-Based Rental Assistance (including Moderate Rehabilitation) under 24 CFR parts 5, 402, 880 through 884 and 886; and
>> . . .
>> (i) Medicaid, 42 U.S.C. 1396 *et seq.*, [with several exceptions, discussed below]
> . . .
>> (iv) Subsidized Housing under the Housing Act of 1937, 42 U.S.C. 1437 *et seq.*

*Id.* at 51,290 (to be codified at 8 C.F.R. § 212.21).[5]

Additionally, the proposed rule added other factors for immigration officers to consider when making a public-charge determination.  The rule still required consideration of the alien's age, health, family status, financial status, education and skills, as well as any affidavits of support the alien presents.  *See* 83 Fed Reg. 51,178 (to be codified at 8 C.F.R. § 212.22).  But the proposed rule also laid out new factors to be afforded extra weight.  Four factors weigh heavily against the alien in a public-charge determination: (1) a finding that the alien "is not a full-time student and is authorized to work," but cannot demonstrate "current employment, employment history, or [a] reasonable prospect of future employment";  (2) a previous finding of inadmissibility on public-charge grounds; (3) a medical diagnosis that would likely require extensive medical treatment or interfere with the alien's ability to be self-sufficient; and (4) receipt of benefits for

---

[5] DHS altered the Final Rule to make clear that certain benefits were exempt from consideration, including "Medicaid [collected] by aliens under the age of 21[, Medicaid collected by] pregnant women during pregnancy and during the 60-day period after pregnancy," school-based services, Individuals with Disabilities Education Act (IDEA) services, Medicare Part D Low-Income Subsidies, and emergency medical care.  84 Fed. Reg. at 41,296–97 (codified at 8 C.F.R. § 212.21).  Further, in certain circumstances, the proposed rule excuses receipt of covered public benefits.  *See id.* (codified at 8 C.F.R. § 212.21) (exempting public benefits from consideration when the recipient has received certain humanitarian relief, the recipient or his spouse was in the Armed Forces, or the recipient received a waiver).

more than twelve months within a thirty-six month period. *Id*. at 51,198–201 (to be codified at 8 C.F.R. § 212.22). Conversely, two factors would weigh heavily in favor of the alien in a public-charge determination: (1) assets or household income over 250 percent of the Federal poverty line, and (2) individual income over 250 percent of the Federal poverty line.[6] *Id*. at 51,292 (to be codified at 8 C.F.R. § 212.22(c)(2)).

During the sixty-day public comment period that followed the NPRM, DHS collected 266,077 comments, "the vast majority of which opposed the rule." 84 Fed. Reg. at 41,297. On August 14, 2019, DHS published the Final Rule in the Federal Register. *Id*. at 41,292. In its 216-page Final Rule, DHS made some changes to the proposed rule (which are not relevant here) and addressed the comments it received. The Final Rule was scheduled to take effect on October 15, 2019, and would apply to anyone applying for admission or adjustment of status after that date. *Id.*

C.   *The Proceedings*

1.      *The Northern District of California Case*

---

[6] The Final Rule added a third factor: private health insurance not subsidized under the Affordable Care Act. 84 Fed. Reg. at 41,504.

On August 13, 2019, the City and County of San Francisco and the County of Santa Clara sued several government agencies and officials, including U.S. Citizenship and Immigration Services (USCIS), the Acting Director of USCIS Kenneth T. Cuccinelli, DHS, and the then Acting Director of DHS Kevin McAleenan.  They brought suit in the United States District Court for the Northern District of California, claiming that the proposed rule violated the APA on two grounds: (1) the rule was not made in accordance with the law, and (2) the rule was arbitrary, capricious, and an abuse of discretion.  *See* 5 U.S.C. § 706(2).  Three days later, on August 16, 2019, California, Maine, Oregon, Pennsylvania, and the District of Columbia, sued the same defendants in the same court.  They claimed that (1) the proposed rule violated § 706 of the APA because (a) it was not made in accordance with the INA, the IIRIRA, the Rehabilitation Act, or state healthcare discretion, (b) it was arbitrary, capricious, and an abuse of discretion, and (2) the proposed rule violated the Fifth Amendment's Due Process Clause because it denied equal protection based on race and unconstitutional animus.

15

Each set of plaintiffs filed a motion to preliminarily enjoin enforcement of the proposed rule.  On August 27, 2019, the district court ordered the two cases consolidated.[7]

The district court heard oral argument on October 2, 2019, and on October 11, granted the preliminary injunction.  *See City & Cty. of San Francisco*, 2019 WL 5100718 at *1, 53.  The court first held that both the Counties and the States had standing to sue because they showed imminent financial injury.  *Id*. at *46–47.  It held that they were in the statute's zone of interests because, in enacting the public-charge provision of the INA, "Congress intended to protect states and their political subdivisions' coffers."  *Id*. at *41.  On the merits, the district court found that the States satisfied the four-factor test for a preliminary injunction.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The court held that the States had a likelihood of success on the merits for at least some of their claims.  It found the States were likely to successfully show that the proposed rule was contrary to law because it unreasonably defined the term "public charge," and thus failed the second step of the *Chevron* analysis.  *City & Cty. of San Francisco*, 2019

---

[7] Several legal and health-care organizations were also parties to the motion for a preliminary injunction below.  The district court found that they failed to establish that they were within the zone of interests.  *City & Cty. of San Francisco*, 2019 WL 5100718, at *53.  They are not parties to this appeal.

WL 5100718, at *28.  Alternatively, the court found that the States had shown a

serious question as to whether the INA unambiguously foreclosed the proposed

change to the definition of public charge, thus causing the Final Rule to fail at

*Chevron* step one.  *Id*.  The court also concluded that the States had demonstrated a

likelihood of success on the arbitrary-and-capricious claim because DHS failed to

adequately consider the adverse economic and public health-related costs of the

proposed rule.  *Id*. at *34, *37.

Further, the court found that the rule's implementation would irreparably

harm the Counties and States by causing them to lose millions of dollars in federal

reimbursements and face increased operational costs.  *Id*. at *46–49.  Focusing on

the public's interest in the continued provision of medical services and the

prevention of communicable diseases, the district court found both the balance of

the equities and the public interest weighed in favor of granting an injunction.  *Id*.

at *50–51.  However, because the court found that the States had failed to show

why a nationwide injunction would be necessary, the court granted an injunction

that applied only to those persons living in plaintiff states or counties.  *Id*. at *53.

On October 25, 2019, DHS sought a stay of the preliminary injunction.

DHS informed the court that it would seek appellate relief if the court did not act

by November 14.

17

2.   *The Eastern District of Washington Case*

On August 14, 2019, Washington, Virginia, Colorado, Delaware, Hawai'i, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, Rhode Island, and the state attorney general on behalf of Michigan sued USCIS, Cuccinelli, DHS, and McAleenan in the United States District Court for the Eastern District of Washington.  They alleged claims similar to those presented in the California cases:  (1) the proposed rule violated the APA because (a) it was not in accordance with immigration law or the Rehabilitation Act, (b) it exceeded DHS's statutory jurisdiction or authority, and (c) it was arbitrary, capricious, and an abuse of discretion, and (2) the proposed rule violated the Fifth Amendment's Due Process Clause because it denied equal protection based on race and unconstitutional animus.

The district court heard oral argument on October 3, 2019, and on October 11, granted the preliminary injunction.  *See Washington*, 2019 WL 5100717, at *23.  The court's conclusions largely mirrored those of the Northern District of California, though there were some differences.  Citing the States' anticipated economic, administrative, and public-health costs, the court held that the States had standing and that the matter was ripe.  *Id*. at *11.  Finding that the INA was enacted "to protect states from having to spend state money to provide for

18

immigrants who could not provide for themselves," the court concluded that the States were within the INA's zone of interests. *Id.*

On the merits, the court held that the States had shown a likelihood of success on the arbitrary-and-capriciousness claim and the *Chevron* claim, though the Washington court was less clear than the California court had been about at which step of the *Chevron* analysis the proposed rule would fail. *Id.* at *13–17. Unlike the California court, the Washington court also found that the States were likely to succeed in proving that DHS had violated the Rehabilitation Act, and that DHS acted beyond its congressionally delegated authority in defining self-sufficiency. *Id.* at *17–18. Noting that "the Plaintiff States provide a strong basis for finding that disenrollment from non-cash benefits programs is predictable, not speculative," and that such disenrollment would financially harm the States, the court found that the States would suffer irreparable harm if the injunction were not issued. *Id.* at *20–21. On these same grounds, the court found that the balance of the equities and public interest both "tip[ped] in favor" of granting a preliminary injunction. *Id.* at *21. However, unlike the California court, the Washington court found a geographically limited injunction untenable, in part because a limited injunction might give immigrants an incentive to move from unprotected states to

protected states.  Accordingly, the Washington court granted the States a

nationwide injunction.  *Id*. at *22–23.

On October 25, 2019, DHS sought a stay of the preliminary injunction.

DHS informed the court that it would seek appellate relief if the court did not act

by November 14.

*     *     *

By November 14, neither district court responded to the respective motions

to stay. On November 15, 2019, DHS filed a motion in this court for an emergency

stay of the injunction.

## II. JURISDICTION

DHS contends that the plaintiffs do not have Article III standing to sue and

that their claims do not fall within the zone of interests protected by the INA.  We

have an obligation to ensure that jurisdiction exists before proceeding to the merits.

*See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998).[8]

Additionally, although no party has raised the issue, we must address whether

---

[8] Both district courts also held that the States' claims fall within the INA's "zone of interests." *See City & Cty. of San Francisco*, 2019 WL 5100718, at *41; *Washington*, 2019 WL 5100717, at *11.  For present purposes, because the issue is close and raises a prudential rather than jurisdictional concern, *see Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017), we will assume that the States' claims satisfy the requirement.

