1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   CHEROKEE DM MELTON
    Supervising Deputy Attorney General
4   JENNIFER C. BONILLA
    JULIA HARUMI MASS
5   ANITA GARCIA VELASCO
    BRENDA AYON VERDUZCO
6   ANNA RICH
    LISA CISNEROS, State Bar No. 251473
7   Deputy Attorneys General
      455 Golden Gate Ave., Suite 1100
8     San Francisco, CA  94102-7004
      Telephone: 415-510-3438
9     Fax: 415-703-5843
      E-mail:  Lisa.Cisneros@doj.ca.gov
10  *Attorneys for Plaintiff State of California*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **STATE OF CALIFORNIA, et al.,**          Case No. 4:19-cv-04975-PJH

17                              Plaintiffs,   **DECLARATION OF LISA CISNEROS IN
                                              SUPPORT OF PLAINTIFFS' MOTION**
18       v.                                   **TO COMPEL COMPLETION OF THE
                                              ADMINISTRATIVE RECORD AND**
19                                            **REQUEST FOR LEAVE TO SERVE**
    **U.S. DEPARTMENT OF HOMELAND SECURITY,** **DISCOVERY**
20  **et al.,**
                                              Date: March 4, 2020
21                              Defendants.   Time: 9:00 a.m.
                                              Courtroom:   3
22                                            Judge:       Hon. Phyllis J. Hamilton
                                              Trial Date:  None set
23                                            Action Filed: August 16, 2019

24

25

26

27

28

I, Lisa Cisneros, declare as follows:

1.     I am a member of the California State Bar, admitted to practice before this Court, employed by the Office of the California Attorney General as a Deputy Attorney General, and counsel for Plaintiff State of California in this action.  I have personal knowledge of the facts set forth herein, and if called upon as a witness, I could testify to them competently under oath.

**Administrative Record Production and the Meet and Confer Process**

2.     On November 25, 2019, Defendants produced an electronic copy of the administrative record with a certified index, certification of the administrative record, and 214,542 records.  Defendants' production did not include metadata or a privilege log.

3.     Attached as Exhibit 1 is a true and correct copy of the Certification of the Administrative Record and an accompanying index, signed by Robert T. Law, on behalf of the Office of Policy & Strategy, United States Citizenship and Immigration Services (USCIS), and the United States Department of Homeland Security (DHS).

4.     On January 9, 2020, I sent a letter to Defendants' counsel Josh Kolsky identifying information that appeared to be missing from the administrative record, and requested a meeting to discuss completion of the record.

5.     On January 13, 2020, Mr. Kolsky sent me an email indicating that he was conferring with his clients regarding the issues raised in the meet and confer letter.  On January 14, 2020, I responded to Mr. Kolsky, and on January 22 and 27, 2020, my colleague, Deputy Attorney General Julia Mass, and I conferred by phone with Mr. Kolsky.

6.     Attached as Exhibits 2, 3, and 4 are true and correct copies of my January 9, 2020 meet and confer letter and email messages that Mr. Kolsky and I exchanged throughout the meet and confer process regarding the completion of the administrative record.

7.     Through the meet and confer process, I identified the following categories of missing materials:

1

- Complete, unredacted copies of all policies, procedures, forms and guidance related to the application of the public charge ground of inadmissibility or any other aspect of the Rule or previous drafts of the Rule;

- The USCIS article, *Public Charge Provisions of Immigration Law: A Brief Historical Background*, dated August 14, 2019, and all data the article references, including Immigration and Naturalization Service (INS), DHS, and Department of State consular processing statistics related to public charge determinations;

- Inter- and intra-agency communications and Agency communications with outside organizations related to the Rule, including records related to the Agency's development of forms related to public charge determinations and estimates regarding the burdensomeness of forms;

- White House communications to the Agency related to the Rule;

- Information and data related to legal permanent residents who may undergo a public charge inadmissibility determination upon return from trips abroad;

- Missing comments from the public; and

- Correct, contemporaneous copies of websites included in the Record.

8.      Through our discussions, Defendants agreed to produce one portion of a policy manual in response to Plaintiffs' letter—Volume 8, Part B, Chapter 3.  Defendants declined to produce additional policy documents that Plaintiffs identified as missing or redacted.  Defendants asserted that some of the policy documents had not been actively considered by the agency during the rulemaking process and that some of the policy documents that appear to be redacted in the administrative record are not missing any substantive information.  Plaintiffs received no additional information following our telephonic meet and confer on January 27 and my follow up email of the same day (Exhibit 4 at 1).

9.      The parties failed to reach agreement with respect to Plaintiffs' request that the record include the USCIS article, *Public Charge Provisions of Immigration Law: A Brief Historical Background*, dated August 14, 2019, and data referenced therein.  Defendants asserted that neither the article nor the data referenced in the article had been considered by the agency in the rulemaking process.  On January 27, 2020, while maintaining our position that the material is necessary to complete the administrative record, Plaintiffs asked whether Defendants would stipulate to this information being produced and considered as extra-record background

2

information in the alternative.  Plaintiffs received no additional information regarding this subject following our telephonic meet and confer on January 27 and my follow up email of the same day (Exhibit 4 at 1).

