UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, et al.,

          Plaintiffs,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

          Defendants.

Case No.  19-cv-04975-PJH

**ORDER GRANTING IN PART,
DENYING IN PART, AND DEFERRING
RULING IN PART ON MOTION TO
DISMISS**

Re: Dkt. No. 160

Before the court is defendants the Department of Homeland Security ("DHS"), the U.S. Citizenship and Immigration Service ("USCIS"), Chad Wolf,[1] and Kenneth Cuccinelli's (collectively "defendants") motion to dismiss.  The matter is fully briefed and suitable for decision without oral argument.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

**BACKGROUND**

This case involves a challenge to the implementation of the final rule entitled "Inadmissibility on Public Charge Grounds," published by DHS on August 14, 2019.  See Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) ("the Rule").  On October 10, 2018, DHS began the rulemaking process to create a new framework for the public charge assessment by publishing a Notice of Proposed

---

[1] Kevin McAleenen was originally named in the complaint, but as of November 13, 2019, Chad Wolf is the current acting secretary of DHS (see https://www.dhs.gov/person/chad-f-wolf).  Pursuant to Federal Rule of Civil Procedure 25(d), an officer's successor is automatically substituted as a party.

1   Rulemaking ("NPRM").  See Inadmissibility on Public Charge Grounds, 83 Fed. Reg.

2   51,114 (Oct. 10, 2018).  On August 14, 2019, DHS published the Rule in the Federal

3   Register.  Id. at 41,292.  The Rule was originally set to become effective on October 15,

4   2019.

5           Publication of the Rule resulted in several complaints filed in federal district courts

6   across the nation.  Three such complaints were filed in the Northern District of California

7   and related before this court.  Dkt. 24.  The present motion involves one of the three

8   cases:  State of California, et al. v. U.S. Department of Homeland Security, et al., Case

9   No. 19-cv-04975-PJH, wherein the States of California, Maine, and Oregon, the

10  Commonwealth of Pennsylvania, and the District of Columbia (the "state plaintiffs" or

11  "plaintiffs") filed a complaint ("Compl.") asserting six causes of action:  (1) Violation of the

12  Administrative Procedure Act ("APA"), 5 U.S.C. § 706—Contrary to Law, the Immigration

13  and Nationality Act ("INA") and the Illegal Immigration Reform and Immigrant

14  Responsibility Act ("IIRIRA"); (2) Violation of APA, 5 U.S.C. § 706—Contrary to Law,

15  Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794 (the "Rehabilitation

16  Act"); (3) Violation of APA, 5 U.S.C. § 706—Contrary to Law, State Healthcare Discretion;

17  (4) Violation of APA, 5 U.S.C. § 706—Arbitrary and Capricious; (5) Violation of the Fifth

18  Amendment's Due Process clause requiring Equal Protection based on race; (6) Violation

19  of the Fifth Amendment's Due Process clause, based on a violation of Equal Protection

20  principles based on unconstitutional animus.  Dkt. 1.

21          On October 11, 2019, this court issued a preliminary injunction enjoining

22  defendants from applying the Rule to any person residing in the City and County of San

23  Francisco, Santa Clara County, the States of California, Oregon, or Maine, the

24  Commonwealth of Pennsylvania, or the District of Columbia.  Dkt. 120 at 92.  Defendants

25  appealed the preliminary injunction on October 30, 2019.  Dkt. 129.  A three-judge panel

26  of the Ninth Circuit stayed the preliminary injunction on December 5, 2019.[2]  Dkt. 141;

27

28  [2] The panel consolidated the three related cases before this court with a similar case
    from the Eastern District of Washington.  That court issued a nationwide injunction of the

United States District Court
Northern District of California

see City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs., 944 F.3d 773 (9th Cir. 2019).  On February 18, 2020, the Ninth Circuit panel voted to deny plaintiffs-appellees' motions for reconsideration and for rehearing en banc.  Dkt. 153.  Other district courts also issued preliminary injunctions prohibiting enforcement of the Rule, but these were ultimately stayed by the Supreme Court.  See Dep't of Homeland Security v. New York, 140 S. Ct. 599 (2020); Wolf v. Cook Cty., Illinois, 140 S. Ct. 681 (2020).  Accordingly, the Rule went into effect on February 24, 2020.

A broader summary of the relevant statutory framework and the changes implemented by the Rule may be found in the court's preliminary injunction order.  Dkt. 120 at 6–10.  To briefly summarize here, DHS promulgated the Rule pursuant to its authority under the INA, 8 U.S.C. § 1101, et seq., which requires that all noncitizens seeking to be lawfully admitted into the United States or to become lawful permanent residents prove they are not inadmissible.  8 U.S.C. §§ 1361, 1225(a).  A noncitizen may be deemed inadmissible on any number of grounds, including that they are "likely at any time to become a public charge."  8 U.S.C. § 1182(a)(4)(A).  The statute directs immigration officials to form an opinion as to whether the applicant "is likely at any time to become a public charge."  Id.  In forming that opinion, immigration officers must consider "at a minimum" five statutorily-defined factors: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; (5) education and skills.  8 U.S.C. § 1182(a)(4)(B)(i).  The Rule would define the term "public charge" and set out various criteria for government officials as part of their totality of the circumstances determination.

## DISCUSSION

### A.   Legal Standard

#### 1.   Rule 12(b)(1)

A federal court may dismiss an action under Federal Rule of Civil Procedure

---

Rule on the same day as this court's geographically limited preliminary injunction order. Washington v. U.S. Dep't of Homeland Security, 408 F. Supp. 3d 1191, 1224 (E.D. Wash. 2019).

12(b)(1) for lack of federal subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Rule 12(h)(3) similarly provides that a court "must dismiss the action" if it "determines at any time that it lacks subject-matter jurisdiction."  Fed. R. Civ. P. 12(h)(3).  "Federal courts are courts of limited jurisdiction" and the burden of establishing subject matter jurisdiction "rests upon the party asserting jurisdiction."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted).

A jurisdictional challenge may be facial or factual.  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  When the attack is facial, the court determines whether the allegations contained in the complaint are sufficient on their face to invoke federal jurisdiction.  Id.  Where the attack is factual, however, "the court need not presume the truthfulness of the plaintiff's allegations."  Id.

When resolving a factual dispute about its federal subject matter jurisdiction, a court may review extrinsic evidence beyond the complaint without converting a motion to dismiss into one for summary judgment.  McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988) (holding that a court "may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction"); see also Land v. Dollar, 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised . . . the court may inquire by affidavits or otherwise, into the facts as they exist.").  "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."  Safe Air for Everyone, 373 F.3d at 1039.

The Ninth Circuit has noted that "jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the requirements specified in Bell v. Hood, 327 U.S. 678 (1946)."  Safe Air for Everyone, 373 F.3d at 1039 (quoting Sun Valley Gas., Inc. v. Ernst Enters., 711 F.2d 138, 140 (9th Cir. 1983)).  "In Bell, the Supreme Court determined that jurisdictional dismissals are warranted 'where the alleged

1    claim under the constitution or federal statutes clearly appears to be immaterial and

2    made solely for the purpose of obtaining federal jurisdiction or where such claim is wholly

3    insubstantial and frivolous.'" Id. (quoting Bell, 327 U.S. at 682–83).

### 2.    Rule 12(b)(6)

5        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the

6    legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock Inc., 349 F.3d 1191,

7    1199–1200 (9th Cir. 2003).  Under Federal Rule of Civil Procedure 8, which requires that

8    a complaint include a "short and plain statement of the claim showing that the pleader is

9    entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule

10   12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient

11   facts to support a cognizable legal theory.  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th

12   Cir. 2013).

13       While the court is to accept as true all the factual allegations in the complaint,

14   legally conclusory statements, not supported by actual factual allegations, need not be

15   accepted.  Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009).  The complaint must proffer

16   sufficient facts to state a claim for relief that is plausible on its face.  Bell Atl. Corp. v.

17   Twombly, 550 U.S. 544, 555, 558–59 (2007).

18       "A claim has facial plausibility when the plaintiff pleads factual content that allows

19   the court to draw the reasonable inference that the defendant is liable for the misconduct

20   alleged."  Iqbal, 556 U.S. at 678.  "[W]here the well-pleaded facts do not permit the court

21   to infer more than the mere possibility of misconduct, the complaint has alleged—but it

22   has not 'show[n]'—'that the pleader is entitled to relief.'"  Id. at 679 (quoting Fed. R. Civ.

23   P. 8(a)(2)).  Where dismissal is warranted, it is generally without prejudice, unless it is

24   clear the complaint cannot be saved by any amendment.  In re Daou Sys., Inc., 411 F.3d

25   1006, 1013 (9th Cir. 2005).

26       Review is generally limited to the contents of the complaint, although the court can

27   also consider documents "whose contents are alleged in a complaint and whose

28   authenticity no party questions, but which are not physically attached to the plaintiff's

United States District Court
Northern District of California

pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999), superseded by statute on other grounds as stated in In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130 (9th Cir. 2017)); see also Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("[A] court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document." (citation omitted)).  The court may also consider matters that are properly the subject of judicial notice (Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001)), and exhibits attached to the complaint (Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989)).

**B.    Analysis**

    **1.    Standing**

        Federal courts may adjudicate only actual cases or controversies, U.S. Const. art. III, § 2, and may not render advisory opinions as to what the law ought to be or affecting a dispute that has not yet arisen.  Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240 (1937).  Article III's "standing" requirements limit the court's subject matter jurisdiction.  Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004) (citing Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101 (1998)).  The burden of establishing standing rests on the party asserting the claim.  Renne v. Geary, 501 U.S. 312, 316 (1991) (citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 n.8 (1986)).  "In order to establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  California v. Trump, 963 F.3d 926, 935 (9th Cir. 2020) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).  "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."  Spokeo Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (second alteration in original) (quoting Warth v. Seldin, 422 U.S. 490, 518 (1975)).

        "At least one plaintiff must have standing to seek each form of relief requested,

United States District Court
Northern District of California

and that party bears the burden of establishing the elements of standing with the manner and degree of evidence required at the successive stages of the litigation." E. Bay Sanctuary Covenant v. Trump ("E. Bay Sanctuary I"), 932 F.3d 742, 763–64 (9th Cir. 2018) (internal quotation marks and citations omitted).  They "need only establish a risk or threat of injury to satisfy the actual injury requirement."  Id.; see also Dep't of Commerce v. New York, 139 S. Ct. 2551, 2565 (2019) (noting that future injuries to states "may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014))).