20

DHS's request for a stay pending appeal is moot in light of the fact that two courts
outside our circuit have also issued nationwide injunctions, and any decision we
issue here would not directly affect those orders. We conclude that, at this
preliminary stage of the proceedings, the States have sufficiently alleged grounds
for Article III standing and that DHS's petition for a stay is not moot.

A.   *Article III Standing*

Article III of the Constitution limits the federal judicial power to the
adjudication of "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. This
fundamental limitation "is founded in concern about the proper—and properly
limited—role of the courts in a democratic society." *Summers v. Earth Island
Inst.*, 555 U.S. 488, 492–93 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498
(1975)). "One of the essential elements of a legal case or controversy is that the
plaintiff have standing to sue." *Trump v. Hawai'i*, 138 S. Ct. 2392, 2416 (2018).
"[B]uilt on separation-of-powers principles," standing ensures that litigants have "a
personal stake in the outcome of the controversy as to justify the exercise of the
court's remedial powers on their behalf." *Town of Chester v. Laroe Estates, Inc.*,
137 S. Ct. 1645, 1650 (2017) (internal citations and alterations omitted).

21

To demonstrate Article III standing, a plaintiff must show a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "At least one plaintiff must have standing to seek each form of relief requested," *Town of Chester*, 137 S. Ct. at 1651, and that party "bears the burden of establishing" the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561. "At this very preliminary stage," plaintiffs "may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their [preliminary-injunction] motion to meet their burden." *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (per curiam). And they "need only establish a *risk* or *threat* of injury to satisfy the actual injury requirement." *Harris v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004); *see Spokeo*, 136 S. Ct. at 1548 (noting that the injury must be "actual or imminent, not conjectural or hypothetical" (quoting *Lujan*, 504 U.S. at 560)).

The district courts concluded that the States had standing based on their alleged loss of federal funds and increase in operational costs related to individuals disenrolling from the non-cash public benefits at issue. DHS challenges this

finding, arguing that predictions of future financial harm are based on an "'attenuated chain of possibilities' that does not show 'certainly impending' injury."[9]  DHS's argument is unavailing for several reasons.

First, the injuries alleged are not entirely speculative—at least for standing purposes.  DHS acknowledges that one result of the Final Rule will be to encourage aliens to disenroll from public benefits.  It predicted a 2.5 percent disenrollment rate when proposing the rule.  84 Fed. Reg. at 41,463.  This disenrollment, DHS predicted, would result in a reduction in Medicaid reimbursement payments to the States of about $1.01 billion.  *Id.* at 41,301.  DHS also acknowledged increased administrative costs that would result from the Final Rule.  *Id.* at 41,389.  To be sure, the predicted result is premised on the actions of third parties, but this type of "predictable effect of Government action on the decisions of third parties" is sufficient to establish injury in fact.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

Moreover, according to evidence supplied by the States, the predicted results have already started.  As more individuals disenroll from Medicaid, the States will no longer receive reimbursements from the federal government for treating them.

---

[9] DHS raises no argument about the second and third elements of the standing analysis.

Similarly, the States have sufficiently alleged that they are facing new and ongoing operational costs resulting from the Final Rule. *See City & Cty. of San Francisco*, 2019 WL 5100718**,** at *48. These costs are predictable, likely, and imminent. It is disingenuous for DHS to claim that they are too attenuated at this point when it acknowledged these costs in its own rulemaking process.

Finally, DHS's reliance on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), is unfounded. There, the Court found that various human rights, labor, legal, and media organizations did not have standing to challenge the constitutionality of a law authorizing governmental electronic surveillance of communications for foreign intelligence purposes. *Id.* at 414. The alleged injury was that the threat of surveillance would compel them to travel abroad to have in-person conversations with sources and witnesses, in addition to other costs related to protecting the confidentiality of sensitive communications. *Id.* at 406–07. The Court found that the injury was not "certainly impending" because it was highly speculative whether the government would imminently target communications between the plaintiffs and foreign individuals. *Id.* at 410–11. The assumption that their communications would be targeted was not enough to demonstrate injury in fact. *Id.* at 411–14. Here, the States are not making assumptions about their

24

claimed injuries.  Unlike in *Clapper*, the States present evidence that the predicted disenrollment and rising administrative costs are currently happening.

Thus, based on the available evidence at this early stage of the proceedings, we conclude that the States have shown that they have suffered and will suffer direct injuries traceable to the Final Rule and thus have standing to challenge its validity.

B.    *Mootness*

Finally, we raise on our own the question of whether we can consider DHS's request for a stay of the district court's preliminary injunctions.  *See Demery v. Arpaio*, 378 F.3d 1020, 1025 (9th Cir. 2004) ("[W]e have an independent duty to consider *sua sponte* whether a case is moot.").  The stay would, presumably, allow the Final Rule to go into effect pending further proceedings in the district court and this court.  The question of mootness arises because, contemporaneous with the district courts' orders here, district courts in Maryland and New York also issued nationwide injunctions.  *Casa de Md/, Inc. v. Trump*, 2019 WL 5190689 (D. Md. Oct. 14, 2019); *New York v. U.S. Dep't of Homeland Sec.*, 2019 WL 5100372

(S.D.N.Y. Oct. 11, 2019).[10]  Thus, unless a stay also issues in those cases, any stay we might issue would not allow the Final Rule to go into effect; the Final Rule would still be barred by those injunctions.

We recently addressed this precise question in *California v. U.S. Department of Health & Human Services*, 941 F.3d 410, 423 (9th Cir. 2019), and we concluded that even if an injunction from another court "has a fully nationwide scope, we nevertheless retain jurisdiction under the exception to mootness for cases capable of repetition, yet evading review."  Similarly, we conclude that DHS's petition is not moot, and we proceed to the merits of its petition.

## III. STANDARD OF REVIEW

DHS requests that we stay the district courts' preliminary injunctions pending resolution of the consideration of the merits of DHS's appeals.  We have authority to do so under the All Writs Act, 28 U.S.C. § 1651, which provides that the courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  *See Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9–10 (1942) (finding that a federal court may stay judgments pending appeal "as part of its traditional equipment for the

---

[10] In a third case out of the Northern District of Illinois, the district court issued an order enjoining enforcement of the Final Rule in Illinois only.  *Cook Cty. v. McAleenan*, 2019 WL 5110267 (N.D. Ill. Oct. 14, 2019).

administration of justice"); *In re McKenzie*, 180 U.S. 536, 551 (1901) (noting the "inherent power of the appellate court to stay . . . proceedings on appeal"); *see also* Fed. R. Civ. P. 62(g).

Two standards affect our determination, the standard applicable to district courts for preliminary injunctions, and the standard for appellate courts for stays pending appeal.  The district court must apply a four-factor standard:

> A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.

*Winter*, 555 U.S. at 20.

Alternatively, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Generally, the purpose of a preliminary injunction is to "preserve the status quo and the rights of the parties until a final judgment issues in the cause."  *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Sierra On-Line, Inc. v. Phoenix*

*Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)).  An injunction is "an

extraordinary remedy that may only be awarded upon a clear showing that the

plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  It "should not be

granted unless the movant, *by a clear showing*, carries the burden of persuasion."

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted).

 The standard we apply to DHS's request for a stay is similar, although the

burden of proof is reversed.  "The party requesting a stay bears the burden of

showing that the circumstances justify an exercise of that discretion," and our

analysis is guided by four factors:

> (1) whether the stay applicant has made a strong showing that he is
> likely to succeed on the merits; (2) whether the applicant will be
> irreparably injured absent a stay; (3) whether issuance of the stay will
> substantially injury the other parties interested in the proceeding; and
> (4) where the public interest lies.

*Nken*, 556 U.S. at 433–34 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

"The first two factors . . . are the most critical," and the "mere possibility" of

success or irreparable injury is insufficient to satisfy them.  *Id.* at 434 (internal

quotation marks omitted).  At this stage of the proceedings, it is now DHS's

burden to make "a strong showing that [it] is likely to" prevail against the States'

claims.  *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken*, 556

28

U.S. at 426).  We consider the final two factors "[o]nce an applicant satisfies the first two."  *Nken*, 556 U.S. at 435.

"A stay is an 'intrusion into the ordinary process of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'"  *Id.* at 427 (citations omitted).  "It is instead 'an exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'"  *Id.* at 433 (alteration omitted) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672–73 (1926)).

There is significant overlap in these standards.  The first prong in both tests—likelihood of success on the merits—is the same.  And the Supreme Court has made clear that satisfaction of this factor is the irreducible minimum requirement to granting any equitable and extraordinary relief.  *Trump v. Hawai'i*, 138 S. Ct. at 2423.  The analysis ends if the moving party fails to show a likelihood of success on the merits of its claims.  *Id.*

## IV. LIKELIHOOD OF SUCCESS ON THE MERITS

Any "person suffering legal wrong . . . or adversely affected or aggrieved" by an agency's final action may seek judicial review.  5 U.S.C. § 702.  The scope of our review is determined by the APA.  As a reviewing court, we must "set

aside" a final rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).  In making this determination, we may "decide all relevant questions of law, interpret . . . statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706.

DHS argues that it is likely to succeed on the merits of its appeal because, contrary to the conclusions of the district courts, the Final Rule is neither contrary to law nor arbitrary and capricious.  We agree.  The Final Rule's definition of "public charge" is consistent with the relevant statutes, and DHS's action was not arbitrary or capricious.