10.     The parties failed to reach agreement with respect to Plaintiffs' request that the record include intra- and inter-agency material such as comments, analyses, memoranda, emails, and reports related to the Rule.  Defendants indicated in our meet and confer process that they believed some of the documents were subject to a deliberative process privilege.  With respect to intra- and inter-agency records related to the development of forms and estimations regarding the time it would take applicants to fill out forms related to public charge adjudications, Mr. Kolsky informed us that Defendants believe such materials are irrelevant to Plaintiffs' claims.  In response to Mr. Kolsky's objection that the category as written was overly broad and burdensome, Plaintiffs proposed that non-substantive records be excluded.  During our telephonic meet and confer on January 27, Mr. Kolsky informed us that his client was still considering this proposal, but Plaintiffs received no additional information regarding this subject following our telephonic meet and confer on January 27 and my follow up email of the same day (Exhibit 3 at 1, 4 at 1-2).

11.     The parties failed to reach agreement with respect to Plaintiffs' request that the record include communications from organizations and individuals outside the federal government other than comment letters submitted through the notice-and-comment process and through meetings with the Office of Management and Budget; communications with the White House.  On January 27, 2020, Plaintiffs asked Mr. Kolsky if the agency had received records from outside individuals or organizations other than the comment letters and materials related to Office of Management and Budget meetings that are included in the administrative record. Plaintiffs received no additional information regarding this subject following our telephonic meet and confer on January 27 and my follow up email of the same day (Exhibit 4 at 1).

12.     Plaintiffs also sought—and have not yet received—an explanation of the Record sufficient to confirm that all non-duplicative comment letters have been included.  During our telephone call on January 27, Defendant agreed to continue helping Plaintiffs to understand the process for logging comment letters and excluding duplicates and to complete the administrative record with any comment letters that may be found to be missing.  (Exhibit 3 at 1, Exhibit 4 at 2).  At 12:30 pm Pacific Time today, Defendants emailed Plaintiffs with additional documentation that Plaintiffs are now considering.

13.     With respect to data related to lawful permanent residents that would be subject to the Rule upon return from abroad after being outside the United States for more than 180 days, Defendants responded that such data was not before the agency during the decision-making process.  (Exhibit 4 at 2)

14.     During our January 22, 2020 phone call, Defendants represented, though their counsel Mr. Kolsky, that they are unable to produce correct, contemporaneous copies of the webpages referenced in the Rule.  Mr. Kolsky indicated that Defendants not save contemporaneous versions when they visited the webpages and do not have a way to reconstruct them.

15.     In the paragraphs that follow I provide information concerning why we believe each of the categories belongs in the administrative record.

**USCIS Policy Documents**

16.     The Notice of Proposed Rulemaking (NPRM) and the Rule cited to and implicated USCIS policies governing adjustment of status and other processes where public charge determinations may come into play, including the USCIS Policy Manual and the Adjudicator's Field Manual (AFM).

/ / /

/ / /

/ / /

4

*USCIS Policy Manual, Vol. 7 – Adjustment of Status, Part B – 245(a) Adjustment*

17.     In the Rule Defendants cite USCIS Policy Manual, Volume 7 – Adjustment of Status, Part B – 245(a) Adjustment at 84 Fed. Reg. 41,398, note 534.  Attached as Exhibit 5 is a true and correct copy of 84 Fed. Reg. 41,398.

18.     The administrative record does not include a complete copy of USCIS Policy Manual, Volume 7 – Adjustment of Status, Part B – 245(a) Adjustment.  Attached as Exhibit 6 is a true and correct copy of the incomplete policy document, USCIS Policy Manual, Volume 7 – Adjustment of Status, Part B, Bates Number AR_00344782-00344799, that Defendants produced in the administrative record

19.     Exhibit 6 shows a printout from a "USCIS Only Internal Version" of the USCIS Policy Manual, current as of June 6, 2019.  The printout lists categories of material contained in Volume 7, Part B, including "Legal Authorities", "Forms", "Adjudicative Templates", "Standard Operating Procedures", "Training Materials", and "Appendices" with "Precedent Decisions" (labeled "Redacted") and "Affected Sections" of the USCIS Policy Manual.  With the exception of "Precedent Decisions," the categories of materials appear as hyperlinks, and the material they appear to link to are not included in the administrative record.

20.     To further investigate the USCIS Policy Manual's contents I reviewed a version that is publicly available at https://www.uscis.gov/policy-manual/export (hereafter "Public Online USCIS Policy Manual").  I printed the complete available copy of the Public Online USCIS Policy Manual on January 21, 2020.  The Public Online USCIS Policy Manual appears to contain many of the policies that were in effect at the time the Rule was published on August 14, 2019.  The printed copy of the Public Online USCIS Policy Manual is 739 pages long, and indicates that the USCIS Policy Manual contains eleven volumes in total.