Finally, "[s]tates are 'entitled to special solicitude in our standing analysis.'" California, 963 F.3d at 936 (quoting Massachusetts v. EPA, 549 U.S. 497, 520 (2007)). "[A] state may sue to assert its 'quasi-sovereign interests in the health and well-being— both physical and economic—of its residents in general.'" Id. (quoting Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 607 (1982)).

In the preliminary injunction order, the court found that the harm alleged by the states was not too speculative and, for that reason, they had established standing.  Dkt. 120 at 83.  The court relied on DHS's own assessments in the Rule and the NPRM that projected a 2.5% disenrollment rate from federal programs, 84 Fed. Reg. at 41,463, and that payments from the federal government to the states would decrease by over $1.5 billion, 83 Fed. Reg. at 51,267–69.  The court found that plaintiffs had alleged sufficient facts in their complaint, as well as evidence submitted in support of the motion for preliminary injunction, to support a harm similar to that assessed by DHS.  Dkt. 120 at 79. The court also determined that the Rule would cause individuals to disenroll from or forego enrolling in Medicaid, the cost of which is split between the federal and state governments.  Id. at 80 ("As individuals disenroll, the plaintiffs will  no longer be reimbursed for treating them.  This will have obvious adverse budgetary consequences.").

Defendants argue that, with regard to aliens who disenroll from federal health

1   benefits, federal health program participants would not distinguish between federal- and

2   state-funded health and social services and, therefore, utilization of all services would be

3   reduced.  Mtn. at 5.  Thus, in order for the states to suffer a harm, aliens would need to

4   disenroll from federal health benefits, then enroll in state health benefits, and the

5   increased amount of state expenses would need to be greater than the costs incurred but

6   for the Rule.  Id. at 6.  With regard to a reduction in Medicaid reimbursements,

7   defendants argue that a reduction in Medicaid funding would be commensurate with a

8   reduction in the provision of health services.  In other words, utilization of healthcare paid

9   by Medicaid would decrease, which means the amount paid by plaintiffs would also

10  decrease.

11        Defendants' renewed standing argument does not alter this court's prior findings.

12  Both DHS's own analysis and plaintiffs, in their complaint and evidence, demonstrate that

13  the Rule will cause individuals to disenroll or forego enrollment from federal health

14  benefits, including Medicaid.  See 84 Fed. Reg. at 41,463.  Defendants contend the

15  disenrollment in Medicaid will result in a corresponding decrease in the provision of

16  services and thus no (or speculative) harm.  This proposition flies in the face of DHS's

17  own analysis in the Rule and the evidence submitted by plaintiffs.

18        In the Rule, DHS received a comment stating that hospitals are compelled to

19  provide emergency services to individuals regardless of their ability to pay but those

20  services will go uncompensated if patients are disenrolled from Medicaid.  Id. at 41,384.

21  While the Rule provides for an emergency services exemption, the commenter expressed

22  concern that different states would interpret the exemption differently resulting in

23  individuals who would be denied admission or avoid treatment.  Id.  In response, DHS

24  acknowledged that "increased use of emergency rooms and emergent care as a method

25  of primary healthcare due to delayed treatment is possible and there is a potential for

26  increases in uncompensated care in which a treatment or service is not paid for by an

27  insurer or patient."  Id.

28        Plaintiffs demonstrate that the cost of such uncompensated care will fall on the

United States District Court
Northern District of California

8

states.  Plaintiffs' complaint alleges "[i]ncreased emergency room use by the uninsured leads to an increased financial burden on hospitals, which are required to provide care to all patients—regardless of their ability to pay."  Compl. ¶ 242.  In other cases, private providers will pass along the cost of uncompensated care to public and private payers of healthcare resulting in increased costs.  Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 593 (Ginsburg, J., concurring in part) ("Health-care providers do not absorb these bad debts.  Instead, they raise their prices, passing along the cost of uncompensated care to those who do pay reliably: the government and private insurance companies.");  see also Decl. of Mari Cantwell, Dkt. 18-2, ¶ 40 ("The cost of uncompensated care would be shifted to the broader healthcare delivery system resulting in higher costs for the state, local entities, and private healthcare payers.");  Decl. of Patrick Allen, Dkt. 18-4, ¶ 47 ("If the number of uninsured in Oregon were to increase and overall public health declines as a result of the Rule, Oregon would incur a negative economic impact due to the accompanying increase in uncompensated costs for hospital and emergency room services that would follow.  These uncompensated care costs would then be shifted to the broader healthcare delivery systems resulting in higher costs for public and private healthcare payers.").  By indirectly passing the cost of care to the states, the Rule creates and reallocates costs to the states.

In sum, plaintiffs have plausibly alleged that a harm will occur—in this instance a reduction in federal funds and a corresponding increase in state funds to cover costs associated with healthcare.  As the Ninth Circuit stated in its opinion, "disenrollment from public benefits means a reduction in federal and state transfer payments, so the States will realize some savings in expenditures.  Nevertheless, we consider the harms to the States, even if not readily quantifiable, significant."[3]  City & Cty. of San Francisco, 944 F.3d at 807 (citation omitted).  Because the court finds that plaintiffs have established

---

[3] In their reply brief, defendants concede that the Ninth Circuit's opinion is controlling on the issue of standing and that the argument was made to preserve it for appeal.  Reply at 1 n.1.

1    standing, it does not address their remaining standing arguments.  See Dkt. 120 at 81–83

2    (finding increased operational costs to provide a basis for standing).

3         For the foregoing reasons, the court DENIES defendants' motion with respect to

4    standing.

5         **2.    Ripeness**

6         "Ripeness is an Article III doctrine designed to ensure that courts adjudicate live

7    cases or controversies and do not 'issue advisory opinions [or] declare rights in

8    hypothetical cases.'  A proper ripeness inquiry contains a constitutional and a prudential

9    component." Bishop Paiute Tribe v. Inyo Cty., 863 F.3d 1144, 1153 (9th Cir. 2017)

10   (alteration in original) (quoting Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d

11   1134, 1138 (9th Cir. 2000) (en banc)).

12        "For a case to be ripe, it must present issues that are definite and concrete, not

13   hypothetical or abstract.  Constitutional ripeness is often treated under the rubric of

14   standing because ripeness coincides squarely with standing's injury in fact prong." Id.

15   (internal quotation marks and citation omitted); see Thomas, 220 F.3d at 1138–39

16   ("Sorting out where standing ends and ripeness begins is not an easy task. . . . [I]n

17   'measuring whether the litigant has asserted an injury that is real and concrete rather

18   than speculative and hypothetical, the ripeness inquiry merges almost completely with

19   standing.'" (citation omitted)).  Allegations that a "threat" to a "concrete interest is actual

20   and imminent" are sufficient to allege "an injury in fact that meets the requirements of

21   constitutional ripeness." Bishop Paiute Tribe, 863 F.3d at 1154.  Therefore, if plaintiffs

22   satisfy the Article III standing requirements under Lujan v. Defenders of Wildlife,

23   addressed above, the action here is ripe. See, e.g., Thomas, 220 F.3d at 1139

24   ("Whether the question is viewed as one of standing or ripeness, the Constitution

25   mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or

26   controversy,' that the issues presented are 'definite and concrete, not hypothetical or

27   abstract.' . . . We need not delve into the nuances of the distinction between the injury in

28   fact prong of standing and the constitutional component of ripeness: in this case, the

United States District Court
Northern District of California

United States District Court
Northern District of California

analysis is the same." (citations omitted)).

"In evaluating the prudential aspects of ripeness, our analysis is guided by two overarching considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" Id. at 1141 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). When the question presented "is 'a purely legal one'" that "constitutes 'final agency action' within the meaning of § 10 of the APA," that suggests the issue is fit for judicial decision. Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 812 (2003). However, an issue may not be ripe for review if "further factual development would 'significantly advance our ability to deal with the legal issues presented.'" Id. (quoting Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 82 (1978)).

In this case, the court has determined that plaintiffs have standing, therefore, it follows that the case is constitutionally ripe for adjudication. See Thomas, 220 F.3d at 1139. The court has not previously addressed prudential ripeness. Defendants contend that plaintiffs' claims fail the prudential ripeness standard because the claims are premised on speculation about the Rule's operation in practice and further factual development is required. Mtn. at 7. Plaintiffs assert that the prudential ripeness standard is met because the Rule is final, and plaintiffs have already presented evidence of a chilling effect. Opp. at 6.

"Determining whether administrative action is ripe for judicial review requires [a court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Nat'l Park Hosp. Ass'n, 538 U.S. at 808 (citing Abbott Labs., 387 U.S. at 149). When considering whether issues are fit for review, the question should be a "purely legal one" and the agency action in question should constitute a "'final agency action' within the meaning of § 10 of the APA." Id. at 812 (quoting Abbott Labs., 387 U.S. at 149).

The second factor examines "the hardship to the parties of withholding court

11

United States District Court
Northern District of California

1    consideration." Id. at 808.  Generally, a showing of hardship requires demonstrating that

2    the regulation in question creates "adverse effects of a strictly legal kind."  Id. at 809

3    (quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998)).  Such

4    adverse effects do not arise if the regulation in question "do[es] not command anyone to

5    do anything or to refrain from doing anything; [it] do[es] not grant, withhold, or modify any

6    formal legal license, power, or authority; [it] do[es] not subject anyone to any civil or

7    criminal liability; [and it] create[s] no legal rights or obligations."  Id. (alterations in original)

8    (quoting Ohio Forestry Ass'n, 523 U.S. at 733).

9        Here, the challenge to the Rule in this case "is a purely legal one," i.e., whether the

10   INA was properly construed and implemented by DHS.  See Abbott Labs., 387 U.S. at

11   149 (noting that "whether the statute was properly construed by the Commissioner" to be

12   a purely legal challenge).  Next, the Rule constitutes a "rule" as defined by the APA.  See

13   5 U.S.C. § 551(4), (13) (defining "agency action" and "rule").  The text of the Rule

14   confirms that its promulgation was an agency action.  See 84 Fed. Reg. at 41,294 ("This

15   rule changes how the Department of Homeland Security (DHS) interprets and

16   implements the public charge ground of inadmissibility.").  This factor indicates the Rule

17   is ripe for review.