A.    *Contrary to Law*

The States argue that the Final Rule is invalid under the APA because the Final Rule's definition of "public charge" is contrary to (1) the INA and (2) the Rehabilitation Act.  We disagree and find that DHS is likely to succeed in its argument that the Final Rule is not contrary to law.[11]

---

[11] The States also brought claims in both courts under the equal protection component of the Due Process Clause.  U.S. CONST. art. V.  Neither district court reached this issue.  We also decline to reach this issue.  We will consider the likelihood of success on the merits only as to those issues that formed the bases for the district courts' injunctions.  In any further proceedings, the district courts are free to consider any issues fairly before them.

1.     The INA and "Public Charge"

When confronted with an argument that an agency's interpretation of a statute that it administers is wrong, we employ the familiar *Chevron* two-step test. First, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If it has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But if Congress has not spoken directly to the issue at hand, we proceed to the second step and ask "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

> We must keep in mind why *Chevron* is an important rule of construction:
>
> *Chevron* is rooted in a background presumption of congressional intent: namely, that Congress, when it left ambiguity in a statute administered by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows. *Chevron* thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency. Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion.

*Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quotation marks and citations omitted).

The district courts found that the Final Rule failed the *Chevron* test at one or both steps because the Final Rule's definition of "public charge" was an impermissible reading of that phrase in the INA.  We will consider each step in turn.

>    a.    *Chevron* Step 1

At *Chevron*'s first step, we determine whether Congress has directly spoken to the issue at hand by "employing traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9.  That means we start with the text.  *Afewerki v. Anaya Law Grp.*, 868 F.3d 771, 778 (9th Cir. 2017).  We will then examine the history of interpretation to see if there has been a judicial construction of the term "public charge" that "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).  Finally, we will consider other factors raised by the district courts and the States.

(1) *Text*.  Under § 212 of the INA, an alien is inadmissible if, "in the opinion of" the immigration official, the alien "is likely at any time to become a public charge."  In making that determination, the immigration official must consider "at a minimum" the alien's age, health, family status, financial resources, education, and skills.  8 U.S.C. § 1182(a)(4)(A).  Congress did not define these terms and

placed no further restrictions on what these officers may consider in the public-charge assessment.  Nor did Congress prescribe how the officers are to regard the five enumerated factors.

We have four quick observations.  First, the determination is entrusted to the "opinion" of the consular or immigration officer.[12]  That is the language of discretion, and the officials are given broad leeway.  Depending on the context in which the "opinion" is given, the decision may be nonreviewable.  Under the rule of consular nonreviewability, only the most egregious abuses of discretion may be reviewed.  *See Kerry v. Din*, 135 S. Ct. 2128, 2140–41 (2015) (Kennedy, J., concurring); *see also Cardenas v. United States*, 826 F.3d 1164, 1171–72 (9th Cir. 2016) (holding that Justice Kennedy's concurring opinion in *Din* is the controlling opinion and summarizing the consular nonreviewability rule).  Indeed, we have previously held that the phrase "in the opinion of the Attorney General" in a now-repealed immigration statute conferred "unreviewable" discretion to the Executive Branch.  *See Kalaw v. I.N.S.*, 133 F.3d 1147, 1151–52 (9th Cir. 1997), *superseded by statute on other grounds*.  And to the extent the federal courts may review such

---

[12] The text of the INA does not mention immigration officers.  Rather, it commits the public-charge determination to the "opinion of the Attorney General."  8 U.S.C. § 1182(a)(4)(A).  As we explained above, Congress has since transferred the authority granted by the INA to DHS's immigration officers.

determinations, our review is narrow.  *See Montero-Martinez v. Ashcroft*, 277 F.3d 1137, 1144 (9th Cir. 2002) (holding that judicial review of discretionary acts by the BIA is limited to "the purely legal and hence non-discretionary" aspects of the BIA's action); *see also Allen v. Milas*, 896 F.3d 1094, 1106–07 (9th Cir. 2018) (noting that judicial review of visa denials is "limited . . . to constitutional challenges" and does not extend to APA-based challenges (emphasis omitted)).

Second, the critical term "public charge" is not a term of art.  It is not self-defining.  That does not mean that officials may pour any meaning into the term, but it does mean that there is room for discretion as to what, precisely, being a "public charge" encompasses.  In a word, the phrase is "ambiguous" under *Chevron*; it is capable of a range of meanings.  So long as the agency has defined the term within that range of meanings, we have no grounds for second-guessing the agency, "even if the agency's reading differs from what [we] believe[] is the best statutory interpretation."  *Brand X*, 545 U.S. at 980 (citing *Chevron*, 467 U.S. at 843–44 & n.11).  It also means that an agency "must consider varying interpretations and the wisdom of its policy on a continuing basis," including "in response to changed factual circumstances, or a change in administrations."  *Id.* at 981 (quotations marks and citations omitted).

Third, Congress set out five factors to be taken into account by immigration officials, but expressly did not limit the discretion of officials to those factors. Rather the factors are to be considered "at a minimum." Other factors may be considered as well, giving officials considerable discretion in their decisions.

Fourth, Congress granted DHS the power to adopt regulations to enforce the provisions of the INA. When Congress created DHS, Congress vested the Secretary of Homeland Security "with the administration and enforcement of . . . all [] laws relating to the immigration and naturalization of aliens" and authorized the Secretary to "establish such regulations . . . as he deems necessary." 8 U.S.C. § 1103(a)(1) & (3); *see also* 6 U.S.C. § 112(b)(1) (authorizing the Secretary to "delegate any of the Secretary's functions to any [DHS] officer, employee, or organizational unit"); *Matter of D-J-*, 23 I. & N. Dec. at 573–74. By granting regulatory authority to DHS, Congress intended that DHS would resolve any ambiguities in the INA. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("A premise of *Chevron* is that when Congress grants an agency the authority to administer a statute by issuing regulations with the force of law, it presumes the agency will use that authority to resolve ambiguities in the statutory scheme."). As we have already noted, the INA's text is ambiguous. DHS has

attempted to elucidate that ambiguity in the Final Rule.  In short, we do not read the text of the INA to unambiguously foreclose DHS's action.

(2) *Historic Understanding.*  Although the foregoing would ordinarily be sufficient to end our inquiry, the current provision, which was most recently rewritten in 1996 in IIRIRA, is merely the most recent iteration of federal immigration law to deem an alien inadmissible if he or she is likely to become a "public charge."  There is a long history of judicial and administrative interpretations of this phrase in the immigration context that predates the enactment of the INA.  Because "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), we must examine this history to determine if "public charge" has a well-defined and congressionally understood meaning that limits DHS's discretion.

The history of the term "public charge" confirms that its definition has changed over time to adapt to the way in which federal, state, and local governments have cared for our most vulnerable populations.  "Public charge" first appeared in this country's immigration law in 1882.  That statute excluded a would-be immigrant from the United States if the person was a "convict, lunatic,

idiot, or a[] person unable to take care of himself or herself without becoming a public charge." Act of Aug. 3, 1882 ch. 376, § 2, 22 Stat. 214.

Congress did not define "public charge" in the 1882 act. We thus ascribe to that phrase its commonly understood meaning at the time, as evidenced by contemporary sources. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 633–34 & nn.6–8 (2012) (citing contemporary dictionary definitions to interpret statutory phrases). An 1828 dictionary defined "charge" as "[t]hat which is enjoined, committed, entrusted or delivered to another, implying care, custody, oversight, or duty to be performed by the person entrusted," or a "person or thing committed to anothers [sic] custody, care or management." Charge, WEBSTER'S DICTIONARY (1828 Online Edition), http://webstersdictionary1828.com/Dictionary/charge; *see also* Stewart Rapaljb & Robert L. Lawrence, DICTIONARY OF AMERICAN AND ENGLISH LAW, WITH DEFINITIONS OF THE TECHNICAL TERMS OF THE CANON AND CIVIL LAWS 196 (Frederick D. Linn & Co. 1888) (defining "charge" as "an obligation or liability. Thus we speak . . . of a pauper being chargeable to the parish or town"). That is a broad, common-sense definition, which was reflected in Nineteenth-Century judicial opinions using the phrase. *See, e.g.*, *In re Day*, 27 F. 678, 681 (C.C.S.D.N.Y. 1886) (defining a "public charge" as a person who "can neither take care of themselves, nor are under the charge or protection of any other

person"); *State v. The S.S. "Constitution"*, 42 Cal. 578, 584–85 (1872) (noting that those who are "liable to become a public charge" are "paupers, vagabonds, and criminals, or sick, diseased, infirm, and disabled persons"); *City of Alton v. Madison Cty.*, 21 Ill. 115, 117 (1859) (noting that a person is not a "public charge" if the person has "ample means" of support).

The 1882 act did not consider an alien a "public charge" if the alien received merely some form of public assistance.  The act itself established an "immigrant fund" that was designed to provide "for the care of immigrants arriving in the United States."  Act of Mar. 26, 1910 ch. 376, § 1, 22 Stat. 214.  Congress thus accepted that providing some assistance to recent immigrants would not make those immigrants public charges.  But Congress did not draw that line with any precision.  Instead, we read "public charge" in the 1882 act to refer generally to those who were unwilling or unable to care for themselves.  In context that often meant that they were housed in a government or charitable institution, such as an almshouse, asylum, or penitentiary.