21.     Attached as Exhibit 7 is a true and correct copy of the Table of Contents for the Public Online USCIS Policy Manual, which I printed on January 21, 2020.

22.     Attached as Exhibit 8 is a true and correct copy of Volume 7 – Adjustment of Status, Part B – 245(a) Adjustment included in the Public Online USCIS Policy Manual, which I printed on January 21, 2020.

23.     Exhibits 7 and 8 indicate that Volume 7 – Adjustment of Status, Part B – 245(a) Adjustment has eight chapters.  None of these chapters were included in the administrative record, though the Rule directly implicates applications for adjustment of status.

24.     The Public Online USCIS Policy Manual does not fill in all of the gaps in the administrative record that Defendants have produced.

25.     The Public Online USCIS Policy Manual does not provide the categories of material listed in Exhibit 6, USCIS Policy Manual, Volume 7 – Adjustment of Status, Part B, Bates Number AR_00344782-00344799, which include: "Legal Authorities", "Forms", "Adjudicative Templates", "Standard Operating Procedures", "Training Materials", "Appendices", "Precedent Decisions" and "Affected Sections" of the USCIS Policy Manual. Though the Public Online USCIS Policy Manual lists legal authorities in a section and in its footnotes, *see* Exhibit 8 at 2, it does not mirror the "Legal Authorities" listed in Exhibit 6, USCIS Policy Manual, Volume 7 – Adjustment of Status, Part B, Bates Number AR_00344782-00344799.

***USCIS Policy Manual, Vol. 7 – Adjustment of Status, Part A – Adjustment Policies and Procedures***

26.     The Rule also implicates USCIS Policy Manual, Volume 7 – Adjustment of Status, Part A – Adjustment of Status Policies and Procedures.

27.     In the Rule, Defendants "reject the assertion that the rule shifts emphasis away from the affidavit of support," implicating USCIS policies regarding the affidavit of support discussed in the USCIS Policy Manual, Volume 7 – Adjustment of Status, Part A – Adjustment of Status Policies and Procedures at 84 Fed. Reg. 41,439.  Attached as Exhibit 9 is a true and correct copy of 84 Fed. Reg. 41,439.

28.     At 84 Fed. Reg. 41,315, Defendants state that the public charge inadmissibility determination is a subjective, discretionary decision that rests with consular officers or DHS immigration officials, implicating USCIS policies regarding the proper use of discretion described in USCIS Policy Manual, Volume 7 – Adjustment of Status, Part A – Adjustment of Status Policies and Procedures.  Attached as Exhibit 10 is a true and correct copy of 84 Fed. Reg. 41,315.

29.     Attached as Exhibit 11 is a true and correct copy of Volume 7 – Adjustment of Status, Part A – Adjustment of Status Policies and Procedures included in the Public Online USCIS Policy Manual, which I printed on January 21, 2020.

30.     Exhibits 7 and 11 indicate that Volume 7 – Adjustment of Status, Part A – Adjustment of Status Policies and Procedures contains eleven chapters.

31.     Attached as Exhibit 12, is a true and correct copy of Volume 7, Part A, Chapter 4 – Documentation, from the Public Online USCIS Policy Manual.  This excerpt addresses documentation for applications for adjustment of status, and states, among other things, "The purpose of this form [the Affidavit of Support] is to show the applicant has adequate means of financial support and is unlikely to become a public charge."

32.     Attached as Exhibit 13, is a true and correct copy of Volume 7, Part A, Chapter 6 – Adjudicative Review, from the Public Online USCIS Policy Manual.  This chapter guides immigration officials by "provid[ing] the steps that should be used as a general guideline for file review when determining if an applicant is eligible for review."  Ex. [] at 150.  The chapter states, among other things, "Most immediate relative and family-based immigrants, and some employment-based immigrants, are inadmissible as likely to become a public charge unless they submit and Affidavit of Support (Form I-864) with their adjustment application."  Ex. [] at 159.

33.     Attached as Exhibit 14, is a true and correct copy of Volume 7, Part A, Chapter 10 – Legal Analysis and Use of Discretion, from the Public Online USCIS Policy Manual, which among other things, describes the proper use of discretion and states, "An officer should

7

determine whether to approve an adjustment application as a matter of discretion by: . . . [e]valuating the case-specific considerations for each case; [and] [a]voiding the use of numbers, points, or any other analytical tool that suggest quantifying the exercise of favorable or unfavorable discretion."

34.     None of the chapters in the Public Online USCIS Policy Manual, Volume 7 – Adjustment of Status, Part A – Adjustment Policies and Procedures, Exhibit 11 were included in the administrative record.  The non-public versions of Exhibits 12, 13, and 14 are also not included in the administrative record.