18       With respect to hardship, the Rule imposes potential adverse effects of a strictly

19   legal kind.  If an alien falls within the Rule's definition of a public charge as determined by

20   an immigration officer, then he or she is inadmissible.  In other words, the Rule defines a

21   legal right—admissibility to the United States.  Concurrently, it also defines the legal

22   powers and authorities of federal government officials in evaluating whether an alien is

23   admissible.  Of course, the Rule does not define the legal rights of plaintiffs or create any

24   legal obligations directly impacting them.  However, the potential adverse effects on

25   individuals cause a direct harm to plaintiffs, as discussed above with regard to plaintiffs'

26   standing.

27       Defendants, citing Habeas Corpus Resource Center v. United States Department

28   of Justice, 816 F.3d 1241, 1252 (9th Cir. 2016), contend that the court "would benefit

from further factual development." Mtn. at 7. They argue that plaintiffs' claims are largely based on speculation about the Rule's operation in practice. Yet, plaintiffs have alleged that the chilling effects of the Rule began before it was even finalized. For example, plaintiffs allege that the District of Columbia's Department of Health Care Finance submitted a comment during the notice and comment period stating that the department has already seen a 3.5 percent average decline in participation in local health care programs that extend coverage to immigrants. Compl. ¶ 158. Moreover, because appellate courts have stayed all preliminary injunctions enjoining the Rule, it is currently in effect.[4]

Plaintiffs' challenge is not speculative and further factual development of the Rule's impact is not needed for purposes of ripeness. Accordingly, the court DENIES defendants' motion with respect to ripeness.

### 3. Zone of Interests

In order to succeed on the merits, plaintiffs must be within the zone of interests of the statute that forms the basis of their challenge. The zone of interests analysis asks "whether Congress created a private cause of action in legislation," Organized Vill. of Kake v. U.S. Dep't of Agric., 795 F.3d 956, 964 (9th Cir. 2015) (en banc), such that "this particular class of persons has a right to sue under this substantive statute," Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014). It is "not a question of Article III standing" and "this inquiry . . . 'does not implicate subject-matter jurisdiction . . . .'" Organized Vill. of Kake, 795 F.3d at 964 (quoting Lexmark, 572 U.S. at 128 & n.4). "[I]n the APA context, . . . the [zone of interests] test is not 'especially demanding.'" Lexmark, 572 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of

[4] The court understands that the district court for the Southern District of New York recently issued a preliminary injunction staying the Rule for the duration of any declared public health emergency associated with the COVID-19 outbreak. See New York v. U.S. Dep't of Homeland Sec., — F. Supp. 3d —, No. 19 Civ. 7777 (GBD), 19 Civ. 7993 (GBD), 2020 WL 4347264, at *14 (S.D.N.Y. July 29, 2020). This stay does not affect the fact that the Rule was effective from February 24, 2020 until July 29, 2020 such that plaintiffs' challenge remains ripe.

Pottawatomi Indians v. Patchak, 567 U.S. 209, 225–26 (2012)).

"Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question[,] . . . but by reference to the particular provision of law upon which the plaintiff relies." Bennett v. Spear, 520 U.S. 154, 175–76 (1997) (first and second alterations in original) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)). Put differently, "the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." Id. at 176 (alteration in original) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990); and citing Air Courier Conf. v. Postal Workers, 498 U.S. 517, 523–24 (1991); see also E. Bay Sanctuary I, 932 F.3d at 768 n.9 ("'[W]e are not limited to considering the [specific] statute under which [plaintiffs] sued, but may consider any provision that helps us to understand Congress'[s] overall purposes in the [INA].'" (alterations in original) (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 401 (1987))). "[F]or APA challenges, a plaintiff can satisfy the test in either one of two ways: (1) 'if it is among those [who] Congress expressly or directly indicated were the intended beneficiaries of a statute,' or (2) 'if it is a suitable challenger to enforce the statute—that is, if its interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further . . . statutory objectives.' California, 963 F.3d at 941–42 (second and third alterations in original) (quoting Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def., 87 F.3d 1356, 1359 (D.C. Cir. 1996)).

In the preliminary injunction order, this court determined that section 1183a's affidavit of support provision is incorporated in and has an integral relationship with the public charge analysis (see 8 U.S.C. §§ 1182(a)(4)(B)(ii), 1183a) and therefore should be considered as part of the zone of interests analysis. Dkt. 120 at 69. Section 1183a explains that someone can sponsor an alien by guaranteeing to financially support him, and thereby alleviate the concern that he may become a public charge. That statute also

provides that any such sponsorship can only be considered in the public charge analysis if it is supported by an affidavit that is "legally enforceable against the sponsor by . . . any State (or any political subdivision of such State), or by any other entity that provides any means-tested public benefit."  8 U.S.C. § 1183a(a)(1)(B).

The court reasoned that by recognizing that states would be paying means-tested public benefits to those subject to a public charge analysis, requiring that states have legally-enforceable rights to recover those expenses when an alien is admitted based on consideration of an affidavit of support, and guaranteeing state-court jurisdiction for such enforcement actions, Congress clearly intended to protect states and their political subdivisions.  Dkt. 120 at 70.  The court also determined that because states have the right to recover payment from an affiant under section 1183a, Congress intended to protect states' financial interests.  Id.

Defendants argue that individual aliens deemed inadmissible, rather than the states, are in the INA's zone of interest.  Mtn. at 8.  Defendants would distinguish the court's preliminary injunction finding because enforcement of affidavits of support does not constitute an injury that falls within the zone of interests.  Id.  Plaintiffs first contend that section 1183a demonstrates Congress's intent to protect states by permitting states to enforce affidavits of support.  Opp. at 7.  Second, in enacting the INA, Congress gave states the discretion to allocate public benefits.  Plaintiffs contend that the Rule disrupts the provision of benefits to noncitizens, resulting in more costly emergency care.  Id. at 7–8.  Third, plaintiffs argue that defendants conflate their merits argument with the zone of interests analysis by contending that the public charge provision is meant to reduce aliens reliance on both states and the federal government.  Id. at 8.

Defendants' zone of interests argument does not alter the court's prior conclusions.  Significantly, plaintiffs rely on section 1183a as a basis for their first claim such that it is a relevant statute for the zone of interests test.  Compl. ¶ 312.  By permitting states to recover payments under section 1183a, plaintiffs are intended beneficiaries under the statute.  Further, the injuries complained of by plaintiffs include

harm to their coffers.  See id. ¶ 233 ("The Public Charge Rule will cause direct economic harm to Plaintiffs in the form of increased uncompensated costs for hospital care."); ¶ 241 ("Immigrants who are chilled from accessing publicly funded health insurance programs for which they are eligible will be more likely to defer primary or preventive healthcare. Deferred care leads to more complex medical conditions later on that are more expensive to treat.").  Harm to the financial well-being of the states falls within the zone of interests protected by the statute.  As stated in the prior order, the affidavit of support section creates a legally enforceable contract against the sponsor and the states may bring an action to compel reimbursement of government expenses.  See 8 U.S.C. § 1183a(a)(1), (b)(1)–(2).

In a footnote, defendants contend that plaintiffs' Fifth Amendment claims fail the zone of interests test because the Supreme Court has suggested that there is a heightened zone of interests requirement for implied causes of action such as plaintiffs' constitutional claim.  Mtn. at 8 n.2.  Yet, in the very case that defendants cite for this proposition, Clarke v. Securities Industry Association, 479 U.S. at 400 n.16, the Court cautioned that "[w]hile inquiries into reviewability or prudential standing in other [non-APA] contexts may bear some resemblance to a 'zone of interest' inquiry under the APA, it is not a test of universal application."  The Court went on to distinguish earlier dicta suggesting a zone of interest inquiry was applicable to constitutional claims, stating "[w]e doubt, however, that it is possible to formulate a single inquiry that governs all statutory and constitutional claims."  Id. (citing Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)).  As plaintiffs point out, the Ninth Circuit has also questioned whether a zone of interests test can be applied in light of the Court's decision in Lexmark, which focused on Congress's intent in creating statutory causes of action as opposed to causes of action that arise under the Constitution.  See Sierra Club v. Trump, 929 F.3d 670, 701–02 (9th Cir. 2019) ("[W]e doubt that any zone of interests test applies to Plaintiffs' equitable cause of action.").  Accordingly, the court declines to apply a zone of interest test to plaintiffs' constitutional claims.

16

United States District Court
Northern District of California

In sum, the zone of interests test is not "especially demanding," Lexmark, 572 U.S. at 130, and, "at the very least, the [states'] interests are 'marginally related to' and 'arguably within' the scope of the statute." E. Bay Sanctuary Covenant v. Trump, 950 F.3d 1242, 1270 (9th Cir. 2020) (quoting Pottawatomi Indians, 520 U.S. at 175–76).  The court, therefore, DENIES defendants' motion with respect to zone of interests.

### 4.   First and Fourth Claims—Contrary to Law and Arbitrary and Capricious

Turning to defendants' motion with regard to individual claims, the court addresses plaintiffs' first and fourth claims together as they present a related issue.  In its preliminary injunction order, the court determined that plaintiffs were likely to succeed on the merits of their claim that the Rule was not in accordance with the INA.  Dkt. 120 at 48.  After a lengthy review of the prior legislative, regulatory, and judicial history of the term "public charge," the court determined that DHS's interpretation of the term "public charge" was not reasonable at Chevron step two.  In its order staying the injunction, the Ninth Circuit determined that, at Chevron step one, the term "public charge" is not a term of art and not self-defining—thus, it was ambiguous.  City & Cty. of San Francisco, 944 F.3d at 792.  At step two, the court also reviewed the lengthy legislative history and case law surrounding the term "public charge" and concluded that there has not been "one fixed understanding of 'public charge' that has endured since 1882."  Id. at 796.  Instead, "[i]f anything has been consistent, it is the idea that a totality-of-the-circumstances test governs public-charge determinations.  But different factors have been weighted more or less heavily at different times, reflecting changes in the way in which we provide assistance to the needy."  Id. In resolving the step two analysis, the Ninth Circuit determined that the Rule was a reasonable interpretation of the INA.  Id. at 799.