The term "public charge" endured through subsequent amendments to the 1882 act.  In 1910, Congress enacted a statute that deemed "paupers; persons likely to become a public charge; professional beggars;" and similar people inadmissible. ch. 128, § 2, 36 Stat. 263 (1910).  Relying on the placement of "public charge"

between "paupers" and "professional beggars," the Supreme Court held that a person is likely to become a public charge if that person has "permanent personal objections" to finding employment. *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915).  In that case, the petitioners, Russian emigres, arrived in the United States with little cash and the intention of going to Portland, Oregon.  The immigration officials considered them likely to become public charges because Portland had a high unemployment rate.  In a spare, three-page opinion by Justice Holmes, the Court noted that the "single question" before the Court was "whether an alien can be declared likely to become a public charge on the ground that the labor market in the city of his immediate destination is overstocked." *Id.* at 9–10.  The Court answered in the negative.  In making the public-charge determination, immigration officers must consider an alien's "personal" characteristics, not a localized job shortage. *Id.* at 10.  The Court observed that  "public charge" should be "read as generically similar to the other[] [statutory terms] mentioned before and after" that phrase. *Id.*  Five years later, we followed the Supreme Court's lead, holding that "the words 'likely to become a public charge' are meant to exclude only those persons who are likely to become occupants of almshouses for want of means with which to support themselves in the future." *Ng Fung Ho v. White*, 266 F. 765, 769 (9th Cir. 1920) (citing *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917)),

39

*aff'd in part and rev'd in part on other grounds*, 259 U.S. 276 (1922).[13]  Thus, as

of 1920, we considered the likelihood of being housed in a state institution to be

the primary factor in the public-charge analysis.

By the mid-Twentieth Century, the United States had largely abandoned the

poorhouse in favor of direct payments through social welfare legislation. At the

federal level, the government had created Social Security and Aid to Families With

Dependent Children (AFDC).  At the state level, governments supplemented

family income through programs such as unemployment insurance and worker's

compensation.  Similar changes were being made in other programs such as mental

health care, where we moved from institutionalizing the mentally ill to a program

of treatment with the end of releasing them.  As Chief Justice Burger observed:

> Historically, and for a considerable period of time, subsidized
> custodial care in private foster homes or boarding houses was the

---

[13] In *Ng Fung Ho*, the petitioner had been admitted to the United States,
based partly on his holding a "certificate" that allowed him to be a "merchant."  *Id.*
at 768.  Several years after his admission, he pleaded guilty to gambling.  *Id.* at
769.  It was then determined that the petitioner was no longer a merchant.  The
government argued that the petitioner was deportable because he had been likely to
become a public charge at the time of his admission.  Because there was no
evidence that the certificate he had produced prior to admission had been
fraudulent, we held that merely pleading guilty to gambling and paying a $25 fine
three years after being admitted did not "prove that the alien . . . was likely to
become a public charge" at the time of admission.  *Id.*  We thus rejected the
government's assertion that the petitioner should be deported on that basis.  *Id.* at
770.

most benign form of care provided incompetent or mentally ill
persons for whom the States assumed responsibility.  Until well into
the 19th century the vast majority of such persons were simply
restrained in poorhouses, almshouses, or jails.

*O'Connor v. Donaldson*, 422 U.S. 563, 582 (1975) (Burger, C.J., concurring).

"[T]he idea that States may not confine the mentally ill except for the purpose of

providing them with treatment [was] of very recent origin."  *Id.* (footnote omitted).

The way in which we regarded the poor and the mentally infirm not only brought

changes in the way we treated them, but major changes in their legal rights as well.

*See, e.g.*, *McNeil v. Director, Patuxent Inst.*, 407 U.S. 245, 248–50 (1972)

(requiring a hearing before a person who has completed his criminal sentence can

be committed to indefinite confinement in a mental institution); *cf. Goldberg v.*

*Kelly*, 397 U.S. 254, 260–61 (1970) (holding that a recipient of public assistance

payments is constitutionally entitled to an evidentiary hearing before those

payments are terminated).

The movement towards social welfare was soon reflected in the definition of

"public charge."  In *Matter of B-*, 3 I. & N. Dec. 323 (BIA 1948), the recently

created BIA articulated a new definition of "public charge."  Permanent

institutionalization would not be the sole measure of whether an alien was a public

charge.  The BIA said it would also consider whether an alien received temporary

41

services from the government.  At the same time, the BIA recognized that mere "acceptance by an alien of services provided by" the government "does not in and of itself make the alien a public charge." *Id.* at 324.  Instead, the BIA stated that an alien becomes a public charge if three elements are met: "(1) The State or other governing body must, by appropriate law, impose a charge for the services rendered to the alien. . . .  (2) The authorities must make demand for payment of the charges . . . .  And (3) there must be a failure to pay for the charges." *Id.* at 326.  In other words, the government benefit received by the alien must be monetized, a bill must be presented to the alien, and the alien must refuse to pay.  Ultimately, in *Matter of B-*, the BIA held that the petitioner had not become a public charge, even though she had been involuntarily committed to a mental institution, because the state of Illinois had not charged her or demanded payment. *Id.* at 327.  The BIA's order was subsequently affirmed by the Attorney General. *Id.* at 337.

Four years later, Congress substantially revised the immigration laws in the Immigration and Nationality Act of 1952.  The amended statute retained the term "public charge," but, for the first time, made clear that the decision was committed to the opinion of a consular officer or the Attorney General.  The INA deemed inadmissible "[a]liens who, in the opinion of the consular officer at the time of

42

application for a visa, or in the opinion of the Attorney General at the time of

application for admission, are likely at any time to become public charges."  Title

2, ch. 2, § 212, 66 Stat. 163, 183 (1952).  Although *Matter of B-* was not

mentioned in the legislative history accompanying the 1952 act, it is notable that

Congress chose to insert this "opinion" language following the BIA's articulation

of a new definition of "public charge" that departed from prior judicial

interpretations of the term.

In 1974, the BIA altered course again.  The BIA limited *Matter of B-*'s three-

part test to determining whether a person had become a public charge after having

been admitted to the United States.  *See Matter of Harutunian*, 14 I. & N. Dec.

583, 585 (BIA 1974).  After noting that the phrase "public charge" had been

interpreted differently by various courts, the BIA held:

> [A]ny alien who is incapable of earning a livelihood, who does not
> have sufficient funds in the United States for his support, and has no
> person in the United States willing and able to assure that he will not
> need public support is excludable as likely to become a public charge
> whether or not the public support which will be available to him is
> reimbursable to the state.

*Id.* at 589–90.  The BIA thus pegged the public-charge determination to whether

the alien was likely to "need public support," irrespective of whether the alien was

likely to be institutionalized for any length of time and billed for the cost by the state.  *Id.* at 589.

That definition of "public charge" was subsequently amended by the INS. In 1987, the INS issued a final rule that deemed an applicant for adjustment of status to be a "public charge" if the applicant had "received public cash assistance."  Adjustment of Status for Certain Aliens, 52 Fed. Reg. 16,205, 16,211 (May 1, 1987).  INS did not state how much "public cash assistance" an alien had to receive, but left the decision to officers who would judge the totality of the circumstances.  *See id.* at 16,211 (noting that "all [the] evidence produced by the applicant will be judged"), 16,212 ("The weight given in considering applicability of the public charge provisions will depend on many factors . . . .").  INS did make clear that "public cash assistance" would not include the value of  "assistance in kind, such as food stamps, public housing, or other non-cash benefits," including Medicare and Medicaid.  *Id.* at 16,209.

In 1996, through IIRIRA, Congress enacted the current language appearing in § 212 of the INA.  Omnibus Consolidated Appropriations Act, Title 5 § 531, 110 Stat. 3009 (1996).  As detailed above, Congress added a requirement that an immigration officer consider an alien's "age;" "health;" "family status;" "assets,

resources and financial status;" and "education and skills" when determining if a person is likely to become a public charge.  8 U.S.C. § 1182(a)(4)(B).

Responding to the 1996 act, INS published the *1999 Field Guidance* to "establish clear standards governing a determination that an alien is inadmissible or ineligible to adjust status . . . on public charge grounds."  64 Fed. Reg. at 28,689. In the *1999 Field Guidance*, INS defined "public charge" as "an alien . . . who is likely to become (for admission/adjustment purposes) primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense."  *Id.* (internal quotation marks omitted).  The *1999 Field Guidance* made clear that the public-charge determination remained a "totality of the circumstances test."  *Id.* at 28,690.  Within this totality-of-the-circumstances assessment, only the receipt of "cash public assistance for income maintenance" should be considered; "receipt of non-cash benefits or the receipt of special-purpose cash benefits not for income maintenance should not be taken into account."  *Id.*  The *1999 Field Guidance* thus largely reaffirmed INS's 1987 rule. For the past twenty years, the *1999 Field Guidance* has governed, until it was replaced by the Final Rule.

So what to make of this history?  Unlike the district courts, we are unable to discern one fixed understanding of "public charge" that has endured since 1882.  If anything has been consistent, it is the idea that a totality-of-the-circumstances test governs public-charge determinations.  But different factors have been weighted more or less heavily at different times, reflecting changes in the way in which we provide assistance to the needy.  Initially, the likelihood of being housed in a government or charitable institution was most important.  Then, the focus shifted in 1948 to whether public benefits received by an immigrant could be monetized, and the immigrant refused to pay for them.  In 1974, it shifted again to whether the immigrant was employable and self-sufficient.  That was subsequently narrowed in 1987 to whether the immigrant had received public cash assistance, which excluded in-kind benefits.  Congress then codified particular factors immigration officers must consider, which was followed by the *1999 Field Guidance*'s definition of "public charge."  In short, we find that the history of the use of "public charge" in federal immigration law demonstrates that "public charge" does not have a fixed, unambiguous meaning.  Rather, the phrase is subject to multiple interpretations, it in fact has been interpreted differently, and the Executive Branch has been afforded the discretion to interpret it.