35.     The administrative record did not include a "USCIS Only Internal Version" table of contents for Volume 7 Part A similar to what was included for Volume 7, Part B (which is attached as Exhibit 6).  However, assuming similar categories of material are in Part A of Volume 7, there are no corresponding materials for categories such as "Legal Authorities", "Forms", "Adjudicative Templates", "Standard Operating Procedures", "Training Materials", "Appendices", "Precedent Decisions" or "Affected Sections," for Volume 7, Part A.

***USCIS Policy Manual, Vol. 7 – Adjustment of Status, Part R – Abandonment of Lawful Permanent Residence***

36.     At 84 Fed. Reg. 41,326, Defendants state that the Rule applies to legal permanent residents returning from a trip abroad that has lasted for more than six months.  According to Defendants, these legal permanent residents must undergo a public charge inadmissibility determination when they seek readmission.  *Id.*  Attached as Exhibit 15 is a true and correct copy of 84 Fed. Reg. 41,326.

37.     The Public Online USCIS Policy Manual shows that Volume 7 – Adjustment of Status includes a Part R – Abandonment of Lawful Permanent Residence that addresses legal permanent residents who have been abroad for an extended period of time.   The Public Online USCIS Policy Manual does not disclose Part R's content.  Attached as Exhibit 16, is a true and correct copy of the page from the Public Online USCIS Policy Manual where Volume 7, Part R,

8

1  is listed.  Exhibit 18 shows that the content of Volume 8, Part A is not accessible through the

2  Public Online USCIS Policy Manual.

3           38.      The USCIS Policy Manual, Volume 7, Part R was not included in the

4  administrative record.  *See* Ex. 16.  *See also* Ex. 1.

5           39.      Nor does the administrative record include for Volume 7, Part R, any categories of

6  materials, such as "Legal Authorities", "Forms", "Adjudicative Templates", "Standard Operating

7  Procedures", "Training Materials", "Appendices", "Precedent Decisions" or "Affected Sections,"

8  which were identified as categories of material in Volume 7 Part B of the USCIS Policy Manual

9  in Exhibit 6.  Based on my comparison of portions of Volume 7 Part B that were included in the

10  administrative record and portions from the Public Online USCIS Policy Manual, I believe that

11  the public online version of Part R does not contain all of what exists in the actual USCIS Policy

12  Manual for Volume 7 Part R.

13  ***USCIS Policy Manual, Vol. 8 – Admissibility***

14           40.      In the Rule's executive summary, 84 Fed. Reg. 41,294, Defendants state that the

15  Rule applies to admissibility determinations at ports of entry and "when adjudicating certain

16  applications for adjustment of status," which are handled by USCIS.

17           41.      Attached as Exhibit 17 is a true and correct copy of 84 Fed. Reg. 41,294.

18           42.      Exhibit 7 shows that USCIS Policy Manual, Volume 8 – Admissibility contains

19  seventeen parts, Parts A through Q.  Based on their titles, at least four parts of Volume 8 relate to

20  the Rule: Part A – Admissibility Policies and Procedures; Part B – Health-Related Grounds of

21  Inadmissibility; Part G – Public Charge Ground of Inadmissibility, Part L – Documentation

22  Requirements.  None of these parts to Volume 8 – Admissibility were included in the

23  administrative record.

24           43.      The Public Online USCIS Policy Manual does not provide the content for

25  Volume 8, Part A Admissibility Policies and Procedures, Part G – Public Charge Ground of

26  Inadmissibility, Part L – Documentation Requirements.

27

28

44.    Attached as Exhibit 18 is a true and correct copy of the page from the Public Online USCIS Policy Manual where Volume 8, Part A-Admissibility Policies and Procedures is listed.  Exhibit 18 shows that the content of Volume 8, Part A is not accessible through the Public Online USCIS Policy Manual.

45.    Volume 8, Part A was not produced with the administrative record.  *See* Ex. 1.

46.    Attached as Exhibit 19 is a true and correct copy of the page from the Public Online USCIS Policy Manual where Volume 8, Part G – Public Charge Ground of Inadmissibility is listed.  Exhibit 19 shows that the content of Volume 8, Part G is not accessible through the Public Online USCIS Policy Manual.

47.    Volume 8, Part G was not produced with the administrative record.  *See* Ex. 1.

48.    Attached as Exhibit 20 is a true and correct copy of the page from the Public Online USCIS Policy Manual where Volume 8, Part L – Documentation Requirements is listed.  Exhibit 20 shows that the content of Volume 8, Part L is not accessible through the Public Online USCIS Policy Manual.

49.    Volume 8, Part L was not produced with the administrative record.  *See* Ex. 1.

50.    Attached as Exhibit 21 is a true and correct copy of the page from the Public Online USCIS Policy Manual where Volume 8, Part B – Health Related Grounds of Inadmissibility as provided in the Public Online USCIS Policy Manual.

51.    Exhibit 21 shows that some content from Volume 8, Part B is accessible through the Public Online USCIS Policy Manual.