Also in its prior order, this court determined that plaintiffs were likely to succeed on the merits that the Rule is arbitrary and capricious because DHS failed to consider costs and benefits, including costs to state governments and health effects on state populations.  Dkt. 120 at 53.  On appeal, the Ninth Circuit motions panel discussed both

17

the cost-benefit issue and the public health effect issue.  With regard to the former, the court observed that DHS "addressed at length the costs and benefits associated with the Final Rule."  City & Cty. of San Francisco, 944 F.3d at 801.  With respect to public health effects, the Ninth Circuit noted that "DHS not only addressed these concerns directly, it changed its Final Rule in response to the comments."  Id.  The court determined that DHS could change its policy as long as DHS acknowledged the change and explained the reasons for it.  Id. at 805.  In sum, the court held that DHS demonstrated that it was likely to succeed on the merits of the arbitrary and capricious claim.

The Ninth Circuit motions panel decision to stay the preliminary injunction presents novel procedural and substantive questions.  The court requested supplemental briefing on these issues, (Dkt. 176), to which both parties responded (Dkts. 177, 178).  As a procedural matter, defendants' motion to dismiss comes after the motions panel's opinion staying the preliminary injunction but before the merits panel has issued its opinion on the preliminary injunction.  The merits panel may issue an opinion that comes out entirely the same way as the motions panel, adopts an entirely contrary view, or lands somewhere in between.  The prospect of conflicting or confirming guidance indicates that deciding these issues prior to the merits panel's opinion may be premature.

With respect to the substantive issues, the Ninth Circuit motion panel opinion implicates both the law of the circuit and the law of the case.  Under the law of the circuit doctrine, "[p]ublished decisions of [the Ninth Circuit] become law of the circuit, which is binding authority that we and district courts must follow until overruled."  E. Bay Sanctuary II, 950 F.3d at 1261.  "Under the law of the case doctrine, a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case."  Gonzalez, 677 F.3d at 390 n.4.  However, "[t]he Ninth Circuit has instructed that a 'district court should abide "by the general rule" that our decisions at the preliminary injunction phase do not constitute the law of the case,' but that '[a]ny of our conclusions on pure issues of law, however, are binding.'"  E. Bay Sanctuary Covenant v. Trump, 354 F. Supp. 3d 1094, 1106 (N.D. Cal. 2018) (alteration in

original) (quoting Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric., 499 F.3d 1108, 1114 (9th Cir. 2007)).

A motions panel opinion reviewing a motion to stay an injunction is not necessarily binding on a future merits panel reviewing the substance of that injunction.  See E. Bay Sanctuary II, 950 F.3d at 1264 ("The decision whether to grant a stay—much like the decision whether to grant a preliminary injunction—is a 'probabilistic' endeavor.  We discuss the merits of a stay request in 'likelihood terms,' and exercise a 'restrained approach to assessing the merits.'  Such a predictive analysis should not, and does not, forever bind the merits of the parties' claims."  (quoting Sierra Club, 929 F.3d at 688)); see also Innovation Law Lab v. Wolf, 951 F.3d 1073, 1081 (9th Cir. 2020) (citing E. Bay Sanctuary II for proposition that "a motions panel's legal analysis, performed during the course of deciding an emergency motion for a stay, is not binding on later merits panels").  While East Bay Sanctuary II indicated that an appellate decision regarding a stay "should not, and does not, forever bind the merits of the parties' claims," 950 F.3d at 1264, this court is bound to follow opinions constituting law of the circuit, see id. at 1263 n.3 ("[T]he first panel to consider an issue sets the law . . . for all the inferior courts in the circuit" and "future panels of the court of appeals . . . ." (first and second alterations in original) (internal quotation marks omitted) (quoting Hart v. Massanari, 266 F.3d 1155, 1171 (9th Cir. 2001))).

Applying the motions panel's opinion would also require determining the extent to which the opinion is binding (or persuasive) on each of plaintiffs' claims that defendants now seek to dismiss in full.  As plaintiffs point out in the supplemental brief, the motions panel did not address all legal issues raised by the States and did not assess the complete administrative record in reaching its decision.  Alternatively, as defendants note, if the court dismisses the first or fourth claims, such a decision would moot the preliminary injunction appeal on those causes of action.

Given the minefield of potential issues, a cautious approach is warranted.  As part of its request for supplemental briefing, the court asked whether it should defer ruling on

United States District Court
Northern District of California

1   plaintiffs' first and fourth claims until the Ninth Circuit merits panel has issued its opinion.

2   Dkt. 176 at 2–3.  Both parties responded that they were not opposed to such a course of

3   action.  Dkt. 177 at 9; Dkt. 178 at 10.  Accordingly, the court DEFERS RULING ON

4   defendants' motion to dismiss plaintiffs' first and fourth causes of action until the Ninth

5   Circuit issues an opinion on the preliminary injunction or otherwise disposes of the case.

### 5.    Second Claim—APA Contrary to Law, Rehabilitation Act

7        Defendants move to dismiss plaintiffs' second claim, which alleges a violation of

8   the APA as contrary to the Rehabilitation Act.  Under the APA, "the reviewing court shall

9   decide all relevant questions of law, interpret constitutional and statutory provisions, and

10  determine the meaning or applicability of the terms of an agency action.  The reviewing

11  court shall . . . hold unlawful and set aside agency action, findings, and conclusions found

12  to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

13  law."  5 U.S.C. § 706.

14       "In the usual course, when an agency is authorized by Congress to issue

15  regulations and promulgates a regulation interpreting a statute it enforces, the

16  interpretation receives deference if the statute is ambiguous and if the agency's

17  interpretation is reasonable.  This principle is implemented by the two-step analysis set

18  forth in Chevron."  Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2124 (2016)

19  (citing Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984)).

20          At the first step, a court must determine whether Congress has
            "directly spoken to the precise question at issue."  If so, "that is
21          the end of the matter; for the court, as well as the agency, must
            give effect to the unambiguously expressed intent of
22          Congress."  If not, then at the second step the court must defer
            to the agency's interpretation if it is "reasonable."
23

24  Id. at 2124–25 (quoting Chevron, 467 U.S. at 842–44).

25       "[I]f the statute is silent or ambiguous with respect to the specific issue, the

26  question for the court is whether the agency's answer is based on a permissible

27  construction of the statute."  Chevron, 467 U.S. at 843; see also Michigan v. E.P.A., 135

28  S. Ct. 2699, 2707 (2015) ("Even under this deferential standard, however, agencies must

operate within the bounds of reasonable interpretation." (internal quotation marks and citation omitted)).  The Chevron analysis calls upon the court to "employ[] traditional tools of statutory construction" to fulfill its role as "the final authority on issues of statutory construction."  Chevron, 467 U.S. at 843 n.9; accord Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1630 (2018).

The Rehabilitation Act prohibits "any program or activity receiving federal financial assistance" or "any program or activity conducted by any Executive agency," from excluding, denying benefits to, or discriminating against persons with disabilities.  29 U.S.C. § 794(a).  "To establish a violation of § 504 of the [Rehabilitation Act ("RA")], a plaintiff must show that (1) she is handicapped within the meaning of the RA; (2) she is otherwise qualified for the benefit or services sought; (3) she was denied the benefit or services solely by reason of her handicap; and (4) the program providing the benefit or services receives federal financial assistance."  Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002) (citing Weinreich v. L.A. Cty. Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997)).

In its prior order on plaintiffs' motion for preliminary injunction, the court determined that plaintiffs were unlikely to succeed on their Rehabilitation Act claim for two reasons.  First, the Rehabilitation Act requires that a plaintiff show that a disabled person was denied services "solely by reason of her handicap."  The Rule does not deny any alien admission into the United States, or adjustment of status, "solely by reason of" disability.  All covered aliens, disabled or not, are subject to the same inquiry:  whether they are likely to use one or more covered federal benefits for the specified period of time.  Even though a disability is likely to be an underlying cause of some individuals qualifying for additional negative factors, it will not be the sole cause.  As such, disability is one non-dispositive factor.  Dkt. 120 at 50.

Second, the INA explicitly lists "health" as a factor that an officer "shall . . . consider" in making a public charge determination.  8 U.S.C. § 1182(a)(4)(B)(i).  "Health" includes an alien's disability and whatever impact the disability may have on the alien's

1   expenses and ability to work.  Congress, not the Rule, requires DHS to take this factor

2   into account.  Courts have recognized that the RA cannot revoke or repeal a more

3   specific statute.  See, e.g., Knutzen v. Eben Ezer Lutheran Hous. Ctr., 815 F.2d 1343,

4   1353 (10th Cir. 1987) (noting that section 504 may not "'revoke or repeal . . . a much

5   more specific statute with an articulated program' . . . absent express language by

6   Congress stating its intent to revoke or repeal that statute" (citations omitted)); Dkt. 120 at

7   50.  The INA's requirement to consider health was enacted subsequent to the RA and is

8   specific to the consideration of who constitutes a public charge.  The Ninth Circuit

9   likewise found that Congress directed DHS to consider health—including an alien's

10  disability—as a factor in public charge determinations.  City & Cty. of San Francisco, 944

11  F.3d at 800.  The court also reasoned that "[n]othing in the Final Rule suggests that

12  aliens will be denied admission or adjustment of status "solely by reason of her or his

13  disability.'"  Id.

14      Defendants argue that plaintiffs' second claim fails because the Rehabilitation Act

15  requires that a disabled person be denied services by reason of her disability and this

16  causal standard is strict.  Mtn. at 15.  According to defendants, plaintiffs cannot meet this

17  strict causal requirement because a medical condition may constitute one factor that is

18  considered as part of the totality of the circumstances test.  Id.  In response, plaintiffs first

19  point out that Congress did not exempt DHS from the Rehabilitation Act's requirements.

20  Opp. at 13.  According to plaintiffs, recipients of Medicaid for more than 12 months,

21  especially those with disabilities, are by definition a public charge.  Id. at 14.  Thus, the

22  Rule would deny such individuals meaningful access to immigration benefits because of

23  their disability-related needs.  Id.