Congress simply has not spoken to how "public charge" should be defined. We must presume that when Congress enacted the current version of the INA in 1996, it was aware of the varying historical interpretations of "public charge." *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009). Yet Congress chose not to define "public charge" and, instead, described various factors to be considered "at a minimum," without even defining those factors. It is apparent that Congress left DHS and other agencies enforcing our immigration laws the flexibility to adapt the definition of "public charge" as necessary.

(3) *Other Factors*. Both district courts found it significant that Congress twice considered, but failed to enact, a definition of "public charge" that is similar to the definition adopted in the Final Rule. *City & Cty. of San Francisco*, 2019 WL 5100718 at *27; *Washington*, 2019 WL 5100717, at *17. During the debates over IIRIRA in 1996, Congress considered whether to enact the following definition of "public charge": "the term 'public charge' includes any alien who receives [certain means-tested] benefits . . . for an aggregate period of at least 12 months or 36 months" in some cases. 142 Cong. Rec. 24,313, at 24,425 (1996). Senator Leahy argued that this was "too quick to label people as public charges for utilizing the same public assistance that many Americans need to get on their feet," and that the phrase "means tested" was "unnecessarily uncertain." S. Rep. No. 104-249, at

47

63–64 (1996).  Nevertheless, the Senate passed the bill containing the definition of

"public charge."  Before the House considered the bill, however, President Clinton

implicitly threatened to veto it because it went "too far in denying legal immigrants

access to vital safety net programs which could jeopardize public health and

safety."  Statement on Senate Action on the "Immigration Control and Financial

Responsibility Act of 1996," 32 Weekly Comp. Pres. Doc. 783 (May 6, 1996).

Ultimately, Congress chose not to enact this "public charge" definition.  In 2013,

the Senate rejected an amendment to the INA that "would have expanded the

definition of 'public charge' such that people who received non-cash health

benefits could not become legal permanent residents.  This amendment would also

have denied entry to individuals whom the Department of Homeland Security

determines are likely to receive these types of benefits in the future."  S. Rep. No.

113-40, at 63 (2013).

The district courts viewed these failed legislative efforts as evidence that

Congress specifically rejected the interpretation of "public charge" DHS

articulated in the Final Rule, and that the Final Rule is thus an impermissible

reading of the INA.  *City & Cty. of San Francisco*, 2019 WL 5100718, at *27;

*Washington*, 2019 WL 5100717, at *17.  We disagree.  If this legislative history is

probative of anything, it is probative only of the fact that Congress chose *not* to

48

codify a particular interpretation of "public charge."[14]  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 184 (1994) ("[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." (quotation marks and citation omitted)).  But the failure of Congress to *compel* DHS to adopt a particular rule is not the logical equivalent of *forbidding* DHS from adopting that rule.  The failure to adopt a new rule is just that: no new rule.[15]  And no change to § 212 means that consular officers, the Attorney General, and DHS retain all the discretion granted them in the INA.

_____

[14] Sometimes it is appropriate to consider language Congress has rejected, primarily when Congress rejected language in favor of the statute adopted and under review.  *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 441–42 (1987) (contrasting Congress's decision to adopt the House proposal over the Senate version).

[15] We can speculate as to the reasons that members of Congress declined to adopt these legislative proposals, but the speculation will not help us.  "A bill can be proposed for any number of reasons, and it can be rejected for just as many others."  *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 170 (2001).  Although some members may have thought the rule too harsh, others may have thought it too lenient, while a third group may have thought the rule should be left flexible and in the hands of the immigration agencies.  If anything, this legislative history proves only that Congress decided not to constrain the discretion of agencies in determining who is a public charge.  That discretion had long been vested in the agencies, and these failed legislative efforts did not alter that discretion.

A second argument made by the States and relied upon by the Eastern

District of Washington is that DHS exceeded its authority by determining what

makes a person "self-sufficient."  *Washington*, 2019 WL 5100717, at *17–18.

This argument is refuted by the statute itself.  As we have discussed, the INA

requires immigration officers to consider an alien's "health," "family status,"

"assets, resources, [] financial status," "education and skills."  8 U.S.C. §

1182(a)(4)(B)(i)(II)–(V) .  The concept of self-sufficiency is subsumed within each

of these factors.  And even if it were not, the statutory factors are not exhaustive;

DHS may add to them.  *See id.* § 1182(a)(4)(B)(i).  Because DHS has been

"charged with the administration and enforcement" of all "laws relating to the

immigration and naturalization of aliens,"  *Id.* § 1103(a)(1); *see also* 6 U.S.C. §

112(b)(1), determining what constitutes self-sufficiency for purposes of the public-

charge assessment is well within DHS's authority.[16]

*      *      *

In short, Congress has not spoken directly to the interpretation of "public

charge" in the INA.  Nor did it unambiguously foreclose the interpretation

articulated in the Final Rule.  Instead, the phrase "public charge" is ambiguous

under *Chevron*.  DHS has the authority to interpret it and "must consider varying

interpretations and the wisdom of its policy on a continuing basis."  *Chevron*, 467

U.S. at 863–64.  Indeed, "the fact that the agency has adopted different definitions

in different contexts adds force to the argument that the definition itself is flexible,

particularly since Congress has never indicated any disapproval of a flexible

---

[16] The Eastern District of Washington also held that, because the states have a "central role in formulation and administration of health care policy," DHS "acted beyond its Congressionally delegated authority" when it adopted the Final Rule. *Washington*, 2019 WL 5100717, at *18; *see also id.* ("Congress cannot delegate authority that the Constitution does not allocate to the federal government in the first place . . . . .").  Congress, of course, has plenary authority to regulate immigration and naturalization.  U.S. CONST. art. I, § 8, cl. 4.  Pursuant to that authority, Congress adopted the "public charge" rule, which no one has challenged on constitutional grounds.  Further, Congress has authorized DHS to adopt regulations.  8 U.S.C. § 1103(a)(3).  DHS thus did not overstep its authority by promulgating the Final Rule.  Indeed, under the district court's analysis, even the *1999 Field Guidance* might be unconstitutional.  But neither the district court nor the States question the lawfulness of the *1999 Field Guidance*.  We see no meaningful difference between INS's authority to promulgate the *1999 Field Guidance* and DHS's authority to adopt the Final Rule.

reading of the statute." *Id.* at 864.  We thus proceed to the second step of the
*Chevron* analysis.

      b.    *Chevron* Step 2

At *Chevron*'s second step, we ask whether the agency's interpretation is
"reasonable—or 'rational and consistent with the statute.'" *Diaz-Quirazco v. Barr*,
931 F.3d 830, 840 (9th Cir. 2019) (quoting *Sullivan v. Everhart*, 494 U.S. 83, 89
(1990)).  If it is, we must defer to it, "even if the agency's reading differs from
what the court believes is the best statutory interpretation." *Perez-Guzman v.
Lynch*, 835 F.3d 1066, 1073–74 (9th Cir. 2016) (quoting *Brand X*, 545 U.S. at
980).

The Final Rule easily satisfies this test.  As we have explained, the INA
grants DHS considerable discretion to determine if an alien is likely to become a
public charge.  To be sure, under the Final Rule, in-kind benefits (other than
institutionalization) will for the first time be relevant to the public-charge
determination.  We see no statutory basis from which a court could conclude that
the addition of certain categories of in-kind benefits makes DHS's interpretation

untenable.[17]  And whether the change in policy results from changing

circumstances or a change in administrations, the wisdom of the policy is not a

question we can review.  *See Brand X*, 545 U.S. at 981.

Our conclusion is reinforced by the Personal Responsibility and Work

Opportunity Reconciliation Act of 1996 (PRWORA), which Congress enacted

contemporaneous with IIRIRA.  PRWORA set forth our "national policy with

respect to welfare and immigration."  8 U.S.C. § 1601.  In relevant part, PRWORA

provides, "Self-sufficiency has been a basic principle of United States immigration

law since this country's earliest immigration statutes."  *Id.* § 1601(1).  As a result,

"[i]t continues to be the immigration policy of the United States that . . . aliens

within the Nation's borders not depend on public resources to meet their needs, but

rather rely on their own capabilities and the resources of their families, their

sponsors, and private organizations."  *Id.* § 1601(2).  Receipt of non-cash public

assistance is surely relevant to "self-sufficiency" and whether immigrants are

"depend[ing] on public resources to meet their needs."  *See id.* § 1601(1)–(2); *see*

---

[17] Cash benefits and in-kind benefits are often treated under the single rubric of a "direct subsidy."  *Witters v. Wash. Dep't of the Servs. for the Blind*, 474 U.S. 481, 487 (1986).  In certain contexts, such as settlement, "compensation in kind is worth less than cash of the same nominal value," *In re Mex. Transfer Litig.*, 267 F.3d 743, 748 (9th Cir. 2001), but the Final Rule does not deal with the valuation of such services.  It deals only with whether in-kind benefits have been received under certain specified programs.

*also Korab v. Fink*, 797 F.3d 572, 580 (9th Cir. 2014).  PRWORA thus lends

support to DHS's interpretation of the INA.

We conclude that DHS's interpretation of "public charge" is a permissible

construction of the INA.

2.      The Rehabilitation Act

The States argue, and the Eastern District of Washington found, that the

Final Rule is inconsistent with the Rehabilitation Act.  *Washington*, 2019 WL

5100717, at *18.  The Northern District of California rejected that argument.  *City*

*& Cty. of San Francisco*, 2019 WL 5100718, at *29–30.  The Rehabilitation Act

provides:  "No otherwise qualified individual with a disability in the United States

. . . shall, solely by reason of her or his disability, be excluded from participation

in, be denied the benefits of, or be subjected to discrimination under any program

or activity . . . conducted by any Executive agency."  29 U.S.C. § 794(a).

"Program or activity" is defined as "all of the operations of . . . [an] agency."  *Id.* §

794(b).