52.    Volume 8, Part B was not produced with the administrative record.  *See* Ex. 1.

53.    The administrative record does not include for Volume 8, Parts A, B, G, or L, any categories of materials that the USCIS Policy Manual appears to contain for Volume 7, Part B such as "Legal Authorities", "Forms", "Adjudicative Templates", "Standard Operating Procedures", "Training Materials", "Appendices", "Precedent Decisions" or "Affected Sections."

*///*

*Adjudicator's Field Manual*

54.     In the administrative record Defendants provided chapters from the "Adjudicator's Field Manual – Redacted Public Version," rather than an unredacted copy of the field manual that is used internally by USCIS personnel.

55.     Attached as Exhibit 22 is a true and correct copy of Chapter 10.5, Bates Number AR_00322791-00344800, as provided in the administrative record.

56.     Attached as Exhibit 23, is a true and correct copy of Chapter 20.5, Bates Number AR_00344801-00344831, as provided in the administrative record.

57.     Attached as Exhibit 24, is a true and correct copy of Chapter 30.2, Bates Number AR_00344832-00344846, as provided in the administrative record.

58.     Attached as Exhibit 25, is a true and correct copy of Chapter 30.3, Bates Number AR_00344847-00344869, as provided in the administrative record.

59.     Attached as Exhibit 26, is a true and correct copy of Chapter 61.1, Bates Number AR_00344870-00344871, as provided in the administrative record.

60.     I have been informed by Defendants' counsel Mr. Kolsky that there is an unredacted version of the Adjudicator's Field Manual.

61.     In the Notice of Proposed Rulemaking (NPRM), 83 Fed. Reg. 51,125, and in the Rule's executive summary, 84 Fed. Reg. 41295, Defendants state that the Rule creates a new bond process.  Ex. 17.  Attached as Exhibit 27 is a true and correct copy of the NPRM at 83 Fed. Reg. 51,125.

62.     Chapter 61 of the Adjudicator's Field Manual (Ex. 26) cross-references Chapter 45 of the Inspector's Field Manual and Chapter 12 of the Deportation Officer's Field Manual and includes two subchapters, 61.1 and 61.2, both of which address posting, cancellation and breaching of immigration bonds.

63.     The administrative record does not contain Chapter 61.2 of the Adjudicator's Field Manual, Chapter 14 of the Inspector's Field Manual, or Chapter 12 of the Deportation Officer's Field Manual.

64.     Attached as Exhibit 55, is a true and correct copy of printouts from the online Adjudicator's Field Manual – Redacted Public Version that show the content of Chapter 61, Chapter 61.1 and Chapter 61.2, which I downloaded from the USCIS website on January 29, 2020 at the web addresses noted at the bottom of each printout page.

**The USCIS Article and Related Historical Data**

65.     In the Rule, 84 Fed. Reg. 41,347, Defendants assert that they "DHS do[] not believe that the [R]ule is inconsistent with historical practice. . . .  Rather, the [R]ule is consistent with existing precedents that have developed since the earliest public charge laws."

66.     Attached as Exhibit 28 is a true and correct copy of 84 Fed. Reg. 41,347.

67.     Attached as Exhibit 29 is a true and correct copy of an article published by USCIS entitled *Public Charge Provisions of Immigration Law: A Brief Historical Background*, dated August 14, 2019, which I downloaded on September 20, 2019 from https://www.uscis.gov/history-and-genealogy/our-history/public-charge-provisions-immigration-law-a-brief-historical-background.

68.     The USCIS article refers to "the widespread use of the public charge provisions of immigration law", provides data tables with partial historical data, and concludes, "For more than 100 years the LPC provision remained one of the most common reasons for excluding immigrants in the United States."  Exhibit 29 at 4-10.

69.     USCIS disseminated this article through a series of posts to the agency's Facebook page on August 15, 21 and 23, and September 9, 12, 19, 25, 2019.  Attached as Exhibit 30 are true and correct copies of screenshots that I took of these Facebook postings on December 23, 2019.

70.     The Department of Homeland Security publishes annual data reports, referred to as the *Yearbook of Immigration Statistics*, for each fiscal year regarding nonimmigrant admissions, foreign nationals who were granted lawful permanent residence (i.e. admitted as immigrants or became legal permanent residents), and inadmissibility determinations.  These reports are made accessible on the department website at https://www.dhs.gov/immigration-statistics/yearbook.

71.     Attached as Exhibit 31 is a true and correct copy of excerpts of the U.S. Immigration and Naturalization Service, *Statistical Yearbook of the Immigration and Naturalization Service, 2001*, (2001 INS Statistical Yearbook), which I downloaded on January 22, 2020 from https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2001.pdf.

72.     Tables 66 from the 2001 INS Statistical Yearbook shows that after 1940 the public charge provision was no longer one of the most common reasons for excluding foreign nationals seeking admission.  Exhibit 31 at 15.