24      Plaintiffs' arguments are unconvincing.  Plaintiffs assert that the Rule is dispositive

25  with regard to a disabled alien's public charge determination as long as the individual in

26  question is a Medicaid recipient for more than 12 months.  Opp. at 14; Compl. ¶ 51.  DHS

27  acknowledged the impact on those individuals with disabilities when it stated that it

28      understands  that  individuals  with  disabilities  receive  public

United States District Court
Northern District of California

> benefits that are listed in the rule. However, Congress did not specifically provide for a public charge exemption for individuals with disabilities and in fact included health as a mandatory factor in the public charge inadmissibility consideration. Therefore, DHS will retain the designation of Medicaid and SNAP as public benefits, notwithstanding the potentially outsized impact of such designation on individuals with disabilities.

84 Fed. Reg. at 41,368 (footnote omitted). While there may be a higher correlation between Medicaid enrollment and having a disability, it does not follow that the disability is the sole reason an individual is determined to be a public charge. When DHS considers public benefits, such as Medicaid, the factor being considered is not the disability but an individual's "assets, resources, and financial status." 8 U.S.C. § 1182(a)(4)(B)(IV). Further, the Rule facially states that the applicable standard is a totality of the circumstances test and a single positive or negative factor is never determinative. 84 Fed. Reg. at 41,295.

Even if the court were to find that receipt of Medicaid was determinative for individuals with disabilities, plaintiffs have not put forward a convincing argument that DHS can disregard Congress's mandate to consider an alien's health as part of the public charge determination. The court's reasoning from the preliminary injunction order applies here. Congress, not the Rule, requires DHS to take this factor into account. The Ninth Circuit agreed with this rationale, observing that the 1996 amendment to the INA requiring immigration officers to consider health occurred twenty-three years after passage of the Rehabilitation Act. Thus, the court stated "[w]e cannot see how a general provision in one statute constrains an agency given a specific charge in a subsequent law." City & Cty. of San Francisco, 944 F.3d at 800.

Thus, plaintiffs have not plausibly alleged sufficient facts to state a claim for an APA cause of action as contrary to the Rehabilitation Act. The court GRANTS defendants' motion to dismiss plaintiffs' second cause of action. Because no factual allegations could alter the court's determination, further amendment would be futile and the dismissal is without leave to amend.

/ / /

United States District Court
Northern District of California

### 6.   Third Claim—APA Contrary to Law, State Healthcare Discretion

Defendants move to dismiss plaintiffs' third claim for violation of the APA as contrary to state healthcare discretion.  The court did not previously address this claim as part of the preliminary injunction order.  The Ninth Circuit likewise did not address this issue.

In the complaint, plaintiffs advance two theories in support of their third claim.  First, they contend that the Rule will effectively deprive plaintiffs of their statutory option under the Children's Health Insurance Program Reauthorization Act of 2009, Pub. L. No. 111-3, § 214, 123 Stat. 8, 56 ("CHIPRA") to provide certain benefits to lawfully residing children and pregnant women.  Compl. ¶¶ 323–24.  Second, plaintiffs argue that the Public Responsibility and Work Opportunity Act ("PRWORA"), 8 U.S.C. §§ 1612–13, 1621(d), 1622(a); 7 U.S.C. § 2016(i), expressly gave states the discretion to decide whether to provide many public benefits to noncitizens and the Rule will effectively deprive the states of this option.  Compl. ¶¶ 325–26.

Defendants argue that the Rule does not deprive the states of their statutory option to extend program eligibility for lawfully residing children and pregnant women under Medicaid and the Children's Health Insurance Program ("CHIP") during their first five years in the U.S.  Mtn. at 16.  Defendants point out that the Rule explicitly excludes CHIP from the definition of public benefit and also excludes public benefits received by children eligible for acquisition of citizenship and Medicaid benefits received by aliens under 21 or pregnant women through 60 days after the last day of pregnancy.  Id.  Thus, the Rule does not deprive plaintiffs of their authority to provide these benefits.  Defendants also contend that the Rule does not limit or change an alien's entitlement to public benefits; rather, it requires immigration officials to consider the receipt of benefits as part of the totality of the circumstances test.  Id.

In response, plaintiffs argue that the Rule's known and predictable chilling effects will effectively deprive plaintiffs of their statutory option to extend program eligibility to certain groups.  Opp. at 15.  Plaintiffs point out that several states have elected to

United States District Court
Northern District of California

1   automatically certify Medicaid enrollees for up to 12 months at a time, yet enrollment in

2   Medicaid for 12 months translates into a heavily weighted factor under the Rule.  Id.

3   Individuals who are subject to both the public charge determination and the automatic

4   Medicaid certification face a particularly harsh choice—continue to enroll in Medicaid and

5   risk a negative public charge determination or disenroll from Medicaid.  By causing

6   disenrollment and underutilization, plaintiffs contend the Rule interferes with their robust

7   safety net systems and benefits authorized by Congress.  Id. at 16.

8          Plaintiffs' arguments implicate Chevron step two, where "deference is not owed to

9   an agency decision if it construes a statute in a way that is contrary to congressional

10  intent or frustrates congressional policy."  CHW W. Bay v. Thompson, 246 F.3d 1218,

11  1223 (9th Cir. 2001) (citing Anaheim Mem'l Hosp. v. Shalala, 130 F.3d 845, 849 (9th Cir.

12  1997)).  As an initial observation, the Rule does not facially detract from or limit the

13  authority with which Congress empowered the states under CHIPRA or PRWORA.  As

14  defendants note in their brief, the Rule directly affects the rights and obligations of those

15  aliens that fall under the scope of the public charge provision.  Plaintiffs acknowledge this

16  point as they argue that the Rule's chilling effect will effectively deprive them of their

17  statutory options.

18         There are two reasons why plaintiffs fail to state a claim.  First, the statutory

19  schemes referenced in the complaint are permissive, not mandatory.  These are

20  programs that states may implement or extend to applicable individuals.  See 8 U.S.C.

21  § 1612(b) ("[A] State is authorized to determine the eligibility of an alien . . . ."); § 1621(d)

22  ("A State may provide that an alien who is not lawfully present in the United States is

23  eligible for any State or local public benefit for which such alien would otherwise be

24  ineligible under subsection (a) only through the enactment of a State law after August 22,

25  1996, which affirmatively provides for such eligibility." (emphasis added)); § 1622(a) ("[A]

26  State is authorized to determine the eligibility for any State public benefits . . . ."); 7

27  U.S.C. § 2016(i) ("[A] State agency may . . . issue benefits under this chapter . . . ."); 123

28  Stat. at 56 ("A State may elect . . . .").  Each state is free to choose whether, and the

1    extent to which, it will exercise the authority granted to it by Congress.

2        Second, each individual is also free to choose whether he or she will accept public

3    benefits from the state.  Plaintiffs have alleged that the Rule will have a chilling effect on

4    immigrants, including those who are not subject to the Rule.  Compl. ¶¶ 145–46.  For

5    purposes of a motion to dismiss, the court accepts as true the chilling effect of the Rule

6    on enrollment in public benefit programs.  Yet, even so, plaintiffs have not demonstrated

7    that the Rule requires or prevents the states from undertaking a particular course of

8    action.  Instead, the Rule impacts the choices of individuals who may or may not be

9    under the Rule's purview.  The opposition even refers to the "particularly hard choices"

10   faced by those subject to the Rule.  Opp. at 15.  Those individuals may be dissuaded or

11   chilled from participating in benefit programs, but the actions of such third parties do not

12   frustrate the availability of the benefits in the first instance.  The states remain free to

13   offer benefits.

14       Thus, the Rule does not prevent the states from offering public benefit programs

15   authorized by Congress and is not contrary to law.  Accordingly, defendants' motion to

16   dismiss plaintiffs' third cause of action is GRANTED.  Because no factual allegations

17   could alter the court's determination, further amendment would be futile and the dismissal

18   is without leave to amend.

19           **7.      Fifth and Sixth Claims—Equal Protection**

20       Defendants move to dismiss plaintiffs' fifth and sixth claims for violation of the

21   Equal Protection component of the Fifth Amendment.  Neither this court nor the Ninth

22   Circuit addressed these claims when considering the preliminary injunction.  The Equal

23   Protection Clause of the Fourteenth Amendment commands that no state shall "deny to

24   any person within its jurisdiction the equal protection of the laws," U.S. Const. amend.

25   XIV, § 1, which amounts to a direction that all persons who are similarly situated should

26   be treated alike.  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  The

27   equal protection component of the Fifth Amendment's Due Process Clause imposes a

28   similar obligation on the federal government.  See Bolling v. Sharpe, 347 U.S. 497, 499–

United States District Court
Northern District of California

26

500 (1954); see also I.N.S. v. Pangilinan, 486 U.S. 875, 886 (1988) (considering "the possibility of a violation of the equal protection component of the Fifth Amendment's Due Process Clause").

Defendants argue that plaintiffs' Equal Protection claims should be dismissed because the Rule is facially neutral, and plaintiffs cannot establish discriminatory intent. Mtn. at 19. Defendants contend that the Supreme Court's decision in Trump v. Hawaii, 138 S. Ct. 2392, 2418 (2018), set a "deferential standard of review" that applies to immigration policies. Mtn. at 20. According to defendants, the Rule is valid under either Hawaii's standard of review or rational basis review because the Rule is plausibly related to DHS's stated objectives. Id. Defendants also contend that the public statements by government officials on which plaintiffs rely were not made by DHS officials and have no express connection to the Rule. Id. at 21.

Plaintiffs respond that the applicable standard of review is provided by Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977), under which they must produce direct or circumstantial evidence that a discriminatory reason more likely than not motivated the defendants and that the defendants' action adversely affected the plaintiffs in some way. Opp. at 21. Plaintiffs argue that they have alleged facts that are indicative of a discriminatory intent. These include: the Rule is more likely to prevent immigrants of color from adjusting their status or changing their visas compared to White immigrant counterparts, which DHS acknowledged, (id. at 22); the Rule reflects a pattern of bias against non-White, non-European immigrants as illustrated by pre- and post-election statements by the President and other statements by decisionmakers (id. at 22–24); and plaintiffs allege that circumstantial evidence in the form of the departure from the normal procedures and the manipulation by the White House of DHS officials also support an inference of discriminatory intent (id. at 24). Plaintiffs next argue that Trump v. Hawaii is not applicable where, as here, DHS's regulated activity applies to people already residing in the United States and national security concerns are not present. Id.