This argument need not detain us long.  First, under the INA, immigration

officers are obligated to consider an immigrant's "health" when making the public-

charge determination.  8 U.S.C. § 1182(a)(4)(B)(i)(II).  To the extent that inquiry

may consider an alien's disability, the officers have been specifically directed by

Congress to do so.  Indeed, Congress's express direction that immigration officers consider an alien's "health" came twenty-three years *after* the Rehabilitation Act. We cannot see how a general provision in one statute constrains an agency given a specific charge in a subsequent law.  The INA does not violate the Rehabilitation Act.  Second, nothing in the Final Rule changes DHS's practice with respect to considering an alien's health.  Nothing in the Final Rule suggests that aliens will be denied admission or adjustment of status "solely by reason of her or his disability." Throughout the Final Rule, DHS confirms that the public-charge determination is a totality-of-the-circumstances test.  *See* 84 Fed. Reg. at 41,295, 41,368.  And DHS specifically addressed this argument in the Final Rule:  "it is not the intent, nor is it the effect of this rule to find a person a public charge solely based on his or her disability."  *Id.* at 41,368.  DHS has shown a strong likelihood that the Final Rule does not violate the Rehabilitation Act.

*          *          *

In sum, DHS is likely to succeed in its argument that the Final Rule should not be set aside as contrary to law.  We will not minimize the practical impact of the Final Rule, but we will observe that it is a short leap in logic for DHS to go from considering in-cash public assistance to considering both in-cash and in-kind public assistance.  DHS has shown that there is a strong likelihood that its decision

to consider the receipt of in-kind government assistance as part of its totality-of-

the-circumstances test is a reasonable interpretation of the INA and does not

violate the Rehabilitation Act.

B.      *Arbitrary and Capricious*

Arbitrary and capricious review under the APA addresses the reasonableness

of the agency's decision.  The classic statement of our scope of review is *Motor*

*Vehicle Manufacturers Association of the United States v. State Farm Mutual*

*Automotive Insurance Co.*, 463 U.S. 29 (1983):

> [T]he agency must examine the relevant data and articulate a
> satisfactory explanation for its action including a rational connection
> between the facts found and the choice made.  In reviewing that
> explanation, we must consider whether the decision was based on a
> consideration of the relevant factors and whether there has been a
> clear error of judgment.  Normally, an agency rule would be arbitrary
> and capricious if the agency has relied on factors which Congress has
> not intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision that runs
> counter to the evidence before the agency, or is so implausible that
> could not be ascribed to a difference in view of the product of agency
> expertise.

*Id.* at 43 (quotation marks and citations omitted); *see Org. Vill. of Kake v. Dep't of*

*Agric.*, 795 F.3d 956, 966–67 (9th Cir. 2015).  An agency's failure to respond to

any particular comment or point put forward by a rule's opponents is not a ground

for finding per se arbitrary-and-capricious action.  *See Safari Aviation Inc. v.*

*Garvey*, 300 F.3d 1144, 1150–52 (9th Cir. 2002) (explaining that there is no per se violation of the APA when an agency fails to address comments); *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984) ("[The APA] has never been interpreted to require the agency to respond to every comment, or to analyse [sic] every issue or alternative raised by the comments, no matter how insubstantial.").

The fact that DHS has changed policy does not substantially alter the burden in the challengers' favor.  DHS must, of course, "show that there are good reasons for the new policy," but, it

> need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

The district courts raised two objections to DHS's consideration that the district courts found made the Final Rule arbitrary and capricious:  (1) DHS's failure to properly weigh the costs to state and local governments and healthcare providers, such as hospitals, resulting from disenrollment from public benefits programs; and (2) DHS's inadequate consideration of the Final Rule's impact on public health.  *City & Cty. of San Francisco*, 2019 WL 5100718, at *31–35; *Washington*, 2019 WL 5100717, at *19.  We will consider each in turn.

57

1.      Costs of Disenrollment

The Northern District of California's principal concern was the higher costs that state and local governments will face as a result of "disenrollment [from] public benefits." *City & Cty. of San Francisco*, 2019 WL 5100718, at *31. Specifically, the district court concluded that "DHS appears to have wholly failed to engage with [comments on the costs of the change].  DHS failed to grapple with the [Final] Rule's predictable effects on local governments, and instead concluded that the harms—whatever they may be—are an acceptable price to pay." *Id.* at *32.  The court further faulted DHS for "refus[ing] to consider the costs associated with predicted, likely disenrollment of those not subject to the public charge determination." *Id.*

We begin with the observation that DHS addressed at length the costs and benefits associated with the Final Rule.  *See* 84 Fed. Reg. at 41,300–03 (summarizing costs and benefits); *id.* at 41,312–14 (estimating costs to health care providers, states, and localities); *id.* at 41,463–81 (responding to various comments on costs and benefits); *id*. at 41,485–41,489 (responding to Executive Orders

requiring an assessment of the costs and benefits of regulatory alternatives).[18]  In

addition, DHS prepared an "Economic Analysis Supplemental Information for

Analysis of Public Benefits Programs,"

www.regulations.gov/document?D=USCIS-2010-0012-63742.

DHS's analysis began by stating, "This rule will impose new costs on this

population applying to adjust status . . . that are subject to the public charge ground

of inadmissibility."  84 Fed. Reg. at 41,300.  It estimated the direct costs to the

federal government of the rule to be $35,202,698 annually.  Some of these direct

costs to the federal government would be offset by "individuals who may choose to

disenroll from or forego enrollment in a public benefits program."  *Id.*  DHS

estimated the reduction in federal transfer payments would be about $2.47 billion

annually.  *Id.* at 41,301.  It further estimated that there would be a reduction in state

transfer payments of about $1.01 billion annually.  *Id.*  DHS also acknowledged

that the Final Rule would impose direct and indirect costs on individuals and

entities.  The first of these, it suggested, were "familiarization costs," which was "a

---

[18] Indeed, DHS's notice is quite comprehensive.  In no fewer than 216 pages (which DHS estimated would take sixteen to twenty hours to read), DHS explained the changes proposed, estimated costs and savings, and addressed scores of comments on topics ranging from potential public-health concerns to whether DHS should consider immigrants' credit scores.  *See generally* 84 Fed. Reg. at 41,292–508.

direct cost of the rule." *Id.* Organizations that work with immigrant communities would similarly experience indirect costs of familiarization. *Id.*

Elsewhere, DHS responded to comments claiming that the Final Rule would cause aliens to disenroll from or forego enrollment in public benefit programs and that this "would be detrimental to the financial stability and economy of communities, States, local organizations, hospitals, safety net providers, foundations, and healthcare centers." *Id.* at 41,312; *see also id.* (suggesting that the Final Rule would increase the use of hospital emergency rooms). DHS identified three categories of aliens who might be affected by the Final Rule. First, there are aliens who are entitled to public benefits and seek to immigrate or adjust status. Their receipt of some public benefits are simply not covered by the rule. DHS noted, for example, that "emergency response, immunization, education, or [certain] social services" are not included in its revised definition of "public benefits." *Id.* On the other hand, there are public benefits to which such an alien is entitled but which will be considered by DHS in its determination whether such alien is a "public charge." DHS "acknowledge[d] that individuals subject to this rule may decline to enroll in, or may choose to disenroll from, public benefits for which they may be eligible under PRWORA, in order to avoid negative consequences as a result of this final rule." *Id.* DHS could not estimate how many

aliens in this category would be affected by the Final Rule "because data limitations provide neither a precise count nor reasonable estimate of the number of aliens who are both subject to the public charge ground of inadmissibility and are eligible for public benefits in the United States." *Id.* at 41,313.

The second category of aliens are those who are unlawfully in the United States. These are "generally barred from receiving federal public benefits other than emergency assistance." *Id.* (footnote omitted). Nevertheless, DHS announced that it will *not* consider "for purposes of a public charge inadmissibility determination whether applicants for admission or adjustment of status are receiving food assistance through other programs, such as exclusively state-funded programs, food banks, and emergency services, nor will DHS discourage individuals from seeking such assistance." *Id.*

Third are those aliens and U.S. citizens who are *not* subject to the Final Rule, but erroneously think they are and disenroll from public benefits out of an abundance of caution. *Id.* Disenrollment by this category of persons should not be influenced by the Final Rule because their receipt of public benefits will "not be counted against or made attributable to immigrant family members who are subject to this rule." *Id.* DHS understood "the potential effects of confusion" over the scope of the Final Rule that might lead to over-disenrollment. DHS stated that it

would "issue clear guidance that identifies the groups of individuals who are not subject to the rule." *Id.*

The Northern District of California pointed out that DHS's response "fails to discuss costs being borne by the states, hospitals, or others, other than to say DHS will issue guidance in an effort to mitigate confusion." *City & Cty. of San Francisco*, 2019 WL 5100718, at *34. The court further criticized DHS for "flatly refus[ing] to consider the costs associated with predicted, likely disenrollment of those not subject to the public charge determination." *Id.* at *35.

We think several points must be considered here. First, the costs that the states, localities, and various entities (such as healthcare providers) may suffer are indirect. Nothing in the Final Rule imposes costs on those governments or entities; the Final Rule does not regulate states, localities, and private entities. Disenrollment will be the consequence of either (1) the free choice of aliens who wish to avoid any negative repercussions for their immigration status that would result from accepting public benefits, or (2) the mistaken disenrollment of aliens or U.S. citizens who can receive public benefits without any consequences for their residency status. DHS addressed both groups. DHS said it did not have data to calculate the size of the first group (and, presumably, the value of the benefits from which they will disenroll), and it had no way to estimate the second. 84 Fed. Reg.

at 41,313.  DHS stated that it would try to compensate for the latter group's error

by publishing clear guidance, and it also noted that other organizations, public and

private, would have an incentive to provide accurate information to persons who

might mistakenly disenroll.  *Id.* at 41,486.