73.     Tables 1 and 66 from the 2001 INS Statistical Yearbook show that from 1891 to 1980, the United States admitted approximately 34 million permanent residents, and during nearly the same period, 1892 to 1980 (the years for which data is provided) excluded only 219,399 as likely to become a public charge.  Exhibit 31 at 16 and 258.

74.     The data in the 2001 INS Statistical Yearbook, Table 1. Immigration to the United States: fiscal years 1820-2001, shows the following:

| Yearbook of Immigration Statistics, 2001 | |
|---|---|
| Table 1. Immigration to the United States | |
| 1891-1900 | 3,687,564 |
| 1901-1910 | 8,795,386 |
| 1911-1920 | 5,735,811 |
| 1921-1930 | 4,107,209 |
| 1931-1940 | 528,431 |
| 1941-1950 | 1,035,039 |
| 1951-1960 | 2,515,479 |

13

| 1961-1970 | | 3,321,677 |
| 1971-1980 | | 4,493,314 |
| | Total | 34,219,910 |

Exhibit 31 at 6 and 16.

75.   The administrative record produced by Defendants does not include data regarding the number of inadmissibility determinations on public charge grounds, and instead is limited to the number of persons who have obtained lawful permanent residency by type and class of admission.  Attached as Exhibit 32 is a true and correct copy of excerpts of the administrative record that contain data tables and spreadsheets from the Department of Homeland Security's Yearbook of Immigration Statistics, as well as a page that lists the Yearbooks of Immigration Statistics available at https://www.dhs.gov/immigration-statistics/yearbook.

76.   The USCIS article also asserted that "the vast majority of denials" for would-be immigrants took place abroad through consular processing by State Department officials.  Exhibit 29 at 3.

77.   Table 2 from the USCIS article compiles data from 1966 through 2017 regarding the number of visa applicants denied as likely to become a public charge.  Exhibit 29 at 6-10. Table 2 does not include data from the 1920s, which the USCIS article states is when consular processing became more prominent and an increasing number of denials took place abroad rather than at ports-of-entry.  Exhibit 29 at 3.  Table 2 does not include the number of visa applicants during a given fiscal year, making it impossible for readers to know the percentage of applicants denied admission based on public charge grounds of inadmissibility.

78.   The Department of State publishes annual data reports regarding visa applications and inadmissibility determinations by consular officers at foreign posts that are made available online at https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics.html.

79.   I reviewed data in the available in the annual Reports of the Visa Office for 2000 to 2018.  From Tables I and XX of these reports, I collected and analyzed data showing the

number of immigrant and nonimmigrant visa applicants deemed ineligible on public charge

grounds, the number of instances ineligibility was overcome, and the total number of visa issued

and refused. These data show that visa denials because an applicant is likely to become a public

charge has been generally less than one percent for nonimmigrant visa applicants and under ten

percent for immigrant visa applicants from 2000 to 2018.  A true and correct copy of my data

chart and true and correct copies of Tables I and XX of the reports I downloaded from

https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics.html on January 27, 2020,

as well as the 2005 reports, which I downloaded on January 28, 2020, and used to obtain the data

are attached hereto as Exhibit 33.

**The Development of the Rule and Related Documents and Communications**

80.     Numerous media reports and at least one book have reported on the development

of the Trump Administration's immigration policy and the Rule, in particular.

81.     Attached as Exhibit 34 is a true and correct copy of excerpts of a book, *Border

Wars*, authored by two New York Times correspondents, Julie Hirschfield Davis and Michael D.

Shear, published on October 8, 2019.

82.     Attached as Exhibit 35 is a true and correct copy of Nick Miroff and Josh Dawsey,

*The Adviser Who Scripts Trump's Immigration Policy*, Washington Post, September 17, 2019.

83.     I am aware that responses to requests pursuant to the Freedom of Information Act

and other publicly disclosed information have also revealed steps in the Rule's development.

84.     The Center for Constitutional Rights received a set of documents from the U.S.

Department of Agriculture (USDA) in response to its Freedom of Information Act (FOIA) request

related to USDA's review and comment on an early draft of the Rule.  Ghita Schwarz, a senior

staff attorney at the Center for Constitutional Rights shared the USDA documents with my office.

85.     The USDA FOIA response, other FOIA responses, and publicly disclosed

information indicate that an inter-agency review process related to the Rule took place at least

from March 2018 through September 2018.

15

86.     Attached as Exhibit 36 is a true and correct copy of an email thread produced in the USDA FOIA response that includes a March 29, 2018 email from the Office of Management and Budget, sharing a draft Notice of Proposed Rulemaking (NPRM) from the Department of Homeland Security and the USCIS with over twenty federal agencies for inter-agency review pursuant to Executive Order 12866.

87.     Attached as Exhibit 37 is a true and correct copy of an email thread including an April 12, 2018 email from USDA, attaching the USDA's Food and Nutrition Service comments to Shannon Joyce at OMB.  The USDA's comment is not included in Exhibit 37, as it was not disclosed in response to the FOIA request.