United States District Court
Northern District of California

The parties' dispute falls into two general camps.  First, they disagree as to the applicable framework to review plaintiffs' Equal Protection challenge.  Plaintiffs assert that the court should apply the disparate treatment framework described in <u>Arlington Heights</u> so that plaintiffs can demonstrate discriminatory intent.  Defendants contend that the deferential standard of review in <u>Trump v. Hawaii</u> applies here such that plaintiffs fail to state a claims regardless of the facts alleged in the complaint.  Second, the parties dispute whether the factual allegations are sufficient to plausibly state a claim for an Equal Protection violation.  The court analyzes each in turn.

### i.   Whether <u>Trump v. Hawaii</u> Applies to the Rule

Relevant to the public charge rule, there are two broad principles intricately intertwined with the Supreme Court's immigration law jurisprudence.  First, the Court has long recognized that Congress's power concerning the initial entry of aliens into the country is plenary.  <u>See</u> <u>Fiallo v. Bell</u>, 430 U.S. 787, 792 (1977) ("This Court has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." (quoting <u>Oceanic Navigation Co. v. Stranahan</u>, 214 U.S. 320, 339 (1909)).  Second, once an alien arrives in the United States and begins establishing ties to the country, the Court has recognized certain constitutional protections extend to those persons, even if their presence is "unlawful, involuntary, or transitory."  <u>Mathews v. Diaz</u>, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States.  The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law." (citations omitted)).

### 1.   Plenary Power Jurisprudence

The Supreme Court's recognition of Congress's plenary power over immigration first arose soon after the passage of the immigration legislation in the latter half of the nineteenth century.  In 1882, Congress enacted the Chinese Exclusion Act, Pub. L. No. 47-126, 22 Stat. 58, which prohibited entry of Chinese laborers into the United States.

See Jennings v. Rodriguez, 138 S. Ct. 830, 866 (2018) (Breyer, J., dissenting).  The Court upheld the constitutionality of the Act in a series of cases, in particular Chae Chan Ping v. United States, 130 U.S. 581 (1889), and Fong Yue Ting v. United States, 149 U.S. 698 (1893).  Chae Chan Ping, 130 U.S. at 581–82, dealt with the exclusion of a Chinese lawful permanent resident who left the United States and then was denied re-entry and Fong Yue Ting, 149 U.S. at 729, involved the deportation of Chinese immigrants because they could not demonstrate by the testimony of "at least one credible white witness" (as required by the Chinese Exclusion Act) that they were lawful residents. In Chae Chan Ping, Justice Field wrote that

> [t]he power of exclusion of foreigners being an incident of sovereignty belonging to the government of the United States as a part of those sovereign powers delegated by the constitution, the right to its exercise at any time when, in the judgment of the government, the interests of the country require it, cannot be granted away or restrained on behalf of any one.

130 U.S. at 609.  In a passage that was later cited with approval by the Court in Fong Yue Ting, Justice Field also expounded on Congress's plenary power with regard to different races of aliens:

> The government, possessing the powers which are to be exercised for protection and security, is clothed with authority to determine the occasion on which the powers shall be called forth; and its determination, so far as the subjects affected are concerned, is necessarily conclusive upon all its departments and officers.  If, therefore, the government of the United states, through its legislative department, considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security, their exclusion is not to be stayed because at the time there are no actual hostilities with the nation of which the foreigners are subjects.

Id. at 606; Fong Yue Ting, 149 U.S. at 706.

However, around the turn of the century, "the Court began to walk back the plenary power doctrine in significant ways."  Castro v. U.S. Dep't of Homeland Sec., 835 F.3d 422, 441 (3d Cir. 2016).  In Kaoru Yamataya v. Fisher, 189 U.S. 86, 87 (1903), a Japanese immigrant entered the United States but a few days later, an immigration

officer sought her deportation because he determined that she was likely to become a public charge.  The Court, while acknowledging its plenary power as described in Fong Yue Ting, stated that immigration officers could not "disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution."  Id. at 100.  In Yamataya, the fundamental principle at stake was the procedural due process right to be heard prior to being taken into custody and deported. Id. at 101.  As the Third Circuit recently described, Yamataya represented a "turning point" in the Supreme Court's plenary power jurisprudence such that Congress's power was qualified by basic constitutional considerations.  Castro, 835 F.3d at 442 (quoting Henry M. Hart, Jr., The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362, 1390 n.85 (1953)).

Though it was a turning point for immigrants inside the United States, Yamataya did not alter Congress's plenary power at initial entry because in United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950), and Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206 (1953), the Court upheld actions by immigration officials to exclude two aliens "on the threshold of initial entry," Mezei, 345 U.S. at 212, without the procedural due process rights afforded in Yamataya.  "Knauff and Mezei essentially restored the political branches' plenary power over aliens at the border seeking initial admission."  Castro, 835 F.3d at 443.  Thus, if the immigration action pertains to initial admission, then Congress's power is plenary.  In Landon v. Plasencia, the Court summarized these two competing interests, stating that it "has long held that an alien seeking initial admission to the United States requests privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.  459 U.S. 21, 32 (1982) (citing Knauff, 338 U.S. at 542; and Nishimura Ekiu v. United States, 142 U.S. 651, 659–60 (1892)).  "As we explained in Johnson v. Eisentrager, 339 U.S. 763, 770 (1950), however, once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.  Our cases have frequently suggested that a continuously

present resident alien is entitled to a fair hearing when threatened with deportation." Id. (citations omitted).

With this framing in mind, the leading case cited by defendants, Trump v. Hawaii, is properly viewed as an initial admission case.  There, the Supreme Court examined an Equal Protection challenge to an executive order issued by the President that restricted entry into the United States by foreign nationals of select countries, nearly all majority-Muslim countries.  Hawaii, 138 S. Ct. at 2403–04.  From the outset, the Court's analysis focused on admission and exclusion cases, citing the plenary power doctrine with regard to initial admission: "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"  Id. at 2418 (quoting Fiallo, 430 U.S. at 792).  The Hawaii court discussed at length the standard of review articulated in Kleindienst v. Mandel, 408 U.S. 753, 756–57 (1972), which involved an Equal Protection challenge to the Attorney General's denial of a temporary nonimmigrant visa for a Belgian author.  Mandel, too, was an initial admission case as the Court cited the rule that "Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise."  Id. at 762 (emphasis added) (citing, e.g., Knauff, 338 U.S. at 542).  Recognizing Congress's plenary power over initial admission decisions, Mandel upheld Congress's delegation to the Executive the decision to exclude as long as "the Executive gave a 'facially legitimate and bona fide' reason for its action."  Hawaii, 138 S. Ct. at 2419 (quoting Mandel, 408 U.S. at 769).

The Hawaii court also framed the initial entry cases in the context of national security, stating "Mandel's narrow standard of review 'has particular force' in admission and immigration cases that overlap with 'the area of national security.'"  Id. (quoting Kerry v. Din, 576 U.S. 86, 104 (2015) (Kennedy, J., concurring)).  In Hawaii, the rationale for such a standard of review rested on the intersection of immigration and national security: "'[a]ny rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,'

31

1    and our inquiry into matters of entry and national security is highly constrained." Id. at

2    2419–20 (quoting Diaz, 426 U.S. at 81–82).

3         Yet, despite the foregoing buildup, the Court specifically declined to determine

4    whether Mandel applied in the particular case concerning the President's proclamation

5    and instead pivoted to a rational basis standard of review.  Id. at 2420 ("For our purposes

6    today, we assume that we may look behind the face of the Proclamation to the extent of

7    applying rational basis review.").  In its rational basis analysis, the Court examined the

8    facts underlying the proclamation, id. at 2421 (rejecting the argument that five of seven

9    countries are Muslim-majority "given that the policy covers just 8% of the world's Muslim

10   population and is limited to countries that were previously designated by Congress or

11   prior administrations as posing national security risks"), and the process by which it was

12   produced, id. ("The Proclamation, moreover, reflects the results of a worldwide review

13   process undertaken by multiple Cabinet officials and their agencies.").

14        After the Hawaii decision, lower courts have recognized that the deferential

15   standard articulated in Mandel, and cited in Hawaii and Fiallo v. Bell, applies to initial

16   admission and exclusion cases but not to aliens who are lawfully admitted into the United

17   States.  For example, several opinions concerning the revocation of temporary protected

18   status ("TPS") for certain groups, distinguished Hawaii on the grounds that the plaintiffs

19   were "foreign nationals . . . [who] are lawfully present in the United States . . . ." Saget v.

20   Trump, 375 F. Supp. 3d 280, 367 (E.D.N.Y. 2019) (citing Centro Presente v. U.S. Dep't of

21   Homeland Sec., 332 F. Supp. 3d 393 410–11 (D. Mass. 2018); and New York v. U.S.

22   Dep't of Commerce, 351 F. Supp. 3d 502, 666 (S.D.N.Y.), aff'd in part, rev'd in part 139

23   S. Ct. 2551 (2019)).  Similarly, in an opinion overturning the Administration's decision to

24   rescind the Deferred Action for Childhood Arrivals ("DACA") program, the Ninth Circuit

25   also distinguished Hawaii, citing, in part, "the physical presence of the plaintiffs within the

26   geographic United States."  Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,

27   908 F.3d 476, 519–20 (9th Cir. 2018), rev'd in part, vacated in part, 140 S. Ct. 1891

28   (2020) (citing Lopez-Valenzuela v. Arpaio, 770 F.3d 772, 781 (9th Cir. 2014) (en banc)).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   As a counterexample, the district court in <u>S.A. v. Trump</u>, 363 F. Supp. 3d 1048, 1094

2   (N.D. Cal. 2018), applied <u>Hawaii</u> to an Equal Protection challenge brought by plaintiffs

3   residing in the United States against a policy prohibiting their family members from

4   entering the United States.  These opinions represent instances where the scope of the

5   challenged action could be cleanly divided: in the cases of TPS or DACA, the individuals

6   were all within the United States; in <u>S.A.</u> the family members were attempting to enter the

7   United States.

8          Here, the Rule applies to immigrants and nonimmigrants seeking initial admission

9   to the United States.  84 Fed. Reg. at 41,295.  It also applies to aliens who are already in

10  the United States and are seeking adjustment of status.  <u>Id.</u>  Because the Rules applies

11  in part to aliens who are already in the United States, defendants cannot entirely rely on

12  the plenary power doctrine to uphold the Rule.  Accordingly, the court proceeds to

13  determine whether an alien inside the United States can state an Equal Protection claim.