  Second, DHS did acknowledge the indirect costs the Final Rule might

impose

> downstream . . . on state and local economics, large and small
> businesses, and individuals.  For example, the rule might result in
> reduced revenues for healthcare providers participating in Medicaid,
> companies that manufacture medical supplies or pharmaceuticals,
> grocery retailers participating in SNAP, agricultural producers who
> grow foods that are eligible for purchase using SNAP benefits, or
> landlords participating in federally funded housing programs.

*Id*.  It did not attempt to quantify those costs, but it recognized the overall effect of

the Final Rule, and that is sufficient.  *See Irvine Med. Ctr. v. Thompson*, 275 F.3d

823, 835 (9th Cir. 2002) ("[T]he Secretary acknowledged that some Medicare

beneficiaries would possibly have to shoulder an additional financial burden as a

result of the repeal of the carry-forward provision.  This acknowledgment did not

render the Secretary's rulemaking statement or reliance upon it arbitrary,

however." (internal citation omitted)) .

Third, DHS is not a regulatory agency like EPA, FCC, or OSHA.  Those agencies have broad mandates to regulate directly entire industries or practices, sometimes on no more instruction from Congress than to do so in the "public convenience, interest or necessity," 47 U.S.C. § 303 (FCC), or as "appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A) (EPA).  When Congress has vested such broad regulatory authority in agencies, the Supreme Court has sometimes insisted that the agencies perform some kind of a cost-benefit analysis.  *See*, *e.g.*, *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (EPA cannot "ignore cost when deciding whether to regulate power plants"); *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 644 (1980) (plurality opinion) (OSHA must "undertake some cost-benefit analysis before [it] promulgates any [safety and health] standard").  *But see Am. Textile Mfs. Inst. Inc. v. Donovan*, 452 U.S. 490, 510–11 (1981) ("Congress uses specific language when intending that an agency engage in cost-benefit analysis.").  By contrast, DHS is defining a simple statutory term—"public charge"—to determine whether an alien is admissible.  Its only mandate is to regulate immigration and naturalization, not to secure transfer payments to state governments or ensure the stability of the health care industry. Any effects on those entities are indirect and well beyond DHS's charge and expertise.  Even if it could estimate the costs to the states, localities, and healthcare

64

providers, DHS has a mandate from Congress with respect to admitting aliens to the United States.  As DHS explained,

> DHS does not believe that it is sound policy to ignore the longstanding self-sufficiency goals set forth by Congress or to admit or grant adjustment of status applications of aliens who are likely to receive public benefits designated in this rule to meet their basic living needs in . . . hope that doing so might alleviate food and housing insecurity, improve public health, decrease costs to states and localities, or better guarantee health care provider reimbursements. DHS does not believe that Congress intended for DHS to administer [§ 212] in a manner that fails to account for aliens' receipt of food, medical, and housing benefits so as to help aliens *become* self-sufficient.

84 Fed. Reg. at 41,314.  Even had DHS been able to calculate the indirect costs that states, localities, and healthcare providers might bear as a result of the Final Rule, it is not clear what DHS was supposed to balance.  Rather, it was sufficient—and not arbitrary and capricious—for DHS to consider whether, in the long term, the overall benefits of its policy change will outweigh the costs of retaining the current policy.

### 2.     Public-Health Concerns

The Northern District of California also found that DHS did not sufficiently respond to certain public-health concerns.  *City & Cty. of San Francisco*, 2019 WL 5100718, at *35–37.  Specifically, the court worried that by disenrolling from public-health benefits like Medicaid, people may forgo vaccinations, which could

have serious public-health consequences.  *Id.*  The district court also pointed out that the *1999 Field Guidance* declined to define "public charge" to include receipt of "health and nutrition benefits" out of fear of possible public-health ramifications.  *Id.* at *37 (citing 64 Fed. Reg. at 28,692).

DHS not only addressed these concerns directly, it changed its Final Rule in response to the comments.  84 Fed. Reg. at 41,297.  With respect to vaccines, DHS stated that it "does not intend to restrict the access of vaccines for children or adults or intend to discourage individuals form obtaining the necessary vaccines to prevent vaccine-preventable diseases."  *Id.* at 41,384.  The Final Rule "does not consider receipt of Medicaid by a child under age 21, or during a person's pregnancy, to constitute receipt of public benefits."  DHS said that would address "a substantial portion, though not all, of the vaccinations issue."  *Id.*  Accordingly, DHS "believes that vaccines would still be available for children and adults even if they disenroll from Medicaid."  *Id.* at 41,385.

Both the Northern District of California and the Eastern District of Washington expressed concern that the Final Rule was a departure from the *1999 Field Guidance*, which raised the vaccine issue, and that the *1999 Field Guidance* had "engendered reliance."  *City & Cty. of San Francisco*, 2019 WL 5100718, at *37; *see also Washington*, 2019 WL 5100717, at *19.   The question is not whether

66

an agency can change a policy that people have come to rely on; clearly, it can. The real question is whether the agency has acknowledged the change and explained the reasons for it.  DHS knew well that it was adopting a change in policy; that was the whole purpose of this rulemaking exercise.  *See Encino Motorcars*, 136 S. Ct. at 2126 (holding that a Department of Labor regulation was "issued without . . . reasoned explanation" where there was "decades of industry reliance on the Department's prior policy" and the new rule was "offered [with] barely any explanation")*; INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (distinguishing an "an irrational departure from [established] policy" from "an avowed alteration of it").  "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Fox Television Stations*, 556 U.S. at 515.  Because DHS has adequately explained the reasons for the Final Rule, it has demonstrated a strong likelihood of success on the merits.

## V. OTHER FACTORS

We have concluded that DHS is likely to succeed on the merits.  Were we reviewing the preliminary injunctions on direct review, this would be sufficient to reverse the district courts' orders.  *See Trump v. Hawai'i*, 138 S. Ct. at 2423.  But

because we are here on DHS's motion for a stay, DHS bears the burden of

satisfying three additional factors: that DHS will suffer some irreparable harm, that

the balance of the hardships favors a stay, and that the stay is in the public interest.

*Nken*, 556 U.S. at 434.

A.    *Irreparable Harm*

We first consider whether DHS has shown that it "will be irreparably injured

absent a stay."  *Nken*, 556 U.S. at 434 (quoting *Hilton*, 481 U.S. at 776).  The

claimed irreparable injury must be *likely* to occur; "simply showing some

'possibility of irreparable injury'" is insufficient.  *Id.* (citation omitted).  DHS has

carried its burden on this factor.

DHS contends that as long as the Final Rule is enjoined,

> DHS will grant lawful-permanent-resident status to aliens whom the
> Secretary would otherwise deem likely to become public charges in the
> exercise of his discretion.  DHS currently has no practical means of
> revisiting public-charge determinations once made, so the injunctions will
> inevitably result in the grant of LPR status to aliens who, under the
> Secretary's interpretation of the statute, are likely to become public charges.

The States do not deny that LPR status might be irrevocably granted to some

aliens, but they claim that DHS has "exaggerate[d] the effect of the injunction"

because the public-charge exclusion has "never played a significant role in

immigration.  In contrast, in just 8 of the 14 Plaintiff States [in the *Washington*

case] over 1.8 million lawfully present residents may be driven from federal and state assistance programs if the injunction is lifted."  They argue that preserving the status quo will not harm DHS pending adjudication on the merits, especially considering that the Final Rule replaces a policy that had been in place for decades.

Several points emerge from the parties' claims.  First, the States appear to concede that decisions to grant adjustment of status to aliens who could otherwise not be eligible are not reversible.  Second, although the States argue that "public charge" exculsions have not been an important component of our immigration scheme in the past, the whole point of DHS's Final Rule is that "public charge" inadmissibility has been underenforced.

Moreover, to the extent the States are contesting the magnitude of the harm to DHS, the claim is irrelevant here.  We have said that this "analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'"  *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)).  But even if we look at the magnitude, the States' own evidence is double-edged.  The States claim that they will suffer harm because millions of persons will disenroll to avoid potential immigration consequences. This seems to prove DHS's point.  If millions of "lawfully present residents" are

currently receiving public benefits and may choose to disenroll rather than be found to be a "public charge" and inadmissible, the harm cited by DHS is not only irreparable, but significant.

Finally, we think the tenability of DHS's past practice is of no import here. Congress has granted DHS the authority to enact and alter immigration regulations and DHS has done that, and it has done so in a way that comports with its legal authority. Thus, as of October 15, 2019, DHS had an obligation to deny admission to those likely to become public charge, as defined by the Final Rule. This is true regardless of DHS's prior policy. As a consequence, the preliminary injunctions will force DHS to grant status to those not legally entitled to it. DHS has satisfied its burden to show irreparable harm to the government absent a stay of the injunctions.

B.   *Balance of Hardships and Public Interest*

Since DHS has satisfied the first two factors, we proceed to the final two: balance of equities and the public interest. *Nken*, 556 U.S. at 435. "Because the government is a party, we consider [these two factors] together." *California v. Azar*, 911 F.3d at 581.