88.     Attached as Exhibit 38 is a true and correct copy of an email thread between USDA and OMB regarding OMB's coordination of inter-agency meetings regarding the draft NPRM.

89.     Attached as Exhibit 39 is a true and correct copy of an email produced in the USDA FOIA response that lists the individuals cleared to attend an inter-agency briefing DHS held regarding the draft NPRM.

90.     Exhibit 39 shows that the following USDA personnel cleared to attend the April 19, 2018 meeting.  Based on biographic information available online, their positions appear as listed:

- Julie Druhan, Senior Program Analyst, Food and Nutrition Programs, OBPA
- Diane Kriviski, Deputy Administrator of Supplemental Nutrition and Safety Programs, Food and Nutrition Service
- Brandon Lipps, Deputy Under Secretary for Food, Nutrition and Consumer Services
- Jessica Shahin, Associate Administrator, Supplemental Nutrition Assistance Program
- Campbell Shuford, Senior Advisor to the USDA Secretary
- Mark Smith, Food Assistance Programs Staff Chief, OBPA
- Kailee Tkacz, Policy Advisor
- Stephen Vaden, General Counsel, Acting General Counsel, and Principal Deputy General Counsel

16

1    91.    Attached as Exhibit 40 are true and correct copies of information that I found

2    online regarding the positions of the above noted USDA personnel, which I printed on January

3    26, 2020.

4    92.    Attached as Exhibit 41 is a true and correct copy of a April 20, 2018 OMB email

5    to USDA staff that attached a file named "HHS combined for USDA.PDF," with the subject line

6    "Comments on DHS Proposed Rule."

7    93.    Based on USDA FOIA documents, it appears that USDA's efforts to arrange a

8    policy-level meeting with DHS continued from April 2018 into June. Attached as Exhibits 42, 43,

9    and 44 are true and correct copy of email threads produced in USDA's FOIA response related to

10   USDA's efforts to obtain a policy-level meeting with DHS regarding the proposed rule.

11   94.    Attached as Exhibit 44 is a true and correct copy of an article I downloaded from

12   the Politico.com website (https://www.politico.com/story/2019/08/02/stephen-miller-green-card-

13   immigration-1630406) by Ted Hesson, entitled *Emails show Stephen Miller pressed hard to limit*

14   *green cards* and dated Aug. 2, 2019.  The article, reported that on June 8, 2018 Stephen Miller

15   wrote to USCIS Director Cissna regarding the pace of the rulemaking process, stating, "Francis—

16   The timeline on public charge is unacceptable," and "The public charge reg has been in the works

17   for a year and a half.  This is time we don't have.  I don't care what you need to do to finish it on

18   time."

19   95.    Attached as Exhibit 45 is a true and correct copy of a document I downloaded

20   from a link in an article on the Propublica.org website (https://www.propublica.org/article/emails-

21   show-the-va-took-no-action-to-spare-veterans-from-a-harsh-trump-immigration-policy) by

22   Yeganeh Torbati, Isaac Arnsdorf and Dara Lind, entitled *"No Comment": Emails Show the VA*

23   *Took No Action to Spare Veterans from a Harsh Trump Immigration Policy* and dated Aug. 19,

24   2019.  Exhibit 45 is an email thread that shows OMB continued to solicit comments from other

25   federal agencies on the proposed rule in July and up to September 2018, just prior to the

26   publication of the NPRM.

27

28

96.     Exhibit 45 includes a July 16, 2018 email in which an unidentified OMB official circulated to numerous federal agencies an updated draft of the NPRM for review and comment under Executive Order 12866 by July 20, 2018.  The email included instructions that stated, in part:

> Given the very tight timeline for this rule, we are asking agencies to limit their comments to operational or legal concerns.  We also want to understand from agencies what processes, forms, advisories, notices etc. the agency might have to alter or amend to implement this rule.  For example, does your agency foresee any disenrollment costs going forward?  Or do you currently have a notice on your enrollment forms indicating that the receipt of benefits under your program will *not* impact an individual's immigration status that you would have to change?
>
> **Please do not worry about non-substantive line edits.  Please recognize, also, that the decision of whether to propose expanding the definition of public charge, broadly, has been made at a very high level and will not be changing.**
>
> Due to the high volume of comments received from the interagency on the previous passback, DHS has asked the agencies please use the provided comment matrix instead of redline going forward.  Please note that the regulatory impact assessment will be circulated at a later date.

Ex. 45 at 1-2 (emphasis in original).

97.     Exhibit 45 also includes an email sent on September 4, 2018, in which an unidentified OMB official circulated another revised draft of the NPRM to numerous federal agencies and requested comments by close of business on September 7, 2018.  Ex. at 3-4.  The email stated in part:

> This draft does not yet have an RIA.  We will circulate an RIA when it becomes available.
>
> Given the very tight timeline for this rule, we continue to ask agencies to limit their comments to operational or legal concerns.  We also want to understand from agencies what processes, notices, etc. the agency might have to alter or amend to implement this rule.  This information will be very helpful in assessing the costs and benefits and for a more clear understanding of the steps required for implementation.