14         **2.      Constitutional Rights of Aliens Admitted to the United**

15              **States**

16         As <u>Yamataya</u> and similar cases demonstrate, persons within the United States can

17  assert at least some rights guaranteed by the Fifth and Fourteenth Amendments.  Early

18  cases only addressed whether persons had a procedural due process right to be heard

19  before the government imposed some legal action on them.  <u>See, e.g.</u>, <u>Wong Wing v.</u>

20  <u>United States</u>, 163 U.S. 228, 237 (1896) ("[T]o declare unlawful residence within the

21  country to be an infamous crime, punishable by deprivation of liberty and property, would

22  be to pass out of the sphere of constitutional legislation, unless provision were made that

23  the fact of guilt should first be established by a judicial trial.").  No procedural due process

24  challenge is alleged here; rather, plaintiffs challenge the Rule on Equal Protection

25  grounds.  The issue may be stated as whether Congress or the Executive may

26  discriminate within different classes of aliens present in the United States based on the

27  race or ethnicity of the aliens.

28         In <u>Mathews v. Diaz</u>, the Court indicated that the equal protection component of the

33

Fifth Amendment's Due Process Clause extends to aliens who are physically present in the United States.  426 U.S. at 77 ("The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law.").  In Plyler v. Doe, 457 U.S. 202, 210 (1982) (citations omitted), the Court stated "[a]liens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."  Then, the Court stated: "Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government."  Id. (citing Mathews, 426 U.S. at 77).  Plyler's holding only applied to a state's classification of aliens rather than the federal government.  Yet, in a footnote, the Court stated "[i]t would be incongruous to hold that the United States, to which the Constitution assigns a broad authority over both naturalization and foreign affairs, is barred from invidious discrimination with respect to unlawful aliens, while exempting the States from a similar limitation.  Id. at 201 n.9 (citing Mathews, 426 U.S. at 84–86).  While dicta, these two cases suggest that the Supreme Court would hold that aliens within the United States are protected by the equal protection component of the Fifth Amendment.

In a case closer to the question at issue here, in Kwai Fun Wong v. United States, 373 F.3d 952, 970–73 (9th Cir. 2004), the Ninth Circuit reviewed at length whether an alien who has not "entered" the United States for purposes of the INA but has physically entered the United States could state a discrimination claim under the equal protection component of the Due Process Clause of the Fifth Amendment.  The court held that non-admitted (but physically present) aliens were not precluded

> from coming within the ambit of the equal protection component of the Due Process Clause.  We cannot countenance that the Constitution would permit immigration officials to engage in such behavior as rounding up all immigration parolees of a particular race solely because of a consideration such as skin color.  Although "Congress has 'plenary power' to create immigration law, and . . . the judicial branch must defer to executive and legislative branch decisionmaking in that area, . . . . that power is subject to important constitutional

limitations."

Id. at 974 (alterations in original) (footnote omitted) (quoting Zadvydas v. Davis, 533 U.S. 678, 695 (2001)).  Kwai Fun Wong distinguished initial entry cases on the grounds that those cases were determinative of "the procedural rights of aliens with respect to their applications for admission," but initial entry cases have not been applied to "deny all constitutional rights to non-admitted aliens."  Id. at 971.  If Kwai Fun Wong establishes that non-admitted, but physically present aliens can bring an Equal Protection challenge, then it follows that admitted aliens subject to the Rule (who are further from Congress's plenary power) may also bring an Equal Protection challenge.

Read together, Mathews, Plyler, and Kwai Fun Wong stand for the proposition that aliens who have been admitted to the United States are not precluded from bringing an Equal Protection challenge on the theory that they were discriminated against on the basis of their race or ethnicity.

### 3.    Resolving the Applicable Standard of Review

Plaintiffs urge the court to apply the Arlington Heights inquiry to the Rule so that they can assert an Equal Protection challenge on behalf of aliens who have been admitted to the United States.  An important point is worth noting at this juncture: Arlington Heights did not address what level of scrutiny—i.e., strict scrutiny, heightened scrutiny, or rational basis—a court should apply to an Equal Protection claim based on racial or ethnic discrimination.  Instead, Arlington Heights described a framework to "[d]etermin[e] whether invidious discriminatory purpose was a motivating factor" by using "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  429 U.S. at 266.  "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  Id. at 265.  Conversely, if the government action in question only has a "racially disproportionate impact," then it may not be unconstitutional.  Washington v. Davis, 426 U.S. 229, 239 (1976).  Accordingly, if plaintiffs are able to demonstrate racial or ethnic discriminatory purpose to be a motivating factor of the Rule, then the court would apply a strict scrutiny standard of

review.

In <u>Department of Homeland Security v. Regents of the University of California</u>, writing for a plurality with regard to the plaintiffs' Equal Protection claim, Chief Justice Roberts stated that "[t]o plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision. Possible evidence includes disparate impact on a particular group, '[d]epartures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body.'" 140 S. Ct. at 1915 (second alteration in original) (quoting <u>Arlington Heights</u>, 429 U.S. at 266–68). This indicates that application of the <u>Arlington Heights</u> framework is appropriate to evaluate whether plaintiffs plead discriminatory animus. Further, the plurality sidestepped the issue of whether the Court's opinion in <u>Reno v. American-Arab Anti-Discrimination Committee</u>, 525 U.S. 471, 488 (1999), foreclosed a constitutional claim by an alien unlawfully present in the United States. <u>See Regents</u>, 140 S. Ct. at 1915. Because the court has likewise determined that <u>Trump v. Hawaii</u> (and the plenary power doctrine more generally) does not apply to the Rule in its entirety, similar to <u>Regents</u>, it is appropriate to apply <u>Arlington Heights</u> in this instance.

Several recent district court opinions have also applied the <u>Arlington Heights</u> framework to evaluate whether the federal government acted with discriminatory purpose despite a facially neutral action. In <u>Cook County, Illinois v. Wolf</u>, No. 19 C 6334, 2020 WL 2542155, at *7 (N.D. Ill. May 19, 2020), the district court in the Northern District of Illinois declined to apply <u>Hawaii</u> and instead applied what the court described as "<u>Arlington Heights</u>-style strict scrutiny," in evaluating a motion to dismiss the plaintiffs' Equal Protection challenge to the Rule. The court reasoned that in "contrast to the President's national security and international relations justifications for the executive order in <u>Hawaii</u>, DHS justified and continues to justify the Final Rule solely on economic grounds." <u>Id.</u>; <u>see also CASA de Maryland, Inc. v. Trump</u>, 355 F. Supp. 3d 307, 312, 324 (D. Md. 2018) (declining to apply <u>Hawaii</u> and <u>Mandel</u> to an Equal Protection challenge against the federal government's decision to TPS status for El Salvador).

### ii.      Whether Plaintiffs' Allegations Plausibly State a Claim

"Under Arlington Heights, a plaintiff must 'simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely that [sic] not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way.'" Ave. 6E Invs., LLC v. City of Yuma, Ariz., 818 F.3d 493, 504 (9th Cir. 2016) (internal quotation marks omitted) (quoting Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d 1142, 1158 (9th Cir. 2013)); see also Regents, 140 S. Ct. at 1915.  "A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'" Ave. 6E Invs., (quoting Arce v. Douglas, 793 F.3d 968, 977 (9th Cir. 2015)).  While Arlington Heights describes an evidentiary framework rather than a pleading standard, the Ninth Circuit has used its factors in evaluating a district court's dismissal of a complaint pursuant to Rule 12(b)(6).[5] See id.

In Arlington Heights, the Court described a series of non-exhaustive factors that guides the inquiry into whether a defendant's actions were motivated by a discriminatory purpose "by examining (1) statistics demonstrating a 'clear pattern unexplainable on grounds other than' discriminatory ones, (2) '[t]he historical background of the decision,' (3) '[t]he specific sequence of events leading up to the challenged decision,' (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant 'legislative or administrative history.'" Pac. Shores Props., 730 F.3d at 1158–59 (alterations in original) (quoting Arlington Heights, 429 U.S. at 266–68; and citing Comm.

---

[5] While not directly applicable to Equal Protection claims, the Supreme Court and the Ninth Circuit have held that, for employment discrimination cases, the McDonnell Douglas evidentiary framework is a useful touchstone to evaluate whether a claim survives a motion to dismiss; however, a plaintiff "is not required to plead a prima facie case of discrimination in order to survive a motion to dismiss." Sheppard v. David Evans & Assoc., 694 F.3d 1045, 1050 (9th Cir. 2012) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508–11 (2002)).  Similar to McDonnell Douglas, the Arlington Heights framework is an evidentiary burden-shifting regime.  A Rule 12(b)(6) motion only requires plaintiffs to meet the requirements of Rule 8 and Twombly/Iqbal.  See Kwai Fun Wong, 373 F.3d at 968 (applying Swierkiewicz to Equal Protection claim that immigration officials discriminated against the plaintiff on the basis of her race).

United States District Court
Northern District of California

Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 703 (9th Cir. 2009));

see also Avenue 6E Invs., 818 F.3d at 504 (applying Arlington Heights factors to an

Equal Protection claim dismissed pursuant to Rule 12(b)(6)).

### 1.    Disparate Impact

Here, plaintiffs allege that the Rule is "more likely to prevent immigrants of color in

the United States from adjusting their status, or extending or changing their visas,

compared to their White immigrant counterparts."  Compl. ¶ 107.  The complaint also

cites the Rule, where DHS stated that it "recognizes that it is possible that the inclusion of

benefits such as SNAP and Medicaid may impact in greater numbers communities of

color, including Latinos and [Asian-American, Pacific Islanders], as well as those with

particular medical conditions that require public benefits for treatment, and therefore may

impact the overall composition of immigration with respect to these groups."  84 Fed.