To balance the equities, we consider the hardships each party is likely to suffer if the other prevails. *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843–44

(9th Cir. 2007) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542

(1987).  We have discussed above the irreparable, non-monetary harm to the

government.  On the other hand, the States contend that they face financial, public-

health, and administrative harms if the Final Rule takes effect and otherwise

eligible individuals disenroll from public benefits.  These effects are indirect

effects of the Final Rule and they are largely short-term, since they will only result

during the pendency of the proceedings in the district courts and any appeals to this

court and the Supreme Court.[19]  Those proceedings are likely to be conducted on

an expedited basis, limiting further any potential harm to be considered by this

court.  DHS does not dispute that the States will incur some financial harm if the

Final Rule is not stayed.  It cannot, because DHS repeatedly addressed the

potential costs to the States in its Final Rule.  *See, e.g.*, 84 Fed. Reb. at 41,300,

41,312–14, 41,385–85, 41,469–70, 41,474.  And while ordinarily, we do not

consider purely economic harm irreparable, we have concluded that "such harm is

irreparable" when "the states will not be able to recover monetary damages."

*California v. Azar*, 911 F.3d at 581.  Yet the States' financial concerns will be

mitigated to some extent.  As DHS explained in the Final Rule, disenrollment from

---

[19] This is not to say that the States will not continue to incur harms after the litigation terminates, but these potential harms are not relevant to the question of a preliminary injunction or a stay.

public benefits  means a reduction in federal and state transfer payments, so the States will realize some savings in expenditures.  84 Fed. Reg. at 41,485–86. Nevertheless, we consider the harms to the States, even if not readily quantifiable, significant.

Balancing these harms is particularly difficult in this case.  First, the harms are not comparable.  DHS's harm is not monetary, but programmatic.  The policy behind Congress's decision not to admit those who are likely to become a public charge may have a fiscal component, but it is not the reason for DHS's Final Rule, nor has DHS argued financial harm as a reason for seeking a stay.  By contrast, the States' proffered harms are largely financial.  Second, both parties' proffered harms are, to a degree, speculative.  We cannot say for certain how many residents of the plaintiff states and counties will disenroll from public benefits programs, nor how much any over-disenrollment will cost the States.  Nor can we say for certain how many aliens might be found admissible during the pendency of the preliminary injunction, and would have been found inadmissible under the Final Rule.  Given the largely predictive nature of both parties' alleged harms, we cannot state with any confidence which is greater.

For the same reasons, the public interest in this case is likewise difficult to calculate with precision.  DHS contends it is in the public's interest not to grant

immigration status to persons likely to become public charges.  The States contend that it is in the public's interest to avoid increased administrative and public-health costs.  Both of these contentions are likely true.  But on balance, we have few standards for announcing which interest is greater.

We recently observed that "balancing the equities is not an exact science." *Azar*, 911 F.3d at 582.  Indeed, Justice Frankfurter once remarked that the balancing of the equities was merely "lawyers' jargon for choosing between conflicting public interests."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring).  Whether the stay is granted or denied, one party's costs will be incurred and the other avoided.  In the end, the "critical" factors are that DHS has mustered a strong showing of likelihood of success on the merits and some irreparable harm.  *Nken*, 556 U.S. at 434.  Those factors weigh in favor of granting a stay, despite the potential harms to the States.  And for that reason, the stay is in the public interest.

## VII. CONCLUSION

The motion for a stay of the preliminary injunction in Nos. 19-17213 and 19-17214 is GRANTED.  The petition for stay of the preliminary injunction in No. 19-35914 is GRANTED.  The cases may proceed consistent with this opinion.

FILED

DEC 5 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*City and County of San Francisco, et al v. USCIS, et al*, No. 19-17213+

BYBEE, Circuit Judge, concurring, perplexed and perturbed:

I join the majority opinion in full.  I write separately to emphasize two points—points that I feel must be made, but are better said in a separate opinion.

We as a nation are engaged in titanic struggles over the future of immigration in the United States.  These are difficult conversations.  As a court, the Ninth Circuit in particular has felt the effects of the recent surge in immigration.  As we observed last year with respect to the asylum problem:

> We have experienced a staggering increase in asylum applications.  Ten years ago we received about 5,000 applications for asylum.  In fiscal year 2018 we received about 97,000—nearly a twenty-fold increase.  Our obligation to process these applications in a timely manner, consistent with our statutes and regulations, is overburdened.  The current backlog of asylum cases exceeds 200,000—about 26% of the immigration courts' total backlog of nearly 800,000 removal cases.  In the meantime, while applications are processed, thousands of applicants who had been detained by immigration authorities have been released into the United States.

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 754 (9th Cir. 2018) (citations omitted).  Because of our proximity to Mexico, Central America, and East Asia, the brunt of these cases will find their way into our court.   And we are well aware that we are only seeing the matters that find their way into federal court, and that the burdens of the increase in immigration are borne not only by our judges, but by the men and women in the executive branch charged with enforcing the immigration laws.

Our court has faced an unprecedented increase in emergency petitions arising out of the administration's efforts to administer the immigration laws and secure our borders.  These controversial efforts have met with mixed success in our court and the Supreme Court.  *See, e.g.*, *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir.) (construction of wall on the border with Mexico), *stay issued*, 140 S. Ct. 1 (2019) (mem.); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) (aliens entering outside a port of entry are ineligible for asylum); *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018) (DACA), *cert. granted*, 139 S. Ct. 2779 (2019) (mem.); *Trump v. Hawai'i*, 878 F.3d 662 (9th Cir. 2017) (per curiam) (entry restrictions), *rev'd*, 138 S. Ct. 2392 (2018); *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) (treatment of detained alien minors under *Flores* agreement); *Hawai'i v. Trump*, 859 F.3d 741 (9th Cir.) (per curiam) (travel ban), *vacated as moot*, 138 S. Ct. 377 (2017) (mem.); *Washington v. Trump*, 847 F.3d 1151 (9th Cir.) (per curiam) (travel ban), *cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017) (mem.).

My first point is that even as we are embroiled in these controversies, no one should mistake our judgments for our policy preferences.  Whether "the iron fist [or an extended velvet glove] would be the preferable policy. . . . our thoughts on the efficacy of the one approach versus the other are beside the point, since our

business is not to judge the wisdom of the National Government's policy."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 427 (2003); *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 165 (1993) ("The wisdom of the policy choices made by Presidents Reagan, Bush, and Clinton is not a matter for our consideration."); *Lochner v. New York*, 198 U.S. 45, 69 (1905) (Harlan, J., dissenting) ("Whether or not this be wise legislation it is not the province of the court to inquire.  Under our systems of government the courts are not concerned with the wisdom or policy of legislation.").

Oh, I am not so naive as to think that a simple declaration of judicial neutrality will quell inquiry into judges' backgrounds, prior writings, and opinions. The battles over judicial nominations provide ample proof that our generation of lawyers bear a diverse set of assumptions about the nature of law, proper modes of constitutional interpretation, and the role of the judiciary.  These are fair debates and they are likely to continue for some time.  We can only hope that over time our differences can be resolved by reason and persuasion rather than by politics by other means.  But I don't know of any judge—at least not this judge—who can say that every opinion and judgment she issued was in accord with her preferred policy outcomes. "[I]n our private opinions, [we] need not concur in Congress' policies to hold its enactments constitutional.  Judicially we must tolerate what personally we

may regard as a legislative mistake." *Harisiades v. Shaughnessy*, 342 U.S. 580, 590 (1952).

My second point is less politic. In this case, we are called upon to review the merits of DHS's Final Rule through the lens of the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 706. Our review is quite circumscribed. We can set aside agency action if it is contrary to law, if it exceeds the agency's jurisdiction or authority, or if the agency failed to follow proper procedure. *Id.* § 706(2)(B)–(D). Those are largely *legal* judgments, which we can address through the traditional tools judges have long used. With respect to the *policy* behind the agency's action, we are largely relegated to reviewing the action for arbitrariness and caprice. *Id.* § 706(2)(A). That is not a very rigorous standard and, as a result, an agency has broad discretion to administer the programs entrusted to it by Congress. *Cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978) ("[F]undamental policy questions appropriately resolved in Congress . . . are *not* subject to reexamination in the federal courts under the guise of judicial review of agency action.").

In the immigration context, whatever dialogue we have been having with the administration over its policies, we are a poor conversant. We are limited in what we can say and in our ability—even if anyone thought we were qualified to do

4

so—to shape our immigration policies.  We lack the tools of inquiry, investigation, and fact-finding that a responsible policymaker should have at its disposal.  In sum, the APA is the meagerest of checks on the executive.  We are not the proper foil to this or any other administration as it crafts our immigration policies.

By constitutional design, the branch that is qualified to establish immigration policy and check any excesses in the implementation of that policy is Congress.  *See* U.S. CONST. Art. I, § 8, cl. 4.  And, so far as we can tell from our modest perch in the Ninth Circuit, Congress is no place to be found in these debates.  We have seen case after case come through our courts, serious and earnest efforts, even as they are controversial, to address the nation's immigration challenges.  Yet we have seen little engagement and no actual legislation from Congress.  It matters not to me as a judge whether Congress embraces or disapproves of the administration's actions, but it is time for a feckless Congress to come to the table and grapple with these issues.  Don't leave the table and expect us to clean up.

FILED

*City and County of San Francisco, et al v. USCIS, et al*, No. 19-17213+

DEC 5 2019

OWENS, Circuit Judge, concurring in part and dissenting in part:

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

While I concur with the majority's jurisdiction analysis, I otherwise respectfully dissent. In light of the: (1) government's heavy burden due to the standard of review, (2) opaqueness of the legal questions before us, (3) lack of irreparable harm to the government at this early stage, (4) likelihood of substantial injury to the plaintiffs, and (5) equities involved, I would deny the government's motions to stay and let these cases proceed in the ordinary course. *See Nken v. Holder*, 556 U.S. 418, 427, 433-34 (2009) (holding that a "stay is an 'intrusion into the ordinary processes of administration and judicial review,'" and "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of [judicial] discretion" (citation omitted)).