18

**Please do not worry about non-substantive line edits.  Please recognize, also, that the decision of whether to propose expanding the definition of public charge, broadly, has been made at a very high level and will not be changing.**

Please use the provided comment matrix.  We ask that you please do not merge cells, columns, rows, etc. or change the formatting in any way.

*Id.* at 3-4 (emphasis in original).

**Ongoing Inter-Agency Process and White House Involvement in the Rulemaking Process**

98.     According to the book *Border Wars*, excerpted at pages 381-82 of Exhibit 34, in April 2019 DHS Secretary Nielsen stepped down, and it was reported that she was forced to do so by the President and Stephen Miller based on her handling of the Rule, among other policy matters.

99.     Exhibit 46 is a true and correct copy of an article I downloaded from the nytimes.com website by Zolan Kanno-Youngs, Maggie Haberman, Michael D. Shear and Eric Schmitt, entitled *Kirstjen Nielsen Resigns as Trump's Homeland Security Secretary*, published by the New York Times and dated April 7, 2019.  Exhibit 46 describes Ms. Nielsen's resignation as in response to pressure from the White House which included frequent calls from the President, pressuring her to enact policy changes, some of which she resisted on legal grounds.

100.     According to the book *Border Wars*, excerpted at pages 381-82 of Exhibit 34, Stephen Miller was frustrated by USCIS Director Cissna's refusal to push forward White House policy agendas without going through legal processes Cissna believed were required.

101.     Exhibit 47 is a true and correct copy of an article I downloaded from Politico.com by Matthew Choi and Anita Kumar, entitled *Citizenship and Immigration Services Chief Resigns* and dated May 24, 2019.  According to Exhibit 47 and excerpts from the book *Border Wars* at page 381-82 of Exhibit 34, Cissna resigned in May 2019 under pressure by the White House, due in part to his handling of the public charge rule.

102.     Exhibit 48 is a true and correct copy of an article I downloaded from Politico.com by Ted Hesson, entitled *Cuccinelli Starts As Acting Immigration Official Despite GOP*

19

*Opposition* and dated June 10, 2019, which reports that on June 10, 2019, Kenneth Cuccinelli

became the Acting Director for USCIS and chosen as an immigration hardliner for the purpose of

driving forward the final publication of the public charge rule.

103.    Exhibit 49 is a true and correct copy of excerpts from the U.S. Office of

Management and Budge WAVES Visitor Records release for June 2019, which I downloaded

from https://www.whitehouse.gov/wp-

content/uploads/2019/08/OMB_WAVES_Release_June_2019.pdf.  Exhibit 49 reveals that days

after Kenneth Cuccinelli became the new USCIS Director, on January 14 and 17, 2019, OMB's

Acting Administrator Paul Ray met twice with top USDA officials and personnel from its Food

and Nutrition Service: Rebecca Adcock, Brandon Lipps, Barbara Murphy, Margaret (Maggie)

Lyons, Campbell Shuford, and Joby Young.

104.    Attached as Exhibit 50 are true and correct copies of information that I found

online regarding the positions of the above noted USDA personnel, which I printed on January

26, 2020.

**Developments After the Rule's Publication**

105.    Attached as Exhibit 51 is a true and correct copy of an article I downloaded from

nytimes.com by Zolan Kanno-Youngs and Maggie Haberman, entitled *White House Fires*

*Homeland Security Dept.'s General Counsel*, published by the New York Times, and dated

September 17, 2019.  According to Exhibit 51 and excerpts from the book *Border Wars* at page

382 of Exhibit 34, DHS General Counsel John Mitnick was fired on September 17, 2019, and his

ouster was prompted by Stephen Miller, as a continuation of the White house purge of top DHS

officials that objected to pushing through restrictive immigration policies on legal and procedural

grounds.

106.    On October 2, 2019, days before the first hearing on the motion for preliminary

injunction, Defendants issued 25 pages of corrections to the Rule.  The corrections addressed,

among other issues, a substantive problem in the Rule that was reported in the media and raised in

the claims of at least one lawsuit.  Attached as Exhibit 52 is a true and correct copy of the October 2, 2019 corrections.

**Racist Statements and Activity**

107.   Exhibit 53 is a is a true and correct copy of an article I downloaded from washingtonpost.com by Kim Bellware, entitled *Leaked Stephen Miller emails show Trump's point man on immigration promoted white nationalism, SPLC reports* and dated November 13, 2019.

108.   Exhibit 54 is a true and correct copy of an article I downloaded from washingtonpost.com by Marc Fisher, entitled *Cuccinelli, a righteous, faith-driven warrior who delights in provocation, will join Trump administration* and dated May 22, 2019.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on January 29, 2020 in San Francisco, California.

LISA CISNEROS
Deputy Attorney General

21