Reg. at 41,369.  Plaintiffs have plausibly alleged that the Rule will impact certain racial

groups more heavily than others.

However, the court notes that the plurality opinion in Regents found that the

disparate impact of the DACA rescission on Latinos was not sufficient to state a claim.

Writing for himself and three other justices, Chief Justice Roberts stated "because

Latinos make up a large share of the unauthorized alien population, one would expect

them to make up an outsized share of recipients of any cross-cutting immigration relief

program. . . . Were this fact sufficient to state a claim, virtually any generally applicable

immigration policy could be challenged on equal protection grounds."  Regents, 140 S.

Ct. at 1915.  This reasoning is persuasive and the Rule's disparate impact, while notable,

is not dispositive.

### 2.    Statements by Decisionmakers

Next, plaintiffs cite evidence of potential bias exemplified by statements of the

President and his advisors.  For example, as a candidate, President Trump called

Mexican immigrants "rapists" and "people who have a lot of problems."  Compl. ¶ 285.

After his inauguration, the President disparaged an immigration plan that would protect

United States District Court
Northern District of California

people from El Salvador, Haiti, and African countries, asking, "Why are we having all these people from shithole countries come here?"  Id. ¶ 292.  Plaintiffs allege that the President was widely reported to have expressed his preference for more immigrants from places like Norway, where the population is over 90 percent white.  Id.  In May 2018, the President called immigrants "animals" during a public White House meeting.  Id. ¶ 294.  In addition to the President, plaintiffs allege that other senior administration officials made statements indicative of racial bias.  But they only offer one example; defendant Kenneth Cuccinelli is alleged to have stated that Washington, D.C.'s animal control policies were worse than U.S. immigration policies because, "You can't break up rat families."  Id. ¶ 299.

Defendants contend that these statements were not made by DHS officials and have no express connection to the Rule.  Mtn. at 21.  It is notable that one of the alleged statements is attributed to Kenneth Cuccinelli who is a named defendant in this case and is alleged to be responsible for implementing and enforcing immigration laws.  Compl. ¶¶ 28, 299.  However, that is the only statement offered by plaintiffs made by a decisionmaker who was directly involved in the Rule's promulgation and it is not clearly tied to the Rule.

With regard to the President's statements, in Regents, 140 S. Ct. at 1916, Chief Justice Roberts' plurality opinion found the President's statements as "unilluminating" and instead noted that "relevant actors were most directly [the] Acting Secretary [of Homeland Security] and the Attorney General."  The opinion stated that "respondents did not 'identif[y] statements by [either] that would give rise to an inference of discriminatory motive.'"  Id. (alterations in original) (citation omitted).  Next, Chief Justice Roberts found the President's statements were "remote in time and made in unrelated contexts" and did not "qualify as 'contemporary statements' probative of the decision at issue."  Id. (quoting Arlington Heights, 429 U.S. at 268).  While a plurality opinion, this reasoning suggests that the President's statements, which have no direct connection to the Rule are not relevant to the Equal Protection analysis.

Applying here, plaintiffs allege both pre- and post-inauguration statements by the President.  The pre-inauguration statements, Compl. ¶¶ 285–87, are similar to those in Regents that are more remote in time and not applicable to the agency action at issue. The post-inaugurations statements pertain to the same time period as the beginning of the rulemaking process but are not connected to the Rule.  The closest statement concerning an immigration plan was in reference to a draft plan that would have protected individuals with TPS status.  Id. ¶ 292.  In sum, plaintiffs have identified a few statements made in unrelated contexts by the President and only one comment from a DHS official that did not appear to have any connection to the Rule or the rulemaking process.  They have not alleged sufficient factual matter concerning statements by decisionmakers.

### 3.      Departure from Normal Procedures

Plaintiffs also contend that the Rule departed from normal procedures as evidenced by the efforts of White House advisor Stephen Miller's comments to fast-track the Rule to completion.  Compl. ¶¶ 300–02.  Defendants assert that the text of the Rule provides the most reliable indicia of its intent and contends that the Rule is devoid of any discriminatory justifications.  Mtn. at 20.  They also argue that the proposed rule, extensive notice and comment process, and changes from the proposed to final rules undermine allegations of improper bias.  Id. at 20–21.

The text of the Rule, while a relevant factor, is not dispositive because the Arlington Heights analysis presumes that the official government action in question is facially neutral.  429 U.S. at 266 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." (citations omitted)).

However, plaintiffs' allegations barely raise an inference of an improper departure from the norm.  Cf. Regents, 908 F.3d at 519 ("DACA received reaffirmation by the agency as recently as three months before the rescission, only to be hurriedly cast aside on what seems to have been a contrived excuse (its purported illegality).  This strange

United States District Court
Northern District of California

1    about-face, done at lightning speed, suggests that the normal care and consideration

2    within the agency was bypassed.").  Plaintiffs' allegations that the Rule was fast tracked

3    do not raise an inference of discriminatory intent.  This rulemaking process was not a 3-

4    month about-face; the NPRM began a year before the final Rule was published.  At most,

5    they plausibly allege that defendants wanted to implement the Rule sooner rather than

6    later.

7         In light of the foregoing, plaintiffs have not alleged sufficient factual matter to state

8    a claim for an Equal Protection violation.  The court GRANTS defendants' motion to

9    dismiss plaintiffs' fifth cause of action.  Because plaintiffs could allege additional factual

10   matter, the dismissal is with leave to amend.[6]

11          **iii.      Sixth Claim—Unconstitutional Animus**

12         In a footnote, defendants argue that plaintiffs' sixth claim should be dismissed

13   because it fails to identify any protected class, rather, plaintiffs allege that the Rule was

14   adopted to harm a politically unpopular group.  Mtn. at 21 n.9.  In response, plaintiffs

15   attempt to clarify the claim, stating that the sixth claim incorporates by reference plaintiffs'

16   previous allegations including the allegation that the Rule is intended to target immigrants

17   of color.  Opp. at 22 n.10.

18         In their complaint, plaintiffs' sixth claim incorporates by reference the allegations

19   set forth in the preceding paragraphs of the complaint.  Compl. ¶ 344.  The sixth claim

20   goes on to allege that "[t]he classification here further violates equal protection principles

21   because defendants adopted it to harm a politically unpopular group and advance

22   unconstitutional animus, and therefore, it is without a permissible, rational basis."  Id.

23   ¶ 345.

24         It appears that plaintiffs are seeking to challenge the Rule under a heightened

25

26   ───────────────

27   [6] Other district courts have found that plaintiffs in those cases have alleged sufficient
     factual allegations to state a claim for violation of the Equal Protection component of the
     Fifth Amendment.  See New York, 2020 WL 4347264, at *6; Cook Cty., Ill., 2020 WL

28   2542155, at *3–5.  These other cases suggest that plaintiffs could allege additional facts
     such that amendment of their complaint is not futile.

rational basis review.  In <u>Animal Legal Defense Fund v. Wasden</u>, the Ninth Circuit stated "[w]hen a law exhibits a desire to harm an unpopular group, courts will often apply a 'more searching' application of rational basis review."  878 F.3d 1184, 1200 (9th Cir. 2018) (quoting <u>Lawrence v. Texas</u>, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring). However, the court indicated that this more searching review applies "[w]hen the politically unpopular group is <u>not</u> a traditionally suspect class."  <u>Id.</u> (emphasis added)

There are two separate problems with the sixth claim.  First, the unpopular group referenced in paragraph 345 is non-White, non-European immigrants.  Opp. at 22 n.10. Yet, plaintiffs' framing of this group is based on the group's racial and ethnic composition, a traditionally suspect class.  <u>See</u> Compl. ¶ 305 ("The Administration has identified a politically unpopular minority, namely non-White, non-European immigrants . . . .").  Thus, the more searching rational basis of review is not available to them.

Second, the factual allegations for the fifth and sixth claims are the same. Assuming plaintiffs are able to state a claim for violation of the Equal Protection component of the Fifth Amendment in a future amended complaint, the court would then determine whether the group is is a traditionally suspect class and what level of scrutiny applies to that group.  <u>See Cleburne</u>, 473 U.S. at 439–42 (describing standards of review applicable to an Equal Protection clause challenge).  For that reason, plaintiffs' sixth claim is entirely duplicative of their fifth claim because it involves the same facts and requested relief.

Accordingly, the court GRANTS defendants' motion to dismiss plaintiffs' sixth cause of action.  Because the claim is duplicative of plaintiffs' fifth claim, the dismissal is without leave to amend.

### CONCLUSION

For the foregoing reasons, the court DENIES defendants' motion to dismiss with respect to their standing, ripeness, and zone of interest challenges.  Defendants' motion to dismiss plaintiffs' second cause of action for violation of the APA, contrary to the Rehabilitation Act, is GRANTED, and the claim is DISMISSED WITHOUT LEAVE TO

United States District Court
Northern District of California

1   AMEND; defendants' motion to dismiss plaintiffs' third cause of action for violation of the

2   APA, contrary to State Healthcare Discretion, is GRANTED, and the claim is DISMISSED

3   WITHOUT LEAVE TO AMEND; defendants' motion to dismiss plaintiffs' fifth cause of

4   action for violation of the Fifth Amendment is GRANTED, and the claim is DISMISSED

5   WITH LEAVE TO AMEND; and defendants' motion to dismiss plaintiffs' sixth cause of

6   action for violation of the Fifth Amendment is GRANTED, and the claim is DISMISSED

7   WITHOUT LEAVE TO AMEND.  Further, the court DEFERS RULING ON defendants'

8   motion to dismiss plaintiffs' first and fourth causes of action.[7]  Plaintiffs will be permitted

9   to file an amended complaint after resolution of the deferred claims.

10          **IT IS SO ORDERED.**

11   Dated: August 3, 2020

12                                                        /s/ Phyllis J. Hamilton
                                                         PHYLLIS J. HAMILTON
13                                                        United States District Judge

---

[7] On April 1, 2020, the court granted in part and denied in part plaintiffs' motion to compel discovery.  Dkt. 159.  The court also stayed discovery "until resolution of defendants' forthcoming motion to dismiss."  Id. at 31.  Because this order defers ruling on two of plaintiffs' claims, the court's prior stay order remains in effect.